# Exhibit A-1

Text message from Michael Fitzgerald to Yelany DeVarona

> What are you worried about?

> Is there anything you feel guilty of that you haven't told me?

No. I worry about my career

And I worry about moving forward in a positive way

And I don't want a rape trial

# Exhibit A-2

Yelany DeVarona admits to providing false affidavit to Miami Beach Police Dept.

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:22-cv-22171-JEM


MICHAEL J. FITZGERALD,
individually, and YALENY
DE VARONA, individually,

        Plaintiffs,

-vs-

RONDA MCNAE, individually,
and WILLIAM NCNAE,
individually,

        Defendants.
_____/


VIDEOTAPED DEPOSITION OF

YELANY DE VARONA

(Pages 1 through 397)



April 12, 2023
9:20 A.M. - 8:21 P.M.


Colson Hicks Eidson
255 Alhambra Circle, Penthouse
Coral Gables, Florida



Examination of the witness stenographically taken
before: Lance W. Steinbeisser, RPR, FPR-C
NCRA-Certified Stenographic Reporter
Florida Professional Reporter

Fitzgerald v. McNae                                    Yelany de Varona | 4/12/2023

Page 126

1    Did you have any communications with any
2  law enforcement officer or agency that refer,
3  relate in any way to Ronda or William McNae?
4      A.  Yes.  I spoke to them on the phone.
5      Q.  Okay.  And did you provide a
6  declaration?
7      A.  To the police department?
8      Q.  Yes?
9      A.  Yes.
10         (Deposition Exhibit 84, Affidavit of
11         Yelany de Varona, was marked for
12         identification.)
13  BY MS. FOTIU-WOJTOWICZ:
14     Q.  And I'm going to mark as Exhibit 84 a
15  copy of your declaration.
16         Is this a copy of the declaration that
17  you provided to the Miami Beach Police Department?
18  Is that right?
19     A.  Yes.
20     Q.  Who drafted this?
21     A.  My attorney.
22     Q.  Which attorney?
23     A.  Roger — Cabrera, I believe, is the last
24  name.
25     Q.  You had your own criminal attorney

Page 127

1  separate and apart from Mr. Fitzgerald?
2      A.  Yes.
3      Q.  And where did he get the information to
4  draft this affidavit?
5      A.  From sitting down and talking to me.
6      Q.  Did he review your text messages along
7  with providing or drafting for you this affidavit?
8      A.  What text messages?  I didn't have any
9  text messages between me and Ronda other than what
10  I provided on my end.  So it really didn't tell
11  much about this situation.
12     Q.  Did you review your text messages with
13  Mr. Fitzgerald prior to drafting this or providing
14  this information to Mr. Cabrera?
15     A.  No.
16     Q.  And you understand that this document
17  was under oath and under penalty of perjury; right?
18     A.  Yes.
19     Q.  Did you review this document before you
20  signed it to make sure everything in it was true
21  and accurate?
22     A.  Yes.  To the best of my knowledge, on
23  that date of May 5th, 2022.
24     Q.  Okay.  And today, you know that it's not
25  accurate; right?

Page 128

1      A.  Yes.  Correct.  Yesterday, I went
2  through text messages with Ronda that I didn't have
3  in my possession at the time when I made this
4  declaration; so now I know that this isn't a true
5  statement.
6      Q.  Okay.  Have you taken any actions to
7  notify the Miami Beach Police Department that you
8  provided them with a false affidavit?
9      A.  No.  I literally found out about this
10  yesterday.
11     Q.  What actions do you intend to take with
12  the Miami Beach Police Department to put them on
13  notice that you provided them with a false
14  affidavit?
15     A.  I don't have any actions.  I will follow
16  up with my attorney and let him know and see what
17  actions he suggests or recommends.
18     Q.  Did you tell your attorney that you
19  participated with Ronda McNae in the lies she told
20  Mr. Fitzgerald about being pregnant with his child?
21         MR. BERLOWE:  Objection.  It's
22     privileged.  Attorney-client privilege.  She
23     doesn't have to discuss or describe her
24     conversations with her attorney.
25         MS. FOTIU-WOJTOWICZ:  That's a good

Page 129

1  point.
2  BY MS. FOTIU-WOJTOWICZ:
3      Q.  When you reviewed this document, did you
4  consider whether it was misleading to state:  Ronda
5  also advised me that she lied to Michael about
6  being pregnant with his child?
7         MS. GUSSIN:  Object to form.
8         THE WITNESS:  No.
9  BY MS. FOTIU-WOJTOWICZ:
10     Q.  Did you consider whether you should also
11  include the fact that you were involved with that
12  lie?
13     A.  No.  Because it wasn't my lie.  It was
14  Ronda's lie.
15     Q.  Okay.  So the fact that you participated
16  with her in the lie was not something that you
17  thought should be provided to the police
18  department?
19         MS. GUSSIN:  Object to form.
20         THE WITNESS:  No.
21     I also didn't think -- I also didn't
22     remember that was mentioned until yesterday in
23     the text messages, because once I read the
24     text message, it even seemed like the way that
25     Ronda worded everything it came from Will, not

Fitzgerald v. McNae                                              Yelany de Varona | 4/12/2023

Page 130

1    Ronda.  So it wasn't even something she would
2    have thought of —
3    BY MS. FOTIU-WOJTOWICZ:
4        Q.  So if you'll pull out Exhibit 82.  Let's
5    go back to Exhibit 82, switch to 2141 — McNae 2141
6    at the bottom.
7        Take a look at that and see if this is
8    what you were referring to that you saw yesterday.
9        MS. GUSSIN:  Is there a specific time
10   stamp —
11       THE WITNESS:  Yeah.  Do you want me to
12   read the whole thing?
13   BY MS. FOTIU-WOJTOWICZ:
14       Q.  Yeah, read the whole thing.
15       A.  On 2/2 at 10:49:  Is that — "straight
16   up the definition of nonviolent rape" — that's
17   Ronda stating?  Because it's hard to tell who's
18   stating what because it's kind of, like, above the
19   phone number and then in between phone numbers; so
20   I'm not sure.
21       Q.  That's Ronda saying:  "That's straight
22   up the definition of nonviolent rape."  "I don't
23   want to put words in your mouth, but if you choose
24   to file a criminal case, I will support you."
25       A.  Okay.

Page 131

1        Q.  Is this what you reviewed that made you
2    recall that Ronda, in fact, told you that she had
3    been — she believed that she had been sexually
4    assaulted?
5        A.  Yes.  Portions of it.
6        Q.  Okay.  And in specific you culled out
7    the part where she says, "That's straight up the
8    definition of nonviolent rape."  Right?
9        A.  Yes.
10       Q.  What was your reaction to that?
11       A.  Well, if you read on, it's a lot of me
12   trying to figure out exactly what happened, so.
13       Q.  That's what you're trying to figure out,
14   what happened, when you said, "Yeah," exclamation
15   point, "A hundred percent he took advantage of
16   you"?
17       A.  Um-hum.
18       Q.  Okay.  That's trying to figure out
19   what happened?
20       A.  Still trying to figure it out, yeah.
21       Q.  Okay.  At 10:49 --
22       A.  I mean, that's a phrase in a way that I
23   would speak, but yeah.
24       Q.  Okay.  And at 10:59, when you said, "He
25   was coherent, and that's what's fucked up, and

Page 132

1    considered rape." that was also you trying to
2    figure out what happened?
3        A.  Yeah, definitely, because at this point,
4    the only side of the story that I have is Ronda's.
5    So how would I know that he was coherent other than
6    what Ronda was telling me?  So I was just siding
7    with Ronda and obviously being friendly with Ronda.
8        Q.  Okay.  Does this refresh your
9    recollection as to whether or not you believed her?
10       A.  Yeah.  I obviously didn't, because I
11   wouldn't have — I would have kept it as something
12   I remembered, my husband raping someone, if I
13   actually believed her.
14       Q.  Okay.
15       A.  And also, at the top, it said something
16   about Will — "Well, I'm going to be honest.  Will
17   was like, Ronda, what he did in Miami to you was
18   not okay."
19       So it very much painted a picture, like,
20   Will was trying to convince her that, like, what
21   happened in Miami was rape, whereas she didn't even
22   know, because she says that she would black out,
23   but then she would remember saying no, but then she
24   would black out.  It was a lot of, like, Okay,
25   yeah — like, still trying to figure out what

Page 133

1    exactly you're telling me.
2        Q.  Okay.  And at this point you were
3    talking with Ronda.  Did you believe that
4    Fitzgerald was a lying sack of shit?
5        A.  Yes.  Because I said that, because he
6    was a lying sack of shit.
7        Q.  Okay.  Maybe that's why you believed
8    Ronda at this point and not Mr. Fitzgerald?
9        A.  Yes.
10       Q.  Do you see anything else in your text
11   messages that you had with Ronda over this time
12   frame where she told you, again, that
13   Mr. Fitzgerald had sexually assaulted her?
14       A.  Not that I know of because I didn't look
15   through the rest of the text.  That's the only
16   thing I read yesterday to confirm that the
17   affidavit I had stated was incorrect on my behalf.
18       Q.  Flip to page 2208, at the bottom, 2202
19   [sic].
20       And if you'll look -- this is about a
21   little more than two weeks later.  Halfway down the
22   page, at 1402, she says, "Eek. Yelany, my
23   counselor read all ten pages.  She said, Without a
24   doubt, it's assault.  So I've been sick to my
25   stomach.  Will's suggesting further action."

Page 134

1    Do you see that?
2    A. Mm-hmm.
3    Q. Yes?
4    A. Yes, I do.
5    Q. Okay. So Ronda didn't just tell you
6    once that he had assaulted her. She told you more
7    than once; right?
8    A. Well, here she's just stating that he
9    wants further action. I don't know what that
10   means, because it's not spelled out.
11   Q. Well, she said, "Without a doubt, it's
12   assault." Right?
13   A. Yes.
14   Q. And your response is "Oh, man. I bet
15   you are feeling sick. I'm so sorry"?
16   A. Yes.
17   Q. Do you ever say, I don't believe that
18   you were sexually assaulted. Mike wouldn't do
19   something like that?
20   A. I don't know. I'd have to read through
21   all of the messages to know.
22   Q. I can save you the time.
23   A. Okay.
24   Q. You don't.
25   2212, if you move on. And at the bottom

Page 135

1    of the page, you say to her, "Okay. Then do what
2    you feel. If you really think he knew you were
3    wasted and took advantage, then do what you think
4    is best."
5    Do you see that?
6    A. Yep.
7    Q. Was that your advice to Ronda when she
8    told you that she had been sexually assaulted by
9    Mr. Fitzgerald?
10   A. I guess so. That's what it states.
11   Q. And Ronda specifically discussed with
12   you also that she was considering going to the
13   police; right?
14   A. I don't know. If you could point it
15   out, I'll confirm.
16   Q. Okay. If you go to page 2216.
17   Do you see at 11:00 o'clock she says,
18   "Speaking to a lawyer. He doesn't need to be aware
19   of. Now, if I choose to file suit, charges or a
20   police report, then yes, he will know."
21   Do you see that?
22   A. Mm-hmm.
23   Q. Yes?
24   A. Yes.
25   Q. And you don't recall Ronda telling you

Page 136

1    that she was considering going to the police in
2    February of 2020?
3    A. Yes. It states here that she was
4    telling me that she was thinking about going to the
5    police.
6    Q. But you didn't remember that when you
7    provided your false affidavit to the Miami Beach
8    Police Department?
9    A. Correct.
10   Q. And you didn't remember the other --
11   three other instances that she talked about where
12   she told you it was sexual assault when you signed
13   that affidavit either; right?
14   A. Correct.
15   Q. And you discussed her accusations
16   against Mr. Fitzgerald with Mr. Fitzgerald at or
17   around that same time; right?
18   A. I did. If you see on the page prior, I
19   just asked her about stuff as well because she was
20   giving me information; so then I wanted to know
21   more about specifics.
22   Q. If you'll look at Exhibit 31 and go to
23   YEL 38.
24   And you did have access to your text
25   messages with Mr. Fitzgerald at the time you signed

Page 137

1    your false affidavit and provided it to the Miami
2    Police Department; right?
3    MR. BERLOWE: Object to form.
4    THE WITNESS: I did not.
5    BY MS. FOTIU-WOJTOWICZ:
6    Q. Have access to your text messages --
7    A. Oh. To my text messages with Mike?
8    Yes, I did.
9    Q. So if you'll flip to YEL 48 and if you
10   go to the bottom of the page.
11   You said, "I told her what she's
12   proposing was serious," parentheses, "to take you
13   to court for rape. She's like, Well, that's what
14   happened. I couldn't say anything. I'm not in
15   that. I wasn't there. You were."
16   Do you see that?
17   A. Yeah.
18   Q. So at this time in -- on March 28, 2020,
19   you were discussing with Mr. Fitzgerald the fact
20   that Mrs. McNae claimed that he raped her; right?
21   A. Mm-hmm.
22   Q. Yes?
23   A. Yes.
24   Q. Why did you provide a declaration to the
25   police?

Fitzgerald v. McNae                                          Yelany de Varona | 4/12/2023

Page 138

1      A. Because they had called me and asked me
2   to come in.
3      Q. How did you decide what information to
4   put in the affidavit?
5      A. I didn't. My attorney did.
6      Q. And what investigation did you do to
7   make sure that the information provided in your
8   affidavit was correct?
9      A. It was just recollection.
10     Q. Do you have a problem with your memory?
11     A. As far as remembering dates, yes. And,
12  yes, I do have a problem remembering more
13  specifically when things happen.
14     Q. Well, this wasn't a question about when
15  things happened. This was a question about whether
16  things happened; right? Do you have a problem with
17  your memory in terms of recollecting whether
18  certain events or conversations happened?
19     A. Yes. This was a long time ago. So
20  definitely four years ago I don't remember.
21     (Deposition Exhibit 85, Initial
22     Disclosures, was marked for
23     identification.)
24  BY MS. FOTIU-WOJTOWICZ:
25     Q. I've marked as Exhibit 85 the Initial

Page 139

1   Disclosures of Plaintiff Yelany de Varona.
2      Do you recognize this document?
3      A. Yes. It's of Michael Fitzgerald and me,
4   no? Oh, I guess it is just me. Yes.
5      Q. If you'll look at number one, it's a
6   list of individuals that may have information that
7   you would use to support your claim.
8      A. Yes.
9      Q. Have you ever spoken with anyone at
10  SoftwareONE AG regarding this case?
11     A. No.
12     Q. Have you ever spoken with anyone at
13  SoftwareONE Inc. regarding this case?
14     A. No.
15     Q. Have you ever spoken with anybody at
16  Microsoft regarding this case?
17     A. No.
18     Q. Have you ever communicated or spoken
19  with John Mayes about any of the issues involved in
20  this lawsuit?
21     A. No.
22     Q. How about Deiter Schlosser?
23     A. No.
24     Q. How about Jennifer Gaines?
25     A. No.

Page 140

1      Q. Frank Rossini?
2      A. No.
3      Q. Alexandra Considine-Tong?
4      A. No.
5      Q. Ashley Gaare?
6      A. No.
7      Q. Patty Ravencroft?
8      A. No.
9      Q. Jared Cheney?
10     A. No.
11     Q. Jessica Bergman-Sevillano?
12     A. On.
13     Q. Timothy Neylan?
14     A. No.
15     Q. Have you ever spoken to any employee of
16  Microsoft regarding any of the issues involved in
17  this case?
18     A. No.
19     Q. Have you ever spoken with Wismar Medina?
20     A. No.
21     Q. Have you ever spoken with Josh Condie?
22     A. No.
23     Q. Have you ever spoken to Tom Wiper about
24  any of the issues involved in this lawsuit?
25     A. Not specifically. Just that the lawsuit

Page 141

1   was going on.
2      Q. When did you talk about the fact that
3   the lawsuit was going on?
4      A. I don't remember.
5      Q. Did you talk anything specific about the
6   lawsuit other than the fact that it was going on?
7      A. No.
8      Q. Have you ever spoken with Matthew Wiper
9   about any of the issues involved in this
10  litigation?
11     A. No.
12     Q. Have you ever spoken with Anthony
13  McMaster regarding any of the issues involved in
14  this litigation?
15     A. No.
16     Q. Have you ever spoken with Richard
17  Bestford with respect to any of the issues involved
18  in this lawsuit?
19     A. No.
20     Q. Have you ever spoken to Anthony
21  Sevillano regarding any of the issues involved in
22  this lawsuit?
23     A. No.
24     Q. How about Dana Lebel?
25     A. No.

# Exhibit A-3

Voicemail from Miami Beach Police, Executive Officer Liuetenant Rodriguez



**Miami PD**
phone
February 11, 2025 at 8:42 AM

0:00                                                    −0:31

Good afternoon. This is Lieutenant Rodriguez from the Miami Beach Police Department. I just wanted to let you know that we have received your email, and I am going to go ahead and assign this to a detective. They should be contacting you in the next day or two. If you have any questions for me, you can please call me back at 305-737-7676 and I'm at extension ⬚⬚⬚⬚ Thank you. Bye.

# Exhibit B-1

Motion to Dismiss, DE 275 filed in Florida Federal court

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 1:22-cv-22171-JEM

MICHAEL FITZGERALD,
individually, and YELANY DE VARONA,
individually,

Plaintiffs,

v.

RONDA MCNAE, individually, and
WILLIAM MCNAE, individually,

Defendants.

_____/



FILED BY_____ D.C.

JAN 1 4 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

## DEFENDANTS' MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 37(B), OR IN THE ALTERNATIVE REOPEN DISCOVERY ON A LIMITED BASIS

1.      Defendant Ronda McNae, appearing pro se, pursuant to Fed. R. Civ. P. 26(a), 26(c), 26(e), and

37(b), respectfully moves this Honorable Court to enter an Order either: (1) dismissing the instant action as

a sanction against Plaintiff, his Attorneys, Peter E. Berlowe, Esq., and Meredith Gussin, Esq., for procedural

violations and misconduct that have irreparably prejudiced Defendant's ability to mount a fair defense; or

(2) alternatively, establishing a schedule for limited discovery and resetting deadlines for the submission of

evidence, including expert witness disclosures. In support of this motion, Defendant states:

2.      Plaintiff and his Counsel have engaged in systemic bad-faith litigation tactics, including discovery

violations, selective invocation of foreign privacy laws, and withholding critical evidence, in direct

violation of Rule 26(a). Importantly, neither Rule 26 nor Rule 37(b) requires a "safe harbor" or pre-filing

conferral for discovery-related sanctions. Despite this, Defendant conferred with Plaintiff's counsel on

October 28, 2024, to seek agreement on reopening discovery, but Plaintiff maintained their opposition. This

refusal, coupled with Plaintiff's obstructionist tactics, further highlights the necessity of this Court's

intervention.

3.      Rule 37(b) further permits dismissal as a sanction for willful discovery misconduct, which Plaintiff,

his Counsel, and SWO have used to undermine the evidentiary record and obstruct Defendant's ability to

litigate this case on equal footing. "Rule 37(b)(2)(B) provides for the preclusion of evidence by a party

failing to provide or permit discovery pursuant to an order to provide or permit discovery. Fed.R.Civ.P.

37(b)(2)(C) permits dismissal against the disobedient party. A trial court may preclude evidence under

Fed.R.Civ.P. 37(b)(2)(B) even if to do so is tantamount to a Fed.R.Civ.P. 37(b)(2)(C) dismissal." *Cine

Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1065 (2d Cir.1979); *Von

Brimer v. Whirlpool Corp.*, 536 F.2d 838, 843-44 (9th Cir.1976). *Rabb v. Amatex Corp.*, 769 F.2d 996 (4th

Cir. 1985).

4.      Plaintiff's failure to identify SoftwareONE UK ("SWO UK") in his Rule 26(a) initial and

supplemental disclosures (*See* Exhibit A) constitutes a material violation of his discovery obligations. While

Plaintiff acknowledged his employment with SWO UK in his complaint and amended complaint, he omitted

his actual employer from his required Rule 26(a) disclosures[1] only listing **SoftwareONE AG** (global entity based in **Switzerland)** and **SoftwareONE Inc.,** (a/k/a **SoftwareONE NORAM, North America**). Fitzgerald and his Counsel intentionally withheld SoftwareONE UK, Fitzgerald's **"actual"** Employer.

5.       This omission obstructed Defendant's ability to properly subpoena documents, such as HR complaints and evaluations, that are directly relevant to Defendant's affirmative defenses, including duress and pre-existing reputational harm. By selectively invoking GDPR and privilege protections to further shield information in favor of his claims, Plaintiff exacerbated the prejudice faced by Defendant.

6.       In the alternative, Defendant moves to reopen discovery under Rules 16(b) and 26(e) to address procedural deficiencies, Plaintiff's omissions, and, newly uncovered evidence. For example, documents from *Jane Doe v. SoftwareONE, Inc.,* 85 Cal. App. 5th 98 (Cal. Ct. App. 2022), hereinafter *Doe v. SWO,* highlighted in Defendant's Motion to Supplement the Record (*See* DE 231), reveal systemic misconduct at SWO that directly implicates Plaintiff in reputational harm preceding the alleged breach of contract. This targeted relief is essential to remedy the prejudice caused by Plaintiff's bad faith and ensure fairness even though we are beyond the end of the formal discovery period.

7.       Defendant further asserts that the CSA is void due to duress. Plaintiff's coercive and manipulative conduct deprived Defendant of free will when signing the agreement. Plaintiff has compounded this coercion through discovery obstruction and litigation misconduct, further prejudicing Defendant's position. While Defendant acknowledges procedural missteps as a pro se litigant, these errors arose from good-faith efforts and limited resources, starkly contrasting with Plaintiff's deliberate exploitation of these limitations. Plaintiff's criticisms of Defendant in DE 262 show the challenges of pro se litigants and underscore the necessity for the Court's intervention.

---

[1] **e) Unknown Representative(s) of SoftwareOne AG:** May have discoverable information concerning the allegations in the Amended Complaint and Defendants' contacts with SoftwareOne related to the allegations of the Amended Complaint;

 **f) Unknown Representative(s) of SoftwareOne Inc. (a/k/a SoftwareOne NORAM):** May have discoverable information concerning the allegations in the Complaint and Defendants' contacts with SoftwareOne Inc. related to the allegations of the Amended Complaint;

8.    As a pro se litigant, Defendant has faced significant procedural challenges compounded by Plaintiff's discovery misconduct. Without access to e-filing in the Southern District of Florida, Defendant has relied on costly courier services and overnight Priority mail, causing delays that opposing counsel has exploited to gain a tactical advantage, such as filing motions to strike in advance of the court scanning the motion for docket entry. The complexity of federal procedures, coupled with Defendant's limited resources and lack of legal training, has further hindered her ability to address discovery deficiencies.

9.    Defendant's communications with her legal insurance provider, ARAG Legal, reveal significant failures that severely prejudiced her ability to defend this case. The attached Request for Additional Legal Representation (*See* Exhibit B) and subsequent ARAG Letter (*See* Exhibit C) demonstrate ARAG's negligence and failure to fulfill its obligations. These documents describe ARAG's termination of prior counsel, the assignment of ineffective counsel, and the resulting procedural and substantive prejudice. Plaintiff strategically exploited these procedural inequities, compounding the barriers Defendant faced as a pro se litigant due to inadequate legal resources and ARAG's failure to provide necessary support. Notably, Plaintiff's counsel, Meredith Gussin, further complicated matters by directly contacting ARAG[2] (*audio transcript*), using Defendant's policy number she acquired through the Discovery of this case to inquire about membership status and attorney withdrawal, underscoring a troubling pattern of overreach.

## II. BACKGROUND

10.    SWO is a global leader in software and cloud solutions, headquartered in Switzerland, with its US entity based in Milwaukee, Wisconsin. Microsoft, a key corporate partner, maintains significant ties with SWO. Plaintiff Fitzgerald served as SWO's Chief Innovation Officer (CIO) and as a member of its Executive Leadership Team, overseeing global business. He also played a pivotal role in advancing Defendant William McNae's career at Microsoft. In March 2016, Plaintiff joined SWO and voluntarily left

---

[2] **Meredith Gussin [00:00:35]**: Yeah, it's William McNae is the insured and his wife Ronda McNae, and they provided a copy of the policy in the discovery process. So I have their member ID. Um...
**ARAG Representative [00:01:55]**: Okay. And was this for like a restraining order and that kind of stuff or?
**Meredith Gussin [00:02:02]**: No, it was a breach of contract and defamation case.

in March 2023 after signing a post-employment settlement agreement that included non-disclosure provisions applicable to all SWO entities. This agreement shields both Plaintiff and his employer from collateral effects the Plaintiff's litigation would have on SWO's reputation and earnings.

11.    This case centers on Plaintiff's allegations of reputational and emotional harm, purportedly stemming from Defendant's alleged breach of a Confidential Settlement Agreement ("CSA"). Plaintiff claims damages resulting from Defendant's communications with his employer, SoftwareONE UK.

12.    Defendant's prior counsel, Alaina Fotiu-Wojtowicz, Esq., and Plaintiff entered into an agreement with the attorneys representing SWO, wherein Defendant's counsel agreed not to pursue further discovery from SWO based on their representations that **all** relevant documents had been produced and they agreed to withdraw their lawsuit and sanctions against Ms. McNae in Wisconsin (*see* DE 68) **(Bold for emphasis)**. The referenced "mediated discovery agreement" communications are *attached as* Exhibit D. However, this agreement has been undermined by the Plaintiff and SWO's Counsel's failure to disclose critical evidence, including documents related to *Doe v. SWO* and internal investigations implicating Plaintiff in systemic misconduct that Defendant was made aware of one year **after** the agreement was reached nor was there any reference provided in SWO's Privilege Log **(Bold for emphasis)**. SWO's attorneys did provide an entry in their Privilege Log pertaining to an HR discrimination complaint made by an employee that was unrelated to this instant action case, but nothing related to the discrimination complaints from *Doe v. SWO*. These documents are central to Defendant's affirmative defenses, including duress, fraudulent inducement, and causation (*See* DE 231).

13.    The CSA, in and of itself, raises significant concerns. Prior to the execution in June 2020, several SWO employees—Jared Cheney, Khristy Young, Chris Chelsey, Ashley Gaare, John Mayes (HR), and Patty Ravencroft (HR)—were aware of allegations of sexual misconduct against Fitzgerald due to Will and Ronda McNae reporting these allegations directly to these individuals. Public scrutiny of these incidents would likely have severely impacted all of their stock earnings, SWO's public share value, and investor confidence following their IPO. SWO's complicity in suppressing these allegations underscores the necessity for a

complete and transparent evidentiary record. According to Fitzgerald, an "internal" review was conducted while he was placed on one day of paid leave; however, no findings from this review have been produced. After the Plaintiff filed his lawsuit against the Defendant in July 2022, DLA Piper, an independent UK-based firm, conducted an investigative review that reportedly concluded with serious findings. Despite Defendant's requests, these findings have not been produced or shared. While Fitzgerald attributes his economic loss and reputational harm to the Defendant, he voluntarily left SWO and subsequently entered into a post-employment settlement agreement with SWO, effectively shielding both himself and SWO from further scrutiny. Given SWO's discovery violations and their refusal to produce relevant evidence, the prior mediated discovery agreement to limit discovery from SWO is no longer tenable.

## A. Plaintiff's Omissions, Counsel's Failures, and Resulting Prejudice

14.     Despite the centrality of Plaintiff's employment to his claims, Plaintiff failed to disclose his employer, SoftwareONE UK, as required under Fed.R.Civ.P. 26(a). Plaintiff selectively invoked the Global Data Protection Regulation (GDPR) and UK privacy laws to withhold unfavorable evidence, obstructing Defendant's ability to substantiate key defenses. These omissions, coupled with prior counsel's inadequate representation, have left significant evidentiary gaps, severely prejudicing Defendant's ability to present her case. Examples of Defendant's persistence to influence prior counsel to take action *are shown in* Exhibit E. Defendant's prior counsel's ineffectiveness can be categorized in the following ways: (1) **Failure to Challenge Privilege Claims**: Plaintiff improperly relied on GDPR and privacy protections to withhold critical HR complaints and performance evaluations, which are essential to Defendant's defenses, including duress and pre-existing reputational harm. Counsel failed to adequately challenge these assertions, leaving key evidence inaccessible; (2) **Neglect of Discovery Violations**: Plaintiff's failure to disclose SWO UK under Rule 26(a) went unchallenged, depriving Defendant of crucial evidence to address allegations of breach and to substantiate affirmative defenses; (3) **Inadequate Discovery Efforts**: Prior counsel issued two subpoenas to (SWO) but relied on assurances of compliance without pursuing further motions to compel. Counsel's over-reliance on promises from SWO and Plaintiff allowed them to withhold critical

evidence, including documents tied to *Doe v. SWO*, leaving material gaps in the record (*See* Exhibit D); (4) **Abandonment of Affirmative Defense**: Counsel unjustifiably pressured Defendant to drop duress as a defense, despite not ordering the deposition transcripts which included expert testimony from Dr. Hopper, Dr. Brock Weedman, and treating therapist Sarah Dellinger to evaluate, which provided the scientific framework corroborative therapy notes to explain Defendant's inability to consent voluntarily due to trauma and coercion; (5) **Insufficient Diligence**: Counsel neglected to file a Motion for Summary Judgment (MSJ), forfeiting an opportunity to narrow the issues before trial even though counsel billed for MSJ work. Over a six-month period, fewer than 60 hours were billed, with key tasks, such as securing deposition transcripts, left unaddressed; and, (6) **Withdrawal at a Critical Stage**: Counsel's abrupt withdrawal in September 2024 forced Defendant to navigate complex federal litigation pro se during a pivotal phase, exacerbating procedural inequities and unresolved discovery issues. *See List of Motions Filed by Defendant to rectify damage caused by ineffective counsel, attached as* Exhibit J.

15.    These failures, compounded by Plaintiff's strategic discovery obstructions and misleading claims, necessitate reopening discovery to address procedural and evidentiary gaps. The attached ARAG letters (*See* Exhibits B and C) underscore the challenges created by inadequate legal representation and the resulting barriers to gathering essential evidence. To remedy these prejudicial omissions, Defendant must be afforded the opportunity to present a complete and robust defense.

**B.  Reference to Systemic Misconduct at SoftwareONE and Its Concealment**

16.    **Systemic Misconduct at SoftwareONE**: Evidence from *Doe v. SWO* reveals pervasive misconduct, including a discriminatory "boys club" culture dominated by young male executives, retaliation against employees who raised concerns, and suppression of dissent through intimidation and exclusion. Specific examples were included in DE 231 based on a sample of documents that could be obtained from the public case files by Defendant.

17.    Had the court been aware of SWO's pervasive misconduct and Plaintiff's involvement, as well as his failure to disclose SWO UK in initial and supplemental disclosures, it could have determined that

enforcing the CSA would contravene public policy by protecting wrongful conduct and suppressing evidence of coercion in its execution. The withheld evidence fundamentally alters the factual and legal basis of the court's prior ruling on Defendant's affirmative defense of Public Policy.

### III. ARGUMENT

#### A. Dismissal with Prejudice is Appropriate Due to Plaintiff's Bad-Faith Discovery Misconduct

18.    Fed.R.Civ.P. 37(b) authorizes dismissal with prejudice for egregious discovery violations, including withholding evidence, asserting baseless privileges, and obstructing discovery. *See e.g., Projects Mgmt. Co. v. Dyncorp Int'l LLC*, 734 F.3d 366 (4th Cir. 2013)(*affirming* sanction of dismissal for failure to timely produce discovery requests*); Beach Mart, Inc. v. L&L Wings, Inc.*, No. 18-1477, No. 18-1486 (4th Cir. Aug. 1, 2019) (*affirming* dismissal of some counterclaims of the Defendant as sanction for withholding evidence). "Dismissal is the ultimate sanction in our adversarial system, it should be reserved for those aggravating circumstances in which a lesser sanction would fail to achieve a just result." *Kozel v. Ostendorf*, 629 So.2d 818 (Fla. 1993).

19.    In this case, Plaintiff's omissions, selective invocation of privilege, and cross-border discovery obstacles compounded the inequities Defendant faced. The letter from DLA Piper to Charles Fussell & Co. (*See* Exhibit F *and quote below*) responds to a request from Defendant's UK barrister for voluntary disclosure of documents relevant to the Miami proceedings (*See Barrister's requests* - Exhibit G). SWO UK refused to provide the requested information, citing obligations under the UK GDPR and Data Protection Act 2018, and advised that such discovery should be sought through formal US and UK legal procedures. This refusal, along with Fitzgerald's refusal, denied access to essential information directly relevant to his allegations of breaching the CSA by contacting his employer. These procedural barriers, compounded by Plaintiff's omissions and bad-faith tactics of privacy gamesmanship, significantly prejudiced the ability to prepare a full and fair defense.

> Your clients seek the voluntary disclosure of documents for use in the Miami Proceedings. SOUK is not a party to the Miami Proceedings. Your letter seeks sensitive and personal employment information about Mr. Fitzgerald, who does not join in your request.

20.     Without Plaintiff Fitzgerald's employment file, there is a critical gap in substantiating his claimed damages. The file is essential to determine whether the alleged breach caused measurable harm or if the damages stem from unrelated factors, such as the prior lawsuit *DOE v. SoftwareONE*. Notably, Plaintiff Carol Eastman, contacted Defendant Ronda McNae on May 28, 2024, stating, "I'm Carol Eastman, a former SoftwareONE employee, in the midst of a lawsuit which includes Mike Fitzgerald," revealing a prior lawsuit initiated before the signing of the CSA. Had Defendant Ronda and Will McNae been aware of Fitzgerald's previously reported misconduct, it would have significantly altered the circumstances of the CSA. Without his complete HR and employment file (including HR complaints that may contain Ms. Eastman's HR report(s) against executives and leaders including Fitzgerald) Plaintiff cannot establish a direct link between the breach and his alleged harm, without intervening factors breaking the chain of causation.

21.     Plaintiff Yelany De Varona, represented by same counsel as Fitzgerald, failed to produce 167 images and video attachments explicitly referenced in text messages with Plaintiff Fitzgerald (YEL000083– YEL000217). Among the omitted items are **92 JPEG images, 5 HEIC images (Apple raw photo format), 3 screenshots, 19 JPG images, 6 FullSizeRender files, 4 rendered images, 26 image numbers, 3 PNG images, and 1 movie file**, none of which were produced in response to discovery requests or included in a privilege log. These missing attachments are likely critical to the claims and defenses in this case *(See Exhibit H and the Subpoena)*. This failure violates Rule 26(a)(1) and Rule 34. In discovery, parties are required to provide complete and accurate responses, including the production of all relevant and responsive documents to ensure a full and fair record. Michael Fitzgerald and Yelany De Varona were married on December 10, 2020; therefore, any claim of spousal privilege does not apply to the attachments referenced in Exhibit H, as they pertain to a period prior to their marriage. The omitted attachments, which extend beyond mere emojis, are critical to the claims and defenses in this case. Parties are obligated to provide a complete and accurate response to discovery requests, including the production of responsive materials or proper disclosure through a privilege log based on Federal Rules of Civil Procedure.

**B. Analysis Under Kozel Factors**

22.    In determining the appropriate sanctions for discovery violations, *Kozel* directs a trial court to consider the following factors: (1) Whether the attorney's disobedience was willful, deliberate, or contumacious, rather than an act of neglect or inexperience; (2) Whether the attorney has previously been sanctioned; (3) Whether the client is personally involved in the act of disobedience; (4) Whether the delay prejudiced the opposing party through undue expense, loss of evidence, or in some other fashion; (5) Whether the attorney offered reasonable justification for noncompliance; and (6) Whether the delay created significant problems of judicial administration.

23.    When the facts are analyzed under the *Kozel* factors, dismissal with prejudice of Plaintiff's complaint as a sanction for willful discovery violations is appropriate. *Sanders v. Gussin*, 30 So.3d 699 (Fla. App. 2010).

**Kozel 1:** Whether the attorney's disobedience was willful, deliberate, or contumacious, rather than an act of neglect or inexperience:

24.    Defendant incorporates and references the factual background stated within her motion for leave to supplement the record (*See* DE 231) as if stated here verbatim. Defendant further asserts that Plaintiff willfully suppressed discoverable information in his failure to disclose his employment with SWO UK in his Rule 26 disclosures (*See* Exhibit A). Neither Plaintiff's Initial nor his supplemental disclosures state Plaintiff's employment with SWO UK. *See* Plaintiff's Initial Disclosures (September 9, 2022), First Supplemental Disclosures (February 27, 2023), and Second Supplemental Disclosures (April 19, 2024). Plaintiff further attempted to suppress his relationship with SWO UK vis à vis the mediated discovery agreement regarding discovery made between SWO and Defendant - through her prior counsel Alaina Fotiu-Wojtowicz, Esq. This mediated agreement was purposed to limit irrelevant, discoverable information while marketed to Defendant's counsel as a focused/contained scope of inquiry in furtherance of moving the matter ahead expeditiously. (*See email correspondence in* Exhibit D). Plaintiff's withheld HR complaints, internal investigations, and concealed employment records could demonstrate the CSA's lack

of mutual benefit or legal sufficiency and, suppressed evidence of misconduct and reputational issues that undermine his credibility and supports Defendant's claim that the CSA was a strategy to hide critical evidence that otherwise would be discoverable.

25.    The CSA is either void from the start, voidable, or amendable, i.e., remove offending clause(s) and enforce the remaining portions. The offending section, Section 4(B) of CSA, *attached hereto as* Exhibit I, is at issue in the matter *sub judice*. The CSA is a contract induced under false pretenses in direct contravention of the Florida State Rules of Professional Responsibility 3.4. Further, Plaintiff's deliberate failure to disclose his SoftwareONE UK employer, coupled with his selective invocation of privacy and GDPR protections, underscores the procedural unconscionability of the CSA. At its core, the CSA was executed under conditions where material information — such as Plaintiff's pre-existing reputational harm — was intentionally withheld, depriving Defendant of the opportunity for informed consent. *See Addit, LLC v. Hengesbach*, 341 So.3d 362 (Fla. App. 2022) (*defining* procedurally unconscionable as "relates to the manner in which a contract is made and involves consideration of issues such as the bargaining power of the parties and their ability to know and understand disputed contract terms" *Id. See also Cartlson v. General Motors Corp.*, 883 F. 2d 287 (4th Cir. 1989) (*describing* as procedurally unconscionable, a contract entered into through fraud or duress insofar as to its bargaining *naughtiness*, in the form of unfair surprise, lack of meaningful choice, and an inequality of bargaining power between the parties entering into the contract); *Hart v. La-Pac. Corp.*, No. 13-2375 (4th Cir. Mar 10, 2016)*(affirming* the lower court's determination that Appellee's prior knowledge of product defects supported a finding of procedural unconscionability of the product warranty). Defendant further submits the CSA is substantively unconscionable as a contract of adhesion that impedes the administration of justice.

26.    "As a general rule, contractual provisions are severable, where the illegal portion of the contract does not go to its essence, and, with the illegal portion eliminated, there remain valid legal obligations." *Fonte v. AT&T Wireless Services, Inc.*, 903 So. 2d 1019, 1024 (Fla. Dist. Ct. 2005) (*citing Gold, Vann & White, P.A* , 831 So. 2d at 696 ); *see also Osprey Health Care Ctr., LLC v. Pascazi* , 329 So. 3d 177, 187

(Fla. 2d DCA 2021) (*explaining* that an unenforceable provision in an arbitration agreement is severable if it 'does not go to the heart of the [arbitration agreement]' " and "[s]tated differently, if an arbitration agreement is otherwise enforceable, a 'court should sever the offending provisions ... so long as such severance does not undermine the parties' intent.' " *Hochbaum v. Palm Garden of Winter Haven, LLC*, 201 So. 3d 218, 223 (Fla. 2d DCA 2016); and then *quoting Lemos v. Sessa*, 319 So. 3d 135, 142 (Fla. 3d DCA 2021).

27.     Section 4(B) of the CSA states, "The McNae's shall not contact Fitzgerald's employer. If Mr. Fitzgerald's employer contacts either of the McNae's, the McNae's shall respond, "the matter has been closed and I cannot speak about more about it," or words to that effect." *See Id.*

28.     Plaintiff, intent on mitigating existing evidence harmful to his case and unknown to Defendant, withheld access to his employer, i.e., SWO UK. Defendant, through her *pro se due* diligence, uncovered the *Doe v. SWO* litigation wherein allegations of misconduct and discrimination involving Plaintiff were made. Defendant's discovery of *Doe v. SWO* presents the bargaining naughtiness of an unfair surprise that voids the CSA as procedurally unconscionable. Disclosure is required pursuant to Rule 26(a). If the consideration [for a contract] is good in part and void in part, the promise will or will not be sustained, depending upon whether it is entire or severable. *Barger v. Garden Way, Inc.*, 499 S.E.2d 737, 231 Ga. App. 723 (Ga. App. 1998); *Hooters of America, Inc. v. Phillips*, 39 F. Supp. 2d. 582 (D.S.C. 1998) (*holding* if severing an unenforceable provision would violate fundamental legal principles, the agreement may be voided in part without remedying the offending portion or removing the offending portion). If the consideration is illegal in whole or in part, the whole promise fails." "`An illegal consideration consists of any act or forbearance, or a promise to act or forbear, which is contrary to law or public policy. *Barger v. Garden Way, Inc.*, 499 S.E.2d 737, 231 Ga.App. 723 (Ga. App. 1998).

29.     Section 4(B) offends as a procedurally unconscionable provision that — at a minimum threshold — warrants its excision. However, given Plaintiff's conduct throughout the course of this litigation, as detailed in Defendant's filing (DE231), the CSA should be voided in its entirety, and the matter dismissed

as a sanction on Plaintiff and his attorneys for their bad faith conduct. The Defendant's due diligence in uncovering the *Doe litigation*, coupled with the procedural unconscionability of Section 4(B), highlights the Plaintiff's prejudicial discovery misconduct. Should this Court determine that the remaining portions of the CSA are enforceable, then severing the offending provision should occur simultaneously with reopening discovery to allow Defendant to gather and present necessary evidence supporting her defense. *See Id.*

30.    Plaintiff further committed sanctionable discovery violations when he blatantly violated this Court's protective order (DE23), issued on December 2, 2022, by improperly utilizing highly sensitive materials obtained through federal discovery to support their state court claims against Defendant William McNae. *See Out of Box Developers, LLC v. LogicBit Corp., 2014 NCBC 7, 10 CVS 8327 (N.C. Super. Ct. Mar 20, 2014)* (*explicating* the Court's authority to issue sanctions pursuant to Rule 37(B) for Rule 26(c) protective order violations and striking the portions of the Defendants' Answers & Counterclaims as sanction). The protective order explicitly limits the use of such materials to "only for the prosecution or defense of this case" and prohibits their use in any other proceeding without prior court approval. Plaintiff did not seek this Court's approval for the use of these sensitive employee-HR communication materials.

31.    While these materials were not labeled confidential, they are highly sensitive HR internal-only communications and should have been protected by the parties' agreed protective order, which explicitly prohibits the use of discovery materials outside of this Federal case.

**Kozel 3:** Whether Plaintiff's attorneys were personally involved in the act(s) of disobedience:

32.    Plaintiff has been represented by present counsel throughout this litigation.

**Kozel 4:** Whether the delay prejudiced the opposing party through undue expense, loss of evidence, or in some other fashion:

33.    As stated *supra*, Defendant has been severely prejudiced through undue expense, and inability to cull and enter evidence into the record for trial. Her efforts to address these deficiencies, such as motions to supplement the record and obtain suppressed evidence, have been obstructed by Plaintiff's continued bad

faith. Plaintiff's conduct also violates Rule 26(a) by failing to disclose accurate employment information, escalating litigation costs and violating this Court's protective order entered December 2, 2022. Defendant's first attorney filed two subpoenas but was unaware of the procedural deficiencies by SWO. This misstep functioned to limit the Defendant's ability to prepare for trial. Due to Plaintiff's selective invocation of UK privacy laws, Defendant was required to hire a UK-based Barrister to pursue Plaintiff's employment records and documents which significantly increased legal costs and burden, generating over $8,000 in additional costs paid by Defendant (not insurance).

34.     The coordinated actions of Plaintiff, SWO, and Plaintiff's counsel represent a deliberate strategy to obstruct the discovery process. This is evidenced by the improper assertion of privilege claims, selective invocation of GDPR protections, and joint motions to quash subpoenas. These tactics have severely prejudiced Defendant's ability to effectively litigate her case by hindering her efforts to substantiate her duress defense, demonstrate Plaintiff's pre-existing reputational harm, and expose systemic misconduct at SWO. This suppression of evidence directly undermines Plaintiff's claims of reputational harm and emotional distress. Plaintiff has improperly stonewalled Defendant's discovery requests by invoking GDPR, disregarding the U.S. Supreme Court's precedent in *Societe Nationale Industrielle Aerospatiale v. U.S. District Court for the Southern District of Iowa*, 482 U.S. 522 (1987), that requires the disclosure of requested information after an international comity analysis. *See also, In re Mercedes-Benz Emissions Litigation*, Civil Action No. 16-CV-881(KM) (ESK) (D.N.J. Jan. 30, 2020) (*affirming* the disclosure of documents deemed GDPR-protected). Here, the Defendant asserts that the employment records and other documents requested from SWO UK are: benign, directly pertinent to this litigation, and, there exists no other means by which to ascertain the information.

35.     For instance, in *SoftwareONE Inc. v. McNae*, Plaintiff and SWO invoked an unsupported "common legal interest" privilege to suppress internal investigations and HR complaints, despite conflicting positions. These coordinated actions of the Plaintiff and his Attorneys have exponentially increased the costs of defense for this pro se defendant.

36.    Plaintiff's misuse of federally protected discovery materials reflects clear bad faith litigation tactics designed to gain an unfair advantage in state court at the Defendants' expense.  Plaintiff filed the state court action after receiving materials through federal discovery. Although these materials were produced before the protective order was issued, the Order retroactively applies to all materials produced in the federal case. Consequently, Plaintiffs' subsequent use of these materials in state court proceedings—without obtaining this Court's prior approval—constitutes a blatant violation of the protective order. These actions have significantly prejudiced Defendant, who is now forced to defend against claims improperly supported by confidential information. Plaintiffs' conduct not only undermines this Court's authority but also erodes the integrity of the discovery process as a whole.

37.    The federal court's dismissal of certain claims without prejudice does not grant Plaintiffs carte blanche to use federally obtained materials to pursue duplicative claims in another jurisdiction. Such actions not only circumvent this Court's oversight but also violate the protective order's intent, constituting an abuse of judicial resources and process. *See e.g., Krause v. Nev. Mut. Ins. Co., Case No. 2:12-cv-00342-JCM-CWH (D. Nev. Jan 03, 2014) (declining* sanction against counsel in procedurally similar improper use of protected information for movant's failure to present existing and available supportive evidence).

**Kozel 5:** Whether the attorney offered reasonable justification for noncompliance

38.    Plaintiff has not provided a reasonable justification for his failure to disclose his employer in his initial and two supplemental Rule 26 disclosures, nor has he fully complied with producing all requested documents and materials during the discovery period. Instead, opposing counsel has repeatedly highlighted and exploited Defendant's pro se status to gain tactical advantages, distract from Plaintiff's own noncompliance, and undermine Defendant's ability to litigate effectively. Specific examples of these tactics can be found in numerous filings, including: DE 226, DE 232, DE 233, DE 234, DE 243, DE 244, DE 248, DE 256, DE 257, DE 261, and DE 262, where opposing counsel openly criticizes Defendant's compliance and advocates for sanctions or strict enforcement of procedural rules.

a. **Criticism of Procedural Non-Compliance**: Opposing counsel has frequently pointed to procedural missteps in Defendant's filings, such as exceeding page limits, omitting certificates of service, or failing to conform to local rules. These critiques are framed as creating unnecessary delays and burdening the court, distracting from the substantive merits of Defendant's claims.

b. **Opposition to Evidence Submission**: Attempts by Defendant to include evidence outside the discovery timeline or raise issues already decided have been criticized as improper and labeled sanctionable abuses of process. Opposing counsel has used these efforts to argue against fairness and procedural integrity, while ignoring Plaintiff's own failures in timely production.

c. **Requests for Sanctions**: Opposing counsel has repeatedly sought sanctions against Defendant, portraying procedural errors as frivolous, intentional abuses of process, or tactics to delay proceedings. Specific examples include:

   • **Frivolous Filings**: Plaintiff argued that motions to strike exceeded page limits and failed to conform to local rules, seeking sanctions for delays these filings allegedly caused.

   • **Discovery-Related Criticism**: Plaintiff criticized Defendant's inclusion of deposition excerpts and evidence outside established timelines, asserting these submissions created undue burdens.

d. **Resistance to Procedural Leniency**: Opposing counsel has consistently argued that pro se litigants should not receive procedural leniency, asserting that such accommodations would disadvantage opposing parties and impose additional burdens on the court.

**Kozel 6**: Whether the delay created significant problems of judicial administration,

39.      Opposing counsel has used Defendant's pro se status as a basis to argue for strict enforcement of procedural rules while leveraging these same limitations to create an uneven playing field. Plaintiff has portrayed Defendant as intentionally disregarding procedural norms, unfairly attributing delays and

16

procedural deficiencies to misconduct rather than challenges inherent to self-representation. Examples include:

a. **Portrayal of Procedural Mismanagement:** Plaintiff emphasized late submissions of briefs and filings, attributing these delays to procedural mismanagement rather than acknowledging the inherent challenges faced by pro se litigants. This approach has further burdened the litigation process and judicial resources

b. **Allegations of Intentional Noncompliance:** Plaintiff accused Defendant of intentional acts of noncompliance, such as a one-day delay in filing a reply brief and the submission of deposition excerpts deemed inadmissible. These actions were framed as improper litigation tactics despite their minor procedural impact.

c. **Exploitation of Pro Se Status:** Plaintiff has used Defendant's untrained legal status to portray her as both disruptive and unqualified, manipulating these characterizations to justify stricter procedural standards. This has delayed proceedings and created inefficiencies, further complicating judicial administration.

d. **Manipulation and Control:** Opposing counsel's arguments have consistently sought to control the narrative by framing Defendant's efforts as abuses of process, diverting attention from Plaintiff's own procedural deficiencies. This manipulation exacerbates delays and undermines equitable resolution.

40.    The systemic misconduct and suppression of evidence necessitate reopening discovery to address procedural gaps. Despite Defendant's diligent efforts to address deficiencies caused by Plaintiff's discovery misconduct and prior counsel's failures, significant evidentiary gaps remain, necessitating the reopening of discovery. Examples include expert witnesses such as Dr. Hopper, Dr. Brock Weedman, and treating therapist Sarah Dellinger to supplement the record. However, these efforts have been insufficient to overcome the compounded effects of Plaintiff's bad-faith tactics and prior counsel's inaction. Key evidence

necessary for Defendant's affirmative defenses, including duress, fraudulent inducement, and lack of consideration, remain inaccessible.

41.    The *Kozel* analysis, as discussed *supra*, demonstrates Plaintiff's bad faith and supports dismissal of Plaintiff's action as an appropriate sanction under Rule 37(b). Plaintiff's repeated misconduct including withholding evidence, asserting baseless privilege claims, and obstructing discovery, mirrors the conduct addressed in *Fla. Bar v. Rosenberg*, 169 So. 3d 1155 (Fla. 2015). In *Rosenberg*, the Florida Supreme Court held that willful noncompliance with discovery obligations and bad-faith conduct warranted severe sanctions to preserve judicial integrity. Defendant submits herein lies another instance where the sanction of dismissal for Plaintiff's bad faith is appropriate.

42.    If the Court finds dismissal too extreme a remedy, reopening discovery is essential to address significant inequities and ensure a complete evidentiary record for fair and thorough adjudication. To achieve this, Defendant seeks targeted discovery relief, including:

(a) **Critical Depositions** of (1) **Michael Fitzgerald (Plaintiff)** – to address the inconsistencies in Plaintiff's representations regarding his employment history, the value-chain of SWO, the mediated discovery agreement, and claims of pre-existing reputational harm. Highlight that Fitzgerald was actively involved in and oversaw internal HR reporting and investigations, raising questions about his credibility and the integrity of his claims; (2) **SWO Representatives** – to resolve privilege assertions and uncover internal investigations and HR complaints implicating Plaintiff; (3) **Key witnesses from *Doe v. SWO*** – to verify systemic misconduct within SWO, including Plaintiff's involvement in fostering a discriminatory and hostile work environment; and, (4) **Dr. Hopper, Dr. Weedman,** and treating therapist **Sarah Dellinger** - to provide expert analysis on emotional distress, duress, and coercion during the CSA's execution.

(b) **Supplemental Subpoenas** to uncover vital evidence – subpoenas are necessary to obtain withheld employment records, HR complaints, and communications, particularly those shielded

under GDPR or privilege assertions involving SWO and SWO UK. These subpoenas aim to uncover the results of the internal investigations of Plaintiff's misconduct.

(c) **Depositions** of key witnesses with material knowledge of Plaintiff's alleged misconduct, internal investigations, and SWO's actions: (1) **Frank Rossini (Group General Counsel for SWO \*all entities & Board Secretary):** Signatory of key agreements specifically the post-employment CSA between SWO (all entities) and Michael Fitzgerald; (2) **Dieter Schlosser (Former CEO, SWO):** Insight into corporate decisions and policies during Plaintiff's tenure; (3) **Brian Duffy (Former CEO, SWO):** Knowledge of workplace practices, Plaintiff's conduct, and SWO's responses to complaints; (4) **Ashley Garre (Former President of the US Business, SWO):** Spoke with Defendant Will McNae by telephone; (5) **Jared Cheney (SWO Employee):** Received Defendant and Will McNae's early 2020 reports of sexual assault by Plaintiff; (6) **Khristy Young (SWO Employee):** informed of the assault; (7) **Patty Ravencroft (SWO US HR):** HR representative to whom Defendant was referred by Ms. Young; (8) **John Mayes (Former Global Leader of HR):** received Defendant and Will McNae's early 2020 reports of sexual assault by Plaintiff and requested Police Reports if filed; (9) **Carol Eastman (*Doe v. SWO*):** a complainant in a related case, directly filed complaints against executives and leaders at SWO.

43.    The requested discovery will focus on: (1) SWO and SWO UK Policies: Internal procedures for handling misconduct and sexual assault reports; (2) actions taken on reports: Specific steps taken by SWO in response to sexual assault allegations from Defendant and Will McNae to Jared, Kristy and Patty; (3) prior Complaints against Plaintiff: HR and investigative records of past allegations involving Plaintiff's misconduct; (4) Key Communications, i.e., relevant agreements, emails, and testimony that implicate Plaintiff or bear on the claims in this case.

44.    Defendant also requests in-Camera Review of Privileged Documents to ensure compliance with discovery obligations and to uncover any improperly withheld materials.

45.     Reopening discovery will not only address procedural inequities but will also allow the Court to adjudicate this case on its merits, free from the prejudice caused by Plaintiff's misconduct, omissions from SWO and SWO UK, and prior counsel's failures. Plaintiff's deliberate obstruction and exploitation of Defendant's pro se status contravenes the principles of fairness and equity enshrined in the Federal Rules of Civil Procedure.

46.     In support of the foregoing motion, Defendant submits a Declaration *attached as* Exhibit K, which outlines systemic barriers, procedural misconduct, and prejudicial actions that have obstructed my ability to fairly defend against Plaintiff's claims including supporting exhibits. Central to the declaration is how Plaintiff improperly uses the status of an incomplete criminal investigation to distort facts in this civil litigation, leveraging systemic failures in law enforcement to cast doubt on Defendant's credibility.

## IV. CONCLUSION

47.     Defendant respectfully requests that this Court dismiss Plaintiff's claims with prejudice under Fed.R.Civ.P. 37(b) as a sanction for Plaintiff's discovery misconduct, including violations of Rule 26. Plaintiff's deliberate withholding of evidence, assertion of baseless privilege claims, and obstruction of discovery have caused irreparable harm and undermined the integrity of these proceedings. If dismissal is not granted, Defendant seeks the imposition of Rule 37 sanctions, including monetary compensation for legal expenses incurred due to Plaintiff's misconduct, an adverse inference instruction presuming withheld evidence supports Defendant's defenses, and an in-camera review of withheld documents to ensure compliance with discovery obligations. Alternatively, Defendant requests that the Court reopen discovery on a limited basis to address evidentiary gaps caused by Plaintiff's misconduct and prior counsel's deficiencies. This relief should include supplemental subpoenas for employment records, HR complaints,

and communications involving SWO UK, depositions of key witnesses and individuals to address privilege assertions, and an in-camera review of withheld documents.

48.     To ensure procedural fairness, Defendant asks the Court to grant temporary e-filing privileges to enable timely submissions, expedite docketing of mailed filings to prevent delays exploited by opposing counsel, and bar Plaintiff from leveraging procedural inequities for tactical advantage. Finally, Defendant requests declaratory relief voiding the Confidential Settlement Agreement due to Plaintiff's coercion or, in the alternative, void Section 4(B) of the CSA and create an opportunity for further discovery to support the Defendant's affirmative defense. Defendant also seeks any additional relief the Court deems just and necessary to address the prejudice caused by Plaintiff's misconduct.

49.     Granting this motion will restore procedural fairness, uphold judicial integrity, and ensure the equitable adjudication of this case. Defendant respectfully requests that the Court consider the attached supporting documents as evidence of the procedural inequities and discovery violations perpetrated by Plaintiff and SWO. These exhibits underscore the necessity for imposing sanctions, reopening discovery, and ensuring procedural fairness.

## RELIEF REQUESTED

1.  Dismiss Plaintiff's claims under Rule 37(b) as a sanction for discovery misconduct.

2.  Void the CSA as procedurally unconscionable or in the alternative, declare Section 4(B) of the CSA offensive and remove Section 4(B) from the CSA.

3.  Impose Rule 37 sanctions, including monetary compensation, an adverse inference instruction, and an in-camera review of withheld documents.

4.  Reopen discovery on a limited basis to address gaps caused by Plaintiff's discovery misconduct and bad-faith.

5.  Ensure procedural equity by granting temporary e-filing privileges and limit Plaintiff from exploiting procedural disadvantages.

6. Extend all remaining deadlines as appropriate, including those related to pre-trial stipulations, to allow for discovery to be reopened.

7. Grant any further relief the Court deems just.

Respectfully submitted,

By: *Ronda McNae*
Ronda Delapina McNae
Pro se Defendant
504 11th Pl, Kirkland, WA 98033
Tel: (206) 914-6752
Prose.rmcnae@gmail.com

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(a)(3)

Pursuant to Local Rule 7.1(a)(3), I certify that I conferred in good faith with Plaintiffs' counsel via email on October 28, 2024. Despite multiple clarifications and efforts to reach an agreement, opposing counsel maintained their opposition to reopen discovery.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 13, 2025, a true and correct copy of the foregoing Defendant's Motion to Dismiss or, in the Alternative, to Reopen Discovery was shipped via FedEx priority mail to the Clerk of the Court at the Miami Courthouse, Southern District of Florida, 400 N. Miami Ave, Room 8N09, Miami, FL 33128. Additionally, in compliance with the Court's requirements for pro se litigants, a copy of the same document was shipped to Plaintiffs' counsel on the same date.

## SERVICE LIST

Peter E. Berlowe, Esq.
Meredith Gussin, Esq.
Assouline & Berlowe, P.A.
Miami Tower
100 SE 2nd Street, Suite 3105
Miami, FL 33131
Tel: 305-567-5576
Fax: 305-567-9343
peb@assoulineberlowe.com
mjg@assoulineberlowe.com
*Counsel for Plaintiff*

*By: Ronda McNae*
Ronda Delapina McNae
Pro se Defendant



ORIGIN ID:PAEA    (425) 941-7374
WILLIAM MCRAE

504 11TH PL

KIRKLAND WA 98033
UNITED STATES US

TO  MIAMI COURT HOUSE
    ATTN: COURT CLERK
    400 N MIAMI AVE
    RM 8N09
    MIAMI FL 33128

FedEx Express

TUE — 14 JAN 12:00P
PRIORITY OVERNIGHT

33128
MIA
FL—US

TRK# 7713 9620 2244

X6 MPBA

# Exhibit B-2

Florida Bar Complaint supporting Motion for Sanctions in Florida Federal court

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO.: 1:22-cv-22171-JEM

MICHAEL FITZGERALD,
individually, and YELANY DE VARONA,
individually,

           Plaintiffs/Co-Defendants,

v.

RONDA MCNAE, individually, and
WILLIAM MCNAE, individually,

           Defendants/Co-Plaintiff

_____/

## MOTION TO SANCTION OPPOSING
## COUNSEL AND MRS. YELANY DE VERONA-FITZGERALD

Defendant Ronda McNae ("Mrs. McNae"), appearing pro se, hereby respectfully requests that this Honorable Court impose sanctions on Plaintiffs' counsel, Meredith Gussin and Peter Berlowe, and Plaintiff Yelany De Varona-Fitzgerald, for violations of the Florida Bar Rules of Professional Conduct, specifically Rules 4-3.3, 4-4.1, and 4-4.2. These rules emphasize the importance of truthfulness in statements, proper communication with represented persons, and candor toward the tribunal.

## PRELIMINARY STATEMENT

Before the United States District Court for the Southern District of Florida, this motion aims to address and highlight grave concerns regarding the behavior of opposing counsel, Meredith Gussin ("Ms. Gussin") and Peter Berlowe ("Mr. Berlowe"), representing Plaintiff Michael Fitzgerald ("Fitzgerald") and Yelany De Verona ("Ms. De Verona"), in case number 1:22-cv-22171-JEM. Grounded in substantial factual evidence, this motion outlines a consistent pattern of conduct by Plaintiff's Counsel that starkly contravenes multiple Florida Bar rules. It specifically aims to present evidence of violations related to Rule 4-4.1, emphasizing truthfulness in statements to others; Rule 4-4.2, concerning communication with individuals represented by counsel; and Rule 4-3.3, which focuses on candor towards the tribunal.

## FACTUAL AND PROCEDURAL BACKGROUND

1.      Plaintiff Michael Fitzgerald commenced this action on July 14, 2022, by filing a one-count complaint against Ronda McNae. [D.E. 1.] On December 30, 2022, Plaintiffs filed an Amended Complaint, which: (1) added Fitzgerald's wife, Ms. De Verona, as an additional plaintiff; (2) added William McNae, Ronda McNae's husband, as an additional defendant; (3) asserted breach of contract claims against both Defendants; and (4) added nineteen tort claims arising out of the same facts as the breach of contract claims against both Defendants. [Id.].

2.      Defendant Ms. McNae (together with Defendant William McNae) moved to dismiss the Amended Complaint on January 27, 2023. [D.E. 39.] In their motion, both Defendants argued that (1) the Amended Complaint failed to allege sufficient facts to support diversity jurisdiction, (2) Fitzgerald's' tort claims were barred by the independent tort doctrine, and (3) Ms. De Verona's loss of consortium claim was derivative of Fitzgerald's deficient tort claims, and therefore must be dismissed. [Id.]

3.      On August 2, 2023 (and as clarified in an Amended Order dated October 24, 2023), the Court dismissed all tort claims asserted by Fitzgerald as barred by the independent tort doctrine, and dismissed all claims asserted by Ms. De Varona because they were derivative of Fitzgerald's tort claims. [D.E. 83, 100.] Plaintiffs moved for leave to amend their complaint, which the Court denied on October 30, 2023. [D.E. 103.] All claims asserted by Ms. De Varona against Defendant Ronda McNae in this action have been dismissed.

4.      January 20, 2024, William McNae was officially served with a lawsuit from Michael Fitzgerald in Florida State Court, *Fitzgerald v. McNae*, Case No. 2023-025855-CA-01.

5.      The exact claims raised in this Federal Case are now being asserted by Fitzgerald against William McNae in Florida State Court, although this Federal Case is still ongoing.

6.      Mrs. McNae's prior counsel, Alaina Fotiu-Wojtowicz ("AFW"), forwarded a preliminary version of the Motion for Attorney Fees and Costs to the Counsel of Ms. De Verona on November 27, 2023. On December 13, 2023, Honorable Judge Martinez permitted AFW to withdraw from the case, instructing Mrs. McNae to submit her Motion for Attorney Fees and Costs by January 25, 2024.

8.      Counsel for Fitzgerald and Ms. De Vernona claim they attempted to 'confer' in [DE 149] regarding [DE 141]. Mrs. McNae received a 'conferral response' December 14, 2023 which was past the deadline agreed upon with prior counsel AFW.

9.      From December 14 to January 11, 2024, Mrs. McNae was without legal representation. Mrs. McNae had no other option given the timing and circumstances but to navigate the proceedings on her own until she found representation. This situation left Mrs. McNae to create and format [DE 141] a few days before the Deadline considering Mrs. McNae is unable to e-file therefore utilizes a local courier service which takes one-to-two-days before documents are reviewed and entered by this Court.

10.     Mrs. McNae, representing herself for roughly one month now, has done her absolute best to comply with all local rules, Federal Rules of Civil Procedure, and following orders made by Honorable Judge Martinez.

## MEMORANDUM OF LAW

The memorandum of law for a Motion to sanction under Rule 11 of the Federal Rules of Civil Procedure mandates that attorneys or parties certify that filings with the court are made in good faith, are not frivolous, have evidentiary support, and are not intended for improper purposes like harassment. If a filing violates these standards, the rule allows the court to impose sanctions on the responsible party or attorney. The rule expands the equitable doctrine that allows courts to award expenses, including attorney's fees, in cases where litigation is conducted in bad faith. This expansion is meant to discourage frivolous claims and defenses, streamline litigation, and reduce abusive tactics.

Rule 11 applies to anyone signing a pleading, motion, or paper, with the court having discretion in pro se situations. The rule emphasizes a deterrent approach to improper pleadings and motions, similar to the approach in imposing sanctions for discovery abuses, which was considered on separate occasions. It mandates that courts focus on the necessity of imposing sanctions in cases of pleading and motion abuses but retains flexibility for courts to tailor sanctions to the specifics of the case.

Historically, courts have exercised the power to impose sanctions on attorneys personally, and the amended rule clarifies the propriety of such actions. The rule also allows for sanctions to

be imposed on the client in certain circumstances, aligning it with practices under Rule 37 for discovery abuses.

Rule 11 sanctions primarily aim to deter rather than compensate. Monetary sanctions are typically paid into court as a penalty, but in specific situations, particularly violations of (b)(1), deterrence may require payment to the injured party. Any award to another party should only cover expenses and attorney's fees directly caused by the violation. The sanction is imposed on those responsible for the violation, including attorneys, law firms, or parties. Law firms are held jointly responsible when their members violate the rule, especially if the offending paper is not withdrawn or corrected promptly.

This provision in Rule 11 removes previous restrictions and holds individuals and firms accountable for their conduct in legal proceedings, reinforcing responsibility to the court and deterring groundless or abusive litigation practices.

## **ARGUMENT**

Plaintiffs' counsel's conduct represents a clear and egregious violation of the principles that underpin the legal profession's integrity. This Court has the authority and duty to impose sanctions to uphold the judicial process's dignity and ensure that such conduct does not go unchecked. Sanctions are warranted to deter future misconduct and to signal to the legal community that such behavior undermines the justice system's effectiveness and fairness.

While acknowledging Mrs. McNae's status as a pro se litigant, it is crucial for this Court to recognize the extraordinary circumstances this case has encountered following Mrs. McNae's transition to self-representation, a situation she did not have control over. Mrs. McNae, though not formally an Officer of the Court but appearing in her own defense, has shown promptness and proactive efforts in respecting this Court and adhering to the Federal Rules of Civil Procedure. Mrs. McNae submitted her first self-written Motions [DE 132 and 133] requesting an extension of time however a ruling on these had not occurred prior to the January 25 deadline for [DE 141]. Mrs. McNae submitted her Motion [DE 141] within twelve days after appearing pro se on January 11, 2024.

Mrs. McNae has endeavored to hold herself accountable to the same laws, ethical standards, and procedures that apply to the Counsel representing the Fitzgerald and Ms. De Verona. In the most recent motion [DE 149] Fitzgerald's counsel states "*Finally, R. McNae failed to comply*

with the mandatory conferral requirements set forth in Southern District of Florida Local Rule 7.3." then proceeds with "In fact, R. McNae continually refuses to confer telephonically with counsel for the Plaintiffs despite repeated requests to do so as well as the requirements of this case to confer in person or via telephone."

However less than one month ago Fitzgerald and Ms. De Verona's Counsel wrote an email to Mrs. McNae on January 17, 2024:

"I recognize that you are pro se, but the Court expects you to act appropriately and follow the rules, as do we. It would really be beneficial that you speak to us by phone on all issues so we can avoid these issues in the future. You will find that we, Ms. Gussin and I, will treat you with courtesy and respect. Finally, your motions do not contain certificates of service, in violation of the local rules.

Only filings that are made through CM/ECF can forgo the use of a certificate of service. GOVERN YOURSELF ACCORDINGLY."

While intending to communicate certain expectations and guidelines, the written correspondence mentions treating Mrs. McNae with courtesy and respect, yet the overall tone comes across as a stern directive which Mrs. McNae interpreted as a warning for non-compliance with court procedures. Further, a phrase like "the Court expects you to act appropriately and follow them" and "GOVERN YOURSELF ACCORDINGLY" are directives and were perceived as authoritarian rather than collaborative. Fitzgerald's Counsel continues to assume knowledge by a pro se litigant although Mrs. McNae is not familiar with these processes.

Additionally, due to Mrs. McNae's status as a pro se litigant and the victim of the alleged sexual assault by their client, there is a reluctance to engage in telephonic discussions with Fitzgerald's Counsel. This motion will inevitably highlight the reasons behind Mrs. McNae's hesitation to rely on telephonic conversations for resolving disputes, especially since written attempts that assert clarity have not been successful. Mrs. McNae is aware that effective conferral requires direct engagement between parties—whether face-to-face, over the phone, or via written communication—with the goal of addressing and resolving issues related to discovery, document production scope, claims of privilege, and other similar concerns. In the context of this case and considering the dynamics at play, opting for written communication provides a documented paper

5

trail that can help prevent misunderstandings and protect against potential intimidation tactics directed at a self-represented litigant.

It is crucial to recognize that the counsel for Fitzgerald is held to a high standard of ethical conduct, as outlined by the Model Rules of Professional Conduct from the American Bar Association (ABA), which most U.S. jurisdictions, including Florida, have adopted in some form. Specifically, The Florida Bar's Rules of Professional Conduct set clear guidelines for attorneys on various ethical issues, including how they communicate and cooperate with opposing parties. These rules are designed to promote professionalism, courtesy, and fairness within the legal profession, standards which, in this instance, appear to have been inadequately met.

## RULE 4-3.3 CANDOR TOWARD THE TRIBUNAL

(a) False Evidence; Duty to Disclose. A lawyer shall not knowingly:

(1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer.

(4) offer evidence that the lawyer knows to be false. A lawyer may not offer testimony that the lawyer knows to be false in the form of a narrative unless so ordered by the tribunal. If a lawyer, the lawyer's client, or a witness called by the lawyer has offered material evidence and the lawyer comes to know of its falsity, the lawyer shall take reasonable remedial measures including, if necessary, disclosure to the tribunal. A lawyer may refuse to offer evidence that the lawyer reasonably believes is false.

Remedial measures:

If perjured testimony or false evidence has been offered, the advocate's proper course ordinarily is to remonstrate with the client confidentially if circumstances permit. In any case, the advocate should ensure disclosure is made to the court. It is for the court then to determine what should be done - making a statement about the matter to the trier of fact, ordering a mistrial, or perhaps nothing.

4-3.3(a)(4) prohibits a lawyer from offering false evidence and requires the lawyer to take reasonable remedial measures when false material evidence has been offered. Florida caselaw prohibits lawyers from presenting false testimony or evidence. *Kneale v. Williams*, 30 So. 2d 284

(Fla. 1947), states that perpetration of a fraud is outside the scope of the professional duty of an attorney and no privilege attaches to communication between an attorney and a client with respect to transactions constituting the making of a false claim or the perpetration of a fraud. *Dodd v. The Florida Bar*, 118 So. 2d 17 (Fla. 1960), reminds us that "the courts are . . . dependent on members of the bar to . . . present the true facts of each cause . . . to enable the judge or the jury to [decide the facts] to which the law may be applied. When an attorney . . . allows false testimony . . . [the attorney] . . . makes it impossible for the scales [of justice] to balance." See *The Fla. Bar v. Agar*, 394 So. 2d 405 (Fla. 1981), and *The Fla. Bar v. Simons*, 391 So. 2d 684 (Fla. 1980).

**At Issue:  Yelany De Varona's (false) Affidavit Produced in Civil Litigation**

1.      On May 5, 2022, Ms. De Varona submitted an Affidavit, under oath, to the Miami Beach Police Department. Notarized by Megan Lauren Conrad, Florida State Commission #GG 968703. Produced as YEL000078-79 and used during Deposition as Exhibit 84.

2.      Paragraph 2 of the Affidavit states, "I learned of Ronda McNae in 2018 and I subsequently developed a cordial relationship with her in February 2020. Ronda and I frequently communicated and on several occasions prior to my marriage she discussed an intimate relationship she had with Michael. On more than one occasion, Ronda also advised me that she lied to Michael about being pregnant with his child. Furthermore, at no time did Ronda ever state to me that Michael raped, assaulted or committed any unlawful act against her."

3.      At the time of Ms. De Varona producing this Affidavit in February 2023, Mrs. McNae had already produced all text communication records between herself and Ms. De Varona in September 2022, **MCNAE 000540-000907**.  5 months before Ms. De Varona produced the Affidavit and 7 months before Ms. De Varona's deposition which was plenty of time to review and remediate errors. On April 12, 2023, Ms. De Varona's Deposition exposed her Affidavit as false. Correction of this affidavit was not remediated by Ms. De Varona or Fitzgerald's counsel.

4.      Ms. De Varona submitted her Affidavit to help Mr. Fitzgerald and knowingly lied to derail a criminal investigation. This Affidavit has had a direct impact on progress Mrs. McNae was making with the detectives in Miami Beach.  Two months later, Mr. Fitzgerald filed his lawsuit against Mrs. McNae.

5.      To overcome these intentional attempts to stall and derail the criminal investigation, Mrs. McNae retained Sabrina Puglisi as her Marcy's Law Advocate to directly engage the police investigation prior to her winning a seat on The Florida Bar Board of Governors.

6.      Additionally, Plaintiffs' counsel specifically added Count XXI Malicious Prosecution Against Ronda McNae, in their Amended Complaint [DE 27], to further intimidate Mrs. McNae. Fitzgerald boldly claimed that Mrs. McNae initiated three (3) criminal proceedings against Fitzgerald in Redmond, Washington; San Francisco California; and Miami Beach, Florida. Mrs. McNae commenced and caused the commencement of each proceeding as she pursued these claims against Fitzgerald in all three (3) jurisdictions. The criminal proceedings in Redmond, Washington, San Francisco, California, and Miami Beach, Florida **each had a bona fide termination in Fitzgerald's favor, in that all cases are now inactive**. Accordingly, neither the Redmond Police Department, the San Francisco Police Department, nor the Miami Beach Police Department found probable cause to pursue any claims against Fitzgerald. Mrs. McNae acted maliciously, and with knowledge that her allegations were fabricated and based upon lies, when she initiated and pursued the criminal proceedings. (Bold emphasis added).

7.      Fitzgerald's counsel knew their statements were false and misleading but entered these claims and allegations in the Amended Complaint [DE 27] anyways. Mrs. McNae is requesting this court scrutinize their accountability for making such claims knowing they were false.

8.      Text communication between Mrs. McNae and Ms. De Varona between February 2 – 14, 2020 clearly shows the fabrication by which Ms. De Varona submitted her Affidavit under oath:

| | | |
|---|---|---|
| | | But I'm just one of those ppl that believes in right and wrong and what he's done is so reckless and wrong that I |
| Yelany De Varona | 2/2/2020 10:09 | want him to pay |
| Yelany De Varona | 2/2/2020 10:10 | He's so reckless |
| Yelany De Varona | 2/2/2020 10:11 | He's so sick man |
| Yelany De Varona | 2/2/2020 10:12 | He's pathological liar |
| Yelany De Varona | 2/2/2020 10:13 | Like deeply deeply delusional |
| Yelany De Varona | 2/2/2020 10:13 | You have a family! He's so reckless |
| | | Yeah will said the same thing. I'm going to let fitz believe Will is separated from all this so he can't try to ruin |
| Ronda McNae | 2/2/2020 10:19 | wills career in any way |
| Yelany De Varona | 2/2/2020 10:19 | He's threatened to ruin Wills career?! |
| Ronda McNae | 2/2/2020 10:20 | He said if his company knew what was going on... they would protect fitz no matter the cost |
| | | I mean when I knew he was cheating on me like 2 years ago with Carrie in the UK. I hung out and hooked up |
| Yelany De Varona | 2/2/2020 10:36 | with a guy |
| Yelany De Varona | 2/2/2020 10:36 | He's never even found out |
| Ronda McNae | 2/2/2020 10:46 | He literally would make will and I think the worst of you |
| | | Did you guys already sleep together at this point or he just didn't want you guys to figure out he's a lying sack |
| Yelany De Varona | 2/2/2020 10:46 | of shit when you realize he's the drama in the equation |
| Yelany De Varona | 2/2/2020 10:47 | I dont know what to say about it he's literally so mentally ill |
| Yelany De Varona | 2/2/2020 10:47 | It's really like mental hospital status |
| Yelany De Varona | 2/2/2020 10:47 | That's all him that's drama, crazy and unstable |

| | | |
|---|---|---|
| Yelany De Varona | 2/2/2020 10:49 | Yeah! 100% he took advantage of you |
| Ronda McNae | 2/2/2020 10:50 | So I didn't know being blacked out meant you were still awake etc... I rarely go out and drink |
| Ronda McNae | 2/2/2020 10:50 | Literally just learned the Actual definition about being blacked out |
| | | It doesn't necessarily mean that you have passed out it means you have reached a level of intoxication where your brain is not writing memories and you are in capable of consent either way. In some states there's laws bc |
| Ronda McNae | 2/2/2020 10:52 | of this |
| | | |
| Ronda McNae | 2/2/2020 10:58 | So he's basically told me what happened which means he had control of the narrative of that night |
| Yelany De Varona | 2/2/2020 10:58 | That's what's fucked up |
| Ronda McNae | 2/2/2020 10:59 | The time following... days and weeks... I couldn't make sense of it but I had to keep it inside. |
| Yelany De Varona | 2/2/2020 10:59 | He was coherent and that's what's fucked up and considered rape |
| Ronda McNae | 2/2/2020 10:59 | Then he's texting me and calling me... telling me he wants to be w me and we need to talk. |
| | | He insisted on coming to see me one weekend in November but I said I was out of town visiting my niece in San Francisco then he insisted on coming and meeting me there while I was exploring the city so that we could |
| Ronda McNae | 2/2/2020 11:00 | talkâ€¦ |
| Yelany De Varona | 2/2/2020 11:00 | Wow I can see how that eats you up inside |
| Ronda McNae | 2/2/2020 11:01 | Will feels he fucked up in Miami all along and wanted to cover it by seeing me on SF... |
| | | However will feels that he force that time together one to get whatever he wanted and make me believe he |
| Ronda McNae | 2/2/2020 11:01 | really wanted something togetherâ€¦ However will think that was his way of covering his tracks about Miami |
| Yelany De Varona | 2/2/2020 11:02 | That's what he does to everyone!!i |
| Yelany De Varona | 2/2/2020 11:03 | He's like I had to leave Ronda, she was getting possessive and  acting crazy |
| Ronda McNae | 2/2/2020 11:03 | He left and I was still in sf. Literally bawling my eyes out |
| Yelany De Varona | 2/2/2020 11:03 | Omg he twisted that night |
| Ronda McNae | 2/2/2020 11:03 | I was testing him... and he fucking flipped it on me. Literally made me think I was nuts |
| | | He was sooooo |
| Ronda McNae | 2/2/2020 11:03 | Defensive and I had that feeling in the pit of my stomach somethings seem so off |
| | | |
| Yelany De Varona | 2/2/2020 11:07 | Dude he straight up lied to my face when I showed him his tinder profile |
| Yelany De Varona | 2/2/2020 11:07 | He's like someone must of hacked me |
| Yelany De Varona | 2/2/2020 11:07 | Bc I caught him on that shit once |
| | | These are messages I found between him and Carrie. He saved her as Chris and I was on his iPad when he was |
| Yelany De Varona | 2/2/2020 11:11 | out of town once Bc my computer wasn't working.. |
| Yelany De Varona | 2/2/2020 11:12 | And I discovered they were talking again for the second time |
| Yelany De Varona | 2/2/2020 11:12 | But if you read it. They are talking about me figuring out they are talking again |
| Yelany De Varona | 2/2/2020 11:15 | This is their convos. It's so sick Bc he does the same thing to me |
| Yelany De Varona | 2/2/2020 11:16 | Always talking about sex ugh |
| Yelany De Varona | 2/2/2020 11:34 | He has mentioned how you were an actress and praised about it. Like proud to be your friend |
| Ronda McNae | 2/2/2020 11:40 | I feel stupid I fell into his trap |
| Yelany De Varona | 2/2/2020 11:42 | Like how was I so dumb to intertwine my life with this person |
| Yelany De Varona | 2/2/2020 11:43 | From the beginning, he was like oh let's get this car for you. I'll pay it and it was clearly a trap |
| Yelany De Varona | 2/2/2020 11:43 | Lets use your American CC for my expenses so you can get points for travel faster |
| Yelany De Varona | 2/2/2020 11:43 | Ugh I'm such a sucker |
| | | |
| Yelany De Varona | 2/2/2020 12:11 | He's mentally unfixable I think |
| Ronda McNae | 2/2/2020 12:12 | Yeah I want to see how far he goes with lies... to also help you ya know |
| Yelany De Varona | 2/2/2020 12:19 | He loved your family dynamic |
| | | I've taken him to points where he is crying his eyes out, shaking and saying he doesn't know wl |
| Yelany De Varona | 2/2/2020 12:31 | up and doesn't want to be but it's the darkness inside him |
| Yelany De Varona | 2/2/2020 12:31 | I dont know it's crazy |
| Yelany De Varona | 2/2/2020 12:31 | That his mind plays with him |
| Yelany De Varona | 2/2/2020 12:48 | Tell him you need some money for tests or something lol |
| Yelany De Varona | 2/2/2020 12:49 | He says outlandish lies why can't you |
| Yelany De Varona | 2/2/2020 12:49 | I dont know say will dropped you |
| Yelany De Varona | 2/2/2020 15:44 | Other than the fact that it's his sport of choice. Lying that is |
| Ronda McNae | 2/2/2020 17:55 | He wanted me to keep things a secret from October until end of January |
| Yelany De Varona | 2/2/2020 17:55 | I mean I'm riding this out till May |

**Yelany De Varona**

So I can keep him content for a couple months or when I have my shit together and save up a few more pay checks
Feb 13, 2020, 5:30 PM

**Yelany De Varona**

I need him to pay off my credit card he has money on and I don't know if tell him I was in on you lying about a baby will make him feel in debt to me. He plays the victim in every scenario

Feb 14, 2020 3:51 AM

## RULE 4-4.1 TRUTHFULNESS IN STATEMENTS TO OTHERS

While representing a client a lawyer shall not knowingly: (a) make a false statement of material fact or law to a third person.

Misrepresentation:

A lawyer is required to be truthful when dealing with others on a client's behalf, but generally has no affirmative duty to inform an opposing party of relevant facts. A misrepresentation can occur if the lawyer incorporates or affirms a statement of another person that the lawyer knows is false. Misrepresentations can also occur by partially true but misleading statements or omissions that are the equivalent of affirmative false statements.

### At Issue:  Conferrals with Prior Counsel for Ronda and William McNae

1.      Fitzgerald's counsel has repeatedly failed to adhere to the proper procedures of conferral that they themselves are blaming Mrs. McNae for [DE 149]. Three such examples of misrepresented conferrals were documented by Mrs. McNae's prior counsel, AFW and Stephanie Casey (William McNae's Counsel in this Case):

- Notable absence of conferral regarding the Plaintiff's Motion to Amend Complaint, filed on December 16, 2022 (DE 24). This lack of communication was duly highlighted by Mrs. McNae's previous counsel, AFW, in her response (DE 26, pages 1-2).
- Plaintiffs' Counsel failed to adequately confer with Ms. Stephanie Casey, counsel for William McNae, before submitting the Motion for Determination of Entitlement to Fees. This omission was also noted by Ms. Stephanie Casey (DE 118, pages 2-3).
- Plantiffs' counsel exploited the fact that Mrs. McNae was navigating her case without legal representation and intentionally induced confusion, wasted both judicial and personal resources from January 12, 2024, until early February. This period of turmoil persisted until Hon. Judge Martinez granted Mrs. McNae's request for an extension of pretrial dates and trial date. In this span, the Court saw roughly ten new docket entries and the submission of eight motions or responses ALL related to Ms. Gussin and Mr. Berlowe refusing to engage

10

in a proper 'conferral' using written communication. Had Plaintiffs' counsel cooperated with Mrs. McNae's attempt to 'confer' on January 12, 2024, this unnecessary expenditure of time and resources could have been avoided. Hon. Judge Martinez, "*Specify the precise dates for each extension requested.*"

> **Notice of Electronic Filing**
> The following transaction was entered on 1/12/2024 at 11:20 AM EST and filed on 1/12/2024:
>
> **Docket Number: 128**
>
> **PAPERLESS ORDER** denying without prejudice [127] Motion for Extension of Time. Plaintiffs are hereby directed to refile this Motion on or before Friday, January 19, 2024 and specify the precise dates for each extension requested, excluding the calendar call and trail dates which this Court will set. Signed by Judge Jose E. Martinez on 1/12/2024.

Mrs. McNae's attempt at conferral below:

> **January 12, 2024:** Mrs. McNae wrote to Plaintiffs' counsel: "*I have carefully reviewed the Judge's recent order. Could you specify the exact dates you have in mind for the upcoming proceedings? I am in the process of preparing my motion for fees and costs pertaining to Ms. De Verona. Additionally, I intend to file a separate motion to request an extension for my reply to document (105).*"

## At Issue:  Misrepresentation and Lack of Truthfulness to a Third Person

1.      P. Sanchez was Mr. Fitzgerald's girlfriend from June – October 2019, and had become friends with Mrs. McNae during this time. Because of communications produced by Mrs. McNae, Fitzgerald's counsel became aware of alarming details that could potentially damage Mr. Fitzgerald's claims of truthfulness and expose details of his behavior. Correspondence begins in November 2019 as Mrs. McNae was attempting to unravel the severity of harm done to her by Fitzgerald.

| | | |
|---|---|---|
| Ronda McNae | 11/17/2019 20:20 | How's the love life? And don't you worry I'm not repeating a single thing.. ðŸ˜¬ I had a desire to reach out before to check in but I didn't know how or what to say. But if you spend enough time with someone... and take a step back... you slowly start piecing together conversations & behaviors. Not that I'm perfect ðŸ˜¥😆™ðŸ˜¢ lord knows I'm a piece of work. |
| | | Ah gosh I'm sorry sorry that you're going through that ðŸ˜ž I can't imagine what that feels like. The thing that actually helped me was welcoming all my emotions, even the bad, instead of suppressing them and dealing with them one day at a time. And I've been wanting to reach out to you! I just didn't know how you perceived me and fitz breaking it off. And if there was any hard feelings. But I'm so glad you made the first move here haha because I've definitely missed ya! |
| Patrice Sanchez | 11/17/2019 20:38 | And honestly I've been focusing on a lot of girlfriend time lately instead of trying to jump into another relationship.. but of course don't mind it when I get a free drink at the bar :) |
| Ronda McNae | 11/17/2019 20:40 | Bahahahahaha free drink - hell yes |
| | | Yeah. I'm trying to get into a recovery week for sex abuse. I went 5 years ago and it was painful as hell! But I'm at a place where I need to do it again and make sure I continue counseling etc. a couple things happened this year and I'm now looking back realizing I didn't work through as much as I should have ðŸ˜¥ðŸ˜¢ðŸ˜¥ |
| Ronda McNae | 11/17/2019 20:44 | Yeah, well it took a bit of time to recognize he may have not been as up front and as honest about stuff  All things you find out over time |
| Ronda McNae | 11/17/2019 20:45 | Yeah... I feel like I'm the same. I welcome my emotions.. but to most people who don't   . they think it's me being a nightmare ðŸ˜œðŸ˜« |
| Ronda McNae | 11/17/2019 20:45 | I was definitely doing a lot of suppressing |
| | | But that's good that you atleast acknowledged that you want to pursue recovery counseling, that's more than most people in the situation can say. |
| | | Oh and I'm pretty sure people thought I was crazy too... I have a whole Spotify playlist titled ðŸ˜¢saddlesðŸ˜¢ |
| Patrice Sanchez | 11/18/2019 7:54 | because they're my fav songs to cry to ðŸ˜¢ðŸ˜¢ |
| Ronda McNae | 11/18/2019 7:57 | Omg I want your playlist |
| Patrice Sanchez | 11/18/2019 8:02 | https://open.spotify.com/user/1265022852/playlist/52YcMUjqmqpeSGkVvMbqsj?si=Dcfznj8jQyOjP91JhyTngA |
| Ronda McNae | 11/18/2019 8:04 | I'm gonna send you mine ðŸ˜‰ once i make it Hahahaha |
| Ronda McNae | 11/18/2019 8:05 | Question . this stays between you & me. |
| | | Do you feel Mike had/has destructive behavior? He seems to be super hot and cold but will gladly point that out in others |
| Ronda McNae | 11/18/2019 8:06 | Yes I definitely saw that behavior. One minute he would send me a breakup text and then the next day be upset with me if I had agreed to move on. Like I had a very hard time reading him at times |
| Patrice Sanchez | 11/18/2019 8:09 | |

2.      To understand the magnitude of P. Sanchez's testimony as a Witness, excerpts from Exhibit A will be shared (MCNAE 000446-000539, MCNAE 000985-001020, and MCNAE 002901-002920):

3.      P. Sanchez to Mrs. McNae: *"I texted my best friend the night after he asked me to be his girlfriend. He later convinced me that I was so drunk that I kind of begged him to be his girlfriend, which is not characteristic of me. My friends even commented, 'That doesn't sound like you."* P. Sanchez expressed her realization of being manipulated, stating, *"He mind fucked me from the very beginning,"* and *"I saw signs of manipulative behavior, which my friends noticed too. I'm embarrassed I chose to ignore it then."*

4.      P. Sanchez then expressed concerns for Mrs. McNae's own safety in relation to Fitzgerald, asking, *"Do you have a restraining order against him? I would lose my shit if I thought I saw him."* P. Sanchez further articulated her perception of Fitzgerald's influence and deceit, stating, *"He has enough money to do whatever he wants and make things go away. He lied about everything, his intentions were cruel no matter the state of mind he was in, he's probably the worst person I've ever crossed paths with."*

5.      Reflecting on Fitzgerald's actions, P. Sanchez remarked, *"But what he did was disgusting and calculated."* Regarding legal action, P. Sanchez expressed, *"Ugh, he's lied to so many people for so long. I'm glad you decided to take legal action...he needs consequences for his insane behavior." "I'm glad they are doing an investigation on him, there is a lot to uncover with that man."*

6.      P. Sanchez encouraged resilience against Fitzgerald's deceptive tactics, saying, *"You definitely shouldn't feel stupid; he was so good at his lies, which actually makes him dangerous. Maybe they'll send him back to the UK."* Then goes on to describe her decision to cease communication with Fitzgerald and shared, *"I had my mind set that weekend (October 19-20, 2019) I didn't want to talk to him again. A compilation of things started surfacing where I had a gut feeling he was psychotic."*

7.      Correspondence continued between Mrs. McNae and P. Sanchez into May 2020. Following P. Sanchez's review of the information compiled by Mrs. McNae, she commented: *"I'm reading through everything right now. And I'm this all truly insane. Even after he raped you and tried to meet you 1x1 was totally his way to plant the seeds of somehow planning to turn this back around on you. I will say, he mastered the art of lying and manipulation. Fucking sick to my stomach reading his life of lies. Well Will is a saint for not completely destroying this man with his bare hands after Mike cornering him at work. He mind fucked everyone in his path. He definitely said exactly what he thought each individual wanted to hear, multiple identities. Oh definitely I'm sure he had a plan the whole time. And if he went out of his way to get to you in SF that is harassment."*

8.      Finally, in response to reviewing a series of screenshots that Ms. De Varona had shared with Mrs. McNae, P. Sanchez then stated to Mrs. McNae, *"Oh wow proof that he is fully aware of his aggressive behavior that night and admitted to assaulting you twice".* (MCNAE 004428, 004391, 004415, 004433):





9.      Prior to P. Sanchez's deposition which was scheduled by Fitzgerald's counsel, an email was sent from Ms. Gussin to P. Sanchez as stated below (and previously mentioned in DE 105). This email deliberately misrepresented the facts and allegations of this case with an intent to intimidate P. Sanchez through the sharing of untruthful statements.   These statements Fitzgerald's counsel knew prior to sending this email were not true and would negatively influence P. Sanchez because she had already stated to Mrs. McNae she would *"lose her shit if she thought she saw him"* (see ¶ 4).  This lack of truthfulness to a Witness should not be tolerated and certainly not be protected under Civil Litigation Privileges of Protection.

From: Meredith J. Gussin

Sent: Monday, January 23, 2023 4:11 PM

To: patricedeonne@gmail.com

Subject: Michael Fitzgerald/Ronda McNae

        *"As you know, in late 2019 after you and Mike ended your relationship, Mike and Ronda engaged in a brief, consensual affair. Months after, Ronda lied to Mike telling him that she was pregnant with his child. Ronda also falsely and maliciously accused Mike of sexually assaulting her, filing police reports in three (3) different states, all of which found her accusations baseless and contrary to the evidence. Mike is extremely distraught over this, as you can imagine. In Mike's civil lawsuit against Ronda, Ronda produced her text*

14

*history between you and her, in which she told you that Mike raped her. Taking her word as true, it is understandable that you would be angry and appalled. However, as stated, none of what Ronda has said about Mike is true. Ronda's attorneys have intimated that they will be calling you at trial to claim that Mike raped you as well in Tulum. It is critical that we speak to you to understand if, in fact, that will be your testimony."*

When a lawyer attempts to speak with another victim of the same perpetrator, particularly in a case involving rape or sexual assault, several legal and ethical considerations come into play, which can vary by jurisdiction. Ethical issues:

1. Violation of Professional Conduct Rules: Most jurisdictions have rules of professional conduct for attorneys that prohibit engaging in actions that can harass or intimidate witnesses or parties involved in a case. Communicating with another victim without proper legal context or safeguards could be seen as an attempt to unduly influence or intimidate, which would be against these rules.

2. Interference with an Ongoing Investigation or Case: If the case is currently under investigation or in court, attempting to contact another victim could be seen as interference with the process, especially if done in a way that could influence testimony or involvement.

3. Potential for Witness Tampering: If the contact is intended to influence the victim's testimony or willingness to participate in legal proceedings, it could be considered witness tampering, which is a criminal offense.

9.      The criminal investigations in Miami and San Francisco are still open: (1) Miami Beach Police Department Case NO: 2021-54358 and (2) San Francisco Police Department Case NO: 199-005-331. Fitzgerald and his counsel believe, since there hasn't been recent activity with criminal charges, these investigations are closed. Considering the number of reported crimes within South Florida and San Fransico, it's understandable this process can last a considerable amount of time and even take years to prosecute. Mrs. McNae filed a courtesy report in Redmond, WA to help reduce the requirement for traveling to San Francisco to provide her statement in-person. After a Detective was assigned, Mrs. McNae traveled to San Francisco to deliver supplemental case information. William McNae filed a report with the Redmond Police due to Fitzgerald telling him in-person on the Microsoft campus he "*would destroy someone if they set him off*". This was

received as a threat and caused him to not only worry about his own personal safety but for his family as well knowing Fitzgerald had already demonstrated erratic and unpredictable behavior.

10.    October 25, 2022, Fitzgerald, through his counsel, contacted Mrs. McNaes (half) brother-in-law, David Robert Carpenter and suggested that Mrs. McNae was likely to retaliate against him for his voluntary participation in this case and that he wanted to set Mrs. McNae's brother-in-law's deposition "*so that any retaliation Ronda [McNae] might take will look like witness tampering.*" (FITZ 00001912) noted in [DE 105]. (See Exhibit B). Ironically, despite Mr. Berlowe having authored and shared detailed emails with his client, David R. Carpenter neither repeated nor referenced any of these details during deposition, leaving Mrs. McNae to question what David R. Carpenter stated and whether or not this was an intentional act of misrepresentation by Fitzgerald.

11.    In April 2023, Fitzgerald's counsel shared untruthful statements related to Mrs. McNae to Marisa Carew and her daughters that Mrs. McNae was "*ruining lives*". Counsel for Fitzgerald knew that by sharing comments such as this with the Carew family it would damage Mrs. McNae's character throughout her community of friends in Kirkland, WA. Marisa Carew made statements to Mrs. McNae via text communication in 2020, such as "*this is probably wrong but it would be great to take him down and somehow get his money while he's in jail*". Moreover, once Counsel for Fitzgerald contacted Marisa Carew, she suddenly had a new narrative of the circumstances and story around Mrs. McNae. This became evident during Marisa Carew's Deposition when she learned Mrs. McNae saved ALL prior correspondence which contradicted her sworn testimony and declaration made under oath. Marisa Carew continued to spread false statements to others within the Kirkland Community which stemmed from conversations Marisa Carew had with Ms. Gussin. During several depositions Ms. Gussin mentioned the name Kelly Radcliff, who is not a party to the case. Since the time of depositions, the McNae family has been ostracized and their children are no longer invited to social gatherings. Ms. Gussin's statements that Mrs. McNae is "*ruining lives*" and she is "*extremely dangerous*" has surfaced in the community. The behavior from Kelly Radcliff has affected the McNae's children the most which has lead to make several reports made to our children's school, even requesting the administrator's ongoing oversight.

| Ronda McNae | [Number Unknown] | 2/20/2020 18:56 | he studies you... learns you and uses it to his advantage |
| Ronda McNae | [Number Unknown] | 2/20/2020 18:56 | Full on psychopath |
| Marisa Carew | +1 206-650-3514 | 2/20/2020 18:56 | FULL |
| Ronda McNae | [Number Unknown] | 2/20/2020 18:56 | Both his gf and I fell that way |
| Marisa Carew | +1 206-650-3514 | 2/20/2020 18:57 | Hope she get some of his money |
| Ronda McNae | [Number Unknown] | 2/20/2020 18:57 | I know... |
| Ronda McNae | [Number Unknown] | 2/20/2020 18:57 | Oh funny he wanted to â€œhelpâ€ cover my counseling costs |
| Ronda McNae | [Number Unknown] | 2/20/2020 18:57 | I said, is this your idea of hush money bc I've figured you out |
| Ronda McNae | [Number Unknown] | 2/20/2020 18:57 | He just said haha |
| Ronda McNae | [Number Unknown] | 2/20/2020 18:58 | Will called a lawyer.. it's just a sticky situation. I just want him to actually cover all my counseling. This is probably wrong but it would be great to take him down and somehow get his money while |
| Marisa Carew | +1 206-650-3514 | 2/20/2020 18:59 | he's in jail |
| Ronda McNae | [Number Unknown] | 2/20/2020 19:02 | Hahahaha I'm definitely at that point where I want revenge |
| Ronda McNae | [Number Unknown] | 2/20/2020 19:02 | It's terrible |
| Ronda McNae | [Number Unknown] | 2/20/2020 19:03 | He turned my life upside down and hardly takes any ownership |
| Ronda McNae | [Number Unknown] | 2/20/2020 19:05 | Honestly he already said he would send me $1500 monthly for a year to cover counseling. And wanted me to sign an agreement which included me basically not talking to anyone about it or him |
| Ronda McNae | [Number Unknown] | 2/20/2020 19:06 | I honestly don't want to â€œtake him to the cleanersâ€ I just want him to know I know he's f'ing nuts |
| Ronda McNae | [Number Unknown] | 2/20/2020 19:07 | And cover my counseling bc it's $150 twice a week right now.. |
| Marisa Carew | +1 206-650-3514 | 2/20/2020 19:07 | Ya NOOO |
| Marisa Carew | +1 206-650-3514 | 2/20/2020 19:07 | He can definitely pay for counseling but you ha e every right to talk about him |
| Ronda McNae | [Number Unknown] | 2/20/2020 19:08 | What I eventually said was.. I'm not signing anything that keeps me from defending Wills character if you ever tried to bring him down |

59                                                        MCNAE 004743

12. Also, in the April – May 2023 timeframe, counsel for Fitzgerald continued to share untruthful statements that were not representative of fact with Chris & Stephanie DiJulio. The DiJulio's did not know Michael Fitzgerald and were not involved in the Florida case in any way. The DiJulio's had made allegations towards Mrs. McNae which were unfounded, frivolous, and fully dismissed by the King County Judge. Counsel for Fitzgerald seized this opportunity to spread untruthful statements with the DiJulios and their legal counsel which ultimately led to Fitzgerald submitting a voluntary Declaration that intended to directly damage and malign Mrs. McNae's character, including:

- Mrs. McNae *"hurt people"*, was *"extremely dangerous"*, and stated or implied that Mrs. McNae was a criminal who was guilty of blackmail or extortion. (FITZ00001688) and included in [DE 105].

- Fitzgerald and his counsel took this opportunity to submit their Amended Complaint [DE 27] in this non-related court proceeding which contains counts and allegations subsequently dismissed by this Court (DE 83 August 2023).

- Fitzgerald's declaration which was submitted by his counsel was full of untruthful statements and allegations not backed up by fact. This excerpt demonstrates their complete lack of professionalism and assumed protection from the civil litigation privileges which should not govern non-related litigation:

17

*"Ms. McNae exhibits poor boundaries and tramples over other people's boundaries without regret or remorse to get what she wants. When Ms. McNae is confronted about boundary transgressions or other negative actions she may have taken, she deflects blame from herself by blaming others, minimizing her role, justifying her actions, and causing distraction by hyperbolizing and exaggerating other people's behaviors so the focus is not on her. She is extremely dangerous and will stop at nothing until she gets her way. She does not take any responsibility for where she may have been at fault. My advice to the DiJulio family if they are seeking to distance themselves from Ronda McNae is: You should not walk away from her; rather you should run!"*

- Mrs. McNae's children were removed from their elementary and middle schools, which at the time was Cedar Park Christian School, due to the compounding false statements and allegations made worse by Fitzgerald's counsel.

- To date, no accountability has been required of Fitzgerald or his counsel for the statements made which were false and lacked truth.  However, Mrs. McNae's children have suffered considerable damage to their reputations and feelings of ostracization by rumors and gossip that has been spread by families known to have communicated with Ms. Gussin: the DiJulios, Carews, and likely Kelly Radcliff.



18

13.     This legal battle has taken a profound toll on the McNae family including their children who have witnessed the effects of this stress and ongoing struggle for justice firsthand. Prior to appearing as a pro se litigant in January 2024, Mrs. McNae attempted to negotiate closure with Fitzgerald's counsel in an effort to resolve this matter prior to the holidays so that her family could begin to move on in fear of litigation without representation. Mrs. McNae realized the importance to continue searching for legal counsel due to this excerpt below:

> On Sat, Dec 23, 2023 at 8:24 AM
>
> Meredith J. Gussin wrote:
>
> *"Dear Mrs. McNae,*
>
> *("Confidentiality and non-disparagement remain imperative for our clients, which would include prohibiting your children from disparaging Mr. Fitzgerald as well. Please send us a proposal at your convenience so we can convey same to our clients.")*
>
> *Thank you, Meredith"*

The McNae Children, ages of 11 and 13, are minors and lack legal capacity to make any legally binding decision such as this. It is highly improper for an Attorney to suggest such claims of minors which further intimidates, causes extreme fear, and angst that Plaintiffs' Counsel believe they can prevent the McNae children from exercising their first amendment right.


## RULE 4-4.2 COMMUNICATION WITH PERSON REPRESENTED BY COUNSEL

(a) In representing a client, a lawyer must not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer.

The prohibition on communications with a represented person only applies in circumstances where the lawyer knows that the person is in fact represented in the matter to be discussed. This rule contributes to the proper functioning of the legal system by protecting a person who has chosen to be represented by a lawyer in a matter against possible overreaching by other lawyers who are participating in the matter, interference by those lawyers with the client-lawyer relationship, and the uncounseled disclosure of information relating to the representation.

**At Issue:  Meredith Gussin's voicemail deposited on Ronda McNae's mobile phone**

- January 2, 2023 at 3:43PM (PT)

Mrs. McNae received a phone call and voicemail from: (305) 793-5642 on Mrs. McNae's personal cell phone, which stated:

*"Hi, my name is Meredith Gussin I'm an attorney with Assouline and Berlowe. We represent Michael Fitzgerald pending between Mr. Fitzgerald and Ronda McNae. You were listed as an individual that might have information and I was hoping you could give me a call back. If you are represented by counsel already, please do let me know. My phone number is (305) 793-5642, that's my cell phone if you get a moment and give me a call back, I'd appreciate it. Thanks so much, take care. Bye"*

- This voicemail was reported and shared with counsel, AFW. AFW had been representing Mrs. McNae since August 2022. After 5 months into this case, this cannot be considered a mere 'mistake' or 'accident' in this profession. This voicemail message sent Mrs. McNae into a full panic attack that was witnessed by her husband and children.


## CONCLUSION

WHEREFORE, in light of the foregoing, Defendant Ronda McNae respectfully urges the Court to exercise its authority and discretion under the relevant legal standards to impose appropriate sanctions. This request is made considering the gravity of the circumstances and the need to uphold the integrity of the judicial process. Mrs. McNae seeks such sanctions as the Honorable Judge Martinez deems just and equitable, to address the issues presented in this motion and to serve as a deterrent against future similar conduct. Additionally, Mrs. McNae requests any further relief the Court finds appropriate under the circumstances. This request is made in the interest of justice and the fair administration of the legal process.


Dated February 13, 2024

Respectfully submitted,

By: *Ronda McNae*
Ronda Delapina McNae
Pro se Defendant
504 11th Pl, Kirkland, WA 98033
Tel: (206) 914-6752
Prose.rmcnae@gmail.com

20

## Witness List:

**Stephanie Casey, Esq.**

COLSON HICKS EIDSON, PA

255 Alhambra Circle, Penthouse

Coral Gables, FL 33134

Tel: 305-476-7400

Fax: 305-476-7444

scasey@colson.com

*Counsel for William McNae in Federal Court*

**Alaina Fotiu-Wojtowicz, Esq.**

BFW - Brodsky Fotiu-Wojtowicz

200 SW 1st Street, Suite 400

Miami, Florida 33131

Tel: 305-503-5054

Fax: 786-749-7644

alaina@bfwlegal.com

*Former counsel for Ronda McNae*

# Exhibit A



Ronda McNae

It was humiliating having to learn the definition of "consent" a year ago    4:54 PM

Patrick Sanchez

He is so fucking sick    5:13 PM

Ronda McNae

We need to report it    4:53 PM

Ronda McNae

The night after he raped me, he had sex with yealny.... While telling me he wants to be with me and move to seattle... Then calls you hours later wanting to be w I    5:12 PM

Patrick Sanchez

There was definitely times he was more aggressive than I was comfortable with    4:52 PM

Ronda McNae

He threatened Will at work... but MS did nothing about it    5:10 PM

Patrick Sanchez

There was actually one night in tulum where I didn't want to have sex and he told me to shut the fuck up and pushed me on the bed and started having sex with me from behind    4:52 PM

Ronda McNae

No... but I'm thinking I need too now    5:09 PM

Patrick Sanchez

Everything is calculated for him he knew what he was doing    4:45 PM

Page 29

MCNAE 000474

# Exhibit B



**Peter E. Berlowe**
To: Michael  Cc: Pat >                    Saturday

## RE: Screenshot 2022-07-16 at 10.48.16 AM

Michael, I know we spoke, but I wanted to get my notes of my call with David Carpenter in writing.

Items of Noted from Call With David Carpenter:

- David & Gretchen Carpenter have had years of trouble with both Ronda and Will. Will is David's half brother. Ronda and Will removed Will and David's mother from her home, brought her to their home in Washington. Got her to sign a power of attorney over her assets to Will. Once signed, they put her in a home and have been using her assets for their personal gain. When David confronted Ronda and Will about stealing the mother's money, Ronda started accusing David's underage son, Ryan, of sending "dick picks" to an underage girl. Ronda told family and mutual friends about this, but never said anything to David or Gretchen. Then Ronda reported their under age son to the Seattle Police Department sex crimes unit. The first time they heard about this was when the Seattle Police came to them. Both the son and the girl denied having any knowledge of the "dick picks" and had no clue about what Ronda



3:51                              LTE

Screenshot 2022-07-...

became contentious litigation between the Carpenters and Ronda and Will, which settled, but the families no longer have direct contact with each other. It has been quiet for a couple of years.

- David's daughter is the Ronda's niece who was playing soccer in San Francisco when Michael and Ronda met there. David says Will was supposed to go on that trip, but had to drop out due to a work related matter that popped up. While Ronda was in San Francisco, David says Will called him and told them that Ronda cheated on him in Miami and Will no longer felt the marriage was worth fighting for, because this was not her first affair (more below on that). David's daughter told him that while Ronda was in San Francisco, she met with the daughter and told the daughter that she thought her marriage to will was over and that they would be getting divorced. She told the daughter that there was no more love in the marriage.
- Years ago, Ronda and Will had gotten involved with a City Church sponsored foster care program where they agreed to foster three children and in exchange, the church gave Ronda and Will a house to live in. Ronda cheated on Will with the next door neighbor. Somehow, the church found out about Ronda cheating on Will, and the church kicked Ronda and Will out of the foster program, throwing them out of the house 3 weeks before Christmas. The children were removed from their care.
- While at Northwest College, Ronda had a



3:51                              LTE

Screenshot 2022-07-...

about Ronda cheating on Will, and the church kicked Ronda and Will out of the foster program, throwing them out of the house 3 weeks before Christmas. The children were removed from their care.
- While at Northwest College, Ronda had a consensual relationship with a fellow male student. She accused the student of raping her. The college investigated, determined Ronda was lying and kicked her out of the college.
- David says Ronda is obsessed with the Basketball Wife life, and always has been. She is very into hanging out with rich people and leaching off their wealth.
- Ronda has regularly used an attorney named Mark Lean (spelling??) to go after people.
- Will had a history of dating girls in distress, who he would try and solve their problems. David thinks this is what attracted Will to Ronda in the first place.
- David said he would be surprised if Ronda can even get pregnant. He thinks she had a procedure (tubes tied??) to avoid pregnancy, because her pregnancies with her two children were so hard on her that there was a fear that she could die if she had another labor.
- David Carpenter can be reached at: ████████████████████ or

**Peter E. Berlowe, Esq.**
**Business and Intellectual Property Litigation**

# Exhibit B-3

Evidence showing opposing counsel implied McNae's minor children would be restricted by a new settlement agreement NDA

On Sat, Dec 23, 2023 at 8:24 AM

Meredith J. Gussin wrote:

*"Dear Mrs. McNae,*

*("Confidentiality and non-disparagement remain imperative for our clients, which would include prohibiting your children from disparaging Mr. Fitzgerald as well. Please send us a proposal at your convenience so we can convey same to our clients.")*

*Thank you, Meredith"*

# Exhibit C-1

Order Denying Motion to Supplement the Record by McNae as Pro se litigant, DE 292

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

**Case Number: 22-22171-CIV-MARTINEZ**

MICHAEL FITZGERALD
and YELANY DE VARONA,

     Plaintiffs,

v.

RONDA MCNAE and WILLIAM MCNAE,

     Defendants.

_____/

## OMNIBUS ORDER DENYING DEFENDANT'S MOTIONS TO SUPPLEMENT RECORD TO INCLUDE DEPOSITION TRANSCRIPTS

**THIS CAUSE** came before this Court upon *pro se* Defendant Ronda McNae's Motion for Leave to Supplement the Record to Include Deposition of Treating Therapist Sarah Dellinger, (ECF No. 224); Motion for Leave to Supplement the Record to Include Deposition of Treating Therapist Dr. Brock Weedman PsyD, (ECF No. 230); and Motion for Leave to Supplement the Record to Include Trauma Expert Deposition of Dr. Jim Hopper PsyD, (ECF No. 242) (collectively "Motions to Supplement Record"). This Court has reviewed the Motions to Supplement Record; Plaintiff Michael J. Fitzgerald's Responses, (ECF Nos. 232, 233, 246); Defendant's Replies, (ECF Nos. 235, 253); pertinent portions of the record, and applicable law and is otherwise fully advised in the premises. Accordingly, for the reasons set forth herein, the Motions to Supplement Record are **DENIED**.

Defendant McNae seeks to "supplement the record" with deposition transcripts of her treating therapists and trauma expert. Although there is no "record" to "supplement," the Court construes these Motions to Supplement the Record as motions in *limine* asking this Court to

include the deposition transcripts as evidence in trial. However, the deadline to submit motions in *limine* was September 23, 2024, per this Court's Order extending certain pretrial deadlines. (ECF No. 168). Moreover, the deposition transcripts would be inadmissible hearsay if Defendant's treating therapists and trauma expert were to testify at trial. *See* Fed. R. Evid. 801(c).

Accordingly, it is **ORDERED AND ADJUDGED** that:

1.  Defendant's Motions to Supplement Record, (ECF Nos. 224, 230, 242), are **DENIED**.

2.  Defendant's Motion to Amend and Correct Certificate of Service, (ECF No. 229), is **DENIED**.

3.  Defendant's Motion to Correct Exhibit, (ECF No. 255), is **DENIED**.

4.  Defendant's Motion for Leave to Amend Motion to Correct and Supplement Exhibit, (ECF No. 259), is **DENIED**.

5.  Defendant's Motion for Leave to File Errata, (ECF No. 260), is **DENIED**.

6.  The Clerk is **DIRECTED** to **RESTRICT** ECF Nos. 224, 230-1, 242, 253, 255, 259.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 7th day of February 2025.

_____
JOSE E. MARTINEZ
UNITED STATES DISTRICT JUDGE

Copies provided to:
All Counsel of Record
Ronda McNae, *pro se*

2

# Exhibit C-2

Order Denying Motion to Supplement the Record by McNae as Pro se litigant, DE 295

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

**Case Number: 22-22171-CIV-MARTINEZ**

MICHAEL FITZGERALD
and YELANY DE VARONA,

     Plaintiffs,

v.

RONDA MCNAE and WILLIAM MCNAE,

     Defendants.

_____/

## ORDER DENYING DEFENDANT'S MOTIONS TO SUPPLEMENT RECORD

**THIS CAUSE** came before this Court upon Defendant Ronda McNae's *pro se* Motions for Leave to Supplement the Record, (ECF Nos. 231, 245), (collectively "Motions to Supplement the Record"). This Court has reviewed the Motions to Supplement Record; Plaintiff Michael J. Fitzgerald's Responses, (ECF Nos. 234, 248); Defendant's Reply, (ECF No. 252); pertinent portions of the record, and applicable law and is otherwise fully advised in the premises. Accordingly, for the reasons set forth herein, the Motions to Supplement the Record are **DENIED**.

Defendant McNae seeks to "supplement the record with critical, newly uncovered evidence deliberately withheld by Plaintiff Michael Fitzgerald and respondent SoftwareONE" and provide this Court "with access to all relevant facts from *Jane Doe v. SoftwareONE, Inc.*, 85 Cal. App. 5th 98 (Cal. Ct. App. 2022)." (ECF No. 231 at 1). Although there is no "record" to "supplement," the Court construes these Motions to Supplement the Record as motions in *limine* asking this Court to include certain evidence in trial. However, the deadline to submit motions in

*limine* was September 23, 2024, per this Court's Order extending certain pretrial deadlines. (ECF No. 168).

Moreover, the Federal Rules of Civil Procedure that Defendant McNae relies on do not support the relief she seeks. Defendant first cites Federal Rule of Civil Procedure 15(d) as authority to support her Motion, however, Rule 15(d) relates to amending and supplementing pleadings, not adding documents into evidence. Defendant does not have a pleading to amend in this matter and the deadline to do so has long passed. (*See* ECF No. 7). Next, Rule 26(e), is also inapplicable, as it pertains to supplementing or correcting a discovery response. Plaintiff Fitzgerald asserts that he was under no obligation to supplement his response to McNae's interrogatories as he is not and has not been a party to any lawsuit other than the instant case against Defendant. (ECF No. 234 at 6). Lastly, Defendant seeks dismissal pursuant to Rule 37, but did not comply with the Rule as she did not file a motion to compel discovery. Moreover, Plaintiff asserts he did not fail to disclose or respond, so there is no discovery violation. (*Id.* at 7).

Defendant seeks to introduce evidence regarding the *Jane Doe* lawsuit to show that "Fitzgerald's damages were not caused by Defendant but were the result of his own misconduct and HR issues at SoftwareONE" and to void the Settlement Agreement at issue because "it was signed under coercion, duress, and fraudulent concealment." (ECF No. 231 at 10–11). However, the *Jane Doe* case and the evidence Defendant seeks to introduce bear no relevance to the instant case. As Plaintiff explains:

> The *Jane Doe* case involves unrelated allegations by a female in her 50s who was a former employee of SoftwareONE, Inc. in or around January 2017. Jane Doe claims that she was discriminated against on the basis of her age and gender. Jane Doe referred to Fitzgerald as a member of the "younger male leadership" at SoftwareONE1 but did not make any allegations that Fitzgerald himself was complicit in any alleged age or gender discrimination. Fitzgerald was not a party to the *Jane Doe* lawsuit, was not subpoenaed in the *Jane Doe* lawsuit, was not

deposed in the *Jane Doe* lawsuit, and was unaware that his name was ever mentioned in ancillary declarations filed in the *Jane Doe* lawsuit until now.

ECF No. 234 at 2. Plaintiff makes clear that he was not aware of the *Jane Doe* case, was neither a party nor a witness to it, and that it had nothing to do the Settlement Agreement that the Parties here entered into and at issue in this case. (*Id.* at 12).

Because the *Jane Doe* case and evidence that Defendant seeks to introduce are irrelevant to this case and to her duress defense, and because Plaintiff did not commit any discovery violations, this Court denies Defendant's Motions to Supplement Record and requests to sanction Plaintiff.

Accordingly, it is **ORDERED AND ADJUDGED** that:

1.     Defendant's Motions to Supplement the Record, (ECF Nos. 231, 245), are **DENIED**.

2.     Plaintiff's Cross-Motion to Strike Exhibit is **GRANTED**. The Clerk is **DIRECTED** to **STRIKE** ECF No. 231-1.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 13 day of February 2025.

_____
JOSE E. MARTINEZ
UNITED STATES DISTRICT JUDGE

Copies provided to:
All Counsel of Record

# Exhibit D-1

ARAG's termination letter to Counsel for McNae, Nov 20, 2023



**Legal Insurance**

**Sent via email to heather@bfwlegal.com**

November 20, 2023

ARAG®
500 Grand Avenue, Suite 100
Des Moines, IA· 50309
800-888-4184
515-246-8710 fax
ARAGlegal.com

Alaina Fotiu-Wojtowicz
Brodsky Fotiu-Wojtowicz, PLLC
200 SE 1st Street, Suite 400
Miami, FL 33131

**RE:     ARAG Case No. 3107432-003; Michael *Fitzgerald v. Rhonda McNae, U.S. District Court Southern District of Florida, Miami Division, Case No. 1:22-cv-22171-JEM***

Dear Alaina Fotiu-Wojtowicz:

On July 28, 2022, you entered into a Fee Agreement – Hourly Rate ("Agreement") with ARAG to provide legal services to Rhonda McNae in the above-referenced legal matter.

Item 8 of the Agreement states, "Either party may terminate this Agreement effective immediately for any reason or no reason at any time providing written notice to the other party." Effective immediately, ARAG hereby elects to enforce said provision of the Agreement terminating ARAG's obligation to pay your legal fees for Rhonda McNae in connection with ARAG Case No. 3107432-003.

ARAG will pay for legal services provided until December 1, 2023, or until withdrawal of representation is complete, whichever is earlier.

Respectfully,

ARAG Legal Department

# Exhibit D-2

ARAG termination letter to McNae regarding their network attorneys



**Legal Insurance**

**Sent via email to willmcnae@gmail.com**

November 20, 2023

ARAG®
500 Grand Avenue, Suite 100
Des Moines, IA· 50309
800-888-4184
515-246-8710 fax
ARAGlegal.com

William and Rhonda McNae
504 11ᵗʰ Place
Kirkland, WA 98033

RE:     **ARAG Case No. 3107432 – Defense of Civil Damage – Rhonda McNae**
        **ARAG Case No. 3266236 – Defense of Civil Damage – William McNae**
        **Member ID # 177202672170**

Dear William and Rhonda McNae:

ARAG is in receipt of William's request for coverage under your legal plan for defense of a new civil lawsuit, *Michael J. Fitzgerald v William McNae, In The Circuit Court of the 11ᵗʰ Judicial Circuit In And For Miami-Dade County, Florida, Circuit Civil Division, Case 2023-025855-CA-01.* Your plan provides paid in full coverage for attorney fees when using a Network Attorney. Any expenses incurred are your responsibility. If you elect to use a Non-Network attorney, then an Indemnity benefit is available where you will be reimbursed up to the benefit amount indicated in your plan for the defense of civil damages claims coverage. It is your responsibility to locate and retain an attorney. ARAG will not be assisting you in locating an attorney to handle this matter on your behalf.

With respect to the civil lawsuit *Michael J. Fitzgerald and Yaleny De Varona v. Rhonda McNae and William McNae, In The United States District Court Southern District of Florida, Miami Divisin, Case No. 1:22-cv-22171-JEM,* effective December 1, 2023, ARAG will no longer cover either of your Non-Network attorney fees for services being rendered in this lawsuit. For purposes of clarity, Brodsky Fotiu-Wojtowski, PLLC and Colson Hicks and Eidson, P.A. law firms are Non-Network Attorneys. If you are able to locate a Network Attorney who will accept your case, then your plan covers your Network Attorney fees as a paid in full benefit pursuant to the terms of your legal plan, with any expenses incurred being your responsibility. If you elect to use a Non-Network attorney, you are eligible to use your plan's Indemnity benefit. Again, ARAG will not be assisting you in locating an attorney to handle this matter on your behalf.

Sincerely,

ARAG Legal Department

# Exhibit D-3

ARAG's denial of coverage, Jan 3, 2024



**Legal Insurance**

<u>**Sent via regular mail and email to willmcnae@gmail.com**</u>

January 3, 2024

Mr. William McNae
504 11ᵗʰ Place
Kirkland, WA 98033

ARAG®
500 Grand Avenue, Suite 100
Des Moines, IA· 50309
800-888-4184
515-246-8710 fax
ARAGlegal.com

RE:     ***Michael Fitzgerald v. William McNae***, Miami Dade County, Circuit Civil Div.
        **Our Insured:     William McNae**
        **Certificate No.: C-10014**
        **Member ID:      177202672170**
        **Policy Term:     January 1, 2023 through December 31, 2023**

Dear Mr. McNae:

ARAG Insurance Company hereby acknowledges receipt of a Complaint in an action brought or to be brought in the Circuit Court of Miami-Dade County in the action entitled, "*Michael Fitzgerald v. William McNae*" (the "Complaint"). We have been unable to identify a case number for this Complaint. You have tendered this Complaint to us for consideration of coverage under the above-referenced Legal Service Insurance Plan.

We now respectfully direct your attention to the following language of the insuring agreement of the Certificate referenced above (the "Certificate"):

***COVERAGE***

The Certificate provides that:
> *We will pay the attorneys fees of a **Network Attorney** for covered **legal services** provided to you resulting from an **insured event** which occurs after your **effective date** and while your **Certificate of Insurance** is in effect for the Legal Matters listed [in the policy].*

The Certificate also provides that:
> *You can select a **Non-Network Attorney** for covered **legal services** provided to you resulting in an **insured event** which occurs after your **effective date** and while your **Certificate of Insurance** is in effect, **we** will reimburse **you** for your attorneys fees for covered **legal services** up to the maximum amounts listed [in your policy].*

The Certificate further provides that "[o]nly matters expressly listed are covered **benefits** and are paid as indicated below."

The Certificate lists several available Legal Services benefits (the "Legal Services Benefits"), including "*Defense of Civil Damage Claims Legal Services*". The Certificate defines this benefit as follows:

*Defense of Civil Damage Claims Legal services for an **insured** in defense against civil damage(s) claims, except claims involving the ownership or use of a motorized vehicle, claims which are covered by other insurance, or claims related to a felony charge.*

### Definitions

The highlighted terms listed in above are defined terms in the Certificate and are defined in the Certificate as follows:

*Network Attorney "means an attorney with whom **we** have contracted to perform covered **legal services** in the United States for **you** and who has contracted with **us** to provide the specific covered **legal services** for which **you** are seeking assistance.*

*Insured Event is defined as "an event covered by this policy whose initiation date will be considered the earlier of the date (a) written notice of a **legal dispute** is ...received by you or ...(c) an attorney is hired by you."*

*Effective Date means "the date on which the **policyholder** enrolls the **named insured** and from which date premium has been paid for **you**."*

*Certificate of Insurance or "Certificate" – the document provided by **us** to the **named insured** that describes the **benefits** and terms of the insurance policy.*

*Legal dispute means "means a disagreement between **you** and any other party regarding **your** legal rights."*

*Legal services means "time spent by your attorney and their office staff for your covered legal matters which does not include costs such as, but not limited to: filing fees, copy costs, mileage, title insurance, expert witnesses, mediator, home studies, transcriptionists, title search, and title abstracting."*

*Benefits are defined as "the Legal Coverages listed in...the benefits section of the Certificate of Insurance."*

*"We" "Us", and "Our" means ARAG Insurance Company.*

*"You" and "Your" means an insured.*

## EXCLUSIONS

The Certificate outlines Exclusions from Legal Services coverage that ARAG Insurance Company is required to provide under the Certificate terms.  The Exclusions section provides that:

*We do not provide coverage for...*

*2. Legal Services arising out of a business interest, investment interests, employment matters, employee benefits, your role as an officer or director of an organization, and patents or copyrights.*

*3. Legal Services in class actions, punitive damages, personal injury, malpractice, court appeals or post judgments (settlement agreement signed by all parties, final binding arbitration, judgment issued by a court).*

*4. Legal Services deemed by us to be, in our reasonable belief you are not actively and reasonably pursuing resolution in your case."*

**Coverage Position**

It is the position of ARAG Insurance Company that, based on the information that you have provided to ARAG Insurance Company and as set forth in the Complaint, there is no coverage available to you for Legal Services Benefits under the Certificate for the claims outlined in Counts One through Six of the Complaint.

**Count One.** It is the position of ARAG Insurance Company that, based on the information that you have provided to ARAG Insurance Company and as set forth in the Complaint, the claim outlined in Count One would be excluded from Legal Services Benefits coverage by Exclusion Two. As noted above, Exclusion Two provides that ARAG Insurance Company excludes coverage for Legal Services Benefits for:

*2. Legal Services arising out of a business interest, investment interests, employment matters, employee benefits, **your** role as an officer or director of an organization, and patents or copyrights.*

It is the position of ARAG Insurance Company that, based on the information that you have provided and as set forth in the Complaint, Plaintiff's claims in Count One arise out of business interests involving Plaintiff and you, as an employee of Microsoft at the time of the claimed actions and communications, and Plaintiff, as an officer and representative of a Microsoft vendor, SoftwareONE, at the time of the claimed actions and communications. Count One would also be excluded because the claims made in Count One are related to employment matters arising out of workplace policies adopted and implemented by Microsoft, your former employer, along with communications among personnel and advisors of Microsoft, Software ONE and you.

It is also the position of ARAG Insurance Company that, based on the information that you have provided and as set forth in the Complaint, Plaintiff's claims in Count One arise out of a settlement agreement signed by all parties, including Plaintiff and you and would be excluded by Exclusion Three. Exclusion Three excludes Legal Services Benefits coverage for:

*3. Legal Services in class actions, punitive damages, personal injury, malpractice, court appeals or post judgments (settlement agreement signed by all parties, final binding arbitration, judgment issued by a court).*

Plaintiff's claims in Count One arise from alleged breaches of a Confidential Settlement Agreement, dated June 15, 2020 among Plaintiff, Ronda McNae and you (the "Settlement Agreement"). The Settlement Agreement states that:

*WHEREAS, the McNaes contend that Fitzgerald caused physical injury and mental injury to them in Miami-Dade County, Florida as a result of Fitzgerald's alleged sexual conduct towards Ronda;*

*WHEREAS, for purposes of avoiding the time and costly expenses associated with litigation, and in the interest of economic expediency, the Parties desire to reach a settlement of all claims between and among themselves; and,*

*WHEREAS, the parties wish to resolve all disputes between and among them;*

Since the Settlement Agreement was entered into to resolve a personal injury dispute and is a settlement agreement signed by all parties, the Count One claims all involve a breach of the Settlement Agreement terms, the Certificate would exclude Legal Services Benefits coverage for Count One.

**Count Two Through Count Six.** It is the position of ARAG Insurance Company that, based on the information that you have provided to ARAG Insurance Company and as set forth in the Complaint, the claim outlined in Count Two through Count Six would be excluded from Legal Services Benefits coverage by Exclusion Two. As noted above, Exclusion Two provides that ARAG Insurance Company excludes coverage for Legal Services Benefits for:

*2. Legal Services arising out of a business interest, investment interests, employment matters, employee benefits, your role as an officer or director of an organization, and patents or copyrights.*

It is the position of ARAG Insurance Company that, based on the information that you have provided and as set forth in the Complaint, Plaintiff's claims in Count Two through Count Six arise out of business interests involving Plaintiff and you, as an employee of Microsoft at the time of the claimed actions and communications, and Plaintiff, as an officer and representative of a Microsoft vendor, SoftwareONE, at the time of the claimed actions and communications. Count Two through Count Six would also be excluded from Legal Services Benefits coverage because the claims made in these Counts are related to employment matters arising out of workplace policies adopted and implemented by Microsoft, your former employer, along with communications among personnel and advisors of Microsoft, Software ONE and you.

Additionally, ARAG Insurance Company reserves its rights with respect to determination of Legal Services Benefits coverage for Count Two through Count Six, based on the information that you have provided and as set forth in the Complaint, based on the availability of other insurance coverage. As noted above, Legal Services Benefits coverage for Defense of Civil Damage Claims Legal services is defined as:

**Defense of Civil Damage Claims Legal services** *for an* **insured** *in defense against civil damage(s) claims, except claims involving the ownership or use of a motorized vehicle, claims which are covered by other insurance, or claims related to a felony charge.*

ARAG Insurance Company will not provide Legal Services Benefits coverage if the claims at issue "are covered by other insurance". The type of claims outlined in Count Two through Count Six are matters that may be covered by ordinary homeowners' insurance coverage. At this time, ARAG Insurance Company reserves its rights regarding the issue of whether this coverage benefit exception applies, pending any necessary additional investigation.

**Reservation of Rights.** Accordingly, we will not provide any Legal Service Benefits coverage for defense of allegations made against you as alleged in the Complaint. Your Certificate does not provide for indemnification for any claimed or determined damages or attorney's fees that you may incur because of this action. Through this reservation of rights, ARAG Insurance Company advises that any action taken by ARAG Insurance Company, its

agents, representatives or attorneys is not to be construed as nor does it constitute a waiver of any rights and/or defenses available to ARAG Insurance Company under the terms, conditions, provisions and exclusions of the above-referenced policy nor shall it bar ARAG Insurance Company from asserting at a later date, any rights or defenses that may be available now or in the future.

Our position relative to the coverage issues as described herein is based on the present allegations contained in the Complaint and on the facts as we know them. We are prepared to re-evaluate our position at any time there may be a material change in the allegations or in the facts.

Sincerely yours,

Jeff LeMay
Director, Customer Care and Claims

To the plan member: You are entitled to a full and fair review of a denied claim. You must submit a written request for review of your denied claim within 180 days of the date of this notice. Your request should include: date of request, printed name and address (and name and address of authorized representative if you have designated one), date of service in question and description of claim denied (claim number, if available). ARAG will provide a written response within 60 days of receipt of your request. Send your written request to: **ARAG Claims Center, 500 Grand Avenue, Suite 100, Des Moines, IA 50309.** If the decision on review is adverse and if you hve employer group coverage subject to ERISA, you have the right to bring a civil action under Section 502(1) of ERISA. Additional information regarding the review or appeal procedure is contained in your benefit plan document.

# Exhibit D-4

Letter to ARAG from former Counsel, Jan 5, 2024



# BRODSKY FOTIU-WOJTOWICZ

January 5, 2024

**VIA ELECTRONIC MAIL**
ARAG Legal Insurance
Special Referral Claims
500 Grand Avenue, Suite 100
Des Moines, IA 50309
srclaims@ARAGlegal.com
Teresa.Hoisington@ARAGlegal.com

RE:   **McNae, Ronda advs Michael Fitzgerald**

To Whom It May Concern:

In order to facilitate your review of our invoice, please see our update on the progress of this case below.

By letter dated November 20, 2023, ARAG terminated the Fee Agreement – Hourly Rate ("Agreement") pursuant to which the undersigned and her firm were "Network Attorneys" under the terms of the McNae's ARAG Policy.[1] Section 7 of the Agreement, however, states that "Attorney will not withdraw from representation until they take reasonable steps to avoid prejudice to the rights of Plan Member." The Agreement further provides that "This entire Section 7 shall survive termination of the Agreement."

Because ARAG terminated the Agreement in the middle of active settlement negotiations, it would have been impossible to withdraw on the short notice provided by ARAG without prejudice to Mrs. McNae. As a result, we were forced, pursuant to the Agreement and our ethical obligations, to stay on as counsel through December 13, 2023, when the Court ultimately granted BFW's Motion to Withdraw. Since that date BFW has provided Mrs. McNae with its entire file so that Mrs. McNae's new ARAG Network Attorney, which Mrs. McNae is plainly entitled to under the terms of her ARAG Policy, has everything he or she needs to continue the successful defense of this case.

Because the services provided from December 1, 2023 through December 13, 2023 were required by the explicit terms of the Agreement, ARAG is responsible to pay those fees. As you can see from our detailed time records, the limited services provided

---

[1]     Pursuant to the McNaes' ARAG Policy, "Network Attorney" is defined as "an attorney with whom **we** have contracted to perform covered **legal service** in the United States for **you** and who has contracted with **us** to provide the specific covered legal services for which **you** are seeking assistance." ARAG contracted with BFW to provide covered legal services to Ronda McNae. As such, we were plainly Network Attorneys throughout the scope of our representation.

ALAINA FOTIU-WOJTOWICZ, ESQ.                         200 SE 1ST STREET, SUITE 400
WWW.BFWLEGAL.COM                                              MIAMI, FLORIDA 33131
ALAINA@BFWLEGAL.COM                                   T. 305-503-5054  F. 786-749-7644

ARAG Legal Insurance
January 5, 2024
Page 2

during this time frame were provided to avoid disruption to ongoing settlement negotiations and to avoid prejudice to Mrs. McNae.

If you have any questions regarding the responses provided herein or require any additional information, please do not hesitate to contact me.

Sincerely,

Alaina Fotiu-Wojtowicz

AFW/hs
enclosures

# Exhibit

# E-1

Evidence of requests made to prior counsel



This snapshot illustrates multiple emails I sent to my prior counsel, Richard Gomez, emphasizing the urgent deadline for my Motion for Summary Judgment. Despite the pressing timeline, Mr. Gomez failed to take the necessary actions to adequately address this critical matter. Compounding this issue, Mr. Gomez did not obtain deposition transcripts for my Expert Witness, Treating Trauma Therapist, and Treating Therapist—documents essential for properly preparing the motion. Instead, he relied solely on my recollections, even though I was not present for the entirety of these depositions. This lack of diligence and preparation is deeply troubling and has resulted in substantial prejudice to my case.



This snapshot underscores my proactive attempts to order deposition transcripts, despite assurances from Mr. Gomez that he would manage this task. Mr. Gomez later justified his inaction by

stating that he "didn't want to tip off the other side," an explanation that was both illogical and

inappropriate given that the proceedings were nearing their conclusion. His failure to obtain these critical

transcripts undermined the preparation and strategy necessary for my defense.



The snapshot above highlights my proactive efforts to address the *Doe v. SWO* case. I possess

text messages dating back to May 28, 2024, referencing a lead from Jane Doe (Carol Eastman), who

contacted me directly. Despite my bringing this critical information to Mr. Gomez's attention, he failed to

take timely or meaningful action. Over a month later, Mr. Gomez made a single phone call, by which time

the case involving Ms. Eastman and SWO had already been classified as "highly confidential" following a

deposition with the company's former CEO. After Mr. Gomez withdrew from my case, I independently

gathered and paid for a substantial amount of court documents over the course of one weekend. These

documents demonstrated that SWO had withheld the *Doe v. SWO* case during discovery, an omission that

significantly prejudiced my defense.

Case 2:24-cv-00211-TL    Document 43-1    Filed 02/18/25    Page 87 of 136
Case 1:22-cv-22171-JEM   Document 275-1   Entered on FLSD Docket 01/14/2025   Page 73 of
210

# Exhibit

# E-2

Detailed analysis of invoices

**<u>Detailed Analysis of Billing Discrepancies and Counsel's Ineffective Representation</u>**

As the Defendant in this matter, I must address significant discrepancies and deficiencies in the representation provided by my former counsel, Richard Gomez. Despite repeated requests, Mr. Gomez refused to provide me with invoices for his services. This refusal prompted me to formally request the invoices from ARAG Legal Insurance, which ultimately revealed troubling issues. The invoices reflected 60 hours of billed work, including a line item for services allegedly performed in January 2024. However, Mr. Gomez did not sign an Agreement to represent me until February 2024, raising serious concerns about the accuracy and integrity of his billing practices. Moreover, I did not receive a copy of the signed Agreement until March 22, 2024, well after his representation had commenced. These failures have not only undermined my ability to adequately prepare for trial but have caused irreparable harm to my case.

## 1. Failure to Adequately Prepare and Manage Case Deadlines

1. **Missed Summary Judgment Deadline:**

   - On June 21, 2024, Mr. Gomez billed 2.0 hours to "review and strategize for summary judgment." Despite this, no Motion for Summary Judgment was filed before the applicable deadline.

   - There are no subsequent billing entries reflecting further work on this critical motion.

   - The failure to file this motion eliminated an essential opportunity to seek dismissal of claims against me or narrow the issues for trial, significantly prejudicing my case.

2. **Minimal Time on Trial Strategy and Preparation:**

   - On June 21, 2024, Mr. Gomez billed only 1.2 hours for a discussion of trial strategy, opposing counsel's proposed stipulated facts, and upcoming deadlines. This is grossly insufficient given the complexity of the case and the approaching trial date.

   - Tasks critical to trial preparation, such as drafting pretrial motions or coordinating expert witness strategies, are either absent or inadequately addressed in the invoices.

## 2. Inadequate Discovery Efforts

1. **Deposition Transcript Review:**

   - Mr. Gomez billed 13.8 hours in June 2024 for reviewing deposition transcripts, including:

     - 8.5 hours on my deposition transcript (350+ pages).

     - 5.3 hours on depositions of opposing parties and experts.

> - 0 hours on my expert depositions as Mr. Gomez did not order them.

- Despite this, these transcripts were not effectively utilized for motions or trial preparation.

## 2. Failure to Obtain Deposition Transcripts:

- Mr. Gomez did not order critical deposition transcripts, leaving me to personally obtain and expedite them after his withdrawal, incurring significant cost and delays.

## 3. Incomplete Discovery Review:

- On June 3, 2024, Mr. Gomez billed only 2.7 hours for reviewing discovery materials via a client call. This cursory effort left critical gaps, as no follow-up work is evident in his records.

## 3. Discrepancies Between Billed Time and My Records

### 1. Phone Call Discrepancies:

- According to my Verizon phone logs, I spent 9 hours and 3 minutes on calls with Mr. Gomez from March to September 2024. However, his invoices reflect fewer calls and limited time billed for phone conferences. This inconsistency raises concerns about transparency in his billing practices.

### 2. July 2024 Gap in Activity:

- During July 2024, Mr. Gomez billed only 0.6 hours, limited to reviewing a court order and drafting emails about stipulated facts. This was a critical month for trial preparation, and his lack of activity reflects a failure to engage during a pivotal time.

## 4. Overcharging and Inefficient Use of Time

### 1. Excessive Time on Basic Tasks:

- Mr. Gomez billed 8.5 hours to review my deposition transcript, an unusually high amount given that no significant actions were taken based on this review.

### 2. Redundant Tasks:

- On June 27, 2024, he billed 1.3 hours for drafting a motion to extend deadlines and an additional 0.4 hours for preparing a proposed order for the same motion. These tasks should have been completed concurrently.

## 5. Failure to Provide Case Files

- Despite my repeated formal requests, Mr. Gomez has failed to provide my complete case files following his withdrawal from representation.

- This omission has obstructed my ability to address procedural gaps or independently manage my case moving forward, compounding the harm caused by his ineffective counsel.

## 6. Summary of Total Hours and Billing Concerns

- **Total Hours Billed:** Mr. Gomez billed 62.9 hours between February and July 2024, per his invoices.

- **Key Omissions:** He failed to file essential motions, coordinate expert testimony, or sufficiently prepare for trial despite billing for tasks that suggest otherwise.

## 7. Impact of Discrepancies

Mr. Gomez's inadequate representation and billing discrepancies have caused significant harm to my case, including:

1. Missing critical deadlines such as the Motion for Summary Judgment.

2. Delaying the case by failing to obtain essential documents like deposition transcripts.

3. Creating procedural and evidentiary gaps that now necessitate reopening discovery to mitigate the prejudice caused by his actions.

## Conclusion

These discrepancies and failures reflect deeply ineffective counsel that has prejudiced my case. Despite my efforts to mitigate the harm, Mr. Gomez's actions—or lack thereof—have caused irreparable damage to my ability to present a full and fair defense. I respectfully request the Court's intervention to reopen discovery and address the substantial gaps created by his representation.

# Exhibit

# E-3

Invoices requested from ARAG Legal insurance regarding prior counsel

## Invoice #1772 (Dated May 18, 2024)

- February 2024:
  - 2.3 hours (Zoom meeting on possible representation)
  - 3.0 hours (Initial court docket review)
  - 3.5 hours (Review of prior counsel's file documents)
  - 1.5 hours (Zoom meeting for case facts, strategy)
  - 1.0 hour (Additional review of documents from prior counsel)
- March 2024:
  - 0.5 hours (Phone call about sanctions motion and strategy)
  - 0.1 hours (Emails regarding Motion for Sanctions)
  - 1.0 hour (Call on settlement strategy)
  - 0.8 hours (Follow-up call about case resolution options)
- April 2024:
  - 0.1 hours (Email about NOA timing)
  - 0.1 hours (Preparing Notice of Appearance)
  - 0.3 hours (Filing Supplemental Corporate Disclosure Statement)
  - 1.5 hours (Preparing Motion for Pretrial Deadlines Extension)
  - 0.4 hours (Drafting proposed order for trial extension, option 1)
  - 0.2 hours (Drafting proposed order for trial extension, option 2)
  - 0.3 hours (Reviewing trial extension order)
  - 0.1 hours (Email about pretrial deadlines extension)
  - 0.2 hours (Emails on settlement issues)
  - 0.5 hours (Call about overall strategy and CA counsel impact)
- May 2024:
  - 0.1 hours (Review plaintiff's notice of 90-day expiration).

**Subtotal for Invoice #1772: 18.0 hours**

## Invoice #1835 (Dated July 29, 2024)

- January 2024:
  - 0.5 hours (Call about case overview and docket review)

- o   0.1 hours (Email about Attorney Eyes Only documents)
- May 2024:
  - o   0.2 hours (Preparing emergency motion for extension hearing)
  - o   0.5 hours (Call about relevant evidence from Carol Eastman case)
- June 2024:
  - o   2.7 hours (Discovery review via call with client)
  - o   2.0 hours (Reviewing deposition transcript, part 1)
  - o   2.8 hours (Reviewing deposition transcript, part 2)
  - o   2.5 hours (Reviewing plaintiff's damage expert deposition)
  - o   8.5 hours (Reviewing your deposition and relevant pleadings)
  - o   3.0 hours (Review of prior counsel's file for relevant claims)
  - o   0.6 hours (Reviewing further deposition transcript)
  - o   2.0 hours (Reviewing and strategizing for summary judgment motion)
  - o   1.2 hours (Call discussing case facts and strategy)
  - o   6.0 hours (Court docket review and expert witness report analysis)
  - o   2.4 hours (Call regarding additional evidence from Carol Eastman case)
  - o   0.3 hours (Emails on deadline calculations)
  - o   1.3 hours (Preparing motion to extend deadlines)
  - o   0.4 hours (Drafting proposed order for trial extension)
  - o   0.3 hours (Reviewing granted extension order)
  - o   0.1 hours (Responding to client email)
  - o   0.3 hours (Memo on case strategy and tasks)
  - o   0.1 hours (Email about magistrate referral)
  - o   1.3 hours (Reviewing magistrate orders and strategy)
  - o   0.3 hours (Call regarding stipulation of facts)
  - o   0.6 hours (Emails about stipulation of facts)
  - o   0.3 hours (Preparing meet and confer emails).

**Subtotal for Invoice #1835: 44.9 hours**


**Total Hours Worked**

**18.0 hours** (Invoice #1772) + **44.9 hours** (Invoice #1835) = **62.9 total hours**

# Exhibit

# E-4

Detailed invoices from prior counsel (redacted)

---------- Forwarded message ---------
From: **Ronda McNae** <⬚⬚⬚⬚⬚⬚@gmail.com>
Date: Tue, Oct 1, 2024 at 9:24 AM
Subject: Request for Billing Invoices and Transparency
To: <⬚⬚⬚⬚⬚@⬚⬚⬚legal.com>, Will McNae <⬚⬚⬚⬚@gmail.com>

Please see attached.

Regards,

Ronda and Will McNae

**One attachment** · Scanned by Gmail ⟳

Case 2:24-cv-00211-TL    Document 43-1    Filed 02/18/25    Page 96 of 136
Case 1:22-cv-22171-JEM   Document 275-1   Entered on FLSD Docket 01/14/2025   Page 82 of
210

Subject: Request for Billing Invoices and Transparency

Dear ARAG Legal Insurance,

I am writing to formally request copies of all billing invoices related to the legal services rendered by your office and covered by my legal insurance, ARAG, in connection with my Florida case. Despite my repeated requests to all counsel involved, I continue to receive evasive responses and have not been provided with the necessary documents.

Yesterday afternoon, ARAG informed Will McNae that three letters were mailed to our home at 504 11th Pl, Kirkland, WA 98033, reflecting the hours billed for work done by Richard Gomez in my Florida Federal Case. We were surprised to learn this news as we have not received these documents, nor have they been made available for our review. Please send those three (3) letters to our home mailing address and email a digital copy since our request is urgent in nature. Email addresses below.

As both a client and a policyholder, I firmly believe I am entitled to receive these records.

**Legal and Ethical Basis for Request:**

1. **Insurance Transparency Requirements**: Insurance companies, including legal insurers such as ARAG, are required to provide transparency regarding the services they pay for on behalf of policyholders. This is part of the contractual relationship between the insurer and the insured. Many insurance policies include provisions requiring the insurer to issue Explanation of Benefits (EOBs) or similar documents that outline what has been covered, which I have not yet received.

2. **Attorney's Ethical Duties**:

   ○ Under the **American Bar Association (ABA) Model Rules of Professional Conduct**, attorneys are required to keep clients reasonably informed about their case, including billing practices. Specifically, **Rule 1.4** mandates that attorneys communicate with their clients about all relevant matters, including fees, and **Rule 1.5** requires transparency in fee arrangements. As your client, I have the right to understand how fees are charged and what legal services were billed to ARAG on my behalf.

   ○ **Florida Bar Rule 4-1.8(f)** also provides that attorneys can accept third-party payments only if (1) the client consents, (2) the client-lawyer relationship remains independent, and (3) confidentiality is maintained. Additionally, **Florida Bar Ethics Opinion 97-1** reiterates that the primary duty of the attorney remains with the insured client, not the third-party insurer, and as such, I retain the right to review invoices related to my case, even if paid by ARAG.

3. **Federal Rules of Civil Procedure (FRCP) and Case File Ownership**:

   ○ Under the **Federal Rules of Civil Procedure (FRCP)**, clients have the right to access their case files, including documents relevant to their case, such as billing records. **FRCP 26** allows for the discovery of any relevant information, and billing invoices fall within this scope, particularly when disputes over fees arise.

4. **Case Law Supporting Clients' Rights to Their File**:

   ○ The courts have repeatedly affirmed that clients have the right to access their complete case file, including billing records. For instance, **Sage Realty Corp. v. Proskauer Rose Goetz & Mendelsohn LLP** (91 N.Y.2d 30, 689 N.E.2d 879, 1997) established that clients are entitled to their entire case file, even if they have not fully paid for the services. Additionally, **In Re ANR Advance Transp. Co.** (302 B.R. 607, E.D. Wis. 2003) reaffirmed that billing invoices are part of the case file, and clients have the right to obtain them.

**Policyholder Rights:**

As a policyholder, I also retain the right to know what my legal insurance has covered. Many state regulations and consumer protection laws mandate that insurance companies provide transparency regarding the services they have paid for. Specifically:

- **Explanation of Benefits (EOB)**: Insurers are obligated to provide a detailed breakdown of what they have paid, the portion I may be responsible for, and any claims processed.

- **Right to Information**: If I request information about what services were covered under my policy, the insurance company is typically required to provide it.

**Conclusion:**

The combination of the **ABA Model Rules**, **Federal Rules of Civil Procedure**, **Florida Bar Rules**, case law, and my rights as a policyholder strongly support my request for transparency in billing. Therefore, I am requesting that you provide me with copies of all billing invoices related to my case and covered by ARAG.

Considering the circumstances surrounding Richard Gomez's late-stage withdrawal, after we resolved the conflict ourselves, things aren't adding up. At this point, I am not willing to waive my attorney-client privilege to disclose these concerning issues. However, I would appreciate an **Explanation of Benefits** and a detailed account of what has been invoiced in respect to my case, including hours billed and work rendered.

Sincerely,

Ronda and Will McNae

rondamcnae@gmail.com
willmcnae@gmail.com

504 11th pl
Kirkland, WA 98033

LAW OFFICES OF

# GOMEZ & GOMEZ

4300 Biscayne Blvd. – Suite 305

Miami, Florida 33137

Richard M. Gomez
richardgomez@rgpalaw.com

Tel: (305) 825-5506
Fax: (305) 825-2699

**VIA EMAIL: ann.cosimano@ARAGlegal.com**

February 12, 2024

Ann Cosimano, General Counsel
ARAG Legal Insurance
500 Grand Avenue, Suite 100
Des Moines, IA 50309
800-888-4184 x 288

| Re: | **Fritzgerald vs. McNae** | |
|---|---|---|
| | **Case No.** | **1:22-c-v-22171-JEM – United States District Court Southern District of Florida** |
| | **ARAG Id No.:** | **177202672170** |
| | **Named Insured:** | **William McNae** |
| | **Coverage Case No:** | **3266236** |
| | **Covered Insured:** | **Ronda McNae** |
| | **Our File No.:** | **5688** |

Dear Ms. Cosimano:

Enclosed please find the executed Amendment to ARAG Attorney Agreement regarding the above referenced matter.  Please return an executed copy for my file.

Please make a note of my cell phone number which is the best way to reach me should you have any questions at any time during our representation of Ms. McNae in this matter 305-336-9175.

Very truly yours,

/s/ Richard M. Gomez

RICHARD M. GOMEZ
RMG/lb
Enclosure

# Amendment to ARAG Attorney Agreement



**ARAG**

Legal Insurance

This Amendment ("Amendment") shall modify the ARAG Attorney Agreement ("Agreement") by and between ARAG North America Incorporated ("ARAG") and Network Attorney Richard Gomez ("Attorney").

Attorney and ARAG agree that the terms of this Amendment shall apply solely with respect to Covered legal services rendered to Ronda McNae by Attorney in the following litigation, exclusive of any appellate or remanded proceedings ("Subject Litigation"):

> *Michael Fitzgerald v. Ronda McNae*, Case No. 1:22-cv-22171-JEM (U.S. Dist. Ct., S.D. Fla.)
> Our Named Insured: William McNae
> Insured Covered by this Amendment: Ronda McNae ("Client")
> Certificate No.: C-10377 (the "Policy")
> Member ID: █████████████
> Policy Term: January 1, 2022 through December 31, 2022

A.  **Section 4. Legal Services Fees, B. Payments for Covered Services, subsection i** of the Agreement shall be replaced in its entirety with the following:

> Attorney may invoice ARAG at the following rates as payment in full for actual time spent on Covered services:
> > (i.)    Attorney $████ per hour.
> > (ii.)   Associate Attorney _____
> > (iii.)  Legal Assistant or Paralegal _____

Attorney will make no additional charges to the Client for attorney's fees unless the Plan Document allows. Payments made by ARAG on behalf of the Client shall be deemed payment when received by Attorney. To the extent benefits do not provide for the payment of costs and expenses incurred on behalf of the Client, Attorney is entitled to obtain reimbursement from the Client for such out-of-pocket expenses including, but not limited to: copy/printing charges; postage, fax charges; telephone charges; filing fees, court fees; delivery services fees; court reporter fees; transcripts; expert fees; witness fees; subpoena fees; private investigators; mock-ups or models; any computer, audio or visual equipment or rental of; and title work. Covered services may not be combined for any one matter to increase maximum fees.

Attorney shall provide a detailed invoice of actual time spent on Covered services to ARAG on at least a monthly basis. If Attorney's billing system rounds up, it must round to the next tenth-hour increment or less.

B.  **Section 1. Definitions, Paragraph B** of the Agreement shall be replaced in its entirety with the following:

> **"Case Confirmation"** refers to the document provided by ARAG to the Client or Attorney acknowledging the Subject Litigation.

C.  Neither any provision of this Amendment, nor ARAG's entry into this Amendment, nor any other act or omission of ARAG constitutes, or is intended to constitute, any total or partial waiver or impairment of any coverage defenses ARAG may have under the Plan Documents and/or applicable law; provided, however, that ARAG will

not, on the basis of lack of coverage, seek to recoup any payments made under this Amendment to the extent such payments are for Covered services rendered by Attorney to Client before the expiration of fourteen (14) days' written notice to Attorney that ARAG will no longer treat the Subject Litigation as if it were a Covered matter.

D.  All remaining terms and conditions of the Agreement remain unchanged. For avoidance of doubt, this Amendment does not apply to or change the Agreement with respect to any engagement other than the Subject Litigation. This Amendment has been agreed upon and executed by the following authorized representatives.

**Attorney**

Attorney Signature

Printed Name, Title

Date

**ARAG**

Ann Cosimano

Ann Cosimano, General Counsel
Printed Name, Title

2/14/2024
Date

# Law Offices of Gomez & Gomez

## INVOICE

4300 Biscayne Blvd. Suite 305
Miami, FL 33137
Phone: 3058255506
Email: richardgomez@rgpalaw.com

Invoice # 1835
Date: 07/29/2024
Due On: 08/28/2024

Ronda D. McNae
504 11th Place
Kirkland, Washington 98033

## Michael J. Fitzgerald and Yaleny De Varona v. Ronda McNae and William McNae Case No. 22-CV-22171-JEM - Southern District of Florida ARAG - Referral-05688

## Michael J. Fitzgerald and Yaleny De Varona v. Ronda McNae and William McNae Case No. 22-CV-22171-JEM - Southern District of Florida ARAG - Referral Certificate No. C-10377 Member ID: 177202672170

| Type | Date | Notes | Quantity | Rate | Total |
|------|------|-------|----------|------|-------|
| Service | 01/11/2024 | Telephone conference with client RE: contact with Alaina Fotiu-Wojtowicz RE: overview of case; address pending issues,client; review of court docket; consultaton with potential co-counsel. | 0.50 | | |
| Service | 01/11/2024 | Subject: Fwd: Fitzgerald/McNae· RE: Request for Access to Attorney Eyes Only Documents | 0.10 | | |
| Service | 05/23/2024 | Preparation of notice of hearing on emergency motion to vacate order and emergency motion for extension of time setting same for 5/28/24 per Judge's instructions. | 0.20 | | |
| Service | 05/29/2024 | Telephone conference with Ronda McNae regarding contact with Carol Eastman; litigant against SoftwareOne with potential useful defense evidence. | 0.50 | | |
| Service | 06/03/2024 | Review of discovery (primarily depositions) for synopsis of each witness deposed to pertain relevancy as to remaining issues to be tried; review of select emails in conjunction. (This was conducted with the client via conference call to streamline). | 2.70 | | |
| Service | 06/04/2024 | Review and outline Michael Fitzgerald depostion transcript dated 3/3/23 (pp. 1-102). | 2.00 | | |
| Service | 06/05/2024 | Additional reveiw/outline of plaintiff's deposition trascript dated 3/3/23 9pp.102 - 200); cursory review of direct by S. Casey. | 2.80 | | |

Invoice # 1835 - 07/29/2024

| | | | |
|---|---|---|---|
| Service | 06/17/2024 | Reivew and outline depostion transcript of Sheri Fiske (plaintiff's damage expert) | 2.50 |
| Service | 06/19/2024 | Review and outline deposition of Ronda McNae pp. 1-359 (took 10 hrs in conjunction with review of relevant pleadings; courtesy adjustment) | 8.50 |
| Service | 06/20/2024 | Review of file documents from prior counsel - for relevancy as to remaining claims/issues to be tried. | 3.00 |
| Service | 06/21/2024 | Additional review and outline of Rhonda McNae deposition pages 435-452. | 0.60 |
| Service | 06/21/2024 | Review of amended complaint, affirmative defenses for overview as to anticipated motion for summary judgment by plaintiff, determination of strategy for filing summary judgment on behalf of defendant, initial review of proposed stipulated facts provided by plaintiff's counsel. | 2.00 |
| Service | 06/21/2024 | Telephone conference with client regarding case facts, review of opposing counsel's proposed stipulated facts, discussion regarding issues to be tried and likely filing of motion for extension of pretrial deadlines and continuance of trial date due to pleadings not being closed. | 1.20 |
| Service | 06/24/2024 | Review of file as to Software One subpoena compliance issue; intial reports of plaintiff's expert witnesses/expert witness disclosures and start of review of court docket for prior relevant filings. | 6.00 |
| Service | 06/25/2024 | Telephone conference with Ronda McNae and Will McNae; reviwe of Carol Eastman v. SoftwareONE lawsuit issues; SoftwareONE representaions and strategy to obtain any benefical documents from attorney Anthony Trujillo/CA atttorney; inital review of social media spreadsheet; discussion as to case not at issue. | 2.40 |
| Service | 06/26/2024 | Meet and confer emails with opposing counsel to address requested deadline calculations (email 6/25 - 6/25). | 0.30 |
| Service | 06/27/2024 | Prepare and file motion for extension of pretrial deadlines and continuance of the trial date due to case not being at issue (drafts 1 - 2 edited per opposing counsel requested modifications to finalize (6/25 - 6/26) | 1.30 |
| Service | 06/27/2024 | Prepare proposed order on motion for extension of pretrial deadlines and continuance of trial; submission to Judge Martinez. | 0.40 |
| Service | 06/27/2024 | Preparation of email to client regarding case update/ motion filed pending ruling. | 0.10 |
| Service | 06/28/2024 | Receipt and review of Order granting unopposed motion for extension of certain pretrial deadlines and | 0.30 |

Invoice # 1835 - 07/29/2024

|  |  |  |  |  |  |
|---|---|---|---|---|---|
|  |  | continuance of trial and rediary/calendar new dates. |  |  |  |
| Service | 06/29/2024 | Receipt and review of email from client dated 6/26/24and response to same regarding opposing counsel request for stipulated facts, timing in light of pleadings still being open and possible disclosure of additional investigative work. | 0.10 | ▬▬ | ▬▬ |
| Service | 06/29/2024 | Prepare case update report to Ann Cosimano. | 0.30 | ▬▬ | ▬▬ |
| Service | 06/29/2024 | Memo to file RE: 6/25/24 strategy conference with clients; TO DO's. | 0.30 | ▬▬ | ▬▬ |
| Service | 07/01/2024 | Email to client RE: order of referral to magistrate and observations as to arguments by OC as to discovery in state court action for future reference/use.. | 0.10 | ▬▬ | ▬▬ |
| Service | 07/01/2024 | Receipt and review of Order (paperless) issued by Judge Martinez regarding referred to Magistrate regarding motion for attorneys fees and costs; review motion to bifurcate and motion for extension, response to same and reply to same; relation to State Court case as argued by Plaintiff; email to clients noting same. | 1.30 | ▬▬ |  |
| Service | 07/02/2024 | Telephone conference with Meredith Gussin regarding initial meet and confer regarding plaintiff's proposed joint stipulation of facts. | 0.30 | ▬▬ | ▬▬ |
| Service | 07/21/2024 | Multiple emails from OC RE: meet and confer on Joint Statement of Undisputed Facts; review of docket and order DE 61 dated 6/12/23; response email to OC with position. (7/8 - 7/21/24) | 0.60 | ▬▬ | ▬▬ |
| Service | 07/22/2024 | Review local rules, and prepare email to OC RE: meet and confer request on Joint Statement of Undisputed Facts. | 0.30 | ▬▬ | ▬▬ |
| Service | 07/26/2024 | Receipt and review of Iowa Court Order - custody of neice/nephew to Wil and Ronda. | 0.10 | ▬▬ | ▬▬ |

| | Subtotal | ▬▬ |
|---|---|---|
| | Total | ▬▬ |

# Detailed Statement of Account

### Current Invoice

| Invoice Number | Due On | Amount Due | Payments Received | Balance Due |
|---|---|---|---|---|
| 1835 | 08/28/2024 | ▬▬ | | ▬▬ |

Case 2:24-cv-00211-TL    Document 43-1    Filed 02/18/25    Page 104 of 136
Case 1:22-cv-22171-JEM   Document 275-1   Entered on FLSD Docket 01/14/2025   Page 90 of
210

Invoice # 1835 - 07/29/2024



Please make all amounts payable to: Law Offices of Gomez & Gomez
Federal Tax ID No. ▓▓▓▓▓▓▓

Please pay within 30 days.

# Law Offices of Gomez & Gomez

# INVOICE

4300 Biscayne Blvd. Suite 305
Miami, FL 33137
Phone: 3058255506
Email: richardgomez@rgpalaw.com

Invoice # 1772
Date: 05/18/2024
Due On: 06/17/2024

Ronda D. McNae
504 11th Place
Kirkland, Washington 98033

## Michael J. Fitzgerald and Yaleny De Varona v. Ronda McNae and William McNae Case No. 22-CV-22171-JEM - Southern District of Florida ARAG - Referral-05688

## Michael J. Fitzgerald and Yaleny De Varona v. Ronda McNae and William McNae Case No. 22-CV-22171-JEM - Southern District of Florida ARAG - Referral Certificate No. C-10377 Member ID: 177202672170

| Type | Date | Notes | Quantity | Rate | Total |
|---|---|---|---|---|---|
| Service | 02/16/2024 | Zoom meeting with client William McNae and Ronda McNae RE: possible representation in case. | 2.30 | | |
| Service | 02/17/2024 | Initial review of court docket for overview. | 3.00 | | |
| Service | 02/17/2024 | Intial review of file documents provided by prior counsel via USB. | 3.50 | | |
| Service | 02/18/2024 | Zoom meeting with client RE: discussion of case facts, strategy and overview. | 1.50 | | |
| Service | 02/18/2024 | Addtional review of file documents provided by prior counsel via USB; t/c with client. | 1.00 | | |
| Service | 02/28/2024 | Telephone conference with client regarding pending motion for sanctions against opposing counsel and plaintiff, response in opposition, strategy moving forward. | 0.50 | | |
| Service | 03/07/2024 | Receipt and review of email from/to client RE: response to Motion for Sanctions and timing of formal Notice of Appearance. | 0.10 | | |
| Service | 03/13/2024 | Telephone conference with client and Stephanie Casey regarding overall case issues and strategy for possible global settlement. | 1.00 | | |
| Service | 03/15/2024 | Telephone conference with Stephanie Cassey RE: over all facts relevant to discuss resolution of case as to | 0.80 | | |

Invoice # 1772 - 05/18/2024

both WII and Ronda McNae; issues as to case not at issue.

| | | | | |
|---|---|---|---|---|
| Service | 04/02/2024 | Email from client RE: NOA timing and strategy. | 0.10 | |
| Service | 04/04/2024 | Preparation of Notice of Appearance. | 0.10 | |
| Service | 04/04/2024 | Prepared and filed Supplemental Certificate of Interested Persons and Corporate Disclosure Statement. | 0.30 | |
| Service | 04/08/2024 | Meet and confer emails with OC for 4/8/24 Motion to Continue/Extend Deadlines | 0.30 | |
| Service | 04/08/2024 | Prepare and file Motion for Extension of Pretrial Deadlines and Continuance of the Trial Date. | 1.50 | |
| Service | 04/08/2024 | Prepare proposed order on Motion for Extension of Pretrial Deadlines and Continuance of Trial Date (option 1). | 0.40 | |
| Service | 04/08/2024 | Prepare proposed order on Motion for Extension of Pretrial Deadlines and Continuance of Trial Date (option 2). | 0.20 | |
| Service | 04/08/2024 | Receipt and review of Order granting motion to strike. | 0.10 | |
| Service | 04/09/2024 | Receipt and review Order on motion to continue and extend pretrial deadlines, resetting trial and pretrial deadlines, new trial date 9/9/24; dairy all new due dates. | 0.30 | |
| Service | 04/10/2024 | Email to/from client RE: Motion for Extension on Pretrial Deadlines and Continuance. | 0.10 | |
| Service | 04/18/2024 | Email to/from client RE: settlement issues as related to Wil McNae and not encompassing Ronda McNae. | 0.20 | |
| Service | 04/29/2024 | Telephone conference with client RE: overall case strategy; contact with CA counsel and potential claim/action in CA and impact on Federal case. | 0.50 | |
| Service | 05/06/2024 | Receipt and review of plaintiff's notice of 90 day expiring to court regarding motion to dismiss counterclaim. | 0.10 | |

| | |
|---|---|
| **Subtotal** | |
| **Total** | |

Invoice # 1772 - 05/18/2024

## Detailed Statement of Account

### Current Invoice

| Invoice Number | Due On | Amount Due | Payments Received | Balance Due |
|---|---|---|---|---|
| 1772 | 06/17/2024 | ▓▓▓▓▓▓ | ▓▓▓▓▓▓ | ▓▓▓▓▓▓ |

Please make all amounts payable to: Law Offices of Gomez & Gomez
Federal Tax ID No. ▓▓▓▓▓▓▓▓

Please pay within 30 days.

# Exhibit E-5

Will McNae's Declaration related to Mr. Gomez (prior counsel)

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 1:22-cv-22171-JEM

MICHAEL FITZGERALD,
individually, and YELANY DE VARONA,
individually,

        Plaintiffs,

v.

RONDA MCNAE, individually, and
WILLIAM MCNAE, individually,

        Defendants.

_____/


**DECLARATION OF WILLIAM MCNAE IN SUPPORT OF DEFENDANT RONDA
MCNAE'S CONVERSATION WITH PRIOR COUNSEL RICHARD GOMEZ**


I, **William McNae**, declare as follows:

1. My name is William McNae. I am over 18 years of age and competent to testify to the matters stated herein. I make this declaration based on personal knowledge and observation.

2. On September 4, 2024, I participated in a conference call with Richard Gomez, the attorney representing my wife, Ronda McNae, in this Federal litigation, and myself in the State court litigation which Plaintiff has sued me in for the same legal matters they were denied in this Federal litigation.

2

3. During the call, Mr. Gomez shifted from topics pertinent to my case and informed Ronda that he intended to drop her sole affirmative defense of duress.

4. When Ronda questioned this decision, Mr. Gomez failed to provide a clear explanation or strategic reasoning. He only responded, "*Your decision needs to match my decision, which is to drop duress.*"

5. Mr. Gomez had no apparent knowledge of the testimony of Ronda's expert witnesses, including Dr. James Hopper, Sarah Dellinger, Brock Weedman, and Dr. James Bhaskar. He appeared to disregard the importance of this evidence and did not make the effort to order the deposition transcripts in preparation for trial.

6. Throughout the conversation, Mr. Gomez seemed disengaged and unwilling to consider Ronda's concerns or her preferences for trial strategy.

7. Subsequent to this call, Ronda discovered that Mr. Gomez had billed fewer than 60 hours for his representation of her for a period of roughly six months, raising concerns about the adequacy and diligence of his preparation.

8. Shortly after Ronda confronted Mr. Gomez about her dissatisfaction with his approach and his lack of preparation, he withdrew from representing her.

9. Based on these observations, I believe Mr. Gomez's actions significantly impaired Ronda's ability to adequately prepare her defense, leaving her without the necessary legal support and undermining her legal strategy.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

3

Executed on December 6, 2024 in Kirkland, WA.

**Signature**: _____

**Name**: Will McNae

# Exhibit E-6

Ronda McNae's Declaration related to Mr. Gomez (prior counsel)

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 1:22-cv-22171-JEM

MICHAEL FITZGERALD,
individually, and YELANY DE VARONA,
individually,

    Plaintiffs,

v.

RONDA MCNAE, individually, and
WILLIAM MCNAE, individually,

    Defendants.

_____/

## DECLARATION OF RONDA MCNAE IN SUPPORT OF THE TELEPHONIC PHONE CONVERSATION WITH PRIOR COUNSEL RICHARD GOMEZ

Regarding September 4, 2024 Call with Mr. Gomez

I, **Ronda McNae**, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I, Ronda McNae, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

2. Ineffective Representation by Mr. Gomez and Prejudice to My Case: On September 4, 2024, during a call with Mr. Gomez, his actions and advice demonstrated ineffective representation that irreparably prejudiced my ability to defend this case.

3. I am the Defendant in the above-captioned matter and submit this declaration in support of my Motion to Reopen Discovery on a Limited Basis.

4. On September 4, 2024, at approximately 4:00 PM, I participated in a phone call with my prior counsel, Richard Gomez, and William McNae. Mr. Gomez began the conversation by stating, "I need to talk to the both of you at the same time. Ronda, I want you to think about this and sleep on it." He then stated, "Your decision needs to match my decision … to drop duress."

5. Mr. Gomez made these statements without reading through my prior counseling reports, my treating therapist's deposition, or my medical records, all of which are critical to understanding the coercion I experienced and its impact on my decision-making.

6. Mr. Gomez provided no legal or strategic justification for dropping my duress defense, which is critical to addressing the coercion I experienced and its impact on my decision-making.

7. Mr. Gomez's statement pressured me to abandon a valid and essential defense, causing substantial prejudice to my ability to present a full and fair case.

8. I repeatedly requested billing invoices from Mr. Gomez to understand the work performed on my case, but he refused to provide them. I ultimately obtained these invoices only after contacting ARAG and submitting a formal request.

9. Based on the invoices I received, Mr. Gomez billed a total of **62.9 hours** for work performed on my case from February 2024, when he was retained, until his withdrawal in September 2024. This equates to fewer than 8 hours per month on average, despite the complexity of my case and the fact that trial was set for November 2024.

10. Mr. Gomez did not order critical deposition transcripts, leaving me to obtain and expedite them at significant cost after his withdrawal. This delay disrupted my ability to use this material for pretrial preparation and motions.

11. Mr. Gomez failed to file a Motion for Summary Judgment on my behalf, despite billing time on June 21, 2024, for "review and strategy" related to summary judgment. We had numerous conversations to prepare for my MSJ. This failure denied me the opportunity to seek dismissal of the claims against me or narrow issues for trial.

12. According to my Verizon phone records, I spent **9 hours and 3 minutes** on phone calls with Mr. Gomez between March and September 2024. His invoices, however, reflect limited billing for phone conferences, creating a discrepancy in his recordkeeping.

13. During July 2024, a critical month for trial preparation, Mr. Gomez billed only **0.6 hours**, primarily for minor administrative tasks. His lack of engagement during this time significantly impacted my ability to prepare for trial.

14. Mr. Gomez's overall lack of preparation and failure to perform necessary tasks, such as obtaining deposition transcripts, pursuing critical discovery, and filing essential motions, has caused irreparable harm to my ability to present a full and fair defense.

15. I have repeatedly requested my complete case file from Mr. Gomez, but he has not provided it to date. This failure has further hindered my ability to rectify the deficiencies created by his ineffective representation.

16. Based on these issues and the harm caused to my case, I respectfully request the Court to reopen discovery on a limited basis to address the significant procedural and evidentiary gaps resulting from Mr. Gomez's representation.

17. I declare under penalty of perjury that the foregoing is true and correct.

18. Dated: December 17, 2024.

By:

**Ronda McNae**

# Exhibit G

Conferral communication

# GOOD FAITH CONFERRAL COMMUNICATION FOR MOTION TO STAY THE CASE

## Pro se Plaintiffs' and Counsel for ARAG Legal Insurance

From: Ronda McNae <prose.rmcnae@gmail.com>
Sent: Tuesday, February 11, 2025 6:32 PM
To: ann.cosimano@araglegal.com; Mullaly, Michael T. <michael.mullaly@squirepb.com>; Will McNae <prose.wmcnae@gmail.com>
Subject: [EXT] Urgent Request for Motion to Stay Proceedings & Settlement Consideration

Dear ARAG Legal Insurance,

I am writing regarding my ongoing federal bad faith litigation against ARAG, as well as recent developments that further support my claims of improper handling of my legal defense.
Given new evidence and a newly assigned law enforcement investigation, I request that ARAG take immediate steps to support a Motion to Stay the case until law enforcement completes its investigation and all regulatory complaints have been reviewed.

Additionally, I am willing to settle this case to avoid another high-profile legal dispute, particularly in light of new evidence brought to light in Miami, FL, implicating Michael Fitzgerald. This evidence was significant enough that the Executive Assistant to the Chief of Police personally called me this morning to inform me that a new detective has been assigned to the investigation.
Furthermore, Nichelle Womble officially appeared in my case yesterday, though securing new legal representation for this matter has been a significant challenge due to the extensive time required to interview potential counsel. Additionally, on January 3rd, the appellate court in Iowa upheld the ruling for parental termination of my niece and nephew, and I have been actively preparing for their adoption, which involves substantial paperwork, medical evaluations, and court proceedings.

The Federal Judge's Ruling Confirmed Prior Counsel's Failures

Additionally, the judge recently ruled that the deposition transcripts I attempted to introduce into the record should have been submitted during pretrial motions while Richard Gomez was still representing me. The court denied my motions to supplement the record, further proving that ARAG-appointed counsel failed to properly prepare my case, meet deadlines, or fulfill essential pretrial obligations. This failure significantly prejudiced my defense and further supports my claims of ARAG's bad faith and legal malpractice.
Given these circumstances, which option does ARAG agree to?
    1. A Motion to Stay the case to allow for legal and investigative developments.
    2. Settlement negotiations to avoid further unnecessary litigation, stress, and resource expenditure.
Additionally, as I have pursued due diligence in understanding ARAG's legal and ethical responsibilities, I have had to report aspects of my federal case to various regulatory bodies, including:

- Securities and Exchange Commission (SEC) – Reported potential securities fraud and failure to disclose material risks before SoftwareONE (SWO)'s IPO.
- Swiss Exchange (SIX Swiss Exchange) – Reported SWO's potential violations of financial disclosure regulations.
- U.S. Department of Justice (DOJ) – Reported obstruction of justice, witness retaliation, and corporate misconduct.
- Federal Bureau of Investigation (FBI) – Reported obstruction of justice, financial coercion, and securities fraud.
- U.S. Attorney's Office – Southern District of Florida – Requested a federal investigation into obstruction, retaliation, and due process violations.
- State Attorney's Office (Florida) – Reported local law enforcement's failure to properly investigate and pursue charges.
- State Bar Association – Reported ethical violations by attorneys involved in suppressing evidence and obstructing justice.
- Florida Bar – Reported litigation abuse and legal misconduct involving attorneys suppressing evidence, retaliatory lawsuits, and unethical legal tactics.
- Judicial Conference of the United States – Reported issues related to litigation and requested judicial reform.

Additionally, I recently discovered that an ARAG representative engaged in a discussion with opposing counsel in my federal case, disclosing details regarding my legal insurance policy. Opposing counsel inquired about policy limits and attorney withdrawal reasons, which could have strategically harmed my legal defense. This raises serious concerns about confidentiality, potential wire fraud, and ARAG's compliance with ethical standards. I am evaluating whether additional regulatory action is necessary regarding this disclosure.

I am also deeply concerned about information I recently received from a lawyer I randomly connected with, who was familiar with ARAG Legal and mentioned that criminal charges were brought against the company in Germany. I have requested supporting documentation regarding this but want to ensure that this is not the case.

Please confirm ARAG's position within the next 48 hours, as I need to prepare a motion as a pro se plaintiff while navigating the filing procedures in Washington State Federal Court.

Sincerely,
Ronda McNae

On Wed, Feb 12, 2025 at 4:44 PM Mullaly, Michael T. <michael.mullaly@squirepb.com> wrote:

Dear Ronda and Will,-

Many thanks for your email. As before, ARAG cannot agree to a stay of the case but is willing to submit a joint motion to extend all scheduling order deadlines by another 90 days. That is designed to ensure the next scheduling order deadline is comfortably after the current trial date of the case in Florida federal court. I have prepared and attached for your consideration a proposed joint motion to seek the Court's permission.

Your email also mentions interest in exploring settlement. ARAG will happily discuss settlement with you any time you wish. Due to the amount of time it can take to reach a resolution, though, we think it is prudent to approach the Court now with a request to extend the case schedule. The most helpful information that you can provide to begin a settlement discussion is a specific statement of what you seek. I'll pass that along to ARAG and we can go from there.

Finally, your email below makes a number of allegations concerning ARAG. Although ARAG has a different view, I do not want to take the time to address that now at the expense of responding to you quickly. That said, I would like to respond to your allegation that "an ARAG representative engaged in a discussion with opposing counsel in my federal case, disclosing details regarding my legal insurance policy." I am familiar with a call during which Mr. Fitzgerald's counsel requested information from ARAG concerning any policy limits and reasons for attorney withdrawal. ARAG has produced a recording of that call to you in this litigation, and for your convenience the recording is attached here as well. As you will hear, the ARAG representative declines to provide any information to Mr. Fitzgerald's counsel. Please confirm that this recording fully resolves your concern.

Thanks and look forward to hearing from you.
Best regards,
Mike

From: Ronda McNae <prose.rmcnae@gmail.com>
Sent: Thursday, February 13, 2025 12:22 AM
To: Mullaly, Michael T. <michael.mullaly@squirepb.com>
Cc: ann.cosimano@araglegal.com; Will McNae <prose.wmcnae@gmail.com>
Subject: Re: [EXT] Urgent Request for Motion to Stay Proceedings & Settlement Consideration [I-AMS.FID5425010]


Dear Michael,

Thank you for your email and for providing the proposed 90-day extension. After reviewing my circumstances, I believe a 90-day extension will not suffice for the following reasons:

1. Criminal Investigation and Newly Uncovered Evidence
   Recent developments in the criminal investigation related to the rape and potential corporate cover-up are both complex and ongoing. Based on newly uncovered evidence, my counsel anticipates the court may grant a limited re-opening of discovery—or possibly outright dismissal—in the Florida case. We need ample time to review and integrate this evidence before proceeding.

2. Counsel's Trial Preparations
   My counsel cannot be reasonably expected to prepare for an April trial in a case of this magnitude. With over 14,000 pages of discovery—including voluminous depositions—and her existing caseload, it is unrealistic to fully and fairly address all issues by April.

3. Adoption Process Constraints
   I am in the process of adopting my niece and nephew, which requires various court approvals and may not be finalized by April. Traveling to Florida for a month-long trial (including the time I need beforehand due to PTSD) is infeasible without violating Iowa State Court orders and Prudent Parenting Laws, particularly since there is no remote learning option for children their age and I do not have a court-approved caregiver for an extended period. Under these circumstances, a longer continuance in the Florida case is absolutely necessary.

4. Confidentiality and Privacy Concerns
   With respect to the attached call recording, my concern extends beyond potential policy-limit disclosures. On the call, ARAG's representative asked, "Is this for the restraining order?"—revealing private information to Ms. Gussin. According to guidance I have received, this may violate privacy laws across multiple jurisdictions, and both Ms. Gussin's conduct and the ARAG representative's disclosure could constitute further legal and ethical violations.

5. Assessing the Extent of Damage in the Florida Case
   I am still assessing the full extent of the damage in my Florida case, particularly because ARAG terminated my legal counsel, and the replacement counsel was highly ineffective—most notably failing to file a significant motion for summary judgment. If it becomes necessary to address these issues in court before the Honorable Judge Lin, scheduling a hearing would be beneficial. Both Will McNae and I can provide additional context regarding these matters at that time.

Given these factors, I respectfully maintain that a longer stay of the current schedule is necessary given ongoing investigations. We are still open to a settlement offers however with prior ineffective counsel, that has further added to damages (I included a draft of what we plan to seek). While I remain open to exploring settlement discussions, adjusting the schedule to accommodate the ongoing investigations and my personal obligations, a 90-day extension alone does not fully address these concerns. I would appreciate ARAG's prompt response, as I must keep the court informed of my position

regarding these scheduling and procedural issues. In the meantime, I will continue to prepare my motion for a stay.

Sincerely,
Ronda McNae

On Wed, Feb 12, 2025 at 4:44 PM Mullaly, Michael T. <michael.mullaly@squirepb.com> wrote:

Dear Ronda and Will,-
Many thanks for your email. As before, ARAG cannot agree to a stay of the case but is willing to submit a joint motion to extend all scheduling order deadlines by another 90 days. That is designed to ensure the next scheduling order deadline is comfortably after the current trial date of the case in Florida federal court. I have prepared and attached for your consideration a proposed joint motion to seek the Court's permission.

Your email also mentions interest in exploring settlement. ARAG will happily discuss settlement with you any time you wish. Due to the amount of time it can take to reach a resolution, though, we think it is prudent to approach the Court now with a request to extend the case schedule. The most helpful information that you can provide to begin a settlement discussion is a specific statement of what you seek. I'll pass that along to ARAG and we can go from there.

Finally, your email below makes a number of allegations concerning ARAG. Although ARAG has a different view, I do not want to take the time to address that now at the expense of responding to you quickly. That said, I would like to respond to your allegation that "an ARAG representative engaged in a discussion with opposing counsel in my federal case, disclosing details regarding my legal insurance policy." I am familiar with a call during which Mr. Fitzgerald's counsel requested information from ARAG concerning any policy limits and reasons for attorney withdrawal. ARAG has produced a recording of that call to you in this litigation, and for your convenience the recording is attached here as well. As you will hear, the ARAG representative declines to provide any information to Mr. Fitzgerald's counsel. Please confirm that this recording fully resolves your concern.
Thanks and look forward to hearing from you.

Best regards,
Mike

From: Ronda McNae <prose.rmcnae@gmail.com>
Sent: Thursday, February 13, 2025 12:22 AM
To: Mullaly, Michael T. <michael.mullaly@squirepb.com>
Cc: ann.cosimano@araglegal.com; Will McNae <prose.wmcnae@gmail.com>
Subject: Re: [EXT] Urgent Request for Motion to Stay Proceedings & Settlement Consideration [I-AMS.FID5425010]

Dear Michael,

Thank you for your email and for providing the proposed 90-day extension. After reviewing my circumstances, I believe a 90-day extension will not suffice for the following reasons:

1. Criminal Investigation and Newly Uncovered Evidence
   Recent developments in the criminal investigation related to the rape and potential corporate cover-up are both complex and ongoing. Based on newly uncovered evidence, my counsel anticipates the court may grant a limited re-opening of discovery—or possibly outright dismissal—in the Florida case. We need ample time to review and integrate this evidence before proceeding.

2. Counsel's Trial Preparations - My counsel cannot be reasonably expected to prepare for an April trial in a case of this magnitude. With over 14,000 pages of discovery—including voluminous depositions—and her existing caseload, it is unrealistic to fully and fairly address all issues by April.

3. Adoption Process Constraints - I am in the process of adopting my niece and nephew, which requires various court approvals and may not be finalized by April. Traveling to Florida for a month-long trial (including the time I need beforehand due to PTSD) is infeasible without violating Iowa State Court orders and Prudent Parenting Laws, particularly since there is no remote learning option for children their age and I do not have a court-approved caregiver for an extended period. Under these circumstances, a longer continuance in the Florida case is absolutely necessary.

4. Confidentiality and Privacy Concerns - With respect to the attached call recording, my concern extends beyond potential policy-limit disclosures. On the call, ARAG's representative asked, "Is this for the restraining order?"—revealing private information to Ms. Gussin. According to guidance I have received, this may violate privacy laws across multiple jurisdictions, and both Ms. Gussin's conduct and the ARAG representative's disclosure could constitute further legal and ethical violations.

5. Assessing the Extent of Damage in the Florida CaseI am still assessing the full extent of the damage in my Florida case, particularly because ARAG terminated my legal counsel, and the replacement counsel was highly ineffective—most notably failing to file a significant motion for summary judgment. If it becomes necessary to address these issues in court before the Honorable Judge Lin, scheduling a hearing would be beneficial. Both Will McNae and I can provide additional context regarding these matters at that time.

Given these factors, I respectfully maintain that a longer stay of the current schedule is necessary given ongoing investigations. We are still open to a settlement offers however with prior ineffective counsel,

that has further added to damages (I included a draft of what we plan to seek). While I remain open to exploring settlement discussions, adjusting the schedule to accommodate the ongoing investigations and my personal obligations, a 90-day extension alone does not fully address these concerns.

I would appreciate ARAG's prompt response, as I must keep the court informed of my position regarding these scheduling and procedural issues. In the meantime, I will continue to prepare my motion for a stay.

Sincerely,

Ronda McNae

On Thu, Feb 13, 2025 at 11:42 AM Mullaly, Michael T. <michael.mullaly@squirepb.com> wrote:

Hi Ronda. Thanks for your response. ARAG proposed a 90-day extension of the scheduling order deadlines based in part on our estimation of what a court is likely to permit given circumstances as they currently exist (rather than as they might develop). Needless to say, our powers of estimation are imperfect, and we cannot offer you legal advice concerning what a court is likely to grant. All that said, ARAG is willing to jointly seek a 120-day extension of the scheduling order deadlines and then see how the circumstances confronting the parties, including some you reference below, continue to develop. ARAG has concerns about the viability of a motion seeking to extend the scheduling order deadlines by more than 120 days and would prefer to proceed more incrementally.

I understand from the below that you may be seeking to further extend the trial date in the Florida federal court action. If you succeed in those efforts and a later trial date—or other life circumstances—significantly affect your ability to comply with the scheduling order in this matter (as extended by 120 days, hopefully), then you would be free to make a future motion to the Court explaining the facts that you believe constitute good cause to obtain further extensions.

Please let me know if this approach is agreeable to you and Will. If so, I will adjust the proposed joint motion to extend the scheduling order dates so that we instead seek 120 days. We can address the other matters you raise below separately, as I know you are eager to resolve case scheduling. Thanks again.

Best regards,

Mike

**From:** Ronda McNae <prose.rmcnae@gmail.com>
**Sent:** Thursday, February 13, 2025 3:45 PM
**To:** Mullaly, Michael T. <michael.mullaly@squirepb.com>
**Cc:** ann.cosimano@araglegal.com; Will McNae <prose.wmcnae@gmail.com>
**Subject:** Re: [EXT] Urgent Request for Motion to Stay Proceedings & Settlement Consideration [I-AMS.FID5425010]


Dear Michael an ARAG,

Thank you for your prompt response and ARAG's willingness to extend the scheduling order by 120 days. However, after careful consideration of the ongoing developments in my legal proceedings, I must respectfully maintain my request for a Motion to Stay the Case rather than a simple extension.

While I acknowledge ARAG's concerns regarding the Court's discretion in granting a longer stay, an extension alone does not resolve the underlying issues that prevent me from fully and fairly litigating this matter at this time. The extraordinary circumstances in this case—including a pending criminal investigation, newly uncovered evidence, and unresolved procedural failures stemming from ARAG-appointed counsel's withdrawal—necessitate a temporary stay rather than merely extending deadlines.

Reasons Why an Extension Is Insufficient and a Stay is Necessary

1. Newly Uncovered Evidence and Pending Criminal Investigation

Recent developments in the criminal investigation concerning the rape and potential corporate cover-up introduce substantial complexity to this case. Given that key facts are still emerging and could lead to further re-opening of discovery or other procedural changes, it is premature to set any firm deadlines until these matters are resolved.

Moreover, given ARAG's legal and ethical obligations, it is concerning that ARAG would object to a stay while this investigation is still ongoing, particularly when the evidence uncovered may directly impact my claims.

2. Unfair Prejudice Without a Stay

- The Florida trial date is still uncertain and may be subject to further continuances based on the unfolding investigation. Proceeding with this case without clarity on those proceedings puts me in a position of defending myself in multiple jurisdictions without adequate resources.
- The denial of my motion to supplement the record in the Florida case underscores that prior ARAG-appointed counsel failed to protect my rights by neglecting to submit critical evidence. Before this case can proceed further, I need the opportunity to rectify these errors, which may require additional motions in Florida federal court.

3. Substantial Personal Hardship and Family Obligations

Beyond the legal complexities, my adoption of my niece and nephew is ongoing, and the legal process requires court appearances and compliance with Iowa state laws. Traveling to Florida for trial without a court-approved caregiver places me in direct conflict with state adoption and guardianship regulations. Given the serious nature of these constraints, a simple deadline extension does not alleviate these challenges. A stay, however, ensures that I can properly balance these legal and personal obligations without suffering additional undue hardship.

ARAG's Position on a Stay Raises Concerns

While I appreciate ARAG's willingness to extend deadlines, I must respectfully question why ARAG is unwilling to agree to a stay when:

- The facts in this case continue to develop, making future adjustments likely necessary.
- The Court would not be burdened by a temporary stay, as both parties would have the opportunity to seek modifications when appropriate.
- ARAG's prior failure to provide adequate representation has already necessitated corrective legal action, which makes it unreasonable to expect me to proceed under current conditions.

Proposal for a Reasonable Resolution

Given these circumstances, I propose the following:

1. Agree to a Motion to Stay the Case until at least 30 days following the resolution of the Florida trial or the completion of the pending criminal investigation, whichever occurs first. This ensures that I am not unduly prejudiced by deadlines set without consideration of external legal developments.
2. If ARAG is unwilling to agree to a full stay, then I request at minimum a stay for a defined period of 6 months, with a joint status update required before any further scheduling changes.
3. If ARAG continues to oppose a stay, I will proceed with filing a formal motion to stay the proceedings with the Court, outlining the extraordinary circumstances and procedural failures that necessitate a pause in litigation.

I am open to further discussion on this matter, but I respectfully urge ARAG to reconsider its position in light of the substantial and documented hardships I am facing. Please confirm ARAG's stance at your earliest convenience so that I may proceed accordingly.

Best regards,

Ronda McNae

On Fri, Feb 14, 2025 at 10:52 AM Mullaly, Michael T. <michael.mullaly@squirepb.com> wrote:
Dear Ronda and Will,-

Thanks for your reply, Ronda. Although ARAG is unwilling to stay the case, in the spirit of compromise ARAG will agree to jointly move for a six-month extension of all scheduling order deadlines. I would like to emphasize that this is double the length of the extension that ARAG offered just days ago, comes on the heels of a 120-day extension that ARAG agreed to in October, and may be a longer deferral of the scheduling order deadlines than the Court is willing to permit without seeing how things actually develop over the next several months. I also would like to reiterate a couple things. First, that you remain free to file motions with the Court seeking any further timing accommodations that you feel are necessary based on future events or constraints as they actually develop. Second, that ARAG agreed to the last significant extension of the scheduling order deadlines based in part on a commitment from you and Will to respond to ARAG's discovery requests by no later than January 23, 2025 (a 90-day extension from the already-extended October 25, 2024 deadline), which has not occurred. This second point is not to suggest that ARAG is unwilling to permit a further extension of your time to respond to ARAG's discovery requests (provided that the scheduling order deadlines are extended, as the current ones do not permit continued flexibility). Rather, it is just one of the circumstances that make ARAG deeply uncomfortable with a complete and indefinite standstill, particularly when it is based on forecasts of what might happen in the future rather than known facts and circumstances.

I hope that each of you will carefully consider ARAG's offer to submit a joint motion to extend the scheduling order deadlines by six months. If you both agree to this, please let me know so I can adjust the draft that I recently circulated. As before, I am not addressing in this email the other topics raised below because I understand your priority to be a resolution of case scheduling matters. Thank you and hope that you both are well.

Best regards,
Mike

**Ronda McNae <prose.rmcnae@gmail.com>**      Feb 17, 2025, 7:54 PM (13 hours ago)
to Michael, ann.cosimano@araglegal.com, Will

**Subject: Notice of In-Person Filing & Document Submission**
Dear Michael and ARAG Legal Insurance,

I am writing to inform you that I will be filing my emergency motion in person tomorrow to ensure compliance with all court filing requirements.

Additionally, I am submitting formal complaints to multiple regulatory bodies regarding ARAG's conduct, including:

- Washington, Iowa, and Florida Insurance Departments – Oversight of ARAG's insurance practices.
- Consumer Financial Protection Bureau (CFPB) and Federal Trade Commission (FTC) – Investigation into fraudulent and deceptive business practices.
- U.S. Department of Justice (DOJ) and Federal Bureau of Investigation (FBI) – Inquiry into potential criminal obstruction, fraud, and corporate misconduct.
- National Association of Insurance Commissioners (NAIC) – Ensuring multi-state insurance regulators are aware of the issues.

As I have reviewed deposition transcripts and internal communications, I have identified significant concerns that further support these complaints and warrant regulatory scrutiny. The complaints include up to a dozen supporting exhibits detailing ARAG's actions.

I will provide you with a copy of these documents tomorrow upon filing. Please let me know if you have any questions.

Best,
Ronda McNae

# Exhibit H

Declaration by Ronda McNae, February 18, 2025

THE HONORABLE TANA LIN

*Pro Se 2025*

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| William MCNAE and RONDA MCNAE, husband and wife, | CASE NO. 2:24-cv-00211-TL |
| Plaintiffs, | |
| v. | DECLARATION IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION TO STAY PROCEEDINGS |
| ARAG INSURANCE COMPANY, | <u>EXPEDITED RELIEF REQUESTED</u> |
| Defendant. | |

**I, Ronda McNae, declare under penalty of perjury as follows:**

I am the Plaintiff in the above-captioned matter. I submit this declaration in support of my Motion to Stay Proceedings due to extraordinary circumstances, including a newly reassigned criminal investigation, newly uncovered evidence in the Florida litigation, ARAG's failure to provide competent legal representation, and my family's ongoing adoption process, which legally restricts my ability to participate in litigation at this time. I have personal knowledge of the facts stated in this declaration, and if called as a witness, I could and would competently testify to them.

PLAINTIFFS' EMERGENCY MOTION

CASE NO. 2:24-CV-00211-TL - 1

THE HONORABLE TANA LIN

*Pro Se 2025*

1
2
3
4

This litigation arises from ARAG's bad faith handling of my legal defense and misconduct in matters directly intertwined with a reactivated criminal investigation, along with separate investigations into ARAG's conduct by regulatory bodies. Since the filing of this lawsuit, new evidence has emerged in the underlying case in Miami, Florida, requiring additional legal proceedings that directly impact my claims.

5
6
7
8
9
10
11
12
13
14

**On February 11, 2025**, I received a call from the **Executive Assistant to the Chief of Police leading Intelligence and Security at the Miami Beach Police Department**, who informed me that a new detective would be assigned to my case. Then, on **February 18, 2025, at 11:21 AM**, I received a call from **Detective Alvarez**, confirming that he has been newly assigned to my case. Detective Alvarez informed me that he will be reaching out on Thursday to discuss follow-up questions before proceeding further. He apologized for the delay, explaining that the City of Miami is preparing for the President's arrival, but assured me that he would prioritize my case. This development confirms that law enforcement has reassigned resources to review serious allegations beyond the initial sexual assault report, which directly impact the evidence, witness testimony, and legal issues in this lawsuit. Proceeding with this civil litigation while law enforcement is actively investigating could result in conflicting findings and prejudice my ability to fully litigate this matter. A stay is necessary to allow the criminal investigation to proceed without interference.

15
16

As a policyholder, I was entitled to full legal representation at no additional cost under my ARAG legal insurance plan, which I obtained through my husband's employer, Microsoft. Despite

17
18
19

PLAINTIFFS' EMERGENCY MOTION
CASE NO. 2:24-CV-00211-TL - 2

THE HONORABLE TANA LIN

*Pro Se 2025*

this contractual obligation, ARAG arbitrarily terminated my legal coverage, denying me the legal

representation I was promised when I purchased this benefit. In November 2023, ARAG

terminated my appointed legal counsel without cause or justification, leaving me unrepresented at

a critical stage of my case. After ARAG terminated my counsel, they offered me a settlement in

exchange for signing a non-disclosure agreement (NDA) and a release of all claims. I declined

ARAG's settlement offer because the financial amount offered would not cover the costs of my

Florida trial and did not compensate for the emotional distress, procedural obstacles, and undue

hardship that ARAG inflicted upon my family, particularly during the holidays of 2023.

Additionally, opposing counsel in the Florida case threatened that my young children would be

bound by an NDA if I proceeded with a settlement, assuming that was my only option. Without

legal counsel and facing these pressures, I was effectively thrust into a pro se position, forced to

defend myself against well-resourced opponents. I chose to represent myself to protect not only

my own rights but also my children's First Amendment rights, ensuring they would not be silenced

by an NDA. The undue pressure from both ARAG and opposing counsel further demonstrates the

prejudice and coercion I have faced in this litigation, necessitating Court intervention through a

stay.

   In addition to my legal battles, my family is in the middle of an adoption process, which

must take priority. In early 2024, we completed an Interstate Compact on the Placement of

Children (ICPC) home study and were approved for long-term placement and adoption of my niece

PLAINTIFFS' EMERGENCY MOTION

CASE NO. 2:24-CV-00211-TL - 3

THE HONORABLE TANA LIN

*Pro Se 2025*

and nephew. On January 3, 2025, the appellate court upheld the termination of parental rights, finalizing the children's legal eligibility for adoption. As part of this process, I am required to comply with Iowa State court orders, including travel restrictions with the children. Due to these legal obligations, I cannot travel to Florida for the underlying trial, which makes proceeding with litigation at this time impossible without causing irreparable harm to my family. Being forced to simultaneously litigate this complex civil case while finalizing the adoption would place an overwhelming burden on me and my family, creating an unnecessary conflict between my legal obligations and my parental responsibilities. *(Exhibit F – Home Study)*

Only after I filed a bad faith lawsuit against ARAG did they eventually appoint legal counsel on my behalf in the Florida case. However, this counsel did more harm than good. ARAG-appointed counsel pressured me to abandon my only affirmative defense of duress. They requested an extension to file a motion for summary judgment, billed for the work, but never actually filed the motion. They failed to obtain critical deposition transcripts related to the underlying sexual assault and trauma, depriving me of key evidence. Prior counsel also billed only 60 hours of work before withdrawing in October 2024—just one month before trial—leaving me unrepresented again. I have worked tirelessly to rectify the irreparable harm caused by this ineffective representation, but the Federal Court in Florida denied my motion to supplement the record, ruling that the evidence should have been submitted earlier when ARAG-appointed counsel was still representing me. This ruling proves that ARAG's failure to provide competent representation has

PLAINTIFFS' EMERGENCY MOTION

CASE NO. 2:24-CV-00211-TL - 4

THE HONORABLE TANA LIN

*Pro Se 2025*

1  already caused substantial prejudice to my case.    See *(Exhibits C1 -2:*  **DE 292 and DE 295)**

2  further confirm that I was prejudiced due to ineffective legal representation, solidifying that

3  ARAG's failure to provide competent counsel has crippled my ability to receive a fair trial.  New

4  counsel officially appeared in my case in the Florida Action on February 10, 2025. However, given

5  ARAG's repeated history of interference with prior appointed counsel, I have serious concerns that

6  they may once again attempt to undermine my legal representation. I respectfully request that this

7  Court take these concerns into account and provide appropriate oversight to prevent further

8  disruptions. While trial in the Florida Action is currently scheduled for April 2025, it is impossible

9  for new counsel to adequately prepare given the vast case record, which includes over 14,000

10  documents and 21 depositions. My counsel in the Florida Action has already indicated the

11  necessity of filing a continuance due to the overwhelming workload, as well as challenges in

12  obtaining court approval from Iowa to travel with my niece and nephew in April. Removing them

13  from school—along with my biological children—would not be in their best interests, especially

14  given the significant amount of school they have already missed due to the Florida Action and the

15  initial criminal investigation. Additionally, ARAG's wrongful actions have now created an even

16  greater financial burden, as I must travel with two additional children rather than just my biological

17  children, as was the case before ARAG terminated my initial counsel. The unnecessary stress,

18  time, and costs ARAG has inflicted on me and my family were entirely avoidable and only serve

19  to further prejudice my ability to properly litigate my case.

PLAINTIFFS' EMERGENCY MOTION

CASE NO. 2:24-CV-00211-TL - 5

THE HONORABLE TANA LIN

*Pro Se 2025*

If this case proceeds, it will interfere with an active criminal investigation and law enforcement's ability to conduct a fair and complete review. I will be forced to engage in legal proceedings while critical witness testimony and law enforcement findings are still pending. ARAG will continue to benefit from the harm they caused by appointing ineffective legal counsel. The demands of litigation will directly interfere with my ability to finalize my adoption process, placing unnecessary stress and hardship on my family. I made repeated good-faith efforts to confer with ARAG and its counsel regarding a reasonable resolution. I initially requested a joint motion to stay due to the extraordinary legal and factual developments, but ARAG refused. ARAG instead offered a six-month extension of deadlines, which does not resolve the fundamental issues requiring a stay. I have also notified ARAG that I am submitting formal complaints to regulatory agencies regarding their conduct, which further supports the need for judicial intervention. Because ARAG has refused to agree to a stay, I have no choice but to seek relief from this Court. Given the ongoing criminal investigation, newly uncovered evidence, my family's adoption process, and procedural failures caused by ARAG, I respectfully request that the Court grant a stay of these proceedings until at least 30 days following the resolution of the Florida trial or the conclusion of the criminal investigation, whichever occurs first.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

DATED THIS 18<u>TH</u> DAY OF FEBURARY 2025, AT <u>SEATTLE, WA</u>

PLAINTIFFS' EMERGENCY MOTION

CASE NO. 2:24-CV-00211-TL - 6

THE HONORABLE TANA LIN

*Pro Se 2025*

1    Respectfully submitted,
Ronda McNae

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18   PLAINTIFFS' EMERGENCY MOTION

CASE NO. 2:24-CV-00211-TL - 7

19