Exhibit 16

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 1:22-cv-22171-JEM

MICHAEL FITZGERALD,
individually, and YELANY DE VARONA,
individually,

        Plaintiffs,

v.

RONDA MCNAE, individually, and
WILLIAM MCNAE, individually,

        Defendants.

_____/



FILED BY _____ D.C.

FEB 6 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

## DEFENDANT RONDA MCNAE'S MOTION FOR LEAVE TO STRIKE PLANTIFF'S MOTION FOR A SURREPLY TO DE 275

Defendant Ronda McNae, appearing pro se, respectfully moves this Court to strike Plaintiffs' Motion for Leave to File a Surreply (DE 284) as procedurally improper. Plaintiffs' motion is another example of excessive motion practice and procedural abuse, aimed at controlling the narrative and prolonging litigation. In support, Defendant states as follows:

### I. INTRODUCTION

Plaintiff asserts that Defendant's Reply (DE 283) introduced new arguments which is inaccurate. Each issue Plaintiff seeks to rebut was already raised in Defendant's Motion to Dismiss (DE 275) and supporting exhibits (DE 275-1 & DE 275-2). Plaintiff's motion (DE 284) is not about responding to genuinely new legal arguments—it is a bad-faith attempt to have the last word and gain an unfair litigation advantage against me, a pro se litigant. Plaintiff has a pattern of improper litigation tactics, including:

- Misuse of privilege claims (DE 67),

- Weaponization of the Confidential Settlement Agreement (DE 105), and

- Retaliatory use of the legal system (DE 39).

Now, Plaintiff seeks to contradict his own prior position. When Defendant previously sought leave to file a surreply (DE 104), Plaintiff opposed the motion, arguing:

1. No new arguments were raised in Plaintiff's reply brief justifying such a surreply;

2. Defendant already had a full opportunity to respond; and

3. A surreply would improperly give Defendant "another bite at the apple."

Despite this firm stance, Plaintiff now reverses course and demands a surreply for himself, claiming Defendant's Reply (DE 283) "raises new arguments" and "exceeds the scope" of the response. This procedural gamesmanship cannot be ignored. The Court should apply the same reasoning Plaintiff previously advocated and deny this motion in its entirety.

## II. LEGAL STANDARD

**Surreplies Are Disfavored and Permitted Only in Limited Circumstances**

Plaintiff's Motion for Leave to File a Surreply (DE 284) does not meet the standard for granting a surreply in the Southern District of Florida. Surreplies are not permitted as a matter of right and are only allowed in rare circumstances when a reply brief introduces new legal arguments or evidence that could not have been anticipated in the response. The Southern District of Florida disfavors surreplies, as they "often amount to nothing more than a last-ditch effort to have the final word." Plaintiff's motion fails to meet this standard and serves only to further Plaintiff's bad-faith litigation strategy.

## III. PLAINTIFF'S MOTION SHOULD BE DENIED BECAUSE DEFENDANT'S REPLY DID NOT RAISE NEW ARGUMENTS

### A. Arguments Plaintiff Challenges Were Already Raised in Defendant's Motion to Dismiss (DE 275)

Plaintiff falsely claims that Defendant's Reply (DE 283) introduced new arguments regarding:

1. Alleged SEC violations by SoftwareONE

2. Plaintiff's counsel providing a misleading timeline to experts

3. Social media surveillance of Defendant as harassment

4. A false affidavit from former Co-Plaintiff Yelany De Varona

However, each of these issues was explicitly raised in Defendant's Motion to Dismiss (DE 275) and its supporting exhibits (DE 275-1 & DE 275-2), including:

1. SoftwareONE's Role and SEC Violations[1]

- Defendant has previously argued that SoftwareONE played a direct role in the misconduct at issue, and its actions may constitute securities law violations.

- Evidence in DE 275-2 supports the claim that SoftwareONE knowingly engaged in deceptive practices, which are relevant to the claims and defenses in this case.

- Plaintiff had a full opportunity to respond to these allegations in his Response (DE 282) and cannot now seek a surreply to reframe the discussion.

---

[1] Michael Fitzgerald was likely in a conflict of interest as he remained a member of the Executive Leadership Team while also serving as a shareholder and investor. As Chief Information Officer (CIO) of SWO Inc., he was subject to heightened ethical and fiduciary obligations, particularly given the timing of the company's IPO on October 25, 2019—just six days after the alleged physical and sexual assault that Defendant later reported to SWO in early February 2020, prior to the negotiation of the Confidential Settlement Agreement (CSA) he pressured the McNae's to sign following threats of job loss. Fitzgerald had a hand in Will McNae's promotion in September 2019 so there was a real threat and fear Fitzgerald would retaliate using his influence to get Will McNae let go from Microsoft. Ironically, Will McNae was let go from Microsoft three months after Fitzgerald's Deposition where Fitzgerald stated the CEO of SWO, Deiter Schlosser, called Microsoft and told them "*to get fucked*".

3

2. Misleading Timeline Provided to Experts

- Defendant previously argued that Plaintiff's counsel selectively omitted key events from case timelines to mislead experts.

- Exhibit B of DE 275-2 contains evidence of these omissions and their impact on the case's factual background.

3. Social Media Surveillance as Harassment

- Defendant previously argued that Plaintiff's legal team and associates monitored her social media as an intimidation tactic.

- Exhibit A of DE 275-1 contains evidence linking Plaintiff's counsel to social media accounts monitoring Defendant's activity.

4. False Affidavit from Yelany De Varona

- Defendant previously raised concerns about Plaintiff's reliance on a false affidavit submitted by Yelany De Varona before the case was even filed.

- Exhibit C of DE 275-1 contains records showing contradictions in Yelany's statements.

Because these issues were already part of the original motion (DE 275), Plaintiff's claim that they are "new arguments" is entirely without merit.

**IV. Supporting Evidence and Legal Grounds for Defendant's Motion to Strike Surreply**

Plaintiffs' counsel has engaged in a sustained pattern of litigation misconduct, including violations of ethical rules, misrepresentation of facts, discovery abuses, and procedural gamesmanship. This conduct not only undermines the integrity of the judicial process but also demonstrates why DE 284 should be stricken. The following sections outline specific instances of misconduct and how they support the relief sought by Defendant.

**1. Violations of Florida Bar Rules & Deceptive Litigation Tactics**

4

Plaintiffs' counsel has repeatedly engaged in unethical conduct, violating multiple Florida Bar Rules to gain an unfair litigation advantage. Their tactics include making false statements, misrepresenting facts, and improperly communicating with represented parties. Although the Court did not grant sanctions in DE 150 due to a procedural error on my part as a pro se litigant, the ruling did not address the merits of the allegations. Rather than seeking to relitigate those individual acts, the following examples illustrate a broader pattern of misconduct by Plaintiffs' counsel.

Key Violations Examples (DE 150 – Motion to Sanction Opposing Counsel):

- Rule 4-3.3 (Candor Toward the Tribunal): Opposing counsel knowingly made false statements in court.

- Rule 4-4.1 (Truthfulness in Statements to Others): Material facts were misrepresented to the Court and opposing parties.

- Rule 4-4.2 (Communication with Represented Parties): Improper contact with represented parties, in violation of ethical obligations.

- Litigation Misconduct: Opposing counsel omitted key facts, altered the procedural background, and filed excessive motions to burden Defendant and prolong litigation.

How This Supports Striking DE 284:

Plaintiffs' counsel has a well-documented history of abusing motion practice by filing misleading and excessive pleadings. DE 284 continues this pattern by seeking unnecessary additional briefing. Given their prior misconduct, the Court should deny further opportunities for Plaintiffs to manipulate the litigation process.

**2. Misrepresentation of Facts & Procedural Misconduct**

Plaintiffs' counsel has distorted facts and misrepresented procedural history to mislead the Court. These deceptive practices have denied Defendant the opportunity to fairly respond and have further delayed proceedings.

Key Violations (DE 155 – Reply in Support of Motion for Sanctions):

- Knowingly misrepresenting case timeline and procedural history.

- Manipulating deposition statements to distort events and mislead the Court.

- Failure to properly confer before filing motions, violating procedural requirements.

- Withholding notice of key filings to prevent Defendant from responding appropriately.

How This Supports Striking DE 284:

DE 284 falsely claims that Defendant's Reply (DE 283) introduced "new arguments" when these issues were already raised in prior motions. Given Plaintiffs' repeated procedural misconduct, their credibility in seeking additional briefing is undermined, warranting the striking of DE 284.

### 3. Discovery Misconduct & Withholding Evidence

Plaintiffs' legal team has engaged in systematic discovery abuses, selectively disclosing documents, withholding exculpatory evidence, and obstructing access to crucial information.

Key Violations:

- DE 231 – Motion to Supplement the Record: Opposing counsel withheld key evidence disproving Fitzgerald's claims of reputational harm and selectively disclosed documents to mislead the Court.

- DE 245 – Additional Motion to Supplement the Record: Plaintiffs' attorneys colluded with SoftwareONE to obstruct discovery, improperly invoked privacy laws to block employment records, and engaged in misrepresentation warranting sanctions.

6

- DE 252 – Reply in Support of Motion to Supplement the Record: Confidentiality provisions were weaponized to conceal SoftwareONE's internal misconduct investigations, and relief was sought under Rule 60(b)(2) & Rule 60(b)(3) for discovery fraud.

How This Supports Striking DE 284:

Plaintiffs' counsel has a demonstrated history of withholding evidence while falsely asserting procedural fairness. DE 284 represents another attempt to suppress unfavorable arguments and unnecessarily prolong briefing, justifying its removal.

**4. Plaintiffs' Pattern of Using the Legal System as a Weapon**

Plaintiffs have repeatedly leveraged the legal system to suppress Defendant's rights and silence her through procedural manipulation, including improper reliance on a Confidential Settlement Agreement (CSA) to conceal critical allegations.

Key Violations:

- DE 105 – Defendant's Affirmative Defenses:
  - Fitzgerald used the CSA to suppress Defendant's allegations.
  - Fraudulent inducement & duress—Fitzgerald coerced Defendant into signing the CSA under false pretenses.
  - CSA is void under the Florida Sunshine in Litigation Act because it conceals allegations of sexual assault, which constitute a public hazard.
- DE 39 – Motion to Dismiss Amended Complaint:
  - Plaintiff's claims are retaliatory and intended to silence Defendant.
  - The claims are legally baseless and disguised as contract claims to punish Defendant.

How This Supports Striking DE 284:

Plaintiffs' attorneys have repeatedly attempted to suppress key evidence through procedural abuse. DE 284 is yet another effort to weaponize the legal process against Defendant, warranting judicial intervention to strike it from the record.

## 5. Plaintiffs' Counsel's Contradictions & Procedural Gamesmanship

Throughout this litigation, Plaintiffs' attorneys have repeatedly contradicted themselves, mischaracterized discovery matters, and engaged in procedural tactics designed to mislead the Court.

Key Violations (DE 99 – Defendant's Motion for Leave to File Surreply):

- Plaintiff's Reply contained false factual statements and mischaracterizations about discovery.

- Contradictions in Witness Objections: Plaintiffs admitted they were not prejudiced by three of the four witnesses in Defendant's Amended Witness List, directly contradicting their own arguments.

How This Supports Striking DE 284:

Plaintiffs' attorneys have demonstrated a pattern of procedural manipulation and factual inconsistencies. DE 284 is yet another example of these tactics and allowing it to remain would only enable further abuse of the judicial process.

The evidence overwhelmingly demonstrates Plaintiffs' pattern of procedural misconduct, misrepresentation, and unethical litigation tactics. Given their history of filing excessive, misleading, and contradictory motions, DE 284 is merely another attempt to distort the proceedings and should be stricken. The Court should not permit additional briefing when Plaintiffs' counsel has already demonstrated a repeated abuse of motion practice.

## IV. PLAINTIFF'S PRIOR MISUSE OF PRIVILEGE CLAIMS (DE 67) FURTHER DEMONSTRATES PROCEDURAL ABUSE

Plaintiff's counsel has a history of manipulating privilege claims to suppress evidence:

- DE 67 shows that Plaintiff opposed Defendant's challenge to privilege claims regarding key employment documents.

- Plaintiff strategically invoked privilege to block damaging evidence while selectively waiving privilege when it suited his case.

This pattern of procedural manipulation mirrors the same bad-faith litigation tactics present in this motion.

## V. REQUEST FOR SANCTIONS UNDER RULE 37

Given Plaintiffs' ongoing bad-faith litigation tactics, Defendant respectfully requests that this Court:

1. STRIKE Plaintiffs' Motion for Leave to File Surreply (DE 284) as procedurally improper.

2. DENY Plaintiffs' request to file a surreply, as no new issues were introduced in Defendant's Reply (DE 283).

3. IMPOSE SANCTIONS under Rule 37(b) and the Court's inherent authority for Plaintiffs' continued misuse of discovery, procedural abuse, and misrepresentations to the Court.

## VI. CONCLUSION

Plaintiff's Motion for Leave to File a Surreply (DE 284) is procedurally improper and should be denied because:

1. Defendant's Reply (DE 283) did not raise new arguments—all issues were presented in Defendant's Motion to Dismiss (DE 275) and exhibits (DE 275-1 & DE 275-2).

2. Plaintiff's broader litigation strategy relies on bad-faith tactics, including weaponization of the CSA (DE 105), retaliation through the legal system (DE 39), and misuse of privilege claims (DE 67).

3. Allowing a surreply would reward excessive motion practice and delay tactics.

Accordingly, Defendant respectfully requests that this Court DENY Plaintiff's Motion for Leave to File a Surreply (DE 284) in its entirety.

Dated: February 4, 2025

By: Ronda Delapina McNae
Pro Se Defendant
504 11th PL Kirkland, WA 98033
Tel: (206) 914-6752
Prose.mcnae@gmail.com

## CERTIFICATE OF CONFERRAL

Pursuant to Local Rule 7.1(a)(3), Defendant certifies that she engaged in active communication with Plaintiffs' counsel, Meredith Gussin and Peter Berlowe, regarding this motion between January 31 and February 3, 2025 (Exhibit A). During this time, Defendant sought Plaintiffs' position on striking DE 284 as procedurally improper. Despite repeated inquiries, Ms. Gussin refused to provide a definitive answer and instead prolonged the conferral process. Given that Plaintiff historically oppose any motion that does not align with their litigation strategy, and given their refusal to state their position clearly, Defendant assumes Plaintiffs oppose this motion. Accordingly, Defendant submits this motion for the Court's consideration.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 4, 2025, a true copy of the foregoing Motion was sent via FedEx to the Clerk of the Court, Southern District of Florida, 400 N. Miami Ave, Room 8N09, Miami, FL 33128, and Plaintiff's counsel, in compliance with pro se litigant requirements.

**SERVICE LIST**
Peter E. Berlowe, Esq.
Meredith Gussin, Esq.
Assouline & Berlowe, P.A.
Miami Tower
100 SE 2nd Street, Suite 3105
Miami, FL 33131
Tel: 305-567-5576
Fax: 305-567-9343
peb@assoulineberlowe.com
mjg@assoulineberlowe.com
*Counsel for Plaintiffs*

# Exhibit A



**Fitzgerald v. McNae**

↤ **Meredith J. Gussin**

Ms. McNae,
We are in receipt of your reply brief in Support of your Motion to Dismiss (DE 283). After review, it has come to light that you asserted new arguments that are beyond the scope of what was included in your Motion or our response. Additionally, you included several documents that were produced during discovery that were marked Confidential. Please advise if you would like to meet and confer on this; otherwise, we would like to file a brief 3-4 page surreply. Kindly advise if you have any opposition to us filing same. I look forward to hearing from you.

**Meredith J. Gussin, Esq.**
**Litigation**



**Response to Your Concerns Regarding DE 283**

**Ronda McNae**

Dear Ms. Gussin,

Thank you for your email regarding DE 283. I appreciate your attention to the details of my reply brief.

To clarify, the arguments raised in DE 283 are not entirely new but are rather expansions on the systemic discovery misconduct that I have consistently referenced throughout these proceedings. My intention was to provide the Court with additional context and evidence demonstrating the pattern of procedural violations and suppression tactics employed.

As for the "Confidential" documents you referenced, please identify specifically which ones you believe were improperly included. To my knowledge, the documents I cited were either supplied without a "Confidential" designation or were provided to your expert, Sheri Fiske, without retaining such designation, effectively removing their confidential status.

That said, I am open to a good-faith discussion to address your concerns. If we cannot resolve this matter informally over email, I would kindly request that you share your specific objections to facilitate a focused and productive exchange. As other bodies are now involved and looking into the matter (that go beyond this immediate litigation), email will have to suffice.

I look forward to your response.

Best regards,
Ronda McNae

On Fri, Jan 31, 2025 at 3:54 PM Meredith J. Gussin <~~~~~~~~~~~~~~~~~> wrote:

What other bodies are you referring to?

The documents that were marked confidential are pages 18-20, 22, 24-27 of your reply brief at Exhibit B. Can you advise where you found those documents as the bates labels have been redacted?

As to new arguments those include reference to Neil Lomax and my husband, Grant Gussin; allegations regarding SEC violations, providing a timeline to Dr DiTomasso, and Ms. De Varona's affidavit. These were not included in your initial motion and are, therefore, beyond the scope of what is appropriate in a reply brief.

Get ~~~~~~~~~~~~~~~

---

**From:** Ronda McNae <~~~~~~~~~~~~~~~~~~~~>
**Sent:** Friday, January 31, 2025 7:08:24 PM
**To:** Meredith J. Gussin <~~~~~~~~~~~~~~~~~~~~>
**Cc:** Peter E. Berlowe <PEB@AssoulineBerlowe.com>
**Subject:** Re: Response to Your Concerns Regarding DE 283

Ms. Gussin,

A quick review confirms that you are mistaken regarding pages 24-27. I encourage you to carefully review your own production. I will locate the copies I received of pages 18-20 and 22 in the next few hours as I'm home with all the kids. If I inadvertently produced these and they were marked, I will rectify or call the chambers to figure out the best procedure in hopes to make an update immediately.

Additionally, what new arguments are you referring to? If I'm not in agreement with your assertion, I will move to strike your motion.

It is particularly ironic that the very documents you now claim are marked "confidential"—internal HR records I previously shared with Microsoft—have been weaponized against my family. This is especially troubling given that I exercised discretion in their disclosure, aligning with Honorable Magistrate Judge Becerra's guidance regarding overbroad designations.

Regarding other governing bodies, my position was made clear in my most recent filing in response to your premature request for a case management conference.

Regards,

Ronda

## Re: Response to Your Concerns Regarding DE 283  

**Ronda McNae**

Ms. Gussin,

If your primary concern is the Grant Gussin issue. I am open to discussing a resolution, though I firmly believe it strongly supports my case. I want to approach this matter in good faith.

-Ronda

On Fri, Jan 31, 2025 at 4:10 PM Meredith J. Gussin <​​​​​​​​​​​​> wrote:

If you disclosed those documents to Microsoft that is in violation of the protective order set in place in this case.

I listed the new arguments in my prior email.

---

**From:** Ronda McNae <​​​​​​​​​​​​>
**Sent:** Friday, January 31, 2025 11:54:47 PM
**To:** Meredith J. Gussin <​​​​​​​​​​​​>
**Cc:** Peter E. Berlowe <PEB@AssoulineBerlowe.com>
**Subject:** Re: Response to Your Concerns Regarding DE 283

Drafting a motion now, please let me know the reason for the designations for these documents. I'm still searching for the first couple pages as the copies I have were snapshots (hence) not having the designation.

-Ronda

On Fri, Jan 31, 2025 at 8:01 PM Meredith J. Gussin <​​​​​​​​​​​​> wrote:

What sort of resolution do you propose? That is not my primary concern. All the new issues remain equally of issue insofar as they are beyond the scope of your motion.

Additionally, will you be voluntarily seeking a removal from the docket of the confidential documents? If not, I believe it is proper for the court to rule on the propriety of your inclusion of protected material in direct violation of the protective order which sets forth the procedure to question or challenge any designation. Your belief that the documents are not confidential isn't sufficient.

14

**From:** Meredith J. Gussin <█████████████████>
**Sent:** Saturday, February 1, 2025 6:09:49 AM
**To:** Ronda McNae <█████████████████>
**Cc:** Peter E. Berlowe <PEB@AssoulineBerlowe.com>
**Subject:** Re: Response to Your Concerns Regarding DE 283

The documents were designated as confidential in the discovery process. The documents you provided neither have this designation nor the bates label which raises our concerns.

Filing another motion by you does not answer whether or not you are opposed to plaintiff filing a surreply to address these issues. Can you please advise whether or not you are opposed to us filing a brief surreply at this time? Thank you.

---

**Ronda McNae** ████████████████

Ms. Gussin,

I apologize, but I do oppose your motion. I did not raise new arguments; I referenced items from prior filings, as well as in this filing, to provide context and explain the broader issue of misconduct.

Could you please clarify the confidentiality designations for the documents in question? I have noticed some discrepancies and am trying to understand your client's rationale. It seems that a number of documents listed as confidential may no longer qualify under that designation.

This needs to be addressed in the state case considering you have pointed to the discovery in this case with some designations that may no longer apply.

Regards,

Ronda

---

**From:** Meredith J. Gussin <█████████████████>
**Sent:** Friday, January 31, 2025 8:01:06 PM
**To:** Ronda McNae <█████████████████>
**Cc:** Peter E. Berlowe <PEB@AssoulineBerlowe.com>
**Subject:** Re: Response to Your Concerns Regarding DE 283

What sort of resolution do you propose? That is not my primary concern. All the new issues remain equally of issue insofar as they are beyond the scope of your motion.

Additionally, will you be voluntarily seeking a removal from the docket of the confidential documents? If not, I believe it is proper for the court to rule on the propriety of your inclusion of protected material in direct violation of the protective order which sets forth the procedure to question or challenge any designation. Your belief that the documents are not confidential isn't sufficient.

**Ronda McNae**

I understand your concerns and appreciate your communication. I believe the documents included in my filing are highly relevant and directly address the discovery misconduct issues raised. Help me understand the confidentiality designations for the documents you believe are confidential. As you mentioned, there are 14,000 documents, many of which are mine and were produced without any confidentiality designation—and look where that has led us. I have not used any discovery materials outside of this case, which unfortunately cannot be said for Fitzgerald. I will follow court procedures with these documents. With that, please explain the designation for each document please? Including those that have been produced to third parties without designation.

-Ronda

**Ronda McNae**

Ms. Gussin,

I apologize, but I do oppose your motion. I did not raise new arguments; I referenced items from prior filings, as well as in this filing, to provide context and explain the broader issue of misconduct.

Could you please clarify the confidentiality designations for the documents in question? I have noticed some discrepancies and am trying to understand your client's rationale. It seems that a number of documents listed as confidential may no longer qualify under that designation.

This needs to be addressed in the state case considering you have pointed to the discovery in this case with some designations that may no longer apply.

Regards,

Ronda

16

**Ronda McNae**

Ms. Gussin,

I found a prior filing that supports why I have copies of some emails that aren't marked confidential. Though you assume otherwise. I will alert the court. You still haven't answered the question below.

Could you please clarify the confidentiality designations for the documents in question? Why do you believe they are still protected? I would like to include in my motion.

Thanks,

Ronda

---

**From:** Meredith J. Gussin <mjgussin@assoulineberlowe.com>
**Sent:** Saturday, February 1, 2025 11:46:55 AM
**To:** Ronda McNae <ronda.mcnae@gmail.com>
**Cc:** Will McNae <presson.mcnae@gmail.com>; Peter E. Berlowe <PEB@AssoulineBerlowe.com>
**Subject:** RE: Notice of Court Filing: Fitzgerald v. McNae Case No. 22-22171

What prior filing are you referring to?

The documents are confidential because they were marked confidential when produced in discovery and Plaintiff has not waived his designations.

**Meredith J. Gussin, Esq.**

**Ronda McNae**

Ms. Gussin,

With all due respect, you're avoiding my question rather than addressing it directly. I have asked the same question several times now.

Please clarify the specific basis for _why_ the confidentiality designations are appropriate, especially given where we are in the case. I am trying to understand your reasoning so I can determine whether any of them should be challenged.

Regards,
Ronda

---

**Ronda McNae**

Dear Ms. Gussin,

I am writing to confer with you regarding my request to obtain e-filing privileges in this matter.

As you are aware, I have been required to file all documents manually, which creates unnecessary delays and additional burdens. Given the volume of filings and the need to efficiently litigate this case, I intend to seek leave of Court to file electronically pursuant to Southern District of Florida Local Rule 5.1 and Administrative Order 2023-7.

Please confirm whether you oppose my request for e-filing privileges. If you oppose, please provide your basis so that I may include your position in my motion to the Court.

Additionally, I intend to file a motion regarding the Confidentiality Designations regarding certain documents that have been improperly designated as "Confidential" under the Protective Order. These documents do not contain trade secrets, proprietary business information, or personally sensitive data and have been misused to obstruct discovery and suppress key evidence.

Please advise whether you oppose this motion as well. If you do, I request that you provide your legal basis for maintaining these confidentiality designations so that I may address it in my motion.

I appreciate your prompt response, as I plan to file sometime early next week.

1) Oppose e-filing privileges?

2) Confidentiality Designations? Provide your position and the legal basis please.

Best regards,
Ronda McNae

**From:** Meredith J. Gussin <mjg@assoulineberlowe.com>
**Sent:** Sunday, February 2, 2025 7:10:08 AM
**To:** Ronda McNae <ronda.mcnae@gmail.com>; Peter E. Berlowe <PEB@AssoulineBerlowe.com>; Will McNae <williammcnae@gmail.com>
**Subject:** Re: Conferral Regarding E-Filing Request

We will provide you with our response by close of business tomorrow. Thank you.

---

**Ronda McNae** <ronda.mcnae@gmail.com>   ☆  ☺  ↩  ⋮

Ms. Gussin,

To keep this straightforward, do you oppose my Motion to Challenge the Confidentiality Designations? A simple yes or no will suffice.

Additionally, do you oppose my Motion to Request E-Filing Privileges?

I will be filing a Motion to Strike, as I previously mentioned. There are also several issues concerning expert testimony that I intend to bring to the Court's attention, though I am still determining the best course of action.

Furthermore, I have uncovered additional evidence that further supports my concerns regarding harassment and intimidation through Instagram. I will follow up with the motion I intend to file on this issue.

Considering I gave you my position and you deflected any response to my prior emails, please provide your position on these motions by 12PM your time tomorrow.

Regards,

Ronda McNae

From: Ronda McNae <█████████████████>
Sent: Sunday, February 2, 2025 8:51 PM
To: Meredith J. Gussin <█████████████████>; Peter E. Berlowe <PEB@AssoulineBerlowe.com>; Will McNae
<█████████████████>
Subject: Conferral Regarding Additional Evidence supporting DE 275

Ms. Gussin,

Pursuant to Local Rule 7.1(a)(3), I am reaching out to confer regarding my intent to file a **Notice of Additional Evidence in Support of Defendant's Motion to Dismiss (DE 275)**. Since filing my Reply in Support of the Motion to Dismiss, I have become aware of additional evidence of litigation misconduct that further supports dismissal.

This Notice is intended to ensure the Court has all relevant information before ruling on the pending Motion to Dismiss. Please advise whether you oppose or do not oppose the filing of this Notice.

I kindly request a response by 12PM Tuesday, so I may include your position in the Certificate of Conferral. If I do not receive a response by that time, I will indicate in my filing that a good-faith attempt to confer was made, but no response was received.

Thank you for your time and attention to this matter.

Best regards,
Ronda McNae

---

From: Peter E. Berlowe <█████████████████>
Sent: Monday, February 3, 2025 4:41 AM
To: Ronda McNae <█████████████████>; Meredith J. Gussin <█████████████████>; Will McNae
<█████████████████>
Subject: RE: Conferral Regarding Additional Evidence supporting DE 275


Sure. Call whenever you have time, so we can have a meaningful meet and confer.


**Peter E. Berlowe, Esq.**

**Sent:** Monday, February 3, 2025 9:51 AM
**To:** Peter E. Berlowe <PEB@AssoulineBerlowe.com>; Meredith J. Gussin <~~~~~~~~~~~~~~~~~~~~~~>; Will McNae
<~~~~~~~~~~~~~~~~~~~~~~>
**Subject:** Re: Conferral Regarding Additional Evidence supporting DE 275

Counsel,

I acknowledge your request for a phone conferral. However, given the history of our communications and dynamics, I will only communicate in writing to ensure clarity, accuracy, and a complete record of discussions. I respectfully request that all correspondence be conducted via email or formal court filings.

I will wait until 12:00PM ET Tuesday, before submitting my filings (stayed below) to allow you an opportunity to provide a written response.

For the prior motions I have emailed requesting your sides position, I request a response by 12PM ET today as I have given proper time considering the back and forth email correspondence.

Lastly, I was advised to keep all communications in writing, especially given my recent submission of information to regulatory authorities.

Regards,

Ronda

**From:** Peter E. Berlowe <PEB@AssoulineBerlowe.com>
**Sent:** Monday, February 3, 2025 7:01:56 AM
**To:** Ronda McNae <ronda.mcnae@gmail.com>
**Cc:** Keisha Hall <khall@assoulineberlowe.com>; Meredith J. Gussin <mgussin@assoulineberlowe.com>
**Subject:** RE: Conferral Regarding Additional Evidence supporting DE 275

Dear Mrs. McNae:

We cannot confer in any way when you do not give any specifics. We do not know your arguments. We do not know the bates numbers of the pages you are referring to. Meet and confer is not a game of pulling teeth. We should have to guess what you are trying to argue. Please provide details.

I am copying Mr. McNae's counsel, because he is represented by counsel in the State Court case, and we do not want to have a communication with someone we know to be represented by counsel. I would ask that you stop copying him on this case, if you don't want us to copy his counsel on our replies.

Sincerely,

**Peter E. Berlowe, Esq.**

**Ronda McNae**  ☆ ☺ ↩ ⋮

Counsel.

I have made multiple good-faith efforts to confer under **Local Rule 7.1(a)(3)** regarding my intent to file the following motions:

1. **Motion for E-Filing Privileges** – Due to the ongoing difficulties of manually filing documents, I am requesting permission from the Court to file electronically through CM/ECF to ensure efficiency and timely filings.
2. **Motion to Challenge Confidentiality Designations** – I have repeatedly requested clarification as to Plaintiffs' confidentiality designations and have not received sufficient justification. As such, I intend to formally challenge certain confidentiality designations that appear improper or selectively applied.

For the above motions, please advise by **12:00 PM ET today** whether you oppose or do not oppose.

Additionally, I am conferring regarding my **Notice of Additional Evidence in Support of Defendant's Motion to Dismiss (DE 275)**, which addresses new evidence of litigation misconduct, including:

- **The withholding of key materials from expert witnesses.**
- **Improper surveillance of my social media accounts (additional individuals)**
- **Selective disclosure of documents to experts.**
- **Discrepancies in the expert witness transcript, raising concerns about accuracy etc.**

Conferral does not require me to provide a full legal brief or Bates numbers, only a reasonable summary of the nature of my filing. I have clearly stated the basis for my filings, and any further details will be provided in the actual motions submitted to the Court.

Please advise by **12:00 PM ET on Tuesday** whether you oppose or do not oppose the filing of this Notice.

If I do not receive a response by the respective deadlines, I will indicate in my filings that I made a good-faith attempt to confer, but opposing counsel failed to provide a position.

Regarding your request that I cease copying Mr. McNae on communications: As I previously stated, the federal court has ordered me to include him on case-related emails, and I will continue to comply with the Court's directive. If you have concerns about this, I suggest you address them with the Court rather than attempt to impose unilateral restrictions. To clarify, the federal court order applies strictly to the federal case and has no impact on the state court action. This order was issued when Will was represented by Richard Gomez in the state matter. Ms. Casey previously informed Will that if Mr. Gomez were representing him in the federal case, then all federal case-related emails would be sent to him. However, we ensured this was not the case.

Advise on your position to the above motions, thank you.

Regards.
Ronda McNae

**From:** Peter E. Berlowe <PEB@AssoulineBerlowe.com>
**Sent:** Monday, February 3, 2025 8:04:42 AM
**To:** Ronda McNae <⟨redacted⟩>
**Cc:** Meredith J. Gussin <⟨redacted⟩>; Keisha Hall <⟨redacted⟩>
**Subject:** RE: Conferral Regarding Additional Evidence supporting DE 275

Dear Mrs. McNae:

Thank you for your email but it is very light on details. How can we confer with you on a confidentiality designation if you refuse to give us the bates number of the document? We cannot read your mind.

How can we confer with you about withholding "key materials" from expert witnesses if you don't tells us what the "key materials" are?

How can we confer with you about this alleged "improper surveillance" of your public social media accounts or identify the individuals? If your referring to me, yes I recently looked at your account to see whether you are continuing to violate the confidential settlement agreement. We will continue to monitor your public social media accounts, as there is nothing improper at doing so.

What "selective disclosure" of documents are you referring to? Which documents? What bates numbers?

What discrepancies in expert witness transcripts? Which transcripts? What line and page should we look at?

Confer in good faith please.

Sincerely,

**Peter E. Berlowe, Esq.**



**Ronda McNae**
See attached

---

8:07

**Meredith J. Gussin**                    Jan 31
To You and Peter E. Berlowe

What other bodies are you referring to?

The documents that were marked confidential
are pages 18-20, 22, 24-27 of your reply brief
at Exhibit B. Can you advise where you found
those documents as the bates labels have been
redacted?

As to new arguments those include reference
to Neil Lomax and my husband, Grant Gussin;
allegations regarding SEC violations, providing
a timeline to Dr DiTomasso, and Ms. De
Varona's affidavit. These were not included in
your initial motion and are, therefore, beyond
the scope of what is appropriate in a reply
brief.

Get Outlook for iOS

---

**From:** Meredith J. Gussin <                              >
**Sent:** Monday, February 3, 2025 8:40 AM
**To:** Ronda McNae <                              >; Peter E. Berlowe <PEB@AssoulineBerlowe.com>
**Cc:** Keisha Hall <                              >
**Subject:** RE: Conferral Regarding Additional Evidence supporting DE 275

Ronda,

The attached email includes those documents that you produced in your Reply brief that we had disclosed as confidential in discovery. You advised that you received copies of those documents via "snapshot." I am not sure what that means, but if you could provide us with the bates label of the documents you included at pages 18-20, 22, 24-27 of your Reply, we can have a meaningful conferral.

As to your request to e-file, the Administrative Procedures of the Southern District of Florida CM/ECF provides at Section 2c: "Pro se litigants will not be permitted to register as Users at this time and must file their documents in the conventional manner."

This is Court procedure, and it is not something an attorney can agree to. As stated previously, your request is not within our purview to grant.

**Meredith J. Gussin, Esq.**
**Litigation**

**Ronda McNae**

Counsel,

Regarding e-filing privileges. I have written to the Judicial Conference of the United States to advocate for meaningful reform. While I will (very) soon have counsel appearing in my case (which moots my request for your position). my experience underscores the significant prejudice faced by pro se litigants. My case serves as a compelling example of the systemic disparities, especially for those without legal insurance—unlike myself, who now has two policies—or the financial resources to sustain prolonged litigation.

The substantial costs I have personally incurred in filing and managing this case further highlight the urgent need for reform. I am committed to continuing this advocacy to ensure that future litigants are not subjected to the same inequities.

Lastly, it is counsel for SoftwareONE, not you, Peter, that I have observed lurking around my Instagram account. While my profile is public, a valid account must still be signed in to view my stories, as those are only accessible to signed-in users. This collective behavior is troubling, particularly given my recent reports to regulatory bodies and the concerns surrounding the IPO. It further underscores the broader pattern of concerning conduct in this case.

-Ronda

Exhibit 17

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 1:22-cv-22171-JEM

MICHAEL FITZGERALD,
individually, and YELANY DE VARONA,
individually,

          Plaintiffs,

v.

RONDA MCNAE, individually, and
WILLIAM MCNAE, individually,

          Defendants.

_____/

FILED BY_____ D.C.

FEB - 6 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

## **DEFENDANT'S MOTION TO CHALLENGE CONFIDENTIALITY DESIGNATIONS**

Defendant Ronda McNae, appearing pro se, moves this Court to strike the improper confidentiality designations applied by Plaintiff Michael Fitzgerald to certain documents produced in discovery. Plaintiff's misuse of confidentiality designations is part of a broader pattern of discovery misconduct aimed at suppressing unfavorable evidence and obstructing Defendant's ability to present her case. These actions violate both the Agreed Protective Order and Rule 26(c) of the Federal Rules of Civil Procedure. "These designations violate Rule 26(c) of the Federal Rules of Civil Procedure and the **Agreed Protective Order Governing the Use and Disclosure of Protected Material (Exhibit A)** because they:

1. Suppress evidence contradicting Plaintiff's claims regarding his separation from SoftwareONE.

2. Obstruct discovery of SoftwareONE's internal findings, which validate Defendant's prior misconduct reports.

3. Hinder Defendant's ability to litigate fairly by improperly restricting the use of non-confidential materials.

Defendant seeks relief under Paragraph 5 of the Protective Order, which allows challenges to confidentiality designations.

## I. INTRODUCTION

Plaintiff improperly designated documents as Confidential to shield damaging evidence rather than to protect any legitimate business interest. These documents contain:

- Plaintiff's employment and voluntary separation from SoftwareONE.

- SoftwareONE's internal findings regarding Plaintiff's conduct.

No Legitimate Basis for Confidentiality

- The Agreed Protective Order (Paragraph 6) explicitly prohibits the designation of entire document productions as confidential.

- The challenged emails contain no trade secrets, proprietary business information, or personally sensitive data and do not meet the Rule 26(c) standard for confidentiality.

- Plaintiff has already disclosed these emails to expert witnesses, waiving any claim of confidentiality.

- Plaintiff has relied on DE 211 and related filings that incorporate these very documents, further undermining their confidentiality claims.

Accordingly, Defendant respectfully requests that the Court strike these improper confidentiality designations.

## II. BACKGROUND

This motion arises from Plaintiff Michael Fitzgerald's improper designation of certain discovery materials as "Confidential" under the Agreed Protective Order. Rather than serving a legitimate legal or business interest, these confidentiality designations have been strategically applied to suppress unfavorable evidence, obstruct discovery, and disadvantage Defendant Ronda McNae in these proceedings.

During a prior hearing, Honorable Judge Becerra explicitly warned counsel against the improper or overly broad application of confidentiality designations. Honorable Judge Becerra stated, "You can't just say everything in the case is attorneys' eyes only. I've never heard of that." The judge emphasized that confidentiality designations, particularly "attorneys' eyes only," must be narrowly tailored and supported by legitimate reasons under the Agreed Protective Order and Rule 26(c) standards.

Honorable Judge Becerra further cautioned that, "If you're too broad on that brush, I'll hear from you then." The judge highlighted that inappropriate over-designation of documents would result in unnecessary litigation and judicial intervention to resolve disputes. *(See Below)*

> MS. FOTIU WOJTOWICZ: He's asked for all documents produced to be attorneys' eyes only.
>
> THE COURT: Well, there's no way you can have a protective order that says that, right? Typically, in a protective order, it says things can be marked attorneys' eyes

only

You can't just say everything in the case is attorneys'
eyes only. I've never heard of that, Counsel. But if there's
documents that you're producing and you want to limit it to
attorneys' eyes only and you're too broad on that brush, I'll
hear from you then.

You know, if Microsoft is going to produce documents in
this case, then they're going to produce them to the parties.
I mean, they're not going to be subject to an attorneys' eyes
only provision as the third party unless you come up with some
other terms to do so.

But I caution you to not be too low on the attorneys' eyes
only because these cases typically would require some -- I
could envision documents that would be appropriate for them to
be attorneys' eyes only.

Don't broad [sic] them with too broad of a brush, or we're
going to be spending a lot of time together going through
documents and having me rule that they are or not attorneys'
eyes only because -- obviously, we'll do that if the brush
that's painted on them is too broad.

Despite explicit warnings from the Court, Plaintiff continues to abuse confidentiality designations by indiscriminately applying them to entire categories of documents without legitimate basis. This improper conduct shields routine business documents and internal investigations from disclosure, creating unnecessary burdens for both the Court and Defendant, and forcing costly and time-consuming challenges that could have been avoided through proper application of the protective order.

## A. Plaintiff Misuses of Confidentiality Designations

Plaintiff improperly designated routine business communications, investigative findings, and internal correspondence as "Confidential," despite these documents containing no trade secrets, proprietary business information, or privileged legal communications. These documents primarily relate to:

- **Plaintiff's employment and voluntary separation from SoftwareONE.**

- **SoftwareONE's internal investigation into Plaintiff's conduct.**

- **Communications between SoftwareONE leadership concerning allegations against Plaintiff.**

Under Rule 26(c) of the Federal Rules of Civil Procedure, confidentiality protections are limited to materials containing trade secrets, proprietary business practices, or privileged legal

advice. The challenged documents do not meet this standard. Instead, these materials provide critical evidence contradicting Plaintiff's claims and revealing SoftwareONE's independent findings regarding his conduct.

Moreover, SoftwareONE's refusal to provide Fitzgerald with its investigation results demonstrates that these findings were not part of a joint legal strategy and should not be protected under a common legal interest privilege. Courts have repeatedly held that confidentiality cannot be used to shield unfavorable evidence, particularly when the information has already been selectively disclosed to certain parties.

**B. Plaintiff's Selective Use of Confidentiality and Discovery Materials**

Plaintiff's approach to confidentiality designations has been inconsistent and strategically self-serving. On one hand, he seeks to withhold damaging evidence by applying broad and improper confidentiality designations. On the other, he has selectively disclosed materials produced in this federal case in separate state court litigation to gain an unfair advantage.

For example:

1. **Plaintiff has introduced discovery materials from this federal case in a separate lawsuit against Will McNae.**

   - These materials include internal Microsoft HR communications, workplace investigations, and other sensitive employer-employee records.

   - Plaintiff's use of these materials in an unrelated legal proceeding contradicts his claims that similar records in this case should remain confidential.

2. **Plaintiff disclosed select discovery materials to his expert witness while withholding full email threads.**

   - This selective disclosure distorts the evidentiary record and denies access to critical context.

   - Courts have consistently rejected such tactics as improper discovery abuse.

3. **Despite Judge Becerra's prior warnings against over-designation, Plaintiff continues to broadly and unjustifiably apply confidentiality claims.**

- Plaintiff's attorneys have previously been cautioned about excessive confidentiality designations and until now, Defendant has sought to avoid unnecessary litigation costs by not challenging each document individually before Judge Becerra.

- Despite this, Plaintiff continues to abuse confidentiality claims to suppress key documents while simultaneously exploiting non-designated materials in collateral litigation.

These actions highlight the bad-faith nature of Plaintiff's confidentiality designations. Instead of being used to protect legitimate confidential information, these designations serve as a litigation tactic to suppress unfavorable evidence while selectively benefiting from the discovery process.

**C. SoftwareONE's Failure to Log or Disclose Relevant Documents**

Adding to the issue, SoftwareONE has refused to disclose critical documents regarding Plaintiff's employment separation and prior allegations against him. Despite acknowledging the existence of certain records before Judge Becerra, SoftwareONE has:

- Failed to log key investigative findings on its privilege log.

- Improperly withheld documents concerning allegations of misconduct involving Plaintiff.

- Suppressed records related to *Doe v. SoftwareONE*, a prior lawsuit alleging a toxic workplace culture that protected high-level executives such as Plaintiff.

SoftwareONE's refusal to produce these documents raises serious concerns about its compliance with federal discovery rules and further undermines the legitimacy of its confidentiality claims. Courts have repeatedly held that selective non-disclosure and improper confidentiality designations constitute discovery misconduct. Accordingly, this motion seeks to correct these abuses by striking improper confidentiality designations, compelling full disclosure of relevant materials, and ensuring that Plaintiff does not gain an unfair litigation advantage through selective and inconsistent application of confidentiality protections.

**III. LEGAL STANDARD**

Plaintiff and SoftwareONE may attempt to justify their confidentiality designations by invoking the common legal interest doctrine. However, this argument is meritless. Courts have consistently held that for the common legal interest doctrine to apply, the parties must share a current, active, and mutual legal defense strategy—not merely a past relationship or aligned business interest.

## A. Improper Confidentiality Designations Under Rule 26(c)

Plaintiff's misuse of confidentiality designations is part of a broader strategy to suppress unfavorable evidence while engaging in improper surveillance and intimidation tactics outside the discovery process. Defendant has identified clear instances of unauthorized monitoring of her private social media accounts by Plaintiff's counsel and associates, raising serious ethical and procedural concerns. The Court should address this misconduct as part of its ruling on Plaintiff's bad-faith litigation tactics.

- Rule 26(c) limits confidentiality protections to documents containing:

    1. Trade secrets.

    2. Proprietary business information.

    3. Privileged legal communications.

- The *Kaplan v. Nautilus Ins. Co.* decision confirms that routine corporate discussions do not qualify for confidentiality protection.

## B. The Common Legal Interest Doctrine Does Not Apply Here:

1. SoftwareONE conducted an independent internal investigation into Plaintiff's conduct, which ultimately resulted in Fitzgerald voluntarily separating from SoftwareONE UK in February 2023.

2. SoftwareONE refused to provide Fitzgerald with its investigation results, proving there was no shared legal strategy.

3. SoftwareONE's suppression of *Doe v. SoftwareONE* records suggests a deliberate effort to withhold damaging information rather than a legitimate confidentiality interest.

Relevant Case Law:

- *United States v. Patel, 509 F. Supp. 3d 1334, 1344 (S.D. Fla. 2020)* ("A shared desire to see the same outcome in a legal matter is not sufficient to establish a common legal interest.")

- *Del Monte Int'l GMBH v. Ticofrut, S.A., 2017 WL 1709784, at 4 (S.D. Fla. May 2, 2017)* (rejecting a common interest claim when parties no longer had aligned legal goals)

## C. No Ongoing Common Legal Interest Exists

- SoftwareONE conducted an independent internal investigation into Fitzgerald's conduct, which resulted in his voluntary separation in February 2023.

- SoftwareONE refused to provide Fitzgerald with the investigation results, demonstrating that it does not share a privileged legal relationship with him.

- Courts have held that retroactively claiming a common legal interest after legal objectives have diverged is improper. *(*Del Monte, 2017 WL 1709784 at 7).*

Because SoftwareONE's findings were not developed in coordination with Plaintiff for a joint legal strategy, these confidentiality designations must be stricken.

## IV. PLAINTIFF'S MISUSE OF DISCOVERY MATERIALS

### A. Selective Disclosure to Experts Distorts the Evidentiary Record

- Plaintiff disclosed certain emails to expert witness Sheri Fiske while withholding full email threads from Defendant.

- This violates Rule 26(g), which prohibits misleading discovery practices.

- Selective production waives confidentiality protections for related materials. (United States v. Patel, 509 F. Supp. 3d at 1344).

### B. Plaintiff Has Weaponized Discovery Materials in Unrelated Litigation

- Fitzgerald has improperly used confidential discovery materials from this case in a separate state court lawsuit against Will McNae.

- Confidentiality protections cannot be exploited for an unfair tactical advantage (*Kaplan, 2018 WL 6445886 at 2*).

## C. Public Policy Requires Disclosure

The Sunshine in Litigation Act was enacted to prevent precisely this type of misconduct, where confidentiality designations are weaponized to conceal evidence of wrongdoing and undermine public accountability. Courts in Florida have consistently enforced this policy to ensure fairness and transparency in litigation.

**Public Policy Concerns Under Florida's Sunshine Law** – Florida's Sunshine in Litigation Act (Fla. Stat. § 69.081) prohibits confidentiality agreements or designations that conceal evidence of misconduct or harm to the public. Courts applying this law routinely reject overbroad confidentiality claims that shield evidence of wrongdoing or prevent public awareness of significant issues, such as workplace harassment or misconduct. SoftwareONE's and Plaintiff's improper designations and refusal to produce findings contravene this public policy by suppressing records that:

- Reveal pre-existing allegations against Plaintiff involving workplace misconduct.

- Validate Defendant's concerns about systemic issues at SoftwareONE, including a "boys' club" culture that shielded executives from accountability.

- Contain information critical to understanding the broader context of Plaintiff's reputational damage.

By improperly designating documents and refusing to produce relevant records, Plaintiff and SoftwareONE are attempting to suppress evidence that could benefit not only Defendant but also the public interest. Courts have held that such practices violate the principles of transparency and accountability embedded in Florida's Sunshine Law. Defendant respectfully requests that the Court strike these designations and compel full disclosure to ensure compliance with both the Protective Order and public policy.

- Florida's Sunshine in Litigation Act (Fla. Stat. § 69.081) prohibits confidentiality agreements that suppress evidence of misconduct.

- Courts reject strategic confidentiality designations that conceal misconduct from the public. (Del Monte, 2017 WL 1709784).

D. **Plaintiff's Misue of Microsoft HR Emails** – Plaintiff has improperly weaponized sensitive internal communications between Microsoft's Human Resources department and Will McNae. These communications, obtained solely through discovery in this federal action, were misused in collateral state court litigation to bolster Plaintiff's claims against Will McNae. Such misuse is directly at odds with the principles of fair discovery and violates the Agreed Protective Order. These emails were:

- Highly sensitive and private communications concerning workplace investigations.
- Explicitly limited to this litigation and not intended for use in unrelated legal matters.
- Exploited to create undue prejudice, causing significant harm to Defendant's ability to defend herself and her family in multiple jurisdictions.

This misuse underscores Plaintiffs' strategic manipulation of the discovery process to gain an unfair advantage, in clear violation of the intent and terms of the Protective Order.

E. **Misuse of Highly Sensitive Discovery Materials in Collateral Litigation** – Plaintiff's misuse of highly sensitive discovery materials produced in this federal action to advance his separate state court case against Will McNae is a clear abuse of the discovery process and a violation of the principles underlying judicial efficiency and fairness. Although the documents Plaintiff used in the state court action were not designated confidential at the time of production, Judge Becerra previously cautioned the parties about the over-designation of documents and the burdens associated with challenging each document individually. Defendant, in an effort to avoid unnecessary litigation costs, refrained from challenging the designation of every document before Judge Becerra. Despite this, Plaintiff has now exploited these materials in state court, including sensitive internal workplace communications between Will McNae and Microsoft's Human Resources and investigative team. These documents:

- Were obtained solely through discovery in this federal litigation.

- Contain private employer-employee communications that are highly sensitive in nature.

- Have been improperly used to entangle unrelated legal proceedings for a strategic advantage.

Improper Use of Internal Communications – Among the exhibits Plaintiff introduced in state court are internal emails between Microsoft and Will McNae's HR department, which were:

- Not publicly available.

- Only accessed due to the discovery process in this federal action.

- Clearly intended for internal investigative and employment-related matters due to an ongoing investigation.

These communications should have remained protected from misuse in collateral litigation, but Plaintiff weaponized them to bolster his claims against Will McNae, in direct contradiction of the principles of fair discovery.

Plaintiff's Strategic Exploitation of Defendant's Email – Additionally, Plaintiff has introduced an email written by Defendant Ronda McNae as evidence in the state court case against Will McNae.

- Plaintiff's use of this email is a clear attempt to entangle separate legal proceedings and expand litigation beyond the intended scope of this case.

- By doing so, Plaintiff has demonstrated that his litigation strategy is not focused on the merits of his claims but rather on overwhelming Defendants with duplicative, costly, and procedurally abusive tactics.

**F. Plaintiff's Contradictory Position on Confidentiality** – The exploitation of non-confidential but highly sensitive discovery materials in collateral litigation—particularly private HR communications, workplace investigations, and unrelated internal discussions—is fundamentally unfair and a blatant manipulation of the discovery process. Despite Plaintiff's own misuse of discovery materials outside this courtroom, he now seeks to challenge confidentiality designations on documents that are being used exclusively in this case, which he initiated.

Plaintiff has:

- Contradicted his own position on confidentiality by exploiting materials from this federal action in separate litigation.

- Weaponized sensitive internal communications from Microsoft's HR and investigative team to improperly entangle legal proceedings.

- Engaged in procedural gamesmanship by increasing litigation burdens and costs on Defendants, despite claiming to be concerned about improper disclosure.

G. **Plaintiff's Double Standard on Confidentiality** – Plaintiff's actions reveal a blatant double standard regarding the application of confidentiality protections. While Plaintiff seeks to impose sweeping confidentiality designations on documents unfavorable to him— effectively suppressing key evidence needed by Defendant—he simultaneously misuses discovery materials produced in this federal litigation to advance his claims in other jurisdictions. For example:

- Documents designated as "Confidential" are withheld from Defendant in this case, despite containing evidence critical to her defense.
- Plaintiff has used non-designated discovery materials, such as Microsoft HR communications, to litigate in state court, while insisting that similar materials produced in this case remain protected.

This inconsistent application of confidentiality protections undermines the fairness and integrity of these proceedings. As the court noted in *Kaplan v. Nautilus Ins. Co.*, 2018 WL 6445886 (S.D. Fla. 2018), parties cannot use confidentiality as both a sword and a shield. Plaintiff's bad-faith tactics must be curtailed to ensure procedural fairness.

## V. SOFTWAREONE'S PRIVILEGE ABUSE & DISCOVERY MISCONDUCT

SoftwareONE's refusal to log critical documents related to Plaintiff's conduct is a clear violation of Rule 26(b)(5), which requires a privilege log identifying withheld documents. During prior proceedings, SoftwareONE's counsel acknowledged the existence of relevant records, including those connected to "Doe v. SoftwareONE," yet these documents were neither logged nor produced. Courts in this district, including in *Del Monte Int'l GMBH v. Ticofrut, S.A.*, 2017 WL 1709784 (S.D. Fla. May 2, 2017), have consistently held that a failure to log documents constitutes

discovery misconduct. The withheld documents include investigative findings that directly contradict Plaintiff's claims, communications revealing a "boys' club" workplace culture, and evidence of pre-existing reputational harm to Plaintiff. These omissions are not minor oversights but deliberate acts to shield unfavorable evidence. The Court should compel production of these documents and sanction SoftwareONE for its bad faith conduct in discovery.

**A. SoftwareONE's Failure to Log or Disclose Relevant Documents**

Adding to the issue, SoftwareONE has refused to disclose critical documents regarding Plaintiff's employment separation and prior allegations against him. Despite acknowledging the existence of certain records before Judge Becerra, SoftwareONE has:

- Failed to log key investigative findings on its privilege log.

- Improperly withheld documents concerning allegations of misconduct involving Plaintiff.

- Suppressed records related to Doe v. SoftwareONE, a prior lawsuit alleging a toxic workplace culture that protected high-level executives such as Plaintiff.

SoftwareONE's refusal to produce critical documents raises serious concerns about its compliance with federal discovery rules and further undermines the legitimacy of its confidentiality claims. Courts have consistently held that selective non-disclosure and improper confidentiality designations constitute discovery misconduct, especially when such actions appear to be strategically motivated. In this case, the investigation at issue was conducted by Jenny Martinez's firm, based in the United States, whose involvement raises questions about the impartiality of the findings. Furthermore, members associated with this investigation, including Michael McCabe, who has appeared in numerous discovery-related emails, have engaged in intimidating and harassing behavior toward Defendant Ronda McNae via social media. These actions lead Defendant to believe that SoftwareONE and its representatives are monitoring this litigation closely, knowing their conduct and actions are highly relevant to the claims at issue.

The situation is particularly concerning given SoftwareONE's ongoing corporate activity, including its announced plans for a secondary listing in Oslo, its acquisition of Norwegian firm Crayon, and its strategic partnership with ServiceNow to modernize IT solutions in the cloud. These developments highlight the company's significant international business interests, which may further incentivize the concealment of damaging or potentially harmful internal

communications and records. Defendant has reason to believe that the confidentiality designations and non-disclosure tactics are being used not only to obstruct this litigation but also to protect SoftwareONE's public image and business dealings during this critical period of corporate activity.

Defendant is increasingly concerned about retaliation due to the disclosures made in recent filings, particularly in light of SoftwareONE's concerted efforts with Fitzgerald surrounding the company's IPO and post-IPO activities. The information brought to light in this litigation implicates multiple individuals who failed to take corrective action despite being aware of the underlying issues. The conduct of key figures such as Michael McCabe and former SoftwareONE President Neil Lomax, who have actively monitored Defendant's social media account; Instagram, raises serious concerns regarding targeted intimidation and instills fear in the McNae family. The use of improper surveillance, including the creation of fake accounts and the use of third-party accounts to monitor Defendant's private social media activity, underscores Plaintiff's intent to intimidate and gain access to information that has not been lawfully obtained through discovery.

**MICHEAL MCCABE SOFTWAREONE INC. COUNSEL**



**NEIL LOMAX PRESIDENT OF SOFTWAREONE**

Such behavior, combined with SoftwareONE's prior legal maneuvers—including the filing of a retaliatory lawsuit against McNae in Wisconsin after she subpoenaed the company—demonstrates a pattern of attempting to silence and intimidate those seeking accountability. Only known accounts logged in can see Ronda McNae's stories (See Below).



Given these circumstances, Defendant is concerned that documents critical to discovery requests, including those related to workplace culture, investigations into Plaintiff's conduct, and allegations of misconduct, may not have been preserved or produced in compliance with federal discovery obligations. Accordingly, this motion seeks to address these abuses by striking improper confidentiality designations, compelling full disclosure of relevant materials, and ensuring that Plaintiff does not gain an unfair litigation advantage through selective and inconsistent application of confidentiality protections. To protect the integrity of this litigation and prevent further retaliation, Defendant respectfully requests that the Court issue an order[1].

FURTHERMORE, Ms. Gussin's assertion that the public nature of Defendant's Instagram profile eliminates any expectation of privacy is both legally flawed and a selective misrepresentation of the law. This argument ignores key limitations on public Instagram profiles

---

1. [1] Compelling SoftwareONE to certify that it has preserved all relevant documents, including communications related to internal investigations and IPO-related activities involving Fitzgerald.
2. Prohibiting any further retaliatory actions against Defendant or her family, including through frivolous legal maneuvers or intimidation tactics.
3. Requiring SoftwareONE to disclose any communications or actions taken to suppress or retaliate against Defendant in response to her discovery efforts.

In the event of further non-compliance, Defendant reserves the right to file a separate motion to enforce preservation obligations and to seek appropriate sanctions under Federal Rules of Civil Procedure 26 and 37.

and is intended as a distraction from Plaintiff's own misuse of confidentiality designations. The Court should focus on Plaintiff's bad-faith discovery practices and improper confidentiality claims, which have significant implications under Federal Rules of Civil Procedure 26(g) and 37(b). Plaintiff's selective enforcement of confidentiality standards, mischaracterization of social media privacy settings, and contradictory litigation behavior highlight their bad faith tactics. This Court should reject Plaintiff's baseless argument about social media privacy and instead scrutinize their misuse of confidentiality designations and procedural abuses. Plaintiff's litigation conduct warrants further scrutiny for the improper and inconsistent application of legal principles, with consequences under relevant procedural rules.

This isn't the first instance of stalking and harassment that Defendant has faced in this litigation. Previously, Plaintiff's wife, Yelany De Verona, created a fake Instagram account to stalk Defendant. During her deposition, Yelany De Verona initially denied creating the fake account and had multiple opportunities to be forthcoming. However, it was only after a convenient break in her deposition that she admitted to creating the account *(See Below)*. Thankfully, Defendant anticipated such behavior and preserved evidence by taking screenshots.



**YEALNY DE VERONA-FITZGERLADS FAKE ACCOUNT**

Defendant discovered further evidence suggesting that Plaintiff's counsel, Meredith Gussin, utilized Grant Gussin's Instagram account to improperly monitor Defendant's social media activity. Screenshots *(See Below)* demonstrating that Grant Gussin's account has viewed multiple posts and stories on Defendant's private Instagram account, despite the account being restricted and inaccessible to unknown individuals without approval. This conduct appears to bypass Defendant's privacy restrictions, constituting an apparent attempt to intimidate, monitor, or harass

Defendant outside of legitimate discovery procedures. Such actions may also violate ethical rules governing attorneys, particularly Florida's Rules of Professional Conduct, Rule 4-8.4, which prohibits conduct involving dishonesty or fraud. When viewed in the context of Plaintiff's history of retaliatory litigation practices, this evidence underscores the pattern of improper and intrusive methods employed by Plaintiff and his counsel to gain an unfair advantage, including selectively weaponizing discovery materials and engaging in inappropriate online surveillance.

**GRANT GUSSSIN**



**B. SoftwareONE Improperly Withheld the "Doe v. SoftwareONE" Records**

- Defendant subpoenaed SoftwareONE for records related to Doe v. SoftwareONE, a known legal matter involving allegations of a "boys' club" culture.

- These records were never produced, despite prior admissions by SoftwareONE's counsel that they existed.

- The failure to log these documents suggests intentional suppression of unfavorable evidence.

As courts have repeatedly held, confidentiality cannot be abused to obstruct discovery or conceal unfavorable information (Del Monte, 2017 WL 1709784). These records likely corroborate longstanding allegations against Plaintiff and directly relate to his claims of reputational harm. By withholding them, SoftwareONE has deprived Defendant of key evidence critical to her defense.

<u>**Sanctions Under Rule 37(b) and Rule 26(g)**</u>

Plaintiffs' and SoftwareONE's conduct in discovery necessitates sanctions under Federal Rules of Civil Procedure 37(b) and 26(g). Rule 37(b) permits sanctions when a party fails to comply with a court order, including a protective order. SoftwareONE's refusal to log, produce, or adequately address withheld documents, coupled with its disregard for the Agreed Protective Order, constitutes noncompliance warranting sanctions. Rule 26(g) further prohibits discovery practices that are inconsistent with good faith, requiring counsel to certify that all discovery responses are accurate, complete, and justified. Plaintiffs' overbroad and unjustified confidentiality designations, as well as their selective disclosure of critical materials, violate this rule and undermine the integrity of the discovery process. Sanctions are necessary to address these abuses, deter future misconduct, and prevent further prejudice to Defendant.

## VI. CONCLUSION AND RELIEF REQUESTED

Plaintiff's misuse of confidentiality designations, combined with retaliatory lawsuits and improper surveillance, demonstrates a concerted effort to obstruct discovery, intimidate Defendant, and gain an unfair advantage. Defendant respectfully requests this Court to strike improper designations, compel full disclosure of relevant documents, and impose sanctions to deter further misconduct. For the foregoing reasons, Plaintiff's improper confidentiality designations and selective misuse of discovery materials constitute a blatant abuse of the discovery process. These actions violate Rule 26(c), the Agreed Protective Order, and public policy as embodied in Florida's Sunshine in Litigation Act. Plaintiff's overbroad designations, coupled with his strategic exploitation of sensitive materials, have obstructed Defendant's ability to fairly litigate this matter while increasing the burdens on the Court and the discovery process. Defendant respectfully requests the Court strike the improper confidentiality designations, compel full production of withheld documents, and impose sanctions under Rules 37(b) and 26(g) to deter further discovery misconduct.

To preserve the integrity of these proceedings and ensure compliance with the Federal Rules of Civil Procedure, Defendant respectfully requests that the Court grant the following relief:

1. **Strike Improper Confidentiality Designations:** Order that all improperly designated documents identified in this motion be reclassified as non-confidential, allowing their full and fair use in these proceedings.

2. **Compel Full Production:** Compel Plaintiff to produce all documents withheld under improper confidentiality designations, including but not limited to the investigative findings and internal communications referenced herein.

3. **Impose Sanctions:** Pursuant to Rules 37(b) and 26(g), sanction Plaintiff for his discovery misconduct, including the improper confidentiality designations, selective disclosures, and misuse of discovery materials. Sanctions should include an award of costs and fees incurred by Defendant in addressing this misconduct, as well as any other measures necessary to deter future violations.

4. **Preclude Use of Improperly Designated Materials:** Preclude Plaintiff from relying on improperly designated documents or selectively disclosed materials in any future motions or at trial.

5. **Cease Improper Surveillance and Monitoring:** Issue an order directing Plaintiffs and their counsel to cease any improper surveillance or monitoring of Defendant's private social media accounts, including the use of fake or third-party accounts, as such actions are intended to intimidate and harass Defendant. While Peter Berlowe asserts that he checks Defendant's social media accounts to monitor for alleged breaches of the CSA, he fails to acknowledge that his client, Michael Fitzgerald, has himself breached the same agreement. This selective enforcement cannot continue to be used as a means to silence Defendant, particularly given that Fitzgerald voluntarily produced the CSA in this case without a confidentiality designation and introduced it in unrelated litigation in Seattle, WA. By doing so, Fitzgerald waived any claim of confidentiality and undermined his own argument. This misuse of the agreement, paired with the continued harassment and surveillance, demonstrates a bad-faith attempt to suppress Defendant's ability to litigate fairly and intimidate her into silence. Such conduct must not be condoned by this Court.

6. **Additional Relief as Appropriate:** Grant any further relief the Court deems just and proper to remedy Plaintiff's bad-faith tactics and ensure procedural fairness.

Defendant seeks the Court's intervention to prevent further abuse of the discovery process, ensure transparency in litigation, and uphold the principles of fairness and justice.

Dated: February 4, 2025

By: Ronda Delapina McNae
Pro Se Defendant
504 11th PL Kirkland, WA 98033
Tel: (206) 914-6752
Pro.welmcnae@gmail.com

## CERTIFICATE OF CONFERRAL

Pursuant to Local Rule 7.1(a)(3), Defendant certifies that she engaged in active communication with Plaintiffs' counsel, Meredith Gussin and Peter Berlowe, regarding this motion between January 31 and February 3, 2025 (**Exhibit B**). During this time, Defendant sought Plaintiffs' position on Challenging the Confidential Designations. Despite repeated inquiries, Ms. Gussin refused to provide a definitive answer and instead prolonged the conferral process. Given that Plaintiffs historically oppose any motion that does not align with their litigation strategy, and given their refusal to state their position clearly, Defendant assumes Plaintiffs oppose this motion. Accordingly, Defendant submits this motion for the Court's consideration.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 4, 2025, a true copy of the foregoing Motion was sent via FedEx to the Clerk of the Court, Southern District of Florida, 400 N. Miami Ave, Room 8N09, Miami, FL 33128, and Plaintiff's counsel, in compliance with pro se litigant requirements.

**SERVICE LIST**
Peter E. Berlowe, Esq.
Meredith Gussin, Esq.
Assouline & Berlowe, P.A.
Miami Tower
100 SE 2nd Street, Suite 3105
Miami, FL 33131
Tel: 305-567-5576
Fax: 305-567-9343
peb@assoulineberlowe.com
mjg@assoulineberlowe.com
*Counsel for Plaintiffs*

# Exhibit A

Case 1:22-cv-22171-JEM Document 23 Entered on FLSD Docket 12/02/2022 Page 1 of 16

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No. <u>1:22-cv-22171-JEM</u>

**MICHAEL J. FITZGERALD,**
**individually,**

     **Plaintiff,**

**v.**

**RONDA MCNAE, individually,**

     **Defendant.**

_____/

**AGREED PROTECTIVE ORDER GOVERNING**
<u>**THE USE AND DISCLOSURE OF PROTECTED MATERIAL**</u>

  IT IS ORDERED that an Agreed Protective Order Governing the Use and Disclosure of Protected Material ("Order") is entered as follows:

**GENERAL PROVISIONS**

  **1.**   **Scope.**   This Order shall govern all Documents, materials, and information disclosed during the course of this Action in any form including, but not limited to, Documents, discovery responses, materials, and information produced or provided by a Party or Non-Party, disclosed through testimony, or contained in pleadings, motions, briefs, or other materials presented to or filed with the Court that are designated as Protected Materials (defined below) in this case.

    A.   No person or entity shall use, disclose, make available, transmit, or otherwise communicate Protected Material in any manner whatsoever except for purposes of this Action, including appeals, and then only in a manner consistent with this Order.

B. A Party's or Non-Party's use for any purpose of its own Documents, information, and testimony which it produces or discloses in the Action shall not be considered a violation of this Order. A Party's own information and testimony does not include information or testimony learned from or based upon any other Party or Non-Party's Protected Material produced in this Action.

2.     **Definitions.** As used in this Order, the following terms shall have the meanings set forth below:

a.  "Action" shall mean the above-captioned litigation.

b.  "Party" and "Parties" shall mean any and all named parties in this Action.

c.  "Non-Party" shall mean any individual, corporation, association, or other natural person or entity that is not a named Party to the Action.

d.  "Document" is intended to be comprehensive and includes any and all materials and information in the broadest sense, and shall include electronically stored information, software, paper records, transcripts, including all non-identical copies of the foregoing, whether different from the originals by reason of any notation made on such copies or otherwise. Document includes Protected Material (defined below).

e.  "Privilege" shall mean the attorney-client privilege, the work-product doctrine, spousal privilege, the common-interest or joint-defense doctrine, and/or any other privilege, protection, or immunity recognized by applicable law.

2

f.  "Confidential Material" means any Document, or any portion thereof, which is or contains confidential or proprietary business, commercial, research, personnel, personal health, process, product, or financial information of the producing Party or Non-Party that does not fall within the Attorney's Eyes Only designation. A Party or Non-Party designating information as Confidential Material shall mark each page of the Document containing such material as "Confidential." A Party or Non-Party shall not designate pages of a Document that do not contain Confidential Material as "Confidential" and a Party or Non-Party shall not designate entire productions as "Confidential."

g.  "Attorney's Eyes Only Material" means any Document, or any portion thereof, which a Party or Non-Party reasonably believes to be so highly sensitive that it is the subject of reasonable efforts to maintain its secrecy above and beyond the protections provided for Confidential Material, subject to objection by any party and a determination by the Court as to whether the material is appropriately designated as "Attorney's Eyes Only Material." A Party or Non-Party designating information as Attorney's Eyes Only Material shall mark each page of the Document containing such material as "Highly Confidential—Attorney's Eyes Only." A Party or Non-Party shall not designate pages of a Document that do not contain Attorney's Eyes Only Material as "Highly Confidential—Attorney's Eyes Only" and a Party or Non-Party shall not designate entire productions as "Highly Confidential—Attorney's Eyes Only."

3

    h. "Protected Material" means Confidential Material, Attorney's Eyes Only Material, or Foreign Private Data, collectively.

## DISCLOSURE OF PROTECTED MATERIAL

3.    **Confidential Material.** Subject to all other terms of this Order, Confidential Material may be disclosed only to:

    a.    the Parties;

    b.    if the Confidential Material was produced by a Non-Party, then the Non-Party that produced the Confidential Material;

    c.    the attorneys for the Parties and/or Non-Parties involved in this Action, including the partners, associates, paralegals, and clerical personnel working under the direct supervision of such counsel and that are directly involved in or assisting with this Action;

    d.    the Court and all persons assisting the Court in the Action, including special masters, mediators, court reporters taking testimony involving such information, and necessary stenographic and clerical personnel thereof, in accordance with the procedures set forth in this Order;

    e.    persons retained as consultants, experts or support personnel (such as litigation support vendors) by any Party and/or Non-Party for the purposes of this Action and the principals and employees associated with those firms and who are directly involved and assisting in this Action; provided that the procedures set forth in paragraph 7 below have been followed;

f.  persons whom the Confidential Material itself indicates were the author, source, or recipient of the Document;

g.  any other person hereafter designated by written stipulation between the Parties, or with a Non-Party; and

h.  any person noticed or called to testify as a witness at a deposition, hearing, or trial in the Action, subject to the protections of paragraphs 11, and 13.

4.  **Attorney's Eyes Only Material.** Subject to all other terms of this Order, Attorney's Eyes Only Material may be disclosed only to:

a.  The Parties' attorneys involved in this Action, including the partners, associates, paralegals, and clerical personnel working under the direct supervision of such counsel and that are directly involved in or assisting in this Action;

b.  The Court and all persons assisting the Court in the Action, including special masters, mediators, court reporters taking testimony involving such information, and necessary stenographic and clerical personnel thereof, in accordance with the procedures set forth in this Order;

c.  Any person who is retained by a Party or its attorneys of record in this litigation as an independent expert for the purpose of this litigation and who agrees in writing to be bound by the terms of this Order;

d.  Persons whom the Attorney's Eyes Only Material itself indicates were the author, source, or recipient of the Document;

e.  any person called to testify as a witness at a deposition, hearing, or trial in the Action, subject to the protections of Paragraph 11 and 13.

  f. Any other person hereafter designated by written stipulation between the Parties, or with a Non-Party, or by further order of the Court.

  **5.** **Limited Disclosure of Protected Material.** Any Document, designated portions of deposition testimony, responses to interrogatories, requests for admissions, or requests for production of documents which are marked as "Confidential" or "Highly Confidential—Attorney's Eyes Only" are to be treated as such by the Party receiving the Document and shall be utilized by such Party only for the prosecution or defense of this case. No Party is obligated to challenge the propriety of any information designated as Confidential Information or Highly Confidential—Attorneys' Eyes Only Information, and a failure to do so in this Action does not preclude a subsequent attack on the propriety of the designation. In the event that any Party to this Action disagrees at any stage of the proceedings with the designation of information as "Confidential" or "Highly Confidential—Attorney's Eyes Only," the Party shall first try to resolve the matter on an informal basis. If the dispute cannot be resolved informally, the Party challenging the confidentiality of the information may apply for appropriate relief from this Court. Each Party or the producing Non-Party shall be given notice and reasonable time (not less than three (3) business days) to respond to the requested relief. The Party or producing Non-Party claiming confidentiality shall have the initial burden of establishing confidentiality.

  **6.** **Designating Documents and Information as Protected Material.** Any Party or producing Non-Party may designate as "Confidential" or "Highly Confidential—Attorney's Eyes Only" Documents or responses to interrogatories, requests for admission, or requests for production of documents by stamping or labeling the document or response as "Confidential" or "Highly Confidential—Attorney's Eyes Only." Documents or responses

shall not be treated as "Confidential" or "Highly Confidential—Attorney's Eyes Only" pursuant to this Order unless they are stamped or labeled as such. The inadvertent failure to designate material as "Confidential" or "Highly Confidential—Attorney's Eyes Only" does not preclude a Party or Non-Party from subsequently making such a designation, and, in that case, the material is to be treated as "Confidential" or "Highly Confidential—Attorney's Eyes Only" only after being properly designated. The Parties and their counsel shall not photocopy any Protected Material unless such photocopies are needed as part of this litigation. Documents produced by Non-Parties shall be treated as Confidential or Attorney's Eyes Only for an initial period of twenty (20) days to allow either Party the opportunity to review documents and make additional designations, where necessary. Subject to paragraph 14, after the period of twenty (20) days from the date of the Non-Parties' production of documents, all documents not designated as Protected Material by the Non-Party or either Party will be deemed not to be Confidential or Attorney's Eyes Only Material.

7.    **Obtain Acknowledgement.** Prior to disclosure of any Protected Material to any person identified in paragraphs 3(e), (g) or 4(c) such person shall be given a copy of this Order and shall certify via a written acknowledgement, that he/she has read and understands this Order and agrees to comply with its terms. The Party providing Protected Material to such person shall retain the signed statement of each such person. Such statements shall be produced to counsel for the opposing party or the producing Non-Party upon written request.

## USE OF PROTECTED MATERIAL

8.    **Use of Protected Material.** Protected Material shall be used only in connection with this Action and any appeals arising therefrom. No Protected Material shall be disclosed to any other person, entity, agency, print or electronic media, social media or anyone outside of

this proceeding, for any purpose, other than as set forth in this Order. No Party shall directly or indirectly post any Confidential or Attorneys Eyes Only Material or content contained therein on the internet or otherwise subject such material to public disclosure. ***Doing so may be sanctionable conduct, in the discretion of the Court. Provided that*** nothing in this Order shall preclude any Party or Non-Party from providing Protected Material that is evidence of unlawful or criminal behavior to the relevant law enforcement authorities. Absent further Court Order, the fact that Protected Material has been provided to law enforcement does not otherwise remove its designation as Protected Material or allow for any additional disclosure except for as provided in this Order.

9.      **Maintaining Confidentiality.**  The recipient of any Protected Material provided pursuant to this Order shall maintain such Protected Material in a secure and safe area. The recipient shall take care that any such information or the content of such information, or notes and memoranda relating thereto, not be disclosed to anyone other than persons described in Paragraphs 3 and 4 herein.

10.     **Filing Confidential Information.**  In the event a Party wishes to use any Protected Material in affidavits, declarations, briefs, memoranda of law, or other papers filed in this Action, the Party shall do one of the following: (1) obtain the consent of the producing Party or Non-Party; (2) where appropriate (e.g., in connection with discovery and evidentiary motions) provide the information solely for *in camera* review; or (3) file such information under seal or with confidentiality protection as provided by the Court under Southern District of Florida Local Rule 5.4(b)(1).

**11. Protected Material in Depositions.** Any Party shall have the right to use Protected Material during depositions, provided that no third parties to whom such Protected Material is not permitted to be disclosed are present during such depositions.

**12.** At any deposition session, upon inquiry with regard to the content of a document marked "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY" whenever counsel for a Party deems that a question and/or the answer to any question has resulted in the disclosure of Protected Material, the deposition (or portions) may be designated by the affected Party as containing Protected Material subject to the provisions of this Order. When such designation has been made, the testimony or the transcript of such testimony shall be disclosed only to those parties described in Paragraph 3 and 4 for Confidential Information and Attorneys' Eyes Only Information, respectively, and the information contained shall be used only as specified in this Order. Parties (and deponents) may, within thirty (30) days after receiving the transcript of a deposition, designate portions of the transcript (and exhibits thereto) as Protected Material. Protected Material within the deposition transcript may be designated by a letter to opposing counsel indicating the portions of the transcript that are "Confidential" or "Highly Confidential—Attorney's Eyes Only." Until expiration of the 30-day period, the entire transcript will be treated as Confidential Material under this Order. If no Party or deponent timely designates Protected Material in a deposition, then none of the transcript or its exhibits (other than those previously designated) will be treated as Protected Material. There shall be no need to redesignate documents or exhibits which have been previously designated as Protected Material.

**13. Protected Material at Trial.** Subject to the Federal Rules of Evidence, Protected Material may be offered in evidence at trial or any Court hearing. Any Party or producing

Non-Party may move the Court for an Order that Protected Material receive additional protections.

**14.    Inadvertent Failure to Designate Confidential Materials.** The inadvertent failure of a Party or Non-Party to designate discovery materials as Confidential Information, Attorneys' Eyes Only Information, or Foreign Private Data as such (whether in the form of documents, interrogatories, testimony, or otherwise) shall not be deemed, by itself, to be a waiver of the Party's or Non-Party's right to so designate such discovery materials as Confidential Information or Highly Confidential—Attorneys' Eyes Only Information. Immediately upon learning of any such inadvertent failure, the producing Party or Non-Party shall notify all receiving parties of such inadvertent failure and take such other steps as necessary to correct such failure after becoming aware of it. Disclosure by a receiving party of such discovery materials to any other person prior to later designation of the discovery materials in accordance with this paragraph shall not violate the terms of this Order. However, immediately upon being notified by a producing Party or Non-Party of an inadvertent failure to designate, the receiving party shall treat such information as though properly disclosed and take any actions necessary to prevent further disclosure.

**15.    Inadvertent Production of Privileged Materials.** Pursuant to Fed. R. Evid. 502, there is no waiver of Privilege or work-product in this matter or any other matter in any other jurisdiction for the inadvertent or unintentional production of documents or information containing information which should have been designated as privileged if the producing Party or Non-Party took reasonable steps to prevent disclosure and also took reasonable steps to rectify the error. The producing Party or Non-Party will be deemed to have taken reasonable steps to prevent communications or information from inadvertent disclosure if that Party or Non-Party utilized

attorney screening, keyword search term screening, advanced analytical software applications and/or linguistic tools or other reasonable means in screening for Privilege, work product or other protection. The producing Party or Non-Party shall be deemed to have taken reasonable steps to rectify the error if, within thirty (30) days of discovery, the producing Party or Non-Party notifies the receiving Party of the inadvertent disclosure and instructs the receiving Party to promptly return all copies of the inadvertently produced communications or information (including any and all work product containing such communications or information). Upon receiving such notice, the receiving Party shall return all copies of such information to the producing Party or Non-Party within seven (7) business days of such request unless the receiving Party intends to challenge the producing Party's or Non-Party's assertion of Privilege or immunity. If a receiving Party objects to the return of such information within the seven (7) business day period described above, the producing Party or Non-Party may move the Court for an order compelling the return of such information. Pending the Court's ruling, a receiving Party may retain the inadvertently or unintentionally produced documents in a sealed envelope (if document is produced in physical form) and shall not make any use of such information.

**16.** **Data Privacy.** This matter is also subject to a Data Privacy Order. (Exhibit A). The Data Privacy Order governs the designation and treatment of "Private Foreign Data," defined therein. The Data Privacy Order is incorporated herein by reference, and the procedures contained in the Data Privacy Order not explicitly addressed by this Protective Order shall control how Foreign Private Data shall be treated in this proceeding.

**17.** **Return of Protected Material.** Upon the final determination of this Action, including the expiration of time for any further appeals, whether by judgment, settlement, or otherwise, and after a request from the opposing Party or producing Non-Party:

a.      Counsel of record for each Party receiving Protected Material shall, within sixty (60) days, destroy or return to the designating Party or Non-Party all such documents containing Protected Material and all notes, memoranda, copies, abstracts, excerpts, or other parts, except that all materials constituting work product of such counsel shall be destroyed by the Party in possession; and

b.      Counsel of record for each Party shall confirm in writing that all Protected Material, documents and things, together with all notes, copies, abstracts, memoranda, excerpts, or other parts, have been returned to the producing Party or Non-Party or destroyed in accordance with the terms of this Order.

## MISCELLANEOUS PROVISIONS

**18.     Information Not Confidential.**   The Parties will not designate as Protected Material any Documents or materials that they have reason to believe, or should have reason to believe, was generally known or readily available to the public prior to its designation, or is not properly designated as Protected Material under this Order. Moreover, in the event that a designating party becomes aware that a Document or material designated as Protected Material is or has become generally known to the public through no fault of the receiving party, or that it was known to the receiving party prior to its designation, or that it was disclosed to the receiving party without restrictions, or that it was developed by the receiving party without reference to the disclosures by the designating party, then the designating party will immediately rescind its designation and give notice of such rescission to the other parties.

**19.     No Admission.** Nothing in this Order shall be construed as an admission as to the relevance, authenticity, foundation, or admissibility of any document, material, transcript, or other information.

**20.** **No Waiver of Privilege.** This Order will not prejudice the right of any Party or Non-Party to oppose production of any information on the ground of Privilege.

**21.** **Other Actions and Proceedings.** If a receiving party (a) is subpoenaed in another action or proceeding, (b) is served with a demand in another action or proceeding in which it is a party, or (c) is served with any legal process by one not a party to this Order, seeking discovery materials which were produced or designated as Protected Material pursuant to this Order, the receiving party shall give prompt actual written notice by hand or facsimile transmission to counsel of record for such producing Party or Non-Party within five (5) business days of receipt of such subpoena, demand or legal process or such shorter notice as may be required to provide the producing Party or Non-Party with the opportunity to object to the immediate production of the requested discovery materials to the extent permitted by law. Should the person seeking access to the Confidential Information or Attorneys' Eyes Only Information take action against the receiving party or anyone else covered by this Order to enforce such a subpoena, demand or other legal process, the receiving party shall respond to the extent permissible under applicable law by setting forth the existence of this Order.

DONE and **ORDERED** in Chambers at Miami-Dade County, Florida on this 2nd day of December, 2022.

_____

HONORABLE JACQUELINE BECERRA

## Exhibit A

## DATA PRIVACY ORDER

Plaintiff Michael Fitzgerald and Defendant Ronda McNae stipulate and agree that the terms and conditions of this Data Privacy Order shall govern the handling of Foreign Private Data, as defined herein, disclosed in connection with this matter, and for good cause, IT IS HEREBY ORDERED AS FOLLOWS:

1.      This matter is subject to an Agreed Protective Order Governing the Use and Disclosure of Protected Material (the "Protective Order"). The Protective Order governs the designation and treatment of "Confidential Material," defined therein. The Protective Order is incorporated herein by reference, and the procedures contained in the Protective Order not explicitly addressed by this Data Privacy Order shall control how Foreign Private Data shall be treated in this proceeding.

2.      "Foreign Private Data" means any personal or private information or third-party business secret that a producing Party or Non-Party believes in good faith to be subject to foreign (i.e., non-U.S.) data protection laws or other foreign privacy or third-party business secrecy obligations, and that would be protected from discovery by a well-founded conclusion that producing the private or personal or third-party business secrecy information would violate such laws or obligations.

3.      "Discovery Material" is all written material, electronic data, videotapes and all other tangible items, produced during this dispute, in whatever format (e.g., hard copy, electronic, digital, etc.) and on whatever media (e.g., hard copy, videotape, computer diskette, CD-ROM, DVD, by secure electronic transmission, hard drive or otherwise).

4.      Discovery Material that contains Foreign Private Data shall be subject to the protections set forth in the Protective Order designated as Confidential Material, if it is not otherwise designated under that Protective Order. Discovery Material that a producing Party or Non-Party considers to be Foreign Private Data shall be marked as such in addition to any other designation under the Protective Order.

5.      Any producing Party or Non-Party may redact from any Discovery Material any Foreign Private Data that the producing Party or Non-Party claims in good faith is required to be redacted under any foreign data protection laws or foreign privacy or third-party business secrecy obligations. Any redactions of Foreign Private Data shall be marked "Private Foreign Data" or "FPD." *Provided that* no Foreign Private Data of Plaintiff Michael Fitzgerald will be redacted, and any such document will be treated as Protected Material and only filed under seal if needed.

6.      The receiving party shall maintain any Discovery Material that is provided under the Protective Order or under this Data Privacy Order and which contains Foreign Private Data that has not been redacted in a reasonably secure and safe manner that ensures that access is limited to the persons authorized under the Protective Order, and shall further exercise the same standard of due and proper care with respect to the storage, custody, use, or dissemination of such information as is exercised by the receiving party with respect to its own proprietary information.

7.      All documents and materials filed on the Court's docket that contain Foreign Private Data that has not been redacted, including, inter alia, any transcripts of depositions, exhibits, answers to interrogatories, briefs, memoranda, declarations, affidavits, and pleadings that are comprised of or contain Foreign Private Data or information taken therefrom, shall be filed under seal.

8.     The unintentional production of Discovery Material containing Foreign Private Data that has not been redacted shall not constitute a waiver of the protections authorized by this Order, or any other order of this Court, provided that the producing Party or Non-Party reasonably promptly notifies the receiving party, in writing, of the production after its discovery of the same. If the producing Party or Non-Party so notifies the receiving party, the receiving party shall treat the unintentionally produced Foreign Private Data as Confidential Material and apply the procedures set forth in the Protective Order.

9.     The right to challenge and the process for challenging the designation or redactions of Foreign Private Data shall be the same as the right to challenge and the process for challenging Discovery Material designated as Protected Material, as set forth in the Protective Order.

10.     Entry of this Order shall not prejudice the right of any Party or Non-Party to seek other or further relief from this Court or any other court, including, but not limited to, other protections necessary to produce Foreign Private Data or to comply with federal, state, or foreign data protection laws or other non-disclosure obligations.

# Exhibit B



**Fitzgerald v. McNae**

**Meredith J. Gussin**

Ms. McNae,
We are in receipt of your reply brief in Support of your Motion to Dismiss (DE 283). After review, it has come to light that you asserted new arguments that are beyond the scope of what was included in your Motion or our response. Additionally, you included several documents that were produced during discovery that were marked Confidential. Please advise if you would like to meet and confer on this; otherwise, we would like to file a brief 3-4 page surreply. Kindly advise if you have any opposition to us filing same. I look forward to hearing from you.

**Meredith J. Gussin, Esq.**
**Litigation**



**Response to Your Concerns Regarding DE 283**

**Ronda McNae**

Dear Ms. Gussin,

Thank you for your email regarding DE 283. I appreciate your attention to the details of my reply brief.

To clarify, the arguments raised in DE 283 are not entirely new but are rather expansions on the systemic discovery misconduct that I have consistently referenced throughout these proceedings. My intention was to provide the Court with additional context and evidence demonstrating the pattern of procedural violations and suppression tactics employed.

As for the "Confidential" documents you referenced, please identify specifically which ones you believe were improperly included. To my knowledge, the documents I cited were either supplied without a "Confidential" designation or were provided to your expert, Sheri Fiske, without retaining such designation, effectively removing their confidential status.

That said, I am open to a good-faith discussion to address your concerns. If we cannot resolve this matter informally over email, I would kindly request that you share your specific objections to facilitate a focused and productive exchange. As other bodies are now involved and looking into the matter (that go beyond this immediate litigation), email will have to suffice.

I look forward to your response.

Best regards,
Ronda McNae

On Fri, Jan 31, 2025 at 3:54 PM Meredith J. Gussin <mjg@assoulineberlowe.com> wrote:

What other bodies are you referring to?

The documents that were marked confidential are pages 18-20, 22, 24-27 of your reply brief at Exhibit B. Can you advise where you found those documents as the bates labels have been redacted?

As to new arguments those include reference to Neil Lomax and my husband, Grant Gussin; allegations regarding SEC violations, providing a timeline to Dr DiTomasso, and Ms. De Varona's affidavit. These were not included in your initial motion and are, therefore, beyond the scope of what is appropriate in a reply brief.

Get Outlook for iOS

---

**From:** Ronda McNae <rondamcnae@gmail.com>
**Sent:** Friday, January 31, 2025 7:08:24 PM
**To:** Meredith J. Gussin <mjg@assoulineberlowe.com>
**Cc:** Peter E. Berlowe <PEB@AssoulineBerlowe.com>
**Subject:** Re: Response to Your Concerns Regarding DE 283

Ms. Gussin,

A quick review confirms that you are mistaken regarding pages 24-27. I encourage you to carefully review your own production. I will locate the copies I received of pages 18-20 and 22 in the next few hours as I'm home with all the kids. If I inadvertently produced these and they were marked, I will rectify or call the chambers to figure out the best procedure in hopes to make an update immediately.

Additionally, what new arguments are you referring to? If I'm not in agreement with your assertion, I will move to strike your motion.

It is particularly ironic that the very documents you now claim are marked "confidential"—internal HR records I previously shared with Microsoft—have been weaponized against my family. This is especially troubling given that I exercised discretion in their disclosure, aligning with Honorable Magistrate Judge Becerra's guidance regarding overbroad designations.

Regarding other governing bodies, my position was made clear in my most recent filing in response to your premature request for a case management conference.

Regards,

Ronda

## Re: Response to Your Concerns Regarding DE 283  

**Ronda McNae**

Ms. Gussin,

If your primary concern is the Grant Gussin issue, I am open to discussing a resolution, though I firmly believe it strongly supports my case. I want to approach this matter in good faith.

-Ronda

On Fri, Jan 31, 2025 at 4:10 PM Meredith J. Gussin < > wrote:

If you disclosed those documents to Microsoft that is in violation of the protective order set in place in this case.

I listed the new arguments in my prior email.

---

**From:** Ronda McNae < >
**Sent:** Friday, January 31, 2025 11:54:47 PM
**To:** Meredith J. Gussin < >
**Cc:** Peter E. Berlowe <PEB@AssoulineBerlowe.com>
**Subject:** Re: Response to Your Concerns Regarding DE 283

Drafting a motion now, please let me know the reason for the designations for these documents. I'm still searching for the first couple pages as the copies I have were snapshots (hence) not having the designation.

-Ronda

On Fri, Jan 31, 2025 at 8:01 PM Meredith J. Gussin < > wrote:

What sort of resolution do you propose? That is not my primary concern. All the new issues remain equally of issue insofar as they are beyond the scope of your motion.

Additionally, will you be voluntarily seeking a removal from the docket of the confidential documents? If not, I believe it is proper for the court to rule on the propriety of your inclusion of protected material in direct violation of the protective order which sets forth the procedure to question or challenge any designation. Your belief that the documents are not confidential isn't sufficient.

25

**From:** Meredith J. Gussin <mjgussin@dadelaw.com>
**Sent:** Saturday, February 1, 2025 6:09:49 AM
**To:** Ronda McNae <ronda.mcnae@gmail.com>
**Cc:** Peter E. Berlowe <PEB@AssoulineBerlowe.com>
**Subject:** Re: Response to Your Concerns Regarding DE 283

The documents were designated as confidential in the discovery process. The documents you provided neither have this designation nor the bates label which raises our concerns.

Filing another motion by you does not answer whether or not you are opposed to plaintiff filing a surreply to address these issues. Can you please advise whether or not you are opposed to us filing a brief surreply at this time? Thank you.

---

**Ronda McNae**

Ms. Gussin,

I apologize, but I do oppose your motion. I did not raise new arguments; I referenced items from prior filings, as well as in this filing, to provide context and explain the broader issue of misconduct.

Could you please clarify the confidentiality designations for the documents in question? I have noticed some discrepancies and am trying to understand your client's rationale. It seems that a number of documents listed as confidential may no longer qualify under that designation.

This needs to be addressed in the state case considering you have pointed to the discovery in this case with some designations that may no longer apply.

Regards,

Ronda

---

**From:** Meredith J. Gussin <mjgussin@dadelaw.com>
**Sent:** Friday, January 31, 2025 8:01:06 PM
**To:** Ronda McNae <ronda.mcnae@gmail.com>
**Cc:** Peter E. Berlowe <PEB@AssoulineBerlowe.com>
**Subject:** Re: Response to Your Concerns Regarding DE 283

What sort of resolution do you propose? That is not my primary concern. All the new issues remain equally of issue insofar as they are beyond the scope of your motion.

Additionally, will you be voluntarily seeking a removal from the docket of the confidential documents? If not, I believe it is proper for the court to rule on the propriety of your inclusion of protected material in direct violation of the protective order which sets forth the procedure to question or challenge any designation. Your belief that the documents are not confidential isn't sufficient.

**Ronda McNae**

 I understand your concerns and appreciate your communication. I believe the documents included in my filing are highly relevant and directly address the discovery misconduct issues raised. Help me understand the confidentiality designations for the documents you believe are confidential. As you mentioned, there are 14,000 documents, many of which are mine and were produced without any confidentiality designation—and look where that has led us. I have not used any discovery materials outside of this case, which unfortunately cannot be said for Fitzgerald. I will follow court procedures with these documents. With that, please explain the designation for each document please? Including those that have been produced to third parties without designation.

-Ronda

**Ronda McNae**

Ms. Gussin,

I apologize, but I do oppose your motion. I did not raise new arguments; I referenced items from prior filings, as well as in this filing, to provide context and explain the broader issue of misconduct.

Could you please clarify the confidentiality designations for the documents in question? I have noticed some discrepancies and am trying to understand your client's rationale. It seems that a number of documents listed as confidential may no longer qualify under that designation.

This needs to be addressed in the state case considering you have pointed to the discovery in this case with some designations that may no longer apply.

Regards,

Ronda

**Ronda McNae**

Ms. Gussin,

I found a prior filing that supports why I have copies of some emails that aren't marked confidential. Though you assume otherwise. I will alert the court. You still haven't answered the question below.

Could you please clarify the confidentiality designations for the documents in question? Why do you believe they are still protected? I would like to include in my motion.

Thanks,

Ronda

---

**From:** Meredith J. Gussin <mjg@assoulineberlowe.com>
**Sent:** Saturday, February 1, 2025 11:46:55 AM
**To:** Ronda McNae <prosovrmcnae@email.com>
**Cc:** Will McNae <prosovrmcnae@gmail.com>; Peter E. Berlowe <PEB@AssoulineBerlowe.com>
**Subject:** RE: Notice of Court Filing: Fitzgerald v. McNae Case No. 22-22171


What prior filing are you referring to?


The documents are confidential because they were marked confidential when produced in discovery and Plaintiff has not waived his designations.


**Meredith J. Gussin, Esq.**

**Ronda McNae** <rondamcnae@gmail.com>
To Maureen Gittman Pope

Ms. Gussin,

With all due respect, you're avoiding my question rather than addressing it directly. I have asked the same question several times now.

Please clarify the specific basis for _why_ the confidentiality designations are appropriate, especially given where we are in the case. I am trying to understand your reasoning so I can determine whether any of them should be challenged.

Regards,
Ronda

---

**Ronda McNae** <rondamcnae@gmail.com>
To Maureen Gittman Pope

Dear Ms. Gussin,

I am writing to confer with you regarding my request to obtain e-filing privileges in this matter.

As you are aware, I have been required to file all documents manually, which creates unnecessary delays and additional burdens. Given the volume of filings and the need to efficiently litigate this case, I intend to seek leave of Court to file electronically pursuant to Southern District of Florida Local Rule 5.1 and Administrative Order 2023-7.

Please confirm whether you oppose my request for e-filing privileges. If you oppose, please provide your basis so that I may include your position in my motion to the Court.

Additionally, I intend to file a motion regarding the Confidentiality Designations regarding certain documents that have been improperly designated as "Confidential" under the Protective Order. These documents do not contain trade secrets, proprietary business information, or personally sensitive data and have been misused to obstruct discovery and suppress key evidence.

Please advise whether you oppose this motion as well. If you do, I request that you provide your legal basis for maintaining these confidentiality designations so that I may address it in my motion.

I appreciate your prompt response, as I plan to file sometime early next week.

1) Oppose e-filing privileges?

2) Confidentiality Designations? Provide your position and the legal basis please.

Best regards,
Ronda McNae

**From:** Meredith J. Gussin <mjg@assoulineberlowe.com>
**Sent:** Sunday, February 2, 2025 7:10:08 AM
**To:** Ronda McNae <prpsumcnae@gmail.com>; Peter E. Berlowe <PEB@AssoulineBerlowe.com>; Will McNae <prpsumcnae@gmail.com>
**Subject:** Re: Conferral Regarding E-Filing Request

We will provide you with our response by close of business tomorrow. Thank you.

---

**Ronda McNae**

Ms. Gussin,

To keep this straightforward, do you oppose my Motion to Challenge the Confidentiality Designations? A simple yes or no will suffice.

Additionally, do you oppose my Motion to Request E-Filing Privileges?

I will be filing a Motion to Strike, as I previously mentioned. There are also several issues concerning expert testimony that I intend to bring to the Court's attention, though I am still determining the best course of action.

Furthermore, I have uncovered additional evidence that further supports my concerns regarding harassment and intimidation through Instagram. I will follow up with the motion I intend to file on this issue.

Considering I gave you my position and you deflected any response to my prior emails, please provide your position on these motions by 12PM your time tomorrow.

Regards,

Ronda McNae

**From:** Ronda McNae <ronamcnae@gmail.com>
**Sent:** Sunday, February 2, 2025 8:51 PM
**To:** Meredith J. Gussin <mjgussin@assoulineberlowe.com>; Peter E. Berlowe <PEB@AssoulineBerlowe.com>; Will McNae <will_mcnae@gmail.com>
**Subject:** Conferral Regarding Additional Evidence supporting DE 275

Ms. Gussin,

Pursuant to Local Rule 7.1(a)(3), I am reaching out to confer regarding my intent to file a **Notice of Additional Evidence in Support of Defendant's Motion to Dismiss (DE 275)**. Since filing my Reply in Support of the Motion to Dismiss, I have become aware of additional evidence of litigation misconduct that further supports dismissal.

This Notice is intended to ensure the Court has all relevant information before ruling on the pending Motion to Dismiss. Please advise whether you oppose or do not oppose the filing of this Notice.

I kindly request a response by 12PM Tuesday, so I may include your position in the Certificate of Conferral. If I do not receive a response by that time, I will indicate in my filing that a good-faith attempt to confer was made, but no response was received.

Thank you for your time and attention to this matter.

Best regards,
Ronda McNae

---

**From:** Peter E. Berlowe < PEB@assoulineberlowe.com >
**Sent:** Monday, February 3, 2025 4:41 AM
**To:** Ronda McNae <ronamcnae@gmail.com>; Meredith J. Gussin < mjgussin@assoulineberlowe.com >; Will McNae <will_mcnae@gmail.com>
**Subject:** RE: Conferral Regarding Additional Evidence supporting DE 275

Sure. Call whenever you have time, so we can have a meaningful meet and confer.

**Peter E. Berlowe, Esq.**

**Sent:** Monday, February 3, 2025 9:51 AM

**To:** Peter E. Berlowe <PEB@AssoulineBerlowe.com>; Meredith J. Gussin <~~~~~~~~~~~~~~~~~~~~~~~~~>; Will McNae <~~~~~~~~~~~~~~~~~~~~~>

**Subject:** Re: Conferral Regarding Additional Evidence supporting DE 275

Counsel,

I acknowledge your request for a phone conferral. However, given the history of our communications and dynamics, I will only communicate in writing to ensure clarity, accuracy, and a complete record of discussions. I respectfully request that all correspondence be conducted via email or formal court filings.

I will wait until 12:00PM ET Tuesday, before submitting my filings (stayed below) to allow you an opportunity to provide a written response.

For the prior motions I have emailed requesting your sides position. I request a response by 12PM ET today as I have given proper time considering the back and forth email correspondence.

Lastly, I was advised to keep all communications in writing, especially given my recent submission of information to regulatory authorities.

Regards,

Ronda

From: Peter E. Berlowe <PEB@AssoulineBerlowe.com>
Sent: Monday, February 3, 2025 7:01:56 AM
To: Ronda McNae <proximitypager@gmail.com>
Cc: Keisha Hall <khall@legopnalegal.com>; Meredith J. Gussin <mjg@assoulineberlowe.com>
Subject: RE: Conferral Regarding Additional Evidence supporting DE 275

Dear Mrs. McNae:


We cannot confer in any way when you do not give any specifics.  We do not know your arguments.  We do not know the bates numbers of the pages you are referring to.  Meet and confer is not a game of pulling teeth.  We should have to guess what you are trying to argue.  Please provide details.


I am copying Mr. McNae's counsel, because he is represented by counsel in the State Court case, and we do not want to have a communication with someone we know to be represented by counsel.  I would ask that you stop copying him on this case, if you don't want us to copy his counsel on our replies.


Sincerely,


**Peter E. Berlowe, Esq.**

**Ronda McNae**   

Counsel,

I have made multiple good-faith efforts to confer under **Local Rule 7.1(a)(3)** regarding my intent to file the following motions:

1. **Motion for E-Filing Privileges** – Due to the ongoing difficulties of manually filing documents, I am requesting permission from the Court to file electronically through CM/ECF to ensure efficiency and timely filings.
2. **Motion to Challenge Confidentiality Designations** – I have repeatedly requested clarification as to Plaintiffs' confidentiality designations and have not received sufficient justification. As such, I intend to formally challenge certain confidentiality designations that appear improper or selectively applied.

For the above motions, please advise by **12:00 PM ET today** whether you oppose or do not oppose.

Additionally, I am conferring regarding my **Notice of Additional Evidence in Support of Defendant's Motion to Dismiss (DE 275)**, which addresses new evidence of litigation misconduct, including:

- **The withholding of key materials from expert witnesses.**
- **Improper surveillance of my social media accounts (additional individuals)**
- **Selective disclosure of documents to experts.**
- **Discrepancies in the expert witness transcript, raising concerns about accuracy etc.**

Conferral does not require me to provide a full legal brief or Bates numbers, only a reasonable summary of the nature of my filing. I have clearly stated the basis for my filings, and any further details will be provided in the actual motions submitted to the Court.

Please advise by **12:00 PM ET on Tuesday** whether you oppose or do not oppose the filing of this Notice.

If I do not receive a response by the respective deadlines, I will indicate in my filings that I made a good-faith attempt to confer, but opposing counsel failed to provide a position.

Regarding your request that I cease copying Mr. McNae on communications: As I previously stated, the federal court has ordered me to include him on case-related emails, and I will continue to comply with the Court's directive. If you have concerns about this, I suggest you address them with the Court rather than attempt to impose unilateral restrictions. To clarify, the federal court order applies strictly to the federal case and has no impact on the state court action. This order was issued when Will was represented by Richard Gomez in the state matter. Ms. Casey previously informed Will that if Mr. Gomez were representing him in the federal case, then all federal case-related emails would be sent to him. However, we ensured this was not the case.

Advise on your position to the above motions, thank you.

Regards,
Ronda McNae

From: Peter E. Berlowe <PEB@AssoulineBerlowe.com>
Sent: Monday, February 3, 2025 8:04:42 AM
To: Ronda McNae <_____>
Cc: Meredith J. Gussin <_____>; Keisha Hall <_____>
Subject: RE: Conferral Regarding Additional Evidence supporting DE 275

Dear Mrs. McNae:

Thank you for your email but it is very light on details. How can we confer with you on a confidentiality designation if you refuse to give us the bates number of the document? We cannot read your mind.

How can we confer with you about withholding "key materials" from expert witnesses if you don't tells us what the "key materials" are?

How can we confer with you about this alleged "improper surveillance" of your public social media accounts or identify the individuals? If your referring to me, yes I recently looked at your account to see whether you are continuing to violate the confidential settlement agreement. We will continue to monitor your public social media accounts, as there is nothing improper at doing so.

What "selective disclosure" of documents are you referring to? Which documents? What bates numbers?

What discrepancies in expert witness transcripts? Which transcripts? What line and page should we look at?

Confer in good faith please.

Sincerely,


**Peter E. Berlowe, Esq.**



**Ronda McNae**

See attached

---

**8:07**

**Meredith J. Gussin**                    Jan 31
To You and Peter E. Berlowe

What other bodies are you referring to?

The documents that were marked confidential
are pages 18-20, 22, 24-27 of your reply brief
at Exhibit B. Can you advise where you found
those documents as the bates labels have been
redacted?

As to new arguments those include reference
to Neil Lomax and my husband, Grant Gussin;
allegations regarding SEC violations, providing
a timeline to Dr DiTomasso, and Ms. De
Varona's affidavit. These were not included in
your initial motion and are, therefore, beyond
the scope of what is appropriate in a reply
brief.

Get Outlook for iOS

**From:** Meredith J. Gussin <                                        >
**Sent:** Monday, February 3, 2025 8:40 AM
**To:** Ronda McNae <                                        >; Peter E. Berlowe <PEB@AssoulineBerlowe.com>
**Cc:** Keisha Hall <                                        >
**Subject:** RE: Conferral Regarding Additional Evidence supporting DE 275

Ronda,

The attached email includes those documents that you produced in your Reply brief that we had disclosed as confidential in discovery. You advised that you received copies of those documents via "snapshot." I am not sure what that means, but if you could provide us with the bates label of the documents you included at pages 18-20, 22, 24-27 of your Reply, we can have a meaningful conferral.

As to your request to e-file, the Administrative Procedures of the Southern District of Florida CM/ECF provides at Section 2c: "Pro se litigants will not be permitted to register as Users at this time and must file their documents in the conventional manner."

This is Court procedure, and it is not something an attorney can agree to. As stated previously, your request is not within our purview to grant.

Meredith J. Gussin, Esq.
Litigation

**Ronda McNae**

Counsel,

Regarding e-filing privileges, I have written to the Judicial Conference of the United States to advocate for meaningful reform. While I will (very) soon have counsel appearing in my case (which moots my request for your position), my experience underscores the significant prejudice faced by pro se litigants. My case serves as a compelling example of the systemic disparities, especially for those without legal insurance—unlike myself, who now has two policies—or the financial resources to sustain prolonged litigation.

The substantial costs I have personally incurred in filing and managing this case further highlight the urgent need for reform. I am committed to continuing this advocacy to ensure that future litigants are not subjected to the same inequities.

Lastly, it is counsel for SoftwareONE, not you, Peter, that I have observed lurking around my Instagram account. While my profile is public, a valid account must still be signed in to view my stories, as those are only accessible to signed-in users. This collective behavior is troubling, particularly given my recent reports to regulatory bodies and the concerns surrounding the IPO. It further underscores the broader pattern of concerning conduct in this case.

-Ronda

# Exhibit 18

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO.: 1:22-cv-22171-JEM

MICHAEL FITZGERALD,
individually, and YELANY DE VARONA,
individually,

        Plaintiffs,

v.

RONDA MCNAE, individually, and
WILLIAM MCNAE, individually,

        Defendants.

_____/

FILED BY _____ D.C.

FEB - 6 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

## DEFENDANT RONDA MCNAE'S MOTION FOR LEAVE TO FILE ELECTRONICALLY USING CM/ECF OR, IN THE ALTERNATIVE, FOR PROCEDURAL ACCOMMODATIONS

**Defendant Ronda McNae**, appearing pro se, respectfully moves this Court for an order granting her permission to electronically file documents using the Court's Case Management/Electronic Case Filing ("CM/ECF") system, pursuant to Rule 5(d)(3) of the Federal Rules of Civil Procedure and Local Rule 5.1 of the Southern District of Florida. In the alternative, should the Court determine that CM/ECF filing is restricted to attorneys, Defendant requests that she be granted alternative procedural accommodations to ensure she is not unfairly prejudiced by the limitations of manual filing, while opposing counsel benefits from electronic filing.

### I. INTRODUCTION

1. Defendant is a pro se litigant required to submit filings manually via mail or in person, resulting in substantial delays, additional costs, and procedural disadvantages in the litigation process.

2. Plaintiff, represented by counsel, enjoys the benefit of **electronic filing privileges**, allowing for **instantaneous docketing** and service of filings—while Defendant must rely on manual filing and mail service, delaying the docketing process by **several days** and creating an **unfair litigation imbalance**.

3. If denied CM/ECF access, Defendant respectfully requests that the Court grant procedural accommodations to **level the playing field**, including:

   a. Requiring **Plaintiff's counsel to serve all filings via email** in addition to mail.

   b. Allowing **Defendant to submit filings via email to the Clerk** for docketing to prevent delays and loss of filings.

   c. Mandating **simultaneous access** to case filings to prevent undue prejudice.

## II. LEGAL STANDARD

4. Rule 5(d)(3) of the Federal Rules of Civil Procedure grants courts the authority to permit electronic filing by pro se litigants where it would promote fairness and efficiency.

5. Local Rule 5.1 of the Southern District of Florida does not prohibit pro se litigants from obtaining CM/ECF access but leaves it to the Court's discretion.

6. In Smith v. D.C., 430 F.3d 450, 457 (D.C. Cir. 2005), the court recognized that e-filing reduces administrative burdens, prevents delays, and ensures fair litigation practices.

## III. PROCEDURAL DISADVANTAGE CAUSED BY DENYING CM/ECF ACCESS

7. Opposing counsel has used procedural delays to gain an unfair advantage:

   a. Plaintiff's counsel can instantly file documents and serve filings electronically at any time—including after business hours and on weekends—while Defendant's filings take several days to appear on the docket.

   b. Plaintiff's counsel has previously filed motions to strike Defendant's filings before they even appeared on the docket, exploiting manual filing delays to gain an advantage.

8. Time Zone and Geographic Barriers:

   a. Defendant resides in Seattle, Washington, while the Court is in Florida. This results in strict early filing deadlines, requiring Defendant to file and mail motions by 3:00 PM Pacific Time to meet delivery cutoffs.

   b. Plaintiff's counsel, having unrestricted CM/ECF access, does not face this hardship.

## IV. FINANCIAL BURDENS CAUSED BY MANUAL FILING

9. Costs of Filing: Defendant incurs $150-$300 per filing, including costs of printing, certified mail, FedEx, or courier services. Plaintiff's counsel files at no cost via CM/ECF.

10. Risk of Lost Filings: Defendant previously had a certified mailing lost by USPS, causing unnecessary delays. If granted CM/ECF access, Defendant would have a secure method to file documents and ensure they are timely received.

## V. UNEQUAL ACCESS TO THE COURTS & RETALIATORY LITIGATION

11. Plaintiff Has Refiled Previously Dismissed Claims in State Court Against Defendant's Husband

   a. Plaintiff originally asserted tort claims in this federal case, which were dismissed. Plaintiff's counsel then refiled those same claims in Florida state court against Defendant's husband.

   b. Defendant's husband, as a state court litigant, has e-filing privileges, allowing him to respond efficiently, while Defendant is forced to manually file in federal court, facing systemic delays.

   c. This forum manipulation highlights a glaring procedural disparity, reinforcing the necessity of e-filing privileges for pro se litigants.

12. Plaintiff's Lawsuit Constitutes Retaliatory Litigation and an Attempt to Suppress Constitutionally Protected Speech

   a. Defendant's litigation stems from her decision to provide police reports to two corporations regarding misconduct. This is protected speech under the First Amendment and public policy.

   b. Plaintiff's claims are designed to intimidate and silence Defendant, mirroring a Strategic Lawsuit Against Public Participation (SLAPP).

   c. Florida's anti-SLAPP statute (Fla. Stat. § 768.295) explicitly prohibits lawsuits aimed at chilling free speech, yet Defendant faces procedural roadblocks preventing her from asserting such protections in a timely manner.

13. Formal Complaints to the Judicial Conference and the Florida Bar **(Exhibit A)**

    a. Defendant has formally submitted letters to the Judicial Conference of the United States detailing the systemic procedural barriers faced by pro se litigants, including the unfair disadvantage created by the inability to access the Court's CM/ECF filing system.

    b. Defendant has also reported concerns to the Florida Bar, highlighting Plaintiff's counsel's strategic use of procedural obstacles to gain an unfair litigation advantage.

    c. These actions underscore the serious and ongoing impact of the lack of procedural fairness, further justifying the need for CM/ECF access or alternative accommodations to ensure equal access to the courts.

## VI. ALTERNATIVE RELIEF IF CM/ECF ACCESS IS DENIED

14. If the Court denies CM/ECF access, Defendant requests procedural accommodations to ensure fairness:

    a. Requiring Plaintiff's counsel to serve all filings via email and U.S. Mail to prevent delays.

    b. Permitting Defendant to submit filings via email to the Clerk for docketing.

    c. Mandating simultaneous electronic service of all case filings to prevent undue prejudice.

## VII. CERTIFICATION OF COMPLIANCE WITH CM/ECF REQUIREMENTS

15. If granted CM/ECF access, Defendant certifies that she:

    a. Has reviewed the Court's CM/ECF Administrative Procedures.

    b. Will comply with all e-filing rules and procedures.

    c. Understands that improper use of CM/ECF privileges may result in revocation.

## VIII. RELIEF REQUESTED

WHEREFORE, Defendant Ronda McNae respectfully requests that this Court:

1. Grant her permission to electronically file documents using the Court's CM/ECF system; or, in the alternative,

2. Order alternative procedural accommodations, including:

    - Requiring Plaintiff's counsel to serve all filings via email and U.S. Mail,
    - Allowing Defendant to submit filings via email to the Clerk, and
    - Ensuring all case filings are served on all parties simultaneously.

Grant any additional relief the Court deems just and proper.

Dated: February 4, 2025

By: <u>Ronda Delapina McNae</u>
Pro Se Defendant
504 11th PL Kirkland, WA 98033
Tel: (206) 914-6752
Prose.mcnae@gmail.com

## CERTIFICATE OF CONFERRAL

Pursuant to Local Rule 7.1(a)(3) of the Southern District of Florida, Defendant certifies that she attempted to confer in good faith with Plaintiff's counsel regarding the relief sought in this motion. Defendant emailed Plaintiff's counsel on **February 1, 2025**, informing them of her intent to seek permission for CM/ECF filing privileges due to the significant procedural disadvantages caused by manual filing. **Exhibit B** for conferral communication. Ms. Gussin's response "Pro se litigants will not be permitted to register as Users at this time and must file their documents in the conventional manner" and "This is Court procedure, and it is not something an Attorney can agree to."

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 4, 2025, a true copy of the foregoing Motion was sent via FedEx to the Clerk of the Court, Southern District of Florida, 400 N. Miami Ave, Room 8N09, Miami, FL 33128, and Plaintiff's counsel, in compliance with pro se litigant requirements.

<u>SERVICE LIST</u>
Peter E. Berlowe, Esq.
Meredith Gussin, Esq.
Assouline & Berlowe, P.A.

Miami Tower
100 SE 2nd Street, Suite 3105
Miami, FL 33131
Tel: 305-567-5576
Fax: 305-567-9343
peb@assoulineberlowe.com
mjg@assoulineberlowe.com
*Counsel for Plaintiffs*

# EXHIBIT A

## COPIES OF LETTERS SENT TO

## THE FLORIDA BAR

## AND

## THE JUDICIAL CONFERENCE

## OF THE UNITED STATES

# THE FLORIDA BAR

**The FLORIDA BAR**                                                February 1, 2025
651 East Jefferson Street
Tallahassee, Florida 32399-2300

**ATTENTION: Roland Sanchez-Medina Jr.**

### Ensuring Equal Access to Justice for Pro Se Litigants and Protecting
### Constitutional Rights Against Retaliatory Litigation

Dear Roland Sanchez-Medina Jr. and Esteemed Members,

I write this letter not solely on my behalf, but on behalf of countless pro se litigants across the country who are navigating an uneven and, at times, insurmountable legal landscape. My current case, **Case No. 1:22-cv-22171-JEM**, exemplifies the barriers faced by individuals who, without the benefit of legal representation or unlimited financial resources must defend themselves against well-resourced parties.

I write this letter to those with the ability to **compel systemic change** because my presiding judge may not have the authority to grant me e-filing privileges as an exception to the rule. However, this issue is not about making exceptions—it is about improving the system for all pro se litigants to ensure a more balanced and equitable legal playing field.

My goal is not just to remedy my own situation but to **advocate for structural reforms** that eliminate the unfair procedural barriers faced by unrepresented litigants. A fair and just legal system should not disadvantage individuals simply because they lack representation or the financial means to hire counsel. I am a stay-at-home mother of two biological teenage children and am in the process of adopting my young niece and nephew, both of whom are now in my care. While building a stable and loving home for my family, I am also defending myself in federal litigation stemming from my decision to provide police reports to two companies in accordance with public policy, even though the misconduct had already been reported to the companies in 2020. The police report gave weight to my voice, highlighting the disparity in how concerns are addressed when supported by official documentation.

Now, 2.5 years into this case, I find myself preparing for trial as a pro se litigant, facing systemic disadvantages that hinder my ability to meaningfully participate in the judicial process. As I continue to recover from the harm that forms the foundation of these lawsuits, I am doing my best to create a safe, structured, and consistent home for the two children I am adopting—all while navigating the often overwhelming challenges of self-representation. Without a college degree or formal legal training, navigating the legal system often feels like an impossible challenge. Yet, I remain steadfast in my commitment to uncovering the truth and making sure it is heard. I am determined to shine a light on the truth and ensure it echoes where it matters most.

**Barriers to Justice: My Personal Experience**

As a pro se litigant, I am required to submit filings manually, a process that imposes severe financial and logistical burdens:

1. **Financial Costs:** Each filing requires certified mail, FedEx, or courier services at costs ranging from $150 to $300 per motion, doubling when including service to opposing counsel. Over the course of this case, these expenses have amounted to thousands of dollars—a heavy burden for any individual, let alone a mother managing a household on a single income.

2. **Time Constraints and Delays:** Living in Seattle, Washington, while litigating in The Southern District of Florida, I must prepare and send filings by early morning to meet courier deadlines. Opposing counsel, with unrestricted access to e-filing, has exploited these delays. For instance, they have filed motions to strike my submissions before my filings even appeared on the docket, leveraging an unfair procedural advantage.

3. **Administrative Inefficiencies:** Manual filing not only delays docketing but also consumes valuable court resources. In contrast, granting pro se litigants access to e-filing would streamline case management and improve judicial efficiency. **Freedom of Speech and Retaliatory Litigation**

4. This litigation goes beyond a breach of contract claim—it represents an attempt to suppress my constitutionally protected rights under the **First Amendment**, specifically my right to freedom of speech and to petition the government for redress of grievances. By reporting misconduct to law enforcement and providing police reports, I exercised my civic duty and fundamental rights.

5. However, this case exemplifies what is commonly referred to as a **Strategic Lawsuit Against Public Participation (SLAPP)**—a lawsuit designed to silence, intimidate, and financially exhaust individuals who engage in protected speech. Florida's anti-SLAPP statute (Fla. Stat. § 768.295) explicitly prohibits such lawsuits, but the protection it provides often feels out of reach for pro se litigants who lack the resources to effectively raise such defenses.

6. Denying pro se litigants access to e-filing systems exacerbates this problem. It creates structural barriers that make it nearly impossible to timely and effectively assert constitutional rights, including anti-SLAPP protections. The ability to file and respond in real time is critical in defending against meritless or retaliatory claims, yet this basic tool remains unavailable to many pro se litigants.

**Systemic Disparities Impacting Survivors of Retaliation**

This case also highlights the broader issue of **retaliatory litigation** faced by survivors of misconduct. By reporting wrongdoing, I sought accountability for actions that undermined public trust. Instead, I now face years of costly, protracted litigation designed to silence my voice and discredit my actions. Denying e-filing privileges to pro se litigants, particularly survivors of misconduct, sends a chilling message: **stay silent, or you may face insurmountable legal retaliation.**

**Access to Justice: A Civil Right**

Denying pro se litigants access to e-filing creates disparities that conflict with fundamental principles of fairness, equal protection, and procedural due process:

1. **Equal Access to the Courts:** Under the Due Process and Equal Protection Clauses of the 5th and 14th Amendments, individuals are guaranteed meaningful access to the courts. Denying e-filing creates a structural barrier that disproportionately impacts low-income litigants and those without representation.

2. **Procedural Fairness:** Allowing opposing counsel to file electronically while pro se litigants are relegated to manual filings creates an uneven playing field in adversarial proceedings. This systemic imbalance undermines the fairness required in civil litigation.

3. **Disparate Impact:** Many pro se litigants represent themselves due to financial constraints. Requiring manual filings imposes additional costs and logistical burdens that exacerbate the challenges faced by these individuals.

## Proposals for Reform

I respectfully urge the Judicial Conference, Local Rules Committee, and advocacy organizations to consider the following reforms:

1. **Grant E-Filing Privileges to Pro Se Litigants:** Pro se litigants should be permitted to use the CM/ECF system upon request, subject to reasonable safeguards such as training or certification.

2. **Adopt Pro Se E-Filing Programs Nationwide:** Federal courts should follow the example of districts like the Eastern District of New York and the Central District of California, which provide e-filing access to pro se litigants while maintaining court oversight.

3. **Ensure Protections for Survivors of Retaliatory Litigation:** Survivors of misconduct who represent themselves should be automatically granted e-filing privileges to ensure they can defend themselves without facing procedural disadvantages.

## Judicial Efficiency and Public Confidence

Providing e-filing access to pro se litigants would benefit not only individual litigants but also the judicial system as a whole:

- **Streamlined Case Management:** E-filing reduces the administrative burden on court staff and ensures more efficient docketing.

- **Timely Resolutions:** Real-time filings enable faster case progression, reducing delays caused by manual submissions.

- **Restoring Public Trust:** Ensuring equal access to electronic filing reinforces the principle of fairness and demonstrates a commitment to justice for all litigants.

## Unequal Litigation Burden and Procedural Manipulation

The disparities in access between represented parties and pro se litigants create **severe procedural disadvantages** that opposing counsel has actively exploited:

1. **Opposing Counsel's Ability to File in Multiple Courts**

- While I am restricted to manual filing in federal court, opposing counsel has the advantage of unrestricted e-filing, allowing them to submit motions instantly across both federal and state courts.

- This has resulted in strategic forum manipulation, where Plaintiff initially filed tort claims in federal court, had them dismissed, then refiled a nearly identical case in state court against my husband, who was granted e-filing privileges.

- If not for my husband's ability to e-file, he would have faced the same overwhelming procedural barriers that I continue to experience.

2. **Strategic Use of Delays Against Pro Se Litigants**

- Opposing counsel has repeatedly taken advantage of my filing restrictions to strike my motions before they even appear on the docket.

- The inherent delays caused by mailing and docketing leave me vulnerable to procedural tactics that would not be possible if I had real-time e-filing access.

3. **Inconsistent Court Access Creates an Unlevel Playing Field**

- If my husband—litigating an identical case in state court—is allowed to e-file, why should I, defending the original claims in federal court, be denied the same access?

- The rules should not allow attorneys to weaponize procedural obstacles against unrepresented litigants.

**How This Reinforces the Urgency of E-Filing Reform**

This case demonstrates why **e-filing access must be extended to pro se litigants nationwide**. If represented parties are granted unrestricted access to electronic filing while pro se litigants are denied, the imbalance does not just create **inconvenience—it actively impacts case outcomes** by allowing opposing counsel to exploit procedural weaknesses.

**E-filing reform is not just a matter of efficiency; it is a matter of fairness.**

Access to the courts is not a privilege—it is a fundamental right. Yet, the current system denies pro se litigants the tools necessary to meaningfully participate in their cases. This issue is especially urgent for survivors of retaliatory litigation, who often face overwhelming financial and emotional burdens in their fight for justice.

I respectfully ask for e-filing privileges in my current case, **Case No. 1:22-cv-22171-JEM**, but more importantly, I urge systemic reform to ensure no other pro se litigant faces the same barriers I have encountered. By addressing this disparity, we can uphold the principles of fairness, equity, and access to justice that form the cornerstone of our legal system.

Sincerely,
**Ronda McNae**
Pro Se Defendant

504 11TH PL

Kirkland, WA 98033

(206) 914-6752

This case demonstrates why **e-filing access must be extended to pro se litigants nationwide**. If represented parties are granted unrestricted access to electronic filing while pro se litigants are denied, the imbalance does not just create **inconvenience—it actively impacts case outcomes** by allowing opposing counsel to exploit procedural weaknesses.

**E-filing reform is not just a matter of efficiency; it is a matter of fairness.**

Access to the courts is not a privilege—it is a fundamental right. Yet, the current system denies pro se litigants the tools necessary to meaningfully participate in their cases. This issue is especially urgent for survivors of retaliatory litigation, who often face overwhelming financial and emotional burdens in their fight for justice.

I respectfully ask for e-filing privileges in my current case, **Case No. 1:22-cv-22171-JEM**, but more importantly, I urge systemic reform to ensure no other pro se litigant faces the same barriers I have encountered. By addressing this disparity, we can uphold the principles of fairness, equity, and access to justice that form the cornerstone of our legal system.

Sincerely,

**Ronda McNae**
Pro Se Defendant

504 11TH PL

Kirkland, WA 98033

(206) 914-6752

# THE JUDICIAL CONFERENCE
# OF THE UNITED STATES

**Judicial Conference of the United States**                    February 1, 2025
Administrative Office of the U.S. Courts
One Columbus Circle, NE
Washington, DC 20544

### Ensuring Equal Access to Justice for Pro Se Litigants and Protecting
### Constitutional Rights Against Retaliatory Litigation

Dear Esteemed Members,

I write this letter not solely on my behalf, but on behalf of countless pro se litigants across the country who are navigating an uneven and, at times, insurmountable legal landscape. My current case, **Case No. 1:22-cv-22171-JEM**, exemplifies the barriers faced by individuals who, without the benefit of legal representation or unlimited financial resources must defend themselves against well-resourced parties.

I write this letter to those with the ability to **compel systemic change** because my presiding judge may not have the authority to grant me e-filing privileges as an exception to the rule. However, this issue is not about making exceptions—it is about improving the system for all pro se litigants to ensure a more balanced and equitable legal playing field.

My goal is not just to remedy my own situation but to **advocate for structural reforms** that eliminate the unfair procedural barriers faced by unrepresented litigants. A fair and just legal system should not disadvantage individuals simply because they lack representation or the financial means to hire counsel. I am a stay-at-home mother of two biological teenage children and am in the process of adopting my young niece and nephew, both of whom are now in my care. While building a stable and loving home for my family, I am also defending myself in federal litigation stemming from my decision to provide police reports to two companies in accordance with public policy, even though the misconduct had already been reported to the companies in 2020. The police report gave weight to my voice, highlighting the disparity in how concerns are addressed when supported by official documentation.

Now, 2.5 years into this case, I find myself preparing for trial as a pro se litigant, facing systemic disadvantages that hinder my ability to meaningfully participate in the judicial process. As I continue to recover from the harm that forms the foundation of these lawsuits, I am doing my best to create a safe, structured, and consistent home for the two children I am adopting—all while navigating the often overwhelming challenges of self-representation. Without a college degree or formal legal training, navigating the legal system often feels like an impossible challenge. Yet, I remain steadfast in my commitment to uncovering the truth and making sure it is heard. I am determined to shine a light on the truth and ensure it echoes where it matters most.

**Barriers to Justice: My Personal Experience**

As a pro se litigant, I am required to submit filings manually, a process that imposes severe financial and logistical burdens:

1. **Financial Costs:** Each filing requires certified mail, FedEx, or courier services at costs ranging from $150 to $300 per motion, doubling when including service to opposing counsel. Over the course of this case, these expenses have amounted to thousands of dollars—a heavy burden for any individual, let alone a mother managing a household on a single income.

2. **Time Constraints and Delays:** Living in Seattle, Washington, while litigating in The Southern District of Florida, I must prepare and send filings by early morning to meet courier deadlines. Opposing counsel, with unrestricted access to e-filing, has exploited these delays. For instance, they have filed motions to strike my submissions before my filings even appeared on the docket, leveraging an unfair procedural advantage.

3. **Administrative Inefficiencies:** Manual filing not only delays docketing but also consumes valuable court resources. In contrast, granting pro se litigants access to e-filing would streamline case management and improve judicial efficiency. **Freedom of Speech and Retaliatory Litigation**

4. This litigation goes beyond a breach of contract claim—it represents an attempt to suppress my constitutionally protected rights under the **First Amendment**, specifically my right to freedom of speech and to petition the government for redress of grievances. By reporting misconduct to law enforcement and providing police reports, I exercised my civic duty and fundamental rights.

5. However, this case exemplifies what is commonly referred to as a **Strategic Lawsuit Against Public Participation (SLAPP)**—a lawsuit designed to silence, intimidate, and financially exhaust individuals who engage in protected speech. Florida's anti-SLAPP statute (Fla. Stat. § 768.295) explicitly prohibits such lawsuits, but the protection it provides often feels out of reach for pro se litigants who lack the resources to effectively raise such defenses.

6. Denying pro se litigants access to e-filing systems exacerbates this problem. It creates structural barriers that make it nearly impossible to timely and effectively assert constitutional rights, including anti-SLAPP protections. The ability to file and respond in real time is critical in defending against meritless or retaliatory claims, yet this basic tool remains unavailable to many pro se litigants.

**Systemic Disparities Impacting Survivors of Retaliation**

This case also highlights the broader issue of **retaliatory litigation** faced by survivors of misconduct. By reporting wrongdoing, I sought accountability for actions that undermined public trust. Instead, I now face years of costly, protracted litigation designed to silence my voice and discredit my actions. Denying e-filing privileges to pro se litigants, particularly survivors of misconduct, sends a chilling message: **stay silent, or you may face insurmountable legal retaliation.**

**Access to Justice: A Civil Right**

Denying pro se litigants access to e-filing creates disparities that conflict with fundamental principles of fairness, equal protection, and procedural due process:

1. **Equal Access to the Courts:** Under the Due Process and Equal Protection Clauses of the 5th and 14th Amendments, individuals are guaranteed meaningful access to the courts. Denying e-filing creates a structural barrier that disproportionately impacts low-income litigants and those without representation.

2. **Procedural Fairness:** Allowing opposing counsel to file electronically while pro se litigants are relegated to manual filings creates an uneven playing field in adversarial proceedings. This systemic imbalance undermines the fairness required in civil litigation.

3. **Disparate Impact:** Many pro se litigants represent themselves due to financial constraints. Requiring manual filings imposes additional costs and logistical burdens that exacerbate the challenges faced by these individuals.

**Proposals for Reform**

I respectfully urge the Judicial Conference, Local Rules Committee, and advocacy organizations to consider the following reforms:

1. **Grant E-Filing Privileges to Pro Se Litigants:** Pro se litigants should be permitted to use the CM/ECF system upon request, subject to reasonable safeguards such as training or certification.

2. **Adopt Pro Se E-Filing Programs Nationwide:** Federal courts should follow the example of districts like the Eastern District of New York and the Central District of California, which provide e-filing access to pro se litigants while maintaining court oversight.

3. **Ensure Protections for Survivors of Retaliatory Litigation:** Survivors of misconduct who represent themselves should be automatically granted e-filing privileges to ensure they can defend themselves without facing procedural disadvantages.

**Judicial Efficiency and Public Confidence**

Providing e-filing access to pro se litigants would benefit not only individual litigants but also the judicial system as a whole:

- **Streamlined Case Management:** E-filing reduces the administrative burden on court staff and ensures more efficient docketing.

- **Timely Resolutions:** Real-time filings enable faster case progression, reducing delays caused by manual submissions.

- **Restoring Public Trust:** Ensuring equal access to electronic filing reinforces the principle of fairness and demonstrates a commitment to justice for all litigants.

**Unequal Litigation Burden and Procedural Manipulation**

The disparities in access between represented parties and pro se litigants create **severe procedural disadvantages** that opposing counsel has actively exploited:

1. **Opposing Counsel's Ability to File in Multiple Courts**

   - While I am restricted to manual filing in federal court, opposing counsel has the advantage of unrestricted e-filing, allowing them to submit motions instantly across both federal and state courts.

   - This has resulted in strategic forum manipulation, where Plaintiff initially filed tort claims in federal court, had them dismissed, then refiled a nearly identical case in state court against my husband, who was granted e-filing privileges.

   - If not for my husband's ability to e-file, he would have faced the same overwhelming procedural barriers that I continue to experience.

2. **Strategic Use of Delays Against Pro Se Litigants**

   - Opposing counsel has repeatedly taken advantage of my filing restrictions to strike my motions before they even appear on the docket.

   - The inherent delays caused by mailing and docketing leave me vulnerable to procedural tactics that would not be possible if I had real-time e-filing access.

3. **Inconsistent Court Access Creates an Unlevel Playing Field**

   - If my husband—litigating an identical case in state court—is allowed to e-file, why should I, defending the original claims in federal court, be denied the same access?

   - The rules should not allow attorneys to weaponize procedural obstacles against unrepresented litigants.

**How This Reinforces the Urgency of E-Filing Reform**

This case demonstrates why **e-filing access must be extended to pro se litigants nationwide**. If represented parties are granted unrestricted access to electronic filing while pro se litigants are denied, the imbalance does not just create **inconvenience—it actively impacts case outcomes** by allowing opposing counsel to exploit procedural weaknesses.

**E-filing reform is not just a matter of efficiency; it is a matter of fairness.**

Access to the courts is not a privilege—it is a fundamental right. Yet, the current system denies pro se litigants the tools necessary to meaningfully participate in their cases. This issue is especially urgent for survivors of retaliatory litigation, who often face overwhelming financial and emotional burdens in their fight for justice.

I respectfully ask for e-filing privileges in my current case, **Case No. 1:22-cv-22171-JEM**, but more importantly, I urge systemic reform to ensure no other pro se litigant faces the same barriers I have encountered. By addressing this disparity, we can uphold the principles of fairness, equity, and access to justice that form the cornerstone of our legal system.

Sincerely,

**Ronda McNae**
Pro Se Defendant

504 11TH PL

Kirkland, WA 98033

(206) 914-6752

# EXHIBIT B



**Fitzgerald v. McNae**  Inbox ✕

← **Meredith J. Gussin**  ☆ ☺ ↩ ⋮

Ms. McNae,
We are in receipt of your reply brief in Support of your Motion to Dismiss (DE 283). After review, it has come to light that you asserted new arguments that are beyond the scope of what was included in your Motion or our response. Additionally, you included several documents that were produced during discovery that were marked Confidential. Please advise if you would like to meet and confer on this; otherwise, we would like to file a brief 3-4 page surreply. Kindly advise if you have any opposition to us filing same. I look forward to hearing from you.

**Meredith J. Gussin, Esq.**
**Litigation**



**Response to Your Concerns Regarding DE 283**  🖶 ☒

**Ronda McNae**  ☆ ☺ ↩ ⋮

Dear Ms. Gussin,

Thank you for your email regarding DE 283. I appreciate your attention to the details of my reply brief.

To clarify, the arguments raised in DE 283 are not entirely new but are rather expansions on the systemic discovery misconduct that I have consistently referenced throughout these proceedings. My intention was to provide the Court with additional context and evidence demonstrating the pattern of procedural violations and suppression tactics employed.

As for the "Confidential" documents you referenced, please identify specifically which ones you believe were improperly included. To my knowledge, the documents I cited were either supplied without a "Confidential" designation or were provided to your expert, Sheri Fiske, without retaining such designation, effectively removing their confidential status.

That said, I am open to a good-faith discussion to address your concerns. If we cannot resolve this matter informally over email, I would kindly request that you share your specific objections to facilitate a focused and productive exchange. As other bodies are now involved and looking into the matter (that go beyond this immediate litigation), email will have to suffice.

I look forward to your response.

Best regards,
Ronda McNae

On Fri, Jan 31, 2025 at 3:54 PM Meredith J. Gussin <━━━━━━━━━━━━━━━━━━━━━━> wrote:

What other bodies are you referring to?

The documents that were marked confidential are pages 18-20. 22. 24-27 of your reply brief at Exhibit B. Can you advise where you found those documents as the bates labels have been redacted?

As to new arguments those include reference to Neil Lomax and my husband, Grant Gussin: allegations regarding SEC violations, providing a timeline to Dr DiTomasso, and Ms. De Varona's affidavit. These were not included in your initial motion and are, therefore, beyond the scope of what is appropriate in a reply brief.

Get ━━━━━━━━━━

---

**From:** Ronda McNae <━━━━━━━━━━━━━━━━━━>
**Sent:** Friday, January 31, 2025 7:08:24 PM
**To:** Meredith J. Gussin <━━━━━━━━━━━━━━━━>
**Cc:** Peter E. Berlowe <PEB@AssoulineBerlowe.com>
**Subject:** Re: Response to Your Concerns Regarding DE 283

Ms. Gussin,

A quick review confirms that you are mistaken regarding pages 24-27. I encourage you to carefully review your own production. I will locate the copies I received of pages 18-20 and 22 in the next few hours as I'm home with all the kids. If I inadvertently produced these and they were marked. I will rectify or call the chambers to figure out the best procedure in hopes to make an update immediately.

Additionally, what new arguments are you referring to? If I'm not in agreement with your assertion, I will move to strike your motion.

It is particularly ironic that the very documents you now claim are marked "confidential"—internal HR records I previously shared with Microsoft—have been weaponized against my family. This is especially troubling given that I exercised discretion in their disclosure, aligning with Honorable Magistrate Judge Becerra's guidance regarding overbroad designations.

Regarding other governing bodies, my position was made clear in my most recent filing in response to your premature request for a case management conference.

Regards,

Ronda

## Re: Response to Your Concerns Regarding DE 283     

**Ronda McNae** ⟨············⟩                    ···········         ☆  ☺  ↩  ⋮

Ms. Gussin,

If your primary concern is the Grant Gussin issue, I am open to discussing a resolution, though I firmly believe it strongly supports my case. I want to approach this matter in good faith.

-Ronda

On Fri, Jan 31, 2025 at 4:10 PM Meredith J. Gussin ⟨················⟩ wrote:

If you disclosed those documents to Microsoft that is in violation of the protective order set in place in this case.

I listed the new arguments in my prior email.

---

**From:** Ronda McNae ⟨···················⟩
**Sent:** Friday, January 31, 2025 11:54:47 PM
**To:** Meredith J. Gussin ⟨·····················⟩
**Cc:** Peter E. Berlowe ⟨PEB@AssoulineBerlowe.com⟩
**Subject:** Re: Response to Your Concerns Regarding DE 283

Drafting a motion now, please let me know the reason for the designations for these documents. I'm still searching for the first couple pages as the copies I have were snapshots (hence) not having the designation.

-Ronda

On Fri, Jan 31, 2025 at 8:01 PM Meredith J. Gussin ⟨······················⟩ wrote:

What sort of resolution do you propose? That is not my primary concern. All the new issues remain equally of issue insofar as they are beyond the scope of your motion.

Additionally, will you be voluntarily seeking a removal from the docket of the confidential documents? If not, I believe it is proper for the court to rule on the propriety of your inclusion of protected material in direct violation of the protective order which sets forth the procedure to question or challenge any designation. Your belief that the documents are not confidential isn't sufficient.

**From:** Meredith J. Gussin <m.j.gussin@berlowe.com>
**Sent:** Saturday, February 1, 2025 6:09:49 AM
**To:** Ronda McNae <ronda.mcnae@gmail.com>
**Cc:** Peter E. Berlowe <PEB@AssoulineBerlowe.com>
**Subject:** Re: Response to Your Concerns Regarding DE 283

The documents were designated as confidential in the discovery process. The documents you provided neither have this designation nor the bates label which raises our concerns.

Filing another motion by you does not answer whether or not you are opposed to plaintiff filing a surreply to address these issues. Can you please advise whether or not you are opposed to us filing a brief surreply at this time? Thank you.

---

**Ronda McNae** <ronda.mcnae@gmail.com>
<Message to m.j.gussin@berlowe.com>  

Ms. Gussin,

I apologize, but I do oppose your motion. I did not raise new arguments; I referenced items from prior filings, as well as in this filing, to provide context and explain the broader issue of misconduct.

Could you please clarify the confidentiality designations for the documents in question? I have noticed some discrepancies and am trying to understand your client's rationale. It seems that a number of documents listed as confidential may no longer qualify under that designation.

This needs to be addressed in the state case considering you have pointed to the discovery in this case with some designations that may no longer apply.

Regards,

Ronda

---

**From:** Meredith J. Gussin <m.j.gussin@berlowe.com>
**Sent:** Friday, January 31, 2025 8:01:06 PM
**To:** Ronda McNae <ronda.mcnae@gmail.com>
**Cc:** Peter E. Berlowe <PEB@AssoulineBerlowe.com>
**Subject:** Re: Response to Your Concerns Regarding DE 283

What sort of resolution do you propose? That is not my primary concern. All the new issues remain equally of issue insofar as they are beyond the scope of your motion.

Additionally, will you be voluntarily seeking a removal from the docket of the confidential documents? If not, I believe it is proper for the court to rule on the propriety of your inclusion of protected material in direct violation of the protective order which sets forth the procedure to question or challenge any designation. Your belief that the documents are not confidential isn't sufficient.

**Ronda McNae**

I understand your concerns and appreciate your communication. I believe the documents included in my filing are highly relevant and directly address the discovery misconduct issues raised. Help me understand the confidentiality designations for the documents you believe are confidential. As you mentioned, there are 14,000 documents, many of which are mine and were produced without any confidentiality designation—and look where that has led us. I have not used any discovery materials outside of this case, which unfortunately cannot be said for Fitzgerald. I will follow court procedures with these documents. With that, please explain the designation for each document please? Including those that have been produced to third parties without designation.

-Ronda

**Ronda McNae**

Ms. Gussin,

I apologize, but I do oppose your motion. I did not raise new arguments; I referenced items from prior filings, as well as in this filing, to provide context and explain the broader issue of misconduct

Could you please clarify the confidentiality designations for the documents in question? I have noticed some discrepancies and am trying to understand your client's rationale. It seems that a number of documents listed as confidential may no longer qualify under that designation.

This needs to be addressed in the state case considering you have pointed to the discovery in this case with some designations that may no longer apply.

Regards,

Ronda

**Ronda McNae**

Ms. Gussin,

I found a prior filing that supports why I have copies of some emails that aren't marked confidential. Though you assume otherwise. I will alert the court. You still haven't answered the question below.

Could you please clarify the confidentiality designations for the documents in question? Why do you believe they are still protected? I would like to include in my motion.

Thanks,

Ronda

---

**From:** Meredith J. Gussin <mjg@assoulineberlowe.com>
**Sent:** Saturday, February 1, 2025 11:46:55 AM
**To:** Ronda McNae <ronda.mcnae@gmail.com>
**Cc:** Will McNae <wosurfmcnae@gmail.com>; Peter E. Berlowe <PEB@AssoulineBerlowe.com>
**Subject:** RE: Notice of Court Filing: Fitzgerald v. McNae Case No. 22-22171

What prior filing are you referring to?

The documents are confidential because they were marked confidential when produced in discovery and Plaintiff has not waived his designations.

**Meredith J. Gussin, Esq.**

**Ronda McNae**

Ms. Gussin,

With all due respect, you're avoiding my question rather than addressing it directly. I have asked the same question several times now.

Please clarify the specific basis for _why_ the confidentiality designations are appropriate, especially given where we are in the case. I am trying to understand your reasoning so I can determine whether any of them should be challenged.

Regards,
Ronda

---

**Ronda McNae**

Dear Ms. Gussin,

I am writing to confer with you regarding my request to obtain e-filing privileges in this matter.

As you are aware, I have been required to file all documents manually, which creates unnecessary delays and additional burdens. Given the volume of filings and the need to efficiently litigate this case, I intend to seek leave of Court to file electronically pursuant to Southern District of Florida Local Rule 5.1 and Administrative Order 2023-7.

Please confirm whether you oppose my request for e-filing privileges. If you oppose, please provide your basis so that I may include your position in my motion to the Court.

Additionally, I intend to file a motion regarding the Confidentiality Designations regarding certain documents that have been improperly designated as "Confidential" under the Protective Order. These documents do not contain trade secrets, proprietary business information, or personally sensitive data and have been misused to obstruct discovery and suppress key evidence.

Please advise whether you oppose this motion as well. If you do, I request that you provide your legal basis for maintaining these confidentiality designations so that I may address it in my motion.

I appreciate your prompt response, as I plan to file sometime early next week.

1) Oppose e-filing privileges?

2) Confidentiality Designations? Provide your position and the legal basis please.

Best regards,
Ronda McNae

**From:** Meredith J. Gussin <mjg@assoulineberlowe.com>
**Sent:** Sunday, February 2, 2025 7:10:08 AM
**To:** Ronda McNae <pronunciah@gmail.com>; Peter E. Berlowe <PEB@AssoulineBerlowe.com>; Will McNae <pronunciah@gmail.com>
**Subject:** Re: Conferral Regarding E-Filing Request

We will provide you with our response by close of business tomorrow. Thank you.

---

**Ronda McNae**

Ms. Gussin,

To keep this straightforward, do you oppose my Motion to Challenge the Confidentiality Designations? A simple yes or no will suffice.

Additionally, do you oppose my Motion to Request E-Filing Privileges?

I will be filing a Motion to Strike, as I previously mentioned. There are also several issues concerning expert testimony that I intend to bring to the Court's attention, though I am still determining the best course of action.

Furthermore, I have uncovered additional evidence that further supports my concerns regarding harassment and intimidation through Instagram. I will follow up with the motion I intend to file on this issue.

Considering I gave you my position and you deflected any response to my prior emails, please provide your position on these motions by 12PM your time tomorrow.

Regards,

Ronda McNae

**From:** Ronda McNae <span class="redacted"></span>
**Sent:** Sunday, February 2, 2025 8:51 PM
**To:** Meredith J. Gussin <span class="redacted"></span>; Peter E. Berlowe <PEB@AssoulineBerlowe.com>; Will McNae <span class="redacted"></span>
**Subject:** Conferral Regarding Additional Evidence supporting DE 275

Ms. Gussin,

Pursuant to Local Rule 7.1(a)(3), I am reaching out to confer regarding my intent to file a **Notice of Additional Evidence in Support of Defendant's Motion to Dismiss (DE 275)**. Since filing my Reply in Support of the Motion to Dismiss, I have become aware of additional evidence of litigation misconduct that further supports dismissal.

This Notice is intended to ensure the Court has all relevant information before ruling on the pending Motion to Dismiss. Please advise whether you oppose or do not oppose the filing of this Notice.

I kindly request a response by 12PM Tuesday, so I may include your position in the Certificate of Conferral. If I do not receive a response by that time, I will indicate in my filing that a good-faith attempt to confer was made, but no response was received.

Thank you for your time and attention to this matter.

Best regards,
Ronda McNae

---

**From:** Peter E. Berlowe <span class="redacted"></span>
**Sent:** Monday, February 3, 2025 4:41 AM
**To:** Ronda McNae <span class="redacted"></span>; Meredith J. Gussin <span class="redacted"></span>; Will McNae <span class="redacted"></span>
**Subject:** RE: Conferral Regarding Additional Evidence supporting DE 275

Sure. Call whenever you have time, so we can have a meaningful meet and confer.

**Peter E. Berlowe, Esq.**

**Sent:** Monday, February 3, 2025 9:51 AM
**To:** Peter E. Berlowe <PEB@AssoulineBerlowe.com>; Meredith J. Gussin <░░░░░░░░░░░░░░░>; Will McNae
<░░░░░░░░░░░░░>
**Subject:** Re: Conferral Regarding Additional Evidence supporting DE 275

Counsel,

I acknowledge your request for a phone conferral. However, given the history of our communications and dynamics, I will only communicate in writing to ensure clarity, accuracy, and a complete record of discussions. I respectfully request that all correspondence be conducted via email or formal court filings.

I will wait until 12:00PM ET Tuesday, before submitting my filings (stayed below) to allow you an opportunity to provide a written response.

For the prior motions I have emailed requesting your sides position, I request a response by 12PM ET today as I have given proper time considering the back and forth email correspondence.

Lastly, I was advised to keep all communications in writing, especially given my recent submission of information to regulatory authorities.

Regards,

Ronda

**From:** Peter E. Berlowe <PEB@AssoulineBerlowe.com>
**Sent:** Monday, February 3, 2025 7:01:56 AM
**To:** Ronda McNae <xxxxxxxxxxxx@xxxx.xxx>
**Cc:** Keisha Hall <xxxxxxxxxxxxxxx@xxxx.xxx>; Meredith J. Gussin <xxxxxxxxxxxxxxx@xxxx.xxx>
**Subject:** RE: Conferral Regarding Additional Evidence supporting DE 275

Dear Mrs. McNae:


We cannot confer in any way when you do not give any specifics. We do not know your arguments. We do not know the bates numbers of the pages you are referring to. Meet and confer is not a game of pulling teeth. We should have to guess what you are trying to argue. Please provide details.


I am copying Mr. McNae's counsel, because he is represented by counsel in the State Court case, and we do not want to have a communication with someone we know to be represented by counsel. I would ask that you stop copying him on this case, if you don't want us to copy his counsel on our replies.


Sincerely,


**Peter E. Berlowe, Esq.**

**Ronda McNae**   ☆ ☺ ↩ ⋮

Counsel,

I have made multiple good-faith efforts to confer under **Local Rule 7.1(a)(3)** regarding my intent to file the following motions:

1. **Motion for E-Filing Privileges** – Due to the ongoing difficulties of manually filing documents, I am requesting permission from the Court to file electronically through CM/ECF to ensure efficiency and timely filings.
2. **Motion to Challenge Confidentiality Designations** – I have repeatedly requested clarification as to Plaintiffs' confidentiality designations and have not received sufficient justification. As such, I intend to formally challenge certain confidentiality designations that appear improper or selectively applied.

For the above motions, please advise by **12:00 PM ET today** whether you oppose or do not oppose.

Additionally, I am conferring regarding my **Notice of Additional Evidence in Support of Defendant's Motion to Dismiss (DE 275)**, which addresses new evidence of litigation misconduct, including:

- **The withholding of key materials from expert witnesses.**
- **Improper surveillance of my social media accounts (additional individuals)**
- **Selective disclosure of documents to experts.**
- **Discrepancies in the expert witness transcript, raising concerns about accuracy etc.**

Conferral does not require me to provide a full legal brief or Bates numbers, only a reasonable summary of the nature of my filing. I have clearly stated the basis for my filings, and any further details will be provided in the actual motions submitted to the Court.

Please advise by **12:00 PM ET on Tuesday** whether you oppose or do not oppose the filing of this Notice.

If I do not receive a response by the respective deadlines, I will indicate in my filings that I made a good-faith attempt to confer, but opposing counsel failed to provide a position.

Regarding your request that I cease copying Mr. McNae on communications: As I previously stated, the federal court has ordered me to include him on case-related emails, and I will continue to comply with the Court's directive. If you have concerns about this, I suggest you address them with the Court rather than attempt to impose unilateral restrictions. To clarify, the federal court order applies strictly to the federal case and has no impact on the state court action. This order was issued when Will was represented by Richard Gomez in the state matter. Ms. Casey previously informed Will that if Mr. Gomez were representing him in the federal case, then all federal case-related emails would be sent to him. However, we ensured this was not the case.

Advise on your position to the above motions, thank you.

Regards,
Ronda McNae

**From:** Peter E. Berlowe <PEB@AssoulineBerlowe.com>
**Sent:** Monday, February 3, 2025 8:04:42 AM
**To:** Ronda McNae <_____>
**Cc:** Meredith J. Gussin <_____>; Keisha Hall <_____>
**Subject:** RE: Conferral Regarding Additional Evidence supporting DE 275

Dear Mrs. McNae:

Thank you for your email but it is very light on details. How can we confer with you on a confidentiality designation if you refuse to give us the bates number of the document? We cannot read your mind.

How can we confer with you about withholding "key materials" from expert witnesses if you don't tells us what the "key materials" are?

How can we confer with you about this alleged "improper surveillance" of your public social media accounts or identify the individuals? If your referring to me, yes I recently looked at your account to see whether you are continuing to violate the confidential settlement agreement. We will continue to monitor your public social media accounts, as there is nothing improper at doing so.

What "selective disclosure" of documents are you referring to? Which documents? What bates numbers?

What discrepancies in expert witness transcripts? Which transcripts? What line and page should we look at?

Confer in good faith please.

Sincerely.

**Peter E. Berlowe, Esq.**

**Ronda McNae**

See attached

8:07

**Meredith J. Gussin**                    Jan 31
To You and Peter E. Berlowe

What other bodies are you referring to?

The documents that were marked confidential
are pages 18-20, 22, 24-27 of your reply brief
at Exhibit B. Can you advise where you found
those documents as the bates labels have been
redacted?

As to new arguments those include reference
to Neil Lomax and my husband, Grant Gussin;
allegations regarding SEC violations, providing
a timeline to Dr DiTomasso, and Ms. De
Varona's affidavit. These were not included in
your initial motion and are, therefore, beyond
the scope of what is appropriate in a reply
brief.

**Get** Outlook for iOS

**From:** Meredith J. Gussin < >
**Sent:** Monday, February 3, 2025 8:40 AM
**To:** Ronda McNae < >; Peter E. Berlowe <PEB@AssoulineBerlowe.com>
**Cc:** Keisha Hall < >
**Subject:** RE: Conferral Regarding Additional Evidence supporting DE 275

**Ronda,**

The attached email includes those documents that you produced in your Reply brief that we had disclosed as confidential in discovery. You advised that you received copies of those documents via "snapshot." I am not sure what that means, but if you could provide us with the bates label of the documents you included at pages 18-20, 22, 24-27 of your Reply, we can have a meaningful conferral.

As to your request to e-file, the Administrative Procedures of the Southern District of Florida CM/ECF provides at Section 2c: "Pro se litigants will not be permitted to register as Users at this time and must file their documents in the conventional manner."

This is Court procedure, and it is not something an attorney can agree to. As stated previously, your request is not within our purview to grant.

**Meredith J. Gussin, Esq.**
**Litigation**

---

**Ronda McNae**  

Counsel,

Regarding e-filing privileges, I have written to the Judicial Conference of the United States to advocate for meaningful reform. While I will (very) soon have counsel appearing in my case (which moots my request for your position), my experience underscores the significant prejudice faced by pro se litigants. My case serves as a compelling example of the systemic disparities, especially for those without legal insurance—unlike myself, who now has two policies—or the financial resources to sustain prolonged litigation.

The substantial costs I have personally incurred in filing and managing this case further highlight the urgent need for reform. I am committed to continuing this advocacy to ensure that future litigants are not subjected to the same inequities.

Lastly, it is counsel for SoftwareONE, not you, Peter, that I have observed lurking around my Instagram account. While my profile is public, a valid account must still be signed in to view my stories, as those are only accessible to signed-in users. This collective behavior is troubling, particularly given my recent reports to regulatory bodies and the concerns surrounding the IPO. It further underscores the broader pattern of concerning conduct in this case.

-Ronda

# Exhibit 19

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

**Case Number: 22-22171-CIV-MARTINEZ**

MICHAEL FITZGERALD
and YELANY DE VARONA,

      Plaintiffs,

v.

RONDA MCNAE and WILLIAM MCNAE,

      Defendants.

_____/

## OMNIBUS ORDER DENYING DEFENDANT'S MOTIONS TO SUPPLEMENT RECORD TO INCLUDE DEPOSITION TRANSCRIPTS

**THIS CAUSE** came before this Court upon *pro se* Defendant Ronda McNae's Motion for Leave to Supplement the Record to Include Deposition of Treating Therapist Sarah Dellinger, (ECF No. 224); Motion for Leave to Supplement the Record to Include Deposition of Treating Therapist Dr. Brock Weedman PsyD, (ECF No. 230); and Motion for Leave to Supplement the Record to Include Trauma Expert Deposition of Dr. Jim Hopper PsyD, (ECF No. 242) (collectively "Motions to Supplement Record"). This Court has reviewed the Motions to Supplement Record; Plaintiff Michael J. Fitzgerald's Responses, (ECF Nos. 232, 233, 246); Defendant's Replies, (ECF Nos. 235, 253); pertinent portions of the record, and applicable law and is otherwise fully advised in the premises. Accordingly, for the reasons set forth herein, the Motions to Supplement Record are **DENIED**.

Defendant McNae seeks to "supplement the record" with deposition transcripts of her treating therapists and trauma expert. Although there is no "record" to "supplement," the Court construes these Motions to Supplement the Record as motions in *limine* asking this Court to

include the deposition transcripts as evidence in trial. However, the deadline to submit motions in *limine* was September 23, 2024, per this Court's Order extending certain pretrial deadlines. (ECF No. 168). Moreover, the deposition transcripts would be inadmissible hearsay if Defendant's treating therapists and trauma expert were to testify at trial. *See* Fed. R. Evid. 801(c).

Accordingly, it is **ORDERED AND ADJUDGED** that:

1.      Defendant's Motions to Supplement Record, (ECF Nos. 224, 230, 242), are **DENIED**.

2.      Defendant's Motion to Amend and Correct Certificate of Service, (ECF No. 229), is **DENIED**.

3.      Defendant's Motion to Correct Exhibit, (ECF No. 255), is **DENIED**.

4.      Defendant's Motion for Leave to Amend Motion to Correct and Supplement Exhibit, (ECF No. 259), is **DENIED**.

5.      Defendant's Motion for Leave to File Errata, (ECF No. 260), is **DENIED**.

6.      The Clerk is **DIRECTED** to **RESTRICT** ECF Nos. 224, 230-1, 242, 253, 255, 259.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 7th day of February 2025.

JOSE E. MARTINEZ
UNITED STATES DISTRICT JUDGE

Copies provided to:
All Counsel of Record
Ronda McNae, *pro se*

2

Exhibit 20

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

**Case Number: 22-22171-CIV-MARTINEZ**

MICHAEL FITZGERALD
and YELANY DE VARONA,

     Plaintiffs,

v.

RONDA MCNAE and WILLIAM MCNAE,

     Defendants.

_____/

## <u>ORDER DENYING DEFENDANT'S MOTIONS TO SUPPLEMENT RECORD</u>

**THIS CAUSE** came before this Court upon Defendant Ronda McNae's *pro se* Motions

for Leave to Supplement the Record, (ECF Nos. 231, 245), (collectively "Motions to Supplement

the Record"). This Court has reviewed the Motions to Supplement Record; Plaintiff Michael J.

Fitzgerald's Responses, (ECF Nos. 234, 248); Defendant's Reply, (ECF No. 252); pertinent

portions of the record, and applicable law and is otherwise fully advised in the premises.

Accordingly, for the reasons set forth herein, the Motions to Supplement the Record are

**DENIED**.

Defendant McNae seeks to "supplement the record with critical, newly uncovered

evidence deliberately withheld by Plaintiff Michael Fitzgerald and respondent SoftwareONE"

and provide this Court "with access to all relevant facts from *Jane Doe v. SoftwareONE, Inc.*, 85

Cal. App. 5th 98 (Cal. Ct. App. 2022)." (ECF No. 231 at 1). Although there is no "record" to

"supplement," the Court construes these Motions to Supplement the Record as motions in *limine*

asking this Court to include certain evidence in trial. However, the deadline to submit motions in

*limine* was September 23, 2024, per this Court's Order extending certain pretrial deadlines. (ECF No. 168).

Moreover, the Federal Rules of Civil Procedure that Defendant McNae relies on do not support the relief she seeks. Defendant first cites Federal Rule of Civil Procedure 15(d) as authority to support her Motion, however, Rule 15(d) relates to amending and supplementing pleadings, not adding documents into evidence. Defendant does not have a pleading to amend in this matter and the deadline to do so has long passed. (*See* ECF No. 7). Next, Rule 26(e), is also inapplicable, as it pertains to supplementing or correcting a discovery response. Plaintiff Fitzgerald asserts that he was under no obligation to supplement his response to McNae's interrogatories as he is not and has not been a party to any lawsuit other than the instant case against Defendant. (ECF No. 234 at 6). Lastly, Defendant seeks dismissal pursuant to Rule 37, but did not comply with the Rule as she did not file a motion to compel discovery. Moreover, Plaintiff asserts he did not fail to disclose or respond, so there is no discovery violation. (*Id.* at 7).

Defendant seeks to introduce evidence regarding the *Jane Doe* lawsuit to show that "Fitzgerald's damages were not caused by Defendant but were the result of his own misconduct and HR issues at SoftwareONE" and to void the Settlement Agreement at issue because "it was signed under coercion, duress, and fraudulent concealment." (ECF No. 231 at 10–11). However, the *Jane Doe* case and the evidence Defendant seeks to introduce bear no relevance to the instant case. As Plaintiff explains:

> The *Jane Doe* case involves unrelated allegations by a female in her 50s who was a former employee of SoftwareONE, Inc. in or around January 2017. Jane Doe claims that she was discriminated against on the basis of her age and gender. Jane Doe referred to Fitzgerald as a member of the "younger male leadership" at SoftwareONE1 but did not make any allegations that Fitzgerald himself was complicit in any alleged age or gender discrimination. Fitzgerald was not a party to the *Jane Doe* lawsuit, was not subpoenaed in the *Jane Doe* lawsuit, was not

deposed in the *Jane Doe* lawsuit, and was unaware that his name was ever mentioned in ancillary declarations filed in the *Jane Doe* lawsuit until now.

ECF No. 234 at 2. Plaintiff makes clear that he was not aware of the *Jane Doe* case, was neither a party nor a witness to it, and that it had nothing to do the Settlement Agreement that the Parties here entered into and at issue in this case. (*Id.* at 12).

Because the *Jane Doe* case and evidence that Defendant seeks to introduce are irrelevant to this case and to her duress defense, and because Plaintiff did not commit any discovery violations, this Court denies Defendant's Motions to Supplement Record and requests to sanction Plaintiff.

Accordingly, it is **ORDERED AND ADJUDGED** that:

1.      Defendant's Motions to Supplement the Record, (ECF Nos. 231, 245), are **DENIED**.

2.      Plaintiff's Cross-Motion to Strike Exhibit is **GRANTED**. The Clerk is **DIRECTED** to **STRIKE** ECF No. 231-1.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 13 day of February 2025.

JOSE E. MARTINEZ
UNITED STATES DISTRICT JUDGE

Copies provided to:
All Counsel of Record

Exhibit 21

**COVER LETTER**                                                                February 15, 2025

Ronda McNae
504 11th Pl, Kirkland, WA 98033
(206) 914 – 6752
Prose.Rmcnae@gmail.com

**Federal Bureau of Investigation (FBI) – Financial Crimes Division**
**Attn: Financial Crimes Investigation Unit**
Miami Field Office
2030 SW 145th Avenue
Miramar, FL 33027

**Federal Bureau of Investigation (FBI) –**
**Financial Crimes Division**
**Attn: Financial Crimes Investigation Unit**
Seattle Field Office
1110 3rd Avenue
Seattle, WA 98101

Subject: Request for Urgent Investigation into ARAG Insurance Company's Unlawful Conduct
Re: *McNae v. ARAG Insurance Co.,* Case No. 2:24-cv-00211-TL (W.D. Wash. 2024)

Dear Special Agent in Charge of the Financial Crimes Division, FBI Miami Field Office,

This formal complaint is submitted in good faith to request a regulatory investigation into ARAG Legal Insurance's unlawful and unethical practices that have obstructed my access to justice and denied me fair legal representation. As detailed in the attached complaint, ARAG's misconduct includes wrongful termination of my legal counsel, coercive settlement tactics, and direct interference in my defense, violating multiple state and federal laws.

ARAG failed to meet industry standards in handling the McNaes' claim. It did not properly investigate coverage concerns, failed to provide a reasonable explanation for withholding benefits, and prioritized its own financial interests over its insureds' legal needs. ARAG's actions were inconsistent with accepted claims handling practices, including:

1. Failure to Investigate: ARAG made coverage decisions without investigating key concerns, including attorney terminations.

2. Failure to Explain: ARAG failed to do so when it terminated the McNaes' attorneys just months before trial, without written notice or justification.

3. Unreasonable Denial of Benefits: Despite no stated benefit cap in the policy, ARAG claimed implicit limitations but failed to identify any policy exclusion justifying its stance on excessive billing or improper benefits.

4. Forcing Its Insured into Litigation: ARAG's termination of the McNaes' attorneys, if deemed improper, left them no choice but to sue for coverage.

5. Breach of Confidentiality: ARAG improperly allowed privileged and confidential information to be shared with opposing counsel.

**DOCUMENTS INCLUDED:**

To substantiate my complaint, I have enclosed the following documents:

1. **Declarations:**

    a. Declaration of Ronda McNae – ARAG's misconduct and impact on McNae's legal defense.

    b. Declaration of Will McNae – Firsthand testimony on ARAG's failure to provide competent legal representation.

    c. Declaration of Ella McNae – Emotional and psychological impact of ARAG's actions on McNae's family.

2. **Legal Filings as Pro se litigant** from *Fitzgerald v. McNae*, No. 1:22-cv-22171-JEM (S.D. Fla.):

    a. DE 150 – Def. McNae's Motion for Sanctions: Outlines the relentless personal attacks made by opposing counsel, emphasizing the disruption and challenges faced by McNae without the proper representation of legal counsel.

    b. DE 275 and 283 – Def. McNae's Motion to Dismiss and Reply in Support of Mtn. to Dismiss: Argues that ARAG's wrongful termination of legal counsel created significant prejudice, hindering McNae's ability to present critical evidence in the case.

    c. DE 292 and DE 295 – Court Orders Denying McNae's Motions: The judge denied McNae's motions to supplement the record, citing procedural limitations. These denials were a direct result of McNae's ARAG in-network attorney failing to file the necessary supplements in a timely manner, leaving McNae, as a pro se litigant, unable to correct the record.

    d. A - List of motions filed pro se in the Southern District of Florida due to ARAG terminating legal counsel just two months before trial. This evidences the severe disadvantage and procedural prejudice suffered by Plaintiffs.

    e. B - List of motions filed due to ineffective counsel (Richard Gomez), an attorney assigned by ARAG. These motions illustrate how ARAG's failure to provide competent legal representation led to significant legal setbacks.

3. **Legal Filings** from *McNae v. ARAG Ins. Co.,* Case No. 2:24-cv-00211-TL (W.D. Wash. 2024)

    a. Expert Report of Mary E. Owen, Esq.

    b. First Amended Complaint for Declaratory Relief (*McNae v. ARAG*)

Given ARAG's pattern of misconduct and obstruction of justice, I respectfully request that your office take immediate action to investigate ARAG Legal Insurance, subpoena its internal communications and policyholder claim files, and impose the appropriate penalties to prevent further harm to policyholders. If any additional information is required, I am available to provide further details and testimony. Please confirm receipt of this complaint and advise on the next steps in your investigation.

Thank you for your time and attention to this serious matter.

Sincerely,

/s/ Ronda McNae
504 11th Pl, Kirkland, WA 98033
(206) 914 – 6752
Prose.Rmcnae@gmail.com

**FORMAL COMPLAINT**                                    February 15, 2025

Ronda McNae
504 11th Pl, Kirkland, WA 98033
(206) 914 – 6752
Prose.Rmcnae@gmail.com

**Federal Bureau of Investigation (FBI) – Financial Crimes Division**
**Attn: Financial Crimes Investigation Unit**
Miami Field Office
2030 SW 145th Avenue
Miramar, FL 33027

**Federal Bureau of Investigation (FBI) –**
**Financial Crimes Division**
**Attn: Financial Crimes Investigation Unit**
Seattle Field Office
1110 3rd Avenue
Seattle, WA 98101

Subject: Urgent Request for Investigation into ARAG Legal Insurance's Unlawful and Unethical Conduct

Dear Regulatory Officials,

This is a follow-up report to my initial complaint submitted online earlier this month, requesting an urgent investigation into ARAG Legal Insurance's fraudulent and obstructive practices, which have denied me fair legal representation and access to justice.

I obtained group legal insurance coverage through ARAG via my husband's Microsoft employee benefit plan. When I was served with a retaliatory lawsuit in Florida federal court (July 2022), I sought legal representation through ARAG. Initially, ARAG acknowledged the complexity and high stakes of my case. However, after I refused to accept an unfair and coercive settlement offer, ARAG wrongfully terminated my legal counsel, abandoned its duty to protect me, and actively sabotaged my case.

**ARAG'S WRONGFUL CONDUCT**

1. **Failure to Investigate:** Washington law (WAC 284-30-370) requires insurers to complete claim investigations within 30 days unless circumstances prevent it. ARAG made coverage decisions without investigating key concerns, including attorney terminations.

2. **Failure to Explain:** Washington law (WAC 284-30-330(13)) requires insurers to provide a factual or legal explanation for claim denials. ARAG failed to do so when it terminated the McNaes' attorneys just months before trial, without written notice or justification. Despite selling a policy with no stated coverage limit, ARAG imposed restrictions that prevented other affiliated attorneys from taking over representation forcing McNae to self-represent *pro se* in Federal court.

3. **Unreasonable Denial of Benefits:** ARAG violated WAC 284-30-330(7) by terminating the McNaes' attorneys mid-litigation and conditioning benefits on new payment limits. Despite no stated benefit cap in the policy, ARAG claimed implicit limitations but failed to identify any policy exclusion justifying its stance on excessive billing or improper benefits.

4. **Forcing Its Insured into Litigation:** ARAG's termination of the McNaes' attorneys, if deemed improper, left them no choice but to sue for coverage. This violates WAC 284-30-330(7), which prohibits insurers from forcing claimants into litigation by unjustly limiting benefits.

5. **Breach of Confidentiality:** ARAG improperly allowed privileged and confidential information to be shared with opposing counsel. This failure compromised the insured's legal position, violating fundamental protections and industry standards that require insurers to safeguard their clients' sensitive information.

## ONGOING HARM AND LEGAL PREJUDICE

Due to ARAG's misconduct and legal malpractice, I was left at a severe disadvantage in my case.

- The Florida federal court denied my motions (DE 292 & 295) because my ARAG-appointed attorney failed to file critical documents in time, leaving me unable to correct the record.

- ARAG's interference and obstruction of due process resulted in irreparable harm to my legal defense.

## LEGAL VIOLATIONS

ARAG's misconduct violates multiple state and federal laws, including:

- Washington Insurance Fair Conduct Act (RCW 48.30.015) – Prohibits bad faith insurance practices.

- Washington Administrative Code (WAC 284-30-330) – Requires insurers to conduct fair and timely claims evaluations and provide a written explanation when denying claims.

- Washington Administrative Code (WAC 284-30-350) – Prohibits misrepresentations of insurance policies.

- Washington Consumer Protection Act (RCW 19.86.020) – Prohibits deceptive trade practices and settlement tactics.

- Federal Trade Commission Act (15 U.S.C. §§ 41-58) – Prohibits deceptive trade practices in insurance.

- IFCA (RCW 48.30.015) – Prohibits unreasonable delays in claims processing and denying claims without proper investigation.

## REQUEST FOR IMMEDIATE REGULATORY ACTION

Given ARAG's pattern of misconduct and obstruction of justice, I respectfully request that your office:

1. Launch an immediate investigation into ARAG's unlawful practices.

2. Subpoena ARAG's internal communications and policyholder claim files to uncover evidence of wrongdoing.

3. Impose sanctions and corrective actions to prevent further harm to consumers and ensure ARAG is held accountable.

I appreciate your time and attention to this serious matter. Please confirm receipt of this complaint and advise on the next steps. I am available to provide further information and testimony as needed.

Sincerely,

/s/ Ronda McNae

Exhibit 22

**Iowa Attorney General**

- Why I Am Reporting: Since ARAG is based in Iowa, ensuring accountability under Iowa law.

- How They Can Assist: Impose regulatory actions against ARAG for violations.

- Violations & Crimes Committed: Consumer fraud, bad faith insurance practices.

**Iowa Supreme Court Attorney Disciplinary Board**

- Why I Am Reporting: Investigating unethical conduct by Iowa-based attorneys affiliated with ARAG.

- How They Can Assist: Revoke or suspend licenses and issue disciplinary action.

- Violations & Crimes Committed: Attorney misconduct, ethical violations.

**Office of the Governor – Iowa**

- Why I Am Reporting: Ensuring state-level oversight of legal and financial misconduct related to ARAG.

- How They Can Assist: Direct Iowa state agencies to investigate fraudulent practices and unethical legal conduct.

- Violations & Crimes Committed: Consumer fraud, attorney misconduct, ethical violations.

**Washington State Attorney General – Financial Crimes Unit**

- Why I Am Reporting: Investigating ARAG's financial misconduct and deceptive business practices.

- How They Can Assist: Can initiate legal action against ARAG for violations of state laws.

- Violations & Crimes Committed: Consumer fraud, bad faith insurance practices.

**Washington State Office of the Insurance Commissioner**

- Why I Am Reporting: Ensuring ARAG complies with state insurance regulations and policyholder protections.

- How They Can Assist: Can impose penalties, investigate insurance misconduct, and enforce compliance.

- Violations & Crimes Committed: Insurance fraud, deceptive business practices.

**Washington State Department of Financial Institutions (DFI)**

- Why I Am Reporting: Investigating ARAG's potential financial misconduct and consumer fraud.

- How They Can Assist: Can oversee compliance with state financial laws and take enforcement actions.

- Violations & Crimes Committed: Financial fraud, deceptive financial practices.

**Office of the Governor – Washington**

- Why I Am Reporting: Ensuring state-level oversight of financial crimes and regulatory enforcement regarding ARAG's misconduct.

- How They Can Assist: Direct state agencies (Attorney General, Insurance Commissioner, Financial Institutions) to investigate fraud and misconduct.

- Violations & Crimes Committed: Consumer fraud, bad faith insurance practices.

**Florida Attorney General**

- Why I Am Reporting: Investigating ARAG's Florida-based misconduct, particularly attorney ethics violations.

- How They Can Assist: Impose state penalties, revoke business licenses, and investigate fraud.

- Violations & Crimes Committed: Fraud, deceptive trade practices.

**Florida Bar – Lawyer Regulation & Ethics Division**

- Why I Am Reporting: Holding Florida attorneys accountable for unethical conduct.

- How They Can Assist: Discipline attorneys, revoke licenses, and enforce legal ethics.

- Violations & Crimes Committed: Attorney misconduct, ethical violations.

**Florida Office of the Inspector General – Financial Crimes Division**

- Why I Am Reporting: Investigating financial misconduct involving Florida-based insurance fraud.

- How They Can Assist: Open a fraud investigation, subpoena records, and take enforcement actions.

- Violations & Crimes Committed: Financial fraud, insurance violations.

**Florida Office of Insurance Regulation**

- Why I Am Reporting: Investigating potential insurance fraud and consumer protection violations by ARAG in Florida.

- How They Can Assist: Regulate insurance practices, investigate fraud, and impose penalties for deceptive insurance policies.

- Violations & Crimes Committed: Insurance fraud, deceptive trade practices.

**Florida Department of Financial Services – Division of Investigative & Forensic Services**

- Why I Am Reporting: Investigating financial misconduct and insurance fraud by ARAG in Florida.

- How They Can Assist: Conduct forensic financial investigations, subpoena records, and prosecute insurance fraud.

- Violations & Crimes Committed: Financial fraud, insurance fraud.

**Federal Bureau of Investigation (FBI) – Financial Crimes Division (Miami & Seattle Field Offices)**

- Why I Am Reporting: Investigating potential financial crimes, fraud, and insurance misconduct involving ARAG.

- How They Can Assist: Open a financial fraud investigation, subpoena records, and coordinate with other federal agencies.

- Violations & Crimes Committed: Obstruction of justice, insurance fraud, deceptive business practices.

**Federal Trade Commission (FTC)**

- Why I Am Reporting: Reporting deceptive trade practices by ARAG, misleading consumers regarding legal insurance.

- How They Can Assist: Issue penalties, investigate consumer complaints, and enforce compliance with consumer protection laws.

- Violations & Crimes Committed: Deceptive trade practices, unfair insurance practices.

**Consumer Financial Protection Bureau (CFPB)**

- Why I Am Reporting: Ensuring ARAG's legal insurance practices comply with consumer financial protection regulations.

- How They Can Assist: Impose penalties, investigate insurance abuses, and enforce financial protections.

- Violations & Crimes Committed: Unfair business practices, misrepresentation of insurance policies.

**U.S. Securities and Exchange Commission (SEC)**

- Why I Am Reporting: If ARAG misled investors or engaged in financial fraud related to public offerings and settlements.

- How They Can Assist: Investigate financial fraud and misrepresentation of business practices affecting investors.

- Violations & Crimes Committed: Securities fraud, misleading financial statements.

**U.S. Department of Justice – Civil Rights Division**

- Why I Am Reporting: If ARAG's conduct led to civil rights violations, such as obstruction of justice.

- How They Can Assist: Prosecute civil rights violations and intervene in cases of misconduct affecting due process.

- Violations & Crimes Committed: Obstruction of justice, due process violations.

**Internal Revenue Service (IRS) – Criminal Investigations**

- Why I Am Reporting: Investigating potential tax fraud related to ARAG's business practices.

- How They Can Assist: Audit financial transactions and impose tax fraud penalties.

- Violations & Crimes Committed: Tax fraud, financial misrepresentation.

**U.S. Postal Inspection Service (USPIS)**

- Why I Am Reporting: If fraudulent legal service offers were sent via mail.

- How They Can Assist: Investigate mail fraud and deceptive advertising practices.

- Violations & Crimes Committed: Mail fraud, misrepresentation of services.

**U.S. Small Business Administration (SBA) – Office of Inspector General (OIG)**

- Why I Am Reporting: Investigating financial fraud and unethical business practices in ARAG's policies.

- How They Can Assist: Review compliance with business regulations and take enforcement actions.

- Violations & Crimes Committed: Financial fraud, deceptive business practices.

**U.S. Department of Health & Human Services (HHS) – Office for Civil Rights**

- Why I Am Reporting: If ARAG's actions denied access to justice for a case involving trauma or civil rights.

- How They Can Assist: Investigate violations related to civil rights protections.

- Violations & Crimes Committed: Civil rights violations, denial of access to justice.

**Judicial Conference of the U.S. – Committee on Judicial Conduct & Disability**

- Why I Am Reporting: Ensuring fair judicial oversight if any misconduct by federal judges occurred.

- How They Can Assist: Investigate judicial misconduct and ethics violations.

- Violations & Crimes Committed: Judicial misconduct, obstruction of justice.

Exhibit 23

# 30(b)(6) Ann Cosimano

# McNae v. ARAG Insurance Company

# August 19, 2024



1325 Fourth Avenue, Suite 1840  Seattle, Washington 98101
Bellingham | Everett | Tacoma | Olympia | Yakima | Spokane
Seattle 206.287.9066    Tacoma 253.235.0111    Eastern Washington 509.624.3261
**www.buellrealtime.com**
email: info@buellrealtime.com

McNae v. ARAG Insurance Company                    30(b)(6) Ann Cosimano

---

**Page 1**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

_____

WILLIAM MCNAE and RONDA MCNAE, )
husband and wife,          )
                           )
         Plaintiffs,       )
                           )
    vs.                    )  No. 2:24-cv-00211-TL
                           )
ARAG INSURANCE COMPANY,    )
                           )
         Defendants.       )

_____

Videoconference Videotaped 30(b)(6)

Deposition Upon Oral Examination

of

ARAG INSURANCE COMPANY

ANN COSIMANO

9:33 a.m.

August 19, 2024

Witness Location: Des Moines, Iowa
(All participants appeared via videoconference.)

REPORTED BY: Karmen Knudson, RPR, CRR, CCR #1935

---

**Page 2**

        APPEARANCES

FOR THE PLAINTIFFS:

    ISAAC RUIZ
    DAVID FADDUOL
    RUIZ & SMART LLP
    901 Fifth Avenue
    Suite 820
    Seattle, WA 98164
    iruiz@ruizandsmart.com
    dfadduol@ruizandsmart.com

FOR THE DEFENDANT:

    MICHAEL MULLALY
    JONATHAN ABELE
    SQUIRE PATTON BOGGS LLP
    41 South High Street
    Columbus, OH 43215
    michael.mullaly@squirepb.com
    jonathan.abele@squirepb.com

    BENJAMIN ROESCH
    JENSEN MORSE BAKER PLLC
    520 Pike Street
    Suite 2375
    Seattle, WA 98101
    benjamin.roesch@jmblawyers.com

COURT REPORTER:

    KARMEN KNUDSON, RPR, CCR
    BUELL REALTIME REPORTING
    1325 Fourth Avenue
    Suite 1840
    Seattle, Washington 98101

ALSO PRESENT:  BROOK YOUNG, VIDEOGRAPHER

---

**Page 3**

1              I N D E X
2   EXAMINATION BY:                    PAGE
3   Mr. Ruiz                    4
4
5
6           EXHIBIT INDEX
7   EXHIBIT MARKED                     PAGE
8
9   1    Fourth Amended Notice of Rule      29
        30(B)(6) Deposition ARAG Insurance
10       Company
11  2    Document titled "ARAG Network       91
        Attorney Practices"
12
13  3    Document titled "Participants and   138
        Decisionmakers"
14  4    Document titled "Criticisms Relating 144
        to Plaintiffs or Plaintiffs'
15       Representatives"
16
17
18
19
20
21
22
23
24
25

---

**Page 4**

1        THE VIDEOGRAPHER:  We are on the record.
2   Today's date is August 19th, 2024.  The time now is
3   approximately 9:33 a.m.  This is the 30(b)(6) deposition
4   of ARAG Insurance Company designee Ann Cosimano.
5   ANN COSIMANO,        witness herein, having been
6                        duly sworn by the Certified
7                        Court Reporter, testified
8                        under oath as follows:
9
10           EXAMINATION
11  BY MR. RUIZ:
12       Q.  Good morning.
13       A.  Good morning.
14       Q.  In what city do you reside?
15       A.  Grimes, Iowa.
16       Q.  And do you have any plans to move from Grimes
17  in the next twelve months?
18       A.  No.
19       Q.  You're represented by counsel at today's
20  deposition?
21       A.  Meaning ARAG?  Yes.  ARAG.
22       Q.  Yes.  And who are those attorneys?
23       A.  Mike Mullaly and Ben Roesch.
24       MR. RUIZ:  Mr. Mullaly, will you be objecting
25  today?

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

McNae v. ARAG Insurance Company                                    30(b)(6) Ann Cosimano

---

Page 5

1          MR. MULLALY:  I will.  Good morning, guys.
2          Q.    (By Mr. Ruiz)  Do you go by any other name,
3    Ms. Cosimano?
4          A.    No.
5          Q.    Have you ever gone by another name?
6          A.    Yes.
7          Q.    Is that -- would that be your maiden name?
8          A.    No.
9          Q.    Oh, no, okay.  What other name have you gone
10   by?
11         A.    Ann Rice, R-i-c-e.
12         Q.    Any others?
13         A.    No.
14         Q.    You know and I have never spoken before.
15   True?
16         A.    Just -- no.
17         Q.    We saw each other last --
18         A.    Each other, yes.
19         Q.    Have you ever spoken with anyone from my law
20   firm?
21         A.    I don't believe so, no.
22         Q.    Have you spoken with any attorneys from
23   Microsoft regarding the McNae case?
24         A.    No.
25         Q.    You were here Friday all day?

---

Page 6

1          A.    Yes.
2          Q.    You were here for the part where I went over
3    sort of the background rules for how a deposition is
4    conducted and certain understandings about not
5    speculating, not guessing, saying you don't remember if
6    you don't remember, things like that?
7          A.    Yes.
8          Q.    Did you all -- did you understand all of that
9    on Friday?  I don't want to waste anyone's time,
10   especially yours, so can we skip that part, then?
11         A.    Yes.
12         Q.    Have you had your deposition taken before?
13         A.    I have sat for depositions, but I can't
14   remember if I was the deponent or if I was just involved
15   in the preparation.
16         Q.    When would that have been?
17         A.    Ten-plus years ago.
18         Q.    As far as specific recollection goes, this is
19   your first time in the witness chair; is that fair?
20         A.    Fair.
21         Q.    Have you testified in court before?
22         A.    Yes.
23         Q.    Tell me about that.
24         A.    It was --
25         MR. MULLALY:  Object to form.

---

Page 7

1          You can answer.
2          A.    It would have been as an ARAG representative
3    in a couple of cases.
4          One would have been a case where an attorney
5    was accused of forging traffic tickets in order to get
6    payment under the insurance plan.  He was printing off
7    tickets for other people and changing the information.
8    And so I was subpoenaed to testify to that case.
9          Very early on in my career, some cases in
10   eviction actions.  I worked for a nonprofit housing
11   organization.
12         Telephonically in cases, I recall one about
13   the payment under the insurance plan for a divorce case.
14   I believe the parties wanted to understand what the
15   payment to the opposing party's attorney was under the
16   legal plan.
17         Another was a case where an attorney was on
18   trial for mortgage fraud in a case.  And he had also had
19   some questionable claims activity for ARAG, and so the
20   prosecutor called me for that case.
21         That's all the ones I can recall right now.
22         Q.    (By Mr. Ruiz)  The cases where you testified
23   in eviction proceedings, those had nothing to do with
24   ARAG, I take it.
25         A.    Exactly.

---

Page 8

1          Q.    The others you mentioned were related to ARAG
2    in some form or another?
3          A.    Yes.
4          Q.    True?
5          A.    True.
6          Q.    Were any of them cases filed against ARAG by
7    an insured?
8          A.    No.
9          Q.    And were any of them cases in which ARAG had
10   filed a lawsuit against the insured?
11         A.    No.
12         Q.    When was the most recent time you testified?
13         A.    I'm -- it would have been probably been the
14   mortgage fraud case, which was still ten-plus years ago.
15         Q.    Have you ever testified in an arbitration?
16         A.    No.
17         Q.    Have you ever submitted a sworn declaration
18   for a court case or an arbitration besides our case?
19         A.    No.
20         Q.    Tell me about that, if you can.
21         A.    Ooh.
22         MR. MULLALY:  Object to form.
23         You can answer.
24         A.    It would have been as it related to fees.
25   It's probably more common, actually, that I get asked to

---

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

McNae v. ARAG Insurance Company                                        30(b)(6) Ann Cosimano

Page 9

1   do something like that for fees, as a clarification,
2   versus to testify.
3           And then I'm trying to remember -- we had an
4   arbitration, and I can't remember if I had to submit a
5   declaration.
6           I wasn't the witness for the arbitration.  We
7   were the -- one of the participants in the arbitration.
8       Q   (By Mr. Ruiz) How many declarations have you
9   signed for our case, the McNae case?
10      A.  Just one, I believe.
11      Q.  Just the -- just the one on scheduling?
12      A.  Yes.
13      Q.  Have you ever served as an expert witness in
14  any case?
15      A.  No.
16      Q.  Would you give a thumbnail sketch of your
17  educational background?
18      A.  Sure.
19          I went to undergrad at Peru State College in
20  Peru, Nebraska, where I got a bachelor's of science
21  degree, and then law school at Creighton University
22  School of Law in Omaha, Nebraska, where I got my juris
23  doctorate.
24      Q.  What year?
25      A.  19 -- oh, gosh.

Page 10

1       Q.  That's okay.  I think I'm --
2           (Crosstalk)
3       Q.  I think I'm older than you.
4       A.  1986?
5       Q.  We're of similar age.
6           All right.  So you have the BA in what
7   subject?
8       A.  It's a BS.  Psychology, sociology, prelaw.
9       Q.  That's in Peru, Nebraska, or Peru County?
10      A.  Peru, Nebraska.  A little town.
11      Q.  What's that close to?
12      A.  Nebraska City.
13      Q.  I only know Sidney and Omaha.
14      A.  About two hours outside of Omaha.
15      Q.  Understood.
16          Then you have your JD; right?
17      A.  Yes.
18      Q.  Any others degrees?
19      A.  No.
20      Q.  Professional licenses issued by a
21  governmental authority?
22      A.  My license to practice law by the State of
23  Iowa.
24      Q.  Any others?
25      A.  No.

Page 11

1       Q.  And then how about professional
2   certifications from private organizations?
3       A.  No.
4       Q.  Any education in insurance claims handling?
5       A.  Not formal.
6       Q.  Have you gone to adjuster school?
7       A.  No.
8       Q.  Have you taken the classes to get an
9   adjuster's license?
10      A.  Yes -- actually, no, not adjusters.  Sorry.
11      Q.  What were you thinking of?
12      A.  Producer.
13      Q.  Oh, an insurance producer?
14      A.  Right.
15      Q.  Sort of what some folks call an insurance
16  agent or insurance broker?
17      A.  Yes.
18      Q.  Did you get a certification for a producer?
19      A.  I did.
20      Q.  When was that?
21      A.  Probably early 2000s.  I did not maintain it.
22  Took it more for the education aspect.
23      Q.  An insurance producer is different from an
24  insurance adjuster; right?
25      A.  Yes.

Page 12

1       Q.  My understanding -- and you tell me if I'm
2   right -- an insurance producer sells policies and an
3   insurance adjuster handles insurance claims.
4       A.  Yes.
5       Q.  Is that fair?
6       A.  Fair.
7       Q.  Have you read any texts regarding insurance
8   claims handling?
9           (Crosstalk)
10          MR. MULLALY:  Object to form.
11          You can answer.
12      A.  Books or policies, it just -- I wonder if you
13  can rephrase the question.
14      Q   (By Mr. Ruiz) That's a good point of
15  clarification.  There's a lot of different things that
16  are texts.
17          Let's start big picture, with like a treatise
18  or a book.
19      A.  No.
20      Q.  Have you read insurance claims handling
21  procedures from any other company besides ARAG?
22      A.  Not that I recall.
23      Q.  Have you read the claims handling procedures
24  from ARAG itself?
25      A.  Yes.

3 (Pages 9 to 12)

McNae v. ARAG Insurance Company                    30(b)(6) Ann Cosimano

Page 13

1      Q.   Okay.  Did you write them or have a role in
2  writing them?
3      A.   No.
4      Q.   Who did?
5          MR. MULLALY:  Object to scope.
6          You can answer.
7      A.   I don't know.
8      Q    (By Mr. Ruiz)  Do you subscribe to any
9  industry publications that put out either magazines or
10 newsletters or bulletins regarding insurance claims
11 handling practices?
12     A.    If -- if like state newsletters or state-
13 issued publications would be included in that list, yes.
14     Q.   Can you give me an example?
15     A.    For example, the states that we're licensed
16 in will often send updates on their -- any changes that
17 they have to their regulations, and I subscribe to many
18 of those.
19     Q.   I understand.  So, for example -- and I'm
20 just making this up -- the Alaska -- whatever their
21 insurance commissioner is called will send out an email
22 blast to people who have signed up, for example.
23         Is that fair?
24     A.   Yes.
25     Q.   And I'm sure there's something here in

Page 14

1  Washington too.  Yes --
2          MR. MULLALY:  Object to form.
3      Q    (By Mr. Ruiz)  -- probably?
4          Do you agree there's probably something from
5  Washington as well?
6      A.   Agree.  Probably.
7      Q.   What about bulletins and publications from
8  private organizations like the ISO?
9      A.   No.
10     Q.   Have you reviewed any documents from an
11 organization like ISO?  And I'm talking about books,
12 treatises, you know, that write insurance policies that
13 insurance companies can base their policies off of.
14         MR. MULLALY:  Object to form.
15         You can answer.
16     A.   Not books, no.
17     Q.   (By Mr. Ruiz)  What about something else not
18 a book?
19     A.   I'm just thinking of the actual policies
20 themselves.  We often review policies written by other
21 companies, especially other legal insurance companies.
22     Q.   Competitors?
23     A.   Right.
24     Q.   Do you know what ISO is?
25     A.   No.

Page 15

1      Q.   Okay.  Are you a part of any industry
2  organizations that provide basic insurance forms that
3  other insurance companies can use?
4      A.   No.
5      Q.   Who wrote -- well, strike that.
6          Do you know who wrote the ARAG insurance
7  policy here?
8          MR. MULLALY:  Object.  Scope.
9          You can answer.
10     A.   Not the original policy.
11     Q    (By Mr. Ruiz)  When was the original policy
12 written?
13         MR. MULLALY:  Same objection.
14         You can answer.
15     A.   We've been in business for over 50 years, and
16 so I believe filed with the first state more than that
17 long ago.  So it would have been the -- the first
18 iteration would have been back then.
19     Q    (By Mr. Ruiz)  Is it fair to say that over
20 the 50 years, the insurance policy language has evolved?
21     A.   Yes.
22     Q.   And each time it has evolved, somebody within
23 ARAG has made changes to it and then sought approval of
24 the changes?
25         MR. MULLALY:  Same objection.

Page 16

1          You can answer.
2      A.   Yes.
3      Q    (By Mr. Ruiz)  And over the last five years,
4  who have been the people -- well, strike that.
5          Have there been changes to the policy in the
6  last five years?
7          MR. MULLALY:  Same objection.
8          You can answer.
9      A.   Yes.
10     Q    (By Mr. Ruiz)  Who at ARAG is responsible for
11 making those changes?
12         MR. MULLALY:  Same objection.
13     A.   We have a product development team, and they
14 originate those requests for changes in the -- in the
15 language.
16     Q.   (By Mr. Ruiz)  Are you a part of the product
17 development team?
18     A.   No.
19         MR. MULLALY:  Same objection.
20         THE WITNESS:  Sorry.
21     Q    (By Mr. Ruiz)  Who is responsible for the
22 product development team at ARAG?
23         MR. MULLALY:  Same objection.
24     A.   Derek Overton, I believe, is the supervisor,
25 and Chris Thomas is the primary individual on that team.

4 (Pages 13 to 16)

McNae v. ARAG Insurance Company                                30(b)(6) Ann Cosimano

Page 17

1      Q.    (By Mr. Ruiz)  On Friday -- I'm a little
2  tired so I'm having trouble remembering things.  So let
3  me start over.
4          On Friday, Ms. Adams referred to three
5  exclusionary provisions in the policy.
6          Do you remember that?
7          MR. MULLALY:  Object to form.
8          You can answer.
9      A.   Yes.
10     Q.    (By Mr. Ruiz)  Who is responsible for
11  revisions to those provisions in the last five years?
12          MR. MULLALY:  Objection.  Scope.
13          You can answer if you know.
14     A.    So it would have been the product team.  And
15  Chris Thomas has been leading that team for quite a
16  while.  And then there is a -- like a subcommittee, like
17  a committee that's made up of multifunctional teams that
18  provides input and assists in kind of crafting the
19  language.
20     Q.    So we have Derek Overton; right?
21     A.   Yes.
22     Q.    And we have Chris Thomas; correct?
23     A.   Yes.
24     Q.    And then we have a multifunctional team that
25  assists in crafting language; correct?  Yes?

Page 18

1      A.   Yes.
2      Q.   Are you a part of the multifunctional team?
3      A.   Yes.
4      Q.   Who else is part of that?
5          MR. MULLALY:  Same objection.  Scope.
6          You can answer.
7      A.    I could probably speak to the teams that are
8  represented.
9          Customer care is represented.  Compliance.
10          I'm going to apologize.  I'm on a few
11  different committees and wanting to make sure I'm
12  getting the right one.
13     Q.    (By Mr. Ruiz)  Take your time.
14     A.    I believe attorney relations.
15          Those are the ones I can say with some level
16  of confidence.
17     Q.    I appreciate that.  And if something else
18  comes to mind -- I really have committed to myself to
19  not go all day today, Ms. Cosimano, and so I'm going to
20  do much better today.  I've committed to but I cannot
21  guarantee.
22          But at any point today, you think of
23  something else on any of these questions, just let me
24  know.  We can -- as long as we get one question out of
25  the way, we can come back to anything else.  All right?

Page 19

1      A.   Understood.
2      Q.   Do you have any training in medicine?
3      A.   No.
4      Q.   Psychiatry?
5      A.   My undergrad degree was psychology/sociology
6  but would not call that formal.
7      Q.   No, it was --
8      A.   I suppose it's formal, but it was not what I
9  went on to do, to pursue as my career.
10     Q.    I appreciate that answer.  I mean, it's true
11  you have your degree.
12          So let me put it to you another way:  Do you
13  use the formal education that you picked up in psychology or
14  anything that you picked up during college on the
15  subject of trauma, do you use those in your work at ARAG
16  at all?
17          MR. MULLALY:  Object to form.
18          You can answer.
19     A.    And I -- day to day just working with people,
20  I think you use a bit of psychology in every
21  interaction.  But I couldn't say to what degree.
22     Q.    (By Mr. Ruiz)  I'm connecting with that
23  because I feel like anyone I talk to, even, you know, my
24  kids, friends, parents, I'm a -- I'm a lawyer no matter
25  who I'm talking to.

Page 20

1      A.   Yeah.
2      Q.   All right.  So that does resonate.
3          Let me turn to a different subject.
4          Your current employer's official name is
5  what?
6      A.   ARAG North America, Inc.
7      Q.   Now, is that the same company that
8  underwrites the policy here?
9      A.   No.
10     Q.    So what's the difference?
11     A.    ARAG North --
12          MR. MULLALY:  Objection to scope.
13          Sorry, Ann.  You can answer.
14     A.    ARAG North America, Inc., is a holding
15  company and there are companies underneath it, one of
16  which is ARAG Insurance Company who writes the policy.
17     Q.    (By Mr. Ruiz)  Are the folks who handle
18  insurance claims and customer care, are those folks
19  employed by the holding company?
20     A.   Yes.
21          MR. MULLALY:  Same objections.
22     Q.    (By Mr. Ruiz)  And then the insurance
23  benefits, that comes out of money from the specific
24  underwriting insurance company; is that fair?
25          MR. MULLALY:  Same objection.

5 (Pages 17 to 20)

McNae v. ARAG Insurance Company                    30(b)(6) Ann Cosimano

Page 21

1    A.   Yes.
2    Q.   (By Mr. Ruiz)  You're not looking for another
3    job right now, are you?
4    A.   No.
5    Q.   You're not contemplating changing jobs in the
6    next year?
7    A.   No.
8    Q.   Can you give me a thumbnail sketch of your
9    employment history, starting with graduating from law
10   school?
11   A.   I started as a corporate counsel with
12   Midamerica Housing Partnership in Cedar Rapids, Iowa. I
13   worked there for approximately three years.  And then I
14   became a staff attorney at ARAG -- at the time, Summus,
15   LLC, later name to be changed to ARAG North America,
16   Inc. -- and have been with them for 24 years.
17   Q.   Describe your career progression from staff
18   attorney to general counsel.
19   A.   Sure.
20        I started as a part-time staff attorney for
21   just a few months, then was hired full-time as corporate
22   counsel in approximately two thousand -- 2017 -- no,
23   2007.  2007.
24        I was promoted to acting general counsel and
25   then, about a year later, general counsel.

Page 22

1    Q.   Okay.  What were your responsibilities as a
2    staff attorney?
3    A.   It was research, provide marketing review,
4    general items as kind of delegated by the then-associate
5    general counsel and general counsel.
6         I didn't have any management duties at that
7    time, so it was strictly reviewing any contracts that
8    might come through.  Started probably more on the simple
9    transactional side.
10   Q.   So if like ARAG had a vendor, you might work
11   on a contract with a vendor?
12   A.   Exactly.
13   Q.   Can you help me with the math?  When did you
14   become general counsel?
15   A.   In about 2008.
16   Q.   So that's about 16 years now.
17   A.   (Witness nods head.)
18   Q.   As general counsel, do you oversee claims
19   handling?
20   A.   I did --
21        MR. MULLALY:  Objection.  Scope.
22        You can answer.
23   A.   I did at one point.
24   Q.   (By Mr. Ruiz)  When?
25        MR. MULLALY:  Same objection.

Page 23

1         You can answer.
2    A.   About 12 years ago, 13 years ago, for maybe a
3    period of two years.
4    Q.   (By Mr. Ruiz)  But not since?
5    A.   No.
6    Q.   What are -- strike that.
7         Let's focus on the last five years.  What
8    have your responsibilities been as general counsel?
9    A.   So in my role, I oversee the legal regulatory
10   compliance, risk, network development, and attorney
11   relations functions for the legal role.  We do contract
12   review, any legal research, give input on product
13   development, marketing review, if there are any
14   Department of Insurance issues or audits.
15        As part of regulatory compliance, that team
16   is responsible for all the form and rate filings of the
17   department as well as internal compliance functions, to
18   act as a resource to help the different departments.
19        From a risk function, it's identifying the
20   risks of the organization, ensuring we have proper
21   controls in place to mitigate them.
22        Network development is the recruitment of
23   attorneys to join the network in the areas where we have
24   members that require service.
25        And then the attorney relations, it's then

Page 24

1    maintaining those relationships with the network
2    attorneys.
3    Q.   Walk me through, if, say, my law firm
4    wanted -- I'm sure ARAG doesn't want us, but if my law
5    firm wanted to join the network, what would the process
6    be like?
7    A.   We have an application process that an
8    attorney fills out, an online application, where they
9    share their licensing background, any disciplinary
10   issues that they might have, their malpractice insurance
11   information and, as part of that process, whether or not
12   they would agree to the terms of our attorney agreement
13   as well as our fee schedule.
14   Q.   Okay.  Does ARAG put on conventions or
15   functions or get-togethers for network attorneys?
16   A.   For the whole net -- for the whole network?
17   Q.   Sure.
18   A.   No.  Nothing where we would like invite the
19   whole network to come, but we have some -- like we
20   sponsored a diversity, equity, and inclusion panel where
21   we invited attorneys from our network to come and give
22   us feedback on how we could be more appealing or attract
23   and retain diverse attorneys to serve our members'
24   needs.
25        If there's a specific purpose to have a small

6 (Pages 21 to 24)

McNae v. ARAG Insurance Company                    30(b)(6) Ann Cosimano

Page 25

1   group of attorneys, then we sponsor those, like a -- we
2   also have an attorney advisory board, and we'll sponsor
3   a get-together with them on occasion.
4       Q.   Who's your direct supervisor?
5       A.   David Murray.
6       Q.   That's the president and CEO?
7       A.   Yes.
8       Q.   How long has this person been your direct
9   supervisor?
10      A.   Probably 14 years.
11      Q.   Is that how long he's been the president/CEO?
12      A.   Yes.
13      Q.   And I take it that Mr. Murray reports to a
14  board of directors.
15      A.   Yes.
16      Q.   Who reports to you?
17      A.   I have direct reports.  I have five.  And
18  then they have direct reports beneath them.
19           Do you want me to list them by name?
20      Q.   No.
21      A.   Okay.
22      Q.   What are the titles of the people who report
23  to you?
24      A.   Sure.
25           Enterprise risk manager, network development

Page 26

1   manager -- oh, I think it's director of enterprise risk
2   management, actually.  Network development manager,
3   attorney relations manager, and two senior paralegals.
4       Q.   Was one of them Cathie Kyle?
5       A.   Kathy Miller.
6       Q.   Kathy Miller.  I'm sorry.
7       A.   Yes.
8       Q.   So what does the director of enterprise risk
9   management do?
10      A.   She manages that enterprise risk function
11  that I described where they identify the risks to the
12  organization and then ensure that we have appropriate
13  mitigation and controls in place; for example, data
14  breach or protection of information security and
15  ensuring that we've got the proper controls in place to
16  protect people's data.
17      Q.   And what's the name of the person who does
18  that?
19      A.   Jodi Selby.
20      Q.   What are the functions of the network
21  development manager?
22      A.   That person's responsible for determining
23  what areas -- where we need network attorneys and then
24  recruiting attorneys in those areas.
25      Q.   What's that person's name?

Page 27

1       A.   Jackie Bruce.
2            Let me know if you want me to spell any of
3   them.
4       Q.   The attorney relations manager, who is that?
5       A.   Allie Winterhof.
6       Q.   What does the attorney relations manager do?
7       A.   She -- once the attorneys join the network,
8   she's responsible for basically ensuring that they have
9   everything that they need to be successful.  So answers
10  questions and assists with any issues that they might
11  have, maintains the attorney portal.
12      Q.   What's the attorney portal?
13      A.   The attorney portal is where network
14  attorneys would come to get information.  They can
15  submit a case request.  They can look up their claims or
16  case history, kind of manage their relationship with
17  ARAG.
18      Q.   And all network attorneys have access to the
19  attorney portal?
20      A.   Yes.
21      Q.   Do network attorneys lose access to the
22  attorney portal once they're no longer network
23  attorneys?
24           MR. MULLALY:  Objection.  Scope.
25           You can answer.

Page 28

1       A.   We allow them to main access for a period of
2   time for runoff claims purposes so they can submit any
3   claims that they might have that are still outstanding
4   for their -- for members they are serving.
5       Q    (By Mr. Ruiz)  I'm going to back up to this
6   idea of the board of directors, who Mr. Murray reports
7   to.
8            Again, having served on some boards, I'm
9   assuming that you occasionally go before the board of
10  directors yourself as general counsel.  Is that fair?
11           MR. MULLALY:  Objection to form and scope.
12           You can answer.
13      A.   Yes.
14      Q    (By Mr. Ruiz)  Now, was the board of
15  directors given any information relating to the McNae
16  claim before or on November 20th, 2023?
17           MR. MULLALY:  Objection.  Scope.
18           You can answer.
19      A.   No.
20      Q    (By Mr. Ruiz)  And what about anytime before
21  this litigation was filed?
22           MR. MULLALY:  Same objection.
23           You can answer.
24      A.   No.
25      Q    (By Mr. Ruiz)  Mr. Murray is the president of

7 (Pages 25 to 28)

McNae v. ARAG Insurance Company

30(b)(6) Ann Cosimano

Page 29

1  the board.  Is that -- or the chairman of the board?
2      A.   No.
3          MR. MULLALY:  Objection to form.
4      Q    (By Mr. Ruiz)  Who's the chairman of the
5  board of directors?
6      A.   His name is Werner Nicoll.
7          MR. RUIZ:  Please mark this Exhibit 1.
8          (Exhibit No. 1 introduced.)
9      Q    (By Mr. Ruiz)  This is the fourth amended
10 notice of Rule 30(b)(6) deposition.  You're shown here
11 in the color purple.
12         Do you see that?
13     A.   Yes.
14     Q.   I'm going to show you the topics, and focus
15 on the ones that are highlighted in purple.  Let me know
16 when I can go down.
17     A.   Okay.
18         Okay.
19         Okay.
20         Okay?
21     Q.   Are the topics that have been highlighted in
22 purple, is that consistent with your -- with your
23 understanding of which topics you've been designated to
24 testify about on behalf of ARAG?
25     A.   Yes.

Page 30

1      Q.   What's your understanding of your
2  responsibilities as a Rule 30(b)(6) witness?
3      A.   Basically to be the designated person to
4  share information on those topics with you in the
5  deposition process.
6      Q.   And what do you understand to be your
7  responsibilities before you get here to the deposition?
8      A.   To have reasonably looked into all of the
9  topics that were designated to me to make sure I had an
10 understanding.
11     Q.   Is today the first time you've ever served as
12 a Rule 30(b)(6) witness?
13     A.   In my recollection, yes.
14     Q.   Like I said on Friday, you're here as the
15 corporation designee.  Unless I specifically say
16 otherwise, all of my questions are asking for ARAG's
17 testimony.
18         Understood?
19     A.   Yes.
20     Q.   And so even though it's a little strange, if
21 I say the word "you," I'm talking about ARAG, not you as
22 a human being.
23         Understood?
24     A.   Yes.
25     Q.   And if I have a question directly addressed

Page 31

1  to you as a human being, which I may do, I promise I'm
2  going to do my best to make that clear.  So, for
3  example, I would say:  Would you, Ms. Cosimano
4  individually, testify on the question of whether you
5  were present at such-and-such meeting.
6          Understood?
7      A.   Yes.
8      Q.   If ARAG does not know the answer to the
9  question or if you as the designee are not prepared to
10 answer the question on behalf of ARAG, would you tell
11 me?
12     A.   Yes.
13     Q.   Describe generally what you did to prepare
14 for today's deposition.
15     A.   I met with individuals both inside and
16 outside the organization, just to make sure I understood
17 the different topics.
18         I had meetings with Mike Mullaly and Ben
19 Roesch as well as Meagen Adams, and Kathy Miller
20 participated in those meetings.
21         I also had conversation with David Murray,
22 Jennifer Beck, Mary Jo Hudson, as well as reviewing
23 statutes and the documents that had been shared with
24 you.
25     Q.   You said you met with individuals both inside

Page 32

1  and outside of the organization.  Let's just name off
2  names.
3          Let's start with the people inside.  Can you
4  name the names?
5      A.   That would be Meagen Adams, Kathy Miller,
6  David Murray, Jennifer Beck.
7          I think that's all the internal.
8      Q.   And outside the organization, you mentioned
9  Mr. Mullaly, Mary Jo Hudson.
10     A.   Yes.
11     Q.   Anyone else?
12     A.   Ben Roesch.
13     Q.   Was Mr. -- how do you pronounce his last
14 name?
15     A.   I said Roesch.  I'm a hundred percent
16 incorrect.
17         MR. RUIZ:  Mr. Roesch, speak up if we're
18 getting it wrong.  We want to be respectful.
19         MR. ROESCH:  I appreciate that.  It's Roesch,
20 like sort of a soft E, like fresh flowers or something
21 like that.
22         THE WITNESS:  Thank you.
23         MR. RUIZ:  That sounds great.
24         MR. ROESCH:  A lot of people say it different
25 ways, so...

8 (Pages 29 to 32)

McNae v. ARAG Insurance Company                          30(b)(6) Ann Cosimano

---

Page 33

1     THE WITNESS:  Same.
2        Q    (By Mr. Ruiz)  Well, let's start with
3  Mr. Roesch.  Did Mr. Roesch have having to do with the
4  underlying facts?
5        MR. MULLALY:  Object to form.
6     A.   Yeah, could you --
7        Q    (By Mr. Ruiz)  Is he just an attorney in this
8  case or was he involved in the handling of the McNae
9  claims?
10    A.   He's an attorney in this case.
11       Q    And so did Mr. Roesch provide you with any
12 facts that you're relying on here today?
13    A.   Relevant to the underlying case, no.
14       Q    He was giving you legal advice to help you
15 get ready, which is privileged and I don't need to hear
16 about them.  Okay?
17    A.   Yes.
18       Q    So then let's go back to the folks who were
19 inside.
20       Ms. Adams was here Friday.  You were here;
21 right?
22    A.   Yes.
23       Q    And she said that she met with you -- with
24 you, Mr. Mullaly, Mr. Roesch, and Ms. Miller in two
25 meetings last week.

Page 34

1     Is that true?
2     A.   Yes.
3        Q    Did you meet with Ms. Adams any other time
4  besides those two meetings in preparation for today's
5  deposition?
6     A.   No.
7        Q    What about with Kathy Miller?  Did you meet
8  with Kathy Miller outside of those two meetings?
9     A.   No.
10       Q    Let's start this next -- the timeline of the
11 next questions at 9:30 a.m. on Friday, and it's going to
12 run through today.
13       Did you have any meetings with people inside
14 or outside the organization since that time, just on
15 9:30 Friday morning?
16    A.   Yes.
17       Q    Who?
18    A.   You said specifically inside?  Or inside or
19 outside?
20       Q    Inside or outside.
21    A.   Okay.
22       Between then, Mike Mullaly, Ben Roesch, David
23 Murray, Jen Beck, Mary Jo Hudson.
24       Q    Now, let's talk about before 9:30 on Friday
25 morning.  Did you have any meetings with Mr. Murray,

Page 35

1  Ms. Beck, or Ms. Hudson before then in preparation for
2  today's deposition?
3     A.   No.
4        Q    So your preparatory meetings with those three
5  people happened since nine o'clock last Friday?
6     A.   Yes.
7        Q    So let's start there.
8        Did you meet with them together or talk with
9  them together or separately?
10    A.   Separately.
11       MR. MULLALY:  Object to form.
12       Q    (By Mr. Ruiz)  When did you speak with
13 Mr. Murray?
14    A.   I spoke with him Saturday evening.
15       Q    How long?
16    A.   15 minutes.
17       Q    What was the purpose of the call?  Or was it
18 a call or was it something else?
19    A.   It was a call.
20       Q    What was the purpose?
21    A.   It was to ensure I was recalling the events
22 of his understanding and knowledge around the McNae case
23 prior to giving my deposition today.
24       Q    What did you tell Mr. Murray?
25       MR. MULLALY:  Object to form.

Page 36

1     You can answer.
2     A.   I asked him -- I asked -- more inquired to
3  him as to his recollection of a meeting that we had in
4  November and any other relevant recollections he might
5  have had around this case.
6        Q    Who did most of the talking on the call, you
7  or Mr. Murray?
8     A.   I would say it was pretty even.
9        Q    What did Mr. Murray say?
10    A.   He shared his recollection being around
11 receiving information and updates about the case and
12 where it was and just who -- what -- who else was in
13 attendance at the meeting, in his recollection of who
14 else was in attendance.
15       Q    Anything else?
16    A.   No.
17       Q    So who else was in attendance?
18    A.   Jennifer Beck.
19       Q    Anyone else?
20    A.   No.
21       Q    What specifically did Mr. Murray tell you
22 about what he remembered about receiving information and
23 updates about where the McNae claim was?
24    A.   He recalled wondering what the status was and
25 understanding the mediation had not been successful.

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

McNae v. ARAG Insurance Company                                    30(b)(6) Ann Cosimano

Page 37

1    He recalled that the case had been continued.
2    Q.   Can you explain what you mean by that he
3  recalled that the case had been continued, beginning
4  with when it was continued and what it means to have
5  been continued?
6         MR. MULLALY:  Objection to form.
7         You can answer.
8    A.   Sure.
9         He recalled being -- that that information
10  was shared with him; that the case was continued to
11  February.
12         As far as his understanding, I don't think it
13  was that detailed as to what his understanding would be
14  of that.  More so just recalled the fact that we had
15  received information that the case was continued.
16    Q.   (By Mr. Ruiz)  Any other facts that
17  Mr. Murray provided you on this call?
18    A.   We talked about the questions around the
19  billing insight, like having discussions around the
20  billing of the two attorneys on the case and that's a
21  fairly unusual situation for us.  And so he did remember
22  that there were two attorneys.
23    Q.   Anything more specific that you remember that
24  he told you on that specific topic?
25         MR. MULLALY:  Objection to form.

Page 38

1         You can answer.
2    A.   Nothing specific.
3    Q.   (By Mr. Ruiz)  You used the word "insight."
4  Did you mean it to mean anything other than the word --
5  the regular English meaning of the word "insight"?
6         MR. MULLALY:  Objection to form.
7         You can answer.
8    Q.   (By Mr. Ruiz)  I guess I'm asking, is insight
9  a computer program, a term inside of ARAG, something
10  like that, or is it just -- you just mean insight?
11    A.   No, just mean insight.
12    Q.   Understood.
13         Do you meet with Mr. Murray regularly to talk
14  about specific claims?
15         MR. MULLALY:  Objection.  Scope.
16         You can answer.
17    A.   No.
18    Q.   (By Mr. Ruiz)  Does Mr. Murray regularly take
19  interest in specific insurance claims that are pending
20  in ARAG?
21         MR. MULLALY:  Same objection.
22         You can answer.
23    A.   Not generally.
24    Q.   (By Mr. Ruiz)  How often does it happen?
25         MR. MULLALY:  Same objection.

Page 39

1    A.   I would say it's on rare occasion.  It would
2  be if there's something very unusual.
3    Q.   (By Mr. Ruiz)  How did he catch wind of the
4  McNae claims?
5         MR. MULLALY:  Objection to form.  Scope.
6         You can answer.
7    A.   I can't say for sure.  I don't know.
8    Q.   (By Mr. Ruiz)  You don't know how he found
9  out about them first?
10         MR. MULLALY:  Same objection.
11    A.   Right.
12    Q.   (By Mr. Ruiz)  We'll come back to that
13  meeting, but before -- before I leave the subject of
14  that meeting, were there any other meetings that you had
15  with Mr. Murray about the McNae claims?
16         MR. MULLALY:  Objection to scope.
17         You can answer.
18    A.   I'm sure it was a topic of discussion at
19  other meetings, just updates, where is everything at.
20         I would say those were probably more from the
21  standpoint of me as the attorney for ARAG giving like
22  updates on where this litigation is.
23    Q.   (By Mr. Ruiz)  Have we exhausted what you
24  learned from Mr. Murray on Saturday?  Is there anything
25  more specific?

Page 40

1         MR. MULLALY:  Objection to form.
2    A.   No.
3    Q.   (By Mr. Ruiz)  Let's turn to Jennifer Beck.
4  Remind me what Jennifer Beck's title is.
5    A.   Vice president of customer experience and
6  business intelligence, I believe.
7    Q.   When did you speak with Ms. Beck in
8  preparation for today's deposition?
9    A.   Sunday morning.
10    Q.   How long did it last?
11    A.   Maybe ten minutes.
12    Q.   When did you ask to set up the time to talk
13  with her?
14         I'm assuming that's how it happened, but --
15  is that how it happened, that you asked to talk with
16  her?
17    A.   Yes.
18         (Crosstalk)
19    A.   Sunday morning.
20    Q.   You asked on Sunday morning?
21    A.   Yes.
22    Q.   After you spoke with Mr. Murray?
23    A.   Yes.  I spoke to him Saturday night.
24    Q.   And did you do it over email or text or
25  something else?

McNae v. ARAG Insurance Company                    30(b)(6) Ann Cosimano

Page 41

1    A.  I asked over text.
2    Q.  What about Mr. Murray?  Did you ask him
3  email, text, or something else?
4    A.  Text.
5    Q.  All right.  You have -- so you have their
6  numbers to text them on work-related things sometimes.
7  Is that fair?
8    A.  On rare occasion, yes.
9    Q.  Have you searched your text messages for
10  texts relating to the McNae claim?
11       MR. MULLALY:  Objection to scope.
12       You can answer.
13    A.  No.
14    Q   (By Mr. Ruiz)  Do you know --
15       (Crosstalk)
16    Q.  Do you know if Mr. Murray has?
17       MR. MULLALY:  Objection to form and scope.
18       You can answer.
19    A.  I don't know.
20    Q   (By Mr. Ruiz)  Do you know if Ms. Beck has?
21       MR. MULLALY:  Same objection.
22       You can answer.
23    A.  I don't know.
24    Q   (By Mr. Ruiz)  So what did you tell Ms. Beck
25  was the reason you were calling her?

Page 42

1    A.  In text, I just asked if she was available
2  for a call.
3    Q.  How did the call go?
4       MR. MULLALY:  Objection to form.
5       You can answer.
6    A.  It was fine.
7    Q   (By Mr. Ruiz)  What did you learn in the
8  call?
9    A.  Jen had -- she had recollection of the
10  meeting and generally that we spoke about the McNae case
11  and the status of where it was.
12       She had less recollection about any specifics
13  relevant to it.  She didn't recall the content of the
14  discussion.
15    Q.  Was this meeting a regular meeting that the
16  three of you had or was it a special meeting that was
17  put together to discuss McNae?
18       MR. MULLALY:  Object to scope.
19    A.  We had had a leadership meeting that day, and
20  this was at the end of the leadership meeting.  We --
21  the three of us were in the room.  It was not a
22  scheduled meeting.
23    Q   (By Mr. Ruiz)  A sidebar, as it were, for a
24  bigger meeting?
25    A.  Yes.

Page 43

1    Q.  And how long did that meeting last, the
2  sidebar part?
3       MR. MULLALY:  Objection.  Scope.
4    A.  Probably 15, 20 minutes.
5    Q   (By Mr. Ruiz)  And that was the only time
6  you spoke with Ms. Beck in preparation for today's
7  deposition; fair?
8    A.  Yes.
9    Q.  Sometimes I take these long breaks because
10  I'm just trying to remember everything that's happened
11  so far.  So I apologize for that.
12       Ms. Adams described the two meetings she had
13  with you, Mr. Roesch, Mr. Mullaly, and Ms. Miller last
14  week.
15       Do you remember that?
16    A.  Yes.
17    Q.  And she recalled the factual information that
18  you provided her.  You were here for that testimony as
19  well?
20    A.  Yes.
21    Q.  Was there any factual information that you
22  provided Ms. Adams that you didn't remember when she was
23  answering those questions?
24       MR. MULLALY:  Object to form and scope.
25       You can answer.

Page 44

1    A.  I'm trying to remember the exact factual
2  information that was pertaining to.  There was a lot
3  said on Friday.
4       I know that there was one -- it was more a
5  nuance as to how Meagen was sharing that I felt -- it
6  was maybe difficult for her to express --
7    Q.  Okay.
8    A.  -- or that she was maybe having trouble
9  articulating.  And it was around the concerns about the
10  settlement and the -- kind of ARAG's thoughts around
11  that or perception of it.
12       My recollection is that really the concerns
13  stemmed from the communication that came in the updates
14  from one of the two attorneys, Casey, that indicated an
15  openness to resolution through a public disclosure and
16  specified that a public statement would be what would be
17  necessary for the parties to resolve and indicated an
18  openness to that, that there was an ask that the
19  plaintiff provide that language.
20       And I think based on that perception was why
21  ARAG had agreed to fund a mediation between the parties,
22  which is very unusual.  That's a noncovered cost under
23  the policy, but in hopes of helping them to bring this
24  matter to resolution, it was something that we had
25  agreed to.

11 (Pages 41 to 44)

McNae v. ARAG Insurance Company                                30(b)(6) Ann Cosimano

---

Page 45

1    Q.   That was concern number one that Ms. Adams
2  tried to articulate on Friday; right?
3    A.   Yes.
4    Q.   Any more specificity that you can provide on
5  concern number one?
6        MR. MULLALY:  Same objections.
7        You can answer.
8    A.   No.  I think that's -- that was what I saw
9  that I thought she was struggling to articulate.
10   Q   (By Mr. Ruiz)  Anything else factually that
11 you had provided to Ms. Adams in those two meetings that
12 maybe she either forgot or had difficulty conveying?
13   A.   I think the concerns around duplication of
14 efforts, it was less about the duplication of efforts on
15 the attorneys' parts, more about the time spent by the
16 two attorneys in conversation with one another and some
17 inconsistencies in the billing in those.
18       So because of this claim --
19 understand the case had started in August of '22 and, by
20 November of '23, was in excess of $800,000, that, in and
21 of itself, was a very unusual circumstance that would
22 draw attention to a claim like this or a case like this.
23 And so I think there was questions or wanting to take a
24 look at that to ensure that the time spent seemed like
25 efficient use of time and seemed like accurate use of

---

Page 46

1  time by the attorneys.
2    Q.   All right.  Anything else that Ms. Adams may
3  not have been able to recall or articulate?  And we're
4  talking about just the facts that you had provided her
5  in those two meetings.
6    A.   Right.
7        I think that's it.
8    Q.   What was Ms. Miller's role in these two
9  meetings?
10   A.   Really more as a -- in case there was an
11 output or a something that had to be done as a result
12 more of a technician.
13   Q.   She was not there to provide you facts to
14 help you testify; is that fair?
15   A.   I think that's fair.
16       MR. RUIZ:  All right.  Can we go off the
17 record?
18       MR. MULLALY:  Yep.
19       THE VIDEOGRAPHER:  Going off the record.  The
20 time now is approximately 10:33 a.m.
21       (Recess 10:33 a.m. to 10:43 a.m.)
22       THE VIDEOGRAPHER:  Back on the record.  The
23 time now is approximately 10:43 a.m.
24   Q   (By Mr. Ruiz)  You mentioned looking at
25 documents to help you get ready for today's deposition.

---

Page 47

1  True?
2    A.   Yes.
3    Q.   Which documents?
4    A.   They were the documents that had been
5  submitted to you.
6    Q.   Any others?
7    A.   Like some regulations, like -- but nothing
8  outside of that.
9    Q.   Which regs?
10       (Crosstalk)
11   Q.   Sorry.  Let me back up.
12       Which regulations?
13   A.   The Washington regulations as well as really
14 our filing info for Washington, some outside regulation.
15 And that was just to confirm that, yes, we are -- we are
16 a casualty company in Washington.
17       And I think that's it.
18       Oh, ERISA.  ERISA regulations.
19   Q.   So I'm hearing three types of regulations.
20       A Washington Administrative Code regulation
21 is number one.  True?
22   A.   True.
23   Q.   And the filings that ARAG has made with the
24 Office of the Insurance Commissioner here in the state
25 of Washington, that's two.  True?

---

Page 48

1    A.   Yes.
2    Q.   And three, some regulations that relate to
3  ERISA, which is a federal law.  Correct?
4    A.   Yes.
5    Q.   So let me -- let's start with the first ones,
6  the Washington regulations, because Ms. Adams said
7  something about a group plan regulation but she couldn't
8  really elaborate.
9        ARAG policy is not in a group health plan.
10 Do you agree?
11   A.   I agree.
12       MR. MULLALY:  Objection.
13       You can answer.
14   Q   (By Mr. Ruiz)  Do you know what Ms. Adams was
15 referring to when she was talking about regulations that
16 applied to group plans?
17       MR. MULLALY:  Object to form and scope.
18       You can answer.
19   A.   Our plan is a group insurance plan.  We
20 don't -- it's not an individual policy.  You can only
21 access it as a member of a group or somebody who is no
22 longer eligible under one of our group policies, unless
23 you purchase specifically an individual plan that we --
24 we don't sell as an insurance product.
25   Q   (By Mr. Ruiz)  But does it make a difference

---

McNae v. ARAG Insurance Company                    30(b)(6) Ann Cosimano

Page 49

1  as to what ARAG says are the right regulations that
2  apply?
3           MR. MULLALY:  Object to form and scope.
4           You can answer.
5      A.   I don't think it's the right regulations.  It
6  might be timing requirements under regulations.
7      Q    (By Mr. Ruiz) Do you have the regulations
8  with you?
9      A.   No.
10     Q.   Do you know the numbers of the provisions
11 that ARAG says -- well, strike that.
12          Do you have -- do you know the numbers of the
13 provisions that you reviewed?
14     A.   No.
15     Q.   Did you review the unfair claims settlement
16 practices regulation?
17     A.   Yes.
18     Q.   Are there different claims settlement
19 practices regulations that apply to group plans?
20          MR. MULLALY:  Object to form and scope.
21          You can answer.
22     A.   I believe, again, it's the time frames
23 under --
24          (Crosstalk)
25     Q    (By Mr. Ruiz) Sorry.  I don't -- I think

Page 50

1  that's the first time we've interrupted each other and
2  I'm sorry.  But we've made it an hour.  That's a record.
3          I think what I'm hearing you say, but you
4  tell me if I'm wrong, that embedded within those
5  regulations are different time frames for individual
6  policies versus a policy that's a group plan.
7          Is that fair?
8          MR. MULLALY:  Same objection.
9      A.   Yes, that's fair.
10     Q    (By Mr. Ruiz) So let's talk about the second
11 category of regulations or regulatory materials.  These
12 are the files at ARAG, the filings that are made with
13 the insurance commissioner.
14          Where did you get those from?
15     A.   And I think -- probably for clarity, that one
16 was less that I checked -- more so that I checked to
17 make sure what type of insurance we were in Washington.
18 So internal, like are we a -- in some states, we're
19 considered legal insurance, as an example.  In some
20 states, we're considered property and casualty.  And I
21 just wanted to ensure that in Washington, what exactly
22 were we specified.
23          And that's a legal insurance -- there's a
24 legal insurance primer, essentially, that was put out
25 that specified that legal insurance is miscellaneous

Page 51

1  casualty in Washington.
2      Q.   This is a point of clarification, again, on
3  something that Ms. Adams said on Friday.
4          She did not believe that legal insurance was
5  property casualty insurance.  But now the clarification
6  is that, according to ARAG's filings in the state of
7  Washington, it's a type of casualty insurance.  Is that
8  fair?
9      A.   Yes.
10          MR. MULLALY:  Object to form and scope.
11     Q    (By Mr. Ruiz) Any other information that you
12 got from the filings with the insurance commissioner?
13          MR. MULLALY:  Object to scope.
14          You can answer.
15     A.   No.
16     Q    (By Mr. Ruiz) Then ERISA, what specifically
17 that's ERISA related did you review?
18     A.   I can't remember exactly what it's called,
19 but it is around claims settlement practices under
20 ERISA.
21     Q.   Anything else?
22          MR. MULLALY:  Object to form and scope.
23          You can answer.
24     A.   No.
25     Q    (By Mr. Ruiz) Where did you get these?

Page 52

1      A.   The Washington -- I researched -- I Googled
2  in the Washington Administrative Code "ERISA filing," I
3  believe.  I received an email.
4      Q.   From your attorneys, probably?
5      A.   Yes.
6      Q.   In getting ready for today's deposition, did
7  you speak with Derek Overton?
8      A.   No.
9      Q.   Did you speak with Chris Thomas?
10     A.   No.
11     Q.   I know you're a member of that
12 multifunctional team that assisted in drafting language,
13 but did you speak with anyone else in preparation for
14 today's deposition?
15     A.   No.
16     Q.   Oh, I almost forgot to ask.  Mary Jo Hudson,
17 you spoke with Mary Jo Hudson in preparation for today's
18 deposition; correct?
19     A.   Yes.
20     Q.   When did you do that?
21     A.   Sunday.
22     Q.   What time?
23     A.   I believe it was early afternoon.
24     Q.   How long?
25     A.   10 -- 10, 15 minutes.

McNae v. ARAG Insurance Company                          30(b)(6) Ann Cosimano

Page 53

1    Q.   When did you ask to speak with her?
2    A.   Slightly before that.  Asked if she was
3 available.
4    Q.   Did you do that over email or text?
5    A.   Text.
6    Q.   Other than yesterday for 10 or 15 minutes,
7 did you speak with Ms. Hudson in preparation for today's
8 deposition?
9    A.   No.
10   Q.   In the call yesterday, was that on the phone?
11   A.   Yes.
12        MR. MULLALY:  Object to form.
13   A.   Yes.
14   Q    (By Mr. Ruiz)  And the only topic discussed
15 was getting ready for today's deposition?
16   A.   Yes.
17   Q.   And did Ms. Hudson provide you with any
18 facts?
19   A.   Yes.
20   Q.   Tell me, please.
21        MR. MULLALY:  Object to form.
22        And please testify only to facts.
23   A.   We talked about basically the timing of some
24 communications that we had had, phone call, regarding
25 the McNae matter.  And we requested assistance from

Page 54

1 Mary Jo with -- basically in the sense of a coverage
2 opinion and some potential legal issues and, after that,
3 had sought assistance with drafting a communication
4 after our claims determination was made then.
5        And then --
6        (Crosstalk)
7    Q    (By Mr. Ruiz)  What was the time frame of
8 that?
9    A.   It would have been after November 20th.
10   Q.   Okay.  I didn't mean to cut you off.  You
11 said "and then..."
12   A.   Also some assistance in like monitoring of
13 the case.  Essentially she checked on some status, like
14 where was the -- what was the status of the case as far
15 as the attorneys' involvement and whether or not they
16 were still associated as attorneys on the case.
17        And I think that's the extent.
18   Q.   Any other facts that Ms. Hudson provided you?
19   A.   No.
20   Q.   I think we've covered everyone you spoke with
21 in preparation for today's deposition.  Do you think so?
22   A.   Yes.
23   Q.   The following questions are going to relate
24 to topics 17, 18, and 19.
25        Topic 17 was:  All duties owed by insurers

Page 55

1 and their agents to the insureds in claims for benefits
2 under ARAG policies.
3        Topic 18 is:  The obligation of your
4 representatives to comply with WAC regulations and/or
5 any other industry standards and claims under ARAG
6 policies.
7        And number 19 is:  Industry standards
8 relating to the handling of insurance claims, such as
9 those of plaintiffs, as understood by you, "you" meaning
10 ARAG.
11        Let me dive into these questions.  And again,
12 when I say "you," I mean ARAG.
13        Do you agree that one of the reasons a person
14 buys insurance is to buy peace of mind?
15        MR. MULLALY:  Object to scope.
16        You can answer.
17   A.   Yes.
18   Q    (By Mr. Ruiz)  Do you agree that an insurance
19 company has a duty to deal fairly and in good faith with
20 its insureds?
21   A.   Yes.
22   Q.   Do you agree an insurance company must treat
23 its policyholders' interests with equal regard as it
24 does its own interests?
25   A.   Yes.

Page 56

1    Q.   When I say "policyholder" in these questions,
2 do you understand that to mean the McNaes?
3    A.   Yes.  We would call them certificate holders,
4 but I understand what you mean.
5    Q.   Do you agree the claims handling process is
6 not supposed to be an adversarial or competitive
7 process?
8    A.   Can you repeat -- can you repeat that?
9    Q.   Yes.  I'll rephrase it a little too.
10   A.   Thank you.
11   Q.   Do you agree that the claims handling process
12 is not supposed to be adversarial or competitive against
13 the insureds?
14        MR. MULLALY:  Object to scope.
15        You can answer.
16   A.   Yes.
17   Q    (By Mr. Ruiz)  Do you agree an insurance
18 company should assist the policyholder with making the
19 claim?
20        MR. MULLALY:  Object to form.
21        You can answer.
22   A.   I'm not sure I understand the question.
23   Q    (By Mr. Ruiz)  Let me rephrase it a little.
24   A.   Sure.
25   Q.   Do you agree an insurance company should give

14 (Pages 53 to 56)

McNae v. ARAG Insurance Company                          30(b)(6) Ann Cosimano

Page 57

1    reasonable assistance to the insured with a claim?
2        A.   Yes.
3        Q.   Do you agree the insurance company must
4    disclose and explain to its insureds all benefits,
5    coverages, and time limits that may apply?
6        A.   Yes.
7        Q.   Do you agree the insurance company has a duty
8    to act reasonably and fairly in interpreting and
9    applying its policy provisions?
10       A.   Yes.
11       Q.   Do you agree claims decisions should be made
12   without regard to effect on company profitability?
13       A.   Yes.
14       Q.   Do you agree an insurance company must
15   conduct a full, fair, and prompt investigation of the
16   claim at its own expense?
17       A.   Yes.
18       Q.   Do you agree an insurance company must fully,
19   fairly, and promptly evaluate and adjust the claim?
20       A.   Yes.
21       Q.   Do you agree an insurance company has an
22   obligation to investigate and search for evidence to
23   support the claim?
24            MR. MULLALY:  Object to scope.
25            You can answer.

Page 58

1        A.   Can you clarify that question for me?
2        Q   (By Mr. Ruiz)  Sure.
3            Do you -- let me break it up.
4        A.   Sure.
5        Q.   Do you agree an insurance company has an
6    obligation to investigate evidence to support the claim?
7            MR. MULLALY:  Object to form and scope.
8            You can answer.
9        A.   Yes.
10       Q.   (By Mr. Ruiz)  Do you agree an insurance
11   company has an obligation to investigate and evaluate
12   all benefits to which the policyholder may be entitled?
13       A.   Yes.
14       Q.   Do you agree an insurance company has an
15   obligation to document in a claim file the events that
16   occur in a claim, including steps taken to investigate?
17            MR. MULLALY:  Object to form.
18            You can answer.
19       A.   Can you restate that?
20       Q   (By Mr. Ruiz)  Sure.
21            Do you agree an insurance company has an
22   obligation to document in the claim file the events that
23   occur in a claim?
24            MR. MULLALY:  Same objection.
25            You can answer.

Page 59

1        A.   The -- I think "the events" is -- might be
2    what's tripping me up.
3        Q   (By Mr. Ruiz)  Sure.  I'll ask it in a
4    different way.
5        A.   Sure.
6        Q.   Do you agree an insurance company has an
7    obligation to document in the claim file what it does in
8    handling the claim?
9            MR. MULLALY:  Object to form.
10           You can answer.
11       A.   It might just be semantics, but I -- I -- I
12   agree a claims file should be complete.  It may just be
13   the wording that's tripping me up.
14       Q   (By Mr. Ruiz)  In what way should the claim
15   file be complete?
16       A.   I think --
17           MR. MULLALY:  Objection to scope.
18           You can answer.
19           THE WITNESS:  Thank you.
20       A.   I think it was the way that you worded it was
21   very broad.  And that might be the intention.  I may
22   have just misunderstood how you were wording it.
23       Q   (By Mr. Ruiz)  Do you agree an insurance
24   company may not deny a claim or part of a claim based on
25   speculation?

Page 60

1            MR. MULLALY:  Object to scope.
2            You can answer.
3        A.   Yes.
4        Q   (By Mr. Ruiz)  Do you agree an insurance
5    company may not deny a claim or a part of a claim based
6    on information that is biased?
7            MR. MULLALY:  Object to form and scope.
8            You can answer.
9        A.   That is biased?  Can you explain biased to
10   me?
11       Q   (By Mr. Ruiz)  Sure.
12           Biased meaning not neutral or not fair toward
13   either side.
14       A.   Yes.
15       Q.   So do you agree?
16       A.   Yes.
17       Q.   Do you agree that for a full or partial
18   denial of a claim, the insurance company must give a
19   written explanation that points to facts and policy
20   provisions?
21       A.   Yes.
22           MR. MULLALY:  Object to scope.
23       Q   (By Mr. Ruiz)  Do you agree an insurance
24   company -- well, strike that.
25           Do you agree an insurance company has an

15  (Pages 57 to 60)

McNae v. ARAG Insurance Company                              30(b)(6) Ann Cosimano

Page 61

1  obligation to explain to the insured how it is
2  determining the amount of benefits to pay?
3       MR. MULLALY:  Object to scope.
4       You can answer.
5       Q.   (By Mr. Ruiz) I can tell from your face
6  that --
7       A.   Yeah.  I --
8       Q.   -- I should reask.  Is that okay?
9       A.   Yes.
10      Q.   Here's a different formulation.  And let me
11  know if this one is something that maybe is more
12  understandable.
13           Do you agree an insurance company has an
14  obligation to explain how it is valuing the claim?
15      MR. MULLALY:  Object to form.
16      You can answer.
17      A.   Is valuing the claim.
18           "Valuing" is -- is odd for us, just because
19  we're paying attorneys' fees and not like a property
20  claim like a roof or a house.  And so that "valuing" is
21  giving me pause.
22      Q.   (By Mr. Ruiz) Do you agree -- well, strike
23  that.
24           Let me -- you know what?  Here we have a
25  situation where two attorneys were terminated.

Page 62

1       A.   Yes.
2       Q.   And so let me ask it a different way.
3           Do you agree an insurance company that
4  provides legal services like ARAG -- well, it doesn't --
5  let me back up.  Strike that.
6           Do you agree a legal insurance company has an
7  obligation to explain to the insured why it is deciding
8  to terminate their attorney?
9       MR. MULLALY:  Object to form and scope.
10      You can answer.
11      A.   I would say it depends.  I think it depends.
12      Q    (By Mr. Ruiz) What does it depend on?
13      MR. MULLALY:  Same objection.
14      You can answer.
15      A.   For me, it would be whether or not that
16  impacted their coverage, so if it was a denial of
17  coverage versus the avenue through which they can get
18  coverage.
19           So if we use this as an example, the
20  termination of those two attorneys didn't -- didn't
21  change the underlying coverage.  The coverage was still
22  available.  It was just those attorneys were not the
23  avenue by which they could get it.
24      Q.   (By Mr. Ruiz) As far as the terminations of
25  the McNaes' attorneys go, ARAG did not have an

Page 63

1  obligation to explain to the McNaes the reasons why?
2       (Crosstalk)
3       MR. MULLALY:  Object to form and scope.
4       You can answer.
5       A.   I think I reviewed that as not a denial of
6  coverage.  Just the inability of the McNaes to use these
7  two specific attorneys.
8       Q.   (By Mr. Ruiz) My question is a little bit
9  different.
10      A.   Okay.
11      Q.   Did ARAG have an obligation to explain to the
12  McNaes the reasons it was terminating the attorneys?
13      MR. MULLALY:  Same objection.
14      You can answer.
15      A.   I say no.  Under this circumstance, no.
16      Q.   (By Mr. Ruiz) Do you agree an insurance
17  company may not misrepresent facts or policy provisions?
18      A.   Yes.
19      Q.   Do you agree an insurance company that's
20  handling a claim in Washington has an obligation to
21  comply with the claims handling regulations found at
22  Washington Administrative Code 284-30?
23      MR. MULLALY:  Object to form and scope.
24      You can answer.
25      A.   Not nec- -- I think it depends whether or

Page 64

1  not that is an ERISA claim or not.
2       Q.   (By Mr. Ruiz) If it's not an ERISA claim,
3  then would you agree?
4       A.   Yes.
5       Q.   Do you agree an insurance company must
6  complete its investigation of a claim within 30 days
7  after notification of a claim, unless the investigation
8  cannot reasonably be completed within that time?
9       A.   The same.  Unless it was an ERISA claim,
10  which has different time frames.
11      Q.   I'm hearing:  Yes, unless it's governed by
12  ERISA.
13      A.   Yes.
14      Q.   Do you agree that claims handlers must keep
15  a -- strike that.
16           Do you agree that anyone who is making claims
17  decisions at an insurance company must keep an open mind
18  when they're performing that work?
19      MR. MULLALY:  Object to form and scope.
20      You can answer.
21      A.   That's an interesting -- I think "open mind"
22  has a lot of potential definitions.  Maybe you can state
23  it different.
24      Q    (By Mr. Ruiz) I'll move on.
25      A.   Okay.

16  (Pages 61 to 64)

McNae v. ARAG Insurance Company                    30(b)(6) Ann Cosimano

Page 65

1    Q.   Do you agree it is an unfair practice for a
2  person making a claims decision to decide the outcome of
3  the claim and then stick to that decision even when the
4  evidence points the other way?
5        MR. MULLALY:  Object to form.
6        You can answer.
7    A.   Depending.  The -- what way -- you said even
8  if it points a different way.  Depending on what way,
9  agree.  I think you can't stand firmly and not be
10  unmoving -- you can't be unmoving.
11    Q    (By Mr. Ruiz)  Let's move on to topic 12,
12  which is:  All claims handling activities by persons or
13  entities other than you, meaning ARAG, that relate to
14  plaintiffs' claims.
15        Besides what you testified earlier about
16  getting ready for today's deposition, did you do
17  anything special to testify on this particular topic?
18        MR. MULLALY:  Object to form.
19        You can answer.
20    A.   I spoke with Mary Jo -- no, nothing other
21  than what we discussed.
22    Q    (By Mr. Ruiz)  When I refer to claims
23  handling activity, I'm referring to any role regarding
24  the investigation or decision-making on the McNae claims
25  or in the preparation of documents.

Page 66

1        Understood?
2    A.   Yes.
3    Q.   So let's start with Mary Jo Hudson.  She is
4  outside legal counsel for ARAG?
5    A.   Yes.
6    Q.   She works for the law firm of Squire, Patton,
7  Boggs U.S., LLP?
8    A.   Yes.
9    Q.   And you did speak with Ms. Hudson for a
10  little while in preparation for today's deposition, just
11  yesterday?
12    A.   Yes.
13        MR. MULLALY:  Object to form.
14    Q    (By Mr. Ruiz)  Now, was Ms. Hudson hired just
15  to work on McNae or does she have a different role than
16  that?
17    A.   Can you clarify the question?
18    Q.   You work with Ms. Hudson on more than just
19  the McNae claim; is that true?
20    A.   Yes.
21    Q.   Okay.  So who is Mary Jo Hudson to ARAG?
22        MR. MULLALY:  Object to form.
23        You can answer.
24    A.   We've worked with Mary Jo in the past.  She
25  was a prior insurance commissioner for the State of

Page 67

1  Ohio, and so occasionally it's nice to get insight from
2  her on different regulatory questions we might have.
3  And so we've used her on a few different occasions over
4  the past maybe five years.
5    Q    (By Mr. Ruiz)  Has she worked on other claims
6  besides the McNae claims?
7        MR. MULLALY:  Object and instruct --
8        (Crosstalk)
9        MR. RUIZ:  It's just a yes-or-no question.
10        MR. MULLALY:  Exactly.
11    Q    (By Mr. Ruiz)  Just a yes-or-no question.
12  Has Mary Jo Hudson worked on any claims besides the
13  McNae claims?
14    A.   No.
15    Q.   Is Ms. Hudson currently retained by ARAG on
16  anything having -- not having to do with the McNae
17  claims?  Again, just yes or no.
18    A.   No.
19    Q.   And whoever reads this transcript, I'm not
20  trying to be rude by boxing you into "yes" or "no."  I'm
21  just trying to keep us safe from delving into privileged
22  communications.
23        Understood?
24    A.   Yes.
25    Q.   If you ever want to elaborate on any of your

Page 68

1  answers, I think you know you can just ask me and I'll
2  always let you.  All right?
3    A.   (Witness nods head.)
4    Q.   Okay?
5    A.   Yes.
6    Q.   Mr. Mullaly might not like it, but I'll be
7  fine with it.
8        All right.  So describe fully what Ms. Hudson
9  did with respect to the handling of the McNae claims.
10        MR. MULLALY:  And again, I'll just object and
11  instruct the witness not to reveal any privileged or
12  work product material in responding.
13    A.   Really just communication.  And then
14  providing some facts about the court file, docket, were
15  the only...
16    Q.   (By Mr. Ruiz)  Say that again.  What was --
17    A.   Drafting --
18    Q.   -- the first one?
19    A.   Drafting of communication.
20    Q.   And then getting information from the court
21  file, which court file?
22    A.   I think I really mean docket.
23    Q.   That's fine.  That's what I thought you
24  meant.  But docket from Florida or docket from
25  Washington?

                                    17 (Pages 65 to 68)

McNae v. ARAG Insurance Company                    30(b)(6) Ann Cosimano

---

Page 69

1    A.   Florida.
2    Q.   When did -- I think you've already answered
3  this, and it's just I want to make sure -- sometimes I
4  forget.
5         When did Ms. Hudson start interacting with
6  the McNae insurance claim?  When's the first time she
7  heard of it?
8         MR. MULLALY:  Object to form.
9         You can answer.
10   A.   All I can say with confidence is it was after
11 November 20th.
12   Q    (By Mr. Ruiz)  So she didn't have anything to
13 do with a decision to terminate the attorneys; true?
14   A.   True.
15   Q.   In the docket she provided you, the docket
16 information her office provided you were from the
17 Florida cases.  Do you know if it was the federal, the
18 state, or both?
19   A.   I believe that was the federal.  I'm not sure
20 the state case had -- had a case number yet at that
21 time.
22   Q.   What specific documents did Ms. Hudson assist
23 with?  Just the names, again.  We'll have to be careful
24 about what I dive into, but right now I'm just looking
25 for names or documents or types of documents.

---

Page 70

1    A.   It was assistance -- after she had provided
2  some guidance and we made our determination, she
3  assisted with the drafting of -- I think it was two
4  letters.
5    Q.   Which letters were those?
6    A.   They were in December and they were to the
7  McNaes, but I couldn't give you the specific -- I
8  couldn't give you the dates.
9    Q.   Were you a part of the conversations where
10 she was drafting and sending work product?  And I'm
11 using the word "work product" in the generic sense, not
12 in the Federal Rules of Civil Procedure sense.
13   A.   Can you help me with what you mean by "work
14 product"?
15   Q.   Sure.
16   A.   Do you mean the letters?
17   Q.   Sure.  I haven't gotten to the point of did
18 she draft the letters out of whole cloth or was she
19 suggesting edits, or whatever it may be, but somehow she
20 was communicating information about what should go in
21 documents or not go in documents.  How did that
22 transmission occur?
23   A.   I was involved.
24   Q.   Was it email?
25   A.   Yes.

---

Page 71

1    Q.   You know, sometimes we have experts or
2  consultants who -- they prefer to communicate some other
3  way and, you know, we have to share a screen and we're
4  looking at the documents together and we're having a
5  conversation or we have to fax it over.
6         Anything -- was there any other way of
7  communicating the language besides email in this case?
8         MR. MULLALY:  Object to form.
9         You can answer.
10   A.   We had -- I think we had some phone calls,
11 but I think that drafting of the documents
12 specifically would have been over email.
13   Q    (By Mr. Ruiz)  So what were the two letters
14 about?
15        Was one of them the January 3rd denial?
16        MR. MULLALY:  Object to form.
17   A.   I believe it was.
18   Q    (By Mr. Ruiz)  Was there another one?
19   A.   I can't recall specifically.
20   Q.   There will be an email trail, right, to --
21 somebody in ARAG will know what Ms. Hudson sent over; is
22 that fair?
23   A.   Yes.
24   Q.   Who was the person at ARAG who was working
25 directly with Ms. Hudson?

---

Page 72

1    A.   Me.
2    Q.   Anyone else?
3    A.   No.
4    Q.   And it sounds to me like, as part of that
5  work, Ms. Hudson pulled information from the federal
6  court dockets to get information.
7         Is that true?
8    A.   Yes.  I just don't recall the timing of that.
9  I don't know if that was pre that letter or post that
10 letter.
11   Q.   Pre or post, the emails will tell the story.
12 Agreed?
13   A.   Yeah.  If that part were --
14        MR. MULLALY:  Objection.
15        THE WITNESS:  Sorry.
16   Q    (By Mr. Ruiz)  Or Ms. Hudson will been able
17 to tell us?
18   A.   Right.
19   Q.   True?
20   A.   True.
21   Q.   Because ARAG has the senior paralegals and
22 other folks who can pull dockets if they want to.  They
23 don't need to hire an outside firm to do that.  True?
24        MR. MULLALY:  Object to form and scope.
25        You can answer.

---

BUELL REALTIME REPORTING, LLC
206.287.9066 I 800.846.6989

McNae v. ARAG Insurance Company                                    30(b)(6) Ann Cosimano

Page 73

1    A.  Yes.
2    Q    (By Mr. Ruiz)  So you wouldn't need to hire
3  Ms. Hudson to have access to those documents.  She was
4  getting those because she -- presumably -- you tell
5  me -- to assist her in the work on the McNae claim that
6  she was doing?
7         MR. MULLALY:  Object to form and scope and to
8  the degree it calls for speculation.
9         You can answer.
10   A.  I think I said:  I'm not sure.
11   Q    (By Mr. Ruiz)  Describe the universe of
12 documents, including emails, that exist in which
13 Ms. Hudson was participating in the claim.
14        MR. MULLALY:  Object to form.
15        You can answer.
16   Q    (By Mr. Ruiz)  We've already talked about the
17 emails where she was transmitting language.  Anything
18 else?
19        MR. MULLALY:  Same objection.
20        You can answer.
21   A.  No.  I think that's all.
22   Q    (By Mr. Ruiz)  And again, Ms. Hudson was
23 brought in before this lawsuit was filed; true?
24        MR. MULLALY:  Object to form and scope.
25        You can answer.

Page 74

1    A.  I believe that's true.
2    Q    (By Mr. Ruiz)  Who decided to reach out to
3  Ms. Hudson to help on the McNae claim?
4         MR. MULLALY:  Object to form.  Object --
5  that's all.
6         You can answer.
7    A.  I believe I was talking to her on a different
8  issue and it was one then that it was, you know, hey, I
9  have another thing, could I chat with you about.
10   Q    (By Mr. Ruiz)  What was the other issue?
11   A.  I was trying to remember that.
12        MR. MULLALY:  I object to scope and instruct
13 the witness not to divulge any attorney-client privilege
14 or work product information.
15        To the extent you can answer without doing
16 so, please do.
17   A.  I can't remember anyway.  I don't recall
18 exactly what it was.
19   Q    (By Mr. Ruiz)  So sounds to me that you don't
20 remember the exact order of the work that Ms. Hudson
21 did, but she did the two things:  contribute language or
22 draft language on letters and pull information from the
23 federal dockets.
24        Anything else?
25        MR. MULLALY:  Object to form.

Page 75

1         You can answer.
2    A.  Yeah.  Those both came after giving coverage
3  opinion and legal assessment.  But yes.
4    Q    (By Mr. Ruiz)  So if I'm right, you don't
5  remember the exact order that that happened.  Is that
6  true?
7    A.  That's true.
8         MR. MULLALY:  Object to form.
9         (Crosstalk)
10   A.  No.  No.
11        Hold on.  Let me...
12   Q    (By Mr. Ruiz)  Oh, yes, this is a great
13 opportunity -- fix what I said, please.
14   A.  Okay, yes, because I'm just kind of realizing
15 in my mind what you said.
16        I do know that the request for assistance on
17 coverage was first.  I do know that it was initially a,
18 hey, I, you know, would like your legal advice and
19 opinion.
20        And then after taking that, after considering
21 that, ARAG came back and asked for assistance in
22 communication.
23   Q    So that's a two-step timeline.  Where in
24 there do you remember the PACER search?
25   A.  After.

Page 76

1    Q    After both of those?
2    A.  (Witness nods head.)
3    Q    But again --
4    A.  Yeah, I don't know if it was PACER.  I don't
5  know how.  I don't know.  All I recall is talking about
6  the status of the attorneys and whether or not they were
7  still associated with the case.
8    Q    Let's move on to Michael Mullaly.  And the
9  reason I ask is because, as you know, in ARAG's
10 discovery responses, Mr. Mullaly is identified together
11 with Ms. Hudson as someone who did work on the claim.
12        And so Mr. Mullaly is also from Squire Patton
13 Boggs U.S., LLP.  Right?
14   A.  Yes.
15   Q    And he -- it says here that he drafted the
16 reservation of rights letter issued on February 9th,
17 2024.
18        Is that true?
19   A.  Yes.
20   Q    It says here that he's corresponded with
21 plaintiffs' counsel in this action.  That would be me
22 and Mr. Fadduol.
23        Is that true?
24   A.  Yes.
25   Q    And also that he's corresponded with Richard

McNae v. ARAG Insurance Company                    30(b)(6) Ann Cosimano

Page 77

1  Gomez, who is currently counsel for each of the McNaes.
2  True?
3      A.  Yes.
4      Q.  Had you worked with Mr. Mullaly --
5      MR. RUIZ:  Michael, can I ask you, is it
6  Mullaly or Mullaly?  I owe you the same respect.  You
7  tell me.
8      MR. MULLALY:  Oh, thanks, Isaac.  Mullaly.
9  Thank you.
10     MR. RUIZ:  Oh, I got it.  I had been doing it
11 right.  Whew.  That could have been embarrassing.
12     MR. MULLALY:  No.
13     Q   (By Mr. Ruiz)  Had you worked with
14 Mr. Mullaly before the McNae claim?
15     A.  No.
16     Q.  And is the McNae claim the only claim you've
17 ever worked on with Mr. Mullaly?
18     A.  Yes.
19     Q.  And I know you -- we're really threading the
20 needle now, Ms. Cosimano, because I know you met with
21 Mr. Mullaly twice last week in preparation for today's
22 deposition.  And so we're going to have to focus on any
23 facts that Mr. Mullaly provided to you regarding his
24 role as described in the discovery responses, but leave
25 out, for now, advice that he was giving you in this

Page 78

1  litigation.
2      Can we thread that needle or try to?
3      A.  Yes, try to.  Yes.
4      Q.  All right.  So tell me, just focus on the
5  facts, what facts did Mr. Mullaly give you, if any --
6  maybe he didn't give you any -- regarding his
7  participation in the claim?
8      MR. MULLALY:  I'll just object on privilege
9  grounds for the record, but as long as you follow
10 Isaac's instructions, we'll be fine.
11     Thanks, Ann.
12     Thanks, Isaac.
13     A.  So my recollection is that for the -- at the
14 end of January/beginning of February time frame, we had
15 met to get an opinion on the state claim from
16 Mr. Mullaly and then, you know, advised of other legal
17 issues surrounding that, and that after considering that
18 opinion, we had asked for his assistance in drafting
19 that communication.
20     Q.  (By Mr. Ruiz)  Anything else?
21     A.  The communication with Mr. Gomez was around
22 negotiation of the fee that ARAG would pay.  We had
23 already contracted with Mr. Gomez for representation of
24 Mrs. McNae in the federal case, and there was, I
25 believe, just some communication about that.  And then

Page 79

1  we ended up just directly resolving that with Mr. Gomez
2  through a similar amendment to his network attorney work
3  to what we had done for Mrs. McNae.
4      Q.  Did Mr. Mullaly have anything to do with that
5  negotiation?
6      MR. MULLALY:  Object to form.
7      You can answer.
8      A.  Very limited.  I think he had proposed one --
9  like the terms, and then just -- I just directly
10 contacted Mr. Gomez.
11     It was very short.  Very limited, I guess I
12 will say.
13     Q.  (By Mr. Ruiz)  Anything else Mr. Mullaly did
14 on the McNae claims?
15     MR. MULLALY:  Object to form.
16     You can answer.
17     A.  That's all I recall.
18     Q.  (By Mr. Ruiz)  We know Mr. Mullaly is
19 involved in the litigation, because he's here and --
20     A.  Right.
21     Q.  -- we've worked with him.
22     Does he have continuing involvement in the
23 claims handling?
24     A.  No.
25     Q.  That has stopped?

Page 80

1      A.  Yes.
2      Q.  So let's see if I can get a timeline.  I
3  think you've kind of given me one, but I'm not sure that
4  it intended as a guideline.
5      Let me back up.
6      What was the first action that Mr. Mullaly
7  took on the McNae claims?  The first thing.
8      A.  Providing coverage advice and opinion.
9      Q.  And did you say that was late January/early
10 February?
11     A.  Yes.
12     Q.  Did Mr. Mullaly deliver a coverage opinion to
13 ARAG?
14     A.  Yes.
15     Q.  And then what was the second thing that he
16 did?
17     A.  After ARAG took into account his opinion, we
18 asked for him to draft communication.
19     Q.  Consistent with his coverage opinion?
20     MR. MULLALY:  Object on the grounds of
21 privilege.
22     If you can answer without divulging attorney-
23 client privilege or work product, you can.
24     A.  Yeah, I don't know how consistent it ended up
25 being.

20 (Pages 77 to 80)

McNae v. ARAG Insurance Company                                30(b)(6) Ann Cosimano

---

Page 81

1    Q.    (By Mr. Ruiz)  What was the third thing that
2    Mr. Mullaly did on the claim?
3    A.    The communication with Mr. Gomez.
4    Q.    Is that the last thing that Mr. Mullaly did
5    on the claim?
6    A.    I believe so.
7    Q.    Based on the timeline, it doesn't sound like
8    Mr. Mullaly had anything to do with the decision to
9    terminate the attorneys on November 20th, 2023.
10        Is that true?
11   A.    That's true.
12   Q.    What documents, including emails, exist in
13   which Mr. Mullaly was participating in the claims
14   handling as you've described it?
15   A.    I believe there was email draft.
16   Q.    There should have been emails relating to the
17   coverage opinion; true?
18        MR. MULLALY:  Object to form and scope.
19        You can answer if you can respond without
20   divulging privileged information.
21   Q.    (By Mr. Ruiz)  Let's treat this as a yes or
22   no, with all due respect.  So as a yes-or-no question,
23   will there be emails at ARAG in which Mr. Mullaly is
24   communicating a coverage opinion, such as by attaching a
25   letter or maybe in the body of the email?

---

Page 82

1    A.    I don't recall if it was written or verbal.
2    Q.    And then if it was verbal -- and I understand
3    that you don't recall -- is there any record of what the
4    coverage opinion was?
5         MR. MULLALY:  Object to form and scope.
6         You can answer.
7    A.    If it was verbal, no.
8    Q.    (By Mr. Ruiz)  Would you have written down
9    some notes?
10        MR. MULLALY:  Object to form and scope.
11        If you can answer, you can.
12   A.    Not that I recall.
13   Q.    (By Mr. Ruiz)  Did you receive the coverage
14   opinion?
15   A.    Yes.
16   Q.    I'm not -- right now, I am not asking you to
17   tell it to me, but if I could -- if I did ask you to
18   describe what the coverage opinion was, would you be
19   able to do it?
20   A.    To a degree, to the best of my recollection.
21   Q.    Did anyone else receive the coverage opinion
22   from Mr. Mullaly?  Again, just a yes-or-no question.
23   A.    I don't recall if there was anybody else.
24        If it was written, no.  If it was verbal, I
25   can't recall if there was somebody else on the call.

---

Page 83

1    Q.    And you don't remember --
2    A.    And I should specify:  from ARAG.
3    Q.    Understood.
4         But you don't remember receiving a written
5    coverage opinion, at least as you sit here right now?  I
6    just want to be --
7    A.    As I sit here right now, I can't say with
8    confidence.
9    Q.    And if it was verbal, you don't remember
10   writing it down anywhere; correct?
11        MR. MULLALY:  Object to scope.
12        You can answer.
13   A.    Correct.
14   Q.    (By Mr. Ruiz)  But if I asked you right now,
15   you would be able, to a degree, to describe what the
16   coverage opinion was.  True?
17        MR. MULLALY:  Object to scope.
18        You can answer.
19   A.    To an extent.
20   Q.    (By Mr. Ruiz)  Well, I'm going to ask the
21   question and I going to let Mr. Mullaly make his
22   record, if he wants.
23        What was the coverage opinion that
24   Mr. Mullaly gave you?
25        MR. MULLALY:  I object on the grounds of

---

Page 84

1    attorney-client privilege and work product.
2         If you can respond to the question without
3    revealing attorney-client privilege or work product
4    material, please answer.
5    A.    I don't think I could respond without doing
6    that.
7    Q.    (By Mr. Ruiz)  Did ARAG think that
8    Mr. Mullaly's coverage opinion was well-reasoned?
9         MR. MULLALY:  Same objections.
10   Q.    (By Mr. Ruiz)  I'm only asking what ARAG --
11   how ARAG received it.
12   A.    Yes.
13   Q.    Did you communicate the coverage opinion to
14   anybody else at ARAG?
15   A.    Not the coverage opinion, no.
16   Q.    Now, what information -- just, again, bullet
17   points, because I'm trying to stay -- I don't want -- I
18   don't want to end up in front of a judge quite yet.  So
19   just bullet points.
20        What information did you provide to
21   Mr. Mullaly to rely upon in crafting whatever that
22   coverage opinion was?
23        MR. MULLALY:  I object on the grounds of
24   privilege and work product.  To the extent -- I'm not
25   objecting to conveyance of factual information but to

---

21 (Pages 81 to 84)

McNae v. ARAG Insurance Company                    30(b)(6) Ann Cosimano

Page 85

1  conveyance of the accumulation of facts as done by
2  counsel, whether it be Ann or myself.
3        So if you can answer, Ann, without revealing
4  attorney-client or work product material, please do.  If
5  it requires revealing those things, please don't.
6        MR. RUIZ:  Yeah.
7     A.   I think the one thing that I could share
8  without doing that would be that we provided the
9  UltimateAdvisor certificate of insurance.
10    Q.   (By Mr. Ruiz)  Did you provide anything else?
11    A.   No.
12    Q.   Well, you must have provided the Complaint
13 from the Florida state court case.  Right?
14    A.   I can't recall that I did.
15    Q.   Any other -- besides -- strike that.
16        Besides the UltimateAdvisor certificate of
17 coverage, do you have recollection of ARAG providing
18 Mr. Mullaly with any other facts?
19        MR. MULLALY:  Same objection.
20        You can answer.
21    Q.   (By Mr. Ruiz)  At the time it was requesting
22 the coverage opinion.
23    A.   I don't.
24    Q.   And you don't remember -- and you don't think
25 that you communicated the coverage opinion to anyone

Page 86

1  else within ARAG?
2     A.   Not the coverage opinion.
3     Q.   Did you convey it to anyone in the claims
4  department?
5     A.   I wouldn't have conveyed the coverage
6  opinion.
7     Q.   How about to Mr. Murray?
8     A.   No.
9     Q.   So no one else within ARAG?
10    A.   Not the coverage -- not the coverage opinion.
11    Q.   Who made the decision to ask Mr. Mullaly to
12 assist in drafting the communication after receiving the
13 coverage opinion?
14    A.   I did.
15    Q.   Did anyone else contribute to that decision?
16    A.   No.
17    Q.   Did anyone at ARAG review that communication
18 before it went out to the McNaes?
19    A.   Yes.
20    Q.   Who?
21    A.   It was myself as well as Jeff LeMay.
22    Q.   Anyone else?
23    A.   No.
24    Q.   So who were the people inside of ARAG who
25 were involved in dealing with Mr. Gomez at the time that

Page 87

1  he was under consideration for being retained by the
2  McNaes?
3        MR. MULLALY:  Object to form.
4        You can answer.
5     A.   I know I was.  And I'm trying to think if
6  there was anyone else.
7        I believe there was one other -- Brittany
8  Gering, I believe, also had communicated with him.  And
9  then Mike.
10    Q.   (By Mr. Ruiz)  Mr. Mullaly?
11    A.   Mullaly.  Sorry.
12    Q.   That's okay.
13        What was the very last action that
14 Mr. Mullaly took on the McNae claims?  Was it the
15 communications with Mr. Gomez?
16    A.   Yes.
17    Q.   Did Mr. Mullaly have anything to do with the
18 final decision of what agreement ARAG entered into with
19 Mr. Gomez?
20    A.   No.
21    Q.   Does Mr. Mullaly have any continuing role
22 relating to the McNaes' claims, at least as far as
23 claims handling is concerned?
24    A.   No.
25    Q.   Is there any other outside party who has been

Page 88

1  involved in the McNae claims handling other than the
2  ones we've talked about today?
3     A.   No.
4        I said that quickly and then I remembered
5  there was one person copied on email, but I don't think
6  she ended up having ultimate involvement.
7     Q.   Do you remember who?
8     A.   Jian Xu.
9     Q.   Was she at Squire Boggs also?
10    A.   Yeah.  I think she ended up being involved.
11 I think she was just somebody that maybe was considering
12 at the beginning.
13    Q.   Is Ms. Xu -- have you ever worked with her
14 before?
15    A.   Yes.
16    Q.   But you don't remember her having anything to
17 do with the actual claims handling in the McNae claim?
18    A.   No.
19    Q.   What kinds of things have you worked with
20 Ms. Xu on?
21    A.   She represented one --
22        MR. MULLALY:  Object to scope.
23        I'm sorry.
24        And just caution you, Ann, not to reveal any
25 attorney-client or work product material.  You may

22  (Pages 85 to 88)

McNae v. ARAG Insurance Company                          30(b)(6) Ann Cosimano

Page 89

1   answer otherwise.
2       Q    (By Mr. Ruiz)  Bullet points.  Give us bullet
3   points without delving into substance.
4       A.   She represented an ARAG member on a very
5   complicated cyber -- it was a Bitcoin -- a Bitcoin case.
6       Q.   Anything else?
7       A.   Yeah.  There's one other case --
8       MR. MULLALY:  Same objections.
9       THE WITNESS:  Yeah.
10      MR. MULLALY:  You can answer.
11      A.   -- that's an attorney case that she's
12  assisting us with in California.
13      Q    (By Mr. Ruiz)  Anything else?
14      MR. MULLALY:  Same objections.
15      You can answer.
16      A.   I think that's all.
17      Q    (By Mr. Ruiz)  Okay.  Before we take a lunch
18  break, I want to ask you about this one concept that
19  I've been thinking about.
20      You're familiar with the insurance product
21  that's called liability insurance; right?  You know what
22  that is?
23      MR. MULLALY:  Object to form and scope.
24      You can answer.
25      A.   Yes.

Page 90

1       Q    (By Mr. Ruiz)  And in liability insurance
2   policies, there's often two kinds of benefits.
3       One is the benefit for if there's a judgment
4   that's entered against you.  Right?  And the insurance
5   company may pay for all or part of the judgment,
6   depending on what the policy terms are on one hand.
7       And then other than, there's the defense
8   benefit, which is that the insurance company may pay for
9   defending you in the case within the constraints of what
10  the policy is.
11      Correct?
12      MR. MULLALY:  Object to form and scope.
13      You can answer.
14      A.   Yes.
15      Q    (By Mr. Ruiz)  Now, are there any documents
16  at ARAG that describe the differences between a typical
17  liability insurance policy on one hand and a legal
18  services policy like what ARAG sells?
19      MR. MULLALY:  Object to form and scope.
20      You can answer.
21      A.   I don't -- I don't know.
22      Q    (By Mr. Ruiz)  Are there any documents at
23  ARAG that address whether the -- well, strike that.
24      MR. RUIZ:  Why don't we go off the record.
25      THE VIDEOGRAPHER:  Going off the record.  The

Page 91

1   time now is approximately 11:39 a.m.
2       (Recess 11:39 a.m. to 12:10 p.m.)
3       THE VIDEOGRAPHER:  Back on the record.  The
4   time now is approximately 12:10 p.m.
5       Q    (By Mr. Ruiz)  Let's talk about network
6   attorneys.
7       I've uploaded the next exhibit into the chat.
8   This is what it looks like.
9       MR. RUIZ:  Please mark this Exhibit No. 2.
10      (Exhibit No. 2 introduced.)
11      Q    (By Mr. Ruiz)  This is an illustrative
12  exhibit that I put together to keep us organized.  It's
13  a list of four topics.
14      Let's see.
15      I'm going to type in a new one.  And then
16  when we're done here with this line of questions, I'll
17  upload the newest version into the chat.
18      Let's start with number 1.  What written
19  policies, procedures, or protocols exist at ARAG
20  regarding determining how ARAG selects and compensates
21  attorneys to represent ARAG insureds?
22      A.   Network development has a policy and
23  protocol -- or would I call it an SOP?  It probably
24  would be an SOP for recruiting network attorneys.
25      Q.   Does SOP standard for standard of practice?

Page 92

1       A.   Standard operating procedures.
2       Q.   So there's a group within ARAG called network
3   development; correct?
4       A.   Yes.
5       Q.   Is that a division?  A department?  Something
6   else?
7       A.   Department.
8       Q.   The network development department has
9   standard operating procedures that relate to determining
10  how ARAG selects and compensates attorneys to represent
11  ARAG insureds?
12      A.   And I'll state specifically network
13  attorneys.
14      Q.   Can you repeat that?  I'm sorry.
15      A.   Yeah.  Specific to network attorneys.
16      Q.   Any other written policies, procedures, or
17  protocols on that subject?
18      A.   In the broader way that you have it written
19  here where it says ARAG insureds, I think there would
20  also be case coordination.  And so that would be when
21  we're finding non-network attorneys to represent ARAG
22  members.
23      Q.   Are there any written policies, procedures,
24  or protocols that apply to case coordination in doing
25  that?

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

McNae v. ARAG Insurance Company                    30(b)(6) Ann Cosimano

Page 93

1     A.   Yes.
2     Q.   What are those called?
3     A.   Ooh.  I know they are in the documents that
4  were produced, but I can't remember the title.
5     Q.   What about the SOP?  Is that in the documents
6  that were produced?
7     A.   I'm not sure the network attorney were
8  produced, since these two attorneys were not -- they
9  didn't come to us in that manner.
10    Q.   This is going to sound like an obvious
11  question, but you were here on Friday when I gave my --
12  said a few words about why I asked a few questions that
13  seem obvious?  I don't want to be rude.  I just want to
14  make sure a few things are in the record.
15         Okay?
16    A.   Okay.
17    Q.   But before an attorney becomes a network
18  attorney, they're just an attorney and -- who is not a
19  network attorney.  Fair?
20    A.   Yes.
21    Q.   And then a network attorney, after they stop
22  being network attorneys, again, they're non-network
23  attorneys.  Correct?
24    A.   Yes.
25    Q.   The lifecycle of a network attorney is that

Page 94

1  at some point they were an attorney who was a non -- not
2  a network attorney who became a network attorney, until
3  they're no longer a network attorney and they just go
4  back to being a regular attorney.
5         Fair?
6     A.   Yes.
7     Q.   Any other written policies, procedures, or
8  protocols at ARAG regarding determining how ARAG selects
9  and compensates attorneys to represent ARAG insureds?
10    A.   Not that I'm aware of.
11    Q.   Now, had the policies, procedures, or
12  protocols at ARAG regarding determining how ARAG selects
13  and compensates attorneys to represent ARAG insureds
14  changed at all in the last three years?
15    A.   I don't know.
16    Q.   What about the last five years?
17    A.   I don't know.
18    Q.   Are there any not-written policies,
19  procedures, or protocols regarding determining how ARAG
20  selects and compensates attorneys to represent ARAG
21  insureds?
22         MR. MULLALY:  Object to form.
23         You can answer.
24    A.   I don't know.
25    Q.   (By Mr. Ruiz) Can you think of any?

Page 95

1         MR. MULLALY:  Same objection.
2         You can answer.
3     A.   No.
4     Q.   (By Mr. Ruiz) And I'm talking about things
5  that sometimes folks will refer to as the unwritten
6  rules of this or that.
7         Are there any unwritten rules regarding
8  determining how ARAG selects and compensates attorneys
9  to represent ARAG insureds, that you know of?
10         MR. MULLALY:  Object to form.
11         You can answer.
12    A.   Not that I'm aware of.
13    Q.   (By Mr. Ruiz) And what training does ARAG
14  provide its employees relating to determining how
15  ARAG -- strike that.
16         What training does ARAG provide its employees
17  regarding selecting and compensating attorneys to
18  represent ARAG insureds?
19    A.   For the teams that are involved in that, they
20  have ongoing training on like where -- how do we
21  identify where gaps are in our network, how -- what are
22  recruiting standards, what campaigns do they have going
23  on, how do they have conversations with attorneys to
24  help them understand the value of joining the network.
25         And I'd say those are -- those are

Page 96

1  continuous.
2     Q.   Who's in charge of that training?
3     A.   Jackie Bruce.
4     Q.   Do you know if there are written training
5  materials?
6         MR. MULLALY:  Object to scope.
7         You can answer.
8     A.   I'm going to say I don't know.  I haven't --
9  yes, I don't know.
10    Q.   (By Mr. Ruiz) Let's look at number 2.  What
11  written policies, procedures, or protocols exist at ARAG
12  regarding determining when and how ARAG terminates
13  network attorneys?
14         MR. MULLALY:  Objection to form.
15         You can answer.
16    A.   There are some -- there is a procedure for
17  SIU, it's called here.  If there's attorneys, they want
18  them to explore -- it can be education or termination.
19    Q.   (By Mr. Ruiz) Anything else?
20    A.   I'd say that's different from network
21  attorneys that are on the network that accept our normal
22  fee schedule versus the attorneys who accept one
23  specific case.  That is different, and they don't
24  generally undergo that same process because they're not
25  a member of the network that is accepting regular

24 (Pages 93 to 96)

McNae v. ARAG Insurance Company                                30(b)(6) Ann Cosimano

Page 97

1   referrals where a member could approach them directly.
2        Q.   So what is the difference between how ARAG
3   handles termination or potential termination of one
4   class of attorney versus the other?
5            MR. MULLALY:  Object.  Scope.
6            You can answer.
7        A.   So it's much like the nature of the contracts
8   themselves and -- and the methods of recruiting, the --
9   when we're recruiting an attorney that's going to handle
10  multiple cases, then they -- they're even trained
11  differently, because they have to learn our claims
12  system.  And so they go through more of a process, where
13  those that you're hiring on a case-by-case basis, it's
14  more individualized.  It doesn't go in front of a
15  committee.
16       Q.   (By Mr. Ruiz)  SIU stands for special
17  investigations unit?
18       A.   Yes.
19       Q.   ARAG has one of those?
20       A.   Yes.
21           MR. MULLALY:  Object to scope.
22       Q.   (By Mr. Ruiz)  And this is the first time
23  I've ever dealt with ARAG, but for other insurance
24  companies' special investigations units, one of the
25  things that they investigate is fraud or potential

Page 98

1   fraud.
2            Do you agree?
3            MR. MULLALY:  Same objection.
4            You can answer.
5        A.   Yes.
6        Q.   (By Mr. Ruiz)  Is that also the case at ARAG?
7            MR. MULLALY:  Same objection.
8            You can answer.
9        A.   Yes.
10       Q.   (By Mr. Ruiz)  Was an SIU investigation ever
11  commenced relating to the McNaes or their attorneys?
12           MR. MULLALY:  Objection.  Scope.
13           You can answer.
14       A.   No.
15       Q.   (By Mr. Ruiz)  What documents exist at ARAG
16  that describe its SIU process?
17           MR. MULLALY:  Objection.  Scope.
18           You can answer if you have knowledge.
19       A.   We have a process document that describes the
20  committee members and meetings and essentially the
21  process.
22       Q.   (By Mr. Ruiz)  Are you a member of the
23  committee, the SIU committee?
24           MR. MULLALY:  Objection.  Scope.
25           You can answer.

Page 99

1        A.   No.
2        Q.   (By Mr. Ruiz)  Who is?
3            MR. MULLALY:  Same objection.
4        A.   I know it's a cross-represent -- like a
5   cross-functional team with representatives from customer
6   care, provider relations, claims, audit.
7        Q.   (By Mr. Ruiz)  On November 19th, 2023, were
8   Ms. Casey and Ms. Fotiu-Wojtowicz network attorneys?
9            MR. MULLALY:  Object to scope and form.
10           You can answer.
11       A.   I'd say under the certificate of insurance,
12  yes.
13       Q.   (By Mr. Ruiz)  Are there any written
14  policies, procedures, or protocols at ARAG regarding
15  termination that applied to Ms. -- well, that applied
16  to attorneys like what Ms. Casey were and
17  Ms. Fotiu-Wojtowicz were on November 19th, 2023?
18           MR. MULLALY:  Same objections.
19           You can answer.
20       A.   I don't believe so.
21       Q.   (By Mr. Ruiz)  Are there now any?
22           MR. MULLALY:  Same objections.
23           You can answer.
24       A.   I don't believe so.
25       Q.   (By Mr. Ruiz)  Are any under development?

Page 100

1            MR. MULLALY:  Same objections.
2            You can answer.
3        A.   Not that I'm aware of.
4        Q.   (By Mr. Ruiz)  Did ARAG attempt to follow
5   some other procedure --
6            MR. MULLALY:  Object --
7        Q.   (By Mr. Ruiz)  -- that's written down
8   somewhere for the termination of Ms. Casey and
9   Ms. Fotiu-Wojtowicz?
10           MR. MULLALY:  Object to form and scope.
11           You can answer.
12       A.   I don't know.
13       Q.   (By Mr. Ruiz)  All right.  So are there any
14  other documents, besides what you've described, at ARAG
15  relating to the determination of when and how ARAG
16  terminates network attorneys?
17           MR. MULLALY:  Same objections.
18       A.   Not that I'm aware of.
19       Q.   (By Mr. Ruiz)  Are there any unwritten
20  rules --
21           (Crosstalk)
22           MR. MULLALY:  Same objection.
23           Sorry, Isaac.
24           MR. RUIZ:  It's okay.
25       Q.   (By Mr. Ruiz)  Are there any unwritten rules

25  (Pages 97 to 100)

McNae v. ARAG Insurance Company                    30(b)(6) Ann Cosimano

Page 101

1    at ARAG for determining when and how ARAG terminates
2    network attorneys?
3         MR. MULLALY:  Same objections.
4         A.    I think "rule" is a hard word.
5         I would say use of the word "rules" is giving
6    me pause.
7         Q.    (By Mr. Ruiz)  Why?
8         A.    Because it sounds like --
9         MR. MULLALY:  Object to form.
10        Go ahead, Ann.
11        A.    Because it sounds like something you apply
12   the same every single -- like unilaterally.
13        Q.    (By Mr. Ruiz)  You mean consistently?
14        A.    Yeah.
15        Q.    Well, that's how I mean it.
16        So are there -- I mean -- or let me ask it --
17   so let me ask it with that understanding.  Are there any
18   unwritten rules regarding determining when and how ARAG
19   terminates network attorneys?
20        MR. MULLALY:  Object to scope.
21        You can answer.
22        A.    I would say there are definite things that
23   are looked at in making that determination.  There are
24   guides.  They would be -- they might differ from
25   circumstance to circumstance, but there are definite

Page 102

1    things that will be considered.
2         Q.    (By Mr. Ruiz)  And these are unwritten?
3         MR. MULLALY:  Object to scope.
4         You can answer.
5         A.    I'm -- I'm not sure.
6         Q.    (By Mr. Ruiz)  My question was just about
7    unwritten.  Are there any unwritten rules for when and
8    how ARAG terminates network attorneys?
9         MR. MULLALY:  Objection to scope.
10        You can answer.
11        A.    I'm not sure if they're written somewhere.
12        Q.    (By Mr. Ruiz)  So if there are unwritten
13   rules, who at ARAG knows them?
14        MR. MULLALY:  Objection to form and scope.
15        You can answer.
16        A.    It would be those people that are entering
17   into the agreements with the attorneys, in that
18   function.
19        Q.    (By Mr. Ruiz)  Are the unwritten rules ever
20   communicated to the attorneys?
21        MR. MULLALY:  Objection to form and scope.
22        You can answer.
23        A.    I don't know.
24        Q.    (By Mr. Ruiz)  Are the unwritten rules ever
25   communicated to the insureds?

Page 103

1         MR. MULLALY:  Same objections.
2         You can answer.
3         A.    I don't know.
4         Q.    (By Mr. Ruiz)  Now, are there any -- let's
5    talk about a different kind of rule, a rule that you
6    don't apply consistently, maybe a rule that you'll just
7    apply sometimes yes, sometimes no.
8         Are there those kinds of rules for
9    determining when and how ARAG terminates network
10   attorneys that are not applied consistently across the
11   board?
12        MR. MULLALY:  Same objections.
13        A.    It's not that the rule wouldn't be applied
14   consist -- it's that the circumstances would be
15   different.  So the circumstances would make it so that
16   sometimes it's not relevant.
17        Q.    (By Mr. Ruiz)  And we're talking about
18   unwritten things; yes?
19        A.    I think both.
20        Q.    Is there a list at ARAG that lays out factors
21   to consider when deciding whether to terminate a network
22   attorney?
23        These are factors -- for example, on one side
24   factors that weigh in favor of termination, to be
25   weighed against factors that weigh against termination,

Page 104

1    is there anything like that at ARAG?
2         A.    I believe there's guide -- like a -- in the
3    SIU process, I think there are things.
4         Q.    Things that you weigh to make a determination
5    against each other?
6         MR. MULLALY:  Same objections.
7         A.    Yes.
8         Q.    (By Mr. Ruiz)  Now, besides the McNaes, have
9    there ever been any ARAG insureds whose attorneys,
10   network attorneys, were fired or terminated in the
11   middle of a legal case?
12        MR. MULLALY:  Same objections.
13        You can answer.
14        A.    I don't know.
15        Q.    (By Mr. Ruiz)  Who would know at ARAG?
16        MR. MULLALY:  Same objection.
17        A.    Meagen Adams would likely know.
18        Q.    (By Mr. Ruiz)  All right.  I asked her and
19   she didn't know either.  She couldn't remember.
20        Are there any documents at ARAG that
21   specifically address termination of a network attorney
22   during an active representation of an ARAG insured?
23        MR. MULLALY:  Objection to scope.
24        You can answer.
25        A.    I don't know.

McNae v. ARAG Insurance Company                              30(b)(6) Ann Cosimano

Page 105

1   Q   (By Mr. Ruiz)  Who would know?
2        MR. MULLALY:  Same objection.
3   A.   Meagen Adams.
4   Q   (By Mr. Ruiz)  Was it you who made the
5   determination to terminate the attorneys?
6        MR. MULLALY:  Same objection.
7   A.   No.
8   Q   (By Mr. Ruiz)  Who made the determination?
9        MR. MULLALY:  Same objection.
10  A.   I'd say it was more of a collaborative, like,
11  discussion and determination.
12  Q   (By Mr. Ruiz)  Okay.  Consensus?
13  A.   Yes.
14  Q.   All right.  Well, we know Ms. Adams wasn't
15  involved.  At least that's what she said.
16       Correct?
17       MR. MULLALY:  Object to form.
18       You can answer.
19  A.   Yes.
20  Q   (By Mr. Ruiz)  So please give the names of
21  every person in the consensus group that decided to do
22  the terminations,
23       MR. MULLALY:  Object to form.
24       You can answer.
25  A.   Jeff LeMay was involved.  Jen Beck.

Page 106

1        And that's probably for the termination
2   determination.
3   Q   (By Mr. Ruiz)  And you?
4   A.   And me.  I was involved in the discussion.
5   Q.   So those are the three, but were you part of
6   the consensus group?
7        MR. MULLALY:  Object.  Scope.
8        You can answer.
9   A.   I was -- I was in the discussion.
10  Q   (By Mr. Ruiz)  Right.  But who ultimately
11  made the decision?
12       MR. MULLALY:  Same objection.
13  A.   I can't say it was any one person.
14  Q   (By Mr. Ruiz)  I don't want to be
15  disrespectful and I don't mean it that way, but was
16  it -- I mean, was there a vote or was it more of a vibe?
17       MR. MULLALY:  Object to form and scope.
18       You can answer.
19  A.   It was really a discussion and then agreement
20  on how to move forward.
21  Q   (By Mr. Ruiz)  There was -- the three of you,
22  all three of you agreed that the terminations would
23  happen?
24       MR. MULLALY:  Same objections.
25  A.   Yes.

Page 107

1   Q   (By Mr. Ruiz)  Is that decision by the three
2   of you recorded anywhere?
3        MR. MULLALY:  Same objections.
4   A.   Not that I'm aware of.  I don't know.
5   Q   (By Mr. Ruiz)  You know, like whenever I meet
6   with a client or anybody, there's usually some follow-up
7   email that says, you know, this will reflect that we met
8   today and discussed 1, 2, and 3.
9        There's nothing like that with respect to the
10  decision to terminate Ms. Casey and Ms. Fotiu-Wojtowicz?
11  A.   I don't know.
12       MR. MULLALY:  Same objection.
13  Q   (By Mr. Ruiz)  You don't remember?
14  A.   Yeah, I don't know.
15  Q.   You agree that the decision to terminate the
16  two attorneys was an important decision to the McNaes?
17       MR. MULLALY:  Objection to form.  Scope.
18  Object to the degree it calls for speculation.
19       You can answer.
20  A.   I -- yes.
21  Q   (By Mr. Ruiz)  It was also important to ARAG;
22  correct?
23       MR. MULLALY:  Same objections.
24  A.   Yes.
25  Q   (By Mr. Ruiz)  And it sounds like there isn't

Page 108

1   a single document at ARAG that records when the decision
2   was made and who made it to terminate the two attorneys.
3        Is that true?
4        MR. MULLALY:  Objection to scope.
5   A.   I think that output of the letter is
6   descriptive of the decision.
7   Q   (By Mr. Ruiz)  Does -- you mean the letter --
8   the identical letters that went out to the two
9   attorneys?
10       MR. MULLALY:  Same objection.
11  A.   Yes.
12  Q   (By Mr. Ruiz)  And -- well, do those -- are
13  those letters honest about the reasons that they were
14  being terminated?
15       MR. MULLALY:  Objection to form and scope.
16  A.   I don't think they were dishonest.
17  Q   (By Mr. Ruiz)  My question's a little bit
18  different.
19       Were those letters -- if you can't answer the
20  question, just let me know and then I'll rephrase.  But
21  were those letters that went out to Ms. Casey and
22  Ms. Fotiu-Wojtowicz on November 20th, 2023, were they
23  honest about the reason that ARAG was terminating them?
24       MR. MULLALY:  Objection to form and scope.
25  A.   I don't know that I can answer that.

27 (Pages 105 to 108)

McNae v. ARAG Insurance Company                                30(b)(6) Ann Cosimano

Page 109

1    Q    (By Mr. Ruiz)  Aside from those letters, is
2  there any other record of the decision within ARAG to
3  terminate the attorneys?
4          MR. MULLALY:  Objection to scope.
5    A.  I don't know.
6    Q    (By Mr. Ruiz)  Okay.  So what I really wanted
7  to ask you was:  When this group was making its
8  consensus decision, could anyone point to a precedent
9  where attorneys were terminated in the middle of
10  litigation involving ARAG insureds?
11          MR. MULLALY:  Objection to form and scope.
12    A.  I'm not sure.
13    Q    (By Mr. Ruiz)  Well, did Mr. LeMay and
14  Ms. Beck have meetings about this without you?
15          MR. MULLALY:  Objection to scope.
16    A.  I don't know.
17    Q    (By Mr. Ruiz)  You never asked them?
18    A.  No.
19    Q.  Okay.  Well, let's get back to my
20  illustrative exhibit.
21          Let's look at number 3.  What written
22  policies, procedures, or protocol exist at ARAG
23  regarding handling complaints by network attorneys
24  regarding compensation for network attorney work?
25    A.  Protocols.  So what procedures?

Page 110

1    Q.  Think of standards, guidelines, things like
2  that.  You know, things that are written down that help
3  people do their work.
4          What policies, procedures, or protocols that
5  are written exist at ARAG regarding how to handle
6  complaints by network attorneys regarding compensation
7  for their work?
8    A.  They would be routed to our attorney
9  relations team.  And that team is trained to help the
10  attorneys -- attorneys aren't required to accept any
11  specific area of law.  So generally if they don't like
12  what they're going to get paid for that area of law,
13  they can drop that area of law and maintain those that
14  the price structure does work for them.
15    Q.  Okay.  But are there any written policies,
16  procedures, or protocols that tell ARAG employees how to
17  handle complaints by network attorneys regarding
18  compensation for their work, if there are complaints?
19    A.  I just know what the process is, but I don't
20  know if it's written.
21    Q.  Are there any unwritten rules, unwritten
22  policies, protocols, or procedures, on that topic?
23    A.  Just, I know what the process is but I don't
24  know if it's written.
25    Q.  Let's move on to number 4.  Are there any

Page 111

1  written policies, procedures, or protocols in existence
2  at ARAG regarding determining what ARAG compensates
3  network attorneys?
4    A.  There is a -- ask the question again.
5    Q.  Sure.
6          Are there any written policies, procedures,
7  or protocols that exist at ARAG regarding determining
8  what ARAG compensates network attorneys?
9    A.  So similar answer.  I know what the process
10  is, but I don't know if it's written.
11    Q.  Describe the process.
12    A.  We have --
13          MR. MULLALY:  Object to form.
14          You can answer.
15    A.  We have a fee schedule committee that meets
16  regularly and we review information that attorneys
17  submit, like claims submission information that includes
18  hours spent for average claims, and then also look at
19  other information, like how much are we paying on
20  exceeds basis for fee schedule cases, and then make
21  recommendations for how to adjust the fee schedule
22  moving forward.
23    Q    (By Mr. Ruiz)  What written policies,
24  procedures, or protocols exist at ARAG regarding
25  determining what fees to pay on behalf of insureds for

Page 112

1  legal representation?
2    A.  I did see in the materials that we submitted,
3  there was, in the case coordination, some information
4  there about establishing contracts.
5    Q.  Anything else?
6    A.  Not that I'm aware of.
7    Q.  Are there any unwritten policies, procedures,
8  or protocols regarding determining what fees to pay on
9  behalf of insureds for legal representation?
10    A.  Not that I'm aware of.
11    Q.  Before the -- I keep calling it the consensus
12  group.  That's the three of you -- Mr. LeMay, Ms. Beck,
13  and you -- who came to the consensus to terminate the
14  two attorneys.  So if I say "consensus group," that's
15  what I mean.  Okay?
16    A.  Okay.
17    Q.  Before the consensus group decided to
18  terminate the two attorneys -- well, strike that.
19          What date did that happen?  When was a
20  decision made by the consensus group?
21          MR. MULLALY:  Object to scope.
22          You can answer.
23    A.  Before November 20th.
24    Q    (By Mr. Ruiz)  You don't know exactly when?
25    A.  Not -- not exact date.

28 (Pages 109 to 112)

McNae v. ARAG Insurance Company                    30(b)(6) Ann Cosimano

Page 113

1    Q.   Are you aware of any document at ARAG that
2  records what day that happened?
3         MR. MULLALY:  Same objection.
4    A.   No.
5    Q    (By Mr. Ruiz)  Did it happen in person?  Did
6  it happen on Teams?  Did it happen some other way?  Did
7  it happen over multiple sessions?
8         MR. MULLALY:  Same objection.
9    A.   My recollection is it was in person.
10   Q    (By Mr. Ruiz)  Did you guys have lunch
11 together?  Did you meet in an office?  How did that
12 happen?
13        MR. MULLALY:  Same objection.
14   Q    (By Mr. Ruiz)  Paint a picture for me,
15 please.
16        MR. MULLALY:  Same objection.
17   A.   It was not lunch together.  It would have --
18 but I don't recall that it was a formal meeting.
19        We're a small office, and so most likely just
20 a gather.  And I'm not even sure it was all in one room
21 at the same time.
22   Q    (By Mr. Ruiz)  Was it an ongoing discussion
23 over multiple sessions, maybe?
24   A.   Yeah, that's -- I'm thinking that's more
25 likely.

Page 114

1    Q.   Did anyone take notes?
2         MR. MULLALY:  Same objection.
3    A.   I -- I don't know.
4    Q    (By Mr. Ruiz)  Did the -- did -- were you
5  guys at a computer looking at documents together?
6         MR. MULLALY:  Same objection.
7    A.   I don't believe so.
8    Q    (By Mr. Ruiz)  Did you print out all of the
9  invoices and case statuses and lay them out on a table
10 so that you all could go through them together?
11        MR. MULLALY:  Object to form and scope.
12        You can answer.
13   Q    (By Mr. Ruiz)  You know what I'm talking
14 about?  Those case --
15   A.   Yeah.
16        (Crosstalk)
17   Q.   -- updates the attorneys submitted?
18        And my question is:  Did you print out those
19 invoices and those case updates and lay them out on the
20 table so that the three of you could go through them
21 together?
22        MR. MULLALY:  Same objection.
23   A.   No.
24   Q    (By Mr. Ruiz)  Of the three of you, which
25 ones of you -- who -- who read those invoices and case

Page 115

1  updates?
2    A.   I think all of us did.
3    Q.   Well, I don't want you to guess.  Were you
4  there when they read theirs?
5    A.   No.
6    Q.   Okay.  So you read them, though?
7    A.   Yes.
8    Q.   And you don't -- you weren't present while
9  they were reading them; correct?
10   A.   No.
11   Q.   Did anyone create any document -- it could be
12 a spreadsheet, a memo, maybe something written on the
13 whiteboard -- that outlined concerns from the invoices
14 and case status updates?
15        MR. MULLALY:  Object to scope.
16        You can answer.
17   A.   I don't know.
18   Q    (By Mr. Ruiz)  Are you aware of anything like
19 that?
20   A.   No.
21        (Mr. Abele enters.)
22   Q.   You know, at the end of a case, the -- and if
23 the prevailing party is entitled to obtain attorney
24 fees, the parties will often engage in litigation in
25 which experts sort of critique invoices and try to call

Page 116

1  out specific duplicative items, work that shouldn't have
2  been performed.
3         Have you ever seen anything like that in your
4  career?
5    A.   I have not.
6    Q.   Now, was there any written analysis of the
7  invoices or the case updates that sought to identify
8  duplicative work or work that should not have been
9  performed?
10        MR. MULLALY:  Object to scope.
11        You can answer.
12   A.   I don't know.
13   Q    (By Mr. Ruiz)  You don't know of any?
14   A.   No.
15   Q.   And did you take evidence class in law
16 school?
17        MR. MULLALY:  Object to scope.
18   A.   Yes.
19   Q    (By Mr. Ruiz)  You know what the attorney-
20 client privilege is; right?
21   A.   Yes.
22   Q.   And the attorney-client privilege -- well,
23 we've been talking about it today.  It means that the
24 communications that you have with your attorney are
25 privileged to the extent you're trying to get legal

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

McNae v. ARAG Insurance Company                                30(b)(6) Ann Cosimano

Page 117

1   advice.
2       Is that your understanding as well?
3   A.  Yes.
4   Q.  But I'm not your attorney, so anything you
5   say to me, unless it's covered by a protective order, I
6   can go blab it wherever I want; right?
7   A.  Yes.
8   Q.  Did Ms. Casey have an attorney-client
9   relationship with Ronda McNae?
10  A.  I don't know.
11  Q.  Did you look into that before you made the
12  decision to terminate Ms. Casey and Ms. Fotiu-Wojtowicz?
13  That specific question of whether Ms. Casey had an
14  attorney-client relationship with Ronda McNae.
15      MR. MULLALY:  Object to scope.
16  A.  No.
17      MR. MULLALY:  You can answer.
18  Q.  (By Mr. Ruiz)  You didn't look into that?
19  A.  (Witness shakes head.)
20      MR. MULLALY:  Same objection.
21  A.  No.
22  Q.  (By Mr. Ruiz)  Did anyone at ARAG look into
23  that, to your knowledge?
24      MR. MULLALY:  Same objection.
25  A.  Not that I'm aware.

Page 118

1   Q.  (By Mr. Ruiz)  You know, I often tell my
2   clients, you know, with very narrow exceptions, if they
3   tell me something, I take it to the grave.  That's what
4   confidentiality means.
5       But again, if you were to tell me something,
6   you're not my client, that rule doesn't apply.
7       You understand that; right?
8       MR. MULLALY:  Objection to form and scope.
9       You can answer.
10  A.  Yes.
11  Q.  (By Mr. Ruiz)  And so Ms. Casey, if she
12  doesn't represent Ronda McNae, did ARAG expect Ms. Casey
13  to call Ronda McNae and ask her, outside of a privileged
14  communication, would you be -- ever be willing to give a
15  public statement of the type that Mr. Fitzgerald wants?
16      Did ARAG have that expectation that Ms. Casey
17  would call Ronda McNae and have that communication?
18      MR. MULLALY:  Object to form and scope.
19  A.  I think we had an expectation of accuracy in
20  the communication to us.
21  Q.  (By Mr. Ruiz)  Right.  But if Will McNae, who
22  was Ms. Casey's client, was receptive to the possibility
23  of Ronda McNae making a statement, how does that dictate
24  what Ronda McNae has to do?
25      And I'm asking for ARAG's testimony on that

Page 119

1   question.
2       MR. MULLALY:  Same objection.
3   A.  And an attorney that had a contract with us
4   had indicated that openness in a communication to us.
5   Q.  (By Mr. Ruiz)  Whose openness?  Will McNae's
6   or Ronda McNae's?
7       MR. MULLALY:  Same objections.
8   A.  The -- the manner in which it was written
9   made it appear that there was -- that that was a
10  possibility.
11  Q.  (By Mr. Ruiz)  Ronda McNae or Will McNae?
12      MR. MULLALY:  Same objections.
13  A.  The way it was -- the way it was worded was
14  that there had to be this public statement of clearing
15  his name, I think was the way it was worded.
16  Q.  (By Mr. Ruiz)  All right.  That came from
17  Will McNae's attorney?
18  A.  Yes.
19  Q.  Did Ms. Fotiu-Wojtowicz, who actually had an
20  attorney-client relationship with Ronda McNae and who
21  actually represented her interests, ever give any
22  written communications, say that Ronda McNae was
23  receptive to that idea?
24      MR. MULLALY:  Objection to form and scope.
25  A.  No.

Page 120

1   Q.  (By Mr. Ruiz)  Did ARAG ever (inaudible) to
2   ask her if Ronda McNae would be open to that idea?
3       THE COURT REPORTER:  Sorry, can you -- that
4   was pretty fast.  Could you say that again?  Did Ronda
5   McNae...?
6       MR. RUIZ:  I'll withdraw the question.
7   Q.  (By Mr. Ruiz)  Did ARAG ever contact
8   Ms. Fotiu-Wojtowicz to ask if Ronda McNae would be open
9   to that idea, the idea of giving a public statement that
10  cleared Mr. Fitzgerald's name?
11      MR. MULLALY:  Same objection.
12  A.  No.
13  Q.  (By Mr. Ruiz)  Did it ever consider doing
14  that?
15      MR. MULLALY:  Same objections.
16  A.  No.
17  Q.  (By Mr. Ruiz)  Why not?
18      MR. MULLALY:  Same objection.
19  A.  Because both of the attorneys indicated that
20  they were open to the mediation.  They felt mediation
21  could potentially net a positive outcome, so they both
22  indicated that they wanted to move forward.
23  Q.  (By Mr. Ruiz)  Just because somebody wants to
24  go to mediation and attends in good faith, there is no
25  guarantee of a resolution.  Do you agree?

BUELL REALTIME REPORTING, LLC
206.287.9066  l  800.846.6989

McNae v. ARAG Insurance Company                          30(b)(6) Ann Cosimano

Page 121

1    A.  Agree.
2    Q.  And ARAG didn't expect Ronda McNae to settle
3  at whatever price; correct?
4        MR. MULLALY:  Same objections.
5    A.  Correct.
6    Q    (By Mr. Ruiz)  Did ARAG only agree to pay for
7  the mediation based on its understanding that Ronda
8  McNae would be willing to go on the record and say that
9  she was not sexually assaulted?
10        MR. MULLALY:  Object to form, scope.
11        You can answer.
12    A.  I think had we known that that was an
13  absolute bar, that there was no possibility that -- and
14  that mediation was futile, we would not have agreed.
15    Q    (By Mr. Ruiz)  But couldn't Mr. Fitzgerald
16  have dropped that -- his demand?
17        You're putting all this on the McNaes.  Would
18  Mr. Fitzgerald have dropped his demand in a mediation?
19        MR. MULLALY:  Same objections.
20    A.  Sure.
21    Q    (By Mr. Ruiz)  Right.
22        And it may surprise you to know that it's
23  very rare that my opening demand at mediation is the
24  exact amount of a settlement at the end of the
25  mediation.

Page 122

1        Does that surprise you?
2        MR. MULLALY:  Same objections.
3    A.  No.
4    Q    (By Mr. Ruiz)  And you are aware that people
5  make demands at the beginning of or before mediation
6  that ultimately do never see the light of day after a
7  settlement happens.  Do you agree with that?
8        MR. MULLALY:  Same objections.
9    A.  I'm sure that happens.
10    Q    (By Mr. Ruiz)  Okay.  And is there any
11  written communication that said that Ronda McNae would
12  absolutely, yes, be willing to go on the record and say
13  that all this time that she was saying that she had been
14  sexually assaulted, that she was lying?
15        MR. MULLALY:  Same objections.
16    A.  You might have -- I'm sorry, you might have
17  to reword that.
18    Q    (By Mr. Ruiz)  Is there any written
19  communication that told ARAG that Ronda McNae absolutely
20  would be willing to give a statement clearing
21  Mr. Fitzgerald?
22        MR. MULLALY:  Object to form and scope.
23    A.  No, there is no written communication that
24  says that.
25    Q    (By Mr. Ruiz)  But ARAG expected her -- in

Page 123

1  exchange for ARAG paying for the mediation, ARAG
2  expected Ronda McNae to go in there and agree to give a
3  statement that said that Mr. Fitzgerald didn't sexually
4  assault her?
5        MR. MULLALY:  Same objections.
6    A.  No.
7    Q    (By Mr. Ruiz)  I'm confused.  I was confused
8  on Friday when I was hearing similar testimony.  I don't
9  know that there's anything I can do to clarify.
10        Is there anything -- well, let me ask it a
11  different way.
12        Were there any telephone calls or Teams
13  meetings or video conferences that ARAG was a part of
14  with the attorneys discussing whether or not mediation
15  was a good idea?
16        MR. MULLALY:  Object to scope.
17        You can answer.
18    A.  No.
19    Q    (By Mr. Ruiz)  And, in fact, all the
20  communication between ARAG and the attorneys regarding
21  potential mediation, they were in writing; correct?
22        MR. MULLALY:  Same objection.
23    A.  Yes.
24    Q    (By Mr. Ruiz)  And we have copies of all that
25  correspondence.  Agreed?

Page 124

1        MR. MULLALY:  Same objection.
2    A.  Yes.
3    Q    (By Mr. Ruiz)  And that correspondence
4  happened after the chief financial officer at ARAG
5  started asking questions about how much was being paid
6  on this claim.
7        Do you agree to that sequence of events?
8        MR. MULLALY:  Object to form and scope.
9    A.  I don't know.
10    Q    (By Mr. Ruiz)  Did the three of you, the
11  consensus group, try to do a quick-and-dirty SIU
12  investigation before you made the decision?
13        MR. MULLALY:  Object to form and scope.
14    A.  In that we talked about the issues.
15    Q    (By Mr. Ruiz)  Other than talking about the
16  issues, did the three of you do anything to investigate?
17        MR. MULLALY:  Same objections.
18    A.  I mean, I guess that's what I would call
19  investigation.
20    Q    (By Mr. Ruiz)  Right.
21        But, I mean, if I wanted to investigate who's
22  in the library over there, which is right next to me, I
23  couldn't just talk about it and find the answer.  I'd
24  actually have to walk over there and look in there.
25        Right?

                                    31 (Pages 121 to 124)

McNae v. ARAG Insurance Company                                          30(b)(6) Ann Cosimano

Page 125

1      MR. MULLALY:  Same objections.
2   A.  Yes.
3   Q.  (By Mr. Ruiz)  When there are facts to be
4   found, you have to go look for them or ask for the
5   facts.  Do you agree?
6      MR. MULLALY:  Object to form.
7   A.  Yes.
8   Q.  (By Mr. Ruiz)  Did anyone in the consensus
9   group suggest that maybe you should speak to one of the
10  attorneys before terminating them?
11     MR. MULLALY:  Object to form and scope.
12  A.  No.
13  Q.  (By Mr. Ruiz)  Did anyone in the consensus
14  group suggest that maybe you should talk to one or both
15  of the McNaes before terminating the attorneys?
16     MR. MULLALY:  Same objections.
17  A.  No.
18  Q.  (By Mr. Ruiz)  Did any of the three of you in
19  the consensus group suggest the possibility of getting
20  attorney advice on the question of duplication?
21     MR. MULLALY:  Same objections.
22  A.  No.
23  Q.  (By Mr. Ruiz)  Does ARAG think that Ms. McNae
24  is lying about the sexual assault?
25     MR. MULLALY:  Same objection.

Page 126

1   A.  No.
2   Q.  (By Mr. Ruiz)  No, absolutely not.  Right?
3   A.  Right.
4   Q.  And so ARAG doesn't expect Ronda to ever say
5   that she was not sexually assaulted; correct?
6   A.  Correct.
7   Q.  Has that always been true, that ARAG did not
8   expect Ronda McNae to go on the record and say she was
9   not sexually assaulted by Michael Fitzgerald or has that
10  changed at some point?
11  A.  I think your word "expect" is weird.  We
12  didn't have an expectation, but the attorney
13  communicated it in a way that made it seem like that was
14  something that would -- would -- they would be open to
15  in order to settle, and had proactively asked the other
16  party to provide the statement.
17  Q.  I guess my question is:  So what?
18      I mean, isn't that her job?  Isn't that the
19  attorney's job to get a full understanding of what the
20  other side is proposing in a settlement?
21     MR. MULLALY:  Object to form and scope.
22  A.  Yes.
23  Q.  (By Mr. Ruiz)  Right.
24      And you criticized her for not taking steps
25  to -- reasonable steps to potentially resolve the claim,

Page 127

1   but her asking for the statement to understand what he
2   was asking for, isn't that a step potentially to explore
3   the possible resolution of a claim?
4      MR. MULLALY:  Same objections.
5   A.  Yes.
6   Q.  (By Mr. Ruiz)  Right.  What if the statement
7   was something -- that he wanted was something that
8   didn't require her to say she wasn't sexually assaulted.
9   Right?
10     MR. MULLALY:  Same objections.
11  Q.  (By Mr. Ruiz)  Right?
12  A.  Right.
13  Q.  And so there's a perfectly good reason for
14  Ms. Casey to ask what the statement said.  Don't you
15  agree?
16     MR. MULLALY:  Same objections.
17  A.  Yes.
18  Q.  (By Mr. Ruiz)  And her asking for the
19  statement doesn't mean that Ronda McNae is going to
20  accept it.  Do you agree?
21  A.  Yes.
22  Q.  And her asking for the statement isn't
23  communicating to ARAG that Ronda McNae would accept it.
24  Do you agree?
25     MR. MULLALY:  Same objections.

Page 128

1   A.  Yes.
2   Q.  (By Mr. Ruiz)  Does ARAG have some problem
3   with Ronda McNae and Will McNae that we don't know
4   about?
5      MR. MULLALY:  Object to form and scope.
6   A.  No.
7   Q.  (By Mr. Ruiz)  Does ARAG think that Ronda
8   McNae and Will McNae should just give up and give
9   Fitzgerald whatever he wants?
10     MR. MULLALY:  Same objections.
11  A.  No.
12  Q.  (By Mr. Ruiz)  Do you think that on
13  November 21st, 2023, Ronda McNae and Will McNae were in
14  a stronger position to resolve the claim, having just
15  learned that they lost their attorneys?
16     MR. MULLALY:  Same objections.
17  A.  I don't know.
18  Q.  (By Mr. Ruiz)  Does ARAG agree that the
19  reason Ms. Casey no longer represented Will McNae was
20  that Will McNae could not afford to pay her?
21     MR. MULLALY:  Same objections.
22  A.  I don't know.
23  Q.  (By Mr. Ruiz)  You don't know one way or
24  another?
25  A.  I don't.

                                    32 (Pages 125 to 128)

McNae v. ARAG Insurance Company

30(b)(6) Ann Cosimano

Page 129

1    Q.   Did Will McNae ever express any
2  dissatisfaction with the work of Ms. Casey?
3         MR. MULLALY:  Same objections.
4    A.   No.
5    Q    (By Mr. Ruiz)  Did Ms. Fotiu-Wojtowicz ever
6  express any -- strike that.
7         Did Ronda McNae express any misgivings or
8  concerns or critiques of the work of
9  Ms. Fotiu-Wojtowicz?
10        MR. MULLALY:  Same objections.
11   A.   Not that I'm aware of.
12   Q    (By Mr. Ruiz)  Did ARAG do any research into
13 the reputation of these two attorneys before terminating
14 them?
15        MR. MULLALY:  Same objections.
16   A.   No.
17   Q    (By Mr. Ruiz)  Do you know what they look
18 like?
19   A.   No.
20   Q.   Do you know what they sound like?
21        MR. MULLALY:  Same objections.
22   A.   No.
23   Q    (By Mr. Ruiz)  Have you ever seen them
24 engaged in advocacy?
25        MR. MULLALY:  Object to form.

Page 130

1    A.   No.
2    Q    (By Mr. Ruiz)  So you don't really know what
3  they're going to look like when they appear in front of
4  this jury or in front of the judge and testify, do you?
5         MR. MULLALY:  Same objection.
6    A.   No.
7    Q    (By Mr. Ruiz)  Did you ask anybody about
8  their reputations?  And I mean ARAG.  Did anyone at ARAG
9  do any investigation to find out what Ms. Casey's and
10 Ms. Fotiu-Wojtowicz's reputations were?
11        MR. MULLALY:  Object to scope.
12   A.   I don't know.
13   Q    (By Mr. Ruiz)  Topic 7 is:  Any complaints
14 filed against ARAG with any state bar association or
15 involving violations of Rules of Professional Conduct.
16        Do you understand that the Rules of
17 Professional Conduct, that that refers to the rules
18 regarding the legal profession in various jurisdictions?
19   A.   Yes.
20   Q.   What did you do to prepare to testify on this
21 topic?
22   A.   Having been with the organization for 24
23 years, any such complaint would have come to my
24 department.
25   Q.   So did you speak with anybody?

Page 131

1    A.   No.
2    Q.   Did you do any searches?
3    A.   No.
4    Q.   What documents exist at ARAG that show how
5  ARAG keeps track of complaints filed against it in any
6  bar -- state bar association or involving violations of
7  the Rules of Professional Conduct?
8         MR. MULLALY:  Object to scope.
9         You can answer.
10   A.   Did you say process documents?
11   Q    (By Mr. Ruiz)  Yes.
12   A.   I don't know that there's anything written.
13   Q.   How does ARAG keep track of any complaints
14 filed against it with any state bar association?
15        MR. MULLALY:  Object to scope.
16   A.   We've had not had one.
17   Q    (By Mr. Ruiz)  And how about any complaints
18 involving violations of the Rules of Professional
19 Conduct or alleged violations?  Have you had any?
20   A.   By ARAG?  No.
21   Q.   Now, do you know of any against -- any such
22 complaints with bar associations or involving Rules of
23 Professional Conduct against Ms. Casey?
24        MR. MULLALY:  Object to scope.
25   A.   No.

Page 132

1    Q    (By Mr. Ruiz)  How about against
2  Ms. Fotiu-Wojtowicz?
3         MR. MULLALY:  Same objection.
4    A.   No.
5    Q    (By Mr. Ruiz)  Is an attorney required to
6  keep representing a civil litigant without getting paid?
7         MR. MULLALY:  Object to scope.
8    A.   I -- I don't know in Washington, what the
9  requirements would be specifically for this case.
10   Q    (By Mr. Ruiz)  I'm talking about Florida.
11   A.   Oh, sorry.
12   Q.   But you don't know?
13   A.   No.
14        MR. MULLALY:  Same objection.
15   A.   I -- yeah, no.
16   Q    (By Mr. Ruiz)  You know, the Rules of
17 Professional Conduct have -- in a lot of states have
18 provisions that deal with the price that an attorney can
19 charge for their services; you know, how much they can
20 charge per hour or contingent fee or whatever.
21        You're aware of that; correct?
22        MR. MULLALY:  Objection to scope.
23   Q    (By Mr. Ruiz)  Correct?
24   A.   Yes.
25   Q.   You have an active bar license, don't you?

33 (Pages 129 to 132)

McNae v. ARAG Insurance Company                    30(b)(6) Ann Cosimano

Page 133

1    A.  Yes.
2    Q.  So you're up to date with the Rules of
3    Professional Conduct at least in Iowa; correct?
4    A.  Yes.
5    Q.  Now, has ARAG obtained any opinion regarding
6    the reasonableness of the hourly rate that Ms. Casey was
7    charging?
8        MR. MULLALY:  Objection to scope.
9    A.  No.
10   Q   (By Mr. Ruiz)  How about with respect to
11   Ms. Fotiu-Wojtowicz?
12       MR. MULLALY:  Same objection.
13   A.  No.
14   Q   (By Mr. Ruiz)  Did it consider ever getting
15   anything like that?
16       MR. MULLALY:  Same objection.
17   A.  I don't know.
18   Q   (By Mr. Ruiz)  Topic 21 is:  All bad faith
19   cases or complaints involving your company lodged
20   against ARAG in the state of Washington within the last
21   ten years.
22       Are there any?
23   A.  We had one complaint just a couple months
24   ago.
25   Q.  Not mine?

Page 134

1    A.  No.
2        And I'm not sure it's really bad faith, how
3    it would be classified.  It was a coverage issue for a
4    plan member that had an easement, an easement issue, and
5    it was both for them and their business.  And easements
6    for us are only covered in an administrative hearing.
7        It was disposed of by the different
8    insurance -- or it was closed without any further
9    information needed on our part.
10   Q.  This was a complaint that was made in front
11   of the Washington Office of the Insurance Commissioner?
12   A.  Yes.
13   Q.  What about any complaints filed in court in
14   the last ten years against ARAG, in Washington?
15   A.  No.
16   Q.  My topic was limited to Washington, but these
17   questions involve -- these are process-related questions
18   about how you would keep track of those records.
19       Is there a system at ARAG for keeping track
20   of lawsuits filed against it?
21       MR. MULLALY:  Object to scope.
22       You can answer.
23   A.  Yes.
24   Q   (By Mr. Ruiz)  Describe the system.
25       MR. MULLALY:  Object to form and scope.

Page 135

1    A.  It would be within the legal department.  We
2    have a file hold system that we would store documents.
3    Q   (By Mr. Ruiz)  Did you search that repository
4    for information relating to Washington for today?
5    A.  No.
6    Q.  Is it searchable?
7    A.  Yes.
8    Q.  Would you go ahead and search that when you
9    get back to the office, just to make sure your testimony
10   here today is correct?
11   A.  Yes.
12   Q.  Thank you.
13       I appreciate that.  And Mr. Mullaly will let
14   me know the results of that, I'm sure.
15       MR. MULLALY:  I will.
16       MR. RUIZ:  Why don't we take a ten-minute
17   break and, you know, we are getting close to the end
18   here, if that's okay with everybody.  I know we haven't
19   been going that long, but I think this would be the time
20   to take a break.
21       THE WITNESS:  All right.
22       THE VIDEOGRAPHER:  Going off the record.  The
23   time now is approximately 1:05 p.m.
24       (Recess 1:05 p.m. to 1:16 p.m.)
25       THE VIDEOGRAPHER:  Back on the record.  The

Page 136

1    time now is approximately 1:16 p.m.
2    Q   (By Mr. Ruiz)  A follow-up question regarding
3    the subject of Mr. Mullaly's role in claims handling.
4        Did Derek Overton provide Mr. Mullaly any
5    information that assisted him in giving a coverage
6    opinion or writing a communication regarding coverage?
7    A.  I don't believe so.
8    Q.  What about Chris Thomas?
9    A.  I don't believe so.
10   Q.  What about anybody else from the
11   multifunctional team that assists in drafting contract
12   language?
13   A.  I don't believe so.
14       I mean, outside of me.
15       (Crosstalk)
16   A.  I gave him the policy, the certificate.
17   Q.  And did you give him any other information
18   besides the policy and the certificate?
19   A.  Probably just the certificate.
20   Q.  Did you give him any information along the
21   lines of:  I was there when this provision was drafted
22   and here's what we intended?
23   A.  Not that I'm aware of.
24   Q.  What about with respect to Ms. Hudson?  Was
25   Ms. Hudson giving -- given any information from Derek

34 (Pages 133 to 136)

McNae v. ARAG Insurance Company                    30(b)(6) Ann Cosimano

Page 137

1  Overton?
2      A.  No, I don't believe so.
3      Q.  Or from Chris Thomas?
4      A.  I don't believe so.
5      Q.  Or from anyone else in the multifunctional
6  team that assists in drafting language?
7      A.  So again, me.  I would have given her
8  information.
9      Q.  Did you give Ms. Hudson any information along
10 the lines of:  I was there when this language was
11 drafted and here's what was intended by the drafters?
12     A.  Not that --
13         MR. MULLALY:  Object to form.
14         You can answer.
15     A.  Not that I recall.
16     Q.  (By Mr. Ruiz)  Now, is there written down
17 anywhere in ARAG, that you know of, an analysis of the
18 drafting history of the exclusions in the policy?
19         MR. MULLALY:  Object.  Scope.
20         You can answer.
21     A.  No.  All of the iterations, I'm sure we've
22 got all of the iterations of the different drafts.
23     Q.  (By Mr. Ruiz)  Did ARAG provide either
24 Mr. Mullaly or Ms. Hudson copies of any claims handling
25 procedures or policies to assist in their work on

Page 138

1  coverage?
2      A.  No.
3         MR. RUIZ:  Please mark this Exhibit 3.  It's
4  entitled "Participants and Decisionmakers."
5         (Exhibit No. 3 introduced.)
6      Q.  (By Mr. Ruiz)  Do you remember seeing this on
7  Friday?
8      A.  Yes.
9      Q.  The only reason I'm showing it to you is to
10 call your attention to number 4.
11        Do you see number 4?  It's called:  Inquiry
12 relating to mediation July 26, 2023?
13     A.  Yes.
14     Q.  And the reason -- this is a follow-up to the
15 discussion we've already had about mediation and what
16 ARAG was thinking at the time.  Okay?
17     A.  Yes.
18     Q.  So let me ask you, who are all of the people
19 at ARAG that participated in the decision to inquire
20 about mediation?
21        MR. MULLALY:  Object to scope.
22        You can answer.
23     A.  If I recall, it was Jen Beck, myself.
24        I can't remember if Meagen was involved in
25 that discussion or not.

Page 139

1      Q.  (By Mr. Ruiz)  Was there a meeting, or how
2  did the discussion happen?
3         MR. MULLALY:  Same objection.
4      A.  I think it was a conversation, because --
5  just saying should we try this, is this something that
6  we feel looks like it could move things forward.
7      Q.  (By Mr. Ruiz)  Is there any record of that
8  discussion between you and Ms. Beck?
9         MR. MULLALY:  Same objection.
10     A.  Not that I'm aware of.
11     Q.  (By Mr. Ruiz)  But it happened face to face?
12     A.  Most likely.  I can't recall.
13     Q.  Is there any record that says are the
14 conditions under which ARAG will pay for the mediation?
15        MR. MULLALY:  Same objection.
16     A.  Outside of the letter itself, no.
17     Q.  (By Mr. Ruiz)  Is there any document that
18 says here are the facts that ARAG is relying on in
19 agreeing to pay for the mediation?
20        MR. MULLALY:  Objection.  Form and scope.
21     A.  Not that I'm aware of.
22     Q.  (By Mr. Ruiz)  Who asked who?  Did ARAG raise
23 the issue of mediation, paying for it, to the attorneys
24 or did the attorneys ask ARAG to pay for the mediation?
25        MR. MULLALY:  Object to scope.

Page 140

1      A.  We raised it with them.
2      Q.  (By Mr. Ruiz)  That was not something that
3  they asked for; true?
4         MR. MULLALY:  Same objection.
5      A.  True.
6      Q.  (By Mr. Ruiz)  And who chose the mediator?
7         MR. MULLALY:  Same objection.
8      Q.  (By Mr. Ruiz)  I'll withdraw the question.
9         Who first said the name of the eventual
10 mediator:  ARAG or the attorneys?
11     A.  ARAG.
12     Q.  (By Mr. Ruiz)  Are you sure?
13        MR. MULLALY:  Same objection.
14     A.  I'm pretty confident.
15     Q.  (By Mr. Ruiz)  Did anyone from ARAG have a
16 telephone conversation or some other voice communication
17 with Ms. Casey or Ms. Fotiu-Wojtowicz before agreeing to
18 pay for the mediation?
19        MR. MULLALY:  Same objection.
20     A.  I don't know.
21     Q.  (By Mr. Ruiz)  Now, the policy doesn't say
22 that ARAG pays for a mediation; true?
23        MR. MULLALY:  Object to form and scope.
24     A.  True.

35 (Pages 137 to 140)

McNae v. ARAG Insurance Company                          30(b)(6) Ann Cosimano

Page 141

1    Q    (By Mr. Ruiz)  So what was in it for ARAG in
2  offering to pay for a benefit that's not covered by the
3  policy?
4         MR. MULLALY:  Objection.  Scope.
5    A    I think in looking at the notes, we had a
6  belief that a mediation -- there was potential that a
7  mediation could resolve the issue.
8    Q    (By Mr. Ruiz)  And, therefore, end the need
9  for payment of legal services?
10   A    Yes.
11   Q    Because if the settlement involved payment of
12 money damages by the McNaes, ARAG wouldn't have helped
13 them pay those amounts; right?
14        MR. MULLALY:  Object to form and scope.
15   A    Correct.
16   Q    (By Mr. Ruiz)  And if Ronda McNae had agreed
17 to say that she had been lying all this time about being
18 sexually assaulted, ARAG wasn't going to compensate her
19 for that either; right?
20        MR. MULLALY:  Object to form.
21   A    Correct.
22   Q    (By Mr. Ruiz)  Who ultimately made the
23 decision to send the letter inviting mediation?
24        MR. MULLALY:  Object to scope.
25   A    Similar, it was discussed and agreed upon

Page 142

1  to -- to offer.
2    Q    (By Mr. Ruiz)  Discussed and agreed upon by
3  who?
4         MR. MULLALY:  Same objection.
5    A    I know, at minimum, it was myself and Jen
6  Beck.  And I believe there was at least one other person
7  that was involved.  I just can't recall exactly who.
8    Q    (By Mr. Ruiz)  And again, is there any record
9  of who was involved and when the decision was made?
10        MR. MULLALY:  Same objection.
11   A    Not that I can think of.
12   Q    (By Mr. Ruiz)  Is there any record that says
13 the reasons ARAG is agreeing to pay for the mediation?
14        MR. MULLALY:  Same objection.
15   A    Not that I'm aware of.
16   Q    (By Mr. Ruiz)  If Ms. Casey and Ms. -- or
17 Ms. Fotiu-Wojtowicz had come back to ARAG and said, no,
18 absolutely not, we won't mediate, what would ARAG have
19 done with that information?
20        MR. MULLALY:  Object to form.  Scope.  Object
21 to the extent it calls for speculation.
22        You can answer.
23   A    Nothing.  I -- I can't think of anything we
24 would have done.
25   Q    (By Mr. Ruiz)  Well, you heard Ms. Adams

Page 143

1  testify that there's a duty to make reasonable efforts
2  to resolve claims; right?
3    A    Yes.
4    Q    Agreeing to mediate is one thing you can do
5  that's an effort to resolve a claim; right?
6    A    It is one thing, yes.
7    Q    Anything else about ARAG's decision -- well,
8  strike that.
9         Are there any documents at ARAG that describe
10 the situations in which it will pay for a mediation when
11 the mediation is not covered by the policy?
12        MR. MULLALY:  Object to scope.
13   A    No.
14   Q    (By Mr. Ruiz)  Are there any policies and
15 procedures that guide employees of ARAG in making a
16 decision like that?
17        MR. MULLALY:  Same objection.
18   A    No.
19   Q    (By Mr. Ruiz)  Who had to approve the
20 expenditure of this money, the cost of mediation?
21 Because it's not cheap; right?
22        MR. MULLALY:  Same objection.
23   Q    (By Mr. Ruiz)  Let me ask it again.
24        Who at ARAG approved the expenditure of money
25 on the mediation?

Page 144

1         MR. MULLALY:  Object to scope.
2    A    I don't recall if we got a -- like a finance
3  approval or not, if that was one of the hoops that we
4  jumped through.
5    Q    (By Mr. Ruiz)  Did ARAG participate in the
6  mediation?
7         MR. MULLALY:  Object to scope.
8    A    No.
9    Q    (By Mr. Ruiz)  Did it ask to?
10        MR. MULLALY:  Same objection.
11   A    No.
12   Q    (By Mr. Ruiz)  Did it ever speak with or
13 communicate with the mediator?
14        MR. MULLALY:  Same objection.
15   A    Just for payment, is -- what I understand, we
16 only did do -- arrange payment.
17   Q    (By Mr. Ruiz)  Other than that?
18        MR. MULLALY:  Same objection.
19   A    Not that I'm aware of.
20        MR. RUIZ:  Please mark this Exhibit 4.
21        (Exhibit No. 4 introduced.)
22   Q    (By Mr. Ruiz)  We're going to do a little bit
23 of work here, Ms. Cosimano.  So the questions from here
24 through the end of this deposition are going to relate
25 to ARAG's criticisms relating to plaintiffs or

36 (Pages 141 to 144)

McNae v. ARAG Insurance Company                                    30(b)(6) Ann Cosimano

Page 145

1    plaintiffs' representatives.  But I want us to use two
2    frames of time.
3          I want to hear from you first just the bullet
4    points of what the criticisms are that ARAG had,
5    criticisms that ARAG had on November 20, 2023, and
6    before, and then separately, any new criticisms that
7    have come to light that ARAG has now from November 21st,
8    2023 and after.
9          Okay?
10   A.   Yes.
11   Q.   And, of course, I'm going to ask you my
12   follow-up questions once we outline what these are and
13   ask you what kind of documents exist, who told you, all
14   that kind of stuff.
15         All right?
16   A.   Yes.
17   Q.   So let's start on by you enumerating the
18   criticisms ARAG had relating to plaintiffs or
19   plaintiffs' representatives that it had on November 20th
20   or before.
21         MR. MULLALY:  Objection to form.
22         You can answer.
23   A.   As far as plaintiffs before November 20th...
24         I don't -- I don't have any criticisms of
25   plaintiffs.

Page 146

1    Q.   (By Mr. Ruiz)  Okay.  That's fine.
2          What about plaintiffs' representatives?
3    A.   For plaintiffs' representatives, it was about
4    billing -- I'm not going to say peculiarities -- billing
5    concerns.
6          So there were concerns in -- first, just
7    overall, the case has been going for -- since August of
8    '22.  By November of '23, there had been over $800,000
9    in attorneys' fees and the case essentially -- the stage
10   that it was at was, you know, completion -- or
11   discovery, some discovery, and a motion to dismiss, in
12   comparison to what we had seen other attorneys in
13   getting to similar gates of litigation.  It was
14   exponentially higher in amount; not by a little.
15         And so then in looking more detailed at the
16   invoices, there were some areas of peculiarity, for
17   example, that the two attorneys were indicating time
18   spent with each other.  Some situations where the
19   time -- the times didn't match.  And then overall just a
20   high volume of those in communication with one another.
21         And I'd say I probably gave you one through
22   six with that box.
23   Q.   All right.  Okay.  I see.  So I can do it
24   this way, then.
25         What else?

Page 147

1    A.   And then the mediation, just being led to
2    believe that there might be more -- mediation might have
3    a higher likelihood of a positive outcome, feeling we
4    were led to believe it might have a higher possibility
5    of positive outcome than what it actually had.
6    Q.   What else?
7    A.   Can you scroll up again?
8    Q.   Yes.
9    A.   Thank you.
10   Q.   While you look, I'm going to fix my
11   capitalizations.
12         Okay.
13         MR. MULLALY:  While you do that, I'd just
14   like to put a general objection on the record to any use
15   of this exhibit as a summary or representation of
16   Ms. Cosimano's testimony distinct from her testimony
17   itself.
18   Q.   (By Mr. Ruiz)  Anything else?
19   A.   Nothing I can think of right now.
20   Q.   Can you read 1 through 7 and let me know if
21   there's anything that you think might have been unfair
22   or inaccurate about?
23         MR. MULLALY:  Object to form.
24         You can answer.
25   A.   Probably that 2 and 3 really should be

Page 148

1    combine -- combined, because it was more in comparison
2    than just on its own.
3    Q.   (By Mr. Ruiz)  All right.  Would you review
4    1 through 6 and let me know if I've been unfair or
5    miscaptured anything?
6    A.   Yeah.  It looks like 3 and 5 are somewhat --
7    attorneys indicating time spent with each other and high
8    volume of communication with one another.
9    Q.   How about now, 1 through 5, is that a fair
10   summary of what you've said?
11         MR. MULLALY:  Object to form.
12         You can answer.
13   A.   Yes.
14   Q.   (By Mr. Ruiz)  Anything else on November
15   20th, 2023 and before?
16   A.   Nothing I can think of right now.
17   Q.   Let's go to November 21st, 2023 and after.
18   Do you still have all those same five concerns?
19         MR. MULLALY:  Object to form.
20         You can answer.
21   A.   As in none of them were resolved between then
22   and now in --
23   Q.   (By Mr. Ruiz)  Yes.
24   A.   Yes.
25   Q.   So I'm just going to go ahead and move them

McNae v. ARAG Insurance Company                              30(b)(6) Ann Cosimano

| Page 149 | Page 151 |
|---|---|
| 1  over there.  Okay? | 1  submitted. |
| 2      A.   Yes. | 2      Q.   Anything else? |
| 3      Q.   What else? | 3      A.   Nothing I can think of. |
| 4      A.   Really, the -- it's not really a criticism so | 4      Q.   Any documents -- well, strike that. |
| 5  much as maybe a clarification. | 5      Any documents from November 20th, 2023 and |
| 6      There was a communication that we sent asking | 6  before conveying ARAG's billing concerns to Ms. Casey or |
| 7  that all communications be sent to the legal inbox.  And | 7  Ms. Fotiu-Wojtowicz? |
| 8  probably more for clarification, that was just because | 8      MR. MULLALY:  Object scope. |
| 9  the McNaes were emailing multiple people, like a broad | 9      You can answer. |
| 10  group of people, and it wasn't consistent in who it was. | 10      A.   Not that I can think of. |
| 11  So it made us a little concerned that we would miss a | 11      Q.   (By Mr. Ruiz)  Are there any documents from |
| 12  communication that we needed.  So we, therefore, just | 12  November 20th, 2023 and before that are communicating |
| 13  asked for them to funnel communications to one place. | 13  billing concerns to either of the McNaes? |
| 14      And so I'm not sure I would call it a | 14      MR. MULLALY:  Same objection. |
| 15  criticism; more as wanting to provide guidance to -- | 15      A.   None that I know of. |
| 16      Q.   All right.  In fairness to you, I will not | 16      Q.   (By Mr. Ruiz)  Is there any document from |
| 17  put it down as a criticism since you said it's not | 17  November 20th, 2023 and before that says that billing |
| 18  really a criticism, it's just clarifying something. | 18  concerns were a reason for terminating the two |
| 19      Right? | 19  attorneys? |
| 20      A.   Yeah. | 20      A.   Not that I'm aware of. |
| 21      Q.   You're not critiquing the McNaes for that? | 21      Q.   Every case is different.  Do you agree? |
| 22      A.   No. | 22      A.   Yes. |
| 23      Q.   All right.  So what else?  Anything to add on | 23      Q.   So like a dog bite case might have different |
| 24  the second column here? | 24  legal needs than a case involving sexual assault, for |
| 25      MR. MULLALY:  Object to form. | 25  example.  Agree? |

| Page 150 | Page 152 |
|---|---|
| 1      You can answer. | 1      A.   Yes. |
| 2      Q.   (By Mr. Ruiz)  Perhaps to -- any complaints | 2      Q.   And so what other case are you aware of in |
| 3  with Mr. Gomez? | 3  which a husband and wife are accused of breaking an NDA |
| 4      A.   No. | 4  relating to a sexual assault? |
| 5      Q.   Anything that you'd like me to add in the | 5      MR. MULLALY:  Object to form and scope. |
| 6  second column here, the complaints that or criticisms | 6      You can answer. |
| 7  relating to plaintiffs or plaintiffs' representatives | 7      A.   This was a unique case. |
| 8  that ARAG developed on November 21st, 2023 or after? | 8      Q.   (By Mr. Ruiz)  Okay.  But can you -- I mean, |
| 9      Sorry.  I withdraw the question.  That was a | 9  did you research to see if there was another case? |
| 10  weird way to say that. | 10      MR. MULLALY:  Same objections. |
| 11      Any other criticisms relating to plaintiffs | 11      A.   No. |
| 12  or plaintiffs' representatives that ARAG had on November | 12      Q.   (By Mr. Ruiz)  What research did ARAG do to |
| 13  21st, 2023 and after? | 13  determine the ability of Mr. Fitzgerald to continue |
| 14      MR. MULLALY:  Object to form. | 14  funding his plaintiff case? |
| 15      You can answer. | 15      MR. MULLALY:  Object to scope. |
| 16      A.   None I can think of. | 16      A.   None. |
| 17      MR. RUIZ:  I've uploaded the revised Exhibit | 17      Q.   (By Mr. Ruiz)  So, you know, if my neighbor |
| 18  4.  This should replace the previous version of Exhibit | 18  sues me for a dog bite, I might be in for a different |
| 19  4. | 19  battle than if Elon Musk sues me for breaching an NDA. |
| 20      Q.   (By Mr. Ruiz)  What documents exist at ARAG | 20      Does ARAG agree with that? |
| 21  relating to the billing concerns it had? | 21      MR. MULLALY:  Object to form and scope. |
| 22      A.   Just their versions of the bills that they | 22      A.   Seems reasonable. |
| 23  submitted to us. | 23      Q.   (By Mr. Ruiz)  Right. |
| 24      Q.   Anything else? | 24      The dog bite case against my neighbor, I |
| 25      A.   And the summary statements that they | 25  might have to pay an attorney significantly less than |

38 (Pages 149 to 152)

McNae v. ARAG Insurance Company                                    30(b)(6) Ann Cosimano

---

Page 153

1    the Elon Musk case involving a breach of an NDA; right?
2         MR. MULLALY:  Same objections.
3    A.   I -- I would assume.
4         Q    (By Mr. Ruiz)  All right.  So was ARAG able
5    to find any comparable case involving a high-net-worth
6    individual bringing a case involving an alleged breach
7    of an NDA in a sexual assault context?
8         MR. MULLALY:  Same objections.
9    A.   None that I'm aware of.
10        Q    (By Mr. Ruiz)  So what specific -- if you
11   could, just specific cases, and I'm looking for names
12   and types of causes of action, did ARAG compare the
13   legal fees in this case to?
14        MR. MULLALY:  Same objections.
15   A.   It would have been to the most extreme cases
16   that we've had submitted here under any cause.
17        Q    (By Mr. Ruiz)  Is the McNae case the most
18   expensive case ARAG has ever had?
19        MR. MULLALY:  Objection.  Scope.
20   A.   I don't know.
21        Q    (By Mr. Ruiz)  Have you looked into that?
22        MR. MULLALY:  Same objection.
23   A.   No.
24        Q    (By Mr. Ruiz)  And it was an unlimited
25   benefit, wasn't it?

---

Page 154

1         MR. MULLALY:  Objection to form and scope.
2    A.   I would never say a benefit is unlimited
3    without limitations and exclusions.  Limitations and
4    exclusions apply in the policy.
5         Q    (By Mr. Ruiz)  Was there a monetary maximum
6    on the benefit in this case?
7         MR. MULLALY:  Objection.  Scope.
8    A.   There were exclusions that could impose a
9    monetary maximum.
10        Q    (By Mr. Ruiz)  You know what a policy limit
11   means; right?
12   A.   Yes.
13        Q.   If you ask me what my auto policy limit is,
14   I'll tell you a million bucks, but I'm not going to tell
15   you that there's an exclusion for intentional accidents.
16        What is the policy limit for defense of a
17   civil case that applied to the McNaes?
18        MR. MULLALY:  Objection to form and scope.
19   A.   Paid in full, subject to the exclusions of
20   the policy and the language of the policy.
21        Q    (By Mr. Ruiz)  What documents exist relating
22   to the concern that ARAG had of the total amount of
23   attorney fees in comparison to other attorneys getting
24   to similar gates of litigation?
25        MR. MULLALY:  Objection to form.

---

Page 155

1         You can answer.
2    A.   Can you -- can you repeat that?  Or --
3         Q    (By Mr. Ruiz)  What documents exist at ARAG
4    that relate to the concern that the total -- regarding
5    the total amount of attorney fees in comparison to other
6    attorneys getting to similar gates of litigation?
7         MR. MULLALY:  Objection to form.
8    A.   Just knowledge of these cases.  There aren't
9    a lot that get to this level, so it's being able to
10   track those.
11        Q    (By Mr. Ruiz)  Yeah, I'm asking about
12   documents.  Are there any documents at ARAG that relate
13   to the concern it had with respect to the McNaes' claims
14   on the total amount of attorney fees?
15        MR. MULLALY:  Same objection.
16   A.   I would -- their bills themselves, their
17   invoices.
18        Q    (By Mr. Ruiz)  Anything else?
19        MR. MULLALY:  Same objection.
20   A.   Not that I'm aware of.
21        Q    (By Mr. Ruiz)  Has anyone done a study of the
22   historical cases that ARAG has been involved in to
23   determine, based on that information, what a fair amount
24   of attorney fees would be in a case like the McNaes'?
25        MR. MULLALY:  Objection to form and scope.

---

Page 156

1    A.   Not that I'm aware of.
2         Q    (By Mr. Ruiz)  In the history of all the
3    claims that ARAG has had, there's got to be a claim
4    that's the cheapest and there's got to be a claim that's
5    the most expensive.
6         Agreed?
7         MR. MULLALY:  Same objections.
8    A.   Yes.
9         Q    (By Mr. Ruiz)  All right.  And the McNaes
10   didn't choose -- strike that.
11        And so long as the policy is in place, ARAG
12   has to follow the terms and provisions of the policy;
13   right?
14   A.   Yes.
15        Q.   Even if it results in it being one of the
16   more expensive cases ARAG has ever had?
17   A.   Yes.
18        Q.   But have you seen a document or a spreadsheet
19   that lays out what the different amounts of indemnity
20   that have been paid on different claims historically?
21        MR. MULLALY:  Objection to scope.
22        Q    (By Mr. Ruiz)  Like ever?
23        MR. MULLALY:  Same objection.
24   A.   At ARAG?
25        Q    (By Mr. Ruiz)  Yes.

---

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

McNae v. ARAG Insurance Company                    30(b)(6) Ann Cosimano

---

Page 157

1    A.  Not that I can recall.
2    Q.  So before today, has anyone done -- looked at
3  the data to figure out, of all of the civil defense
4  claims handled by ARAG, what the lowest amount paid and
5  the highest amount that's ever been paid on indemnity
6  is?
7         MR. MULLALY:  Object to scope.
8    A.  I don't know.
9    Q.  (By Mr. Ruiz)  And you're aware that attorney
10  fees generally, the hourly rates, they go up over time.
11  Right?
12         MR. MULLALY:  Same objection.
13    A.  Yes.
14    Q.  (By Mr. Ruiz)  The average attorney today is
15  going to get paid more per hour than the same attorney
16  would have gotten paid 20 years ago.  Agreed?
17         MR. MULLALY:  Objection to form and scope.
18    A.  Yes.
19    Q.  (By Mr. Ruiz)  Is there any document at ARAG
20  from November 20th, 2023rd and before -- strike that.  I
21  said it again.
22         Is there any document at ARAG from November
23  20th, 2023 and before that communicates to the attorneys
24  that ARAG thinks they billed too much?
25    A.  I don't know.

---

Page 158

1         MR. MULLALY:  Objection to scope.
2    Q.  (By Mr. Ruiz)  You don't know?
3    A.  I don't know.
4    Q.  Well, you were a part of the consensus group;
5  right?
6         MR. MULLALY:  Objection to form and scope.
7    A.  I think your question was to any attorney.
8    Q.  (By Mr. Ruiz)  Oh, I'm talking about the --
9  well, to Ms. Casey and Ms. Fotiu-Wojtowicz.
10         Is there any document that communicated to
11  Ms. Casey and Ms. Fotiu-Wojtowicz ARAG's concern that
12  they were -- that the total amount that they were
13  billing was too high?
14         MR. MULLALY:  Objection.  Scope.
15    A.  I don't believe there is.
16    Q.  (By Mr. Ruiz)  What about any communication
17  to the McNaes saying the same thing?
18         MR. MULLALY:  Same objection.
19    A.  Before November 20th, no, I don't believe
20  there was.
21    Q.  (By Mr. Ruiz)  And is there any document
22  inside of ARAG that says -- and I'm talking again from
23  November 20th, 2023 and before -- that says that the
24  total amount of attorney fees that's been billed so far
25  is one of the reasons we're terminating these attorneys?

---

Page 159

1         MR. MULLALY:  Same objection.
2    A.  No, I don't believe there is.
3    Q.  (By Mr. Ruiz)  And again, no one at ARAG did
4  an analysis of ARAG's own historical data to quantify
5  the difference between how much this case was costing
6  versus past cases; right?
7    A.  I don't know.
8         MR. MULLALY:  Objection to form.
9    A.  I don't know.
10    Q.  (By Mr. Ruiz)  What documents exist
11  regarding -- strike that, please.
12         What documents existed on November 20th, 2023
13  and before at ARAG that criticized the attorneys for
14  spending too much time with each other or having too
15  high of a volume of communication with one another?
16    A.  I don't know of a document that exists.
17    Q.  Was that concern ever communicated to
18  Ms. Casey or Ms. Fotiu-Wojtowicz before November 20th,
19  2023?
20         MR. MULLALY:  Object to scope.
21    A.  No.
22    Q.  (By Mr. Ruiz)  Was that ever communicated to
23  the McNaes before that date?
24         MR. MULLALY:  Same objection.
25    A.  No.

---

Page 160

1    Q.  (By Mr. Ruiz)  Is there any document from
2  November 20th, 2023 and before inside of ARAG that says
3  one of the reasons we're terminating Ms. Casey and
4  Ms. Fotiu-Wojtowicz is that they are spending too much
5  time communicating with each other?
6         MR. MULLALY:  Objection to form and scope.
7    A.  Not that I'm aware of.
8    Q.  (By Mr. Ruiz)  Are there any documents inside
9  of ARAG that existed on November 20th, 2023 and before
10  that called out the situations in which times didn't
11  match on invoices?
12         MR. MULLALY:  Object to scope.
13    A.  Not that I'm aware of.
14    Q.  (By Mr. Ruiz)  Does ARAG believe that
15  Ms. Casey was billing for work she did not do?
16    A.  I don't know.
17    Q.  Does ARAG believe that Ms. Fotiu-Wojtowicz
18  was billing for work she did not do?
19    A.  I don't know.
20    Q.  Has ARAG investigated whether Ms. Casey or
21  Ms. Fotiu-Wojtowicz were billing for work they did not
22  do?
23         MR. MULLALY:  Object to scope.
24    A.  No.
25    Q.  (By Mr. Ruiz)  Has anyone inside of ARAG

---

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

McNae v. ARAG Insurance Company                    30(b)(6) Ann Cosimano

Page 161

1  accused Ms. Casey or Ms. Fotiu-Wojtowicz for billing for
2  work they did not do?
3      A.  Clarify "accused."
4      Q.  Well, I guess I just mean accused.
5          Has anyone inside of ARAG accused them of
6  billing for work they did not do?
7          MR. MULLALY:  Object to form.
8      A.  I don't know.
9      Q.  (By Mr. Ruiz)  Have you ever looked at the
10  docket from the Fitzgerald versus McNae federal case?
11      A.  I believe I have.
12      Q.  How recently?
13      A.  Not recently.
14      Q.  Had you looked at it on November 20th, 2023?
15          MR. MULLALY:  Object to scope.
16      A.  Yes.
17      Q.  (By Mr. Ruiz)  Have you ever tried to
18  download the whole docket from PACER?
19      A.  No.
20      Q.  Do you know how long it would take to do
21  that?
22      A.  No.
23      Q.  Okay.  Do you know how big the PACER file is
24  for the Fitzgerald versus McNae case, the federal case?
25      A.  No.

Page 162

1          MR. MULLALY:  Object to form and scope.
2      Q.  (By Mr. Ruiz)  You've seen lots of federal
3  dockets; right?
4      A.  "Lots"?  I don't know what "lots" is.
5      Q.  A fair point.
6          You know, one of the things I love to do is
7  go look at the federal dockets for my competitors, their
8  cases against insurance companies.  Sometimes I'm
9  surprised that they only have ten entries or twelve
10  entries and then there's a resolution.
11          My cases, as you know, they tend to have more
12  entries than that, even though we try to be efficient.
13          But if you go look at the Fitzgerald versus
14  McNae federal case, there's a whole lot more than 20 or
15  30 or 40 entries.  Do you agree?
16      A.  Yes.
17          MR. MULLALY:  Object to form.
18      Q.  (By Mr. Ruiz)  On the face of the docket,
19  it's a heavily litigated case; correct?
20          MR. MULLALY:  Object to form and scope.
21      A.  Yes.
22      Q.  (By Mr. Ruiz)  Did Ms. Casey or
23  Ms. Fotiu-Wojtowicz ever file something that was
24  frivolous or unfounded?
25          MR. MULLALY:  Same objections.

Page 163

1      A.  I don't know.
2      Q.  (By Mr. Ruiz)  Did they ever file anything
3  that wasted the court's time?
4          MR. MULLALY:  Same objections.
5      A.  I don't know.
6      Q.  (By Mr. Ruiz)  Did they file ever -- before
7  November 20th, 2023, was there anything on file that
8  Ms. Casey or Ms. Fotiu-Wojtowicz put in that told ARAG,
9  these people don't want to resolve the case, they just
10  want to milk it?
11          MR. MULLALY:  Same objections.
12      A.  I don't know.
13      Q.  (By Mr. Ruiz)  Is there any document that
14  communicates to the McNaes ARAG's concern that the
15  attorneys were spending too much time communicating with
16  each other?
17          MR. MULLALY:  Objection to scope.
18      A.  No.
19      Q.  (By Mr. Ruiz)  And is there any -- I may have
20  already asked this, but I want to make sure I don't
21  forget.
22          Is there any document at ARAG that says that
23  the attorneys communicating with each other too much is
24  one of the reasons they're being terminated?
25          MR. MULLALY:  Same objection.

Page 164

1      A.  No.
2      Q.  (By Mr. Ruiz)  What documents exist at ARAG
3  relating to situations in which the attorney times
4  didn't match each other?
5      A.  Specific to this case?
6      Q.  Yes, I'm talking about the McNaes' claims.
7      A.  None that I'm aware of.  Just the bills
8  themselves.
9      Q.  Let me ask another question, because there's
10  another phenomenon called double billing, which is the
11  attorney billing twice for the same work that they did.
12          Does ARAG contend that Ms. Casey double-
13  billed work?
14      A.  I don't know.
15          MR. MULLALY:  Object to form.
16      A.  I don't know.
17      Q.  (By Mr. Ruiz)  Does ARAG contend that
18  Ms. Fotiu-Wojtowicz double-billed for work?
19          MR. MULLALY:  Object to form.
20      A.  Can you clarify what you mean by double
21  billing?
22      Q.  (By Mr. Ruiz)  Double billing means I bill
23  you twice for the same thing I did once.
24      A.  Yeah, I -- I don't know.  That wasn't
25  something specifically that I recall being discussed.

41 (Pages 161 to 164)

McNae v. ARAG Insurance Company                          30(b)(6) Ann Cosimano

---

Page 165

1    Q.   Back to the criticism that the situations --
2  that there were situations in which times on invoices
3  didn't match.  Can you elaborate on that?
4    A.   Yeah.
5         There were times where maybe there was an
6  entry in both invoices that there was a phone call or a
7  meeting or something that they had to do together but
8  the amount of time spent wasn't the same.
9    Q.   Did ARAG ever try to talk to the attorneys
10 about that?
11   A.   No.
12        MR. MULLALY:  Object to scope.
13   Q    (By Mr. Ruiz)  Did ARAG ever try to
14 communicate to the attorneys about that?
15        MR. MULLALY:  Same objection.
16   A.   No.
17   Q    (By Mr. Ruiz)  How about to the McNaes?
18        MR. MULLALY:  Same objection.
19   A.   No.
20   Q    (By Mr. Ruiz)  Did ARAG explore the
21 possibility that maybe one person was under-billing the
22 amount of time?
23   A.   No.
24        MR. MULLALY:  Same objection.
25   A.   No.

---

Page 166

1    Q    (By Mr. Ruiz)  Did ARAG just assume that one
2  of them was cheating?
3         MR. MULLALY:  Objection to form.  Scope.
4    A.   No.
5    Q    (By Mr. Ruiz)  Is ARAG saying that one or the
6  other, Ms. Casey or Ms. Fotiu-Wojtowicz, was cheating?
7    A.   No.
8    Q.   Is ARAG saying that one or the other,
9  Ms. Casey or Ms. Fotiu-Wojtowicz, was committing fraud
10 on ARAG?
11   A.   I wouldn't -- I wouldn't want to say that.
12   Q.   And you're -- well, here you have to say the
13 truth.
14        So is ARAG saying that?
15   A.   No, meaning I wouldn't want to say that
16 without having done the work necessary to make a claim
17 like that.  That's --
18   Q.   And you haven't done that?
19   A.   -- a serious contention.
20   Q.   And you haven't done that kind of work;
21 right?
22   A.   To the level of confidence necessary to
23 let -- to lodge a claim like that.
24   Q.   You haven't done the work to the level you
25 would need to make an accusation like that?

---

Page 167

1    A.   Right.
2    Q.   For example, you haven't talked to the
3  attorneys about it; right?
4    A.   Right.
5    Q.   And you haven't tried to?
6    A.   No.
7    Q.   And you haven't reported them to the bar
8  association or anything like that; right?
9    A.   No.
10   Q.   And you haven't talked to the McNaes about
11 this concern; right?
12   A.   No.
13   Q.   You didn't send any communication to the --
14 to the McNaes regarding this concern that there was
15 situations in which times on invoices didn't match;
16 right?
17        MR. MULLALY:  Object to form and scope.
18   A.   No.
19   Q    (By Mr. Ruiz)  Now, give me a sense of
20 timing.
21        These concerns 1 through 4, there were
22 billing concerns, total amount of attorney fees in
23 comparison to other attorneys getting to similar gates
24 of litigation, attorneys indicating time spent with each
25 other, high volume of communication with one another,

---

Page 168

1  and the situations in which times didn't match.
2         When did these concerns germinate at ARAG?
3  When -- what was the "aha" moment?
4         MR. MULLALY:  Object to form.
5    A.   I think it was post the mediation, and then
6  that prompted really a deep exploration into the bills
7  and looking at the invoices.  And so I think all of that
8  then was kind of aggregated at that time.
9    Q    (By Mr. Ruiz)  What do you mean by "deep
10 exploration"?
11   A.   Like going back and looking at all of them
12 from the beginning of the representation.
13   Q.   And who was it who did that?
14   A.   I think it was a combination, but I was -- I
15 was definitely one of the people.
16   Q.   I've looked at the bills, and maybe your
17 memory is a lot better than mine, but I don't think I
18 could do that without writing something down.
19        MR. MULLALY:  Object to form.
20   Q    (By Mr. Ruiz)  Is it possible -- are you
21 saying that it's possible for a person to lay out all of
22 those invoices and case status updates for not one
23 attorney but two attorneys and be able to do the
24 analysis that you're talking about without writing
25 anything down?

---

42 (Pages 165 to 168)

McNae v. ARAG Insurance Company                    30(b)(6) Ann Cosimano

Page 169

1          MR. MULLALY:  Object to form and scope.
2     A.   Yes.
3     Q    (By Mr. Ruiz)  Did you mark up the invoices?
4  Did you highlight?  Did you make notes on the side?
5          MR. MULLALY:  Same objections.
6     A.   No.
7     Q    (By Mr. Ruiz)  Did you make a list of
8  questions you'd like to ask the attorneys?
9          MR. MULLALY:  Same objections.
10    A.   No.
11    Q    (By Mr. Ruiz)  Did you make a list of bullet
12 points of things you're going to raise with Ms. Beck or
13 somebody else over at ARAG?
14         MR. MULLALY:  Object to scope.
15    A.   No.
16    Q    (By Mr. Ruiz)  You just read through them and
17 kept all this information in your mind?
18         MR. MULLALY:  Object to form and scope.
19    A.   Compared, did back-and-forth comparison.
20    Q    (By Mr. Ruiz)  But you kept --
21         (Crosstalk)
22    Q.   -- all that information in your mind.  You
23 didn't write it down?
24    A.   Yes.
25    Q.   You didn't dictate your thoughts?

Page 170

1     A.   No.
2     Q.   You didn't send a message on Teams or text or
3  an email to anybody?
4          MR. MULLALY:  Same objections.
5     A.   No.
6     Q    (By Mr. Ruiz)  Now, did you print these out
7  or were you looking at them on the computer?
8     A.   Computer.
9     Q.   You never printed them out?
10    A.   No, I didn't.
11    Q.   Do you understand why it's a little bit hard
12 to believe -- I believe -- I want to believe you, but
13 it's a little bit hard to believe that you looked at all
14 of those invoices on top of everything you have to do at
15 work at ARAG that you talked about earlier today, all
16 your responsibilities, and that you would be able to
17 keep all of those comparisons and criticisms and
18 questions you had in your mind without writing anything
19 down?
20         Do you understand why that might be a little
21 bit difficult for me to swallow?
22         MR. MULLALY:  Object to form and scope.
23    A.   I'm not going to deny that you feel that way.
24    Q    (By Mr. Ruiz)  But you're certain, you're a
25 hundred percent sure you didn't -- you did that work and

Page 171

1  you didn't write anything down?
2          MR. MULLALY:  Same objections.
3     A.   I don't believe I did.
4     Q    (By Mr. Ruiz)  Do you ever take notes?
5     A.   Yes.
6     Q.   Did you take notes when Mr. Mullaly was
7  prepping you for today's deposition?
8     A.   A few.
9     Q.   You took some notes; right?
10    A.   Yeah.
11    Q.   But you didn't take any notes in the
12 comparison of all these invoices?
13         MR. MULLALY:  Object to scope.
14    A.   No.  Not -- because they're -- the way that
15 they are in the computer.
16    Q    (By Mr. Ruiz)  Right.
17         But you have legal pads at ARAG; right?
18    A.   Yes.
19         MR. MULLALY:  Object to form.
20    Q    (By Mr. Ruiz)  Yeah.  And we use those -- we
21 use those to make notes as attorneys; right?
22    A.   Yes.
23    Q.   But you didn't use one when you were making
24 this critical decision with respect to the McNaes.
25 Agreed?

Page 172

1     A.   Not that I recall.
2     Q.   Is there any document at ARAG that says that
3  the situations in which the times didn't match, that
4  that was one of the reasons for terminating the
5  attorneys?
6          MR. MULLALY:  Objection to scope.
7     A.   No.
8     Q    (By Mr. Ruiz)  Is there any document that
9  relates to the concern that ARAG felt it had been led to
10 believe that mediation would have a higher likelihood of
11 a positive outcome?
12         MR. MULLALY:  Same objection.
13    A.   Can you rephrase?
14    Q    (By Mr. Ruiz)  Sure.
15         Is there any document at ARAG from November
16 20th, 2023 or before that says that ARAG has a criticism
17 or concern that they had somehow been misled about the
18 likelihood of success of mediation?
19         MR. MULLALY:  Same objection.
20    A.   Not that I recall.
21    Q    (By Mr. Ruiz)  DID ARAG ever communicate that
22 to the attorneys on November 20th or before?
23    A.   No.
24         MR. MULLALY:  Same objection.
25    Q    (By Mr. Ruiz)  What about to the McNaes?

43 (Pages 169 to 172)

McNae v. ARAG Insurance Company                          30(b)(6) Ann Cosimano

Page 173

1      MR. MULLALY:  Same objection.
2   A.   No.
3      Q    (By Mr. Ruiz)  And inside of all of ARAG,
4   from November 20th, 2023 and before, is there any
5   document that says that we were misled into the
6   prospects of mediation and that's one of the reasons
7   we're terminating the attorneys?
8      MR. MULLALY:  Same objection.
9   A.   Not that I'm aware of.
10     Q    (By Mr. Ruiz)  Let's talk about all of the
11  same things but November 21st, 2023, and after.
12     So what documents exist at ARAG relating to
13  its billing concerns from November 21st and after?
14     MR. MULLALY:  Same objection.
15  A.   Same documents.  The bills and status
16  updates.
17     Q    (By Mr. Ruiz)  What documents exist at ARAG
18  from November 21st and after regarding the total amount
19  of attorney fees that were being charged compared to
20  other attorneys that got to similar gates of litigation?
21     MR. MULLALY:  Object to form and scope.
22  A.   I'm not aware of anything new, anything
23  additional.
24     Q    (By Mr. Ruiz)  Are there any documents from
25  November 21st, 2023 and after relating to the attorneys

Page 174

1   indicating that they had spent too much time
2   communicating with each other?
3      MR. MULLALY:  Same objection.
4   A.   Not aware of anything new.
5      Q    (By Mr. Ruiz)  Is there any document from
6   November 21st, 2023 and after regarding situations in
7   which times on invoices didn't match?
8   A.   I don't believe so.
9      Q.   Is there any document from November 21st,
10  2023 and after regarding whether it had been led to
11  believe that mediation would have a higher likelihood of
12  a positive outcome?
13  A.   I don't believe so.
14     Q.   Any other criticisms, besides what we've
15  covered, of either plaintiffs or their representatives?
16     MR. MULLALY:  Object to form.
17     You can answer.
18  A.   None I can think of.
19     Q    (By Mr. Ruiz)  Over lunch, did you have time
20  to think about whether there's any writing or written --
21  strike that.
22     Have you had any time to think over whether
23  there was -- that coverage opinion is reflected anywhere
24  in writing?
25  A.   I didn't --

Page 175

1      Q.   We're talking about the coverage opinion from
2   Mr. Mullaly.
3   A.   I didn't take the time over lunch to try to
4   do that.
5      Q.   I don't want you let you go today without
6   giving you another chance to answer that question.
7      Is there a document at ARAG that records
8   Mr. Mullaly's coverage opinion?
9      MR. MULLALY:  Objection.  Scope.
10     You can answer.
11  A.   I just can't remember if it was written.
12     Q    (By Mr. Ruiz)  Is there any document at ARAG
13  that states the reasons that ARAG was deciding to
14  terminate the two attorneys?
15     MR. MULLALY:  Objection.  Scope.
16     You can answer.
17  A.   Not that I'm aware of.
18     Q    (By Mr. Ruiz)  And is there any document at
19  ARAG that states the reasons why ARAG was making an
20  exception and would offer to pay for a mediation?
21     MR. MULLALY:  Objection to scope.
22     You can answer.
23  A.   Not that I'm aware of.
24     MR. RUIZ:  Can we go off the record?
25     THE VIDEOGRAPHER:  We're going off the

Page 176

1   record.  The time now is approximately 2:06 p.m.
2      (Recess 2:06 p.m. to 2:10 p.m.)
3      THE VIDEOGRAPHER:  Back on the record.  The
4   time now is approximately 2:10 p.m.
5      MR. RUIZ:  All right.  Thank you,
6   Ms. Cosimano.  It was nice to meet you.  I don't think I
7   have any more questions right now.
8      Last Friday, we did talk about the future
9   regarding the ERISA topics, but that's not anything we
10  need to get into today, I don't think.
11     THE WITNESS:  Okay.
12     MR. MULLALY:  Thank you, Isaac.  We also have
13  no questions, but we would like to reserve our right to
14  review and sign.
15     MR. RUIZ:  On behalf of plaintiffs, we would
16  like to order Etran with electronic PDF exhibits.
17     In addition, we don't need the original right
18  now and we don't need the video right now, but I thank
19  you both.
20     MR. MULLALY:  May we please place the same
21  order?  Thank you.
22     THE VIDEOGRAPHER:  This concludes the
23  30(b)(6) deposition of ARAG Insurance Company designee
24  Ann Cosimano.  The time now is approximately 2:11 p.m.
25  We are going off the record.

                                    44  (Pages 173 to 176)

McNae v. ARAG Insurance Company                    30(b)(6) Ann Cosimano

Page 177

```
 1              (Reading and signing was requested
 2               pursuant to FRCP Rule 30(e).)
 3              (Deposition concluded at 2:11 p.m.)
 4              (Reporter officially marked exhibits
 5               at conclusion of deposition.)
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 178

```
 1              REPORTER'S CERTIFICATE
 2         I, KARMEN M. KNUDSON, the undersigned Certified
 3    Court Reporter, pursuant to RCW 5.28.010 authorized to
 4    administer oaths and affirmations in and for the State
 5    of Washington, do hereby certify that the sworn
 6    testimony and/or proceedings, a transcript of which is
 7    attached, was given before me at the time and place
 8    stated therein; that any and/or all witness(es) were
 9    duly sworn to testify to the truth; that the sworn
10    testimony and/or proceedings were by me stenographically
11    recorded and transcribed under my supervision, to the
12    best of my ability; that the foregoing transcript
13    contains a full, true, and accurate record of all the
14    sworn testimony and/or proceedings given and occurring
15    at the time and place stated in the transcript; that a
16    review of which was reserved; that I am in no way
17    related to any party to the matter, nor to any counsel,
18    nor do I have any financial interest in the event of the
19    cause.  Reading and signing was requested pursuant to
20    FRCP Rule 30(e).
21         WITNESS MY HAND and DIGITAL SIGNATURE this 28th
22    day of August, 2024.
23                        _____
24              Karmen M. Knudson, CCR, RPR, CRR
25              Certified Court Reporter No. 1935.
```

45 (Pages 177 to 178)

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Exhibit 24

# Michael Mullaly

# McNae v. ARAG Insurance Company

# July 16, 2024



1325 Fourth Avenue, Suite 1840  Seattle, Washington 98101
Bellingham | Everett | Tacoma | Olympia | Yakima | Spokane
Seattle 206.287.9066    Tacoma 253.235.0111    Eastern Washington 509.624.3261
**www.buellrealtime.com**
email: info@buellrealtime.com

McNae v. ARAG Insurance Company                                    Michael Mullaly

---

**Page 1**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

WILLIAM MCNAE and RONDA MCNAE,  )
husband and wife,          )
                           )
        Plaintiffs,        )
                           ) No. 2:24-cv-00211
vs.                        )
                           )
ARAG INSURANCE COMPANY,    )
                           )
        Defendant.         )
                           )

VIDEOCONFERENCE DEPOSITION UPON ORAL EXAMINATION

OF

MICHAEL MULLALY

Witness located in
Columbus, Ohio

(ALL PARTICIPANTS APPEARING VIA VIDEOCONFERENCE)

DATE TAKEN:  JULY 16, 2024
REPORTED BY:  ANITA W. SELF, RPR, CCR #3032

---

**Page 2**

1                   A P P E A R A N C E S
2
     FOR THE PLAINTIFFS:
3
         DAVID FADDUOL
4        Ruiz & Smart LLP
         901 Fifth Avenue, Suite 820
5        Seattle, Washington  98164
         206.203.9100
6        dfadduol@ruizandsmart.com
7
     FOR THE DEFENDANT:
8
         BENJAMIN ROESCH
9        Jensen Morse Baker PLLC
         520 Pike Street, Suite 2375
10       Seattle, Washington  98101
         206.682.1846
11       benjamin.roesch@jmblawyers.com
12
13                     * * * * *
14
15
16
17
18
19
20
21
22
23
24
25

---

**Page 3**

1    VIDEOCONFERENCE DEPOSITION OF MICHAEL MULLALY
2                   EXAMINATION INDEX
3    EXAMINATION BY:                      PAGE
4    MR. FADDUOL                          4
5
                      EXHIBIT INDEX
6
     EXHIBITS FOR IDENTIFICATION            PAGE
7
8    1    Letter dated February 9, 2024       12
9    2    Email string, Subject: RE:
          ARAG-Draft Letter re William McNae
10        State Court Complaint
          (Attorney-Client Privileged)       15
11   3    List of Persons and Entities
          Involved                           34
12
                      * * * * *
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**Page 4**

1         COLUMBUS, OHIO; JULY 16, 2024
2              9:01 A.M.
3              -o0o-
4
5    MICHAEL MULLALY,        witness herein, having been
6              first duly sworn on oath,
7              was examined and testified
8              as follows:
9
10             E X A M I N A T I O N
11   BY MR. FADDUOL:
12        Q.  Okay.
13        Mr. Mullaly, can you just say something?  You
14   kind of came off a little quiet there.  I want to make
15   sure I can hear you okay.
16        A.  Sure.  Are you able to hear me well now?
17        Q.  Yeah.  I'll turn up my volume a little bit.
18        Can you state your full name, please?
19             MR. FADDUOL:  I'm sorry, Ben.
20             MR. ROESCH:  I was going to say something
21   real quick off the top.  I don't think it's -- it
22   affects the deposition particularly substantive, but
23   wanted to get it on the record, which is that, you
24   know, Mr. Mullaly isn't, you know, an employee of
25   ARAG.  You know, he's not -- we're making him

---

1 (Pages 1 to 4)

McNae v. ARAG Insurance Company                                    Michael Mullaly

---

Page 5

1    available, you know, in response to the deposition
2    notice.  I think probably, technically, because he's
3    not a party, you know, a subpoena, you know, would
4    theoretically be required.
5         All -- all we want to say is that we're
6    not waiving any sort of rights or arguments as to his
7    status by virtue of appearing here for the deposition
8    this morning.
9         MR. FADDUOL:  Okay.
10        Well, fair enough.  I think that you
11   appreciate, from our perspective, he was acting as an
12   agent for ARAG, even though he may not be an employee,
13   in some capacities, at least.  And we will just deal
14   with those issues later if they become necessary, I
15   guess.
16        MR. ROESCH:  I -- I think that's a good
17   approach.  Thank you, sir.
18   BY MR. FADDUOL:
19        Q.  Okay.  All right.
20        I apologize, Mr. Mullaly.  I think I left off
21   with:  Could you state your full name for the record,
22   please?
23        A.  Certainly.  Michael Thomas Mullaly.
24        Q.  Mullaly.  I apologize.  I've been saying your
25   name wrong this whole time.  Okay.

---

Page 7

1    time you don't understand one of my questions?
2        A.  I will.
3        Q.  And will you agree to tell me if I'm unclear
4    in any of my questions?
5        A.  I will.
6        Q.  And will you agree not to guess or speculate?
7    If there's something you don't know, will you tell me?
8        A.  Yes.
9        Q.  In response to one of my questions, of
10   course.
11       A.  Of course, yes.
12       Q.  Have you ever testified in court before?
13       A.  No, I don't believe I have.
14       Q.  Have you ever testified in an arbitration
15   before?
16       A.  No.
17       Q.  Have you ever --
18       A.  I don't know if you can hear -- sorry.  The
19   video froze momentarily.  Sorry.  I think it's okay.
20   Apologies.
21       Q.  Okay.
22       Have you ever served as an expert witness in
23   any case before?
24       A.  I have not.
25       Q.  Could you just give me a brief background

---

Page 6

1        A.  Oh, I don't even notice.  It's a tough one.
2        Q.  I've got that same issue, so I understand.
3        Where are you today?
4        A.  I'm in Columbus, Ohio.
5        Q.  And are you in an office building?
6        A.  I am.  I'm in my office at Squire Patton
7    Boggs, not in my fiscal office, but in our offices in
8    a conference room.
9        Q.  Are you alone there in the conference room?
10       A.  I am.
11       Q.  Okay.
12       And do you reside in Columbus, Ohio?
13       A.  I reside in Upper Arlington, Ohio.
14       Q.  Have you ever given a deposition before?
15       A.  I have not.
16       Q.  Have you taken a deposition before?
17       A.  I have.
18       Q.  Do you have a ballpark idea of how many
19   depositions you've taken?
20       A.  I would say greater than ten.
21       Q.  Okay.
22       So I'll skip those rules that we kind of talk
23   about at the beginning of depositions at times because
24   I assume that you're familiar with them.
25       But will you agree to tell me today if at any

---

Page 8

1    sketch of your educational history?
2        A.  Sure.  Could you tell me a little bit more
3    what you're looking for?
4        Q.  Well, I guess the -- the highlights, such as
5    college, graduate degrees, any other education like
6    that, things of that nature?
7        A.  Okay.  Sure.
8        I have a bachelor's degree from Princeton
9    University, and a law degree from Boston College Law
10   School, and no other -- no other formal education.
11       Q.  And you hold a law license, correct?
12       A.  I do.
13       Q.  In what states?
14       A.  In Massachusetts and in Ohio.
15       Q.  Do you have any certificates or
16   certifications, or any other type of -- kind of --
17   maybe less formal education, at least related to the
18   insurance industry?
19       A.  No, I don't have any certifications of that
20   kind.
21       Q.  Can you give me a brief background similar to
22   your education and experience regarding your work
23   experience?
24       A.  Sure.  After law school?
25       Q.  Yes.

---

2 (Pages 5 to 8)

McNae v. ARAG Insurance Company

Michael Mullaly

---

Page 9

1    A.  Okay.
2        After law school, I clerked for a year at the
3    Massachusetts Appeals Court, and then I worked for
4    three years at a litigation boutique in Boston.  Some
5    people broke off from that to form another litigation
6    boutique in Boston, and I joined them.  And then my
7    next job was here at Squire Patton Boggs in Columbus.
8    Q.  And how long have you been with Squire?
9    A.  This is my eighth year.
10   Q.  And that -- that first law firm that you
11   worked for after you clerked, what was the name of
12   that firm?
13   A.  It was called Corwin & Corwin --
14   Q.  And what was your --
15   A.  -- C-O-R- -- oh, pardon me.
16   Q.  I'm sorry.  Go ahead.  I cut you off.
17   A.  C-O-R-W-I-N.
18   Q.  And what was the firm after Corwin?
19   A.  It was named Desmond D-E-S-M-O-N-D, Strang,
20   S-T-R-A-N-G, & Scott, S-C-O-T-T.
21   Q.  And how long were you at Desmond?
22   A.  I believe about -- less than three years.  I
23   think two to three years.
24   Q.  Before you did your work clerking, had you
25   worked in the -- in the insurance industry at all?

---

Page 10

1    A.  No.  No.
2    Q.  Describe generally what, if anything, you did
3    to prepare for today's deposition.
4    A.  I met with Ben and Gabe on a couple of
5    occasions, and that's essentially it.
6    Q.  And you're referring to Ben Roesch, who's on
7    the meeting here with us, correct?
8    A.  I am.  And Gabe Baker, who is part of Ben's
9    firm.
10   Q.  And when did you initially meet with them to
11   begin preparing for your deposition?
12   A.  I'm trying to remember.  I met with Ben
13   yesterday.  We also met on another occasion, maybe
14   approximately a week before, and Gabe also
15   participated on that occasion.
16   Q.  So maybe sometime last week with the meeting
17   with Ben and Gabe?
18   A.  It may have been towards the end of the week
19   prior, but around that time.
20   Q.  How long did you all meet for?
21   A.  This is an estimate.  I would say probably
22   about two hours each time.
23   Q.  Was anyone else in those meetings other than
24   Ben and Gabe?
25   A.  No.

---

Page 11

1    Q.  Did you review any documents in preparation
2    for your deposition?
3    A.  Did I review any documents with Ben and Gabe,
4    or generally?
5    Q.  Either with them or generally in preparation
6    for your deposition.
7    A.  I did not review any documents with Ben and
8    Gabe.  I did look at the coverage position letter that
9    I prepared in this matter.
10   Q.  Is that the letter -- is that a letter that
11   was sent directly to the McNaes, or a letter that was
12   sent to my office?
13   A.  It was a letter sent to your office in early
14   February.
15   Q.  Okay.
16       So I have up on the screen what I think is
17   the letter you're referring to.  Is this the letter
18   that you're referring to?  And I can scroll.
19   A.  It's very difficult to read, but yes, I can
20   read the date, yes.
21   Q.  And I'll tell you, one of the tricky things
22   about these meetings is I can't see what it looks like
23   on your screen, and sometimes, I can kind of play with
24   things a little bit to make them more visible for you,
25   so let me try to do this.

---

Page 12

1        How's that?
2    A.  That's much better.  Thank you.  And yes, that
3    is the letter that I reviewed.
4        MR. FADDUOL:  Okay.
5        So I will mark this as Exhibit 1 to your
6    deposition.
7        (Exhibit Number 1 was marked.)
8    BY MR. FADDUOL:
9    Q.  And it's the letter starting with Bates
10   Number ARAG 3516.
11       So you reviewed this letter in preparation
12   for your deposition.  Did you review any other
13   documents in preparation for your deposition?
14   A.  I did not.
15   Q.  And this is a letter that you drafted,
16   correct?
17   A.  Yes.
18   Q.  Did you have any assistance in drafting this
19   letter?
20   A.  With the composition of the letter, no.  No, I
21   wrote it myself.
22   Q.  And when you said with the composition, that
23   sounded like it had a little asterisk on your answer.
24       Is there any further explanation to that
25   that's necessary?

---

3 (Pages 9 to 12)

McNae v. ARAG Insurance Company                                    Michael Mullaly

---

Page 13

1    A.  I would just say that, you know, the -- the
2  company, you know, reached its coverage position and
3  asked me to prepare a letter communicating that
4  coverage position.  So, you know, to the extent that
5  that was the cadence of events, you know, I -- I'd
6  want to acknowledge that.  But no one assisted me
7  with, you know, putting the words on the paper.
8    Q.  Okay.
9        What is your understanding about how the
10 company -- I assume you're talking about ARAG -- came
11 to its coverage position?
12       MR. ROESCH:  Object to the extent this
13 calls for attorney-client-protected information and/or
14 work product.
15       Mr. Mullaly, you can answer to the extent
16 that you have information independent of those
17 sources.
18    A.  I don't.
19 BY MR. FADDUOL:
20    Q.  Does this letter reflect a coverage position
21 that you came to after an investigation that you did,
22 or does this just recite your understanding of ARAG's
23 coverage position?
24       MR. ROESCH:  Again, object to the extent
25 that this calls for information protected by the

---

Page 14

1  attorney-client privilege, work product doctrine.
2        Mr. Mullaly, you can answer to the extent
3  that you have knowledge outside of those sources.
4    A.  May I ask you to repeat the question, David?
5  I'm sorry.
6  BY MR. FADDUOL:
7    Q.  Yeah.
8        Does this letter reflect -- and I'm referring
9  to Exhibit 1 to your deposition, the letter you
10 drafted -- does it reflect the coverage position that
11 you came to after an investigation into coverage?  Or
12 does it simply reflect the company's coverage
13 position, referring to ARAG?
14       MR. ROESCH:  Same objection.
15       But yeah, you can go ahead.
16    A.  Thank you.  It reflects the company's coverage
17 position.
18 BY MR. FADDUOL:
19    Q.  Did you do any investigation into the claim
20 that the McNaes submitted to ARAG?
21       MR. ROESCH:  Object to the form.
22 Ambiguous as to what "investigation" means.
23    A.  Yeah.  May I -- may I ask what -- what you
24 mean by "investigation," David?
25 ///

---

Page 15

1  BY MR. FADDUOL:
2    Q.  Well, you know what?  I think I'll get back
3  to that.  I don't want to get too sidetracked on where
4  we're going.
5        When did you first become, I guess, involved
6  in this case?
7    A.  I first became involved in this case at the
8  very end of January of this year.
9    Q.  And do you know when your firm first became
10 involved in this case?
11    A.  To the best of my knowledge, I'd say at the
12 very end of November of last year, or possibly at the
13 very beginning of December of last year.
14       MR. FADDUOL:  Okay.  I have attached a
15 series of emails that I have marked, and I'm going to
16 mark as Exhibit 2 to your deposition.  They start with
17 the Bates Number ARAG 3143.
18       (Exhibit Number 2 was marked.)
19 BY MR. FADDUOL:
20    Q.  Are you able to see this on your screen, sir?
21    A.  I see an email, dated February 2nd, now one
22 also dated from February 2nd from Ann Cosimano.
23    Q.  Yeah.
24        And this is three pages, and I really just
25 want to ask you about the last page.

---

Page 16

1    A.  Okay.
2    Q.  But let me know if you want to see any more
3  of this.  I'm just -- I kind of scrunched it so that
4  it might be more visible on your screen, but I'm happy
5  to accommodate you.  But the first -- I think the
6  first email in this string is this email from you to
7  Ann Cosimano.
8        Do you see that?
9    A.  Yes, I see that.
10   Q.  And this is an email on February 1st,
11 correct?
12   A.  It is.
13   Q.  And is this an email that you sent?
14   A.  It is.
15   Q.  And you identify that you are an attorney in
16 Mary Jo's insurance group in the second sentence,
17 correct?
18   A.  That's correct.
19   Q.  Who is Mary Jo?
20   A.  Mary Jo is the practice group leader of the
21 insurance regulatory group in the Columbus office of
22 Squire Patton Boggs.  She's a former superintendent of
23 insurance of Ohio.
24   Q.  And did --
25       (Crosstalk.)

4 (Pages 13 to 16)

McNae v. ARAG Insurance Company                                    Michael Mullaly

---

Page 17

1    A.  She's -- yeah, so she's a partner at the firm
2  here.
3               (Reporter clarification.)
4    A.  I believe I said she's a partner at the firm.
5  Please tell me if that continues.  I can try to get
6  IT.
7    **Q.  Okay.**
8    **So I think where we left off was, I had asked**
9  **if Mary Jo was a supervisor of yours.**
10   A.  I would say yes, she is a supervisor of mine.
11   **Q.  And do you work in the -- I think you**
12 **referred to it as the insurance regulatory group there**
13 **in Columbus, Ohio.**
14   **Did I remember that correctly?**
15   A.  That is correct, and a portion of my work is
16 with that group.
17   **Q.  And how long have you done insurance-related**
18 **work at Squire?**
19   A.  I would say probably seven of my eight years
20 here, I've had a focus on insurance in one way or
21 another.
22   **Q.  When you were at Corwin or Desmond, did you**
23 **do insurance-related work?**
24   A.  Very little.  It would have been incidental.
25 I mean, I believe I had maybe two or three cases that

---

Page 18

1  had some kind of nexus to insurance, but it -- it was
2  attenuated, and I don't remember any of the details.
3  I would not say that that was, you know, a focus of my
4  practice at that time.
5    **Q.  And there's another person on this email,**
6  **Chassica Soo.**
7    **Do you see that?**
8    A.  Yes, I do.
9    **Q.  Who is Chassica?**
10   A.  Chassica, I believe, is a senior associate in
11 our Los Angeles office.
12   **Q.  Does she work in the same group as you?**
13   A.  No.
14   **Q.  Based upon the approximately seven years that**
15 **you've been doing insurance work, do you have an**
16 **understanding that insurance companies are obligated**
17 **to investigate claims that are made to them?**
18   A.  That's consistent with my general
19 understanding, yes.
20   **Q.  Okay.**
21   **And in terms of that experience and your**
22 **understanding of that word "investigate" in that**
23 **context, did you do any investigation into the claims**
24 **that the McNaes submitted to ARAG?**
25   MR. ROESCH:  Again, object.  Vague with

---

Page 19

1  respect to what you mean with respect to the term
2  "investigate."
3               You can go ahead and answer, yeah, if you
4  can.
5    A.  Did I investigate the claim in that sense?  I
6  would say no, I -- I -- no, I wasn't -- I didn't
7  perform an investigative function.
8  BY MR. FADDUOL:
9    **Q.  Did you evaluate the claims that the McNaes**
10 **submitted in any way?**
11              MR. ROESCH:  Objection.  Vague with
12 respect to meaning of "evaluate."
13   A.  I would say that the full answer would require
14 me to say, I was asked to and I did provide legal
15 advice in the form of a legal coverage opinion.  I
16 wouldn't characterize that as an evaluation of the
17 claim.  It was legal advice pertaining to coverage and
18 the company's own exposure.  But I didn't perform an
19 evaluation of the claim, I wouldn't say, no.
20 BY MR. FADDUOL:
21   **Q.  And when you refer to your coverage opinion**
22 **that you provided to the company, is that separate**
23 **from the doc- -- the letter that we were looking at**
24 **before, Exhibit 1?**
25   A.  Yes, it is.  It's separate.

---

Page 20

1    **Q.  Are the conclusions that you came to in your**
2  **coverage opinion different than the conclusions that**
3  **are expressed by you in Exhibit 1?**
4    MR. ROESCH:  Object to the extent this
5  calls for attorney-client protected information.
6               You can answer to the extent you have any
7  independent knowledge.
8    A.  I cannot answer without breaching privilege.
9  BY MR. FADDUOL:
10   **Q.  Who did you speak to, if anyone, regarding**
11 **the McNae claims at ARAG?**
12   A.  At what time?
13   **Q.  At any time.**
14   MR. ROESCH:  And just to clarify, David --
15 sorry -- do you mean with respect to the litigation?
16 Do you mean with respect to some other aspect of the
17 claim?
18   MR. FADDUOL:  Well, I mean, my impression
19 is that he wasn't involved with the claim at all
20 before late February, so I don't think we're talking
21 about a large window.
22 BY MR. FADDUOL:
23   **Q.  And you kind of gave me a weird look there,**
24 **sir.  Do -- do you disagree?**
25   A.  I believe you said late February.  I think you

---

5 (Pages 17 to 20)

McNae v. ARAG Insurance Company                                          Michael Mullaly

|   | Page 21 |
|---|---|

1    meant late January.
2        Q.  I did.  I apologize.
3        A.  That's okay.
4        Q.  So, in the time since late January when you
5    first became involved in this matter, who at ARAG have
6    you spoken to, if anyone, about anything?
7        A.  About anything?  I would say Ann Cosimano and
8    Kathy Miller.
9        Q.  Anyone else that you recall?
10       A.  No.
11       Q.  Who is Kathy Miller?
12       A.  Kathy Miller, to the best of my understanding,
13   is a paralegal who works with Ann Cosimano at ARAG.
14       Q.  And who is Ann Cosimano?
15       A.  Ann Cosimano is the general counsel of ARAG.
16       Q.  And so I take it, then, your understanding is
17   that Kathy Miller works within the general counsel's
18   office at ARAG; is that fair?
19       A.  Yes, that's my understanding.
20       Q.  Have you spoke to anyone at ARAG outside of
21   the legal department of ARAG?
22       A.  No.
23       Q.  And we actually looked at a letter that you
24   had written to Ann, correct?
25       A.  We looked at an email I wrote to Ann.  Is that

|   | Page 22 |
|---|---|

1    what you mean?
2        Q.  It is.
3        A.  Yes.
4        Q.  And have you had any written correspondence
5    with anyone other than Ann or Kathy at ARAG?
6        A.  No, with the possible exception of an IT
7    person, you know, just thanking him, but no, no
8    substantive communications with anyone other than
9    Kathy and Ann.
10       Q.  Have you had any substantive communications
11   with Stephanie Casey?
12       A.  No.
13       Q.  I'm going to get this name horribly wrong,
14   but have you had any substantive communications with
15   Alaina Fotiu-Wojtowicz?
16       A.  No, I have not.
17           MR. FADDUOL:  And I'll give you a spelling
18   at the end, Anita.
19   BY MR. FADDUOL:
20       Q.  You know who I'm referring to by Alaina,
21   though, correct?
22       A.  I do know who you're referring to, and I would
23   be similarly perplexed to say her name, so --
24       Q.  Fair enough.  Have you had any substantive
25   communications with Richard Gomez?

|   | Page 23 |
|---|---|

1        A.  Well, yes, I have spoken with Richard Gomez.
2        Q.  Okay.
3            Tell me about those conversations.
4        A.  I played a limited role in the onboarding of
5    Richard Gomez who, to my understanding, is
6    representing Ronda McNae and Will McNae in the
7    underlying litigations.  So the direct communications
8    that I had with Mr. Gomez were related to negotiation
9    and discussion of a rate at which he would be willing
10   to represent Mr. McNae in the state litigation.
11       Q.  And did you say a rate at which he would be
12   willing to represent?
13       A.  A rate of compensation, the terms under which,
14   you know, he would be willing to accept, you know,
15   that case.
16       Q.  And did you all come to an agreement?
17       A.  An agreement was reached, but I wasn't a
18   participant in -- in that final stage of the
19   discussion.
20       Q.  Do you recall when you first interacted with
21   Richard Gomez?
22       A.  I don't recall specifically, I'm sorry, or
23   generally.
24       Q.  Did you have any written communication with
25   Richard Gomez?

|   | Page 24 |
|---|---|

1        A.  I believe I did write to him.  That -- that
2    may have been our initial contact.  I don't recall for
3    certain.  We spoke on the phone also.
4        Q.  Do you think that that written communication
5    was an email?
6        A.  Yes, it would have been an email.
7        Q.  What is the substance of the communications,
8    as far as you recall it, with Richard Gomez?
9        A.  It's very general.  We had been informed by
10   your office that Mr. McNae wished to be represented by
11   Mr. Gomez.  I believe we had also been informed by
12   your office that Mr. McNae had paid something to
13   Mr. Gomez, and was seeking reimbursement for that.
14           So I contacted Mr. Gomez to discuss under what
15   terms he would represent Mr. McNae as an ARAG network
16   attorney because he was unwilling to do so at -- at
17   the standard rate.  So it was basically soliciting
18   from him, you know, information about under what terms
19   he would be willing to represent Mr. McNae as a
20   network attorney, and discussion of what he had been
21   paid by Mr. McNae, and the circumstances surrounding
22   that.
23       Q.  And who authorized you at ARAG to conduct
24   those negotiations with Mr. Gomez?
25       A.  Ann Cosimano.

McNae v. ARAG Insurance Company                                    Michael Mullaly

Page 25

1    Q.  Did you have any -- were you given any
2  guidance as to the bounds of the terms that you were
3  able to negotiate with Mr. Gomez?
4    A.  No, and I also had no authority.  I was
5  relaying information back and forth.
6    Q.  What was the standard ARAG rate that
7  Mr. Gomez would not agree to?
8    A.  I don't recall specifically.  I'm sorry.
9    Q.  Do you recall any concerns that Mr. Gomez
10 expressed to you regarding ARAG's standard rate?
11   A.  Not as such.  I mean, what he said to me was
12 that he wanted to be paid a, quote, market rate,
13 something substantially, you know, along those lines.
14 But no, I mean, he didn't -- the discussion was
15 mostly, you know, what rate he wanted, not -- not a
16 comment on ARAG's rates.
17   Q.  Well, I take it that the rate that he wanted
18 was higher than ARAG's rates; is that fair?
19   A.  Yes.  Yeah.
20   Q.  And he wasn't asking, at least by his
21 perspective or any premium.  He was just asking for
22 the market rate as he perceived it; is that fair?
23        MR. ROESCH:  Objection.  Calls for
24 speculation.
25   A.  I agree.  I have no basis for judgment there.

Page 26

1  I mean, he -- he made an assertion about market rate
2  at one point, but I mean, I don't know separate
3  from -- I don't know the full significance of that.
4  It's just what he --
5    Q.  Yeah.  That's what he told you, right?
6    A.  Yes.  Yeah, he did say that.
7    Q.  Do you recall how many times you spoke to
8  Mr. Gomez?
9    A.  I'd say three to four.  He was very busy, so
10 all of the communications were just kind of circling
11 back to remind him of -- of the kind of open question.
12 But yeah, I'd say two to four times.  Certainly more
13 than two.  Around four.
14   Q.  And I think you already said this, but you
15 don't recall even generally when those communications
16 occurred?
17   A.  Not really.  I would be guessing.  I'm sorry.
18   Q.  Are there any notes or documents that show
19 the result of those communications?
20   A.  Not that I've seen.  That show the -- the end
21 outcome, you mean?
22   Q.  Yes.
23   A.  Not that I've seen.  I mean, there may well
24 be, but I've never seen them.
25   Q.  At least as to your experience with

Page 27

1  Mr. Gomez, where you left off with him, what was the
2  outcome of that negotiation?
3    A.  He -- I'm sorry.  I'm trying to recall, and I
4  don't really.  I think he had a question that I
5  relayed to Ann, I believe, but there was nothing
6  settled at that point.  I mean, it was still, I'd say,
7  in an information exchange, you know, period, and
8  that, you know, was the last communication I had with
9  him.
10   Q.  What was --
11   A.  Then he wrote to me -- oh, sorry -- and said
12 that he and Ann had -- had reached an agreement, I
13 believe.  So -- but didn't say what it was.  Because I
14 had asked him -- you know, I was following up with
15 him, and that's when he, I think, wrote to me and
16 said, you know, this has been resolved with Ann.
17   Q.  What was the question that he had for Ann
18 that he relayed to you?
19   A.  It may have been the -- I don't remember, and
20 I don't remember if it was a question.  I don't
21 remember which way the question was directed.  I'm
22 sorry, I -- I really shouldn't say it because I just
23 don't know with sufficient certainty.  I know one or
24 the other, Ann or Mr. Gomez, had a question that I
25 relayed to the other, and that that was my last

Page 28

1  involvement in that matter.
2    Q.  Well, whether you were relaying a question
3  from Ann to Richard or Richard was relaying a question
4  from himself to Ann through you, what was the
5  question, if you recall?
6    A.  I don't recall that.  I know it related to,
7  like, amount of compensation.  But beyond that, I -- I
8  don't remember.
9    Q.  Was the entirety of the substance of your
10 communications with Richard regarding the amount of
11 his compensation to represent Will?
12   A.  Yes, and also about amounts that Will had paid
13 to Mr. Gomez when Will retained him independently.  I
14 should include that.  But apart from that, yes.
15   Q.  What is an ARAG network attorney, if you
16 know?
17   A.  What is an ARAG network attorney?  My general
18 understanding is that it is an attorney who has
19 applied to and been qualified to be added to a panel
20 of attorneys who have agreed to represent ARAG
21 insureds at particular rates and under certain
22 conditions.  And beyond that, I really don't know.
23   Q.  And it was your understanding that, at the
24 time you were interacting with him, that Mr. Gomez was
25 an ARAG network attorney, correct?

7 (Pages 25 to 28)

McNae v. ARAG Insurance Company                                    Michael Mullaly

---

Page 29

1    A.  Yes, that's correct.
2    Q.  In regards to this matter, have you spoken to
3  any other ARAG network attorneys?
4    A.  No.
5    Q.  And I think we've already covered this, but I
6  just want to make sure I'm covering all my bases.
7         Before the end of January 2024, you had no
8  knowledge or experience with the McNaes' case; is that
9  correct?
10   A.  That's correct.
11   Q.  Or I guess the -- the claims that the McNaes
12 had submitted to ARAG.
13   A.  Yeah, I think that's right.  I mean, I may
14 have had a general awareness that Mary Jo was working
15 on some case, but I didn't know.  I think, in
16 retro- -- you know, it was ARAG, but I had no
17 substantive knowledge of the case or the claims until
18 the end of January of this year.
19   Q.  Did you have any involvement with the
20 drafting of letters between ARAG and the McNaes prior
21 to your February letter?
22   A.  No.
23   Q.  Before the McNae matter, had you done any
24 work for ARAG?
25   A.  No, not to my recollection.  No, I don't

---

Page 30

1  believe I have.
2    Q.  Do you --
3    A.  Pardon me --
4       MR. ROESCH:  And I'll caution the witness
5  not to reveal any specific client confidences.
6       THE WITNESS:  Right.
7    A.  I believe there was a matter very unrelated
8  some years ago with ARAG, but that's it.
9  BY MR. FADDUOL:
10   Q.  A matter that you worked on with ARAG; is
11 that what you're saying?
12   A.  Yes.  I was involved in a matter, but only
13 very slightly.
14   Q.  What was your role in that previous instance
15 in working with ARAG generally?
16      MR. ROESCH:  And again, very, very
17 generally, without revealing any client confidences.
18   A.  I'm trying to remember.  I really don't
19 remember, David.  I'm sorry.  I know there was --
20 there was something, but my role was so minor, and it
21 was so long ago, I just don't -- I don't remember.
22 BY MR. FADDUOL:
23   Q.  Let me ask you probably an easier way.
24   A.  Okay.
25   Q.  Would you agree that negotiating with Richard

---

Page 31

1  Gomez to facilitate him acting on behalf of the
2  McNaes, or representing the McNaes and being paid by
3  ARAG, constituted, you know, assisting ARAG in
4  processing that claim?
5       MR. ROESCH:  Objection.  Vague.
6       Go ahead and answer if you can.
7    A.  I mean, I think that calls for a legal
8  conclusion.  I don't -- is it -- that's processing the
9  claim?  I mean, I guess what you're trying to -- are
10 you asking -- I guess, just could I ask what you mean
11 by -- by processing a claim?  I mean, are you talking
12 about, you know, discharging some kind of, you know,
13 quasi-fiduciary function?  Or -- I mean, I -- I guess
14 I'm just trying to understand specifically what you're
15 asking.
16 BY MR. FADDUOL:
17   Q.  Yeah.
18      Will McNae made a claim to ARAG for benefits
19 under his policy with ARAG, correct?
20   A.  Yes.
21   Q.  And as part of that claim, and pursuant to a
22 reservation of rights, ARAG agreed to pay for Richard
23 Gomez to represent Will, at least with some bounds on
24 that agreement, correct?
25   A.  Yeah, subject to the letter, right.

---

Page 32

1    Q.  And you assisted in that process by
2  negotiating with Mr. Gomez, correct?
3    A.  I communicated with him.  I'm not sure I would
4  characterize it as negotiation, but yes, I did have
5  communications with him that were intended to
6  facilitate a negotiation with him, yes.
7    Q.  Okay.
8       Had you ever done any kind of negotiating on
9  behalf of ARAG like that in any previous instances?
10   A.  With the caveat that I don't think I was
11 negotiating on behalf of ARAG, the answer is no, I --
12 no.
13   Q.  What is a special referral attorney with
14 ARAG, if you know?
15      MR. ROESCH:  And -- yeah, and again, don't
16 speculate.
17   A.  Yeah, I really -- I don't know the details to
18 give a complete answer without speculation and
19 surmise, so I'm sorry.
20 BY MR. FADDUOL:
21   Q.  Do you have any knowledge of who was
22 primarily in charge of handling the McNae claim by
23 ARAG?
24      MR. ROESCH:  Objection --
25   A.  No.

---

8 (Pages 29 to 32)

McNae v. ARAG Insurance Company                           Michael Mullaly

---

Page 33

1    MR. ROESCH: -- to the extent it calls for
2  attorney-client-privileged communication or work
3  product in the -- in the defense of the lawsuit.
4        Go ahead and answer to the extent that you
5  have knowledge independent of those.
6    A.  I have no knowledge independent of those.
7  BY MR. FADDUOL:
8    Q.  I think I asked you this, but what is your
9  understanding of when your firm first became involved
10 in the McNae claim with ARAG?
11   A.  My understanding is that it -- that occurred
12 at the very end of November of last year, or the very
13 beginning of December of last year.
14   Q.  Would you agree that one of the reasons a
15 person buys insurance is to buy peace of mind?
16   MR. ROESCH:  Objection.  Calls for
17 speculation.
18   A.  Yeah, I -- I agree.  I mean, I have nothing to
19 say about why a particular person buys insurance.
20 BY MR. FADDUOL:
21   Q.  Do you agree that an insurance company has a
22 duty to deal fairly and in good faith with its
23 policyholders?
24   A.  That's my general understanding, yes.
25   Q.  Do you agree that an insurance company must

---

Page 34

1  treat its policyholder's interests with equal regard
2  as it's -- as it does its own interests?
3    A.  That's also consistent with my general
4  understanding.
5    Q.  Okay.
6    MR. FADDUOL:  Okay.  I am going to mark as
7  Exhibit 3 to your deposition a document that our
8  office created.
9        (Exhibit Number 3 was marked.)
10 BY MR. FADDUOL:
11   Q.  And I'm not trying to hide the ball with you
12 here, sir.  This is just a list of names that I've
13 seen in documents, and in no particular order.  We've
14 talked about a few of these folks, and I just want to
15 make sure that I've covered all of them with you.
16   Are you able to see this document okay?
17   MR. ROESCH:  Yeah, David, would you mind
18 blowing it up just a little bit?
19   MR. FADDUOL:  Yeah, and let me do --
20   MR. ROESCH:  Thank you.
21 BY MR. FADDUOL:
22   Q.  How's that?  Is that a little better?
23   A.  A little.  It's a little fuzzy.  I'm sorry.
24   MR. FADDUOL:  I'm just gonna --
25   MR. ROESCH:  Yeah, that's helpful.

---

Page 35

1    A.  There you are.  Thank you.  For me, at least.
2  BY MR. FADDUOL:
3    Q.  Okay.
4        And I'm going to start from the top left and
5  work my way down.
6        We've already talked about Ann, correct?
7    A.  We have.
8    Q.  And who is Meagan Adams, if you know?
9    A.  My concern here is that -- first of all, I
10 don't recall if this is -- go ahead.
11   MR. ROESCH:  Yeah.  So, David, I think
12 some of these questions are going to touch on
13 information that Mr. Mullaly only has, you know, as a
14 result of, you know, his -- his work in the
15 litigation.  And so, you know, his -- his knowledge,
16 if any, of a lot of these people is going to be, you
17 know, part of his -- his work product.
18   And -- and the same thing would be true
19 of, you know, the -- the relevance of anything that
20 they did, and -- and that sort of thing.  So I guess
21 I -- I don't want to sort of get in the way of this
22 too much, you know, and -- and make a bunch of kind of
23 unnecessary objections.
24   So I guess, you know, to the extent that
25 Mr. Mullaly knows who these people are, you know, and

---

Page 36

1  what their functions are at ARAG generally, or with
2  respect to the claim independent of his -- you know,
3  his -- his work product in this case, I -- I think
4  it's okay to answer, but otherwise, I -- I don't think
5  that's proper.
6    MR. FADDUOL:  Well, let me -- let me ask
7  it a different way.
8  BY MR. FADDUOL:
9    Q.  Have you ever spoken to Meagan Adams, sir?
10   A.  I have not.
11   Q.  Have you ever spoken to Andrea Morse?
12   A.  No.
13   Q.  Have you ever spoken to Cathie Kyle?
14   A.  No.
15   Q.  Have you ever spoken to Kathy Miller?
16   A.  Yes, I have.
17   Q.  And I probably should have asked a better
18 question.
19   Have you ever corresponded in any way with
20 Meagan Adams, Andrea Morse, or Cathie Kyle?
21   A.  Not to my recollection, I don't believe I
22 have.
23   Q.  Have you ever corresponded in any way with
24 Jamie Lane?
25   A.  No.

9 (Pages 33 to 36)

McNae v. ARAG Insurance Company                                    Michael Mullaly

---

Page 37

1    Q.  Have you ever corresponded with Kari Faust?
2    A.  No.
3    Q.  Have you ever corresponded with Brittany
4    Gering?
5    A.  No.
6    Q.  Have you ever corresponded with Jan Tyler?
7    A.  No.
8    Q.  Have you ever corresponded with any of the
9    remaining names in that left column, starting with Jan
10   Tyler and working your way down?
11   A.  No, I don't believe I have.
12   Q.  And let's -- just do the left -- the
13   right-hand side in chunks.
14        Have you ever corresponded with any of the
15   folks that I've highlighted on the screen?
16   A.  So you've highlighted Jennifer Beck through
17   Jeff LeMay, and I don't believe I've corresponded with
18   any of them.
19   Q.  Okay.
20        And you're after Mr. LeMay, so we'll skip
21   you.
22        We've already spoke about Mary Jo, right?
23   A.  We have.
24   Q.  Have you ever communicated with Andrea Tyler?
25   A.  I don't believe I have, no.

---

Page 38

1    Q.  And the next is Richard Gomez.  We've spoken
2    a little bit about him today.
3        Other than our -- the communications that we
4    spoke about today that you had with Mr. Gomez, are
5    there any others that you've ever had?
6    A.  No, I don't believe so.  Not that I can
7    recall.
8    Q.  Okay.
9        And we've already spoke about Chassica,
10   right?
11   A.  Yes.
12   Q.  Have you ever communicated in any way with
13   Alaina, who I'm struggling to highlight on the screen?
14   There.
15   A.  No, I don't believe I have.
16   Q.  Do you know who Anthony Murphy is?
17       MR. ROESCH:  Again -- again, objection to
18   the extent of work product.
19       If you have independent knowledge, go
20   ahead and answer.
21   A.  Yeah, I -- I don't know, and if I did, it
22   would be through the source that's been described, so
23   no.
24   BY MR. FADDUOL:
25   Q.  And you've never communicated with Stephanie

---

Page 39

1    Casey, correct?
2    A.  I have not.
3    Q.  Have you ever communicated with Destiny
4    Nelson?
5    A.  No, I don't believe so.
6    Q.  Have you ever communicated with Rafael Diaz?
7    A.  No, I don't believe so.
8    Q.  Have you ever communicated with Jonathon
9    Cohen?
10   A.  I don't believe I have.
11   Q.  Have you ever communicated with Darren
12   Gibbons?
13   A.  I believe Darren Gibbons is an IT person
14   who -- to whom I've sent a message saying something
15   like "Thank you."  Other than that, I -- I don't
16   believe I have.
17   Q.  Is he the IT person that you referenced
18   earlier in your deposition?
19   A.  He is.  I believe so.  I may be mistaken,
20   but -- but I'm pretty sure that he is, yes.
21   Q.  Is it your belief that he's an employee at
22   ARAG?
23   A.  I don't know.  I mean, I -- I would be
24   guessing.  I mean, that -- that would make sense, but
25   I -- I don't know one way or the other.

---

Page 40

1    Q.  Have you ever --
2    A.  I don't know if he's -- sorry.  Go ahead.
3    Q.  Have you ever communicated with Heather
4    Preston?
5    A.  I don't believe I have.
6    Q.  And have you ever communicated with Sarah
7    Tharp?
8    A.  I don't believe I have.
9    Q.  Do you agree that an insurance company has a
10   duty to act reasonably and fairly in interpreting and
11   applying its policy provisions?
12   A.  Yes.  I mean, that's -- that's consistent with
13   my general understanding, yes.
14   Q.  Do you agree that claims decisions should be
15   made without regard to effect on company
16   profitability?
17   A.  Yes.  That's consistent with my general
18   understanding.
19   Q.  Do you agree that an insurance company must
20   fairly, fully, and promptly evaluate and adjust a
21   claim?
22   A.  Yes, that's my understanding.
23   Q.  Do you agree that, for a full or partial
24   denial of a claim, an insurance company must give a
25   written explanation pointing to facts and policy

---

10 (Pages 37 to 40)

McNae v. ARAG Insurance Company                              Michael Mullaly

---

Page 41

1  provisions?
2      A.  Yes.  It's my understanding that some, maybe
3  all, jurisdictions require that.
4      Q.  Would you agree that Washington is one of
5  those jurisdictions?
6      A.  To my knowledge, it is, but -- I can't speak
7  to Washington law with certainty, but yeah.
8      Q.  Do you agree that an insurance company
9  handling a claim in Washington has an obligation to
10  comply with the claims handling regulations found at
11  Washington Administrative Code 28 -- excuse me --
12  284-30?
13     A.  If the handling of the claim is subject to
14  Washington law, yes.
15     Q.  Do you agree that an insurance company must
16  complete its investigation of a claim within 30 days
17  after notification of the claim, unless it cannot
18  reasonably be completed within that time?
19          MR. ROESCH:  Objection.  If we're talking
20  about specific portions of the Washington
21  Administrative Code, I think it makes sense to, you
22  know, put those up for Mr. Mullaly to -- to see.
23          MR. FADDUOL:  I wasn't referencing the
24  Washington Administrative Code.
25  ///

---

Page 42

1  BY MR. FADDUOL:
2      Q.  You can answer, sir.
3      A.  I'm sorry.  Would you repeat the question?
4  Because I -- I believe it said specific days of --
5  number of days.
6          MR. FADDUOL:  Anita, can you repeat that
7  question for him, please?
8          (The reporter read back the
9          requested portion.)
10         MR. ROESCH:  Object to the form as -- as
11  vague.
12     A.  I'd have to say, I mean, if that is what the
13  Washington Administrative Code says, and if the claim
14  is subject to the Washington Administrative Code, then
15  yes.  But I -- I don't have independent knowledge
16  of -- of what the code says, and I can't speak to it
17  without seeing it.
18  BY MR. FADDUOL:
19     Q.  So if the Washington Administrative Code says
20  that, you would agree, assuming the claim falls under
21  Washington law, but otherwise, you would disagree with
22  that notion; is that fair?
23     A.  I don't know that I would disagree.  I would
24  just acknowledge that, you know, it can be a function
25  of -- of local law, you know, what the specific

---

Page 43

1  requirements are in a particular circumstance.
2          And you know, beyond, you know, expressing my
3  general understanding of, you know, how these
4  requirements, you know, exist and operate, you know,
5  I -- I -- I'm -- I can't give a legal opinion about
6  any specific case.
7          So -- so yeah, I would just say it's -- it's
8  too vague for me to answer really because I -- I would
9  have to know the jurisdiction and the particular facts
10  and circumstances to give an answer.  And you know,
11  that's a hypothetical, so I can't -- I can't give a --
12  a complete response to that.
13  BY MR. FADDUOL:
14     Q.  Do you recall the February reservation of
15  rights letter that we were discussing earlier that you
16  drafted?
17     A.  I do.
18     Q.  In drafting that reservation of rights
19  letter, did you do any investigation to determine what
20  coverages applied to the McNaes under their policy
21  with ARAG?
22          MR. ROESCH:  Object to the extent that
23  "investigation" is vague, and therefore, to the form.
24     A.  Yeah.  I mean, with that objection, I mean,
25  I -- I wouldn't characterize it as an investigation.

---

Page 44

1  I think I may have, you know, made sure I had the --
2  yeah, I mean, I may have looked at the state court
3  docket.  But investigate?  No.
4  BY MR. FADDUOL:
5      Q.  Okay.
6          So, in drafting that letter, you reviewed the
7  state court docket.  Are you talking about in the
8  Florida matters?
9      A.  I'm talking about in the Florida state court
10  matter pertaining to William McNae because that letter
11  addressed only William McNae.
12     Q.  In drafting that letter, did you speak to
13  anyone regarding the coverage analysis contained in
14  that letter?
15          MR. ROESCH:  So object to the extent this
16  calls for attorney-client-privileged information, as
17  well as work product.
18          You can answer to the extent of the
19  existence of any communications, but not their
20  substance.
21     A.  So I was asked to and did provide a legal
22  coverage opinion on the -- you know, the company
23  reached a coverage position and -- and told me, you
24  know, what that coverage position was, and asked me to
25  communicate it in a letter, and -- and that's what I

---

11 (Pages 41 to 44)

McNae v. ARAG Insurance Company                                    Michael Mullaly

---

Page 45

1  did.
2  BY MR. FADDUOL:
3      Q.  And my question is, geared toward any
4  investigation that you did in drafting that letter,
5  and in investigating the coverage opinion that you
6  expressed in your February letter, did you do any kind
7  of communicating with anyone in investigating the
8  opinions that you held on -- that you put in the
9  letter?
10         MR. ROESCH:  Objection.  Vague.
11     A.  Yeah.  I mean, not to be -- I mean, I wouldn't
12 characterize the February letter as containing my
13 coverage analysis.  That -- that was a separate --
14 that was conveyed separately.  I mean, I was -- I had
15 discussions with the company about what coverage
16 position they wanted to take.  That's the decision
17 they reached, and they asked me to communicate that
18 position.  And those are the communications I had
19 surrounding the drafting of the February 9th letter.
20 BY MR. FADDUOL:
21     Q.  In drafting the February 9th letter, did you
22 review any documents other than the correspondence --
23 excuse me -- other than the claim documents from the
24 Florida matter?  That was a bad question.  Let me
25 start that one over.

---

Page 46

1          MR. ROESCH:  Yeah.  Thank you.
2  BY MR. FADDUOL:
3      Q.  In drafting your February reservation of
4  rights letter, did you review any documents other than
5  the Florida state pleadings?
6      A.  I don't remember.  I may have reviewed past
7  communications to the McNaes, but I don't recall if
8  that's true, and if it is, I don't recall which ones.
9      Q.  Did you review any of the insurance policies
10 in drafting that letter?
11     A.  Yes.
12     Q.  So in drafting that letter, you reviewed some
13 state court pleadings, you reviewed the insurance
14 policies, and maybe communications with the McNaes.
15 Anything else?
16     A.  Not that I can recall.
17     Q.  Is there anything that you wanted to review
18 that you were unable to review for any reason in
19 drafting that letter?
20     A.  Not that I recall.
21     Q.  And I think we've covered this, but just to
22 be specific, the February 9th letter does not contain
23 your coverage analysis; it contains the coverage
24 analysis done by ARAG, correct?
25         MR. ROESCH:  Object to the extent --

---

Page 47

1      A.  Yes.
2          MR. ROESCH:  Yeah.  So I -- just vague in
3  terms of "coverage analysis" versus "coverage
4  position."
5      A.  Yes.  I would say --
6          THE WITNESS:  Oh, sorry, Ben.  Were you
7  finished?
8          MR. ROESCH:  Go ahead.
9      A.  I would say that the February 9th letter
10 conveys the company's coverage position.
11 BY MR. FADDUOL:
12     Q.  But not your coverage analysis, correct?
13     A.  Well, I think that requires, you know, going
14 into privileged matters.
15         MR. ROESCH:  Objection again, yeah.
16         MR. FADDUOL:  Hang on.  Hang on.  If he
17 made a coverage analysis for the purposes of
18 communicating that to the McNaes, that's fair for me
19 to ask about.  If he made a coverage analysis separate
20 to the company, then that's fine.
21 BY MR. FADDUOL:
22     Q.  But I just want to be clear --
23         (Unreportable crosstalk.)
24     Q.  -- everyone thinks, right?
25         MR. ROESCH:  I think that's a sort of

---

Page 48

1  slight misunderstanding of -- of the process that
2  Mr. Mullaly testified to.  You know, the -- the first
3  step is providing a coverage analysis, legal coverage
4  analysis to the company.  The company then -- and we
5  can confirm this with Mr. Mullaly -- expressed the
6  coverage position that it wished to convey to
7  Mr. McNae, and Mr. Mullaly then drafted that --
8  drafted that letter.
9  BY MR. FADDUOL:
10     Q.  Sir, what were you asked to do in drafting
11 the February 9th letter?
12     A.  I was asked to draft a response to, if I
13 recall, a communication from your office demanding
14 coverage under Mr. McNae's policy.
15     Q.  And what were you asked to communicate to the
16 McNaes in that letter?
17     A.  What is contained in the letter.
18     Q.  Were you ever asked to create a coverage
19 opinion in response to the claims made by the McNaes
20 to ARAG?
21     A.  Was I asked to --
22         THE WITNESS:  Sorry.  Go ahead.
23         MR. ROESCH:  Objection.  You can answer to
24 the extent of the existence of a -- of a request, but
25 not the -- the substance thereof, which would be

---

12 (Pages 45 to 48)

McNae v. ARAG Insurance Company                                    Michael Mullaly

---

Page 49

1   attorney-client privilege.
2       A.  Yes.  Yeah.  I -- I was asked to, you know,
3   render a legal coverage opinion.
4   BY MR. FADDUOL:
5       **Q.  Other than Mr. Gomez, did you interact with**
6   **any other folks outside of ARAG for the purposes of**
7   **assisting the McNaes in getting legal representation?**
8       A.  No.
9       **Q.  Have you spoken about this matter to anyone**
10  **other than ARAG employees, folks at your firm, or**
11  **Mr. Gomez?**
12      A.  No.  Well, with the exception of Ben and his
13  firm.
14      **Q.  Fair enough.**
15          MR. ROESCH:  I assumed that was kind of
16  encompassed.
17          THE WITNESS:  Yeah.
18          MR. FADDUOL:  Okay, sir.  I think that's
19  all the questions I have for you, I guess, pending if
20  Ben has any questions.
21          MR. ROESCH:  I do not.
22          MR. FADDUOL:  Okay.
23          THE WITNESS:  Well, thank you, David.
24          THE COURT REPORTER:  Mr. Fadduol, would
25  you like to order the transcript?

---

Page 50

1           MR. FADDUOL:  Yes.
2           THE COURT REPORTER:  Mr. Roesch, would you
3   like a copy?
4           MR. ROESCH:  Yes.
5               (Videoconference deposition
6               concluded at 10:16 a.m.)
7               (Reading and signing was not
8               requested pursuant to FRCP Rule
9               30(e).)
10
11              -o0o-
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 51

1                    C E R T I F I C A T E
2
3   STATE OF WASHINGTON      )
4                            ) ss.
    COUNTY OF PIERCE         )
5
6
7       I, ANITA W. SELF, a Certified Court Reporter in
8   and for the State of Washington, do hereby certify
9   that the foregoing transcript is true and accurate to
10  the best of my knowledge, skill, and ability.  Reading
11  and signing was not requested pursuant to FRCP Rule 30(e).
12      IN WITNESS WHEREOF, I have hereunto set my hand
13  and seal this 26th day of July 2024.
14
15
16
17              _____
18              ANITA W. SELF, RPR, CCR #3032
19
20
21
22
23
24
25

---

13 (Pages 49 to 51)

# Exhibit 25

# 30(b)(6) Meagen Adams

# McNae v. ARAG Insurance Company

# August 16, 2024



1325 Fourth Avenue, Suite 1840  Seattle, Washington 98101
Bellingham | Everett | Tacoma | Olympia | Yakima | Spokane
Seattle 206.287.9066    Tacoma 253.235.0111    Eastern Washington 509.624.3261
**www.buellrealtime.com**
email: info@buellrealtime.com

McNae v. ARAG Insurance Company                    30(b)(6) Meagen Adams

---

**Page 1**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

---

WILLIAM MCNAE and RONDA MCNAE, )
husband and wife,              )
                               )
        Plaintiffs,            )
                               )
    vs.                        )  No. 2:24-cv-00211-TL
                               )
ARAG INSURANCE COMPANY,        )
                               )
        Defendants.            )

---

Videoconference Videotaped 30(b)(6)

Deposition Upon Oral Examination

of

ARAG INSURANCE COMPANY

MEAGEN ADAMS

9:32 a.m.

August 16, 2024

Witness Location:  Des Moines, Iowa
(All participants appeared via videoconference.)

REPORTED BY:  Karmen Knudson, RPR, CRR, CCR #1935

---

**Page 2**

1              APPEARANCES
2
3   FOR THE PLAINTIFFS:
4       ISAAC RUIZ
        DAVID FADDUOL
5       PAIGE LEWIS
        RUIZ & SMART LLP
6       901 Fifth Avenue
        Suite 820
7       Seattle, WA 98164
        iruiz@ruizandsmart.com
8       dfadduol@ruizandsmart.com
9   FOR THE DEFENDANT:
10      MICHAEL MULLALY
        JONATHAN ABELE
11      SQUIRE PATTON BOGGS LLP
        41 South High Street
12      Columbus, OH 43215
        michael.mullaly@squirepb.com
13      jonathan.abele@squirepb.com
14      BENJAMIN ROESCH
        JENSEN MORSE BAKER PLLC
15      520 Pike Street
        Suite 2375
16      Seattle, WA 98101
        benjamin.roesch@jmblawyers.com
17
18  COURT REPORTER:
19      KARMEN KNUDSON, RPR, CCR
        BUELL REALTIME REPORTING
20      1325 Fourth Avenue
        Suite 1840
21      Seattle, Washington 98101
22
23  ALSO PRESENT:   BROOK YOUNG, VIDEOGRAPHER
                    ANN COSIMANO
24
25

---

**Page 3**

1                 I N D E X
2   EXAMINATION BY:                    PAGE
3   Mr. Ruiz                  5
4
5
6               EXHIBIT INDEX
7   EXHIBIT MARKED                     PAGE
8
9   1    Fourth Amended Notice of Rule    43
         30(B)(6) Deposition ARAG Insurance
10       Company
11  2    Document titled "Persons Involved   103
         ARAG"
12
13  3    Document titled "Participants and   109
         Decisionmakers"
14  4    Order Extending Pretrial Deadlines  118
         and Continuing Trial
15
16  5    Email from Meagen Adams dated    133
         11/21/23
17       ARAG000261
18  6    Letter to William McNae dated    136
         December 6, 2023 from ARAG Legal
19       Department
         ARAG003733 to 3734
20  7    Email to Casey from Legal US dated   140
         12/20/23
21       ARAG006809
22  8    Letter to William McNae from Jeff   146
         LeMay dated January 3, 2024
23       ARAG003727 to 3731
24  9    Email to William McNae from ARAG   159
         Legal dated October 24, 2023
25

---

**Page 4**

1          EXHIBIT INDEX (Continuing)
2   EXHIBIT MARKED                    PAGE
3
    10    Email to William McNae from ARAG    159
4         Legal dated July 31, 2023
5   11    Group Legal Insurance Certificate and  160
          Service Plan
6         ARAG001630 to 1661
7   12    UltimateAdvisor Plus policy    160
          ARAG001525 to 1629
8
9   13    ARAG Claim Form received 01/23/24    212
          ARAG005704 to 5706
10  14    Email string re: William McNae    216
          ARAG001135 to 1137 *CONFIDENTIAL*
11
12  15    Teams message dated 12/29/23    217
          ARAG000710
13  16    Email string re: William and Ronda    220
          McNae
14        ARAG006882 to 6888
15  17    Case notes for Case 3107432    220
          ARAG003794 to 6881  *CONFIDENTIAL*
16
17  18    Document titled "Subject of    233
          Guidelines, Standards, Trainings, if
18        any, at ARAG"
19
20
21
22
23
24
25

1 (Pages 1 to 4)

McNae v. ARAG Insurance Company                          30(b)(6) Meagen Adams

---

**Page 5**

1          THE VIDEOGRAPHER:  We are on the record.
2   Today's date is August 16th, 2024.  The time now is
3   approximately 9:32 a.m.  This is a 30(b)(6) deposition
4   of ARAG Insurance Company designee Meagen Adams.
5          MEAGEN ADAMS,         witness herein, having been
6                       duly sworn by the Certified
7                       Court Reporter, testified
8                       under oath as follows:
9
10         EXAMINATION
11  BY MR. RUIZ:
12     Q.   Good morning, Ms. Adams.  How are you?
13     A.   I'm good.
14     Q.   Is anyone in the room with you?
15     A.   No.
16     Q.   Okay.  I could have sworn I saw you nod at
17  somebody, but it might have been just somebody walking
18  by.
19          If somebody joins you, will you let me know?
20     A.   Yes, I would.
21     Q.   Thanks.
22          What city do you reside in?
23     A.   Marshalltown, Iowa.
24     Q.   Do you have any plans to move from there in
25  the next twelve months?

---

**Page 6**

1      A.   No.
2      Q.   Are you represented by counsel at today's
3   deposition?
4      A.   Yes.
5      Q.   Who is that?
6      A.   Michael and Benjamin.
7      Q.   Michael?
8      A.   Mullaly.
9      Q.   Mullaly?
10     A.   Mm-hmm.
11     Q.   And Benjamin --
12     A.   And Benjamin Roesch.
13     Q.   Okay.  Who will be making objections on your
14  behalf today?
15          MR. MULLALY:  I will.
16          Michael.
17          MR. MULLALY:  Pardon me.
18          THE WITNESS:  Sorry.
19          MR. RUIZ:  Mr. Mullaly?
20          MR. MULLALY:  Yes.  Yes, Isaac.
21     Q    (By Mr. Ruiz)  And I'm assuming you've been
22  assisted by counsel in getting ready for today's
23  deposition?
24     A.   Yes.
25     Q.   Ms. Adams, do you go by any other name

---

**Page 7**

1   besides Meagen Adams?
2      A.   No.
3      Q.   Have you ever gone by any other name?
4      A.   Yes.
5      Q.   A maiden name, maybe?
6          (Crosstalk)
7      A.   Yes.
8      Q.   A married name?
9      A.   Yes.
10     Q.   Okay.  Which name is that?
11     A.   Previously maiden name Wozny, W-o-z-n-y.
12  Married name Wilson, W-i-l-s-o-n.  Married name
13  Phillips, P-h-i-l-l-i-p-s.
14     Q.   You and I have never spoken before; right?
15     A.   That's correct.
16     Q.   Have you ever spoken with anyone from my law
17  firm?
18     A.   Not to my knowledge.
19     Q.   So as a lawyer in the case, the topics that
20  I'm going to be addressing with you -- this covers a
21  time period of when I wasn't there.  And so depositions
22  are the main opportunity that attorneys like me have to
23  obtain admissible testimony about the key facts of a
24  case from people who directly know the facts, and that
25  includes, you know, organizations like ARAG who know the

---

**Page 8**

1   facts.
2          Before I go further, how should I pronounce
3   ARAG?  Is it ARAG?  ARAG?  Something else?
4      A.   ARAG.
5      Q.   ARAG.  What does ARAG stand for?
6      A.   It's a part of a much longer German word.  So
7   it's truncated for use in North America.
8      Q.   Do you know that German word?
9      A.   I do not.  I do not speak German.
10     Q.   Fair.
11          All right.  So -- but back to why we're here.
12          It's important that you not only tell the
13  truth, which I know you know already, but that you also
14  not guess to any of the questions.
15          Do you agree not to guess?
16     A.   Yes, I agree to that.
17     Q.   And if one of my questions doesn't make sense
18  or if it's confusing or misleading, it's my preference
19  that you tell me about your concerns so I can rephrase
20  the question.
21          Would you please do that?
22     A.   Yes, I will.
23     Q.   If I show you a document today and you need
24  more time to read it, let me know so that I can assess
25  how to proceed.

---

                                    2 (Pages 5 to 8)

McNae v. ARAG Insurance Company                                    30(b)(6) Meagen Adams

---

Page 9

1          Would you please do that?
2     A.   Yes, I'll do that.
3     Q.   If you don't remember information, would you
4  just tell me that you don't remember instead of guessing
5  or speculating?
6     A.   Yes.
7     Q.   Now, this is important.  I've only recently
8  started saying this because I finally -- something
9  clicked.
10         If I ask you something that seems like an
11 obvious question, I promise you I'm not trying to be
12 annoying.  There are going to be a few questions that I
13 ask where I think I know the answer, and I know you know
14 the answer.  It's just that we are required to have
15 admissible evidence on every little fact, even if it's
16 something that might seem obvious to you or to me.
17         Do you understand that?
18    A.   I do.
19    Q.   And if you need a break at all during today's
20 deposition, just let me know.  The rules require that if
21 there's a question that's out there that's pending, that
22 you please answer that, but then, you know, it will be
23 good for the whole group to take breaks anyway.  Just
24 let me know.
25         All right?

---

Page 10

1     A.   Yes.
2     Q.   Have you ever had your deposition taken
3  before?
4     A.   Yes.
5     Q.   Now -- well, how many times?
6     A.   Three.
7     Q.   Leaving aside anything that doesn't have to
8  do with work, professional, how many times have you been
9  deposed?
10    A.   Zero.
11    Q.   So this is your first time?
12    A.   Maybe I misunderstood the question.
13    Q.   This is your first time you've been deposed
14 in connection with ARAG or insurance or anything like
15 that?
16    A.   Oh.  I'm sorry.  I have that reversed.
17    Q.   Oh, that's okay.
18    A.   Yeah, I apologize.
19    Q.   No need to apologize.  That might fall into
20 the category of one of my confusing questions, which I
21 hope I won't have very many of.
22         All three times that you've been deposed have
23 been for work; is that fair?
24    A.   Yes, that's correct.
25    Q.   Have any of them been as a Rule 30(b)(6)

---

Page 11

1  designee?
2     A.   Yes.
3     Q.   How many of the three?
4     A.   Three.
5     Q.   When was the last time that you testified as
6  a Rule 30(b)(6) designee?
7     A.   I don't recall.
8     Q.   Would it have been in the last year?
9     A.   No.
10    Q.   Okay.  Around, abouts, how long?  More than
11 two or three years?
12    A.   More than two to three years, yes.
13    Q.   All three of those times that you served as a
14 corporate designee, have they been for ARAG?
15    A.   No.
16    Q.   Who else?
17    A.   For Grinnell Mutual Reinsurance Company.
18    Q.   Of the three, how many of them were for
19 Grinnell?
20    A.   Two.
21    Q.   Does Grinnell have anything to do with ARAG?
22    A.   No.
23    Q.   Was the third one for ARAG?
24    A.   Yes.
25    Q.   What kind of case was the one that you

---

Page 12

1  testified in on behalf of ARAG?
2     A.   It was a case involving our contract with one
3  of our network attorneys.
4     Q.   Did the network attorney file a lawsuit
5  against ARAG?
6     A.   Yes.
7     Q.   Which jurisdiction was that in?
8     A.   I don't recall.
9     Q.   Was it Washington?
10    A.   I'm not certain.
11    Q.   What kind of insurance company is Grinnell?
12    A.   They are a property and casualty insurer.
13    Q.   Did you used to work with them?
14    A.   Yes.
15    Q.   We'll get into when you worked for who and
16 what you did for that in a little bit, so I won't jump
17 ahead.
18         Have you ever testified in a courtroom?
19    A.   No.
20    Q.   Have you ever testified over Zoom as part of
21 a trial?
22    A.   Yes.
23    Q.   Okay.  Tell me about that.
24    A.   Similar --
25         MR. MULLALY:  Object to the form.

---

McNae v. ARAG Insurance Company                                30(b)(6) Meagen Adams

Page 13

1       You may answer.
2       THE WITNESS:  Sorry about that.
3       MR. MULLALY:  No, it's okay.
4   A.   Similar to this proceeding, if that's part of
5   the trial process.
6   Q.   (By Mr. Ruiz)  So one of those three times
7   that you testified was over Zoom?  Is that what you're
8   saying?
9   A.   Yes.
10  Q.   Was that the one for ARAG?
11  A.   Yes.
12  Q.   What about not in a deposition but sort of
13  everybody else is in a courtroom, there's a jury
14  watching, but you are appearing over teleconference?
15  Anything like that?
16  A.   Would you say that again, which...
17  Q.   Sure.
18      Sometimes we have trials nowadays where, you
19  know, there's a judge and a jury present but the
20  testimony is over Zoom.
21      Have you done that?
22  A.   Not in a trial.
23  Q.   Have you testified in an arbitration?
24  A.   No.
25  Q.   I know that you did a sworn declaration for

Page 14

1   our case when we were, you know, hashing it out over
2   deposition dates.
3       Do you remember that?
4   A.   Yes.
5   Q.   Okay.  Have you ever done a declaration for
6   any other case?
7   A.   Yes.
8   Q.   Okay.  Tell me about that.
9   A.   Same --
10      MR. MULLALY:  Object to form.
11      You can answer.
12  A.   The same declaration that I made for this
13  meeting today is similar to the same declaration that I
14  made in those other circumstances.
15  Q.   (By Mr. Ruiz)  The declaration that you did
16  in this case was really about dates and scheduling as
17  opposed to the substance of the case; is that fair?
18      MR. MULLALY:  Object to form.
19      You can answer, Meagen.
20  Q.   (By Mr. Ruiz)  I don't want to put words in
21  your mouth, but is that your understanding generally
22  what that declaration was about; dates, scheduling,
23  things like that?
24      MR. MULLALY:  Same objection.
25      You can answer, Meagen.

Page 15

1   A.   Yes.
2   Q.   (By Mr. Ruiz)  In any of the other
3   declarations that you've done, have they delved into
4   such things as opposed to scheduling and dates?
5   A.   I don't remember.
6   Q.   Have you signed any other declarations in our
7   case besides the one that I've mentioned?
8   A.   Not that I recall.
9   Q.   Have you ever served as an expert witness in
10  a case?
11  A.   No.
12  Q.   Would you give a thumbnail sketch of your
13  educational background?
14      MR. MULLALY:  Object to form.
15      You can answer, Meagen.
16      THE WITNESS:  Sure.
17  A.   My postsecondary education is completing a
18  bachelor's degree.
19  Q.   (By Mr. Ruiz)  Where?
20  A.   Central University of Iowa.
21  Q.   What city is that in?
22  A.   Pella, P-e-l-l-a.
23  Q.   What was the major?
24  A.   Communications.
25  Q.   What year?

Page 16

1   A.   Completed in 1997.
2   Q.   And then after that, did you have any formal
3   education?
4   A.   No.
5   Q.   Do you hold any professional licenses?
6   A.   I do.
7   Q.   Which ones?
8   A.   CPCU.
9   Q.   Any others?
10  A.   No.
11  Q.   What does CPCU stand for?
12  A.   Charter Property Casualty Underwriter.
13  Q.   What does the "charter" in Charter Property
14  Casualty Underwriter stand for?
15  A.   I don't know.
16  Q.   Me neither.  I've wondered that for a long
17  time.
18      But property casualty underwriting, that's
19  referring to specific kinds of insurance products; is
20  that fair?
21  A.   Yes.
22  Q.   Is the product that ARAG offers, is that a
23  property casualty insurance product, based on your
24  understanding?
25  A.   It is not.

4 (Pages 13 to 16)

McNae v. ARAG Insurance Company                    30(b)(6) Meagen Adams

---

Page 17

1          MR. MULLALY:  Object to the form.  It's
2    beyond the scope of the notice.
3          But you can answer.  You did answer.
4          THE WITNESS:  Sorry.
5     Q.   (By Mr. Ruiz)  Now, do you hold any other
6    professional licenses?
7     A.   No.
8     Q.   An adjuster's license?
9     A.   No.
10    Q.   I'm wondering if the CPCU is more of a
11   professional certification as opposed to a license.  Do
12   you think it might be more of a certification or --
13         MR. MULLALY:  Object to the form.
14    Q.   (By Mr. Ruiz)  -- Or a credential?
15         MR. MULLALY:  Pardon me.
16    Q.   (By Mr. Ruiz)  Or a credential?
17         MR. MULLALY:  You can answer, Meagen.
18    A.   I don't know.
19    Q.   (By Mr. Ruiz)  Well, let me back up.
20         The CPCU, is that issued by a governmental
21   body?
22    A.   No.
23    Q.   It's issued by a private organization; right?
24    A.   Yes.
25    Q.   Are there any other credentials or

---

Page 18

1    certifications that you've obtained from professional
2    private organizations?
3     A.   No.
4     Q.   Do you have any training as a lawyer?
5     A.   No.
6     Q.   Do you have any training in medicine?
7     A.   No.
8     Q.   Do you have any training in psychiatry?
9     A.   No.
10    Q.   Do you have any training in trauma?
11         MR. MULLALY:  Object to form.
12         You can answer, Meagen.
13    A.   No.
14    Q.   (By Mr. Ruiz)  Would you please give a
15   thumbnail sketch of your employment history.  We've
16   talked about education.  Now the question is more about
17   employment.
18         MR. MULLALY:  Object to form.
19         You may answer, Meagen.
20    Q.   (By Mr. Ruiz)  Let me ask it again.  I want
21   to make sure I ask clean, crisp questions, to the extent
22   that I can, Ms. Adams.
23         Would you please give a thumbnail sketch of
24   your employment history.
25    A.   Yes.

---

Page 19

1          In 1997, I joined Grinnell Mutual Reinsurance
2    Company.  I exited Grinnell Mutual in about 2006 and I
3    joined State Auto Insurance Company.  I exited State
4    Auto in 2012 and joined ARAG.
5     Q.   Have you lived in Iowa this whole time?
6     A.   Yes.
7     Q.   Grinnell Mutual Reinsurance Company is in
8    Iowa?
9     A.   Yes.
10    Q.   What city?
11    A.   Grinnell.
12    Q.   Oh, that's what I thought.
13         And State Auto Insurance Company, is that
14   also in Iowa?
15    A.   Yes.
16    Q.   What city?
17    A.   West Des Moines.
18    Q.   What about ARAG?  Where is that?
19    A.   Des Moines, Iowa.
20    Q.   What different positions did you have from
21   1997 through 2006 when you were working for Grinnell?
22    A.   I was a claims assistant, I was a claims
23   adjuster, and I was a claims manager.
24    Q.   Why did you leave?
25    A.   At that time, I was just ready for change of

---

Page 20

1    scenery.
2     Q.   You mean city or professional?
3     A.   Both.
4     Q.   And when you worked at State Auto Insurance
5    Company from 2006 to 2012, what different positions did
6    you hold?
7     A.   I was a claims supervisor.
8     Q.   The whole time?
9     A.   Yes.
10    Q.   What does a claims supervisor do?
11    A.   They oversee the activities of the claims
12   adjusters.
13    Q.   All right.  So Grinnell and State Auto
14   Insurance Company, those are both in the property
15   casualty area; is that true?
16    A.   That's right.
17    Q.   Why did you leave State Auto?
18    A.   I needed to move from the management
19   structure at that company to something different.
20    Q.   Can you say a little bit more on that?
21         MR. MULLALY:  Object to form.
22         You can answer, Meagen.
23    A.   Looking for opportunities that had more
24   involvement with the company.
25    Q.   (By Mr. Ruiz)  I take it it was your choice

McNae v. ARAG Insurance Company                    30(b)(6) Meagen Adams

Page 21

1  to leave both -- from both Grinnell and State Auto?
2      A.  Yes, it was.
3      Q.  How did you choose ARAG as your next place of
4  employment?
5      A.  I found ARAG through Palmer, which is a job
6  placement company.
7      Q.  What different positions have you held at
8  ARAG?
9      A.  Claims manager.  Currently manager of claims
10 and case coordination.
11     Q.  How long were you a claims manager?
12     A.  Six years.
13     Q.  In doing the math, you've been the manager of
14 claims and case coordination for another six years.  Is
15 that right?
16     A.  Yes.
17     Q.  What does a claims manager do?
18         Let me -- let me back up.  Forget that
19 question.  I have to ask these good questions.
20         What are the responsibilities that you had
21 when you were claims manager at ARAG?
22     A.  I would directly oversee the claims
23 activities for the company and the people performing
24 them.
25     Q.  Were there other claims managers?

Page 22

1      A.  No.
2      Q.  You were the claims manager?
3      A.  That's right.
4      Q.  And what's the difference between a claims
5  manager and the manager of claims and case coordination?
6      A.  It is overseeing an additional department
7  within the organization.
8      Q.  Would that be the department of case
9  coordination?
10     A.  Yes.
11     Q.  What's the difference between claims and case
12 coordination?
13     A.  Case coordination functions to find
14 attorneys.  The claims department functions to process
15 claims for payment.
16     Q.  For the last six years, you've been the
17 manager of both?
18     A.  Yes.
19     Q.  I should have asked this, but believe it or
20 not, the answer isn't always what I think it is.
21         Who is your employer?
22     A.  ARAG.
23     Q.  ARAG.  Is there a longer name, like the
24 official name of your employer, like whoever's on your
25 paycheck, something like that?

Page 23

1      A.  ARAG Legal Insurance.  I believe that's what
2  we have.
3      Q.  Do you have an employment contract?
4      A.  No.
5      Q.  You're not looking for another job right now,
6  are you?
7      A.  No.
8      Q.  So I'm doing the math.  From 1997 to 2024, I
9  think that's 27 years in the insurance industry.  Is
10 that right?
11     A.  Yes.
12     Q.  What drew you to the insurance industry?
13     A.  I was looking for something immediately out
14 of college, and I was a resident of Grinnell with a
15 communications degree, and there was an opening that
16 fit.
17     Q.  And you stuck around for 27 years in the
18 industry?
19     A.  Yes.
20     Q.  Do you find it rewarding to work in this
21 industry?
22     A.  Yes.
23     Q.  Why?
24         MR. MULLALY:  Object that it's beyond the
25 scope of the notice.

Page 24

1          But you may answer, Meagen.
2      A.  Insurance provides help for people when they
3  need it.
4      Q.  (By Mr. Ruiz)  And it makes you feel good
5  about what you do?
6      A.  Yes.
7      Q.  Are you an insured of ARAG?
8      A.  Yes.
9      Q.  How long have you been an insured with ARAG?
10     A.  Twelve years.
11     Q.  I'm not going to dive into details here, but
12 have you ever made a claim with ARAG?
13     A.  Yes.
14     Q.  Okay.  More than one?
15     A.  Yes.
16     Q.  Who is your supervisor?
17     A.  Jeff LeMay.
18     Q.  Oh, I recognize that name.
19         What's Mr. LeMay's title?
20     A.  He's the director of customer care and
21 claims.
22     Q.  The entire time that you've been at ARAG, has
23 Mr. LeMay been your supervisor?
24     A.  No.
25     Q.  When did he start being your supervisor?

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

McNae v. ARAG Insurance Company                    30(b)(6) Meagen Adams

---

Page 25

1      A.   I couldn't say precisely when that was.
2      Q.   Has it been over a year?
3      A.   Yes.
4      Q.   And his name is in the documents we received,
5  so we know he had some involvement in the stuff we've
6  got to talk about today.  We'll get into that.  But has
7  it been five years that Mr. LeMay has been your
8  supervisor?
9           MR. MULLALY:  Object to form.
10          You may answer, Meagen.
11     Q    (By Mr. Ruiz)  Let me rephrase.
12          Has it been at least five years that
13  Mr. LeMay has been your supervisor?
14     A.   Yes.
15     Q.   Tell me about Mr. LeMay's background.  Do you
16  know what his educational history is?
17     A.   I couldn't say.
18     Q.   Do you know how long he's been with the
19  company, ARAG?
20     A.   Yes.
21     Q.   How long has Mr. LeMay been with ARAG?
22     A.   Approximately ten years.
23     Q.   Less than you?
24     A.   Yes.
25     Q.   Has he always held the position that he holds

---

Page 26

1  now?
2      A.   No.
3      Q.   What position did he have before?
4      A.   Director of customer care.
5      Q.   All right.  So -- but now, he's the director
6  of customer care and claims; yes?
7      A.   Yes.
8      Q.   Are those two different departments, customer
9  care and claims?
10     A.   Yes.
11     Q.   All right.  So now we've got three
12  departments:  customer care, claims, case coordination.
13          Those are the three; right?
14     A.   Yes.
15     Q.   We've already talked about claims and case
16  coordination.
17          Tell me, what does customer care do?  What
18  department -- what -- withdraw the question?
19          Would you please describe what customer --
20  what the customer care department does?
21     A.   Customer care speaks with our plan members
22  and attorneys to help them initiate their cases with us.
23     Q.   Are there employees at ARAG who are parts of
24  more than one department?  Like somebody, could they be
25  in case coordination and in claims?

---

Page 27

1      A.   No.
2      Q.   All right.  So each one of these departments
3  has different team members; is that true?
4      A.   Yes.
5      Q.   Which department, if any, makes coverage
6  determinations?
7      A.   Customer care begins the coverage
8  determination process.
9      Q.   Customer care begins the coverage
10  determination process.
11          I think you can guess what my next question
12  is going to be.  Who ends it?
13     A.   If customer care has all the information they
14  need to make that determination, it ends with customer
15  care.
16     Q.   And if it doesn't?
17     A.   Then customer care may ask for assistance
18  from others, including the claims department.
19     Q.   Besides the claims department, who else may
20  customer care turn to for assistance with coverage
21  determination?
22     A.   They --
23          MR. MULLALY:  Object to form.
24          You may answer, Meagen.  Sorry.
25     A.   They may turn to our legal team, legal

---

Page 28

1  department.
2      Q    (By Mr. Ruiz)  Who else?
3      A.   I don't know of anyone else.
4      Q.   So now we have four.  One, customer care
5  department; two, claims department; three, case
6  coordination department; and four, legal department.
7          Is that four different departments at ARAG?
8      A.   Yes.
9      Q.   Now, there's something I saw in the documents
10  called SR.  Maybe it stands for special referrals.
11          Do you know what that is?
12     A.   Yes.
13          MR. MULLALY:  Object to form.
14          You can answer.
15     A.   Yes.
16     Q    (By Mr. Ruiz)  Is that its own department or
17  part of another department?
18     A.   That is just a term that we use internally.
19  And that is handled within our case coordination
20  department.
21     Q.   You know, I might be wrong about this, but I
22  could have sworn I saw something about an SR Committee.
23          Is that a thing?
24          MR. MULLALY:  I'll object just because I
25  think these are questions that pertain more to the topic

---

7 (Pages 25 to 28)

McNae v. ARAG Insurance Company                    30(b)(6) Meagen Adams

Page 29

1  for Ann.
2      But you may answer, Meagen.
3      MR. RUIZ:  All right.  And just so whoever
4  reads that transcript knows, that word appears in
5  documents that relate specifically to this claim, which
6  is why I'm asking.
7      Q.   (By Mr. Ruiz)  Is there an SR Committee?
8      A.   The phrase "SR Committee" is a bit of an
9  outdated phrase, but some people may continue to use it.
10     Q.   Why is it outdated?
11     A.   We updated the title to Complex Claims
12  Committee.
13     Q.   When you say "we," you're talking about ARAG?
14     A.   Yes.
15     Q.   When was the terminology changed from SR
16  Committee to Complex Claims Committee?
17     A.   I couldn't say a date.
18     Q.   Was it before the McNaes' suit in Florida in
19  federal court?
20     A.   Yes.
21     Q.   But you would agree with me that there are
22  documents that still use that SR Committee terminology?
23     A.   Yes.
24     MR. MULLALY:  Object to form.
25     You can answer.

Page 30

1      Q.   (By Mr. Ruiz)  All right.  Well, has the
2  function changed along with the name change from SR
3  Committee to Complex Case Committee?
4      A.   No.
5      Q.   So it's just a different name for the
6  committee?
7      A.   Yes.
8      Q.   All right.  Well, I won't worry too much
9  about the exact name for now, but I do want to know
10  about what it does.
11     So what does a -- whether you call it SR
12  claims -- SR Committee or Complex Claims, what is the
13  function?
14     A.   The function is to create awareness around
15  claim exposures and cases that exceed the authority of
16  our claims specialists for processing.
17     Q.   The first one is creating awareness for
18  claims exposures.
19     Create awareness among who?
20     A.   The committee is comprised of individuals in
21  different departments in the organization who would
22  otherwise not have access or routinely be reviewing
23  claims.
24     Q.   Has this committee been in existence the
25  entire time that you've been at ARAG?

Page 31

1      A.   Yes.
2      Q.   Does this committee make coverage
3  determinations?
4      A.   No.
5      Q.   And so when it creates awareness, is it just
6  creating awareness within the committee or does it
7  create awareness outside of the committee also?
8      A.   Just within the committee.
9      Q.   Who is in the committee?
10     MR. MULLALY:  Object to form.
11     You can answer, Meagen.
12     A.   I am in the committee, as well as Jeff LeMay,
13  Patty Hannum, Kara Hogue, Cassie Pickering, Jennifer
14  Guthrie, Tad Niemann, Chris Thomas, Jen Beck.  And then
15  the claims specialists who are processing the claims are
16  also in attendance to present the various cases.
17     Q.   (By Mr. Ruiz)  Is anyone from the C-suite on
18  this committee, like say a CFO?
19     A.   Kara Hogue is the CFO.
20     Q.   What about any other C-suite person, like a
21  CEO or COO or anything like that?
22     A.   Jen Beck as a vice president.
23     Q.   What is she the vice president of?
24     A.   Customer experience.
25     Q.   Anybody else?

Page 32

1      A.   No.
2      Q.   How often -- well, I don't even know.
3  Does -- are there meetings of the committee?
4      A.   Yes.
5      MR. MULLALY:  I'll object that this is
6  outside the scope of the notice, except to the extent
7  specifically related to the claim at hand.
8      Q.   (By Mr. Ruiz)  You're a member of this
9  committee, Ms. Adams?
10     A.   Yes.
11     Q.   All right.  So how often does this committee
12  meet?
13     A.   Once a week.
14     Q.   How long does it meet for?
15     A.   It varies.
16     Q.   Could it be an hour?
17     A.   Yes.
18     Q.   Could it be longer?
19     A.   Typically not.
20     Q.   Are these meetings in person or Zoom or
21  something else?
22     A.   They're held over Teams.
23     Q.   And what comes out of the meeting?  What
24  kinds of -- strike that.
25     What kinds of decisions does the committee

8 (Pages 29 to 32)

McNae v. ARAG Insurance Company                              30(b)(6) Meagen Adams

---

Page 33

1    make?
2         MR. MULLALY:  Object to form.
3         You can answer, Meagen.
4    A.   The decisions consist of whether we believe
5    we may need more information before processing an
6    invoice for payment.
7    Q.   (By Mr. Ruiz)  Any other kind of decision?
8    A.   No.
9    Q.   You used the -- you referred to situations
10   that may exceed authority of the claims specialist.
11        Question one on that is:  Is claims
12   specialist what you call an adjuster at ARAG?
13   A.   Yes.
14   Q.   What are the roles and -- strike that.
15        What are the responsibilities of a claims
16   specialist at ARAG?
17   A.   The claims specialist is responsible for
18   reviewing incoming requests for payment and confirming
19   whether they should be paid.
20   Q.   Anything else?
21   A.   No.
22   Q.   Well, we know that sometimes they go to these
23   committee meetings and present on their claims.  Is that
24   fair?
25   A.   Yes.

---

Page 34

1    Q.   Okay.  Anything else that they do?
2    A.   There are tasks that are necessary to make
3    that decision of whether or not a claim should be paid.
4    Q.   Can you outline some of those tasks, please?
5    A.   They would review the request in comparison
6    to the coverage that's allowed under the benefit plan.
7    They would request additional information in scenarios
8    where what we have on file is not adequate.
9    Q.   Anything else?
10   A.   They would review invoices that are provided,
11   again, for the purpose of confirming that what's in the
12   invoice is covered or noncovered.
13   Q.   Do the claims specialists make coverage
14   determinations?
15   A.   Yes.
16   Q.   What kinds of coverage determinations?
17   A.   They would make coverage determinations, for
18   instance, if a plan member were not active at the time
19   of the event that occurred that resulted in them
20   requesting payment.
21   Q.   Any other kind?
22   A.   They would make that coverage determination
23   if the information contained within the request for
24   payment indicated that it were a noncovered event.
25   Q.   You said that sometimes the committee gets

---

Page 35

1    involved when the claims specialist's authority is
2    exceeded.
3         Do you remember saying that?
4    A.   Yes.
5    Q.   Can you elaborate on what that means?
6    A.   Yes.
7         When the cumulative amount of payments for a
8    particular case exceed $10,000, the committee is then
9    made aware of those cases via the committee process.
10   Q.   How is the committee made aware?
11   A.   In the committee meetings.
12   Q.   Is it something that automatically happens or
13   does a claims specialist have to bring it to the
14   attention of the committee?
15   A.   Our internal systems route those claims
16   directly to a queue for the committee's review.
17   Q.   Is that the case even for the kinds of
18   coverages in the ARAG policy that don't have a maximum
19   dollar amount?
20        MR. MULLALY:  Object to form.
21        You can answer.
22   A.   Could you ask that differently?
23   Q.   (By Mr. Ruiz)  Sure.
24        There are some coverages in the ARAG policy
25   that don't have a dollar amount, say if you use a

---

Page 36

1    non-network attorney, for example.
2         Strike that.
3         There are some coverages that I've seen in
4    the policy that do not have a maximum limit if you use a
5    network attorney.  So in a situation involving that, if
6    the amount of benefit exceeds $10,000, does that come to
7    the committee's attention?
8         MR. MULLALY:  Object to form.
9    A.   Yes.
10        MR. MULLALY:  You can answer, Meagen.
11   A.   Yes, it does.
12   Q.   (By Mr. Ruiz)  So when you're talking about
13   the claims specialist's authority, is that a reference
14   to the $10,000 total?
15   A.   Yes.
16   Q.   And anything that exceeds that has to go
17   before the committee?
18   A.   Yes.
19   Q.   And does the committee make a decision about
20   whether to pay in excess of the $10,000?  Or what
21   happens?
22   A.   The committee provides input whether
23   additional information is needed prior to processing the
24   claim.
25   Q.   Is this done in writing?

---

9 (Pages 33 to 36)

McNae v. ARAG Insurance Company                                    30(b)(6) Meagen Adams

---

Page 37

1    Let me withdraw that question.
2    Is a written record created of what the
3    committee does with respect to a given claim?
4    A.    Yes.
5    Q.    What is that record called?
6    A.    I don't recall the title of the entry field.
7    Q.    Okay.  It's something that's in the
8    computerized claims system at ARAG?
9    A.    Yes.
10   Q.    So the next question kind of requires me to
11   give a little bit of context, so please give me a little
12   bit of leeway here.
13   Back when you were at the auto insurance
14   company, you probably were familiar with this idea that
15   an adjuster gets assigned at the beginning of the claim
16   and then that adjuster stays assigned to that claim, as
17   long as it's open, until another adjuster gets assigned.
18   Is that the way it works at ARAG?  That for
19   any insured who has an ongoing legal claim, that it's
20   the same claims specialist who stays assigned to that,
21   or does it get assigned to a different claims specialist
22   potentially every month when the new bill comes in?
23   MR. MULLALY:  Object to form.
24   You can answer, Meagen.
25   A.    When the invoices arrive, they may be routed

Page 38

1    to different members of the claims team.
2    Q.    (By Mr. Ruiz)  When there's an ongoing legal
3    proceeding for which ARAG is providing coverage, does
4    ARAG assign a person within ARAG to oversee that?
5    A.    No.
6    Q.    Why not?
7    A.    The authorities and processes that we have
8    in place bring attention to that as the invoices are
9    received to the group of people that I previously
10   mentioned.
11   Q.    You know how Harry Truman used to have a sign
12   on his desk that says "The buck stops here"?
13   So for any given claim, is there someone
14   inside of ARAG where you can say, well, the buck stops
15   there on this particular claim?
16   MR. MULLALY:  Object.  It's beyond the scope
17   of the notice.
18   But you can answer, Meagen.
19   A.    I'm not certain what -- what type of buck
20   stops here you might mean by that.
21   Q.    (By Mr. Ruiz)  Well, let me elaborate, then.
22   That's a fair point.
23   If this case that I have gets screwed up,
24   it's going to be on me.  Right?  The clients are going
25   to be calling me and I'm going to be the one in trouble.

Page 39

1    If a mistake gets made on a claim for
2    somebody who's insured by ARAG, who's the front-line
3    person who is accountable for that?
4    MR. MULLALY:  Object to form.
5    You can answer, Meagen.
6    A.    I would say that would be me.
7    Q.    (By Mr. Ruiz)  Every month when the two
8    attorneys would send in their bills on Will McNae's and
9    Ronda McNae's cases in the year of 2023, would you
10   personally be involved in the process of reviewing those
11   materials and paying them every month?
12   A.    No.
13   Q.    That would have been the claims specialists?
14   A.    Yes.
15   Q.    Now, after a claim reaches the $10,000
16   threshold and it goes before the committee, does it stay
17   in front of the committee or it just goes one and done?
18   A.    Every subsequent invoice would also go to the
19   committee.
20   Q.    And the claims specialist would go there and
21   present every subsequent time?
22   A.    Yes.
23   Q.    What kinds of questions does the committee
24   ask?
25   (Crosstalk)

Page 40

1    MR. MULLALY:  I'll object --
2    Sorry, Meagen.
3    Object that it's beyond the scope of the
4    notice, except with regard to the specific claim.
5    But you can answer, Meagen.
6    A.    The committee would ask questions around
7    topics such as an amount in dispute, to ensure that that
8    information had been gathered, and may also have
9    questions around updates in the case.  We have updated
10   court dockets, that sort of thing, on file.
11   So mostly around file content.
12   Q.    (By Mr. Ruiz)  Is there somebody at ARAG who
13   is monitoring the dockets?
14   A.    No.
15   MR. MULLALY:  Object to form.
16   You can answer, Meagen.
17   Q.    (By Mr. Ruiz)  You said "no."  Is that
18   something that's provided by the attorneys themselves?
19   A.    Sometimes.
20   Q.    Back to Mr. LeMay.  Who is his supervisor?
21   A.    Jen Beck.
22   Q.    That's the VP of customer experience?
23   A.    Yes.
24   Q.    And who does Ms. Beck report to?
25   A.    David Murray.

10 (Pages 37 to 40)

McNae v. ARAG Insurance Company                    30(b)(6) Meagen Adams

Page 41

1    Q.   I recognize that name.  He's the boss; right?
2         MR. MULLALY:  Object to form.
3         You can answer, Meagen.
4    A.   He's the president.
5    Q    (By Mr. Ruiz)  And is Mr. -- is there a CEO?
6    A.   That would also be Mr. Murray.
7    Q.   Right.  So he is the boss.
8         Let's do a little bit of administration here.
9    I'll show you today -- I'm going to try to follow these
10   steps:  I will first drop it into the chat, upload it so
11   that everyone can see, then I will -- I'm doing it now.
12        Hold on.
13        Well, hold on.
14        Then I'll share my screen and then show it to
15   you and then I'll ask for it to be marked.
16        MR. RUIZ:  But because I had to reinstall
17   Zoom this morning, I think that we should just take --
18   you know what that means on a Mac.  I think we should go
19   off the record, take our first break of the day, and be
20   back in five or ten minutes, depending on what works for
21   everyone.
22        Can we go off?
23        THE VIDEOGRAPHER:  Going off the record.  The
24   time now is approximately 10:23 a.m.
25        (Recess 10:23 a.m. to 10:33 a.m.)

Page 42

1         THE VIDEOGRAPHER:  Back on the record.  The
2    time now is approximately 10:33 a.m.
3    Q    (By Mr. Ruiz)  Ms. Adams, the McNaes' claims,
4    those were before the committee; right?
5         MR. MULLALY:  Object to form.
6         You can answer, Meagen.
7    A.   Yes.
8    Q    (By Mr. Ruiz)  And for the rest of today, if
9    I say "the committee," can we have an understanding that
10   I'm talking about what used to be called the SR
11   Committee and is now called the Complex Claims
12   Committee?
13   A.   Yes.
14   Q.   Okay.  Is there another committee that has
15   involvement in the McNaes' claims?
16   A.   No.
17   Q.   All right.  You had mentioned that some of --
18   one of the potential outcomes of a committee meeting are
19   like identification of information that is still needed.
20        Is that fair?
21   A.   Yes.
22   Q.   Now -- and you're a member of the committee?
23   A.   Yes.
24   Q.   And you have been the entire time that the
25   McNaes have had claims; is that fair?

Page 43

1    A.   Yes.
2    Q.   Is there any information right now that the
3    committee is waiting for from the McNaes?
4    A.   I don't know, offhand.
5    Q.   Okay.  Has there been in the past?
6    A.   I don't recall on specific claims that were
7    presented.
8    Q.   Can you see a document on your screen?
9    A.   Yes.
10   Q.   Do I need to make it bigger so that you can
11   read the text?
12   A.   A little larger would be helpful, yes.
13   Q.   Is that better?
14   A.   Yes.  Thank you.
15        MR. RUIZ:  Please mark this Exhibit 1.
16        (Exhibit No. 1 introduced.)
17   Q    (By Mr. Ruiz)  If we go down, do you see how
18   we've highlighted your name yellow?
19   A.   Yes.
20   Q.   And then there's another designee,
21   Ms. Cosimano, who will be here Monday.  Right?
22   A.   Yes.
23   Q.   We've highlighted her name lilac or purple.
24   Do you see that?
25   A.   Yes.

Page 44

1    Q.   Now, if we go down, Shannon from my office
2    has helpfully highlighted the topics that you've been
3    identified on in yellow.  I'm going to go ahead and show
4    you those to make sure -- as a quality check.  You let
5    me know if we've gotten any of this wrong.
6         Let me know if I can go down further.
7    A.   Sure.  Go ahead.
8         Okay.
9         Okay.
10        Okay.
11        Okay.
12   Q.   All right.  Is there anything that we've
13   gotten wrong in the highlighting?
14   A.   No, I don't believe so.
15   Q.   That's Exhibit 1.  It's always helpful for
16   whoever reads this transcript to know the exact topics
17   that you've been designated to speak on.
18        Did you bring any documents with you for
19   production today?
20   A.   Into this meeting?
21   Q.   Yes.
22   A.   No.
23   Q.   What's your understanding of what your
24   responsibilities are as a Rule 30(b)(6) designee?
25   A.   To provide --

McNae v. ARAG Insurance Company                          30(b)(6) Meagen Adams

Page 45

1        MR. MULLALY:  Object.  It calls for a legal
2   conclusion.
3        But you can answer, Meagen.
4    A.   To provide answers to the topics that have
5   been presented that need to be discussed.
6    Q.   (By Mr. Ruiz)  Answers on behalf of...?
7    A.   On behalf of ARAG.
8    Q.   And you're here as a corporation designee;
9   true?
10   A.   Yes.
11   Q.   And just so we're real clear, unless I say
12  otherwise, all of my questions are asking for the -- for
13  the organization's testimony.
14        Do you understand?
15   A.   Yes.
16   Q.   So if I say the word "you" in one of my
17  questions, from here on out, I'm talking about the
18  organization, not about you as a human being.
19        Understood?
20   A.   Yes.
21   Q.   So if I have a question that's directly
22  addressed to you as a human being -- that can happen --
23  I'm going to do my best to make that clear.
24        So, for example, I might say:  Were you,
25  Ms. Adams, present at such and such meeting?  And I'm

Page 46

1   asking for your individual testimony.
2        That's an example.  Do you understand?
3    A.   Yes.
4    Q.   And if the organization does not know the
5   answer to the question or if you as a designee are not
6   prepared to answer the question, will you just tell me?
7    A.   Yes.
8    Q.   Would you describe generally what you did to
9   prepare to be the designee today?
10   A.   Yes.
11        I reviewed documents and met with Mr. Mullaly
12  and Mr. Roesch.
13   Q.   Anything else?
14   A.   No.
15   Q.   Whatever you do, don't infer from any of my
16  questions that I'm asking you to disclose any legal
17  advice that your attorneys have given you.
18        If I want to get that information, I promise
19  I would ask directly, make it really clear what I'm
20  doing, but I don't think I'm going to.
21        Is that understood?
22   A.   Yes.
23   Q.   So both of the people you identified, those
24  are lawyers; right?
25   A.   Yes.

Page 47

1    Q.   Okay.  And Mr. Roesch, is he an employee of
2   ARAG?
3    A.   No.
4    Q.   All right.  Who does he -- who is his
5   employer?
6    A.   I don't recall the name of the firm.
7    Q.   Okay.  So for the specific purpose of getting
8   ready for today's deposition, did you speak with any
9   other persons besides the two attorneys?
10   A.   I did speak with Ann Cosimano.
11   Q.   All right.  You had mentioned her.
12        When did you speak with Ms. Cosimano?
13   A.   We spoke in a meeting with Mr. Mullaly and
14  Mr. Roesch yesterday, the 15th of August, as well as --
15  I believe it was Tuesday of this week.
16   Q.   The 13th?
17   A.   Yes, the 13th.
18   Q.   So you were in the same room with
19  Ms. Cosimano and the two attorneys on Tuesday and
20  Thursday of this week; is that fair?
21        MR. MULLALY:  Object to form.
22        You can answer.
23   A.   We were in a meeting via Teams.
24   Q    (By Mr. Ruiz)  Thanks for the clarification.
25        Let's talk about the Tuesday meeting.  How

Page 48

1   long did that last?
2    A.   Approximately an hour and a half.
3    Q.   How long did the Thursday meeting last?
4    A.   Oh, approximately an hour.
5    Q.   Besides speaking with Ms. Cosimano on Tuesday
6   and Thursday in the presence of your two attorneys, did
7   you speak with any other persons for the specific
8   purpose of preparing you for today's deposition?
9    A.   I did, now that you mention.  I spoke with
10  Teresa Hoisington.
11   Q.   Why don't we get out everybody you've spoken
12  to for the specific purpose of preparing for today's
13  deposition.
14        We've got Ms. Cosimano, Ms. Hoisington.  Who
15  else?
16   A.   That's it.
17   Q.   All right.  Ms. Hoisington, when did you have
18  this communication with her?
19   A.   I spoke with her on Wednesday, August 14th.
20   Q.   How long did you speak with her?
21   A.   Approximately ten minutes.
22   Q.   Was this in person?
23   A.   No.
24   Q.   How did it happen?
25   A.   Via Teams.

12 (Pages 45 to 48)

McNae v. ARAG Insurance Company                                    30(b)(6) Meagen Adams

Page 49

1    Q.   All right.  So let's go back to the two times
2  you were in the meetings with Ms. Cosimano.
3         Did Ms. Cosimano provide you information that
4  you'll be using today?
5         MR. MULLALY:  Objection.
6         I just would like -- I know you made this
7  clear what you are and aren't looking for, obviously,
8  but I'd just like to put on the record, Meagen, you
9  know, you can respond to the extent it doesn't require
10 you to reveal any attorney-client privilege or work
11 product material.
12     Q.   (By Mr. Ruiz) Ms. Cosimano -- is she an
13 attorney?
14     A.   Yes.
15     Q.   All right.  Is she your attorney for this
16 case?
17     A.   No.
18     Q.   Ms. Cosimano did have direct involvement in
19 the handling of the McNae claims; correct?
20     A.   Yes.
21     Q.   And she's been identified as the other
22 corporate designee who will be testifying Monday; right?
23     A.   Yes.
24     Q.   Let me ask you a yes-or-no question:  Did
25 Ms. Cosimano provide you facts relating to the testimony

Page 50

1  you'll have today?
2     A.   Yes.
3     Q.   All right.  Now tell me all the facts she
4  provided you.
5     A.   She was able to tell me about a discussion
6  that took place for which I was not present.
7     Q.   Continue.
8     A.   And that concerned the communication to the
9  McNaes regarding the contracts that were established
10 with the non-network attorneys that had been working on
11 those cases.
12     Q.   Continue.
13     A.   We also had some discussion about --
14 actually, it was Mr. Mullaly's letter that had been sent
15 regarding the cases here.
16         I need to think if there was anything else.
17     Q.   All right.  Take your time.  I want to make
18 sure I get it all.
19     A.   She helped me understand that timeline of
20 events around the generation of the communication and
21 some of the reasoning around the termination decision.
22     Q.   Any -- anything else?
23         MR. MULLALY:  Object to form.
24         You can answer, Meagen.
25     A.   I feel like that represents what we

Page 51

1  discussed.
2     Q.   (By Mr. Ruiz) Let's go back to the
3  beginning, then.
4         You know what?  Before we do that, we've
5  got -- I've got these -- you've given me topics here,
6  but before that, let's talk about your conversation with
7  Ms. Hoisington.
8         Do you remember that, you mentioned that?
9     A.   Yes, I remember.
10     Q.   Okay.  Good.
11         And that was a ten-minute Teams
12 communication?
13     A.   Yes.
14     Q.   Was that one of those where you can see each
15 other's faces or was it a chat?
16     A.   It was a video call.
17     Q.   And did you receive any facts from
18 Ms. Hoisington that helped you prepare for today?
19     A.   Yes.
20     Q.   What were those facts?
21     A.   Teresa helped to clarify for me the efforts
22 that were made in attempting to locate representation
23 for the McNaes.
24     Q.   Before or after termination?
25         MR. MULLALY:  Object to form.

Page 52

1         You can answer.
2     A.   Before.
3     Q.   (By Mr. Ruiz) All right.  So before
4  Ms. Fotiu-Wojtowicz and Casey -- Ms. Casey were
5  terminated, there were efforts to find alternate
6  representation?
7         MR. MULLALY:  Object to form.
8         You can answer, Meagen.
9     A.   The efforts I am speaking Teresa -- to Teresa
10 about were the initial efforts when the McNaes contacted
11 ARAG.
12     Q.   (By Mr. Ruiz) All right.  At the beginning
13 of the claim?
14     A.   Yes.
15     Q.   Anything else that you spoke with
16 Ms. Hoisington about?
17     A.   No.  That is all.
18     Q.   So let's go back to the facts you received
19 from Ms. Cosimano.
20         First, you said that she was able to share
21 information regarding a discussion that had occurred
22 outside of your presence.
23         Elaborate what that discussion was about.
24         MR. MULLALY:  Object to form.
25         And I'll just remind you, Meagen, please

13 (Pages 49 to 52)

McNae v. ARAG Insurance Company                    30(b)(6) Meagen Adams

---

Page 53

1  testify only to facts. Don't testify to any attorney-
2  client communication or work product.
3      Q    (By Mr. Ruiz) Yeah, I'm only interested in
4  facts. If your attorney said, hey, that's a great fact
5  or that's a horrible fact, it doesn't matter to me. I
6  only care about information you received from
7  Ms. Cosimano about facts.
8          So what facts did Ms. Cosimano provide you
9  about these discussions?
10     A    The facts provided were that we had
11 identified some concerns about the direction of the
12 case with regards to pursuing resolution and had lost
13 confidence in the attorneys that were performing
14 services, and that based on those reasons, the
15 termination letters were generated.
16     MR. MULLALY: And, Isaac, if I may interject.
17 I don't want to interrupt your questioning.
18         The specifics of, you know, the facts that
19 Ms. Adams had just described are something that we
20 intend to present principally through Ann's testimony on
21 topic 30, if it's helpful to know that.
22     MR. RUIZ: I don't think I have anything to
23 say in response to that, but let me continue.
24     Q    (By Mr. Ruiz) Identify each and every
25 concern that ARAG had that you just talked about that

---

Page 54

1  were mentioned in these discussions.
2      MR. MULLALY: I object that it's beyond the
3  scope of the notice topics.
4          But you can answer, Meagen.
5      Q    (By Mr. Ruiz) Well, let me ask you a backup
6  question.
7          Does this have anything to do at all with
8  ARAG's handling of the McNae insurance claims?
9      A    Yes.
10     Q    All right. Well, then answer the question.
11 Identify each and every concern that ARAG had that were
12 the subject of this discussion.
13     A    We had concern about the progression towards
14 resolution of the dispute.
15         We had concern about the need for two
16 attorneys and the subsequent amount of time that was
17 spent between the two of them performing very similar
18 tasks.
19         We had concern about other limitations and
20 policy language that may apply that would preclude
21 coverage.
22     Q    Any other concerns?
23     A    I don't think so.
24     Q    Who were the people involved in this
25 discussion that you were not a part of?

---

Page 55

1      A    I don't know who all of the attendees were.
2      Q    Don't need all. Just give me the ones you
3  know.
4      A    Ann Cosimano, David Murray.
5          Those are the one that I know for certain --
6  with certainty.
7      Q    You used the word "attend." Was there a
8  meeting?
9      A    I'm sorry?
10     Q    I think I heard you in your answers use the
11 word "attend." So was there a meeting that was attended
12 by these folks? What did they attend?
13     A    I don't know that there was a meeting
14 scheduled or -- I don't know.
15     Q    How did the discussion happen? Was it in
16 person? Zoom? Teams? Phone?
17     A    I don't know.
18     Q    Have you conducted any kind of investigation
19 since learning about the discussion to figure out all
20 the information that ARAG has about it?
21     MR. MULLALY: Object to form just, again,
22 because of the witness by whom will be presenting this.
23         But you can answer, Meagen.
24     Q    (By Mr. Ruiz) Yeah, you have to answer. I
25 mean --

---

Page 56

1      MR. MULLALY: Of course.
2      Q    (By Mr. Ruiz) -- it's just a -- it's not --
3  this is just a question about a fact, what did you do.
4          Did you conduct any investigation, after
5  learning this from Ms. Cosimano, to find out everything
6  that ARAG has about the discussion?
7      A    Are you asking that of me as an individual or
8  as a representative of ARAG?
9      Q    It's the same question, isn't it?
10         I mean, like, you're the representative of
11 ARAG and you know what you did to get ready. I mean,
12 all these questions have been about what you've done to
13 get ready. This is just another one.
14         So in getting ready for today's deposition,
15 did you do any work to find out all of the information
16 that ARAG has about this discussion you learned about
17 from Ms. Cosimano?
18     A    I did no further investigation into that
19 discussion.
20     Q    Did you ask to talk to Mr. Murray about it?
21     A    No, I did not.
22     Q    But Mr. Murray was a part of this
23 discussion -- of this discussion?
24     A    Yes.
25     Q    Are you sure?

---

14 (Pages 53 to 56)

McNae v. ARAG Insurance Company                    30(b)(6) Meagen Adams

Page 57

1        Is ARAG sure?
2    A.   Yes.
3    Q.   All right.  And what's Mr. Murray's title?
4    A.   He's the president and CEO.
5    Q.   Does Mr. Murray get involved in everybody's
6  claims or just this one?
7        MR. MULLALY:  Object to form.
8        You can answer, Meagen.
9    A.   Mr. Murray is not routinely involved in
10 claims.
11   Q.   (By Mr. Ruiz)  But he was involved in this
12 one?
13   A.   Yes.
14   Q.   Now, is there any -- I'm going to jump ahead,
15 way ahead.
16        When you were at Grinnell and when you were
17 at the auto insurance company, there was something
18 called a claims log.
19        Do you know what a claims log is?
20        MR. MULLALY:  Object to form.
21        You can answer, Meagen.
22   A.   I'm not sure of that terminology.
23   Q.   (By Mr. Ruiz)  A claims diary, claims notes.
24 Have you ever heard of this?
25   A.   I've heard of claims diary and claims notes,

Page 58

1  yes.
2    Q.   Very good.
3        And what it is, it's like a running journal,
4  date, time and activity that happens on a claim.
5        Is that your understanding of what that is
6  also?
7        MR. MULLALY:  Object to form.
8        You can answer.
9    A.   Yes.
10   Q.   (By Mr. Ruiz)  Right.
11        Is there such a thing for claims at ARAG?
12   A.   Yes.
13   Q.   All right.  What's it called?
14   A.   Claims comments.
15   Q.   Is there a computer program that handles
16 this?
17   A.   Yes.
18   Q.   And what's the computer program called?
19   A.   Pulse.
20   Q.   Is that that thing with the red light,
21 stoplight thing that I've seen in the discovery
22 production?
23   A.   Yes.
24   Q.   Okay.  But I haven't seen a printout from
25 start to finish of all of the claims comments.  I've

Page 59

1  seen snippets, like here's one page of it, here's
2  another page, here's one picture of a stoplight, here's
3  a green light, here's a -- is there an ability to print
4  a single claims comment regarding a claim from start to
5  finish?
6        MR. MULLALY:  Object to form.
7        You can answer, Meagen.
8    A.   I don't know.
9    Q.   (By Mr. Ruiz)  Have you ever tried that?
10   A.   No.
11   Q.   Is there any claims comment that talks about
12 Mr. Murray's involvement in the McNae claims?
13   A.   No, I don't believe so.
14   Q.   Now, you didn't talk to Mr. Murray.  We're
15 agreed; right?
16   A.   Right.
17        MR. MULLALY:  Object to form.
18        You can answer.
19   Q   (By Mr. Ruiz)  Right?
20   A.   Right.
21   Q.   But you are certain that Mr. Murray was
22 involved in that discussion with Ms. Cosimano; correct?
23   A.   Yes.
24   Q.   Now, is there any document that records that
25 discussion having occurred?

Page 60

1    A.   No, not to my knowledge.
2    Q.   Is there any claims comment that records that
3  conversation having occurred?
4    A.   No.
5    Q.   Is there a recording, like an audio recording
6  or a video recording, of that discussion having
7  occurred?
8    A.   I don't know.
9        MR. MULLALY:  Object to form.
10        You can answer.
11   A.   I don't know.
12   Q.   (By Mr. Ruiz)  Who initiated the discussion?
13   A.   I don't know.
14   Q.   Was Mr. Murray involved in any other aspect
15 of the McNae claim?
16        Well, let me back up.
17        Have you asked anybody to find out if
18 Mr. Murray was involved in any other aspect of the McNae
19 claim?
20   A.   No.
21   Q.   You didn't ask Ms. Cosimano?
22   A.   No.
23   Q.   And you didn't ask Mr. Murray?
24   A.   No.
25   Q.   And you've never talked to Mr. Murray about

McNae v. ARAG Insurance Company                    30(b)(6) Meagen Adams

Page 61

1  the McNae claim; is that correct?
2      A.   That's correct.
3      Q.   How often do you talk with Mr. Murray?
4      A.   Infrequently.
5      Q.   Put a little meat on that.  Once a year.
6  Twice a year?
7      A.   Once a year.
8      Q.   When was the last time that you had a
9  discussion with Mr. Murray about a specific claim?
10     A.   I have not had a discussion with Mr. Murray.
11     Q.   Ever?
12     A.   No.
13     Q.   What was the last -- is there any other claim
14  that you -- in which Mr. Murray has participated in a
15  discussion of how ARAG should handle the claim, besides
16  the McNaes?
17         MR. MULLALY:  I object as beyond the scope.
18         You can answer, Meagen.
19     Q    (By Mr. Ruiz)  My next question will be:
20  Which one?
21         So I want you to take as much time as you
22  need to figure out if there is another claim.
23     A.   I don't recall.
24     Q.   The letters that terminated the attorneys
25  went out November 20th, 2023.  On what day did the

Page 62

1  discussion happen?
2          MR. MULLALY:  Object to form.
3          You can answer.
4      A.   During the week of November 6th.
5      Q    (By Mr. Ruiz)  Was it one discussion or did
6  it occur over multiple conversations/meetings?
7      A.   I don't know.
8      Q.   Now, are there any emails between
9  Ms. Cosimano and Mr. Murray or involving those two that
10  were a part of that discussion?
11     A.   I don't know.
12     Q.   Did you ask Ms. Cosimano that question?
13     A.   No.
14     Q.   How long did the discussion last?
15     A.   I don't know.
16     Q.   When was the first time that you ever heard
17  of that discussion having occurred?
18     A.   August 13th.
19     Q.   Three days ago?
20     A.   Yes.
21     Q.   Yes?
22         Remind me what your title is.
23     A.   Manager of claims and case coordination.
24     Q.   Remind me who is ultimately responsible on
25  claims at ARAG to make sure that they're done right.

Page 63

1          MR. MULLALY:  Object to form.
2          You can answer.
3      Q    (By Mr. Ruiz)  You said that was you; right?
4          MR. MULLALY:  Object to form.
5          You can answer.
6      A.   Yes.
7      Q    (By Mr. Ruiz)  All right.  So you said
8  concern number one was lack of progression toward
9  resolution of the dispute.
10         You remember you said that?
11     A.   Yes.
12     Q.   What are the facts that ARAG had in November
13  of 2023 that gave you concerns about the progression
14  towards resolution of the dispute?
15         MR. MULLALY:  I'd like to again object, that
16  there's a more specific topic by which we'll be
17  addressing this.
18         But you can answer, Meagen.
19     Q    (By Mr. Ruiz)  Please answer, ma'am.
20     A.   Yes.  We had communication from, I believe,
21  Stephanie Casey that settlement negotiations had been
22  occurring and that one specific request of the plaintiff
23  in that case was at issue, and that in those
24  negotiations, they had asked the plaintiff's counsel to
25  provide a proposed settlement agreement.  And based on

Page 64

1  that, ARAG had moved forward to offer to provide funds
2  for mediation.
3      Q.   Continue.
4          MR. MULLALY:  Object to form.
5          You can answer.
6      A.   We then subsequently found that the
7  plaintiff's request for Mrs. McNae to make a public
8  statement was not something that they were willing to
9  consider.  And that was in -- that was misaligned with
10  the information that we had previously, and that is what
11  gave us pause about whether pursuing resolution of that
12  matter was occurring.
13     Q    (By Mr. Ruiz)  Anything else?
14     A.   No.
15     Q.   All right.  There are different ways to
16  resolve a dispute, a litigation.  Right?  One is to just
17  win.
18         Do you agree?
19     A.   Yes.
20     Q.   Hadn't Will McNae won?
21         MR. MULLALY:  Object to form.
22         You can answer.
23     Q    (By Mr. Ruiz)  At the time Ms. Casey was
24  terminated, hadn't Mr. McNae won?
25         MR. MULLALY:  Object to form.

16  (Pages 61 to 64)

McNae v. ARAG Insurance Company                    30(b)(6) Meagen Adams

Page 65

1      You can answer.
2      Q    (By Mr. Ruiz)  Please do.  Answer.
3      A.   I understand that his case was dismissed
4   without prejudice.
5      Q.   All right.  So which -- does ARAG agree that
6   that's a victory?
7           MR. MULLALY:  Object to form.  Outside the
8   scope.
9           You can answer.
10     A.   Yes.
11     Q    (By Mr. Ruiz)  Now, for there to be a
12  settlement of litigation, both sides have to agree.
13          Does ARAG agree with that?
14     A.   Yes.
15     Q.   So like a case we're talking about right now,
16  like here, this case, both sides have not agreed to a
17  settlement.  That's why we're here.  Right?
18          MR. MULLALY:  Object to form.
19          You can answer.
20     A.   Yes.
21     Q    (By Mr. Ruiz)  Right.  And you wouldn't
22  expect Mr. Mullaly to recommend a settlement that is
23  against ARAG's interests, would you?
24          MR. MULLALY:  Object to form.  Solicits
25  personal opinion, so outside scope.

Page 66

1      You can answer.
2      Q    (By Mr. Ruiz)  Can you answer that?
3      A.   I can answer that.  And, no, I would not
4   expect Mr. Mullaly to suggest that.
5      Q.   All right.  And there's nothing in the ARAG
6   insurance policy that requires your insured to settle
7   every case no matter what?
8      A.   No.
9      Q.   No, there isn't; right?
10     A.   Correct.  No, there is not a requirement.
11     Q.   So you've kind of -- you've used a couple of
12  words without saying the specific things.
13          You used the word "misaligned," it was a
14  misalignment.  What was misaligned specifically?
15          MR. MULLALY:  Object to form.
16          You can answer.
17     A.   The status updates from Stephanie Casey --
18     Q    (By Mr. Ruiz)  Uh-huh.
19     A.   -- discussed the plaintiff's request that
20  Mrs. McNae make a public statement.
21          In that same status update, it was indicated
22  that they were seeking plaintiff's proposal regarding
23  that dispute, which gave indication that they were
24  interested in what the plaintiff's counsel would propose
25  for resolution.

Page 67

1           We then find that the public statement was
2   not something that Mrs. McNae was interested in doing,
3   regardless.
4      Q.   And ARAG had a problem with that?
5           MR. MULLALY:  Object to form.
6           You can answer.
7      A.   What are you asking if ARAG -- what ARAG had
8   a problem with?
9      Q    (By Mr. Ruiz)  Did ARAG have a problem with
10  Ms. McNae not being comfortable making the public
11  statement?
12     A.   No.
13     Q.   All right.  In fact -- okay, well, let me
14  back up.
15          You keep talking about the public statement.
16  What public statement specifically?  I want the jury to
17  hear exactly what ARAG's understanding is of what the
18  public statement would be.
19          MR. MULLALY:  Object to form.
20          You can answer.
21     A.   We understand that the plaintiff -- part of
22  the plaintiff's request was that Mrs. McNae make a
23  public statement indicating that the plaintiff had not
24  committed the assault on Mrs. McNae.
25     Q    (By Mr. Ruiz)  Ms. McNae was not comfortable

Page 68

1   making that public statement; right?
2           MR. MULLALY:  Object to form.
3           You can answer.
4      A.   Right.
5      Q    (By Mr. Ruiz)  And nothing in the insurance
6   policy required her to settle if making such a public
7   statement was one of the conditions; right?
8      A.   Right.
9      Q.   All right.  So what does the public statement
10  have to do with anything?
11          MR. MULLALY:  Object to form.
12          You can answer.
13     Q    (By Mr. Ruiz)  Did ARAG -- let me withdraw
14  the question.
15          Did ARAG have a concern -- well, strike that.
16          I still don't understand the misalignment.
17  Misalignment, to me, means that there is -- what -- tell
18  me A and B.  What is A that's misaligned with B?  What's
19  misaligned with what?  Just give me the two things.
20          MR. MULLALY:  Object to form.
21          You can answer.
22     A.   The status updates from Stephanie Casey
23  indicated that there was a willingness to review a
24  proposal from plaintiff's counsel in the same status
25  update that was sharing with us that that was part of

BUELL REALTIME REPORTING, LLC
206.287.9066  l  800.846.6989

McNae v. ARAG Insurance Company                          30(b)(6) Meagen Adams

---

Page 69

1  what the plaintiff was going to be requesting.
2      Q.   (By Mr. Ruiz)  All right.
3      A.   So with that knowledge, Stephanie Casey was
4  soliciting a resolution, settlement agreement, from
5  plaintiff's counsel.
6           Conversely, we know that Mrs. McNae had zero
7  interest in providing that public statement.  So --
8      Q.   Is there a -- okay.  Is there a problem with
9  Ms. McNae not wanting to make that public statement --
10 that's all I want to know -- from ARAG?
11     A.   No.
12     Q.   Okay.  So how is that misaligned with
13 anything?
14          MR. MULLALY:  Object to form.
15          You can answer.
16     Q   (By Mr. Ruiz)  I want to make sure I
17 understand --
18          (Crosstalk)
19     Q.   -- what's -- so on one hand, the plaintiff
20 was requesting a public statement from Ms. McNae.  Do
21 you agree with that?
22     A.   Yes.
23     Q.   As a part of a settlement proposal.  Do you
24 agree?
25     A.   Yes.

---

Page 70

1      Q.   On the other hand, Ms. McNae was unwilling to
2  give that public statement; correct?
3      A.   Yes.
4      Q.   And ARAG doesn't think there's a problem with
5  that; right?
6          MR. MULLALY:  Object to form.
7          You can answer.
8      A.   Right.
9      Q   (By Mr. Ruiz)  Should Ms. McNae have made the
10 public statement?
11          MR. MULLALY:  Object.  Outside the scope.
12 Solicits personal opinion, so outside the scope.
13          You can answer.
14          MR. RUIZ:  I'm asking on behalf of ARAG only.
15     Q   (By Mr. Ruiz)  Should Ms. McNae --
16          MR. MULLALY:  It falls outside the scope, but
17 you can answer.
18     Q   (By Mr. Ruiz)  Should Ms. McNae have made the
19 public statement that was being requested by the
20 plaintiff?
21     A.   ARAG doesn't have a position on that.
22     Q.   All right.  So is there a misalignment in the
23 plaintiff demanding the public statement and Ms. McNae
24 saying no?  Is that the misalignment?
25     A.   No.

---

Page 71

1      Q.   Okay.  Then you also mentioned that the
2  plaintiff had requested that Ms. McNae make a -- what is
3  it, a counter settlement offer?  Is that right?
4          MR. MULLALY:  Object to form.
5          You can answer.
6      A.   No, I don't think I said that.
7      Q.   (By Mr. Ruiz)  All right.  So what's
8  misaligned with -- what's misaligned with Ms. McNae not
9  wanting to make the statement?
10     A.   That piece of what we understood the
11 plaintiff was requesting in a settlement agreement was
12 not indicated to be a -- an obstacle in Stephanie
13 Casey's status updates to us.  Therefore, it appeared
14 that they were willing to consider a settlement
15 agreement from plaintiff's counsel, which gives the
16 indication that resolution of the matter was possible.
17          Later, we learned that that would not have
18 been possible because of this one term within what the
19 plaintiff was looking for that Mrs. McNae was not in
20 agreement with.
21     Q.   Okay.  I'm just going to be honest, I don't
22 understand what you're saying, but you've said it and
23 then the jury will be able to hear it and so I'm not
24 going to keep asking.  All right?
25          Is there anything more you have to say about

---

Page 72

1  the concern regarding the progression toward resolution
2  of the dispute?
3      A.   No.
4      Q.   Now, the second thing you mentioned was the
5  need for two attorneys and subsequent amount of time
6  spent when it appeared to ARAG that the two of them were
7  performing similar tasks.
8          Did I record that correctly as the second
9  concern?
10     A.   Yes.
11     Q.   Okay.  Would you explain that concern fully?
12          MR. MULLALY:  Object that this is within the
13 scope of topic 30 and we've designated someone else to
14 address topic 30.
15          But you can answer, Meagen.
16     A.   Let me get a drink of water real quick.
17          The concern here was regarding the amount of
18 time necessary or as indicated in the invoices for the
19 attorneys to collaborate, which was out of the ordinary
20 for what we typically see on claims.  And having two
21 attorneys performing the same or similar tasks is
22 equally as unusual.
23     Q   (By Mr. Ruiz)  Anything else?
24     A.   No, I don't think so.
25     Q.   Before November 20th, 2023, was there ever a

---

McNae v. ARAG Insurance Company                              30(b)(6) Meagen Adams

---

Page 73

1    time that ARAG requested information relating to
2    settlement efforts that counsel for either of the McNaes
3    refused to provide?
4         A.   No.
5         Q.   Before November 20th, 2023, was there ever a
6    time that ARAG asked to communicate with the McNaes
7    directly relating to their settlement efforts?
8         A.   No.
9         Q.   Before November 20th, 2023, was there ever a
10   time that ARAG asked to speak with Ms. Casey or
11   Ms. Fotiu-Wojtowicz to discuss settlement efforts?
12        A.   No.
13        Q.   Before November 20th, 2023, was there ever a
14   time that ARAG asked to speak with Ms. Casey or
15   Ms. Fotiu-Wojtowicz to discuss concerns that ARAG had
16   with the direction of the litigation?
17        A.   No.
18        Q.   Before November 20th, 2023, did ARAG seek an
19   opinion from any attorney in Florida to determine
20   whether the McNaes had made reasonable settlement
21   efforts?
22             MR. MULLALY:  Object on the grounds of
23   attorney-client privilege and work product.
24             If you are able to answer without divulging
25   either of those, you can respond, Meagen.

---

Page 74

1             MR. RUIZ:  Hold on.  This is a yes-or-no
2    question.  It's a fact.  And if something is privileged,
3    we're entitled to know the communication exists.
4         Q.   (By Mr. Ruiz)  And so you do have to answer
5    this question.  Just answer with a "yes" or "no."
6             Before November 20th, 2023, did ARAG seek an
7    opinion from any attorney in Florida to determine
8    whether the McNaes had made reasonable settlement
9    efforts?
10             MR. MULLALY:  Object.
11             You can respond "yes" or "no," Meagen.
12        A.   No.
13        Q.   (By Mr. Ruiz)  Before November 20th, 2023,
14   did ARAG seek an opinion from any attorney in Florida to
15   determine whether Ms. Casey and Ms. Fotiu-Wojtowicz were
16   unreasonably duplicating work?
17             MR. MULLALY:  Same objection.
18             But you can respond "yes" or "no," Meagen.
19        A.   No.
20        Q.   (By Mr. Ruiz)  Does ARAG agree that for a
21   settlement of litigation to occur, both sides of the
22   litigation have to be willing to settle the specific
23   terms?
24        A.   Yes.
25        Q.   What settlement offer did Mr. Fitzgerald make

---

Page 75

1    before November 20th, 2023, that either Will or Ronda --
2    to either Will or Ronda that ARAG says Will or Ronda
3    should have accepted?
4             MR. MULLALY:  Object to form.
5             You can answer.
6         A.   We did not make that determination.
7         Q.   (By Mr. Ruiz)  Does the insurance agreement
8    with ARAG require that the McNaes settle for any price,
9    whatever Mr. Fitzgerald wanted?
10        A.   No.
11        Q.   Isn't it true that Ms. Casey was successful
12   in motion practice against the claims brought by
13   Mr. Fitzgerald?
14             MR. MULLALY:  Object to form.
15             You can answer.
16        A.   Yes.
17        Q.   (By Mr. Ruiz)  And isn't it true that
18   Mr. Fitzgerald's claims against Mr. McNae had been
19   dismissed by November 20th, 2023?
20        A.   I don't recall the date.
21        Q.   You recall that they were dismissed, though,
22   don't you?
23        A.   Yes, I do.
24        Q.   That's one way to resolve the litigation,
25   isn't it?

---

Page 76

1             MR. MULLALY:  Object to form.
2             You can answer.
3         A.   Yes.
4         Q.   (By Mr. Ruiz)  Does ARAG agree, then, that
5    being successful in motion practice -- in essence,
6    defeating claims filed by Mr. Fitzgerald -- is one kind
7    of reasonable effort to resolve claims?
8             MR. MULLALY:  Object to form.
9             You can answer.
10        A.   Yes.
11        Q.   (By Mr. Ruiz)  What motions does ARAG say
12   that counsel for either of the McNaes should have filed
13   against Mr. Fitzgerald that they failed to file?
14        A.   We don't provide that direction.
15        Q.   Well, I know you didn't provide that
16   direction, but does ARAG have a belief that there was a
17   motion that either -- that counsel for either of the
18   McNaes should have filed against Mr. Fitzgerald but that
19   they failed to do?
20        A.   No, none.
21        Q.   What specific settlement offer does ARAG say
22   that counsel for either of the McNaes should have
23   offered to Mr. Fitzgerald that they failed to offer?
24             MR. MULLALY:  I object.  This question and
25   the previous one are directly within the scope of topic

---

19 (Pages 73 to 76)

McNae v. ARAG Insurance Company                           30(b)(6) Meagen Adams

Page 77

1    30.
2          You can answer, though, Meagen.
3          MR. RUIZ:  Okay.  Are you saying that this
4    is -- this is within the scope of topic 30, Mr. Mullaly?
5          MR. MULLALY:  Yes.  I think you're asking for
6    criticisms of the McNaes' defense counsel below and
7    that's the subject of topic 30.
8          MR. RUIZ:  Well, I think it's also relates to
9    the handling of a claim.
10         MR. MULLALY:  It may have, but topic 30 is
11   much more specific and we've informed you that we intend
12   to provide this evidence to topic 30.
13         But, nevertheless, I mean, the answer won't
14   bind the company, in our view, but you can answer,
15   Meagen.
16         MR. RUIZ:  In my view, it will.
17   Q    (By Mr. Ruiz)  Ms. Adams, what specific
18   settlement offer does ARAG say counsel for either of the
19   McNaes should have offered to Mr. Fitzgerald that they
20   failed to offer?
21   A    None.
22   Q    The third concern that you mentioned, the
23   subject of the discussion between Ms. Cosimano and
24   Mr. Murray, was a concern about other limitations in
25   policy language that may apply that would preclude

Page 78

1    coverage.
2          Tell me everything you have about that.
3          MR. MULLALY:  Object to form.
4          You can answer.
5    A    We've already talked about the reasonable
6    pursuit of resolution, which is one of them.
7          We do have potential coverage limitation
8    due to the case involving personal injury, which is
9    excluded.
10         We also have the issue of employment matters,
11   which is specific to Mr. McNae.
12         I feel like that is representative of the
13   coverage limitations that could apply.
14   Q    (By Mr. Ruiz)  I want you to make sure you
15   get them all.
16         You've mentioned -- you mentioned three.  Are
17   there any others?
18   A    No.
19   Q    Are any of these three potential limitations
20   identified in the termination letters that went out on
21   November 20th, 2023?
22         MR. MULLALY:  Objection to form.
23         You can respond.
24   A    Is it possible for me to see that letter
25   again?

Page 79

1    Q    (By Mr. Ruiz)  It is possible.  And we'll
2    come back to it.
3          I mean, I know the answer and the document
4    will speak for itself.
5          Any other limitations or exclusions?
6    A    No.
7    Q    Now, did Ms. Cosimano tell that you these
8    were discussed in that meeting with Mr. Murray?
9          MR. MULLALY:  Object to the extent it
10   solicits attorney-client communication and work product.
11         But you can testify to facts surrounding the
12   situation that Ms. Cosimano conveyed to you.
13         MR. RUIZ:  This is a yes-or-no question.
14   Q    (By Mr. Ruiz)  Did Ms. Cosimano specifically
15   tell you that these three things, these limitations,
16   were discussed in that discussion with Mr. Murray?
17         MR. MULLALY:  Same objection.
18         You can respond "yes" or "no."
19   A    I don't know.  I know that these were the
20   output of that conversation.
21   Q    (By Mr. Ruiz)  What do you mean, "the
22   output"?  What output?
23   A    That these were the concerns that were
24   identified.
25   Q    By who?

Page 80

1    A    From that conversation.
2    Q    Okay.  I thought you said there wasn't
3    anything in writing recording that the discussion
4    happened.  Did I get that wrong?
5    A    No, you --
6          MR. MULLALY:  Object to form.
7          You can answer.
8    A    No, you're correct.
9    Q    (By Mr. Ruiz)  All right.  So what output
10   happened?  Was it just something that -- marching orders
11   from Ms. Cosimano or something else?  What was the
12   output?
13         MR. MULLALY:  Object to form.
14         You can answer.
15   A    I'm just making sure that I understand what's
16   being asked, but...
17   Q    (By Mr. Ruiz)  The discussion happened and
18   then there was output.  Is this output that you're
19   talking about documents, instructions, or is it just
20   somebody's understanding in their mind?
21   A    No.  The output is the termination of the
22   non-network attorneys.
23   Q    Okay.  Any other output from that meeting,
24   that discussion?
25   A    No.

BUELL REALTIME REPORTING, LLC
206.287.9066  l  800.846.6989

McNae v. ARAG Insurance Company                                    30(b)(6) Meagen Adams

Page 81

1    Q.   All right.  But I'm -- just take my word for
2    it.  I'll represent to you that those terminations do
3    not mention these limitations or exclusions.
4         I'll show you later.  You don't have to take
5    my word for it, but just for now, I want you to assume
6    I'm right.
7         Did Ms. Cosimano tell you as a matter of fact
8    that she discussed these limitations and exclusions with
9    Mr. Murray in that discussion?
10        MR. MULLALY:  Object to form.
11        You can respond "yes" or "no" but don't
12   respond in a way that reveals any privileged
13   communications.
14   A.   No.
15        Q    (By Mr. Ruiz)  No, she did not tell you.
16   Right?
17   A.   Right.
18        Q.   What about the piece of two attorneys
19   allegedly doing duplicative work?  Did Ms. Cosimano tell
20   you that that was discussed with Mr. Murray, yes or no?
21        MR. MULLALY:  Same objection.
22        You can respond "yes" or "no."
23   A.   No.  I don't know.  I don't recall that being
24   specifically stated in that -- in the way that you're
25   asking.

Page 82

1    Q    (By Mr. Ruiz)  Let's go back to the
2    beginning.  And maybe it's a good time to check in.
3         Do you remember we agreed at the beginning no
4    assuming, no guessing, no speculating?  Right?
5    A.   Yep, I do.
6    Q.   And you weren't -- you personally, Ms. Adams,
7    were not a part of that discussion; correct?
8    A.   Correct.
9    Q.   And so please don't fill in the gaps and
10   assume what might have been talked about in that
11   discussion.
12        Do you understand?
13   A.   Yes.
14   Q.   This whole conversation has been about what
15   Ms. Cosimano told you.
16        Now, did she tell you about the concern
17   regarding the progression toward resolution of the
18   dispute?
19   A.   Did she --
20        (Crosstalk)
21        MR. MULLALY:  Object to form.
22        Q    (By Mr. Ruiz)  Did Ms. Cosimano tell that you
23   she discussed with Mr. Murray the concern relating to
24   progression toward resolution of the dispute?
25   A.   No.

Page 83

1         MR. MULLALY:  Same objection.
2         Q    (By Mr. Ruiz)  All right.  So she didn't tell
3    you about that and she didn't tell you about the need
4    for two attorneys doing duplicative work and she didn't
5    tell you about the other limitations or policy language.
6         Let me back up, then.  I feel like I might
7    have just wasted a bunch of time.
8         What did Ms. Cosimano tell you was the
9    substance of the conversation, that discussion she had
10   with Mr. Murray?
11        And don't fill in the gaps.  I only want to
12   know exactly what she told you.
13        MR. MULLALY:  If the substance of what she
14   told you is attorney-client privilege or work product,
15   please don't respond.  But, otherwise, you can answer
16   the question.
17        Q    (By Mr. Ruiz)  Ms. Adams, I only want facts.
18   What are the specific facts that Ms. Cosimano told you
19   regarding what she discussed with Mr. Murray?
20        MR. MULLALY:  Same objection.
21        You can respond.
22   A.   The specifics of that conversation and the
23   topics that were discussed specifically with Mr. Murray
24   were not part of what Ann shared with me.
25        Q    (By Mr. Ruiz)  All right.  Well, did she

Page 84

1    share any facts besides letting you know that a
2    discussion happened?
3    A.   No.
4    Q.   Did she share any facts about anything
5    relating to the McNae claims during those two meetings
6    with the attorneys this week?  Did she share any facts
7    besides the fact that this discussion happened?
8         MR. MULLALY:  Again, objection on attorney-
9    client and work product grounds.
10        But if you can respond, stating facts without
11   invading those things, please answer.
12   A.   Yes.
13        Q    (By Mr. Ruiz)  Tell me.
14        MR. MULLALY:  Same objection and same
15   instruction.
16        But you can respond.
17   A.   She shared with me details around the
18   concerns that had been identified and some of the
19   timeline of events that had occurred, since I was not
20   present for some of those events.
21        Q    (By Mr. Ruiz)  Can you be any more specific
22   than that?
23        MR. MULLALY:  Object to form.
24        You can respond.
25   A.   The conversation that took place that I was

21 (Pages 81 to 84)

McNae v. ARAG Insurance Company                    30(b)(6) Meagen Adams

---

Page 85

1  not present for is what she shared with me that took
2  place the week of November 6th, and the concerns that
3  we've just listed out were shared with me during those
4  meetings that I had with Ann.
5      Q    (By Mr. Ruiz)  Anything else?
6          MR. MULLALY:  Object to form.
7          You can answer.
8      A.   No.
9      Q    (By Mr. Ruiz)  All right.  So let me break it
10 up into two pieces.
11         Ms. Cosimano told you about this discussion
12 that occurred the week of November 6th.  Correct?
13     A.   Yes.
14     Q.   And separate from that, she shared three
15 concerns that Ms. Cosimano had about the claim?
16         MR. MULLALY:  Object to form.
17         You can answer.
18     A.   The concerns were not phrased or specific to
19 Ann.  So they were concerns that were identified and she
20 shared with me.
21     Q    (By Mr. Ruiz)  Who identified the concerns?
22     A.   I don't know.
23     Q.   Did you ask her?
24     A.   No.
25     Q.   Did you ask her when those concerns arose for

---

Page 86

1  her?
2          MR. MULLALY:  Object to form.
3          You can respond.
4      Q    (By Mr. Ruiz)  Did Ms. Cosimano tell you when
5  those concerns came up?
6      A.   No.
7      Q.   And did you tell her -- I mean did you ask
8  her?
9      A.   No.
10     Q.   Any other concerns that Ms. Cosimano told you
11 about besides --
12         MR. MULLALY:  Objection.
13     Q    (By Mr. Ruiz)  -- besides the three that
14 you've mentioned?
15         MR. MULLALY:  Same instruction regarding
16 privilege.  You can answer as long as you don't reveal
17 privileged information.
18     A.   No.
19     Q    (By Mr. Ruiz)  Have we covered everything
20 that Ms. --
21         MR. MULLALY:  Objection.
22         MR. RUIZ:  Hold on.
23     Q    (By Mr. Ruiz)  Have we covered all the facts
24 that Ms. Cosimano shared with you during these two
25 meetings?

---

Page 87

1      A.   Yes.
2      Q.   Have we also covered everything that
3  Ms. Hoisington shared with you during the ten-minute
4  Teams call you had with her?
5      A.   Yes.
6      Q.   I'm almost afraid to ask, but besides
7  Ms. Cosimano and Ms. Hoisington, did you talk to anybody
8  else in preparation for today's deposition, excluding
9  the two attorneys?
10     A.   No.
11     Q.   Now, did you send any correspondence to
12 anybody eliciting information to help you prepare for
13 today's deposition?
14     A.   No.
15     Q.   You've said you reviewed documents to help
16 you get ready.  Right?
17     A.   Yes.
18     Q.   Which documents did you review?
19     A.   The same documents that were provided by
20 Attorney Mullaly for this case.
21     Q.   You reviewed documents that you understand
22 have already been produced to us?
23     A.   Yes, that's right.
24     Q.   And, now, did you go into the ARAG computer
25 system to look at the claim information there?

---

Page 88

1      A.   I did not.
2      Q.   Any other documents you looked at in getting
3  ready for today?
4      A.   No.
5      Q.   How much time did you spend reviewing
6  documents to help you get ready for today?
7      A.   I would say eight to ten hours.
8      Q.   And again, these were collected by ARAG's
9  attorneys?
10     A.   That's right.
11         MR. RUIZ:  Can we go off the record?
12         THE VIDEOGRAPHER:  Going off the record.  The
13 time now is approximately 11:38 a.m.
14         (Recess 11:38 a.m. to 12:21 p.m.)
15         THE VIDEOGRAPHER:  Back on the record.  The
16 time now is approximately 12:21 p.m.
17     Q    (By Mr. Ruiz)  Ms. Adams, this is an exhibit
18 that I created with the names of some persons or
19 entities that were involved in the facts, based on my
20 review of the documents.  And I intend to ask you
21 questions about whether you recognize these names, as
22 well as a few follow-up questions.
23         So let's start with David R. Murray.  He's
24 the president and CEO of ARAG; is that true?
25     A.   Yes.

22 (Pages 85 to 88)

McNae v. ARAG Insurance Company                    30(b)(6) Meagen Adams

Page 89

1    Q.    All right.  What was the full extent of his
2    role relating to the McNaes' insurance claims?
3    A.    I'm aware of one conversation.
4    Q.    Okay.  Anything else?
5    A.    No.
6    Q.    Who is Andrea Morse?
7    A.    She was the -- she was previously the chief
8    financial officer for ARAG.
9    Q.    Is she something else now?
10   A.    She has retired.
11   Q.    When did she retire?
12   A.    I believe around April of 2024.
13   Q.    So about four months ago?
14   A.    Yes.
15   Q.    What was the full extent of her involvement
16   relating to the McNaes' insurance claims?
17   A.    As the CFO, she is in a role where she would
18   provide final approval for the financial transaction for
19   each individual invoice.
20   Q.    Anything else?
21   A.    Not that I know of, no.
22   Q.    Is Ms. Andrea Morse a part of the committee?
23   A.    She used to be when she was employed at ARAG.
24   Q.    So Ms. Morse was part of the committee up and
25   through -- up until April of this year?

Page 90

1    A.    Yes.
2    Q.    She was at the committee meetings where the
3    McNae claim was discussed, then?
4    A.    She was part of the invitee group to that,
5    yes.
6    Q.    What about Mr. Murray?  Is he a part of the
7    committee?
8    A.    No.
9    Q.    Next name is Ann Cosimano.  Who is Ann
10   Cosimano?
11   A.    General counsel.
12   Q.    How long has she been general counsel?
13   A.    I don't know.
14   Q.    What was the extent of Ms. Cosimano's
15   involvement with the McNaes' insurance claim?
16   A.    She had conversation with David.  And part
17   that -- just making sure I have the timeline correct in
18   my mind.
19         I know that she reviewed status updates and
20   bills that were received on the McNae claims.
21   Q.    Anything else?
22         MR. MULLALY:  Object just on attorney-client
23   privilege, work product grounds.
24         If you can respond without revealing those
25   things, please answer, Meagen.

Page 91

1    Q.    (By Mr. Ruiz)  Just listen to my question,
2    Ms. Adams:  What was the extent of Ms. Cosimano's
3    involvement with the McNaes' insurance claim?  That is
4    the only question for which I want an answer.
5         MR. MULLALY:  Same objection, same
6    instruction.
7         You can answer.
8    A.    She looked at invoices and provided the
9    concerns about potential coverage exclusions.
10   Q.    (By Mr. Ruiz)  This is during the handling of
11   the claim; correct?
12   A.    That would have been around that November
13   communication that was issued.
14   Q.    Okay.  What about before November of 2023?
15   Did Ms. Cosimano have any involvement with the McNaes'
16   insurance claim?
17   A.    I don't recall that timeline.
18   Q.    Isn't it Ms. Cosimano who suggested the
19   mediation in the summer of 2023?
20         MR. MULLALY:  Object to form.
21         You can answer.
22   A.    Yes, it is.
23   Q    (By Mr. Ruiz)  All right.  So what else did
24   Ms. Cosimano do with respect to the McNae claim?
25   A.    She communicated with the McNaes' counsel to

Page 92

1    determine if mediation would move this towards
2    resolution.
3    Q.    Anything else that Ms. Cosimano did with
4    respect to the McNaes' insurance claims?
5    A.    She would have reviewed documentation in
6    order to create that communication.
7    Q.    Jeff LeMay, he is the director of customer
8    care and claims; is that right?
9    A.    Yes.
10   Q.    What's the full extent of his involvement
11   with the McNaes' insurance claim?
12   A.    He is the individual named on some of the
13   communications that were sent regarding this case, and
14   he is a member of the Complex Claims Committee and one
15   of the individuals that would approve claims over that
16   $10,000 threshold that we talked about earlier.
17   Q.    Anything else?
18   A.    No.
19   Q.    Who is Jennifer Beck?  What's her title?
20   A.    She's a vice president, customer experience.
21   Q.    Ms. Beck is a member of the committee?
22   A.    She is.
23   Q.    Who reports to Ms. Beck?
24   A.    Jeff LeMay reports to her, as well as, I
25   believe, Lonita McLean, who is in our business

23 (Pages 89 to 92)

McNae v. ARAG Insurance Company                              30(b)(6) Meagen Adams

---

Page 93

1    intelligence and data department.
2        Q.   What was the full extent of Ms. Beck's
3    involvement with the McNae insurance claims?
4        A.   She, as a member of the committee, would have
5    been aware of those and one of the individuals that
6    would approve claims above that $10,000 threshold.
7        Q.   Does the committee vote to approve claims
8    above the $10,000 threshold or just anybody on the
9    committee can make the approval?
10       A.   There is no vote --
11           MR. MULLALY:  Objection.
12       Q   (By Mr. Ruiz) Is it consensus?
13           MR. MULLALY:  Object to form.
14           You can answer.
15       A.   The claims that are presented are -- we're
16   just looking for if there are any questions about
17   documentation that may be needed.
18       Q.   (By Mr. Ruiz)  For any given claim, who makes
19   the decision about whether the $10,000 threshold can be
20   exceeded?
21       A.   I'm not sure -- there isn't a person that
22   makes the decision about that.
23       Q.   So as long as it gets presented to the
24   committee, then the claim examiner, claims specialist,
25   can exceed the $10,000?

---

Page 94

1            MR. MULLALY:  Object to form.
2            You can answer.
3        A.   Yes.
4        Q.   (By Mr. Ruiz)  Did I spell Lonita McLean's
5    name right?
6        A.   Yes.
7        Q.   And she's in the business intelligence and
8    data department?
9        A.   Yes.
10       Q.   What does the business intelligence and data
11   department do?
12       A.   And it may be just business intelligence, so
13   I apologize for that.
14           They produce reports.
15       Q.   What kinds of reports?
16       A.   Queries and reports that the business needs
17   to understand the important data points in the company.
18       Q.   Have you ever seen one of these reports?
19       A.   Yes.
20       Q.   Okay.  Give me an example of a kind of
21   report.  What kind of data?
22           MR. MULLALY:  Object.  This is outside of
23   scope.
24           You can answer, Meagen.
25       A.   One report that we use is to calculate the

---

Page 95

1    success of quality reviews that we conduct on our team
2    members.  And this report allows us to understand that
3    very easily.
4        Q.   (By Mr. Ruiz)  Are there any financial
5    reports that are produced?
6            MR. MULLALY:  Same objection.
7            You can answer.
8        A.   Yes.
9        Q.   (By Mr. Ruiz)  Give me an example.
10           MR. MULLALY:  Same objection.
11           You can answer.
12       A.   I don't have access to those reports, but I'm
13   aware of their existence.
14       Q.   (By Mr. Ruiz)  Who is -- who is Cathie Kyle?
15       A.   Cathie is our claims analyst, a member of the
16   claims team.
17       Q.   So she is in the claims department?
18       A.   Yes.
19       Q.   Who does she report to?
20       A.   Me.
21       Q.   Is there a difference between a claims
22   analyst and a claims specialist?
23       A.   Yes.
24       Q.   What is the difference?
25       A.   Cathie's role does not involve processing

---

Page 96

1    claims.  Her role --
2            (Crosstalk)
3        A.   I'm sorry.
4        Q.   I'm sorry.  You guessed where I was --
5        A.   I anticipated, and I should have just --
6            (Crosstalk)
7        A.   Cathie's role is to gather court records or
8    other necessary information to help document claim files
9    when it's necessary and provide recommendations on
10   coverage.
11       Q.   All right.  The reason she's on this list is
12   I saw her name on the documents that have been produced
13   to us.
14           What was the full extent of her involvement
15   with the McNaes' insurance claim?
16           MR. MULLALY:  Object to form.
17           You can answer.
18       A.   Cathie provided some clarification to Andrea
19   Morse regarding the nature of the legal matter so that
20   Andrea could complete her approval and review.
21       Q.   (By Mr. Ruiz)  Over email?
22       A.   Yes.
23       Q.   So you saw that email that Cathie Kyle sent
24   to Andrea Morse about that?
25       A.   I did.

---

McNae v. ARAG Insurance Company                    30(b)(6) Meagen Adams

Page 97

1          MR. MULLALY:  Object to the form.
2          You can answer.
3      Q    (By Mr. Ruiz)  You did?
4      A.   I did, yes.
5      Q.   Did she have any other involvement with the
6  McNaes' insurance claims?
7      A.   Yes, I would -- yes.
8      Q.   Elaborate, please.
9      A.   I recall -- well, let's see.  If -- one
10  second.  I have to think way back.
11          Cathie and I discussed this case early on, as
12  we had not seen a case like it before.  So we just
13  wanted to collaborate on that and make sure that we were
14  both aware of the case.
15      Q.   What do you mean by "early on"?  Can you give
16  me a time frame?
17      A.   I can't give you an exact time frame.  I mean
18  shortly -- shortly after the case was presented to ARAG
19  from the McNaes initially when they called us to
20  inquire.
21      Q.   Anything else that Cathie Kyle did on the
22  McNae claim besides that email to Andrea Morse and then
23  this conversation she had with you early on?
24      A.   No.
25      Q.   You are Meagen Adams.  You're the manager for

Page 98

1  case coordination and claims.  Is that right?
2      A.   Yes.
3      Q.   And if you would, describe your full
4  participation in the McNaes' insurance claims.
5          MR. MULLALY:  Object to form.
6          You can answer.
7      A.   As I mentioned, I recall having a
8  conversation with Cathie after receipt of the case that
9  the McNaes had presented to us.
10          As a member of the committee, I was present
11  for the individual invoices being shared with that
12  group.  I would have approved -- I approved invoices
13  between $10,000 and $15,000.
14      Q    (By Mr. Ruiz)  Anything else?
15      A.   I don't think so.
16      Q.   Who is -- who is Jaime Lane?
17      A.   Jaime Lane is a senior claims specialist.
18      Q.   What is the extent of Jaime Lane's
19  involvement in the McNaes' insurance claim?
20      A.   As a senior claims specialist, reviewing
21  invoices and sharing those invoices with the committee.
22      Q.   Anything else?
23      A.   No.
24      Q.   Who is Karissa Banning?
25      A.   Karissa is the claims supervisor.

Page 99

1      Q.   Does she report to you?
2      A.   Yes.
3      Q.   What was the extent of Ms. Banning's
4  involvement with the McNaes' insurance claims?
5      A.   I am glad you asked, because Karissa is also
6  a member of the committee and I'm now just realizing
7  that I didn't mention her previously.  So -- so that
8  would be her involvement:  as a member of the committee,
9  seeing the invoices brought to that group.
10      Q.   Anything else?
11      A.   No.
12      Q.   Heather Preston?
13          (Crosstalk)
14          MR. MULLALY:  Sorry to interrupt.  When we're
15  done going through this chart, may we go off the record
16  briefly?
17          MR. RUIZ:  Sure.
18          MR. MULLALY:  Thank you.
19      Q    (By Mr. Ruiz)  Who is Heather Preston?
20      A.   She's a senior claims specialist.
21      Q.   Does she also report to you?
22      A.   No.  She reports to Karissa.
23      Q.   What was the extent of Ms. Preston's
24  involvement in the McNae insurance claims?
25      A.   As a senior claims specialist, she would

Page 100

1  review invoices and present those invoices to the
2  committee.
3      Q.   Anything else?
4      A.   No.
5      Q.   Sarah Tharp, who is that?
6      A.   Sarah is a senior claims specialist.
7      Q.   Who is the extent of Ms. Tharp's involvement
8  in the McNae insurance claims?
9      A.   As a senior claims specialist, she would be
10  responsible for reviewing invoices and presenting those
11  to the committee.
12      Q.   Anything else?
13      A.   No.
14      Q.   Diane Schmuck, what was Diane's title?
15      A.   Diane is a senior claims specialist.
16      Q.   Is her involvement the same as Ms. Tharp?
17      A.   It is.
18      Q.   And Kathy Miller, who is that?
19      A.   She is a paralegal.
20      Q.   Is she employed by ARAG?
21      A.   Yes.
22      Q.   What was her involvement in the McNaes'
23  insurance claim?
24      A.   I'm not sure.
25      Q.   What about Cassandra Pickering?  Is she the

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

McNae v. ARAG Insurance Company                    30(b)(6) Meagen Adams

---

Page 101

1    supervisor of customer care?
2    A.  She is one of the supervisors, yes.
3    Q.  Who does she report to?
4    A.  Erica Toomey.
5    Q.  And what was the extent of Ms. Pickering's
6    involvement in the McNaes' insurance claim?
7    A.  I'm not sure.
8    Q.  Who is Jan Tyler?
9    A.  She is a customer care representative.
10   Q.  Who does she report to?
11   A.  I'm not sure.
12   Q.  Do you know Ms. Tyler's involvement with the
13   McNaes' insurance claim?
14   A.  I do not.
15   Q.  Brittany Gering, she's a customer care
16   supervisor?
17   A.  Yes.
18   Q.  What was her involvement with the McNaes'
19   insurance claim?
20   A.  I know that she was speaking with the McNaes
21   throughout -- she kind of served as a point of contact
22   for them.  It seemed that many of the phone
23   conversations were directed to her when they would have
24   inquiries.
25   Q.  And that's part of her job, to handle phone

---

Page 102

1    calls from insureds like that?
2    A.  Yes.
3    Q.  Okay.  At a certain point, the McNaes were
4    told to stop calling Brittany; is that right?
5    MR. MULLALY:  Object to form.
6    You can answer.
7    A.  Yes, I understand that to be true.
8    Q.  (By Mr. Ruiz)  Who made the decision to tell
9    the McNaes to stop calling Brittany?
10   A.  I don't know.
11   Q.  Who does Ms. Gering report to?
12   A.  Erica Toomey.
13   Q.  Who is Teresa -- oh, we know.  We already
14   covered Teresa Hoisington, didn't we?
15   A.  We did, yeah.
16   Q.  Have we covered the extent of her involvement
17   with the McNaes' insurance claim?
18   A.  No.
19   Q.  Tell me what it was.
20   A.  She was involved in attempting to connect the
21   McNaes with an attorney that could represent them.  And
22   this was shortly, within days, after the McNaes
23   contacted ARAG to request assistance.
24   Q.  What else did she do on the McNaes' insurance
25   claim?

---

Page 103

1    A.  That describes the extent of her involvement.
2    Q.  And then we have the Complex Claims
3    Committee.
4    Now, we've discussed that already; correct?
5    A.  Yes.
6    Q.  Oh, here's a little reminder to myself.
7    Is there anything else who is not on this
8    list who had involvement within ARAG on the McNaes'
9    insurance claims, that you know?
10   MR. MULLALY:  Object to form.
11   You can answer.
12   A.  No, not that I'm aware of.
13   MR. RUIZ:  Now, please mark this -- what
14   exhibit are we on?  Is this going to be Exhibit 2?
15   MR. MULLALY:  Yes.
16   MR. RUIZ:  Please mark this as Exhibit 2 with
17   the changes.  I'll upload the changes in a second.
18   (Exhibit No. 2 introduced.)
19   Q  (By Mr. Ruiz)  Did any of these people
20   ever -- well, let's leave -- let me ask you this first.
21   I withdraw the question.
22   Did Brittany Gering ever speak with Ronda
23   McNae or Will McNae?
24   A.  Yes.
25   Q.  Okay.  How many times?  Do you know?

---

Page 104

1    A.  I don't know.
2    Q.  Leaving Brittany Gering aside, did any of the
3    people on Exhibit No. 2 ever speak with Ronda McNae or
4    Will McNae?
5    A.  I don't know.
6    Q.  Did any of the people on Exhibit 2 ever speak
7    with Stephanie Casey?
8    A.  I don't know.
9    Q.  Did any of the people on Exhibit 2 ever speak
10   with Alaina Fotiu-Wojtowicz?
11   A.  I don't know.
12   Q.  Now, has anyone on Exhibit 2 ever spoken with
13   Richard Gomez?
14   A.  Yes -- well -- yes.
15   Q.  Who?
16   A.  Ann Cosimano.
17   Q.  Okay.  How many times?
18   A.  I don't know.
19   Q.  Anyone else?
20   A.  I don't recall.
21   Q.  Okay.  We'll have Ms. Cosimano here on
22   Monday, but do you know what she talked to Mr. Gomez
23   about?
24   A.  Yes.
25   Q.  What?

---

26 (Pages 101 to 104)

McNae v. ARAG Insurance Company                    30(b)(6) Meagen Adams

---

Page 105

1     A.   About providing representation services to
2  the McNaes.
3        Q.   Did anyone on Exhibit 2 ever have
4  communication with anyone at Microsoft relating to
5  either Will McNae or Ronda McNae?
6        A.   Not that I'm aware of, no.
7        Q.   Okay.  Now, in getting ready for today's
8  deposition, did you ask anyone that question?
9        A.   No.
10       Q.   And to be clear, the only person on Exhibit 2
11  who you spoke with -- I mean the only two people on
12  Exhibit 2 who you spoke with in preparation for today's
13  deposition are Ann Cosimano and Teresa Hoisington; is
14  that right?
15       A.   Actually, in -- let's see.
16          This list includes Kathy Miller, and I had
17  failed to recall that she had been in attendance at the
18  meetings that I had with Mr. Mullaly and Mr. Roesch.  So
19  I would need to update that to include Kathy, so she
20  should also be included in the people that I spoke with.
21       Q.   Did Kathy Miller provide you any of the facts
22  that you used to prepare for today?
23       A.   Kathy -- Kathy provided confirmation to me
24  about our internal compliance department and how that
25  collaborates with the claims department.  And that was

Page 106

1  it.
2        Q.   I keep learning about new departments.
3  What's the internal compliance department?
4        A.   That's a group that, specific to my
5  relationship with -- shares any updates to state
6  statutes or regulations to any of the departments that
7  they may partner with so we can make adjustments if
8  there are changes that are material to our processes and
9  systems.
10       Q.   What else do they do?
11       A.   I'm not sure of the full range of their
12  responsibilities beyond that.
13       Q.   Who is in charge of the internal compliance
14  department?
15          MR. MULLALY:  Object.  Beyond the scope.
16          You can respond if you know, Meagen.
17       A.   That group reports through Ann Cosimano.  I
18  believe.
19       Q   (By Mr. Ruiz)  Is the internal compliance
20  department located there in the same place in Iowa as
21  you?
22       A.   Yes.
23       Q.   Did the internal compliance department have
24  any involvement with the McNaes' insurance claim?
25       A.   No.

Page 107

1        Q.   All right.  What information did Kathy Miller
2  provide you about how the internal compliance
3  department, I guess, relates to the claims handling side
4  of the company?
5          MR. MULLALY:  Object to form.
6          You can answer, Meagen.
7       A.   I'd ask for confirmation that my recollection
8  of that relationship was correct, in that the compliance
9  department would provide notification to me if there
10  were changes relating to claims handling that would need
11  review or action.
12       Q   (By Mr. Ruiz)  Are there any other facts that
13  Ms. Kathy Miller provided to you?
14       A.   She did share the time frames in which
15  responses are to be provided to insureds specific to the
16  state of Washington.
17       Q.   And what did she tell you about that?
18       A.   Well, there were different sections regarding
19  whether the insurer is a group plan versus an individual
20  plan and those sorts of things.  But the standard
21  appeared to be 20 business days for most
22  acknowledgments.
23       Q.   Are you able to say which specific -- strike
24  that.
25          You're talking about the Washington

Page 108

1  Administrative Code provisions; true?
2       A.   Yes.
3       Q.   And did you bring them with you, which
4  specific ones you talked about with Kathy Miller?
5       A.   No.
6       Q.   Are you able to just right now recall which
7  provisions those were?
8          MR. MULLALY:  Object.  Out of scope.
9          You can answer, Meagen.
10       A.   No.
11       Q   (By Mr. Ruiz)  All right.  Well, what is it
12  that you remember about what those regulatory
13  requirements are?
14          MR. MULLALY:  Same objection.
15          You can answer.
16       A.   The response time that's appropriate when an
17  insured makes a claim for benefits.
18       Q   (By Mr. Ruiz)  Anything else?
19          MR. MULLALY:  Same objection.
20          You can answer.
21       A.   There were -- yes.  There were pieces --
22  rather, a list of -- identified as actions that an
23  insurer should not take regarding denial of a claim.
24       Q   (By Mr. Ruiz)  Anything else?
25          MR. MULLALY:  Same objection.

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

McNae v. ARAG Insurance Company                    30(b)(6) Meagen Adams

Page 109

1    You can answer.
2    A.   No.
3    Q    (By Mr. Ruiz)  All right.  Have we covered
4  all the facts that Kathy Miller gave you in preparation
5  for today's deposition?
6    A.   Yes.
7    MR. RUIZ:  I have uploaded the updated
8  Exhibit No. 2 into the Zoom.  Please use that updated
9  version that I typed on on the screen.
10   And we can go off the record for a moment.
11   MR. MULLALY:  Oh, there's no need, Isaac.
12  Thank you.  I've addressed it.
13   (Crosstalk)
14   MR. RUIZ:  Sorry about that.
15   MR. MULLALY:  No, no, thank you.
16   THE VIDEOGRAPHER:  Let me take us off the
17  record, please.
18   Going off the record.  The time now is
19  approximately 12:52 p.m.
20   (Discussion off the record.)
21   THE VIDEOGRAPHER:  Back on the record.  The
22  time now is approximately 12:53 p.m.
23   MR. RUIZ:  Please mark this Exhibit 3.
24   (Exhibit No. 3 introduced.)
25   Q    (By Mr. Ruiz)  Ms. Adams, I put together this

Page 110

1  exhibit mainly to keep me organized, but hopefully it
2  will help us both.
3    I have questions about nine events from
4  the -- from the case, and I'm going to ask you about
5  each one of them.
6    The first event is accepting coverage for
7  that federal action.  So as you will recall, there was a
8  federal action brought.  Then there was an amendment to
9  the federal action.  Then, much later, there was a state
10  court action filed against Will McNae.
11   Does that -- is that consistent with your
12  understanding?
13   A.   Yes.
14   Q.   Okay.  So this is just talking about that
15  federal court action.
16   Who are the people who were involved in
17  deciding that ARAG would accept coverage relating to the
18  federal case?
19   MR. MULLALY:  Object to form.
20   You can answer, Meagen.
21   A.   Customer care.
22   Q    (By Mr. Ruiz)  Is there a specific person in
23  customer care?
24   A.   I don't recall.
25   Q.   What documents exist at ARAG that relate to

Page 111

1  that decision?
2    A.   Oh.  There would be notes taken by the
3  customer care representative that spoke with the McNaes
4  and placed on -- on file.
5    Q.   Was anyone outside of ARAG consulted on the
6  decision to accept coverage?
7    MR. MULLALY:  Object to form.
8    You can answer.
9    A.   No.
10   Q    (By Mr. Ruiz)  And do we know who
11  ultimately -- like is there a specific person we can
12  point to who made the decision at ARAG to accept
13  coverage relating to the federal case?
14   MR. MULLALY:  Object to form.
15   You can answer.
16   A.   No.
17   Q    (By Mr. Ruiz)  Was a decision to accept
18  coverage a mistake?
19   MR. MULLALY:  Object to form.
20   You can answer.
21   A.   No.
22   Q    (By Mr. Ruiz)  Now, did anyone at ARAG
23  receive negative feedback over the decision to accept
24  coverage relating to the federal case?
25   MR. MULLALY:  Object to form.

Page 112

1    You can answer.
2    A.   No.
3    Q    (By Mr. Ruiz)  The second event is the
4  decision by ARAG to agree to entering into an agreement
5  with Alaina Fotiu-Wojtowicz.  And I'll represent to you
6  that the date of that agreement was July 28, 2022.
7    Who are all the people who were involved in
8  deciding that ARAG would enter into that agreement?
9    A.   Teresa Hoisington.
10   Q.   Anyone else?
11   A.   No, I don't think so.
12   Q.   What documents exist at ARAG that relate to
13  that decision?
14   A.   The fee agreement itself that was executed
15  with this attorney.
16   Q.   Anything else?
17   A.   I believe there are some notes regarding a
18  phone call with customer care that would have been
19  documented in the same way as above when the McNaes
20  spoke with us about this attorney.
21   Q.   Any other documents?
22   A.   No.
23   Q.   So was anyone outside of ARAG consulted on
24  the decision to enter into this agreement?
25   A.   No.

McNae v. ARAG Insurance Company                                    30(b)(6) Meagen Adams

---

Page 113

1    Q.   Who at ARAG, what specific person, ultimately
2  made the decision?
3    A.   Teresa Hoisington.
4    Q.   Was that decision a mistake?
5    A.   No.
6    Q.   Did anyone at ARAG receive negative feedback
7  over making that decision?
8    A.   No.
9    Q.   Event number three is the decision to agree
10 to entering agreement with Stephanie Casey.  And I'll
11 represent to you that the date of that was January 12,
12 2023.
13        Who are all the people involved in deciding
14 that ARAG would enter into that agreement?
15   A.   Teresa Hoisington.
16   Q.   What documents exist at ARAG that relate to
17 that decision?
18   A.   The fee agreement that was executed with this
19 attorney, as well as notes taken from customer care.
20   Q.   Anything else?
21   A.   No, I don't believe so.
22   Q.   Was anyone outside of ARAG consulted in this
23 decision?
24   A.   No.
25   Q.   And was it Ms. Hoisington who ultimately made

---

Page 114

1  the decision to enter into this agreement?
2    A.   Yes.  Yeah.
3    Q.   Was that decision a mistake?
4    A.   No.
5         MR. MULLALY:  Object to form.
6         You can answer.
7    Q   (By Mr. Ruiz)  Did anyone at ARAG receive
8  negative feedback over making that decision?
9    A.   No.
10   Q.   Now, for events number two and three -- you
11 see those up on the screen?
12   A.   I do.
13   Q.   Was the committee involved in making those
14 decisions?
15   A.   No.
16   Q.   Was Mr. Murray involved in making those
17 decisions?
18   A.   No.
19   Q.   Let's look at number four.  This is the
20 inquiry relating to mediation on or about July 26, 2023.
21       You're aware of that event; right?
22   A.   I am.
23       MR. MULLALY:  Object to form.
24   Q   (By Mr. Ruiz)  You said you were?
25   A.   Yes, I am aware of that.

---

Page 115

1    Q.   So this was an inquiry relating to mediation
2  on July 26, 2023, which was sent to Ms. Fotiu-Wojtowicz
3  and Ms. Casey.
4         Who are all the people involved in deciding
5  that ARAG would suggest mediation at that time?
6         MR. MULLALY:  Object to form.
7         You can answer.
8    A.   Ann Cosimano.
9    Q   (By Mr. Ruiz)  Anyone else?
10   A.   Not that I'm aware of.
11   Q.   Was the committee involved?
12   A.   No.
13   Q.   Was Mr. Murray involved?
14   A.   I don't know.
15   Q.   What documents exist at ARAG that relate to
16 the decision to make that inquiry relating to mediation?
17   A.   The communication itself is the only document
18 I'm aware of.
19   Q.   Was anyone outside of ARAG consulted in that
20 decision?
21   A.   Not that I'm aware of.
22   Q.   And it was Ms. Cosimano who ultimately made
23 the decision to have this inquiry relating to mediation?
24   A.   I don't know.
25   Q.   All right.  I think we know that Ms. Cosimano

---

Page 116

1  sent the letter.  Right?
2    A.   Yes.
3         MR. MULLALY:  Object to form.
4         You can answer.
5    Q   (By Mr. Ruiz)  Yes.  And -- but we don't know
6  who made the decision that that letter should be sent.
7  Is that fair?
8    A.   Yes.
9    Q.   Was a decision to make the inquiry a mistake?
10        MR. MULLALY:  Object to form.
11        You can answer.
12   A.   No.
13   Q   (By Mr. Ruiz)  And did anyone at ARAG receive
14 negative feedback over the decision to make that
15 inquiry?
16   A.   No.
17   Q.   A mediation did happen; true?
18   A.   Yes.
19   Q.   Did ARAG attend the mediation?
20   A.   Not to my knowledge.
21   Q.   Did it ask to attend the mediation?
22        MR. MULLALY:  Objection.  Outside of the
23 scope.
24        You can respond.
25   A.   I don't know.

---

McNae v. ARAG Insurance Company                    30(b)(6) Meagen Adams

---

Page 117

1    Q    (By Mr. Ruiz)  Did ARAG believe it had a
2  right to attend the mediation?
3           MR. MULLALY:  Outside of scope.
4           You can respond.
5    A.   I don't know.
6    Q    (By Mr. Ruiz)  Did ARAG expect to be invited
7  to the mediation?
8           MR. MULLALY:  Out of scope.
9           You can respond.
10   A.   I don't know.
11   Q    (By Mr. Ruiz)  Did anyone from ARAG ever
12 communicate with a mediator?
13   A.   I'm -- I don't know.
14   Q    And I'm talking about before, during, or
15 after the mediation.
16         Either before, during, or after the
17 mediation, just to be clear about my question, did
18 anyone from ARAG communicate with a mediator?
19   A.   Not to my knowledge.
20   Q.   Did it ask to?
21   A.   Not that I know of.
22   Q.   Now, did anyone from ARAG ever communicate
23 with Mr. Fitzgerald or either of the plaintiffs who sued
24 the McNaes?
25         MR. MULLALY:  Objection.  Out of scope.

---

Page 118

1           You can answer.
2    A.   No.
3    Q    (By Mr. Ruiz)  Did anyone from ARAG ever
4  communicate with the attorneys who were representing the
5  plaintiff that sued the McNaes?
6           MR. MULLALY:  Objection.  Out of scope.
7           You can answer.
8    A.   Not that I'm aware of.
9           MR. RUIZ:  Please mark this Exhibit 4.
10          (Exhibit No. 4 introduced.)
11   Q    (By Mr. Ruiz)  Have you ever seen this
12 document before?  It's okay if you haven't.  I just
13 want -- I'm just asking.
14   A.   No, I don't think so.
15   Q.   Okay.  I'll represent to you that I pulled
16 this off the docket of the underlying case, that
17 Southern District of Florida case against Ronda McNae
18 and Will McNae.
19         Understood?
20   A.   Yes.
21   Q.   And you see the name of the case is listed
22 here on the first page?
23   A.   Yes.
24   Q.   And the date of the document is October 26,
25 2023.  Do you see that?

---

Page 119

1    A.   Yes.
2    Q.   And that's less than a month before November
3  20th, 2023; right?
4    A.   Yes.
5    Q.   The title of this document is "Order
6  Extending Pretrial Deadlines and Continuing Trial."  Do
7  you agree?
8    A.   Yes.
9    Q.   Did ARAG have a copy of this document on or
10 before November 20th, 2023?
11   A.   Not that I'm aware of.
12   Q.   Did you personally ever ask to see this
13 document?
14   A.   No.
15         MR. MULLALY:  Object to form.
16   Q    (By Mr. Ruiz)  Have you ever discussed this
17 document with anyone inside of ARAG?
18   A.   No.
19   Q.   Okay.  Do you see at the bottom of this page,
20 it says:  Parties shall -- well, let's go up.
21         Do you see paragraph 2 of this document?
22   A.   Yes.
23   Q.   It says:  Trial is rescheduled to
24 commence during the two-week period beginning Monday,
25 February 12th, 2024, at 9:30 a.m. before Jose E.

---

Page 120

1  Martinez, United States District Judge.
2         Do you see that?
3    A.   Yes.
4    Q.   Did I read that correctly?
5    A.   Yes.
6    Q.   And then if you go to the bottom of the page,
7  it reads:  Parties shall file their Daubert motions and
8  motions for summary judgment 15 days after the close of
9  pleadings.
10         Did I read that correctly?
11   A.   Yes.
12   Q.   What are Daubert motions?
13   A.   I don't know.
14         MR. MULLALY:  Out of scope.
15         Yeah, you can answer if you know.
16   Q    (By Mr. Ruiz)  Now, what's ARAG's
17 understanding of what other pretrial motions would need
18 to be filed in the federal court action if it went to
19 trial?
20         MR. MULLALY:  Object to form.
21         You can answer.
22   A.   I don't know what those would be.
23   Q    (By Mr. Ruiz)  And when would those be due?
24         MR. MULLALY:  Outside of scope.
25         You can answer.

---

30 (Pages 117 to 120)

McNae v. ARAG Insurance Company                                    30(b)(6) Meagen Adams

---

Page 121

1    A.   This document states 45 days after the close
2  of pleadings.
3    Q.   (By Mr. Ruiz)  And when would that be?  Do
4  you know?
5    A.   No, I don't know.
6    Q.   Do you see it says:  Joint Pretrial
7  Stipulation must be filed 75 days after closing?
8    A.   Yes, I see that.
9    Q.   What's a joint pretrial stipulation?
10     MR. MULLALY:  Objection.  Out of scope.
11     You can answer if you know.
12    A.   I don't know.
13    Q.   (By Mr. Ruiz)  Of course -- well, let me ask
14  you this:  What are voir dire questions?
15     MR. MULLALY:  Objection.  Outside of scope.
16     You can answer if you know.
17    A.   I don't know.
18    Q.   Of course, the trial involves
19  jury selection, preparation of exhibits, preparation of
20  witnesses, opening statements, direct witness
21  examinations, cross-examinations, motions for judgment
22  as a matter of law, evidentiary objections, motion in
23  limine, closing arguments.
24     Does ARAG agree that a federal court trial in
25  a civil case involves those things?

---

Page 122

1     MR. MULLALY:  Objection to form.  Objection.
2  Out of scope.
3     You can answer.
4    A.   Yeah, I'd say so.  Yes.
5    Q.   (By Mr. Ruiz)  Now, is there any record at
6  ARAG that indicates any consideration of the pressing
7  needs of an upcoming trial before deciding to terminate
8  the attorneys for Mr. and Mrs. McNae?
9     MR. MULLALY:  Objection to form.
10     You can answer.
11    A.   I'm sorry, could you repeat that?
12    Q.   (By Mr. Ruiz)  Is there any record at ARAG
13  that indicates any consideration of the pressing needs
14  of an upcoming trial before deciding to terminate the
15  attorneys for Mr. and Mrs. McNae?
16     MR. MULLALY:  Same objection.
17     You can answer.
18    A.   No record.
19    Q.   (By Mr. Ruiz)  Did any discussion of these
20  pressing needs occur before ARAG decided to terminate
21  the attorneys for Mr. and Mrs. McNae?
22     MR. MULLALY:  Objection to form.
23     You can answer.
24    A.   I wasn't present for that discussion, so if
25  that was included, I'm -- I'm not aware.

---

Page 123

1    Q.   (By Mr. Ruiz)  Okay.  I appreciate you not
2  guessing or speculating.
3     Was any warning given by ARAG to either
4  Mr. or Mrs. McNae that ARAG was considering terminating
5  the attorneys before November 20th, 2023?
6     MR. MULLALY:  Objection to form.
7     You can answer.
8    A.   No.
9    Q.   (By Mr. Ruiz)  Why not?
10     MR. MULLALY:  Objection to form.
11     You can answer.
12    A.   I don't know.
13    Q.   (By Mr. Ruiz)  Was any warning given to
14  either Ms. Casey or Ms. Fotiu-Wojtowicz that ARAG was
15  considering terminating them before November 20th of
16  2023?
17     MR. MULLALY:  Objection to form.
18     You can answer.
19    A.   No.
20    Q.   (By Mr. Ruiz)  Why not?
21     MR. MULLALY:  Objection to form.
22     You can answer.
23    A.   I don't know.
24    Q.   (By Mr. Ruiz)  Has anyone at ARAG after
25  November 20th, 2023 said something along the lines of,

---

Page 124

1  you know, maybe we should have given the McNaes a heads-
2  up that this might be coming?
3     MR. MULLALY:  Objection to form.  Outside of
4  scope.
5     You can answer.
6    A.   Not that I'm aware of.
7    Q.   (By Mr. Ruiz)  Has anyone inside of ARAG,
8  since November 20th, 2023, said something like, hey, you
9  know what, maybe we should have told Ms. Casey and
10  Ms. Fotiu-Wojtowicz that we were considering terminating
11  their contracts?
12     MR. MULLALY:  Objection to form.  Objection.
13  Out of scope.
14     You can answer.
15    A.   No.
16    Q.   (By Mr. Ruiz)  Has anyone inside of ARAG
17  since November 20th, 2023 said, hey, you know what, it
18  might have been the right thing to do --
19     MR. MULLALY:  Same objection.
20     MR. RUIZ:  Hold -- you've got to wait for my
21  question to end.
22     MR. MULLALY:  I thought you were done.
23    Q.   (By Mr. Ruiz)  -- might have been the right
24  thing to do to check the case schedule to see when the
25  trial is and what the needs of the case is before we

---

31 (Pages 121 to 124)

McNae v. ARAG Insurance Company                               30(b)(6) Meagen Adams

Page 125

1    terminate Ms. Casey and Ms. Fotiu-Wojtowicz?
2        MR. MULLALY:  Same objection.
3        You can answer.
4        And apologies, Isaac.
5    A.  No.
6    Q    (By Mr. Ruiz)  Why not?
7        MR. MULLALY:  Same objections.
8        You can answer.
9    A.  Our records indicated that the case was set
10   for trial in February.  So we -- we were aware from one
11   of the attorneys providing us an update that -- the time
12   frame that was involved.
13   Q    (By Mr. Ruiz)  Did ARAG consult with any
14   attorneys before November 20th, 2023 to see if they
15   would be available to take over the representations of
16   the McNaes?
17   A.  No.
18   Q.  Why not?
19   A.  We've outlined the options to the McNaes that
20   were available to them.
21   Q.  How does ARAG think Ronda McNae felt when she
22   found out ARAG was terminating Ms. Fotiu-Wojtowicz?
23       MR. MULLALY:  Objection to form.  Outside of
24   scope.  Calls for speculation.
25       You can answer.

Page 126

1    A.  Mrs. McNae communicated her frustration with
2    ARAG.
3    Q    (By Mr. Ruiz)  And ARAG can certainly
4    understand that; right?
5        MR. MULLALY:  Same objections.
6        You can answer.
7    A.  Yes.
8    Q    (By Mr. Ruiz)  And how does ARAG think Will
9    McNae felt when he found out ARAG was terminating
10   Ms. Casey?
11       MR. MULLALY:  Same objections.
12       You can answer.
13   A.  Mr. McNae also communicated his frustration
14   to ARAG.
15   Q    (By Mr. Ruiz)  What was the time period from
16   when ARAG started considering whether to terminate
17   Ms. Fotiu-Wojtowicz to when it decided to terminate her?
18       MR. MULLALY:  Objection to form.
19       You can answer.
20   A.  I don't know.
21   Q    (By Mr. Ruiz)  What documents exist relating
22   to the decision -- and we're talking about event number
23   five here on the screen on Exhibit 3 again.
24       What documents exist relating to the decision
25   whether to terminate Ms. Fotiu-Wojtowicz's contract?

Page 127

1        MR. MULLALY:  Object to form.
2        You can answer.
3    A.  None that I'm aware of.
4    Q    (By Mr. Ruiz)  Who are all the people who
5    were involved in making that decision?
6    A.  I don't know.
7    Q.  And who ultimately made the decision?
8    A.  I don't know.
9    Q.  It wasn't you; right?
10   A.  Correct.
11   Q.  Did anyone inside of your company even
12   suggest that, hey, this might be the wrong decision?
13       MR. MULLALY:  Object to form.
14       You can answer.
15   A.  I don't know.
16   Q    (By Mr. Ruiz)  Did you know the decision was
17   going to be made before it got made?
18       Let me ask it again.
19       Did you know the attorneys were going to be
20   terminated before they were terminated?
21       MR. MULLALY:  Object to form.
22       You can answer.
23   A.  I was aware that that was under consideration
24   by reviewing a draft of the letters that were prepared.
25   Q    (By Mr. Ruiz)  And did you voice any

Page 128

1    concerns -- any concerns -- about the possibility of
2    terminating these two attorneys?
3        MR. MULLALY:  Object to form.
4        You can answer.
5    A.  I had questions about some of the terminology
6    in the letter.
7    Q    (By Mr. Ruiz)  Is there an email that says
8    that?
9    A.  Yes.
10   Q.  All right.  I'm not sure I've seen that
11   email.  I'll go back and look at it.
12       Was it one of the emails that you saw in
13   getting ready for today?
14   A.  I don't recall.
15   Q.  Did you have any conversations with anyone
16   about this possible decision to terminate the two
17   attorneys?
18       MR. MULLALY:  Object to form.
19       You can answer.
20   A.  No.
21   Q    (By Mr. Ruiz)  Is there any record of anyone
22   at ARAG voicing concern for the negative impacts of the
23   decision to terminate Ms. Fotiu-Wojtowicz, negative
24   impacts on Ms. McNae?
25       MR. MULLALY:  Object to form.  Calls for

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

McNae v. ARAG Insurance Company                                    30(b)(6) Meagen Adams

Page 129

```
1    speculation.
2            You can answer, Meagen.
3       A.   Not that I'm aware of.
4       Q    (By Mr. Ruiz) Did anyone at ARAG -- well,
5    strike that.
6            At the time that it was under consideration
7    to terminate Alaina Fotiu-Wojtowicz, did anyone speak up
8    or articulate the interests of Ronda McNae?
9            MR. MULLALY: Object to form.
10           You can answer.
11           MR. RUIZ: That's a good objection because I
12   left out a word.
13      Q    (By Mr. Ruiz) When the decision to terminate
14   Alaina Fotiu-Wojtowicz was under consideration, did
15   anyone inside the organization articulate the negative
16   impacts on Ronda McNae or what would be in her interests
17   to do?
18           MR. MULLALY: Same objection.
19           You can answer.
20      A.   I'm not sure.
21      Q    (By Mr. Ruiz) Have you seen any document
22   that reflects that?
23      A.   No.
24      Q.   So who wrote the termination letter?
25           MR. MULLALY: Object to form.
```

Page 130

```
1            You can answer.
2       A.   I'm not sure.
3       Q    (By Mr. Ruiz) Who said, "Send it"?
4       A.   I don't know that -- individually who -- who
5    made that decision.
6       Q.   Have you ever called Mr. Murray and asked to
7    talk to him and said, hey, Mr. Murray, I disagree with
8    X, Y, or Z that you're doing?
9            MR. MULLALY: Object to form. Outside of
10   scope if it's not related to the McNae case.
11           You can answer, Meagen.
12      Q    (By Mr. Ruiz) On anything, whether it's
13   claim related or anything else, Ms. Adams, have you ever
14   done that?
15           MR. MULLALY: Objection. Outside of scope.
16   Objection to form.
17           You can answer.
18      A.   No.
19      Q    (By Mr. Ruiz) Was it a mistake to terminate
20   Ms. Fotiu-Wojtowicz?
21           MR. MULLALY: Object to form.
22           You can answer.
23      A.   No.
24      Q    (By Mr. Ruiz) Let's move on to number six,
25   then. This is the termination of Stephanie Casey, also
```

Page 131

```
1    occurring on November 20th, 2023.
2            What was the time period when ARAG started
3    considering whether to terminate Ms. Casey to when it
4    decided to terminate her?
5            MR. MULLALY: Objection. Form.
6            You can answer.
7       A.   I'm not sure.
8       Q    (By Mr. Ruiz) What documents exist relating
9    to the decision whether to terminate Ms. Casey?
10           MR. MULLALY: Objection to form.
11           You can answer.
12      A.   The letter itself.
13      Q    (By Mr. Ruiz) Other than that?
14      A.   I'm not aware of any.
15      Q.   Who are all the people who were involved in
16   making the decision?
17      A.   I don't know.
18      Q.   Who ultimately made the decision?
19      A.   I'm not sure.
20      Q.   Similar to the questions I asked you with
21   respect to Alaina Fotiu-Wojtowicz but now with respect
22   to Stephanie Casey.
23           Now, did anyone inside of ARAG even suggest
24   that it would be a mistake to terminate Ms. Casey's
25   contract?
```

Page 132

```
1            MR. MULLALY: Objection to form.
2            You can answer.
3       A.   I don't know.
4       Q    (By Mr. Ruiz) And is there any record of
5    anyone inside of ARAG voicing concern for the negative
6    impacts of this decision on Mr. McNae?
7            MR. MULLALY: Objection to form.
8            You can answer.
9       A.   Not that I'm aware of.
10      Q    (By Mr. Ruiz) Did anyone inside of ARAG
11   speak up for Mr. McNae's interests?
12           MR. MULLALY: Objection to form.
13           You can answer.
14      A.   I'm not sure.
15      Q    (By Mr. Ruiz) Did anyone inside of ARAG
16   articulate that there could be negative impacts on
17   Mr. McNae from the decision to terminate Ms. Casey?
18           MR. MULLALY: Object to form.
19           You can answer.
20      A.   I'm not sure.
21      Q    (By Mr. Ruiz) Did anyone -- strike that.
22           And who wrote the termination letter that was
23   sent to Ms. Casey?
24           MR. MULLALY: Object to form.
25           You can answer.
```

33 (Pages 129 to 132)

McNae v. ARAG Insurance Company                                30(b)(6) Meagen Adams

Page 133

1    A.   I don't know.
2    Q.   (By Mr. Ruiz)  Who said, "Send it, send this
3    letter"?
4    A.   I'm not sure.
5    Q.   And I'm guessing ARAG does not think it was a
6    mistake to fire Ms. Casey.
7         MR. MULLALY:  Object to form.
8         You can answer.
9    Q.   (By Mr. Ruiz)  Does ARAG think it was a
10   mistake to terminate Ms. Casey's contract?
11        MR. MULLALY:  Object to form.
12        You can answer.
13   A.   No.
14        MR. RUIZ:  Please mark this Exhibit 5.
15        (Exhibit No. 5 introduced.)
16   Q.   (By Mr. Ruiz)  All right.  Ms. Adams, do you
17   agree this is an email that you sent on November 21st,
18   2023?
19   A.   Yes.
20   Q.   And who are these folks that you sent it to?
21   Is that the committee?
22   A.   No.
23   Q.   Okay.  Who are they?
24   A.   Those are --
25        MR. MULLALY:  Object to form.

Page 134

1         You can answer.
2         THE WITNESS:  Sorry.
3    A.   Those include the claims supervisor, senior
4    claims specialist, and the claim analyst.
5    Q.   (By Mr. Ruiz)  Is what you've written in this
6    email true?  Take a close read of it.
7    A.   There is a -- no.  It's -- it's not
8    completely accurate.
9    Q.   All right.  Well, read it all and then we're
10   going to go -- we're going to go over it.
11   A.   I've read it.
12   Q.   All right.  What's inaccurate about this?
13        Oh -- strike that.
14        Did you write this yourself?
15   A.   Yes, I did.
16   Q.   Did anyone help you write it?
17   A.   No.
18   Q.   Okay.  So why does it contain an inaccuracy?
19   A.   In the first sentence, I made a word choice
20   that was incorrect.  It says "ceasing coverage for these
21   cases," and it should have read that we were
22   discontinuing payments for those cases.
23   Q.   Yeah, but you wrote "ceasing coverage";
24   right?
25   A.   I did, mm-hmm.

Page 135

1    Q.   All right.  And you wrote it one day after
2    the decision to terminate occurred; right?
3    A.   Yes, I did.
4         MR. MULLALY:  Object to form.
5         Sorry.
6    Q    (By Mr. Ruiz)  Now, you're aware that a
7    letter went out to the McNaes on November 20th, 2023
8    also; right?
9    A.   Yes.
10   Q.   And what did that letter say about the
11   possibility of getting new counsel, if you remember?
12   A.   I don't recall without seeing the
13   communication again.
14   Q.   Regardless, you agree that you sent this
15   email on November 21st, 2023; right?
16   A.   Yes.
17   Q.   Yeah.  This is a genuine, authentic copy of
18   the email that you sent; right?
19   A.   Yes.
20   Q.   And this was just one day after the
21   terminations happened; right?
22        MR. MULLALY:  Object to form.
23        You can answer.
24   A.   Yes.
25   Q    (By Mr. Ruiz)  And at the time you wrote

Page 136

1    this, you didn't think you were making a mistake in what
2    you were writing, did you?
3         You didn't make a mistake in this email on
4    purpose, did you, ma'am?
5    A.   No mistake -- a mistake wouldn't have been
6    made on purpose.
7    Q.   Right.
8         We're back at Exhibit 3.  Can you look at
9    number 7, the letter of December 6, 2023 to William
10   McNae.
11        Do you see that item?
12   A.   Yes.
13   Q.   And then this is that letter.
14        MR. RUIZ:  Please mark it as Exhibit No. 6.
15        (Exhibit No. 6 introduced.)
16   Q.   (By Mr. Ruiz)  What is this document?
17   A.   Letter addressed to William McNae.
18   Q.   What's the date?
19   A.   December 6, 2023.
20   Q.   What was the purpose of ARAG sending this
21   letter?
22   A.   Could you scroll down a little bit, please?
23        This letter is communicating the indemnity
24   benefit that is available under the legal plan.  It's
25   reiterating the December 1st, 2023 termination date for

34 (Pages 133 to 136)

McNae v. ARAG Insurance Company                                30(b)(6) Meagen Adams

Page 137

1    the counsel that they had.
2        And if you could scroll a little further, I
3    see we're talking about the topic of reasonably pursuing
4    resolution in the case.
5        Oh, and inviting -- if there are any ARAG
6    network attorneys that they speak with that may be
7    interested in taking their case, that we would be in
8    communication with them.
9    Q.    Who are all the people who participated in
10   the creation of this document?
11   A.    I don't know.
12   Q.    Do you know any of them?
13   A.    No, not certain -- not with certainty.
14   Q.    Were you involved?
15   A.    No.
16   Q.    Who approved this document going out?
17   A.    I don't know.
18   Q.    Who said it should be sent to Mr. McNae?
19   A.    I don't know.
20   Q.    Does ARAG agree that this letter was in fact
21   sent on behalf of ARAG?
22   A.    Yes.
23   Q.    Is this a true and correct copy of the
24   letter?
25   A.    Yes.

Page 138

1    Q.    No reason to doubt the authenticity of this
2    copy; right?
3    A.    Right.
4    Q.    Was it a make -- was it a mistake to send
5    this letter the way it's written?
6        MR. MULLALY:  Object to form.
7        You can answer.
8    A.    No.
9    Q    (By Mr. Ruiz)  Do you see up here -- I've
10   been meaning to ask you all day and I keep forgetting.
11       Do you see this logo that says "ARAG Legal
12   Insurance"?
13   A.    Yes.
14   Q.    What is legal insurance?
15       MR. MULLALY:  Object.  Out of scope.
16       You can answer.
17   A.    Legal insurance is a voluntary benefit that's
18   offered through employers; at least the ARAG benefit
19   plan is.  And it provides assistance in connecting with
20   an attorney to help people with their legal needs.
21   Q    (By Mr. Ruiz)  Well, more than just
22   assistance; right?  It pays benefit, it pays money,
23   doesn't it?
24   A.    Yes.
25       MR. MULLALY:  Same objection.

Page 139

1        You can answer.
2    Q.    (By Mr. Ruiz)  Within the terms of the legal
3    insurance contract; correct?
4    A.    Yes.
5    Q.    Now, you brought it up here that this letter
6    goes into this idea of pursuing reasonable avenues of
7    settlement.
8        Do you see that?
9    A.    I do, yes.
10   Q.    As a general matter, does ARAG think that
11   terminating attorneys three months before trial helps or
12   hurts the possibility of resolving litigation on terms
13   favorable to ARAG's insureds?
14       MR. MULLALY:  Object to form.  Out of scope.
15       You can answer.
16   Q    (By Mr. Ruiz)  As a general matter.
17       MR. MULLALY:  Same.
18       You can answer.
19   A.    It depends.
20   Q.    (By Mr. Ruiz)  Depends on what?
21       MR. MULLALY:  Same objections.
22       You can answer.
23   A.    The timeline of three months, it may or may
24   not be enough time for someone to -- to prepare.
25   Q    (By Mr. Ruiz)  What about in the McNae claim?

Page 140

1        If you're looking at it on November 20th,
2    2023, would three months have been enough time for a new
3    attorney -- well, first of all, to find a new attorney,
4    and then to have that attorney to get ready for trial?
5    A.    I don't know.
6        MR. MULLALY:  Objection to form.  Objection.
7    Speculation.  Objection.  Out of scope.
8        You can answer.
9    A.    I don't know.
10   Q    (By Mr. Ruiz)  Is there any record inside of
11   the organization, ARAG, that even considers that
12   question?
13   A.    Not to my knowledge.
14       MR. RUIZ:  Can we go off the record?
15       MR. MULLALY:  Yes.
16       THE VIDEOGRAPHER:  Going off the record.  The
17   time now is approximately 1:33 p.m.
18       (Recess 1:33 p.m. to 1:45 p.m.)
19       THE VIDEOGRAPHER:  Back on the record.  The
20   time now is approximately 1:45 p.m.
21       MR. RUIZ:  Please mark this Exhibit No. 7.
22       (Exhibit No. 7 introduced.)
23   Q    (By Mr. Ruiz)  Ms. Adams, do you agree that
24   this is an email sent from Legal US to Stephanie Casey?
25   A.    Yes.

35 (Pages 137 to 140)

McNae v. ARAG Insurance Company                    30(b)(6) Meagen Adams

---

Page 141

1      Q.   Okay.  So who is Legal US?
2      A.   That's the legal department at ARAG.
3      Q.   This particular email was sent by Jeff LeMay?
4      A.   His name is at the bottom, yes.
5      Q.   Is he a part of the legal department?
6      A.   No.
7      Q.   So doesn't he have his own email address?
8      A.   Yes.
9      Q.   Why didn't he send this to Ms. Casey under
10  his own email account?
11          MR. MULLALY:  Object to form.
12          You can answer.
13     A.   I don't know.
14     Q    (By Mr. Ruiz)  Who are all the people who
15  were involved in writing this exhibit, this email?
16     A.   I don't know that.
17     Q.   You agree that the date of this email is
18  December 20th, 2023 and the time is 8:23 p.m.?
19     A.   Yes.
20     Q.   And you agree that that's Stephanie Casey,
21  the attorney who was termination who was representing --
22  who was representing Mr. McNae?  Agreed?
23          MR. MULLALY:  Object to form.
24          You can answer.
25     A.   Yes.

---

Page 142

1      Q    (By Mr. Ruiz)  And you don't know who are all
2   the people who participated in writing this?
3      A.   No.
4      Q.   Have you ever discussed this document with
5   anybody?
6      A.   No.
7      Q.   Who ultimately approved that this email
8   should be sent?
9      A.   I don't know.
10     Q.   Who made the decision that Jeff LeMay should
11  sign it?
12     A.   I don't know.
13     Q.   Do you agree that this email was sent on
14  behalf of ARAG?
15     A.   Yes.
16     Q.   Is this a true and correct copy of the email?
17     A.   Yes.
18     Q.   Is there any reason to doubt the authenticity
19  of this email?
20     A.   No.
21     Q.   Do you see the highlighted language?  It
22  says: "As you know, ARAG advised Mr. McNae and you that
23  his pre-trial indemnity benefit has been exhausted, and
24  that Mr. McNae should be responsible for any additional
25  pre-trial legal fees"?

---

Page 143

1      Did I read that correctly?
2      A.   Yes.
3      Q.   On what day does ARAG say that Mr. McNae
4   exhausted his pretrial indemnity benefit?
5          MR. MULLALY:  Object to form.
6          You can answer.
7      A.   The indemnity benefit, which is spelled out
8   in the benefit plan -- I don't know what date, but it
9   would have been early on in the representation of this
10  case, based on the dollar amount.
11     Q    (By Mr. Ruiz)  Is there any document anywhere
12  at ARAG before November 20th, 2023 that says that
13  Mr. McNae has exhausted his pretrial indemnity benefit?
14     A.   Not that I'm aware of.
15     Q.   And you reviewed all the documents that were
16  produced to me in this case; right?
17          (Crosstalk)
18          MR. MULLALY:  Object to form.
19          You can answer.
20     A.   I did.
21     Q    (By Mr. Ruiz)  Are you able to identify any
22  of those documents from ARAG before November 20th, 2023
23  that say that Mr. McNae exhausted his pretrial indemnity
24  benefit?
25     A.   No.

---

Page 144

1      Q.   Who -- and I'm asking for a specific person.
2      Who made the determination that Mr. McNae
3   exhausted his pretrial indemnity benefit?
4          MR. MULLALY:  Object to form.
5          You can answer.
6      A.   I don't know.
7      Q    (By Mr. Ruiz)  Did either of the termination
8   letters say that Mr. McNae had exhausted his pretrial
9   indemnity benefit?
10          MR. MULLALY:  Object to form.
11          You can answer.
12     A.   No, I don't believe so.
13     Q    (By Mr. Ruiz)  Regardless of who made the
14  determination allegedly that Mr. McNae had exhausted his
15  pretrial indemnity benefit, when was that decision made?
16          MR. MULLALY:  Object to form.
17          You can answer.
18     A.   I don't know.
19     Q    (By Mr. Ruiz)  Where is it recorded for the
20  first time that ARAG felt that Mr. McNae had exhausted
21  his pretrial indemnity benefit?
22          MR. MULLALY:  Object to form.
23          You can answer.
24     Q    (By Mr. Ruiz)  Let me rephrase just to get
25  rid of the word "felt."

---

36 (Pages 141 to 144)

McNae v. ARAG Insurance Company                                    30(b)(6) Meagen Adams

Page 145

1     Where is it recorded for the first time at
2  ARAG has Mr. McNae had exhausted his pretrial indemnity
3  benefit?
4        MR. MULLALY: Same objection.
5        You can answer.
6     A.  I'm not sure.
7     Q   (By Mr. Ruiz) When was the possibility that
8  Mr. McNae was close to exhausting his pretrial indemnity
9  benefit first communicated to either Mr. McNae or
10 Mrs. McNae?
11       MR. MULLALY: Same objection.
12       You can answer.
13    A.  I believe we previously looked at the
14 communication of -- December 6, was it?
15    Q   (By Mr. Ruiz) Anytime before December 6?
16    A.  Prior to that, I'm not sure.
17    Q.  Was it a mistake to send Exhibit 7, which is
18 up on your screen, the way it's --
19       MR. MULLALY: Object --
20       (Crosstalk)
21       MR. MULLALY: Pardon me.
22       Object to form.
23       You can answer.
24    A.  No.
25    Q   (By Mr. Ruiz) Back on the screen is Exhibit

Page 146

1  3. We were just talking about event number eight.
2     Do you see that?
3     A.  Yes.
4     Q.  Now I'm going to turn to event number nine.
5     This is a letter of January 23rd, 2024 to
6  William McNae relating to coverage. All right?
7     A.  Yes.
8        MR. RUIZ: Please mark this Exhibit 8.
9        (Exhibit No. 8 introduced.)
10    Q   (By Mr. Ruiz) This is a letter sent by ARAG.
11 Do you agree?
12    A.  Yes.
13    Q.  The date is January 3rd, 2024; correct?
14    A.  Yes.
15    Q.  And the addressee is William McNae; true?
16    A.  Yes.
17    Q.  It is signed at the end by Jeff LeMay,
18 director of customer care and claims; correct?
19    A.  Yes.
20    Q.  Who are all of the people who participated in
21 creating this document?
22    A.  I'm not sure.
23    Q.  Were attorneys involved? That's a yes-or-no
24 question.
25    A.  May I see more of the content?

Page 147

1     Q.  Yes, of course. Let me know when you want me
2  to scroll down.
3     A.  Yes, please scroll.
4        Yes, there could have been attorneys
5  involved.
6     Q.  Attorneys inside of ARAG or outside?
7     A.  Inside. I can't say about outside.
8     Q.  Who are the attorneys who would have been
9  involved in creating Exhibit 8?
10    A.  Ann Cosimano.
11    Q.  Who else?
12    A.  No one else internally as far as attorneys
13 go.
14    Q.  Did Jeff LeMay have any role in writing the
15 words on this letter?
16    A.  I don't know.
17    Q.  Besides this letter and besides an insurance
18 contract, what other information did ARAG rely on in
19 reaching its coverage decision?
20    A.  Could you ask that again? I'm sorry.
21    Q.  You understand that this letter relates to
22 the state court action commenced against William McNae;
23 right?
24    A.  Yes.
25    Q.  You also understand that this letter relates

Page 148

1  to whether ARAG thinks there's coverage for that.
2  Right?
3     A.  Yes.
4        MR. MULLALY: Object to form.
5        You can answer.
6     Q   (By Mr. Ruiz) Besides this letter itself and
7  besides the insurance contract, is there any other
8  information that ARAG was relying on in reaching its
9  coverage decision?
10       MR. MULLALY: Object to form.
11       You can answer.
12    A.  I'm not sure.
13    Q   (By Mr. Ruiz) Well, did ARAG do any research
14 to assist it in making the coverage decision?
15       MR. MULLALY: Object to form.
16       You can answer.
17    A.  I can't say what research was conducted.
18    Q   (By Mr. Ruiz) Because you don't know?
19    A.  Right, I don't know.
20    Q.  You don't know if any research was conducted;
21 right?
22    A.  Right.
23    Q.  Well, do you know if ARAG relied on any
24 literature to assist it in its coverage decision?
25       MR. MULLALY: Object to form.

37 (Pages 145 to 148)

McNae v. ARAG Insurance Company                                    30(b)(6) Meagen Adams

Page 149

1    You can answer.
2    A.   No.
3    Q.   (By Mr. Ruiz)  Who ultimately approved
4  sending this letter, Exhibit No. 8, which is the
5  January 3rd, 2024 letter?
6    A.   I don't know.
7    Q.   Who said it should be sent to Mr. McNae?
8    A.   I'm not sure.
9    Q.   But you do agree that this letter was
10 actually sent on behalf of ARAG?
11   A.   Yes.
12   Q.   And this is a true and correct copy of that
13 letter; right?
14   A.   Yes.
15   Q.   No reason to doubt the authenticity of this
16 letter; right?
17   A.   Right.
18   Q.   Does ARAG agree it is important, when writing
19 a letter to the insured, to accurately quote the
20 language from the controlling insurance contract?
21       MR. MULLALY:  Object.  Out of scope.
22       You can answer.
23   A.   Yes, that's important.
24   Q    (By Mr. Ruiz)  Does this letter accurately
25 quote the language from the insurance contract?

Page 150

1        MR. MULLALY:  Object.  Out of scope.
2        You can answer.
3    A.   I would need to go through and compare it to
4  the benefit plan language to answer that.
5    Q.   (By Mr. Ruiz)  You've never looked at that
6  specific question before now; right?
7        MR. MULLALY:  Object to form.
8        You can answer.
9    A.   What was that question?
10   Q.   (By Mr. Ruiz)  You've never examined whether
11 the quotations in this letter of the contract are
12 accurate?
13       MR. MULLALY:  Same objection.
14       You can answer.
15   A.   Correct, I've not made that comparison.
16   Q    (By Mr. Ruiz)  Has anyone inside of ARAG gone
17 back to double-check that this letter is accurately
18 quoting the contract language?
19   A.   I don't know.
20   Q.   Again, the date of this letter was
21 January 3rd, 2024; true?
22   A.   Yes.
23   Q.   When was the Florida state court case filed?
24   A.   I don't recall the date offhand.
25   Q.   Was that before or after the conversion plan

Page 151

1  was purchased?
2    A.   I believe -- it was after.
3    Q.   Does ARAG agree that this letter takes the
4  position there is no coverage for legal services in
5  defense of a Florida state court action?
6        MR. MULLALY:  Objection to form.
7        You can answer.
8    A.   Yes.
9    Q.   (By Mr. Ruiz)  Was it a mistake to send this
10 letter the way it's written?
11       MR. MULLALY:  Objection to form.
12       You can answer.
13   A.   No.
14   Q.   (By Mr. Ruiz)  Is there any document in which
15 ARAG changes its coverage position and says, yes, we
16 agree there is coverage for legal services in defense of
17 a Florida state court action?
18       MR. MULLALY:  Objection to form.
19       You can answer.
20   A.   Not that I'm aware of, no.
21   Q.   (By Mr. Ruiz)  Is there anyone at ARAG who,
22 at any time while termination was under consideration or
23 after, stood up and said, "It's not okay to do this to
24 the McNaes"?
25       MR. MULLALY:  Objection to the form.

Page 152

1        You can answer.
2    A.   Not to my knowledge.
3    Q.   (By Mr. Ruiz)  From the moment that ARAG
4  started considering terminating the attorneys, has
5  anyone at all inside of ARAG advocated on behalf of the
6  McNaes and fought against the terminations?
7        MR. MULLALY:  Objection to form.
8        You can answer.
9    A.   No, not that I'm aware of.
10   Q.   (By Mr. Ruiz)  And from the moment that ARAG
11 started considering terminating the attorneys, has
12 anyone at all inside of ARAG advocated on behalf of the
13 McNaes and fought to have the attorneys reinstated?
14       MR. MULLALY:  Objection to form.
15       You can answer.
16   A.   No, not that I'm aware of.
17   Q.   (By Mr. Ruiz)  From the moment that ARAG
18 found out about the Florida state court action against
19 Mr. McNae, has anyone at all inside of ARAG advocated on
20 behalf of the McNaes and fought to stop ARAG from
21 sending the January 3rd, 2024 letter relating to
22 coverage?
23       MR. MULLALY:  Objection to form.
24       You can answer.
25   A.   No.

McNae v. ARAG Insurance Company                          30(b)(6) Meagen Adams

Page 153

1    Q    (By Mr. Ruiz)  Earlier today you said who --
2  who inside of ARAG normally makes the initial coverage
3  determination?
4    A.   Customer care.
5    Q.   All right.  And so did customer care make the
6  determination relating to the Florida state court
7  action?
8    A.   I don't know.  That would be the typical
9  course of action.
10    Q.   Do you -- but -- I'm not asking for you to
11  assume or speculate.
12         Was customer care -- did they make the
13  decision about whether to accept or deny coverage
14  relating to the Florida state court action?
15         MR. MULLALY:  Object to form.
16         You can answer.
17         THE WITNESS:  I think I want -- could I ask
18  you, Mr. Mullaly, for a moment with this question?
19         MR. MULLALY:  Only if you have a question
20  relating to privilege -- sorry, go ahead, Isaac.
21         THE WITNESS:  That's what I wasn't sure of.
22    Q    (By Mr. Ruiz)  Well, I don't want you to give
23  me any information about advice that you have received,
24  but I do want to know what facts the company has in its
25  possession.

Page 154

1         Do you know the fact that -- whether customer
2  care made the decision?
3         MR. MULLALY:  Object to form.
4         You can answer.
5    A.   Yes, they made -- made the decision.
6    Q.   (By Mr. Ruiz)  Who inside of customer care
7  made the decision?
8    A.   I don't know.
9    Q.   What was Mr. Murray's involvement in the
10  decision about whether to accept or deny coverage with
11  respect to the Florida state court action?
12    A.   Oh, I don't know.
13         MR. MULLALY:  Object to form.
14         You can answer.
15    A.   I don't know.
16    Q    (By Mr. Ruiz)  Is there any record at all
17  inside of ARAG in which an employee of ARAG articulates
18  the negative impacts to the McNaes from ARAG's
19  decisions?
20         MR. MULLALY:  Object to form.
21         You can answer.
22    A.   No.
23    Q.   (By Mr. Ruiz)  Okay.  And are you aware of
24  any person who stood up and articulated the possible
25  negative impacts on the McNaes from ARAG's decisions?

Page 155

1    A.   No.
2         MR. MULLALY:  Object to form.
3         You can answer.
4    Q.   (By Mr. Ruiz)  You know, I have a little bit
5  of a confession.  I've been doing this for 24 years and
6  I've lost track of how many depositions I've taken, and
7  no matter how many I do, I'm always nervous at the
8  beginning.  You can probably tell.
9         And it's because what we're doing here is
10  real important and there's a legal proceeding and you're
11  under oath and I have to make sure that I ask the right
12  questions to help my clients.
13         Were you nervous this morning when this
14  deposition started?
15         MR. MULLALY:  Object to form.  Object.
16  Outside of scope.
17         You can answer.
18    A.   A little.
19    Q    (By Mr. Ruiz)  Yeah?
20         Can you understand how Ronda McNae might have
21  felt during those days when she was pro se in the
22  federal court action?
23         MR. MULLALY:  Object to form.  Object.  Out
24  of scope.  Calls for speculation.
25         You can answer.

Page 156

1    Q    (By Mr. Ruiz)  I'm asking on behalf of ARAG.
2  I want ARAG's position.
3         Can ARAG understand how Ronda McNae must have
4  felt in those days when she didn't have an attorney in
5  this very heated federal court lawsuit in Florida?
6         MR. MULLALY:  Same objections.
7         You can answer.
8    Q.   (By Mr. Ruiz)  Does ARAG understand that?
9         MR. MULLALY:  Same objections.
10         You can answer.
11    A.   Yes, we do understand.
12    Q    (By Mr. Ruiz)  Yeah.  And that's not a good
13  feeling; right?
14         MR. MULLALY:  Same objections.
15         You can answer.
16    Q    (By Mr. Ruiz)  Did we lose you?
17         MR. RUIZ:  Is she frozen for everybody else?
18         MR. MULLALY:  Yes.
19         THE VIDEOGRAPHER:  Do you want to go off or
20  wait a second?
21         MR. RUIZ:  Let's wait a second.
22    Q    (By Mr. Ruiz)  Hi, Ms. Adams.
23    A.   Sorry.  It seems things froze there.
24    Q.   I'm glad to have you back.
25         MR. RUIZ:  Karmen, what was the last question

39 (Pages 153 to 156)

Page 157

1  I asked, please?
2       THE COURT REPORTER: I'll read the last two
3  so it will make sense.
4       (The reporter read back.)
5       MR. MULLALY: Same objection.
6    Q    (By Mr. Ruiz) Right, Ms. Adams?
7       MR. MULLALY: Same objection.
8       You can answer.
9    A    Right.
10    Q    (By Mr. Ruiz) And can ARAG understand what
11  it must have felt like to have it suggested to Ms. Ronda
12  McNae that she put out a statement saying that she had
13  not been sexually assaulted?
14       MR. MULLALY: Same objections.
15       You can answer.
16    A    I'm a little confused by the question, I
17  guess.
18    Q    (By Mr. Ruiz) Well, you're aware that one
19  of the settlement terms that was proposed by
20  Mr. Fitzgerald -- you mentioned it earlier -- was a
21  public statement by Ms. McNae recanting that she had
22  been sexually assaulted by him; isn't that right?
23    A    Yes.
24    Q    Did ARAG understand why that might not be
25  something that Ronda McNae would be interested in doing?

Page 158

1    A    Yes.
2    Q    And that the very suggestion would be
3  offensive to a normal human being?
4       MR. MULLALY: Same objections.
5       You can answer.
6    A    Yes.
7    Q    (By Mr. Ruiz) What is this document?
8    A    Could you enlarge that, please?
9       Thank you.
10       Yeah, if you could scroll. Thank you.
11       This is a communication about enrollment in
12  the UltimateAdvisor Plus benefit plan.
13    Q    What's the UltimateAdvisor Conversion Plan?
14    A    That is a product that is offered to plan
15  members who are no longer eligible for a group plan due
16  to a change in their employment status.
17    Q    Mr. McNae was let go by Microsoft?
18       MR. MULLALY: Object to form. Object.
19  Outside of scope.
20       You can answer.
21    Q    (By Mr. Ruiz) Ms. Adams, Mr. McNae stopped
22  being employed by Microsoft; would you agree?
23    A    Yes.
24    Q    And then he converted his plan and he's no
25  longer -- as of October 1st, 2023, he was no longer a

Page 159

1  part of the group plan. Do you agree?
2    A    Yes.
3    Q    He had this individual plan that he was
4  paying for himself. Do you agree?
5    A    Yes.
6       THE COURT REPORTER: Isaac, you got quieter.
7  Is your microphone --
8       MR. RUIZ: Yeah, probably.
9       Is that better?
10       THE COURT REPORTER: Yes. Thank you.
11       THE COURT REPORTER: And, sorry, was that
12  last document Exhibit 9?
13       MR. RUIZ: Yes.
14       (Exhibit No. 9 introduced.)
15       MR. RUIZ: Please mark this one Exhibit 10.
16       (Exhibit No. 10 introduced.)
17    Q    (By Mr. Ruiz) Ms. Adams, do you agree that
18  this appears to be an email from ARAG to William McNae
19  dated July 21st, 2023?
20    A    Yes.
21    Q    And this is an email that ARAG sent regarding
22  converting from the group plan to his individual plan?
23       MR. MULLALY: Object. Out of scope.
24       You can answer.
25    A    Yes, that's right.

Page 160

1       MR. RUIZ: Please mark this Exhibit No. 11.
2       (Exhibit No. 11 introduced.)
3    Q    (By Mr. Ruiz) What is this document?
4    A    This is the certificate for the
5  UltimateAdvisor Conversion Plan.
6    Q    This is the group plan?
7       MR. MULLALY: Object to form.
8       You can answer.
9    A    It's -- it's the UltimateAdvisor group plan,
10  yes.
11    Q    (By Mr. Ruiz) Well, let me -- let's -- let's
12  figure it out, because I have two documents.
13       This is called group legal insurance; right?
14    A    Yes.
15    Q    Now, let me -- let's just -- let's go compare
16  a couple of documents.
17       The version I showed you first starts with
18  Bates No. 1630.
19       Now, this is a different document, and this
20  one starts with Bates No. 1525.
21       MR. RUIZ: Please mark the one that starts
22  with 1525 as Exhibit 12.
23       (Exhibit No. 12 introduced.)
24    Q    (By Mr. Ruiz) Is there -- what's the
25  difference between these two documents?

McNae v. ARAG Insurance Company                              30(b)(6) Meagen Adams

| | |
|---|---|
| Page 161 | Page 163 |

Page 161

1    MR. MULLALY: Object. Outside of scope.
2        You can answer.
3    A.   Yeah, if you could scroll down further, that
4  would...
5    Q.   (By Mr. Ruiz) Let me know when I can go
6  further.
7    A.   Yeah. Keep scrolling.
8        Okay. So, yeah, this document here is the
9  policy with all of that information here. And the other
10  document is the benefit plan, as you can see the content
11  at the beginning there is a bit different, so it has
12  those first pages that differ.
13   Q.   But they both have the same definitions?
14   A.   Yes.
15   Q.   All right. So --
16       MR. MULLALY: Object --
17       (Crosstalk)
18       MR. MULLALY: I'm sorry. Just --
19       (Crosstalk)
20       MR. MULLALY: Sorry, Isaac.
21   Q.   (By Mr. Ruiz) We're both going to get there
22  together. I just want -- you're going to tell me what
23  these two documents are and how they're used. Right?
24       MR. MULLALY: Object to outside of scope.
25       You can answer.

Page 162

1    A.   Yes.
2    Q.   (By Mr. Ruiz) All right. And can you share
3  some information about what these documents are, what
4  the differences are, how they're used?
5        MR. MULLALY: Same objection.
6        You can answer.
7    A.   This document that we're looking at right now
8  contains, on the first two pages that we scrolled
9  through, premium price, a list of the specific
10  endorsement forms that are --
11   Q.   (By Mr. Ruiz) You're talking about Exhibit
12  12. Yes. Keep going.
13       MR. MULLALY: Same objection.
14       You can answer.
15   A.   Yes. So this is -- includes the declarations
16  page and the other document does not.
17   Q.   And this says "Conversion Plan"; right?
18   A.   Yes.
19   Q.   UltimateAdvisor Conversion Plan.
20       Is this the document -- is this the policy
21  that Mr. McNae was buying individually?
22       MR. MULLALY: Same objection.
23       You can answer.
24   A.   Yes.
25   Q.   (By Mr. Ruiz) Understood.

Page 163

1        Let's stay with Exhibit 12, then. What is a
2  conversion plan?
3        MR. MULLALY: Same objection.
4        You can answer.
5    A.   It's the plan that's available for
6  individuals who have ended their employment with a group
7  that had been working with ARAG for that benefit.
8    Q.   (By Mr. Ruiz) Is this a contract?
9        MR. MULLALY: Same objection.
10       You can answer.
11   A.   I guess I don't know.
12   Q.   (By Mr. Ruiz) Do you see there's a section
13  on -- this is page 3 of the exhibit, the PDF we're
14  looking at. There's a policy period, says January 1st,
15  2023 through December 31st, 2023 also.
16       Do you see that?
17   A.   Yes.
18   Q.   Does ARAG agree that Mr. McNae was a party to
19  this policy?
20       MR. MULLALY: Same objection.
21       You can answer.
22   A.   Yes.
23   Q.   (By Mr. Ruiz) And Ronda McNae was also an
24  insured under this policy as his spouse; correct?
25       MR. MULLALY: Same objection.

Page 164

1        You can answer.
2    A.   Yes.
3    Q.   (By Mr. Ruiz) And ARAG obviously agrees that
4  ARAG is a party to this contract. Agreed?
5    A.   Yes.
6    Q.   And Mr. McNae paid the premiums for this
7  UltimateAdvisor Conversion Plan; right?
8        MR. MULLALY: Same objection.
9        You can answer.
10   A.   Yes.
11   Q.   (By Mr. Ruiz) Now, is there any document at
12  ARAG that addresses the question of which contract
13  governs claims for payment following conversion?
14       MR. MULLALY: I'm sorry, would you repeat
15  that, Isaac?
16       MR. RUIZ: Sure.
17   Q.   (By Mr. Ruiz) After the plan is converted by
18  the individual and is being paid individually, is there
19  any document at ARAG that addresses whether the old
20  version controls or the new version controls?
21       MR. MULLALY: Object. Out of scope.
22       You can answer.
23   A.   The definitions in the benefit plan itself
24  stipulate how those are addressed by the insured event.
25   Q.   (By Mr. Ruiz) Depending on when the insured

41 (Pages 161 to 164)

McNae v. ARAG Insurance Company                                    30(b)(6) Meagen Adams

Page 165

1   event arises?
2       A.   Yes.
3       Q.   So for the Florida state court action, which
4   contract governed?
5           MR. MULLALY:  Same objection.
6           You can answer.
7       A.   The conversion plan.
8       Q.   (By Mr. Ruiz)  Are there any provisions that
9   are different between the group legal insurance
10  certificate and service plan and the UltimateAdvisor
11  Conversion Plan that affected ARAG's coverage analysis?
12          MR. MULLALY:  Object.  Out of scope.
13          You can answer.
14      A.   No.
15      Q.   (By Mr. Ruiz)  Are there any provisions that
16  are different between the group legal insurance
17  certificate and service plan and the UltimateAdvisor
18  Conversion Plan that affected ARAG's benefits decision?
19          MR. MULLALY:  Objection to form.
20          (Crosstalk)
21          MR. MULLALY:  Objection.  Out of scope.
22          You can answer.
23      A.   No.
24      Q.   (By Mr. Ruiz)  Are there any provisions that
25  are different between the two that affected ARAG's

Page 166

1   attorney terminations?
2           MR. MULLALY:  Same objections.
3           You can answer.
4       A.   No.
5       Q.   (By Mr. Ruiz)  We're still on Exhibit 12.
6   Who drafted this contract?
7           MR. MULLALY:  Objection.  Out of scope.
8           You can answer.
9       A.   I don't know.
10      Q.   (By Mr. Ruiz)  Does any other insurance
11  company use a form that is similar to this?
12          MR. MULLALY:  Same objection.
13          You can answer.
14      A.   I don't know.
15      Q.   (By Mr. Ruiz)  Are there any other insurance
16  companies that provide the same kinds of benefits of
17  ARAG; namely, legal insurance?
18          MR. MULLALY:  Same objection.
19          You can answer.
20      A.   Yes, I believe so.
21      Q.   (By Mr. Ruiz)  Who?
22          MR. MULLALY:  Same objection.
23          You can answer.
24      A.   I'm aware of MetLife.  But as far as
25  insurance goes, I guess I don't know if there are other

Page 167

1   actual insurance products that provide that.
2       Q.   (By Mr. Ruiz)  Is there another form of
3   policy that Mr. McNae could have purchased other than
4   this Ultimate Conversion Plan from ARAG?
5           MR. MULLALY:  Same objection.
6       A.   No.
7       Q.   (By Mr. Ruiz)  If I wanted to -- and I don't.
8   But if I wanted to buy a policy from ARAG, I'm not
9   employed, Ruiz & Smart, my firm, doesn't provide it and
10  I'm not employed by anybody who does, can I get -- can I
11  buy insurance or apply to buy insurance from ARAG?
12          MR. MULLALY:  Objection.  Out of scope.
13          You can answer.
14      A.   No.
15      Q.   (By Mr. Ruiz)  We're on page 6 of the PDF of
16  Exhibit 12.  These are the definitions that apply to the
17  conversion plan.  Agreed?
18      A.   Yes.
19      Q.   Is there any other document that sets forth
20  definitions that apply to the conversion plan?
21      A.   No.
22      Q.   If we go down to the definition of insured,
23  okay, does ARAG agree that this is the definition of
24  insured under the contract?
25      A.   Yes.

Page 168

1       Q.   Both Mr. McNae and Mrs. McNae are insureds;
2   true?
3       A.   Yes.
4       Q.   Then there's also a definition of insured
5   event.
6           Do you see that?
7       A.   Yes.
8       Q.   And it says an insured event is:  "An event
9   covered by this policy whose initiation date will be
10  considered the earlier of the date (a) written notice of
11  a legal dispute is sent or filed by you or received by
12  you or; (b) a ticket or citation is issued or; (c), an
13  attorney is hired."
14          Did I read that correctly?
15      A.   Yes.
16      Q.   Then down below that same page, there's a
17  definition of legal services; correct?
18      A.   Yes.
19      Q.   Legal services is defined as:  "Time spent by
20  your attorney and their office staff for your covered
21  legal matters which does not include costs such as, but
22  not limited to:  filing fees, copy costs, mileage, title
23  insurance, expert witnesses, mediator, home studies,
24  transcriptionists, title search, and title abstracting."
25          Did I read that correctly?

                                    42 (Pages 165 to 168)

McNae v. ARAG Insurance Company                              30(b)(6) Meagen Adams

Page 169

1    A.  Yes.
2    Q.  Now let's go to page 8 of the PDF.  Do you
3  see the insurance agreement?
4    A.  Yes.
5    Q.  And the second paragraph reads:  "You can
6  choose a Network Attorney or Non-Network Attorney for
7  legal services provided to you resulting from an insured
8  event which occurs after your effective date and while
9  your certificate of insurance is in effect.  We will pay
10 benefits for legal services up to the maximum amount
11 listed in the benefits section of this policy."
12       Did I read that correctly?
13   A.  Yes.
14   Q.  We're on page 11 of the PDF now, still on
15 Exhibit 12.
16       Do you see there's a section called "Relation
17 of the Parties"?
18   A.  Yes.
19   Q.  And the first paragraph reads:  "You have the
20 unrestricted right to choose an attorney.  The attorney
21 is not our agent or employed by us or the policyholder.
22 We and the policyholder shall at no time control or
23 interfere with the performance of the attorney and we do
24 not guarantee the skill of the attorney.  Any payment to
25 a network attorney for legal services is our

Page 170

1  responsibility up to your policy limits."
2       Did I read that correctly?
3    A.  Yes.
4    Q.  Who is the policyholder for purposes of this
5  contract?
6       MR. MULLALY:  Object.  Out of scope.
7       You can answer.
8    A.   I need to go back up and see the policyholder
9  definition.
10       And then the declarations page.
11       It's the UltimateAdvisor Conversion Plan.
12   Q.  (By Mr. Ruiz)  All right.  So you agree that
13 under this document, neither ARAG nor the
14 UltimateAdvisor Conversion Plan will interfere or
15 control the performance of the attorneys?  Is that
16 right?
17   A.   Well, the policyholder is the UltimateAdvisor
18 group.  I'm...
19   Q.  How about we say this:  Does ARAG agree that
20 ARAG shall, at no time, control or interfere with the
21 performance of the attorney?
22       MR. MULLALY:  Object.  Out of scope.
23       You can answer.
24   A.  Yes.
25   Q.  (By Mr. Ruiz)  Why don't we do this and look

Page 171

1  up the deposition of network attorney.  That's a defined
2  term under this contract; right?
3    A.  Yes, it is.
4    Q.  Network attorney -- we're now on page 7 of
5  the PDF -- means "an attorney with whom we have
6  contracted to perform covered legal services in the
7  United States for you and who has contracted with us to
8  provide the specific covered legal services for which
9  you are seeking assistance."
10       Did I read that correctly?
11   A.  Yes.
12   Q.  Is there any other definition of network
13 attorney?
14       MR. MULLALY:  Objection.  Out of scope.
15       You can answer.
16   Q   (By Mr. Ruiz)  Let me ask it another way.
17       Are you aware of any other definition of
18 network attorney at ARAG?
19   A.  No.
20   Q.  Ms. Casey was an attorney.  Do you agree?
21   A.  Yes.
22   Q.  And Ms. Fotiu-Wojtowicz was also an attorney.
23 Do you agree?
24   A.  Yes.
25   Q.  And with respect to both, ARAG had a contract

Page 172

1  with each.  Right?
2    A.  Yes.
3    Q.  And the contract was for them to perform
4  covered legal services in the country of the United
5  States.  Right?
6       MR. MULLALY:  Object.  Out of scope.
7       You can answer.
8    Q   (By Mr. Ruiz)  Correct?
9    A.  Yes.
10   Q.  Florida is in the United States; right?
11   A.  Yes.
12   Q.  And that contract was actually to perform
13 covered legal services in the United States for the
14 McNaes; right?
15       MR. MULLALY:  Same objection.
16       You can answer.
17   A.  Yes.
18   Q   (By Mr. Ruiz)  And right here in this
19 definition where it talks about "you," that's talking
20 about the McNaes; right?
21   A.  Yes.
22   Q.  And Ms. Casey and Ms. Fotiu-Wojtowicz, they
23 contracted with "us," meaning ARAG, to provide the
24 specific covered legal services for which the McNaes
25 were seeking assistance; correct?

43 (Pages 169 to 172)

McNae v. ARAG Insurance Company                    30(b)(6) Meagen Adams

Page 173

1     MR. MULLALY:  Same objection.
2         You can answer.
3     A.    Yes.
4     Q     (By Mr. Ruiz)  Is there any document at ARAG
5  that says that Ms. Casey or Ms. Fotiu-Wojtowicz were not
6  network attorneys during the time that they had a
7  contract with ARAG?
8     MR. MULLALY:  Same objection.
9         You can answer.
10     A.    No.
11     Q     (By Mr. Ruiz)  Does ARAG agree that during
12  the time that Ms. Casey and Ms. Fotiu-Wojtowicz, when
13  they had contracts with ARAG, that they were network
14  attorneys?
15     MR. MULLALY:  Same objection.
16         You can answer.
17     A.    Yes.
18     Q     (By Mr. Ruiz)  Does anyone at ARAG have a
19  different position than that?
20     MR. MULLALY:  Same objection.
21         You can answer.
22     A.    No.
23     Q     (By Mr. Ruiz)  And would you remind me what
24  the indemnity benefit is for network attorneys for the
25  defense of civil claims?

Page 174

1     MR. MULLALY:  Objection to form.
2         You can answer.
3     A.    I don't recall offhand without seeing the
4  schedule.
5     Q     (By Mr. Ruiz)  It's unlimited, isn't it?
6     MR. MULLALY:  Objection to form.
7         You can answer.
8     Q     (By Mr. Ruiz)  I'll show you.  You don't have
9  to answer yet.  Let me show you first.
10         I'm going to show you in both documents.
11  Let's start with Exhibit No. 11.
12     MR. MULLALY:  I don't mean to interrupt you,
13  Isaac.  I think Exhibit 11 might be the certificate for
14  the 2024 policy here.
15     MR. RUIZ:  Well, I'm going to show her both.
16     Q     (By Mr. Ruiz)  So let's go to Exhibit No. 11
17  and let's go to Bates No. 1636.
18         Let's see the section called "Defense of
19  Civil Damage Claims Legal Services for an insured"?  Do
20  you see that?
21     A.    Yes.
22     Q     And what does it say the benefit is for
23  network attorneys?
24     MR. MULLALY:  Object to form.
25         You can answer.

Page 175

1     A.    That it's paid in full.
2     Q     (By Mr. Ruiz)  Right.
3         Is there anything in this document that says
4  paid in full means some other number?
5     A.    No.
6     Q     Let's look at the other document.  This is
7  Exhibit 12.  Bates No. 1545.
8         Do you see it up on the screen?
9     A.    Yes.
10     Q     What is the benefit for network attorneys in
11  the defense of civil damages claims?
12     A.    Paid in full.
13     Q     Right.
14         Is there -- and in this document, is there
15  some other part of this document that says paid in full
16  actually means some other amount?
17     MR. MULLALY:  Object to form.
18         You can answer.
19     A.    No.
20     Q     (By Mr. Ruiz)  All right.  So it's not true
21  that on November 19th, 2023, Mr. McNae or Mrs. McNae had
22  exhausted their network attorney benefit; right?
23     MR. MULLALY:  Objection to the form.
24         You can answer.
25     A.    I guess I'm unclear as to having communicated

Page 176

1  that the network attorney benefit was exhausted.
2     Q     (By Mr. Ruiz)  All right.  Well, you tell me.
3  Did ARAG think that on November 19th, 2020 -- well,
4  strike that.
5         Did ARAG ever believe that as of November
6  20th, 2023, either of the McNaes had exhausted their
7  network attorney benefit?
8     MR. MULLALY:  Objection.  Out of scope.
9         You can answer.
10     A.    No.
11     Q     (By Mr. Ruiz)  Because, in fact, they had
12  not.  Right?
13     A.    Correct.
14     Q     And on November 19th, 2023, they hadn't --
15  they had two network attorneys.  One of them -- each one
16  had a network attorney working for them.  Right?
17     MR. MULLALY:  Objection to form.  Objection.
18  Out of scope.
19         You can answer.
20     A.    Yes.
21     MR. RUIZ:  I think we -- I'm hearing some
22  noises.  So whoever is making some vulnerable noises,
23  maybe go mute.
24     Q     (By Mr. Ruiz)  Back on Exhibit 12, Bates No.
25  1625.  Do you agree that these are the exclusions in the

                                    44 (Pages 173 to 176)

McNae v. ARAG Insurance Company                          30(b)(6) Meagen Adams

---

Page 177

1  agreement?
2      A.   This looks like one set of exclusions.
3      Q.   I'm only seeing four.  Are there any other
4  exclusions?
5          MR. MULLALY:  Object.  Outside of scope.
6          You can answer.
7      A.   Well, there is the UltimateAdvisor -- okay.
8      Q.   (By Mr. Ruiz)  It's Exhibit 12.  I promise I
9  will also show you Exhibit No. 11, but let's go through
10 one at a time.
11     A.   Okay.  Yes, those are the exclusions.
12     Q.   There are four of them; right?
13     A.   Yes.
14     Q.   Now, again, for clarity, let's say that there
15 are three cases:  a federal case against Will McNae, a
16 federal case against Ronda McNae, and a state case
17 against Will McNae.
18         Can we agree to that?
19     A.   Yes.
20     Q.   And which exclusions does ARAG say apply to
21 the McNaes' claims for benefits?  Just give me the
22 numbers.
23         MR. MULLALY:  Objection to form.
24         You can answer.
25     A.   2 and 3.  I'm...

---

Page 178

1          From this list, 2.  I was -- that's why I was
2  wanting to make sure I had the correct set of exclusions
3  in front of me.
4      Q.   (By Mr. Ruiz)  Okay.  Let's look at number 2,
5  then.  Who made the determination that exclusion number
6  2 applied?
7          MR. MULLALY:  Objection to form.
8          Can I ask the Bates number of this page,
9  Isaac?
10         MR. RUIZ:  1625 of Exhibit 12.
11     Q.   (By Mr. Ruiz)  Ms. Adams, who made the
12 determination that exclusion number 2 applied?
13         MR. MULLALY:  Is it 1629?  Because --
14         MR. RUIZ:  1625.
15         MR. MULLALY:  Okay.
16     Q.   (By Mr. Ruiz)  See at the bottom here?
17         MR. MULLALY:  Of -- I'm sorry, can you scroll
18 down to the bottom again?  I apologize.
19         MR. RUIZ:  Well, just what I told you.  1625.
20     Q.   (By Mr. Ruiz)  Now, let me ask the question
21 again, Ms. Adams.
22         Who at ARAG made the determination that
23 exclusion number 2 applied?
24     A.   I don't know.
25         MR. MULLALY:  Objection to form.

---

Page 179

1      Q.   (By Mr. Ruiz)  You don't know?  You don't
2  know?
3      A.   No, not an individual --
4          MR. MULLALY:  Object to form.
5          (Crosstalk)
6          MR. MULLALY:  I'd like to note for the record
7  that this is the service plan.
8          MR. RUIZ:  I'm going to show her both
9  documents.  You can note it for the record, but I'm
10 going to show her both, don't you worry.
11     Q.   (By Mr. Ruiz)  Ms. Adams, you don't know the
12 specific person who made the determination that
13 exclusion number 2 applied?
14         MR. MULLALY:  Object to form.
15         You can answer.
16     A.   No.
17     Q.   (By Mr. Ruiz)  All right.  Who are all the
18 people who, together, made that decision?
19         MR. MULLALY:  Object to form.  Object.  Out
20 of scope.
21     A.   I don't know who all the people are.
22     Q.   (By Mr. Ruiz)  Okay.  So which part of
23 exclusion 2 do you say applies?
24         MR. MULLALY:  Object to form.  Object.  Out
25 of scope.  There are no topics about the service plan.

---

Page 180

1      Q.   (By Mr. Ruiz)  You can answer, ma'am.
2      A.   Well, with this being the service plan, I'm
3  not sure that this is the --
4      Q.   Well, why don't we --
5          (Crosstalk)
6      Q.   You take direction quite well from your
7  attorney.  But let me -- let me just show you the other
8  document, then.  Why -- I mean, I'm not trying to trick
9  you.
10         Here we are.  Exhibit No. 11, Bates No. 1654.
11         And do you see that there are four
12 exclusions?
13     A.   Yes.
14     Q.   All right.  Now, which exclusions does ARAG
15 say apply?
16     A.   2, 3, and 4.
17     Q.   Who made the determination that exclusion
18 number 2 applied?
19         MR. MULLALY:  Object to form.
20         You can answer.
21     A.   I'm not sure.
22     Q.   (By Mr. Ruiz)  All right.  Well, who all was
23 involved in making that decision?
24         MR. MULLALY:  Object to form.
25         You can answer.

---

45 (Pages 177 to 180)

McNae v. ARAG Insurance Company                    30(b)(6) Meagen Adams

Page 181

1    A.   I don't know who all was included in that.
2        Q.   (By Mr. Ruiz)  All right.  Well, how about,
3    which one of these parts of exclusion 2 do you see
4    apply?
5        A.   Employee --
6        MR. MULLALY:  Object to form.
7        You can answer.
8        Sorry.
9        THE WITNESS:  Sorry.
10       MR. MULLALY:  I'm objecting because this
11   is -- well, never mind.
12       Objection to form.
13       You can answer.
14       A.   The employment matters exclusion would apply
15   to any of Mr. McNae's matters.
16       Q.   (By Mr. Ruiz)  Which other -- which other
17   part of exclusion 2?
18       MR. MULLALY:  Objection to form.  Objection.
19   Out of scope.
20       You can answer.
21       A.   I don't see anything else in exclusion 2.
22       Q.   (By Mr. Ruiz)  Okay.  And explain to me why
23   the employment matters exclusion applies to the -- to
24   Mr. McNae's claims.
25       MR. MULLALY:  Same objections.

Page 182

1        You can answer.
2        A.   The Complaint from the plaintiff is referring
3    to the business relationship as well as alleged
4    communications from Mr. McNae to his then-employer,
5    Microsoft, as part of the basis of that lawsuit.
6        Q.   (By Mr. Ruiz)  Anything else?
7        MR. MULLALY:  Out of scope.  Objection to
8    form.
9        You can answer.
10       A.   No, I don't think so.
11       Q.   (By Mr. Ruiz)  Isn't it true that the
12   reference in the case to employment was simply a part of
13   the description of how these people met and not an
14   integral part of the lawsuit?
15       MR. MULLALY:  Objection to form.
16       You can answer.
17       A.   I believe the Complaint alleged that
18   Mr. McNae had sent some communications to his employer
19   about the handling of the matter by Microsoft.
20       Q.   (By Mr. Ruiz)  Do you know where I'm getting
21   those words that the reference to employment is simply a
22   part of the description of how these people met and not
23   an integral part of the current lawsuit?
24       MR. MULLALY:  Objection to form.
25       You can answer.

Page 183

1        Q.   (By Mr. Ruiz)  Have you ever heard those
2    words?
3        A.   I don't recall.
4        Q.   They're your words.  They're your words in an
5    email that you wrote.
6        Let's ask -- let me ask you about number 3.
7    Who made the decision that exclusion number 3 applied?
8        MR. MULLALY:  Objection to form.  Objection.
9    Out of scope.
10       You can answer.
11       A.   I don't know.
12       Q.   (By Mr. Ruiz)  Who all was involved in making
13   that decision?
14       A.   I don't know.
15       Q.   All right.  So which part of these applies to
16   the case?
17       MR. MULLALY:  Same objections.
18       You can answer.
19       A.   Personal injury.
20       Q.   (By Mr. Ruiz)  All right.  Is personal injury
21   defined by this agreement?
22       MR. MULLALY:  Same objections.
23       You can answer.
24       A.   It is not.
25       Q.   (By Mr. Ruiz)  What research has -- well,

Page 184

1    strike that.
2        How does ARAG define personal injury?
3        MR. MULLALY:  Out of scope.
4        You can answer.
5        A.   Personal injury would include --
6        Q.   (By Mr. Ruiz)  One second.  One second.  I'm
7    not asking for your personal testimony.  I'm asking for
8    ARAG's testimony.  So let me back up.
9        Is there any document at ARAG that discusses
10   the meaning of personal injury?
11       MR. MULLALY:  Objection.  Out of scope.
12       You can answer.
13       A.   No.
14       Q.   (By Mr. Ruiz)  Were you the person who made
15   the determination that the personal injury exclusion
16   applied?
17       A.   No.
18       Q.   And you didn't talk to whoever made that
19   decision; right?
20       A.   No.
21       Q.   Have you looked -- have you seen any document
22   inside of ARAG that examines whether or not the personal
23   injury exclusion applies?
24       A.   No.
25       Q.   Are you aware of anyone at ARAG who, up until

46 (Pages 181 to 184)

McNae v. ARAG Insurance Company                    30(b)(6) Meagen Adams

Page 185

1  this moment, has articulated a definition of what
2  personal injury means in the context of this exclusion?
3      A.  I'm not aware of a -- of a company stance
4  on -- on that definition at this time.
5      Q.   And did you research what personal injury
6  might mean, say, in a dictionary?
7      A.  I -- yeah, I imagine I have.
8      Q.   Well, do you -- don't imagine.  Please don't
9  imagine.  I need to know what you specifically remember,
10  because whatever you answer, I'm going to ask you for
11  the details.
12          Do you have specific recollection of
13  researching what personal injury means in the context of
14  this exclusion?
15          MR. MULLALY:  Objection.  Out of scope.
16          You can answer.
17      A.  Yes.
18      Q.   (By Mr. Ruiz)  Okay.  Tell me exactly when
19  you did that.
20      A.  I don't know.
21          MR. MULLALY:  Same objection.
22      Q.   (By Mr. Ruiz)  Did you do it in getting ready
23  for today's deposition?
24      A.  No.
25      Q.   Did you do it in connection with the McNae

Page 186

1  claim?
2      A.  No.
3      Q.   And since you never talked to whoever made
4  the decision, you don't know what definition they
5  applied to personal injury; right?
6          MR. MULLALY:  Objection to form.
7          You can answer.
8      A.  No.
9      Q.   (By Mr. Ruiz)  Can you point to a single
10  document at ARAG that says this is what personal injury
11  means in the context of exclusion number 3?
12          MR. MULLALY:  Objection.  Out of scope.
13          You can answer.
14      A.  No.
15      Q.   (By Mr. Ruiz)  Are you aware of any document
16  in which ARAG explained what personal injury means to
17  the McNaes?
18      A.  No.
19      Q.   All right.  And so when you are going to tell
20  me what the definition of personal injury means, where
21  does that definition come from, so I can go look?
22          MR. MULLALY:  Objection.  Out of scope.
23          You can answer.
24      A.  Definition of personal injury, since we've
25  established that I don't have a document to show you

Page 187

1  that, would be just based on my own personal search.
2      Q.   (By Mr. Ruiz)  All right.  Personal search --
3  but you haven't searched for the McNae claim; right?
4      A.  No.
5      Q.   What -- tell me the book, then, that you
6  searched so I can go check.
7          MR. MULLALY:  Objection.  Out of scope.
8          You can answer.
9      A.  Google.
10      Q.   (By Mr. Ruiz)  Google.  Right.  Okay.
11          So what page inside of Google did you pick?
12  I mean, if I look in Google, I'll get 10,000 things.
13          MR. MULLALY:  Same objection.  Objection to
14  form.
15          You can answer.
16      A.  I don't remember.
17      Q.   (By Mr. Ruiz)  When did you do the Google
18  search?
19      A.  I don't remember.
20          MR. MULLALY:  Same objections.
21      Q.   (By Mr. Ruiz)  Was it within the last year?
22          MR. MULLALY:  Same objections.
23          You can answer.
24      A.  Yes.
25      Q.   (By Mr. Ruiz)  Okay.  And what was your

Page 188

1  search query?
2          MR. MULLALY:  Same objections.
3          You can answer.
4      A.  I don't remember.
5      Q.   (By Mr. Ruiz)  Okay.  Did you type in the
6  language from this exclusion and ask Google what it
7  meant?
8          MR. MULLALY:  Same objections.
9          You can answer.
10      A.  No.
11      Q.   (By Mr. Ruiz)  Tell me the exact definition
12  Google gave you.
13          MR. MULLALY:  Same objections.
14          You can answer.
15      A.  I don't know.
16      Q.   (By Mr. Ruiz)  ARAG is not going to deny
17  coverage based on a Google search; right?
18      A.  No.
19      Q.   Right.  So then we can move on.
20          Mr. Fitzgerald's case against the McNaes,
21  ARAG takes the position that it's a personal injury
22  case?
23          MR. MULLALY:  Objection.  Out of scope.
24          You can answer.
25      A.   There's a possibility that the personal

47 (Pages 185 to 188)

McNae v. ARAG Insurance Company                    30(b)(6) Meagen Adams

Page 189

1    injury exclusion applies.  That's why we include it in
2    the reservation of rights.
3         Q    (By Mr. Ruiz)  I'm asking a different
4    question.
5         Does ARAG take the position that
6    Mr. Fitzgerald is bringing personal injury claims
7    against the McNaes?
8              MR. MULLALY:  Objection.  Out of scope.
9              You can answer.
10        A    Yes.
11        Q    (By Mr. Ruiz)  Okay.  What are those claims?
12             MR. MULLALY:  Same objection.
13             You can answer.
14        A    In the -- was this -- was your question
15   specific to one of the cases?
16        Q    (By Mr. Ruiz)  Any of them.  Tell me which
17   claims Mr. Fitzgerald has brought that are personal
18   injury claims.  Because this isn't a car accident or
19   anything like that.  It's something different.
20        So tell me, which specific claims are
21   personal injury claims?
22             MR. MULLALY:  Objection to form.  Objection.
23   Out of scope.
24             You can answer.
25        A    Claims for the damages related to libel and

Page 190

1    reputation that has been suffered according to his
2    Complaint.
3         Q    (By Mr. Ruiz)  Okay.  What else?
4              MR. MULLALY:  Same objections.
5              You can answer.
6         A    There are other claims for the impact on
7    Mr. Fitzgerald's personal relationships.
8         Q    (By Mr. Ruiz)  What else?
9              MR. MULLALY:  Same objections.
10             You can answer.
11        A    I don't recall the other specific requests.
12        Q    (By Mr. Ruiz)  When was the first time ever
13   that ARAG sent a reservation of rights letters -- letter
14   to either of the McNaes?
15        A    That occurred at the time that the first
16   attorney was contracted with for Ronda McNae's case.
17        Q.   And when was the first time that ARAG said it
18   might rely on exclusions 2, 3, or 4?
19             MR. MULLALY:  Objection to form.
20             You can answer.
21        A    I'm not sure which communications
22   specifically cited those.
23        Q.   Is it ARAG's position that all of
24   Mr. Fitzgerald's claims are personal injury claims?
25             MR. MULLALY:  Objection to form.  Objection.

Page 191

1    Out of scope.
2              You can answer.
3         A    Yes.
4         Q    (By Mr. Ruiz)  You don't know who made that
5    decision; right?
6              MR. MULLALY:  Same objections.
7              You can answer.
8         A    No, I don't.
9         Q    (By Mr. Ruiz)  So if you don't know who made
10   the decision, how do you know that that decision has
11   been made?
12             MR. MULLALY:  Same objections.
13             You can answer.
14        A    Because I read the letter that was sent.
15        Q    (By Mr. Ruiz)  Other than reading the
16   reservation of rights letter -- which we just went over.
17   Right?  We looked at it.  Correct?
18        Do you agree that we looked at that
19   reservation of rights letter a few minutes ago?
20             MR. MULLALY:  Objection to form.
21             You can answer.
22        A    Yes.
23        Q    (By Mr. Ruiz)  Right.  So other than reading
24   that January 3rd letter, what other information do you
25   have relating to exclusions?

Page 192

1         A    I'm not sure what you mean by other
2    information relating to exclusions.
3         Q.   Well, you understand that a Rule 30(b)(6)
4    deposition is aimed at getting all of the information
5    that's reasonably available to the company; right?
6         And so just to be honest with you, my
7    expectation would have been that you would have seen
8    that letter and then you would have actually had
9    conversations with people to find out the information
10   that ARAG has on -- you know, that led it to make that
11   decision.
12        Besides reading the January 3rd, 2024
13   reservation of rights letter, have you done any work to
14   understand what ARAG's position is with respect to the
15   exclusions?
16             MR. MULLALY:  Objection to form.
17             You can answer.
18        A    We had discussion about exclusions in the
19   meetings that I previously mentioned with counsel.
20        Q    (By Mr. Ruiz)  But counsel's already told you
21   you can't tell me about those, at least not advice that
22   you received from your attorneys, unless he says you can
23   do that right now.  But I'm not going to expect him to
24   do it.
25        So I'm talking about information that you

McNae v. ARAG Insurance Company                    30(b)(6) Meagen Adams

Page 193

1  received from folks inside of ARAG.  Besides that
2  January -- that January 2024 reservation of rights, is
3  there any other information that you have relating to
4  ARAG's position on exclusions?
5        MR. MULLALY:  Objection to form.
6        You can answer.
7     A.  No.
8     Q   (By Mr. Ruiz)  So if I wanted to know all the
9  facts that ARAG has in support of those exclusions, I
10  should just read that letter; right?
11        MR. MULLALY:  Objection to form.  Object.
12  Outside of scope.
13        You can answer.
14     A.  I'm not sure what I'm answering.
15        Yes, you can read that letter.
16     Q   (By Mr. Ruiz)  Is there any information you
17  have about the decision to rely on those exclusions
18  besides what's in that letter?
19     A.  No.
20     Q.  That's what I meant by my question.
21        Let me ask you about exclusion number 4.
22  Legal services deemed by us to be frivolous or lacking
23  in merit.
24        Okay.  Which part of exclusion number 4 does
25  ARAG say applies to the McNaes?

Page 194

1        MR. MULLALY:  Objection to form.  Objection.
2  Out of scope.
3        You can answer.
4     A.  The very last portion of that.
5     Q   (By Mr. Ruiz)  It's just the piece that says
6  that "in our reasonable belief, you are not actively and
7  reasonably pursuing resolution in your case."  Right?
8     A.  Yes.
9     Q.  Tell me everything that ARAG has done to
10  investigate whether the McNaes are actively and
11  reasonably pursuing resolution in their cases.
12        Don't hold back.  I want to know everything
13  that ARAG has done to investigate.
14     A.  We reviewed the status updates from both
15  attorneys that were providing invoices to ARAG, and
16  based on that information that was provided, we agreed
17  to provide payment for mediation, and following that,
18  learning that the mediation was not successful in
19  resolving the matter, came to understand that the
20  statuses that had been provided to us contained what
21  looked to be the possibility that settlement was being
22  pursued by solicitation of a proposed settlement
23  agreement and then later learned that that wasn't
24  something that was ever likely to have been acceptable
25  to both parties involved.

Page 195

1     Q.  Anything else?
2     A.  Not that I'm aware of.
3     Q.  No one from ARAG called Ms. Casey to get a
4  better understanding of what was being done to pursue
5  resolution in the case.  Agreed?
6     A.  Not that I'm aware of.
7     Q.  And no one called or reached out to
8  Ms. Fotiu-Wojtowicz to find out, you know, to have full
9  understanding of what was being done to pursue
10  resolution in the case.  Agreed?
11        MR. MULLALY:  Object to form.
12        You can answer.
13     A.  Again, not that I'm aware of.
14     Q   (By Mr. Ruiz)  Right.  No mediator will
15  ever guarantee that the mediation will result in a
16  settlement.  Do you agree?
17     A.  Yes, I agree.
18     Q.  Do you know how many mediations I have that
19  result in a settlement on the day of mediation?  What
20  percentage?
21        MR. MULLALY:  Object to form.
22        You can answer.
23     A.  No, I don't.
24     Q   (By Mr. Ruiz)  All right.  Just because I
25  don't reach a settlement in a mediation, does that mean

Page 196

1  that I'm not being reasonable in pursuing resolution of
2  a case?
3        MR. MULLALY:  Object to form.
4        You can answer.
5     A.  No.
6     Q   (By Mr. Ruiz)  Why didn't ARAG just pick up
7  the phone to talk to Ms. Casey or Ms. Fotiu-Wojtowicz?
8        MR. MULLALY:  Object to form.
9        You can answer.
10     A.  I don't know.
11     Q   (By Mr. Ruiz)  And why didn't somebody just
12  send them an email?  Because, you know, there were
13  emails that went back and forth about bills.  Why didn't
14  somebody send Ms. Casey or Ms. Fotiu-Wojtowicz an email
15  asking for a fuller understanding of what was being done
16  to resolve the case?
17        MR. MULLALY:  Objection to form.  Objection
18  to scope.  There will be testimony under another topic
19  about this.
20     A.  I don't know.
21     Q   (By Mr. Ruiz)  Isn't that something that
22  you've thought about before today's deposition?
23        MR. MULLALY:  Objection.  Outside of scope.
24        You can respond.
25     A.  No.

49 (Pages 193 to 196)

McNae v. ARAG Insurance Company                    30(b)(6) Meagen Adams

Page 197

1    Q    (By Mr. Ruiz)  Isn't it something that
2    somebody at ARAG said, hey, why didn't we just call
3    Ms. Casey or Ms. Fotiu-Wojtowicz to fully understand
4    what was going on?
5         Hasn't anyone said that inside of ARAG, ever?
6         MR. MULLALY:  Same objections.
7         You can answer.
8    A.   Not that I'm aware of.
9    Q    (By Mr. Ruiz)  Isn't it possible that ARAG
10   got it wrong and that, in fact, Ms. Casey and
11   Ms. Fotiu-Wojtowicz were reasonably pursuing resolution
12   of the case?
13        MR. MULLALY:  Objection to form.
14        You can answer.
15   A.   I don't feel like that's a yes-or-no
16   question.  I feel like there's always a chance that
17   someone can make an error.
18   Q    (By Mr. Ruiz)  Including ARAG.
19        MR. MULLALY:  Objection to form.
20        You can answer.
21   A.   Yes, that's --
22        (Crosstalk)
23   Q    (By Mr. Ruiz)  True?
24        Did anyone at ARAG reach out to the McNaes to
25   explore the connection between the claims that

Page 198

1    Mr. Fitzgerald was bringing and Mr. McNae's employment?
2    A.   No.
3    Q.   Why not?
4         MR. MULLALY:  Objection.  Outside of the
5    scope.  Objection to form.
6         You can answer.
7    A.   I'm not sure.
8    Q    (By Mr. Ruiz)  Do you understand that an
9    insurance company is allowed to ask the insureds for
10   information that could be useful in a coverage
11   determination?  Right?
12   A.   Yes.
13   Q.   Right.
14        And -- but ARAG didn't do that here, did it?
15   A.   We did ask information from the McNaes --
16   Q.   When?
17        (Crosstalk)
18   A.   -- coverage.
19   Q.   When?
20   A.   When they called to request assistance with
21   locating an attorney.
22   Q.   At the beginning.
23        And then from the time that Ms. Casey and
24   Ms. Fotiu-Wojtowicz were hired through November 20th,
25   2023, did ARAG request any item of information from the

Page 199

1    McNaes?
2    A.   No.
3    Q.   Why not?
4         MR. MULLALY:  Objection to form.  Objection.
5    Out of scope.
6         You can answer.
7    A.   Requests for information would have been
8    forwarded to the attorneys that were representing them.
9    Q    (By Mr. Ruiz)  In that case, let me ask it
10   this way:  Did you request any information from the
11   time -- well, did you -- did you convey any information
12   requests to the McNaes through their attorneys?
13   A.   Not that I'm aware of.
14   Q.   Now, those attorneys were not representing
15   the McNaes against ARAG, were they?
16        MR. MULLALY:  Objection to form.  Objection.
17   Out of scope.
18        You can answer.
19   A.   No.
20   Q    (By Mr. Ruiz)  All right.  And they made that
21   clear in a letter that was sent to ARAG; right?  At
22   least one of them did.
23        MR. MULLALY:  Objection to form.
24        You can answer.
25   A.   Correct.

Page 200

1    Q    (By Mr. Ruiz)  So why would you have
2    forwarded a coverage-related inquiry to the McNaes
3    through their attorneys?
4    A.   The inquiry would have been for documentation
5    or information that the attorney would secure and
6    provide to us.
7    Q.   And ARAG could have done that; right?
8    A.   Yes.
9    Q.   And, yet, ARAG did not do that; right?
10        MR. MULLALY:  Object to form.
11        You can answer.
12   A.   I'm not certain, over the course of the
13   multiple invoices, what requests we might have made
14   specifically.
15   Q    (By Mr. Ruiz)  What documents exist at ARAG
16   that guide adjusters in applying exclusion number 2?
17   A.   We would need to look at the -- I believe the
18   coverage administration guide may cover that.
19   Q.   But you don't know?
20   A.   I would need to look at the document.
21   Q.   Any other document that might cover it?
22   A.   No.
23   Q.   Do you agree that the McNaes were not sued by
24   Microsoft?
25        MR. MULLALY:  Object to form.  Object.  Out

McNae v. ARAG Insurance Company

30(b)(6) Meagen Adams

Page 201

1    of scope.
2        You can answer.
3    A.   I'm not aware of Microsoft having filed a
4    lawsuit against the McNaes.
5    Q    (By Mr. Ruiz)  And do you agree that the
6    McNaes did not sue Microsoft?
7        MR. MULLALY:  Same objections.
8        You can answer.
9    A.   Correct.  I'm not aware of them having sued
10   Microsoft.
11   Q    (By Mr. Ruiz)  And Mr. Fitzgerald has not
12   alleged a breach of any employment contract; correct?
13       MR. MULLALY:  Same objections.
14       You can answer.
15   A.   Correct.
16   Q    (By Mr. Ruiz)  And no one alleges employment
17   discrimination; correct?
18       MR. MULLALY:  Same objections.
19       You can answer.
20   A.   Correct.
21   Q    (By Mr. Ruiz)  Didn't Mr. Fitzgerald simply
22   refile some of the claims that had been -- that had been
23   dismissed without prejudice in -- when he did the
24   federal court -- strike that.
25       Doesn't ARAG agree that Mr. Fitzgerald's

Page 202

1    Florida state court action is a refiling of some of the
2    claims that had been dismissed by the federal court?
3        MR. MULLALY:  Objection to form.  Objection.
4    Scope.
5        You can answer.
6    A.   Yes, some of the claims are the same.
7    Q    (By Mr. Ruiz)  Some of the claims that ARAG
8    had previously agreed there was coverage for.  Right?
9        MR. MULLALY:  Same objections.
10       You can answer.
11   A.   Yes.
12   Q    (By Mr. Ruiz)  And when you looked at the
13   federal court complaint with respect to William McNae,
14   you wrote that the reference to employment is simply
15   part of the description of how these people met and not
16   an integral part of the current lawsuit; right?
17       MR. MULLALY:  Objection to form.
18       You can answer.
19   A.   Yes.
20   Q    (By Mr. Ruiz)  Those were your words to
21   Cathie -- to Cathie Kyle on January 23rd, 2023; right?
22   A.   Yes.
23       MR. MULLALY:  Objection.  Form.
24       (Crosstalk)
25   Q    (By Mr. Ruiz)  Yes?

Page 203

1    A.   Yes.
2    Q    What changed between the start of 2023 and
3    the end of 2023 that led ARAG to invoke exclusion number
4    2?
5        MR. MULLALY:  Objection to form.  Objection.
6    Scope.
7        You can answer it.
8    A.   What changed was that there were other
9    individuals that had a moment to take a look at the case
10   and review what had been done with it.
11   Q    (By Mr. Ruiz)  Who were -- give me the names.
12   Who were those other individuals?
13   A.   Ann Cosimano.
14   Q.   Who else?
15   A.   What was the end date that you had said for
16   this question?
17   Q.   The end of -- the end of 2023.
18       What happened between the beginning of 2023
19   when you wrote that email and the end of 2023?
20       MR. MULLALY:  Objection to form.
21       You can answer.
22   A.   I don't recall when -- so I'll go with Ann at
23   this point, because I don't recall some of the specific
24   dates.
25   Q.   Anyone else look at it?

Page 204

1    A.   That's what I can't say with certainty, what
2    the -- the dates that you've mentioned.
3    Q.   So did Ms. Cosimano say come talk to
4    (inaudible) decision in my deposition (inaudible) we had
5    previously --
6        THE COURT REPORTER:  Sorry, Isaac.  I don't
7    know if it's my internet, but you froze like twice
8    there.  Can you start over?
9        MR. RUIZ:  I'm sorry.
10   Q    (By Mr. Ruiz)  Did anyone come talk to you
11   about your January 3rd, 2023 email when ARAG was
12   changing its position on coverage?
13   A.   No.
14       MR. MULLALY:  Object to form.
15   Q    (By Mr. Ruiz)  What was the answer?
16   A.   The answer was "no."
17   Q.   Why not?
18   A.   I don't know.
19       MR. MULLALY:  Object --
20   Q    (By Mr. Ruiz)  Well, let me -- let me put it
21   on you now, then.
22       When you found out that the coverage decision
23   changed, did you tell anybody:  Hey, hold on.  In
24   January of 2023, I decided the opposite?
25       Did you say that to anybody?

McNae v. ARAG Insurance Company                                30(b)(6) Meagen Adams

Page 205

1    A.   No.
2    Q.   Why not?
3         MR. MULLALY:  Objection to form.  Objection.
4    Out of scope.
5         You can answer.
6    A.   Well, it became evident to me that my initial
7    interpretation of that was fairly narrow.
8    Q    (By Mr. Ruiz)  Explain, please.
9         MR. MULLALY:  Objection to form.
10        You can answer.
11   A.   The verbiage in that exclusion discusses
12   arising out of employment matters.  And it -- that is a
13   fairly broad -- "arising out of" is more broad than
14   perhaps what I was originally thinking, which may have
15   been, you know, more directly -- I can't think of the
16   other phrase that might have applied.  But in any case,
17   that "arising out of" is not as limiting as what my
18   initial thought was.
19        Q    (By Mr. Ruiz)  You read it one way in January
20   of 2023 and then somebody else inside of ARAG, they're
21   saying they read it a different way at the end.
22        Is that fair?
23        MR. MULLALY:  Objection to form.  Objection.
24   Scope.
25        You can answer.

Page 206

1    A.   Yes.
2    Q    (By Mr. Ruiz)  And at the beginning of
3    (inaudible) -- 26 years in the --
4         THE COURT REPORTER:  Sorry.  My internet is
5    having issues.  Everybody froze.  Now I know it's me.
6    Sorry about that.
7         MR. RUIZ:  Let me know when I can go.
8         THE COURT REPORTER:  Yep.
9         MR. RUIZ:  Can I go?
10        THE COURT REPORTER:  Yes.
11   Q    (By Mr. Ruiz)  In January of 2023, you were
12   reading the policies through the eyes of somebody who
13   had been in the insurance industry for 26 years; right?
14        MR. MULLALY:  Objection to form.
15        You can answer.
16   A.   Yes.
17   Q    (By Mr. Ruiz)  All right.  And you were
18   reading it through the eyes of the person who's in
19   charge of claims at ARAG; correct?
20        MR. MULLALY:  Objection to form.
21        You can answer.
22   A.   Yes.
23   Q    (By Mr. Ruiz)  And you've been in charge for
24   six years?
25        Yes?

Page 207

1    A.   No.
2    Q.   How many years have you been in charge of
3    claims at ARAG since the beginning?
4    A.   Twelve.
5    Q.   Twelve years.
6         So you know the rule for how exclusions are
7    supposed to be read; right?
8         MR. MULLALY:  Objection to form.
9         You can answer.
10   Q    (By Mr. Ruiz)  You were taught a long time
11   ago the rule that if there's an ambiguity in an
12   exclusion, it is construed in favor of the policyholder;
13   right?
14   A.   Yes.
15   Q.   You've known that rule from the beginning, 27
16   years.  Right?
17   A.   Yes.
18   Q.   So did you tell anybody, remind anyone of
19   that rule, at any point during the handling of the McNae
20   claim?
21        MR. MULLALY:  Objection to form.  Objection.
22   Scope.
23        You can answer.
24   A.   No.
25   Q    (By Mr. Ruiz)  Why not?

Page 208

1         (Crosstalk)
2    Q.   I keep asking you that question.  I'm
3    genuinely curious.  Why didn't you?
4         MR. MULLALY:  Same objections.
5         You can answer.
6    A.   The -- the choice of how to word provisions
7    in the benefit plan are heavily handled with our legal
8    team, and the intent of those things are also part of
9    how those are constructed.
10        So in a situation where my reading of it may
11   not have been in alignment with the intent or the
12   understanding of our legal counsel on how that applies,
13   I do trust that legal counsel will be able to redirect
14   if I make an error.
15   Q    (By Mr. Ruiz)  Earlier you said you didn't
16   know who wrote the contract.  Right?
17        MR. MULLALY:  Objection.  Out of scope.
18        You can answer.
19   Q    (By Mr. Ruiz)  You don't know who wrote this
20   contract; correct?
21   A.   Correct.  Not specifically.
22   Q.   You don't know if any of these attorneys had
23   any involvement in writing this contract.  Do you agree?
24        MR. MULLALY:  Same objections.
25        You can answer.

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

McNae v. ARAG Insurance Company                    30(b)(6) Meagen Adams

Page 209

1      A.   I'm not clear.  Which -- who --
2      Q    (By Mr. Ruiz)  Any attorney.  Can you give me
3  the name of any attorney who was involved in writing the
4  insurance contract?
5      A.   Oh.
6           MR. MULLALY:  Same objections.
7           You can answer.
8      A.   Yes.  The content is created in part by Ann
9  as our legal counsel, in addition to our product
10 development team.
11     Q    (By Mr. Ruiz)  Okay.  So is there any
12 document that explains within ARAG what the intention is
13 behind these exclusions?
14     A.   No.  Not that I've seen.
15     Q.   What does -- what have you been trained about
16 whether -- when there's an undefined term in a policy,
17 whether a legal definition should be applied versus the
18 definition that an average purchaser of insurance would
19 apply?
20          Have you been taught anything on that topic?
21          MR. MULLALY:  Objection.  Out of scope.
22          You can respond.
23     A.   The definition of undefined terms would be
24 what a -- what a layperson would understand.
25     Q    (By Mr. Ruiz)  Right.  Not a lawyer; right?

Page 210

1           MR. MULLALY:  Same objection.
2           You can answer.
3      A.   Correct.
4      Q    (By Mr. Ruiz)  Right.
5           And you were taught that 27 years ago when
6  you got into the insurance industry; right?
7           MR. MULLALY:  Same objections.
8           You can answer.
9      A.   Yes.
10     Q    (By Mr. Ruiz)  And you've known it all along?
11          MR. MULLALY:  Same.
12          You can answer.
13     A.   Yes.
14          MR. RUIZ:  How long have we been going in
15 this -- since we came back?
16          THE VIDEOGRAPHER:  About an hour and a half.
17          MR. RUIZ:  Okay.  Let's take ten minutes.
18          THE VIDEOGRAPHER:  Going off the record.  The
19 time now is approximately 3:15 p.m.
20          (Recess 3:15 p.m. to 3:28 p.m.)
21          THE VIDEOGRAPHER:  Back on the record.  The
22 time now is approximately 3:28 p.m.
23          MR. RUIZ:  Another administrative matter
24 before we dive back into the questions.
25          So since this Rule 30(b)(6) deposition notice

Page 211

1  was first sent quite some time ago, there was a
2  requested amendment to the answer by ARAG and the
3  amendment added a new defense relating to ERISA.
4           Of course, I'll let Mr. Mullaly characterize
5  that if I've got it wrong.
6           And off the record, I raised the possibility
7  of, you know, I do have a list of questions that kind of
8  go to that defense, but I recognize that if we had
9  served the deposition notice after the amendment, that I
10 might have put in some topics that were more designed
11 for that.
12          And so the request I have made is for the
13 ability to send a new Rule 30(b)(6) deposition notice
14 that's limited to just that defense and facts that
15 relate to that defense and then come back at a later
16 time with either this designee or some other designee to
17 address those questions.
18          I can't imagine it would take very long to do
19 that.
20          Mr. Mullaly?
21          MR. MULLALY:  Sure.  I understand where
22 you're coming from.  I think we can meet and confer on
23 that.
24          I think, you know, certainly, you know, those
25 issues are potentially -- you know, they're very likely

Page 212

1  to be outside the scope of the things that we prepared
2  Ms. Adams for, so I think that's probably the sensible
3  approach.
4           You know, we'd want to talk about timing of
5  that deposition, because I think all of us are looking
6  for information still from Microsoft and I think we need
7  to make sure that everyone's working from full
8  information.  But in principal, I think it makes sense
9  to address those in a separate deposition.
10          MR. RUIZ:  All right.  I think you're right,
11 Mr. Mullaly.  And I know that a discovery conference has
12 occurred on the Microsoft documents and I think it's --
13 you know, I think it's in everybody's interests to have
14 the record be full and accurate.  And so we will
15 continue that conversation next week after these
16 depositions are done.
17          All right?
18          And I appreciate the -- I appreciate -- I
19 appreciate your willingness to handle it this way.  So
20 thank you.
21          Back to the questions.  I've uploaded another
22 document into the chat, and here it is on the screen.
23 Please mark this Exhibit No. 13.  It's an ARAG claim
24 form.
25          (Exhibit No. 13 introduced.)

53 (Pages 209 to 212)

McNae v. ARAG Insurance Company                    30(b)(6) Meagen Adams

Page 213

1    Q.   (By Mr. Ruiz)  Do you see that on your
2    screen, Ms. Adams?
3    A.   Yes.  Would you mind magnifying that just a
4    little bit for me?
5    Thank you.
6    Q.   So there's a bunch of these in the discovery
7    production and I'm not going to ask you about all of
8    them.  I'm just going to ask you about one.
9    Can you tell me what this is?
10   A.   Yes.  This is a PDF of the ARAG claim form.
11   Q.   And what's the purpose of this kind of form?
12   A.   The purpose is to represent the claim that
13   was submitted by any -- any individual attorney to ARAG
14   for consideration.
15   Q.   I noticed that there seems to be an ARAG
16   claim form once a month for each attorney.
17   Does that make sense to you?
18   A.   Yes, it does.
19   Q.   So this would be one per monthly bill?
20   A.   Yes.
21   Q.   And who fills out the form?
22   A.   The form is filled out by the attorney
23   submitting their request.
24   Q.   Now, this form is provided to the attorney,
25   this attorney fills it out and sends it back to ARAG?

Page 214

1    A.   No.  The -- this form is a PDF representation
2    of an online submission from the attorney.
3    Q.   And it gets filled out each month when the
4    attorney requests payment of benefits in the form of a
5    payment of their legal services?
6    A.   Yes.  They fill that out every time.
7    Q.   Then what happens with this form inside of
8    ARAG after it's filled out?
9    A.   The information on this form is presented to
10   a claims specialist for review.
11   Q.   Then what happens?
12   A.   Then a decision is made by the claims
13   specialist about whether to approve or decline or
14   request more information.
15   Q.   If Mr. McNae had not converted his plan
16   and -- when he left Microsoft, would he be entitled to
17   keep getting benefits from ARAG going forward until his
18   case has ended or would --
19   MR. MULLALY:  Objection --
20   Q.   (By Mr. Ruiz)  -- or would the benefits end
21   once he was terminated?
22   MR. MULLALY:  Pardon me.
23   Objection to form and scope.
24   You can answer.
25   A.   The benefits for Mr. McNae under his

Page 215

1    Microsoft plan would -- they do not end at the time that
2    his employment terminates.
3    Q.   (By Mr. Ruiz)  They do or they do not?
4    A.   They do not.
5    Q.   They do not end.  So --
6    A.   They -- for the legal matter that -- that we
7    are currently paying claims for.
8    Q.   Understood.
9    So if he had been -- for that first lawsuit,
10   the federal court case, even if he had not converted, he
11   would still be entitled to the protections of the
12   policy?
13   A.   That is correct.
14   Q.   As long as those cases were ongoing?
15   MR. MULLALY:  Object to form.
16   You can answer.
17   A.   Yes, that's right.
18   Q.   (By Mr. Ruiz)  Are there any documents at
19   ARAG that say that, that even after an employee is
20   terminated or ends their employment, that they continue
21   to be entitled to benefits from ARAG so long as that
22   case is going?
23   MR. MULLALY:  Objection to form.
24   You can answer.
25   A.   I believe the benefit plan stipulates that.

Page 216

1    MR. RUIZ:  Please mark this Exhibit 14.
2    (Exhibit No. 14 introduced.)
3    MR. MULLALY:  This might be my error.  Is
4    this, by chance, Exhibit 15 or have I just lost track
5    somehow?
6    MR. RUIZ:  I thought we were on 14.
7    THE COURT REPORTER:  Yeah, 14.
8    MR. MULLALY:  Okay.  My mistake.  I'm sorry.
9    Q.   (By Mr. Ruiz)  Ms. Adams, do you agree that
10   this is an email exchange between Andrea Morse and
11   Cathie Kyle from May 30th, 2023?
12   A.   Yes.
13   Q.   And Andrea Morse, is that the chief financial
14   officer?
15   A.   Yes, at the time.
16   Q.   Is this a true and correct copy of the email
17   exchange?
18   A.   Yes, it is.
19   Q.   Now, have you ever had a conversation with
20   either Cathie Kyle or Andrea Morse about this email
21   exchange?
22   A.   No, I don't think so.
23   MR. RUIZ:  Just so that everybody knows,
24   ignore the document I just uploaded to Zoom.  That's not
25   going to be an exhibit, because it's already been

54  (Pages 213 to 216)

McNae v. ARAG Insurance Company                    30(b)(6) Meagen Adams

Page 217

1   marked.
2         Please mark this Exhibit 15.
3         (Exhibit No. 15 introduced.)
4         Q    (By Mr. Ruiz) Ms. Adams, do you agree that
5   this appears to be a Teams message?
6         A.   Yes.
7         Q.   Have you seen this document before?
8         A.   Yes.
9         Q.   Who was involved in this conversation?
10        A.   I see my name, so I am involved.
11        Q.   Who else?
12        A.   I can't tell who the other person is from
13  this message.
14        Q.   Me neither.
15             What is this Teams message about?
16        A.   Well, this Teams message is about the
17  adjudication of the claim there for William McNae.
18        Q.   Someone wrote to you on December 29th, 2023
19  at 12:28 p.m.: "Also, after working with Ann, I have
20  applied additional deductions to claim 15887433, for
21  William McNae and sent it back to the committee queue.
22  I think it is okay to move forward with, I sent it there
23  first, just in case I should do anything else."
24             Did I read that correctly?
25        A.   Yes, you did.

Page 218

1         Q.   And looks like somebody applied a thumbs up
2   emoji there to that message.  Would that have been you?
3         A.   Yes.
4         Q.   What does that message mean?
5         A.   That means that the person reviewing this
6   claim had some sort of communication with Ann and there
7   were deductions identified that were applicable to that
8   particular invoice.
9         Q.   Who is Ann?
10        A.   Ann Cosimano.
11        Q.   All right.  And the deductions, it's
12  referring to the attorney bills?
13        A.   Yes.
14        Q.   And then you responded not too much longer
15  after that; right?
16        A.   Right.
17        Q.   You wrote: "When you get a chance, could
18  you -- could you put in a brief claim comment to explain
19  the direction on the McNae claim, since my last note
20  said sent to Legal.  Claim 15887433.  Thanks."
21             Did I read that correctly?
22        A.   You did.
23        Q.   What did you mean?
24        A.   And this is December of '23.
25             By then, our -- Ann was involved -- or had --

Page 219

1   had some involvement with the claim.  So my note there
2   would be that the claim had been sent to legal and that
3   we just needed to put a note -- an additional note on
4   the -- on the claim record.
5         Q.   Why had it been sent to legal?
6              Well, strike that.
7              Who made the decision to send the claim to
8   legal?
9         A.   If I recall correctly, the -- yeah.  Once we
10  had Ann and legal involved with this claim, future
11  claims would also be referred for review.
12        Q.   Why was legal put on the claim to begin with?
13        A.   I don't recall.
14        Q.   Your next comment was that it had moved past
15  committee.  What does that mean?
16        A.   Oh.  That's referring to within the claims
17  system.
18        Q.   Is that the Complex Claims Committee?
19        A.   Yes.
20        Q.   And what does it mean when it says "Andrea's
21  queue"?
22        A.   Once the claim has moved past the committee
23  step, then because of the cumulative dollar amount that
24  had been paid on this case, it goes to the CFO for
25  financial approval for the payment transaction to be

Page 220

1   made.
2         MR. RUIZ:  Please mark this Exhibit 16.
3         (Exhibit No. 16 introduced.)
4         Q    (By Mr. Ruiz) Do you agree that this an
5   email exchange that you had with Cathie Kyle on
6   January 3rd, 2023?
7         A.   Yes.
8         Q.   And is this a true and correct copy of those
9   emails?
10        A.   Yes.
11        Q.   Any reason to doubt the authenticity of this
12  document?
13        A.   No.
14        MR. RUIZ:  Please mark this Exhibit 17.
15        (Exhibit No. 17 introduced.)
16        Q    (By Mr. Ruiz) I put this document together.
17  It didn't get produced like this.  They were produced in
18  different places, looks like it's different printouts of
19  things, but it all kind of looks the same.
20             I'm scrolling through it really fast so you
21  can see there's a lot of yellow in here.
22             I'm going to go ahead and take my time just
23  so you can see graphically what this looks like.
24             Is this looking familiar to you?
25        A.   Yes.

McNae v. ARAG Insurance Company                                30(b)(6) Meagen Adams

Page 221

1    Q.    What kind of documents are we looking at
2    here?
3    A.    These are screenshots of internal system
4    notes regarding this case.
5    Q.    All right.  So is there a way to just get all
6    of the case comments printed out in order without having
7    to do these screenshots the way they've been produced?
8    A.    I'm -- yeah, I'm not sure...
9    Q.    Let me show you, give you an example of what
10   I'm dealing with here.
11         So this is page 1.  It has some of that.
12         Do you see -- you can see this has been
13   pasted together.  Can you tell?
14   A.    Yes.
15   Q.    All right.  Do you know who did this?
16   A.    No.
17   Q.    All right.  You didn't do it?
18   A.    No.
19   Q.    And you don't know if there's a way
20   technically to just print out all the notes just in one
21   giant PDF?
22   A.    Not -- no, I don't know.
23   Q.    Anyway, what -- remind me the name of the
24   computer system is that all this comes from.
25   A.    Well, the claims system is Pulse.

Page 222

1    Q.    Is this from Pulse?
2    A.    No.  The screen here is not.
3    Q.    What is this form?
4    A.    This is from Member Configurator.
5    Q.    What is Member Configurator?
6    A.    That is the system where our customer care
7    representatives can access plan member account
8    information and add notes about their interactions with
9    plan members.
10   Q.    Would there be any coverage information on
11   Member Configurator?
12   A.    Yes.
13   Q.    And if there's a coverage determination made,
14   is that something that goes in Member Configurator or
15   does it go somewhere else or both?
16   A.    That would be in here, yes.
17   Q.    So let's look at PDF page 2.  And do you see
18   that there are entries for different dates?
19   A.    Yes.
20   Q.    And why are there no entries between January
21   3rd, 2023 and November 20th of 2023?
22         MR. MULLALY:  Objection to form.
23         You can answer.
24   A.    I don't know.
25   Q    (By Mr. Ruiz)  Well, January 3rd, 2023 is

Page 223

1    that date of the email that you had with Cathie Kyle
2    that I just showed you; right?
3    A.    Yeah.  Yes.
4    Q.    And then November 20th, 2023 is the date that
5    the attorneys were terminated; right?
6         MR. MULLALY:  Objection to form.
7         You can answer.
8    A.    Yes, that's right.
9    Q.    (By Mr. Ruiz)  All right.  But is this saying
10   that there was no activity between January 3rd and
11   November 20th?
12        MR. MULLALY:  Objection to form.
13        You can answer.
14   A.    I'm not -- I'm not sure if there was activity
15   between those dates.
16   Q.    (By Mr. Ruiz)  This is PDF page 22 of Exhibit
17   17.  What is this from?
18   A.    Oh, that -- just a moment.
19        Could you scroll down just a little bit?  Is
20   there anything additional at the bottom of this?
21        No.
22        Oh.  This looks like -- well, I guess I have
23   to say that I don't use this particular view, so I can't
24   specifically say what this -- what this is.
25   Q.    Do you agree that here on PDF page 22 of

Page 224

1    Exhibit 17, it says -- there's a list of -- it says
2    select plan?  Do you see that?
3    A.    Yes.
4    Q.    Then there's the UltimateAdvisor Conversion
5    Plan, and it says that the effective date was October
6    1st, 2023.  Agreed?
7    A.    Yes.
8    Q.    And that it is active.  True?
9    A.    Yes.
10   Q.    And there was a previous plan, which is a
11   Microsoft Corporation plan; right?
12   A.    Yes.
13   Q.    And that that one was suspended as of
14   September 30th, 2023; is that right?
15   A.    Yes.
16   Q.    And the suspension reason was terminated
17   employment; do you agree?
18   A.    Yes.
19   Q.    Now, when was this document printed?  Do you
20   know?
21   A.    No, I don't know.
22   Q.    Let's go to PDF page 32 now.
23        Do you see the red traffic light?
24   A.    Yes.
25   Q.    What does a red traffic light mean?

56 (Pages 221 to 224)

McNae v. ARAG Insurance Company                    30(b)(6) Meagen Adams

---

Page 225

1    A.   The red traffic light means that one of the
2   rules within the rules engine behind that traffic light
3   has a mismatch.
4    Q.   And so if you see a red traffic light, what
5   does -- strike that.
6         Who at ARAG uses this view?
7    A.   The claims specialists use this view.
8    Q.   The folks who decide whether to pay?
9    A.   Yes.
10   Q.   And so what does the red light -- what is
11  that meant to convey to the claims specialist?
12   A.   That is meant to convey that there is some
13  sort of mismatch in data points or another alert to let
14  them know that there's additional information they
15  should be reviewing before making a decision.
16   Q.   And who decided to put a red traffic light
17  here?
18        MR. MULLALY:  Object.  Outside of scope.
19        You can answer.
20   A.   The red traffic light is not decided by a
21  person.  It's based on the automation rules that run on
22  all of the claims.
23   Q.   Page 35 of this exhibit.
24   A.   Could you make it larger?  I'm sorry.
25   Q.   Oh, I wish I could.

---

Page 226

1    A.   Okay.
2    Q.   I mean, it's -- it's a small -- do you see it
3   now?
4    A.   Yeah.  Well enough.  Yeah.
5    Q.   It says Karissa -- there's a comment.  Do you
6   see the comment?
7    A.   I do, yes.
8    Q.   It says:  I have a red light alert because of
9   how much that has been paid out on this case.  I wanted
10  to make sure that it is okay to pay this.  Per the
11  notes, I believe we are good, but because of the light,
12  I wanted to make sure.
13        Did I read that correctly?
14   A.   Yes.
15   Q.   That looks like it was written by somebody
16  whose initials are JRB?
17   A.   It's -- oh.  J -- it's JRE -- it's truncated
18  there a bit, but...
19   Q.   It's Jamie-something-or-other; right?
20   A.   Jamie Rennie.
21   Q.   Jamie Rennie?
22   A.   Yes.
23   Q.   All right.  And let's look at Bates No. 161.
24  Do you see there's a section called "Claims Status
25  History"?

---

Page 227

1    A.   Yes.
2    Q.   And it says description:  Claim detail
3   7266499 changed from submitted to pending for the action
4   of transfer to another examiner for adjudication and
5   reason of coverage question.
6         THE COURT REPORTER:  I can't see it because
7   it's so small, and I can't hear what you're saying
8   either.
9         MR. RUIZ:  It's a small document.
10        THE COURT REPORTER:  But maybe just speak up
11  a little bit?
12        MR. RUIZ:  I don't know what to do -- I'll
13  also slow down.
14   Q.   (By Mr. Ruiz)  Ms. Adams, do you see the
15  section called "Status History"?
16   A.   Yes.
17   Q.   And there's an action called "Claims Status
18  Changed"; right?
19   A.   Yes.
20   Q.   And the description reads:  "Claim detail
21  7266499 changed from submitted to pending for the action
22  of transfer to another examiner for adjudication and
23  reason of coverage question.
24        Did I read that correctly?
25   A.   Yes.

---

Page 228

1    Q.   What did that mean?
2    A.   That means that the person reviewing this
3   claim wanted to consult with their supervisor on the
4   claim.
5    Q.   Do we know what date?
6    A.   That -- if you go over to the right, is
7   that...
8         Oh.  I don't see it there.  It almost looks
9   like it was chopped off.
10   Q.   Right.  I'm seeing the same thing as you.
11        But you don't know the date?
12   A.   No.
13   Q.   Now, we're on page 195 of this PDF.
14        Do you see that it says that his two claims
15  are both in defense of civil damages?
16   A.   Yes.
17   Q.   We're talking about William McNae; right?
18   A.   Yes.
19   Q.   They're both in defense of civil damages;
20  correct?
21   A.   Yes.
22   Q.   Now, interesting that the claim that Ronda
23  McNae had for civil action defendant was closed.
24        Do you see that that's what it says?
25   A.   Yes, I see that.

---

57 (Pages 225 to 228)

McNae v. ARAG Insurance Company

30(b)(6) Meagen Adams

---

Page 229

1      Q.   Can you explain what that means?
2          MR. MULLALY:  Objection.  Outside of scope.
3          You can answer.
4      A.   This is coming from the Member Config
5   application system, and I can't definitively say all of
6   the reasons that a case status might change from open to
7   closed.
8      Q.   (By Mr. Ruiz)  And down here, there's
9   another -- the defense of civil damage loss date
10  July 15th, 2022.
11         Do you see that?
12     A.   I do.
13     Q.   That's Mr. Fitzgerald's lawsuit against Ronda
14  McNae; right?
15     A.   Yes.
16     Q.   And it says closed.  Do you see that?
17     A.   Yes.
18     Q.   Do you know when this document was printed?
19     A.   No.
20     Q.   Is there any way to know based on this
21  document?
22         MR. MULLALY:  Object to form.
23         You can answer.
24     A.   I don't know if there's a way to tell.
25     Q.   Well, it must be after April 2nd, 2024,

---

Page 230

1   because there's an open date of that date here.
2          Do you see that?
3      A.   Yes.
4      Q.   So whenever this was printed, it was printed
5   after April 2nd of 2024.  Agreed?
6      A.   Yes, I would agree.
7      Q.   So for the defense of civil damage claim that
8   Mr. McNae has open, do you agree that according to this,
9   ARAG opened that on April 2nd of 2024?
10         MR. MULLALY:  Objection to form.
11         You can answer.
12     A.   Yes, that's -- that's what that means.
13     Q.   (By Mr. Ruiz)  Now, who enters that
14  information?
15     A.   That information is generated by the system
16  when the case is opened by customer care representative.
17     Q.   Somebody doesn't type it in, that's
18  automatically generated when the claim is open?
19     A.   That's correct.
20     Q.   ARAG opened the claim for defense of a civil
21  damage relating to the Florida state court case on
22  April 2nd, 2024; right?
23         MR. MULLALY:  Object to form.  Outside of
24  scope.
25         You can answer.

---

Page 231

1      A.   Yes.
2      Q.   (By Mr. Ruiz)  And the loss date for that was
3   November 2nd, 2023; correct?
4      A.   Yes.
5      Q.   And whenever that document was created, at
6   that time, Ronda McNae's claims were closed.  Agreed?
7          MR. MULLALY:  Objection to form.  Objection.
8   Scope.
9          You can answer.
10     A.   The -- yes.  The case status is indicating
11  closed.
12     Q.   (By Mr. Ruiz)  This is Exhibit 2 again.
13         To the extent that these ARAG employees did
14  anything on the McNae claim, were they acting on ARAG's
15  behalf?
16     A.   Yes.
17     Q.   And everything they did was within the
18  authority given to them by ARAG?
19         MR. MULLALY:  Objection.  Outside of scope.
20         You can answer.
21     A.   Yes.
22     Q.   (By Mr. Ruiz)  Does ARAG have any criticisms
23  of any of the people mentioned in Exhibit No. 2?
24     A.   No.
25     Q.   Does ARAG stand by the work performed by

---

Page 232

1   these individuals?
2      A.   Yes.
3      Q.   What are the different systems that ARAG
4   uses to disseminate policies, procedures, protocols,
5   trainings, or other guidance or requirements to
6   employees that relate to claims handling?
7      A.   We employ written guides, procedures, those
8   types of manuals, in addition to either in-person or via
9   Teams meetings with the individuals responsible for
10  reviewing claims, and that that is done just within the
11  claims department.
12     Q.   Is there an internal website where these
13  policies, protocols, procedures, guidelines are kept?
14     A.   Yes.
15     Q.   What's that called?
16     A.   File Hold.
17     Q.   Any other website or service that's used to
18  collect these -- these documents?
19     A.   No.
20     Q.   In the document that we looked at earlier,
21  there was something called Knowledge Tree.  What's
22  Knowledge Tree?
23     A.   Knowledge Tree is part of the customer care
24  process and represents the initial questions that are
25  asked of someone requesting to use their benefit plan.

---

58 (Pages 229 to 232)

McNae v. ARAG Insurance Company                                    30(b)(6) Meagen Adams

Page 233

1      MR. RUIZ:  Please mark this Exhibit No. 18.
2      (Exhibit No. 18 introduced.)
3      Q    (By Mr. Ruiz)  This is another document that
4   I created to keep me organized.
5      Does ARAG have any policies, protocols, or
6   procedures relating to topic 1, the full, fair, and
7   prompt investigation of claims arising under insurance
8   policies?
9      MR. MULLALY:  Object to form.
10     You can answer.
11     A.  Yes.
12     Q    (By Mr. Ruiz)  What are they?
13     A.  The documents?  Is that the --
14     Q.  Yes.  What are the documents -- what are the
15   policies, protocols, procedures or trainings that ARAG
16   has on the subject of full, fair, and prompt
17   investigation of claims arising under insurance
18   policies?
19     A.  Our coverage administration guide is intended
20   to fulfill the fair investigation of claims with regards
21   to the various coverages.
22     And we've also just inherently created within
23   our claims system, Pulse, prioritization to allow claims
24   to be handled in date-received order to ensure that
25   they're being reviewed promptly.

Page 234

1      Q.  Anything else?
2      A.  No, I don't think so.
3      Q.  What does -- does ARAG have any policies,
4   protocols, or procedures or trainings relating to the
5   obligation of good faith generally?
6      MR. MULLALY:  Object to form.
7      You can answer.
8      A.  With the issue of good faith, that's more
9   inherently part of just how we do business on a daily
10  basis.  So there is no written document that describes
11  how we go about doing that.
12     Q    (By Mr. Ruiz)  What does good faith mean in
13  the insurance world?
14     MR. MULLALY:  Objection.  Out of scope.
15     You can answer.
16     A.  Well, it involves your item number 1 on this
17  list, including that full, fair, and prompt
18  investigation of claims, and abiding by all of the terms
19  of the benefit plan, or insurance policy as it may be.
20     Q.  Does ARAG have any policies, protocols,
21  procedures or trainings relating to number 3, the
22  handling of claims for legal services generally?
23     MR. MULLALY:  Objection to form.
24     You can answer.
25     A.  Yes.  We have guides that describe how to

Page 235

1   process claims for ARAG as well as the coverage
2   administration guide.  In conjunction, those would be
3   the documents.
4      Q    (By Mr. Ruiz)  Does ARAG have any policies,
5   protocols, procedures or trainings relating to number 4,
6   the exclusions relied upon by ARAG in this case?
7      MR. MULLALY:  Same objection.
8      You can answer.
9      A.  The coverage administration guide addresses
10  all of the coverages and lack of coverages in the
11  benefit plan.
12     Q    (By Mr. Ruiz)  Anything else?
13     A.  No.
14     Q.  Does ARAG have any policies, protocols,
15  procedures, guidelines, or trainings relating to topic
16  number 5, communication with insureds?
17     A.  No, I don't think so.
18     Q.  Does ARAG have any policies, protocols,
19  procedures, guidelines or trainings relating to topic
20  number 6, compliance with the Washington claims handling
21  regulations?
22     MR. MULLALY:  Object to form.  Objection.
23  Scope.
24     You can answer.
25     A.  This falls within that compliance department

Page 236

1   that I mentioned earlier that provides any updates
2   regarding claims handling regulations as part of their
3   responsibilities in the organization.
4      Q.  (By Mr. Ruiz)  Well, you know, in the --
5   we're limited in time and, you know, there's just -- we
6   have to make choices in these depositions.  I can't ask
7   you about every document, but there's something called a
8   Coverage Administration Guide, which you've already
9   talked about.
10     You know what that is; right?
11     A.  Yes.
12     Q.  And at the end of that, I'm sure you know,
13  there's a section on the California Code of Regulations.
14     Did you know that?
15     A.  Yes.
16     Q.  And they quote the preamble from that.
17     Is there any document in ARAG that sets out
18  the Washington Administrative Code regulations?
19     MR. MULLALY:  Objection.  Out of scope.
20  Objection to form.
21     But you can answer.
22     A.  No.
23     Q    (By Mr. Ruiz)  And did the compliance
24  department send any emails out or advisories or notices
25  specifically addressing Washington regulations?

59 (Pages 233 to 236)

McNae v. ARAG Insurance Company                    30(b)(6) Meagen Adams

Page 237

1    A.   Not that I can recall.
2    Q.   Does ARAG have any policies, protocols,
3  procedures, guidelines, or trainings relating to the
4  rights of insureds under conversion plans?
5         MR. MULLALY:  Same objections.
6         You can answer.
7    A.   No, not -- not specifically.
8    Q    (By Mr. Ruiz)  Are there any policies,
9  protocols, procedures, guidelines, or trainings about --
10  well, let's call it the Complex Claims Committee?
11         Are there any?
12    A.   Yes.  The involvement of that committee is
13  outlined in the claims handling procedure documents.
14    Q.   Any other documents?
15    A.   No.
16    Q.   Does ARAG have any policies, procedures,
17  protocols, guidelines, or trainings relating to topic 9,
18  the termination of attorneys during active litigation?
19         MR. MULLALY:  Objection to scope and form.
20         You can answer.
21    A.   No.
22         MR. RUIZ:  For the court reporter, I've
23  uploaded a revised version of Exhibit 18.  Please use
24  that version.  It's the one that I typed on here on the
25  video.

Page 238

1    Q    (By Mr. Ruiz)  You know how a lot of times
2  today when I ask you a question, you'll answer and I'll
3  say, "Is there anything else?"  You know, that kind of
4  question I ask?
5    A.   Yes.
6    Q.   Yeah.  You know, when we are getting trained
7  as lawyers, we call those questions to make sure we
8  exhaust the knowledge of the witness.  We want to make
9  sure we get everything.
10         And so I'm just looking at my notes, and one
11  of the things that I -- on my assignment of to-dos that
12  I wanted to cover with you was ARAG's interpretation and
13  analysis of the exclusions that are applying to the
14  subject claims.
15         And so have I exhausted the information that
16  you have on the subject of the interpretation and
17  analysis of the exclusions applicable to the subject
18  claims?
19         MR. MULLALY:  Object to form.
20         You can answer.
21    A.   Yes, I think so.
22    Q    (By Mr. Ruiz)  So I want to talk to you about
23  topics 28, 20, and 29.  And I'm just going to read them
24  out to you so you know what you are.
25         28 was:  Any and all plans, policies,

Page 239

1  protocols, and procedures for saving money, cutting
2  costs, including results or similar performance
3  standards for the claims department, however described
4  and whatever called.
5         And topic 29 was:  All documents regarding
6  bonuses, compensation, incentives, or other incentives
7  given or paid to claims representatives, claims
8  managers, or their supervisors.
9         All right?
10    A.   (Witness nods head.)
11    Q.   And to make this more manageable, let's put a
12  time frame on these questions.  Let's say the beginning
13  of 2022 to the present.
14         Okay?
15    A.   Okay.
16    Q.   Because the claim was first made in the year
17  of 2022, right, by Ms. McNae?
18    A.   Yes.
19    Q.   So all of these questions, I just want you to
20  know, I'm limiting it to that time frame, January 1st,
21  '22 to the present.
22         Understood?
23    A.   Yes.
24    Q.   So what policies, protocols, or procedures
25  have been in place at ARAG related to saving money on

Page 240

1  claims?
2         MR. MULLALY:  Object to form.
3         You can answer.
4    Q    (By Mr. Ruiz)  If any.
5         MR. MULLALY:  Same objection.
6         You can answer.
7    A.   We have employed some automation within the
8  claims system to reduce manual tasks that claims
9  specialist might otherwise have to do, and that allows
10  us to move through more claims in a shorter period of
11  time than we did otherwise.
12    Q.   (By Mr. Ruiz)  Anything else?
13    A.   Otherwise, we've made small -- also within
14  the technology area, just small enhancements to achieve
15  that same goal.
16    Q.   All right.  Any other policies, protocols, or
17  procedures that have been in place relating to saving
18  money on claims?
19         MR. MULLALY:  Objection to form.
20         You can answer.
21    A.   No.
22    Q    (By Mr. Ruiz)  Or have there been any
23  policies, protocols, or procedures related to improving
24  results for the claims department?
25         MR. MULLALY:  Object to form.

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

McNae v. ARAG Insurance Company                                30(b)(6) Meagen Adams

Page 241

```
 1          You can answer.
 2      A.  No, not beyond what I've just described as
 3  far as technology and tool enhancements.
 4      Q.  (By Mr. Ruiz)  Why did Mr. Murray take an
 5  interest in the McNaes' claims?
 6          MR. MULLALY:  Object to form.  Object to
 7  scope.
 8          You can answer.
 9      A.  I don't know.
10      Q.  (By Mr. Ruiz)  Was there a danger that the
11  McNaes' insurance claims were going to bankrupt the
12  company or something?
13          MR. MULLALY:  Same objections.
14          You can answer.
15      A.  No.
16      Q.  (By Mr. Ruiz)  That wasn't a worry, was it?
17          MR. MULLALY:  Same objection.
18          You can answer.
19      A.  No.
20      Q.  (By Mr. Ruiz)  Was the McNae claim going to
21  make a difference between a profitable and an
22  unprofitable year for ARAG?
23          MR. MULLALY:  Same objections.
24          You can answer.
25      A.  No.
```

Page 242

```
 1      Q.  (By Mr. Ruiz)  Is the McNae claim the largest
 2  claim -- strike that.
 3          Are the two McNae claims together, are they
 4  the largest claims ARAG has ever had?
 5          MR. MULLALY:  Same objections.
 6          You can answer.
 7      A.  I don't know.
 8      Q.  (By Mr. Ruiz)  No one's told you that,
 9  though; right?
10          MR. MULLALY:  Same objections.
11          You can answer.
12      A.  No, no one has told me that.
13      Q.  (By Mr. Ruiz)  And what policies, protocols,
14  or procedures have been in place relating to improving
15  results for the claims department?
16          MR. MULLALY:  Objection to form.
17          You can answer.
18      A.  Just the technology changes to allow us to
19  process more claims more efficiently.  That result.
20      Q.  (By Mr. Ruiz)  Do you know what a loss ratio
21  is?
22      A.  Yes.
23          MR. MULLALY:  Objection to form.  Outside the
24  scope.
25          Sorry.  But you can go ahead and answer.
```

Page 243

```
 1          The answer is "yes."  I apologize.
 2      Q.  (By Mr. Ruiz)  So we're still talking about
 3  that time period from January 1st, 2022 to the present.
 4  Okay?
 5      A.  Yes.
 6      Q.  What policies, protocols, or procedures have
 7  been in place -- had been in place, applying to the
 8  claim department, for the purposes purpose of improving
 9  the loss ratio for ARAG?
10          MR. MULLALY:  Same objections.
11          You can answer.
12      A.  From a loss ratio perspective, I'm not aware
13  of any.
14      Q.  (By Mr. Ruiz)  How many years have you been
15  with the company?
16      A.  Twelve.
17      Q.  In those twelve years, we know that ARAG
18  terminated two attorneys for the stated reason that they
19  were not making reasonable efforts to resolve the
20  litigation.  Right?
21      A.  Yes.
22      Q.  That's Ms. Casey and Ms. Fotiu-Wojtowicz.
23  Right?
24          MR. MULLALY:  Same objections.
25          You can answer.
```

Page 244

```
 1      Q.  (By Mr. Ruiz)  Correct?
 2      A.  Yes.
 3      Q.  And, you know, earlier when you were talking
 4  about it, you were saying that Ms. -- you were relying
 5  on information from Ms. Casey, but is it ARAG's position
 6  that both of the attorneys failed to make reasonable
 7  efforts to resolve the case or just one of them?
 8          MR. MULLALY:  Objection to scope.
 9          You can answer.
10      A.  Both of them.
11      Q.  (By Mr. Ruiz)  All right.  So how many other
12  times in the twelve years that you've been working with
13  ARAG has ARAG terminated a network attorney for the
14  stated reason that they were not making reasonable
15  efforts to resolve the claim?
16          MR. MULLALY:  Objection to form and scope.
17          You can answer.
18      A.  I'm not sure.
19      Q.  (By Mr. Ruiz)  Well, can you think of one
20  other one?
21          (Crosstalk)
22          MR. MULLALY:  Same objection.
23      Q.  (By Mr. Ruiz)  I'm going to ask you who it
24  is, but can you think of one other one besides the two
25  in our case?
```

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

McNae v. ARAG Insurance Company                    30(b)(6) Meagen Adams

---

Page 245

1          MR. MULLALY:  Same objections.
2          You can answer.
3     A.   No, I don't -- I don't have any others to
4    tell you about.
5     Q   (By Mr. Ruiz)  You've never heard of such a
6    thing; right?
7          MR. MULLALY:  Same objection.
8          You can answer.
9     A.   No, I haven't.
10    Q   (By Mr. Ruiz)  And so starting on November
11   21st, 2023, has ARAG done that to anybody else?
12         MR. MULLALY:  Same objections.
13         You can answer.
14    A.   Not to my knowledge.
15    Q   (By Mr. Ruiz)  So it's happened two times,
16   both times to the McNaes, and as far as you know, no
17   other times to anybody else; is that fair?
18         MR. MULLALY:  Same objections.
19         You can answer.
20    A.   Yes, that's fair.
21    Q   (By Mr. Ruiz)  Is Ms. Casey a good attorney?
22         MR. MULLALY:  Same objections.
23         You can answer.
24    A.   I don't know.
25    Q   (By Mr. Ruiz)  Now, did ARAG ask anyone to

---

Page 246

1    find out if Ms. Casey's a good attorney?
2     A.   No.
3     Q.   Is Ms. Fotiu-Wojtowicz a good attorney?
4          MR. MULLALY:  Objection to scope and form.
5          You can answer.
6     A.   I don't know.
7     Q   (By Mr. Ruiz)  Did ARAG, anyone from ARAG,
8    ask anybody to find out if Alaina Fotiu-Wojtowicz is a
9    good attorney?
10    A.   No.
11    Q.   No.
12         What's the name of Mr. Fitzgerald's attorney?
13    A.   I don't know.
14    Q.   And did ARAG do any investigation to
15   determine what kind of attorney that attorney is?
16         MR. MULLALY:  Objection to scope.
17         You can answer.
18    A.   No.
19    Q   (By Mr. Ruiz)  You know, ARAG would agree
20   that some plaintiffs are more aggressive than others;
21   right?
22         MR. MULLALY:  Same objection.
23         You can answer.
24    A.   Yes, that seems like a fair statement.
25    Q   (By Mr. Ruiz)  And ARAG would also agree that

---

Page 247

1    some plaintiffs are more unreasonable than others?
2          MR. MULLALY:  Same objection.
3          You can answer.
4     A.   Yes, that seems fair.
5     Q   (By Mr. Ruiz)  All right.  And ARAG
6    understood that the case that Mr. Fitzgerald brought was
7    very personal to Mr. Fitzgerald, based on what the
8    allegations were.  Agreed?
9          MR. MULLALY:  Objection to scope and
10   speculation.
11         You can answer.
12    A.   Yes, the Complaint contained some personal
13   matters.
14    Q   (By Mr. Ruiz)  All right.  And similarly, it
15   must have been very personal to the McNaes based on what
16   was being alleged.  Agreed?
17         MR. MULLALY:  Same objection.
18         You can answer.
19    A.   Yes, that seems accurate.
20    Q   (By Mr. Ruiz)  Does ARAG agree that there was
21   more than just money on the line in the federal court
22   litigation?
23         MR. MULLALY:  Same objections.
24         You can answer.
25    A.   Yes.

---

Page 248

1     Q   (By Mr. Ruiz)  Does ARAG agree that the
2    damages claimed in the federal court litigation and in
3    the state court litigation threatened to bankrupt the
4    McNaes?
5          MR. MULLALY:  Same objections.  Calls for
6    speculation.
7          You can answer.
8     A.   I don't know.
9     Q   (By Mr. Ruiz)  Did ARAG ever look into that?
10    A.   No.
11    Q.   After ARAG terminated Ms. Casey and
12   Ms. Fotiu-Wojtowicz, was there any chance at all that
13   ARAG would ever rehire them?
14         MR. MULLALY:  Objection to form and scope.
15         You can answer.
16    A.   I don't know.
17    Q   (By Mr. Ruiz)  Has that ever been discussed
18   inside of ARAG?
19    A.   Not to my knowledge.
20    Q.   Would ARAG consider that today if -- if it
21   was requested?
22         MR. MULLALY:  Objection to scope.
23         You can answer.
24    A.   Can I have you clarify that question, if
25   you're referring just to the McNae matter?

---

McNae v. ARAG Insurance Company                    30(b)(6) Meagen Adams

Page 249

1    Q.    (By Mr. Ruiz)  Sure.
2         If the McNaes requested that ARAG rehire
3    Ms. Casey and Ms. Fotiu-Wojtowicz, would ARAG do that?
4         MR. MULLALY:  Object to scope.  Calls for
5    speculation from the particular witness.
6         If you know, you can answer.
7    A.    I don't know.
8    Q.    (By Mr. Ruiz)  Who is a more effective
9    attorney:  Mr. Gomez or Ms. Casey and
10   Ms. Fotiu-Wojtowicz?
11        MR. MULLALY:  Same objections.
12        You can answer.
13   A.    I don't know.
14   Q.    (By Mr. Ruiz)  Who do the McNaes think is a
15   better attorney?
16        MR. MULLALY:  Same objections.
17        You can answer.
18   A.    I don't know.
19   Q.    (By Mr. Ruiz)  Did ARAG ever attempt to place
20   a limit on the maximum amount of money that Mr. Gomez
21   could charge?
22        MR. MULLALY:  Object to form.
23        You can answer.
24   A.    I'm trying to recall.
25        Yes, I believe so.

Page 250

1    Q.    (By Mr. Ruiz)  Explain.
2         MR. MULLALY:  Object to form.
3         You can answer.
4    A.    I -- there was a communication regarding
5    negotiation of fees with Mr. Gomez, and that is where a
6    limitation was discussed, proposed.
7    Q.    (By Mr. Ruiz)  One of the three -- oh, strike
8    that.
9         Who at ARAG brought that subject up?
10   A.    Ann Cosimano.
11   Q.    And who communicated that to Mr. Gomez?
12   A.    I'm going to say I'm not sure.  I would have
13   to guess.
14   Q.    Did Mr. Gomez agree?
15   A.    No.
16   Q.    This morning you said there were three
17   concerns with Ms. Fotiu-Wojtowicz and Ms. Casey.
18        One was that they hadn't made -- allegedly
19   hadn't made reasonable efforts to resolve the claim, and
20   two was duplication of work.
21        Do you remember that?
22        MR. MULLALY:  Object to form and scope.
23        You can answer.
24   Q.    (By Mr. Ruiz)  Do you remember that?
25   A.    Yes.

Page 251

1    Q.    What was the third one?  Can you remind me?
2         MR. MULLALY:  Same objection.
3         You can answer.
4    A.    The applicability of exclusions.
5    Q.    (By Mr. Ruiz)  Let's focus on duplication of
6    work.  Why was that a problem for --
7         MR. MULLALY:  Objection to scope -- oh.
8    Q.    (By Mr. Ruiz)  Why was that a problem for
9    ARAG?
10        MR. MULLALY:  Objection.  Scope.
11        You can answer.
12   A.    That is -- duplication of attorney services
13   is not payable under the fee agreement with ARAG.
14   Q.    (By Mr. Ruiz)  Is there an analysis inside of
15   ARAG that says these specific things were duplicated
16   that did not need to be duplicated, like identifying
17   specific things?
18        MR. MULLALY:  Objection to form and scope.
19        You can answer.
20   A.    Yes.  There was review of those invoices
21   in --
22        (Crosstalk)
23   Q.    (By Mr. Ruiz)  I don't mean to interrupt.
24   I'm sorry.  Please continue.
25   A.    That was all.

Page 252

1    Q.    Is there a document that says these are the
2    items that were duplicated between Ms. Casey and
3    Ms. Wojtowicz?
4         MR. MULLALY:  Same objections.
5         You can answer.
6    A.    Not to my knowledge.
7    Q.    (By Mr. Ruiz)  But whatever the level of
8    duplication, it was enough that it contributed to -- you
9    say it contributed to ARAG's decision to terminate.
10   Right?
11        MR. MULLALY:  Same objections.
12        You can answer.
13   A.    Yes.
14   Q.    (By Mr. Ruiz)  But then again, Mr. Gomez is
15   duplicating work.  That is undeniable; right?
16        MR. MULLALY:  Same objections.
17        You can answer.
18   A.    I don't know.
19   Q.    Well, you tell me.  Hadn't he been working on
20   the case before Ms. Wojtowicz and Ms. Casey were
21   terminated?
22        MR. MULLALY:  Objection to form.
23        You can answer.
24   A.    No.  His -- his contract with us was after
25   the termination occurred.

63 (Pages 249 to 252)

McNae v. ARAG Insurance Company                                    30(b)(6) Meagen Adams

---

Page 253

1    Q    (By Mr. Ruiz)  Yeah.  These are not trick
2   questions.
3          He had not attended any of the depositions;
4   right?
5    A.   Right.
6    Q.   He had not talked to any of the witnesses;
7   right?
8    A.   Right.
9    Q.   He had not read any of the court filings;
10  right?
11   A.   Right.
12   Q.   He had not developed any strategy on the
13  case; right?
14   A.   Right.
15   Q.   So once Ms. Fotiu-Wojtowicz and Ms. Casey got
16  fired and he gets brought on, he has to learn all that
17  that the other attorneys already knew.
18        Do you agree?
19        MR. MULLALY:  Objection to the form and
20  scope.
21        You can answer.
22   A.   Yes.
23   Q    (By Mr. Ruiz)  All right.  Because he didn't
24  attend the depositions, now he has to read the
25  depositions and read them carefully.

---

Page 254

1          Do you agree?
2          MR. MULLALY:  Same objections.
3          You can answer.
4    A.   Yes.
5    Q    (By Mr. Ruiz)  And he has to get up to speed
6   on all the motions that have been filed.  Agreed?
7          MR. MULLALY:  Same objections.
8          You can answer.
9    A.   Yes.
10   Q    (By Mr. Ruiz)  That's all work that ARAG's
11  already paid Ms. Casey and Ms. Fotiu-Wojtowicz to do;
12  right?
13         MR. MULLALY:  Same objections.
14         You can answer.
15   A.   He -- no.  The fee agreement is talking about
16  two attorneys simultaneously doing the same body of
17  work.
18   Q    (By Mr. Ruiz)  Well, you don't have one fee
19  agreement with both Ms. Casey and Ms. Fojtowicz --
20  Wojtowicz.  You have two different agreements; correct?
21   A.   That's true.
22   Q.   And each one of them had a separate client.
23  Agreed?
24   A.   Yes.
25   Q.   They owed fiduciary responsibilities to

---

Page 255

1   different people.  Agreed?
2    A.   Yes.
3          MR. MULLALY:  Objection to scope.
4          You can answer.
5    Q    (By Mr. Ruiz)  Ms. McNae was not represented
6   by Ms. Casey; agreed?
7    A.   Agreed.
8    Q.   And was there anything in Ms. Casey's
9   contract with ARAG that said she was not allowed to do
10  any work that overlapped with the work that Ms. -- let
11  me start over.
12        Was there anything in the contract that ARAG
13  had with Ms. Casey that said she could not overlap in
14  any way with the work that was to be done by
15  Ms. Fotiu-Wojtowicz?
16        MR. MULLALY:  Objection to scope.
17        You can answer.
18   A.   No, not specifically.
19   Q    (By Mr. Ruiz)  Right.
20        And regardless, once they were terminated,
21  Mr. Gomez, the new attorney, he has to do a lot of the
22  work that's already been done just to get up to speed
23  and understand what's going on.
24        Do you agree?
25        MR. MULLALY:  Objection to form and scope.

---

Page 256

1          You can answer.
2    A.   Yes.
3    Q    (By Mr. Ruiz)  Does ARAG consider that to be
4   duplication of effort?
5          MR. MULLALY:  Same objections.
6          You can answer.
7    A.   No.
8    Q    (By Mr. Ruiz)  Now, when you hired Mr. Gomez,
9   did you say:  You must do these following things to
10  promote resolution of the claims?
11         MR. MULLALY:  Same objections.
12         You can answer.
13   A.   No.
14   Q    (By Mr. Ruiz)  No.  And are you holding
15  Mr. Gomez to the same standard that you held Ms. Casey
16  and Ms. Fotiu-Wojtowicz?
17         MR. MULLALY:  Same objections.
18         (Crosstalk)
19         MR. MULLALY:  You can answer.  I'm sorry.
20   Q    (By Mr. Ruiz)  And I'm specifically referring
21  to the alleged failure to resolve the claim.
22         MR. MULLALY:  Same objections.
23         You can answer.
24   A.   Yes, the same provisions apply.
25   Q    (By Mr. Ruiz)  All right.  Yeah.  Different

---

64 (Pages 253 to 256)

McNae v. ARAG Insurance Company        30(b)(6) Meagen Adams

---

Page 257

1    question.
2           I'm asking if you're holding him to the
3    different -- to the same standard.  Is there an internal
4    document at ARAG that is criticizing Mr. Gomez for
5    failing to take steps to resolve the claims?
6        A.  No.
7        Q.  Has there been a meeting between the
8    president and Ms. Cosimano to discuss whether Mr. Gomez
9    is failing to take reasonable steps to resolve the
10   claims?
11       A.  I don't know.
12       Q.  Has there been any meeting between anybody to
13   address the issue of whether Mr. Gomez is taking
14   reasonable steps to resolve the claims?
15       A.  Not to my knowledge.
16       Q.  So explain to me how it is that ARAG is
17   allegedly applying the same standard to Mr. Gomez that
18   it applied to Ms. Casey or Ms. Fotiu-Wojtowicz.
19       MR. MULLALY:  Object to form.
20       You can answer.
21       A.  We're conducting the same review of the
22   invoices and the status updates that are received to
23   understand what's happening with the -- with the case.
24       Q  (By Mr. Ruiz)  What's happening with the
25   case?

---

Page 258

1        A.  I have --
2       MR. MULLALY:  Object to scope.
3       You can answer.
4       A.  I haven't recently reviewed one of those
5   invoices.
6       Q  (By Mr. Ruiz)  Well, just since the last time
7   you looked at them, what's happening with the case?
8       MR. MULLALY:  Same objection.
9       You can answer.
10      A.  I can't answer that.
11      Q  (By Mr. Ruiz)  Okay.  Are there any documents
12   at ARAG that address not overpaying claims using that
13   language, "overpaying"?
14      MR. MULLALY:  Object to form.
15      You can answer.
16      A.  Yes.
17      Q  (By Mr. Ruiz)  Tell me about those.
18      A.  Our claims adjudication document would --
19   points to ensuring that invoices are calculated
20   correctly when they're received and making any updates
21   that are necessary before approving them.
22      Q.  Any other documents?
23      A.  No.
24      Q.  Are there any written strategies relating to
25   not overpaying claims besides the document that you've

---

Page 259

1    mentioned?
2       MR. MULLALY:  Objection to form.
3       You can answer.
4       A.  No.
5       Q.  (By Mr. Ruiz)  Has there been a bonus program
6   that applied to members of the claims department?
7       MR. MULLALY:  Objection to form.
8       You can answer.
9       A.  Yes.
10      Q.  (By Mr. Ruiz)  How does the bonus program
11   work?
12      A.  The bonus program applies to all members of
13   the ARAG organization, and every person is eligible for
14   a percentage of their annual salary.
15      Q.  How does the company decide whether there's
16   going to be a bonus in a given year?
17      A.  The company looks at profit and revenue and,
18   based on those results, makes that determination about
19   the bonus.
20      Q.  Bonus determination for employees of ARAG,
21   including members of the claims department, that's tied
22   to the profitability of the company?
23      MR. MULLALY:  Objection to form.
24      You can answer.
25      A.  Yes, in part.

---

Page 260

1       Q  (By Mr. Ruiz)  What documents exist that
2   describe the bonus program?
3      A.  We do -- hm.
4      I know we have an internal policy that
5   addresses that.  I don't know the name of it offhand,
6   but it's, you know, the incentive program.
7      Q.  It's written down somewhere?
8      A.  Yes.
9      Q.  Okay.  What -- if you wanted to get a copy of
10   it, where would you go?
11      A.  I can check --
12      (Crosstalk)
13      MR. MULLALY:  Sorry.  Go ahead.
14      Object to scope.
15      You can answer.
16      A.  It's available to internal employees on our
17   internal website.
18      Q.  (By Mr. Ruiz)  Has there been any discipline
19   of any ARAG employee related to the handling of the
20   McNaes' insurance claims?
21      MR. MULLALY:  Objection to form.
22      You can answer.
23      A.  No.
24      Q  (By Mr. Ruiz)  Has there been any reprimand
25   of any of the employees for what they did on the McNae

---

65 (Pages 257 to 260)

McNae v. ARAG Insurance Company                                30(b)(6) Meagen Adams

---

Page 261

1    insurance claims?
2         MR. MULLALY: Same objection.
3         You can answer.
4    A.    No.
5    Q.    (By Mr. Ruiz) In your -- is it twelve years
6    at ARAG?
7    A.    Yes, twelve years.
8    Q.    In your twelve years, has there ever been
9    discipline of any employee relating to how they handled
10   an insurance claim?
11        MR. MULLALY: Object. Outside of scope.
12        You can answer.
13   A.    No, not related to a single claim or case.
14   Q.    (By Mr. Ruiz) What about a reprimand?
15        MR. MULLALY: Same objection.
16        You can answer.
17   A.    At times, if a team member is not meeting
18   their expectations in their role, there would be
19   discussions around how to improve that.
20   Q.    (By Mr. Ruiz) Now, Ms. Cosimano, she doesn't
21   report to you; right?
22   A.    No.
23   Q.    And -- I guess, you don't report to her
24   either. Agreed?
25   A.    I used to, but not any longer.

---

Page 262

1    Q.    But you're not in a position to disagree with
2    Ms. Cosimano on any claim decision she made, are you?
3         MR. MULLALY: Objection to form and scope.
4         You can answer.
5    A.    I would not be uncomfortable voicing my
6    disagreement with her decision if I had reason to.
7    Q.    (By Mr. Ruiz) But you didn't in connection
8    with the McNaes' insurance claims; right?
9    A.    Correct.
10        (Crosstalk)
11        MR. MULLALY: Objection to form.
12        Sorry. You can answer.
13   A.    I didn't --
14        (Crosstalk)
15   Q.    (By Mr. Ruiz) -- disagreed, because you
16   don't disagree with --
17        (Crosstalk)
18        THE COURT REPORTER: Sorry, can we slow it
19   down a lot? There's a lot of stepping on and I'm
20   getting really tired.
21   Q.    (By Mr. Ruiz) You didn't disagree with
22   anything ARAG did with respect to the McNaes' claim.
23   Agreed?
24        MR. MULLALY: Objection to form and scope.
25        You can answer.

---

Page 263

1    A.    I agree with that.
2    Q.    (By Mr. Ruiz) And even after everything
3    we've covered here today, you still don't disagree with
4    anything ARAG did?
5         MR. MULLALY: Same objections.
6         You can answer.
7    A.    No, I -- I don't disagree.
8    Q.    (By Mr. Ruiz) And in the twelve years you've
9    worked for ARAG, has there ever been a time that you
10   disagreed with an action taken by ARAG on an insurance
11   claim?
12        MR. MULLALY: Objection to scope.
13        You can answer.
14   A.    Yes.
15   Q.    (By Mr. Ruiz) Okay. When was the last time?
16        MR. MULLALY: Same objection.
17        You can answer.
18   A.    I don't know the last time.
19   Q.    (By Mr. Ruiz) All right. Well, I'm assuming
20   it doesn't happen very often. Is that right?
21        MR. MULLALY: Same objection.
22        You can answer.
23   A.    You're correct. That doesn't happen very
24   often.
25   Q.    (By Mr. Ruiz) So give me one example of a

---

Page 264

1    time that you disagreed with a decision that ARAG made.
2         MR. MULLALY: Same objection.
3         You can answer.
4    A.    A circumstance involving providing --
5    providing payment -- I'm trying to think of the best way
6    to describe it. But essentially just due to a
7    miscommunication with a plan member, agreeing to pay for
8    their infraction as opposed to applying that under the
9    benefit plan.
10   Q.    (By Mr. Ruiz) So the decision to not give
11   the McNaes a warning that their attorneys were going to
12   be terminated or possibly be terminated, you agree with
13   that? You agree with the decision not to warn them;
14   right?
15        MR. MULLALY: Objection to form and scope.
16        You can answer.
17   A.    I -- I don't disagree with that action that
18   was taken.
19   Q.    (By Mr. Ruiz) You don't -- you don't
20   disagree with the fact that the -- you don't think there
21   was anything wrong with not warning the McNaes that ARAG
22   was considering terminating their attorneys?
23        MR. MULLALY: Same objections.
24        You can answer.
25   A.    No.

---

66 (Pages 261 to 264)

McNae v. ARAG Insurance Company                                    30(b)(6) Meagen Adams

---

Page 265

1     Q    (By Mr. Ruiz)  You don't think there's
2   anything wrong with not warning the attorneys that they
3   were being considered to be terminated; right?
4         MR. MULLALY:  Same objection.
5         You can answer.
6   A.  No, I don't think there's anything wrong.
7     Q    (By Mr. Ruiz)  And there's nothing wrong with
8   ARAG not asking the attorneys for more information about
9   reasonable settlement efforts before they were
10  terminated; right?
11        MR. MULLALY:  Same objection.
12        You can answer.
13  A.  That's right.
14    Q    (By Mr. Ruiz)  Did Ms. Casey ever lie to
15  ARAG?
16  A.  I don't know.
17        MR. MULLALY:  Objection.  Scope.
18    Q  (By Mr. Ruiz)  Please answer.
19  A.  I don't know.
20    Q.   Did Ms. Alaina Fotiu-Wojtowicz ever lie to
21  ARAG?
22        MR. MULLALY:  Objection.  Scope.
23        You can answer.
24  A.  I don't know.
25    Q    (By Mr. Ruiz)  Okay.  What are all the

---

Page 266

1   different places that documents about a specific
2   insurance claim can be found at ARAG?
3   A.    Within the claim record itself, in the Pulse
4   system.
5     Q.   Where else?
6   A.    Nowhere else.  That's where they're housed.
7     Q.   Well, there's got to be more, because we saw
8   that Teams message.  Right?
9         MR. MULLALY:  Object to form.
10        You can answer.
11    Q   (By Mr. Ruiz)  Remember we looked about a
12  Teams message about the McNae insurance claim?
13  A.    Yes, I remember.
14    Q.   All right.  So there's information inside of
15  Teams about insurance claims too; right?
16        MR. MULLALY:  Objection to form.
17        You can answer.
18  A.    Yes.  On occasion, there are notes about
19  claims within the Teams system.
20    Q    (By Mr. Ruiz)  And I guess I've been assuming
21  that the employees of ARAG used Microsoft Outlook for
22  email.  Is that true?
23  A.    Yes.
24    Q.   And we've seen a plethora of emails relating
25  to the McNaes.  So we know that there's information

---

Page 267

1   inside of Microsoft Outlook or whatever the email server
2   is relating to insurance claims as well.  Correct?
3   A.    Yes.
4     Q.   Right.
5         Do you know how Mr. Murray prefers to
6   communicate?  Is it Outlook?  Is it text message?
7   Teams?
8         Do you know how he likes to communicate?
9         MR. MULLALY:  Objection to scope.
10        You can answer.
11  A.    No, I don't know.
12    Q    (By Mr. Ruiz)  All right.  And so we've got
13  Outlook, Teams, Pulse.  Any other place where, at ARAG,
14  information about an insurance claim could be located?
15  A.    No, I don't think so.
16    Q.   All right.  So I've seen faxes.  Where do
17  faxes go?  Because I know I sent you one, so I know that
18  you guys get faxes.
19        Where do those go?
20  A.    Outlook.
21    Q.   Okay, those go into Outlook.  So that's
22  another kind of document that you could find inside of
23  Outlook?
24  A.    Yes.
25    Q.   Do you know what procedure was used by ARAG

---

Page 268

1   to collect the documents relating to the plaintiffs in
2   this case?
3         MR. MULLALY:  Objection to scope.
4         You can answer if you have knowledge.
5   A.    What was -- what was the question again?
6     Q    (By Mr. Ruiz)  What was the procedure used
7   inside of ARAG to collect the documents relating to the
8   McNaes so that they could be produced to me
9         MR. MULLALY:  Objection to scope.
10        If you have knowledge, you can answer.
11  A.    The -- the piece that I have knowledge of
12  is that the claims and case coordination teams, each
13  individual, retrieved Outlook emails, Teams messages,
14  and provided those to Kathy Miller for assembling.
15    Q.   What about other teams, other departments?
16        MR. MULLALY:  Same objection.
17        You can answer if you have knowledge.
18  A.    I can't speak for the other teams.
19    Q   (By Mr. Ruiz)  Okay.  Do you know if anyone
20  asked Mr. Murray to search his emails?
21        MR. MULLALY:  Same objection.
22        If you have knowledge, you can answer.
23  A.    I don't know.
24    Q   (By Mr. Ruiz)  Okay.  Or his Teams or his
25  Outlook or anything like that?

---

67 (Pages 265 to 268)

McNae v. ARAG Insurance Company                    30(b)(6) Meagen Adams

Page 269

1        MR. MULLALY:  Same objection.
2        You can answer.
3    A.  I don't know.
4    Q     (By Mr. Ruiz)  Recorded telephone calls, are
5  there any of those?
6    A.  Yes.  We have recorded telephone calls.
7    Q.   Okay.  And what system is used to maintain
8  those?
9    A.  Genesis.
10   Q.   Is every call between an insured and ARAG
11 recorded?
12       MR. MULLALY:  Objection.  Scope.
13       You can answer if you know.
14   A.  I don't know.
15   Q     (By Mr. Ruiz)  And so who would be in charge
16 of searching Genesis for calls relating to the McNaes?
17       MR. MULLALY:  Same objection.
18       You can answer if you know.
19   A.  Jeff LeMay.
20   Q     (By Mr. Ruiz)  All right.  So we started with
21 Pulse and then we grew to Outlook, Teams, and now we
22 have Genesis.
23       I want you to think real hard, if you can,
24 what other systems are there that have information
25 relating to insurance claims?

Page 270

1        MR. MULLALY:  Objection to form.
2        You can answer.
3    A.  I don't know of any other.
4    Q     (By Mr. Ruiz)  Okay.  Sometimes insurance
5  companies will do background checks on their insureds,
6  for whatever reason.
7        Did they -- did ARAG do anything like that
8  for -- relating to Ronda or Will McNae?
9    A.  I've never known of background checks to be
10 conducted.  So no.
11   Q.   Has ARAG produced all communications with
12 Richard Gomez?
13       MR. MULLALY:  Objection to scope.
14       If you know, you can answer.
15   A.  I don't know.
16   Q     (By Mr. Ruiz)  Is ARAG getting ready to
17 terminate Mr. Gomez?
18       MR. MULLALY:  Objection to scope.
19       If you have knowledge, you can answer.
20   A.  I don't know.
21   Q     (By Mr. Ruiz)  Is ARAG considering
22 terminating Mr. Gomez?
23       MR. MULLALY:  Objection to scope.
24       If you have knowledge, you can answer.
25   A.  I don't know.

Page 271

1    Q     (By Mr. Ruiz)  If ARAG decides it may
2  terminate Mr. Gomez, will it let the McNaes know as soon
3  as it is considering the possibility this time?
4        MR. MULLALY:  Object to form and scope.
5        You can answer if you know.
6    A.  I don't know.
7    Q     (By Mr. Ruiz)  Is Mr. Gomez making reasonable
8  efforts towards resolving the claims?
9        MR. MULLALY:  Objection to scope.
10       You can answer if you know.
11   A.  Yes.
12   Q     (By Mr. Ruiz)  Explain, please.
13       MR. MULLALY:  Objection to form.
14       You can answer.
15   A.  Invoices and information received from
16 Mr. Gomez are being communicated directly to Ann
17 Cosimano, who is then sending those over to the claims
18 department for processing after Ann has taken a look at
19 those.
20   Q     (By Mr. Ruiz)  All right.  But my question
21 was about whether Mr. Gomez was making reasonable
22 efforts toward resolving the claims, and you just told
23 me who looks at the invoices.
24       Explain why you believe ARAG believes -- what
25 is Mr. Gomez doing that represents reasonable efforts

Page 272

1  towards resolving the claims?
2        MR. MULLALY:  Objection to scope.
3        You can answer if you know.
4    A.  I can't answer that.
5    Q     (By Mr. Ruiz)  You don't know?
6    A.  No, I don't know.
7    Q.   Well, remember at the beginning, I said
8  please don't guess or speculate?  So I'm going to ask
9  you the question again.
10       Does ARAG believe that Mr. Gomez is making
11 reasonable efforts towards resolving the claims?
12       I don't want you to guess --
13       (Crosstalk)
14   Q.   I don't want you to guess.  I only want to
15 answer if you know what ARAG's position is.
16       MR. MULLALY:  Objection to scope.
17       You can answer if you have knowledge.
18   A.  Yes.
19   Q     (By Mr. Ruiz)  Now, what leads you to say
20 "yes"?
21       MR. MULLALY:  Same objections.
22       You can answer.
23   A.  When Ann Cosimano forwards the invoices to me
24 with the instruction to process them for payment, I
25 trust that Ann Cosimano is providing me with information

68 (Pages 269 to 272)

McNae v. ARAG Insurance Company                    30(b)(6) Meagen Adams

---

Page 273

1    that's accurate.
2        Q    (By Mr. Ruiz)  In addition to your faith in
3    Ms. Cosimano, what facts do you have, what facts does
4    ARAG have, that Mr. Gomez is making reasonable efforts
5    toward resolving the claims?
6        MR. MULLALY:  Same objection to scope.
7        You can answer.
8        A.   Besides Ann Cosimano's review and advice, no,
9    I'm -- no other -- no other sources.
10       Q    (By Mr. Ruiz)  Does one of those documents
11   that Ms. Cosimano forwards to you say the words that she
12   believes Mr. Gomez is making reasonable efforts towards
13   resolving the claims?
14       A.   No.
15       Q.   You're assuming that she thinks that?
16       A.   Yes.
17       Q.   Okay.  Remember what I said about
18   assumptions.  I really -- I'm serious when I say, I
19   don't want you speculating or assuming.  I'm asking for
20   what ARAG knows.  And after I ask what ARAG knows, you
21   know I always ask, "Well, explain the facts that lead to
22   that."
23       Does ARAG believe that Mr. Gomez is making
24   reasonable efforts towards resolving the claims?
25       MR. MULLALY:  Objection to scope.

---

Page 274

1        If you have knowledge, you can answer.
2        A.   Then I don't know.
3        MR. RUIZ:  All right.  Can we go off the
4    record?
5        MR. MULLALY:  Sure.
6        THE VIDEOGRAPHER:  The time now is
7    approximately 4:55 p.m.
8        (Recess 4:55 p.m. to 4:58 p.m.)
9        MR. RUIZ:  No further questions.
10       THE VIDEOGRAPHER:  Back on the record.  The
11   time now is approximately 4:58 p.m.
12       MR. RUIZ:  I jumped the gun.
13       Ms. Adams, thank you for being here today.  I
14   don't know if I'll see you again, but have a good
15   weekend.
16       THE WITNESS:  Thank you.  You too.
17       MR. MULLALY:  Thank you, Isaac.
18       We have no questions at this time, and I'll
19   reserve our right to review and sign.
20       MR. RUIZ:  We will go ahead and order an
21   Etran with PDF exhibits.  No original at this time.
22   Thank you.
23       MR. MULLALY:  May we have the same, please?
24       MR. RUIZ:  No video at this time either.
25   But, Brook, it is nice to see you.

---

Page 275

1        THE VIDEOGRAPHER:  All right.  This concludes
2    today's 30(b)(6) deposition of ARAG Insurance Company
3    designee Meagen Adams.  The time now is approximately
4    4:59 p.m.  We are going off the record.
5        (Reading and signing was requested
6        pursuant to FRCP Rule 30(e).)
7        (Deposition concluded at 4:59 p.m.)
8        (Reporter officially marked exhibits
9        at conclusion of deposition.)

---

Page 276

1        REPORTER'S CERTIFICATE
2        I, KARMEN M. KNUDSON, the undersigned Certified
3    Court Reporter, pursuant to RCW 5.28.010 authorized to
4    administer oaths and affirmations in and for the State
5    of Washington, do hereby certify that the sworn
6    testimony and/or proceedings, a transcript of which is
7    attached, was given before me at the time and place
8    stated therein; that any and/or all witness(es) were
9    duly sworn to testify to the truth; that the sworn
10   testimony and/or proceedings were by me stenographically
11   recorded and transcribed under my supervision, to the
12   best of my ability; that the foregoing transcript
13   contains a full, true, and accurate record of all the
14   sworn testimony and/or proceedings given and occurring
15   at the time and place stated in the transcript; that a
16   review of which was reserved; that I am in no way
17   related to any party to the matter, nor to any counsel,
18   nor do I have any financial interest in the event of the
19   cause.
20       WITNESS MY HAND and DIGITAL SIGNATURE this 27th
21   day of August, 2024.
22
23       _Karmen Knudson_
24       Karmen M. Knudson, CCR, RPR, CRR
25       Certified Court Reporter No. 1935.

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989